ORIGINAL

Approved: _____
NEGAR TEKEEI / SAMSON ENZER
Assistant United States Attorneys

Before:   HONORABLE JAMES L. COTT
United States Magistrate Judge
Southern District of New York

18 MAG 2695

- - - - - - - - - - - - - - - - - x
                         :
                         :   **SEALED COMPLAINT**

UNITED STATES OF AMERICA   :
                         :   Violations of
      - v. -           :   15 U.S.C. §§ 78j(b), 78ff;
                         :   17 C.F.R. §§ 240.10b-5; 18
SOHRAB SHARMA,         :   U.S.C. §§ 371, 1343, 1349
   a/k/a "Sam Sharma," and  :   and 2
Robert Farkas,         :
   a/k/a "Bob,"        :   COUNTY OF OFFENSES:
                         :   New York
        Defendants.     :
                         x

- - - - - - - - - - - - - - - - -

SOUTHERN DISTRICT OF NEW YORK, ss.:

    BRANDON RACZ, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

## COUNT ONE
### (Conspiracy To Commit Securities Fraud)

    1.    From at least in or about July 2017, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

    2.    It was a part and object of the conspiracy that SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, and others known and unknown, willfully and

knowingly, directly and indirectly, by use of the means and
instrumentalities of interstate commerce and of the mails, and
of the facilities of national securities exchanges, would and
did use and employ manipulative and deceptive devices and
contrivances in connection with the purchase and sale of
securities, in violation of Title 17, Code of Federal
Regulations, Section 240.10b-5, by (a) employing devices,
schemes, and artifices to defraud; (b) making untrue statements
of material fact and omitting to state material facts necessary
in order to make the statements made, in the light of the
circumstances under which they were made, not misleading; and
(c) engaging in acts, practices, and courses of business which
operated and would operate as a fraud and deceit upon persons,
in violation of Title 15, United States Code, Sections 78j(b)
and 78ff, to wit, the defendants and others known and unknown
participated in a scheme to defraud purchasers of Centra Tech,
Inc. ("Centra Tech") cryptocurrencies by making material
misrepresentations about Centra Tech, its purported partnerships
with Bancorp, Visa and Mastercard, its products, its licensing
in various states, and its executive personnel, causing
investors to purchase more than $25 million worth of Centra Tech
cryptocurrencies, which function as unregistered securities,
during the time period of Centra Tech's initial coin offering.

                              Overt Acts

        3.    In furtherance of the conspiracy and to effect its
illegal object, SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT
FARKAS, a/k/a "Bob," the defendants, and others known and
unknown, commmitted the following overt acts, among others, in
the Southern District of New York and elsewhere:

        a.    On or about August 14, 2017, SHARMA, in an
interview by a cryptocurrency podcast, made material
misrepresentations about an initial coin offering for the
digital assets and cryptocurrency company Centra Tech, for which
he was a founder, President, and Chief Technology officer at
various times.

        b.    On or about September 6, 2017, FARKAS, a chief
marketing officer for Centra Tech, sent an email to an
individual at a marketing company describing Centra Tech's
currency conversion capabilities as "allow[ing] real time
conversion of all supported cyrptocurrencies to give the user
the ability to spend their assets in real time anywhere in the
world that accepts Visa or Mastercard."

      c.    On or about November 28, 2017, FARKAS attended a blockchain technology conference in New York City, New York, on behalf of Centra Tech, a sponsor of the conference, for the purpose of promoting Centra Tech and its products.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Securities Fraud)

4.    From at least in or about July 2017, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, and of the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, the defendants and others known and unknown participated in a scheme to defraud purchasers of Centra Tech cryptocurrencies by making material misrepresentations about Centra Tech, its purported partnerships with Bancorp, Visa and Mastercard, its products, its licensing in various states, and its executive personnel, causing investors to purchase more than $25 million worth of Centra Tech cryptocurrencies, which function as unregistered securities, during the time period of Centra Tech's initial coin offering.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT THREE
### (Conspiracy To Commit Wire Fraud)

5.    From at least in or about July 2017, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma,"

3

and ROBERT FARKAS, a/k/a "Bob," the defendants, and others known
and unknown, willfully and knowingly combined, conspired,
confederated, and agreed together and with each other to commit
offenses against the United States, to wit, wire fraud, in
violation of Title 18, United States Code, Section 1343.

6.    It was a part and an object of the conspiracy that
SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a
"Bob," the defendants, willfully and knowingly, having devised
and intending to devise a scheme and artifice to defraud, and
for obtaining money and property by means of false and
fraudulent pretenses, representations, and promises, would and
did transmit and cause to be transmitted by means of wire,
radio, and television communication in interstate and foreign
commerce, writings, signs, signals, pictures, and sounds for the
purpose of executing such scheme and artifice, in violation of
Title 18, United States Code, Section 1343, to wit, the
defendants and others known and unknown participated in a scheme
to defraud purchasers of Centra Tech cryptocurrencies by making
material misrepresentations about Centra Tech, its purported
partnerships with Bancorp, Visa and Mastercard, its products,
its licensing in various states, and its executive personnel.

(Title 18, United States Code, Section 1349.)

### COUNT FOUR
### (Wire Fraud)

7.    From at least in or about July 2017, up to and
including the date of this Complaint, in the Southern District
of New York and elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma,"
and ROBERT FARKAS, a/k/a "Bob," the defendants, willfully and
knowingly, having devised and intending to devise a scheme and
artifice to defraud and for obtaining money and property by
means of false and fraudulent pretenses, representations, and
promises, and attempting to do so, did transmit and cause to be
transmitted by means of wire, radio, and television
communication in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds for the purpose of
executing such scheme and artifice, to wit, the defendants and
others known and unknown participated in a scheme to defraud
purchasers of Centra Tech cryptocurrencies by making material
misrepresentations about Centra Tech, its purported partnerships
with Bancorp, Visa and Mastercard, its products, its licensing
in various states, and its executive personnel, and in the
course of executing such scheme, caused interstate and
international wires to be sent, including emails between New

York, New York and Florida and a location outside of the United States.

(Title 18, United States Code, Section 1343 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

8.    I have been a Special Agent with the FBI for approximately two and a half years. I am currently assigned to a squad that investigates white collar crimes, including complex financial frauds and conduct within the regulatory jurisdiction of the U.S. Securities and Exchange Commission ("SEC"). I have participated in investigations of such offenses, and have made and participated in arrests of individuals who have committed such offenses.

9.    The information contained in this Complaint is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources, including, but not limited to: (a) business records and other documents, such as trading records, bank records, telephone records, and records of electronic communications, including text messages; (b) publicly available documents; (c) conversations with, and reports of interviews with, non-law-enforcement witnesses; (d) conversations with, and reports prepared by, other agents; and (e) conversations with representatives from the U.S. Securities and Exchange Commission ("SEC"). Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions and statements of and conversations with others are reported herein, they are reported in substance and in part. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

## The Defendants and Relevant Entities

10.    Based on my review of publicly available information and records provided by Centra Tech to representatives of the SEC, I have learned the following, in substance and in part:

a.    Centra Tech is a Delaware corporation based in Miami Beach, Florida. Centra Tech advertises itself through its website, https://centra.tech (the "Centra Tech Website"), press releases, and statements on the Internet as a company that

offers various methods to store and spend digital assets such as cryptocurrencies. For example, the Centra Tech Website currently advertises that Centra Tech "offers blockchain products such as a Wallet to store digital assets, a Prepaid Card to spend the digital assets, and three soon to be released products and services, which include a Marketplace to buy goods with the digital assets, a cryptocurrency Exchange Platform to buy, sell and trade digital assets, and a open-source hyper speed DPoS Blockchain."

      b.    The following individuals, among others, are or have been employed at Centra Tech:

      i.    SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, was a founder of Centra Tech, its President, and its Chief Technology Officer. On October 31, 2017, Centra Tech announced that SHARMA was "stepping aside to support the continued growth of the company," and announced a "reconstituted executive management team" that did not include SHARMA.

      ii.    ROBERT FARKAS, a/k/a "Bob," has held various positions at Centra Tech, including as its chief marketing officer and chief operating officer.

      c.    The Bancorp, Inc. ("Bancorp") is a Delaware-based financial services company with offices throughout the United States. Bancorp provides a variety of financial services to companies and individuals, including issuing debit and prepaid cards, and payments processing, which it does by virtue of contractual partnerships with other financial services companies such as Visa and Mastercard, among others.

      d.    Visa Inc. ("Visa") is a U.S.-based multinational financial services corporation headquartered in Foster City, California. Visa facilitates electronic funds transfers throughout the world, most commonly through "Visa"-branded credit cards and debit cards.

      e.    Mastercard Incorporated ("Mastercard") is a U.S.-based multinational financial services corporation headquartered in Purchase, New York. Mastercard's principal business is to process payments between the banks of merchants and the card issuing banks or credit unions of the purchasers who use the "Mastercard" brand debit and credit cards to make purchases.

## Relevant Regulatory Background and Definitions

11.   An "initial coin offering" ("ICO") is a type of fundraising event in which an entity offers participants a unique digital "coin" or "token" in exchange for consideration. The consideration often comes in the form of "virtual currency" or "cryptocurrency," but can also be "fiat currency," which is currency, like the U.S. dollar and the Euro, that a government has declared to be legal tender, but is not backed by a physical commodity.  "Virtual currency" or "cryptocurrency" is a digital representation of value that can be digitally traded and functions as (1) a medium of exchange, (2) a unit of account, and/or (3) a store of value, but does not have legal tender status.  Unlike fiat currency, like the U.S. dollar and the Euro, virtual currency is not issued by any jurisdiction and functions only by agreement within the community of users of that particular currency.  Examples of virtual currency are Bitcoin and Ether.[1]

12.   The tokens or coins issued in an ICO are issued and distributed on a "blockchain" or cryptographically-secured ledger.  Tokens often are also listed and traded on online platforms, typically called virtual currency exchanges, and they usually trade for other digital assets or fiat currencies. Often, tokens are listed and tradeable immediately after they are issued.

13.   ICOs are typically announced and promoted through the Internet and e-mail.  Issuers usually release a "whitepaper" or "white paper" describing the project and the terms of the ICO. In order to participate in the ICO, investors are generally required to transfer funds to the issuer.  After the completion of the ICO, the issuer will distribute its unique "coin" or "token" to the participants.  The tokens may entitle the holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, and/or voting rights.  These tokens may also be listed on online platforms, often called virtual currency exchanges, and be tradable for virtual currencies.

---

[1] Based on my training, experience, and participation in this investigation, I have learned that "Ether" is a cryptocurrency whose blockchain is generated by the Ethereum platform, and the term "Ether" is sometimes used interchangeably with "Ethereum."

14.   Under Section 2(a)(1) of the Securities Act of 1933, a security includes "an investment contract." 15 U.S.C. § 77b. An "investment contract" is a contract, transaction or scheme "whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *S.E.C.* v. *W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946). "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* at 301. Importantly, the economic realities of the transaction or product and not its name determine whether the instrument is a security. *United Hous. Found, Inc.* v. *Forman*, 421 U.S. 837, 851 (1975). Pursuant to Sections 5(a) and 5(c) of the Securities Act, a company or individual conducting an offer or sale of securities to the public must file a registration statement with the SEC. 15 U.S.C. § 77e(a) and (c).

## Overview of the Scheme to Defraud

15.   From at least July 2017 up to and including the day of this Complaint, SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, and others known and unknown, participated in a scheme to defraud purchasers of Centra Tech cryptocurrencies by making material misrepresentations about Centra Tech, its purported partnerships with Bancorp, Visa, and Mastercard, its products, its licensing in various states, and its executive personnel. Through these misrepresentations, SHARMA and FARKAS caused investors to purchase more than $25 million worth of Centra Tech cryptocurrencies, which function as unregistered securities, during the time period of Centra Tech's initial coin offering.

## The Centra Tech ICO

16.   As set forth in greater detail below, based on my participation in this investigation and my review of reports and records prepared by others, from in or about July 2017 through in or about October 2017, Centra Tech raised capital, by offering unregistered securities via an ICO, to operate what Centra Tech advertised would be the world's first multi-blockchain debit card (the "Centra Tech ICO"). In sum, Centra Tech accepted digital currency from investors in exchange for Centra Tokens that Centra Tech stated could be "exchange[d] . . . on the Cryptocurrency exchanges for a profit" and would "allow[] users to join [Centra Tech's] success and mission *while generating a profit*." (emphasis added). In doing so, Centra Tech made multiple false statements, including on the Centra Tech Website and in materials posted to the Centra Tech Website,

regarding, among other things, (a) the "Centra Card" or the "Centra Debit Card," a debit card that was falsely advertised as one that would allow users to make purchases using any blockchain currency of choice and would work at any location that accepted Visa or Mastercard, (b) Centra Tech's partnerships with Bancorp, Visa, and Mastercard, which did not exist, (c) individual state licenses held by Centra Tech, at least some of which did not exist, and (d) the identity of one of Centra Tech's executives, who does not appear to exist.

17. Based on my review of publicly available information and records provided by Centra Tech to representatives of the SEC, among other sources, I have learned the following, in substance and in part:

a. On or about July 23, 2017, Centra Tech issued a press release that it paid to be published on the website "cointelegraph.com" (the "July 23 Press Release"). In the July 23 Press Release, Centra Tech described the Centra Tech ICO as "truly a ground floor opportunity to be part of a global solution to the blockchain currency dilemma that offers a comprehensive rewards program for both token and card holders while giving the ability to spend your cryptocurrency in real time with no fees." The July 23 Press Release also touted Centra Tech's products: (1) the "Centra Debit Card" which purported to "enable[] users to make purchases using their blockchain currency of choice," and "work[] anywhere that accepts Visa or MasterCard," (2) the "Centra Wallet App," which "makes it easy for people to register for the Centra Debit Card, store their cryptocurrency assets, as well as control its functions," and (3) "cBay," the "world's first Amazon type of marketplace created especially for cryptocurrency acceptance." The July 23 Press Release also advertised Centra Tech's "Currency Conversion Engine" as allowing users "the ability to spend their assets anywhere in the world that accepts Visa and/or MasterCard."

b. On or about July 25, 2017, Centra Tech issued a press release that it paid to be published on the website Bitcoin.com (the "July 25 Press Release"). In the July 25 Press Release, Centra Tech described the Centra Tech ICO as "truly a ground floor opportunity to be part of a global solution to the blockchain currency dilemma that offers a comprehensive rewards program for both token and card holders while giving the ability to spend your cryptocurrency in real time with no fees." The July 25 Press Release also touted Centra Tech's products: (1) the "Centra Debit Card" which purported to "enable[] users to

make purchases using their blockchain currency of choice," and "work[] anywhere that accepts Visa or MasterCard," (2) the "Centra Wallet App," which "makes it easy for people to register for the Centra Debit Card, store their cryptocurrency assets, as well as control its functions," and (3) "cBay," the "world's first Amazon type of marketplace created especially for cryptocurrency acceptance."   The July 25 Press Release also advertised Centra Tech's "Currency Conversion Engine," as allowing users "the ability to spend their assets anywhere in the world that accepts Visa and/or MasterCard."

       c.   Centra Tech also posted several different versions of a white paper advertising the Centra Tech ICO on the Centra Tech Website.  A version of the ICO White Paper that was downloaded from the Centra Tech Website on or about August 3, 2017 and labeled "FINAL DRAFT" ("White Paper-1") contained several statements describing the ICO and the Centra Card using terminology indicative of a securities offering.  For example:

       i. White Paper-1 described the Centra Tech ICO as a token offering for which 400 Centra Tokens, or "CTR"s, would be sold for 1 ETH.  Based on my training, experience, and participation in this investigation, I have learned that "ETH" is the currency code for Ether, a cryptocurrency whose blockchain is generated by the Ethereum platform.

       ii. Centra Tech stated that it would be offering "68% of all [Centra] Tokens to be created for purchase in our crowd sale to the public" and would "allocate 20% of all [Centra] Tokens created to distribution of bug bounty, business development, community projects, market expansion, and more" while "[t]he remaining 12% will be distributed to Centra Techs founders, early investors, and employees as an incentive to create a long lasting mutual interest and dedication to the tokens and their prolonged value."

       iii. In providing details about the Centra Card and the Centra Tech ICO,  White Paper-1 referenced different levels of investment opportunity:

       1. The "Centra Black Card founders edition" was to be issued to "our first 500 ICO backers whom purchase with 100+ ETH" and would carry with it an "enhanced rewards program."

       2. The "Centra Gold Card limited edition" would be "allocated to our first 1000 contributors whom purchase CTR

Tokens with 30+ ETH," and would also carry an "enhanced rewards program."

> 3. The "Centra Blue & Virtual Card" would be the "signature and traditional card."

iv. White Paper-1 advertised multiple "rewards" programs for Centra Token holders.  For example, White Paper-1 advertised that Centra Token holders would receive a ".8% ETH" reward for every transaction in the "network" (the "Network Rewards Program").  This was in contrast to another rewards program advertised in White Paper-1, which offered "Card rewards of up to 2% of your purchases made on the Centra card."  Based on my review of White Paper-1, and representations made by SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, as described in paragraph 30.e., below, explaining that "through our revenue share we actually give .8 percent of that away to token holders as part of our program to join the Centra Tokens," I believe the Network Rewards Program functions like a dividend in that it is offering a share – .8% ETH – of Centra Tech's revenue.

v. Although it claimed that holders of the Centra Token "by no means own any securities or interest in Centra Tech," and that the Centra Tokens "are not securities nor shares," White Paper-1 promised that Centra Token purchasers would "be able to place their wallet to use on Centra Debit card, or exchange them [the Centra Tokens] on the Cryptocurrency exchanges for a profit."  White Paper-1 also claimed that the Centra Card and Centra Wallet were "already live in beta," and that Centra Tech was "offering our initial crowd sale of tokens to appropriately fund the vision of Centra Tech's future."  It further claimed that Centa Tech's "initial coin offering allows users to join our success and mission *while generating a profit*."  (emphasis added).

vi. White Paper-1 also contained several misrepresentations, as described further in paragraphs 34 through 43, below, about Centra Tech's relationships with financial services institutions.  For example:

> 1. In describing the Centra Card, White Paper-1 stated:  "For our United States clients the Centra Card will be a Visa card while for international users the Centra card issued will be a MasterCard. . . . The Centra Card allows all supported cryptocurrencies to become spendable in real time based on the government fiat being used at the time the card is used at a participating location that accepts Visa or MasterCard."

2. White Paper-1 contained multiple images of Centra Cards with the "Visa" logo.

3. White Paper-1 also stated that one benefit and advantage of the Centra Card was "Access to 36+ Million Points of Sale where Visa and/or Master-Card is accepted in 200+ countries."

4. A product comparison table in White Paper-1 reported that the issuers of the Centra Card were "MasterCard and Visa."

5. White Paper-1 contained a timeline of Centra Tech's "milestone items," including a "Major Banking Partnership signed and license agreement with VISA USA Inc formulated" in January 2017, and a "Beta Launch of Centra Black Card and Centra Wallet App Live" in March 2017.

6. White Paper-1 also used the logos of Bancorp, Visa and Mastercard when describing Centra Tech's partners.

vii.    White Paper-1 stated that "Centra Tech holds individual licenses in 38 states namely Alabama, Arizona, Alaska, Arkansas, Connecticut, Delaware, District of Columbia, Florida, Georgia, Idaho, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Mississippi, Nevada, Nebraska, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, Oregon, Rhode Island, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, and West Virginia."  It further stated that the licenses "are held under categories of Money Transmitter, Sales of Checks, Electronic Money Transfers, and Seller of Payment Instruments."

viii.    White Paper-1 advertised the "Centra Tech Team" as comprising, among other individuals, SHARMA as the "CTO & Co-Founder"; FARKAS as the "CMO"; and "Michael Edwards" as the "CEO & Co-Founder."

### SHARMA's Representations in Connection with the Centra Tech ICO

18.  On or about August 14, 2017, SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, was interviewed by Neocash Radio, a cryptocurrency podcast, about the Centra Tech ICO.  Based on my

review of a recording of the interview, I have learned that SHARMA stated, among other things, the following:[2]

    a.  "[I]nternationally, we currently have our license with Mastercard, to service international clients. Domestically, we do have the Visa partnership, so we are able to issue Visa cards domestically and Mastercards internationally."

    b.  "Right now we are currently in our live Beta stage, which we have members of our internal organization as well as some external that have gotten our Centra Black Founder cards recently.  We're going through . . . pretty much a phase two of testing right now where we are just going through daily transactions, testing volume, etc., and we've gotten really good results so far on it."

    c.  SHARMA also stated that Centra Tech had "pretty much a successful test rate in terms of errors, in terms of proof processes and the whole flow of the card attaching to the app," when discussing the Centra Wallet.

    d.  SHARMA identified "Mike Edwards" as a "VP and co-founder" who was an early investor in Centra Tech.

    e.  In describing the rewards system for purchasers in the ICO, SHARMA stated:  "The rewards percentage that we get from Visa and Mastercard through our revenue share we actually give .8 percent of that away to token holders as part of our program to join the Centra tokens."

    f.  "[R]ight now is a great time to join our system, we have a token sale that is going on, it finishes on October 5th . . . we're currently a little bit north of $10 million raised in our first eight days of our crowd sale so I definitely want to thank all of my contributors and anyone who is listening for joining that as well."

    g.  SHARMA stated that there was currently a 20% token bonus on top of the current token sale that "can be redeemed via email."

---

[2] The summaries and transcript of the recorded interview set forth herein is based on a preliminary draft transcription and remains subject to revision.

h.   "We have a couple of large deals we're working on right now with a few companies so we should be over by I would say early September."

i.   SHARMA directed listeners to the Centra Tech website, www.centra.tech, to find out more about the Centra Tech ICO:  "You can go to our website, www.centra.tech, and you can click the token sale page as well as our white paper is on there and you can just get an insight of everything from A to Z."

j.   SHARMA stated that while Centra Tech was licensed in 38 states, "the states that we are operating in currently for licensing purposes is just so the ability to withdraw and transmit your Bitcoins.  As far as actually utilizing the card itself to the wallet and spending the cryptocurrencies, that's available in all states."

k.   SHARMA also stated that he was able to work through the U.S. licensing issues with a contact he knew at Metropolitan Commercial Bank.  SHARMA stated that "our system is connected to the bank and we're connected to the clients."

## Additional Representations by FARKAS

19.   Based on my review of records provided by Centra Tech to the SEC, and which were provided to me in connection with this investigation, I have learned, in substance and in part, the following:

a.   On or about August 30, 2017, SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, sent an email to an individual not at Centra Tech, and copied ROBERT FARKAS, a/k/a "Bob," the defendant, to the email.  In that email, SHARMA conveyed a message that SHARMA had received from Bancorp stating the following:

> Mr. Sharma:  I left a voicemail on your phone, but I am following up here as well.  CENTRA TECH IS HEREBY DIRECTED TO CEASE AND DESIST FROM REPRESENTING THAT THE BANCORP BANK HAS ANY CONNECTION WITH, OR IS THE ISSUER OF ANY CARD PRODUCTS RELATED TO CENTRA TECH.  YOU ARE ALSO DIRECTED TO CEASE AND DESIST USING OUR LOGO OR OTHER IMAGES IN CONNECTION WITH THE MARKETING OF ANY CARD PRODUCTS OR WALLETS YOU OFFER.  Please REMOVE any and all references to The Bancorp Bank or The Bancorp Inc. from

any and all websites, marketing materials or
other communications, including blogs as this
has not been authorized by The Bancorp.    I
expect   you   will   be   hearing   from   federal
banking regulators as well.

b.    On or about September 6, 2017, FARKAS exchanged
emails with an individual at a company that provides a search
engine allowing users to look up, confirm, and validate
transactions that have taken place on the Ethereum blockchain
("Company-1").  In the emails, FARKAS inquired about how to
obtain advertising space on Company-1's website, and stated, in
substance and in part, the following:

I know there are some past issues but we are now
complete on our Pre-ICO raised over 10M in ETH and
have been verified by all of our staff on Token Market
.  .  .

We have ad space everywhere else except here.  Please
let me know if you need any identifying documents or
anything to proceed with our ad space.

FARKAS also provided the advertising text that he wanted
Company-1 to post"  "Centra Card ® & Centra Wallet ® Now
available Worldwide!"  FARKAS signed the email "Robert Farkas
CMO."  After receiving a response from Company-1 that it was
"not able to cater to [Centra Tech's] advertising needs at this
point [in] time," FARKAS forwarded the emails to
"ssharma491@gmail.com," an email address used by SHARMA.[3]

c.    In or about early September 2017, FARKAS, using
the email address "support@centra.tech," and at times signing
his name "Bob," or "Robert Farkas CMO Centra," exchanged a
series of emails with an individual at a marketing company
seeking to write promotional materials and/or articles about
Centra Tech ("Individual-1").  On or about September 6, 2017,
FARKAS described Centra Tech as follows:

The biggest  problem  in  the  crypto  world  is
being    able    to    spend    your    cryptocurrency

---

[3] Based on records provided to the FBI by Google, I have learned
that SHARMA is listed as the subscriber for the email address
"ssharma491@gmail.com."  In addition, based on my review of
records produced by Centra Tech to the SEC, I have learned that
SHARMA uses the email address "ssharma491@gmail.com."

> effortlessly.   The Centra Card and Centra
> Wallet app are the solution.   Our Currency
> Conversion Engine Module (CCE Module) allows
> real   time   conversion   of   all   supported
> cyrptocurrencies to give the user the ability
> to spend their assets in real time anywhere in
> the world that accepts Visa or Mastercard.
>
> ...
>
> Thanks,
> Bob

On or about September 13, 2017, Individual-1 appears to have
provided FARKAS with a draft of written materials related to
Centra Tech and, later that same day, FARKAS responded with
edits, including the following:

> Title: Can we change it too: This company
> has brought cryptocurrency into the real
> world
> reason being is that our card is live and
> working and has been shipped to clients
> already ☺
> .  .  .
> Thanks,
> Bob

   20.   From approximately in or about September 2017 through
in or about December 2017, FARKAS received and responded to
multiple emails either directly or through the
"support@centra.tech" email account from individuals interested
in participating in the Centra Tech ICO, interested in
purchasing Centra Tokens, or otherwise seeking information about
Centra Tech.

   21.   Based on my review of records provided by Centra Tech
to the SEC, I have learned, in substance and in part, that, in
or about October 2017, FARKAS registered Centra Tech as a
sponsor of "Consensus: Invest 2017," a blockchain technology
summit or conference that took place on or about November 28,
2017 in New York City, New York.   I have reviewed a video posted
to Centra Tech's YouTube channel on or about January 5, 2018
entitled "Centra Consensus NYC Cryptocurrency Blockckain Expo
Invest."   The video depicts what appears to be people and
activities at the "Consensus" Invest 2017," including a Centra

Tech booth or table at the conference, and shows FARKAS engaging in conversations with various people during the conference. Based on the foregoing, I believe that FARKAS was in New York City, New York, on or about November 28, 2017, and engaged in promotional and marketing activities for Centra Tech at the "Consensus: Invest 2017" conference.

## The Fraudulent Partnerships with Bancorp, Visa, and Mastercard

22.    Based on my conversations with a representative of Bancorp ("Witness-1") and my review of documents provided by Bancorp, I have learned, in substance and in part, the following:

a.    In approximately August 2017, Witness-1 learned from Bancorp's marketing group that a potential investor or purchaser of Centra Tech tokens had inquired as to whether Bancorp had a business relationship with Centra Tech, as was represented by Centra Tech in its marketing materials at the time.

b.    In investigating the inquiry in approximately August 2017, Witness-1 reviewed the Centra Tech Website and a white paper posted on the Centra Tech Website.  Witness-1 discovered that Bancorp's issuer statement, a statement regarding who the card issuer is any time a Visa or Mastercard image is displayed, was being used on the Centra Tech Website. Witness-1 knew by looking at the Centra Tech Website and white paper that Bancorp would not ever work with a company such as Centra Tech by virtue of the risk level of the product Centra Tech was offering.

c.    Witness-1 reviewed Bancorp internal databases, to include Bancorp's list of entities with which it had card issuance relationships and entities involved in Bancorp's co-branded incentive card program, to see whether Bancorp had any sort of relationship with Centra Tech.  Through this process, Witness-1 confirmed that Bancorp did not have any relationships with Centra Tech.

d.    Witness-1 took screenshots of the Centra Tech Website, including a page that misrepresented Bancorp's issuer statement.

e.    One screenshot that Witness-1 retained stated, among other things:

The Centra Card Visa Debit Card is issued by The Bancorp Bank, member FDIC, pursuant to a license from Visa U.S.A. Inc. "The Bankcorp"[4] and "The Bancorp Bank" are registered trademarks of The Bankcorp Bank © 2014. Use of the Card is subject to the terms and conditions of the applicable Cardholder Agreement and fee schedule, if any.

The Centra Card Mastercard® Debit Card is issued by The Bancorp Bank, member FDIC, pursuant to a license from Mastercard International Incorporated. "The Bankcorp" and "The Bancorp Bank" are registered trademarks of The Bankcorp Bank © 2014. Use of the Card is subject to the terms and conditions of the applicable Cardholder Agreement and fee schedule, if any.

 f. As described above, Witness-1 reviewed a white paper that was posted to the Centra Tech Website in August 2017. Witness-1 recalled that the white paper contained multiple misrepresentations, including about Centra Tech's purported relationship with Bancorp.

 g. In approximately August 2017, Witness-1 attempted to reach individuals at Centra Tech through, among other methods, the "Contact Us" portion of the Centra Tech Website to request that Centra Tech remove the Bancorp logo and the false statements regarding Centra Tech's purported relationship with Bancorp. Witness-1 did not receive a response from Centra Tech.

 h. Based on my conversations with another representative of Bancorp ("Witness-2") and my review of documents provided by Bancorp, I have learned, in substance and in part, that, on or about August 30, 2017, Bancorp sent a cease and desist notice to Centra Tech to which Centra Tech did not respond.

 23. Based on my conversations with a representative of Visa ("Witness-3") and my review of documents provided by Visa, I have learned, in substance and in part, the following:

---

[4] This excerpt from the Centra Tech Website has not been altered to correct spelling or other errors. In this excerpt, "Bancorp" is also spelled "Bankcorp."

a.   On or about October 10, 2017, Visa became aware that Centra Tech was using the Visa name and logo on marketing materials in connection with the Centra Card and the Centra Tech ICO.

b.   Visa employees researched whether Visa had any relationship, direct or indirect, with Centra Tech.  Visa determined that it had no relationship with Centra Tech.

c.   Visa employees took screenshots of portions of the Centra Tech Website using and showing the Visa name and trademark, including of purported Centra Cards with the Visa logo.

d.   On or about October 10, 2017, Visa's Legal Department sent an email to Centra Tech, at support@centra.tech, attaching a cease and desist letter (the "October 10 Letter"). In the October 10 Letter, Visa stated, in part:

> It has come to our attention that Centra Tech ("Centra") is using the Visa-Owned Marks on its site https://www.centra.tech as well as on its various social media sites (e.g., Facebook, Twitter, Instagram, YouTube) and other mediums. It appears Centra is purporting to be an authorized distributor of VISA payment cards utilizing cryptocurrency technology. . . . However, to the best of our knowledge and good faith belief, Centra is not authorized to use the Visa-Owned Marks in this manner, nor is it authorized to issue, sell, or otherwise distribute VISA payment cards. If this is not the case, please advise and explain immediately, i.e., if Centra is working with an authorized Visa Issuing bank.

Visa attached to the October 10 Letter multiple screenshots from the Centra Tech Website in which Centra Tech had misappropriated the Visa trademark.

e.   In the October 10 Letter, Visa requested that Centra Tech cease and desist from using Visa's trademarks and "promoting that it is an authorized distributor of VISA payment cards," and for Centra Tech to remove all references to Visa from the Centra Tech Website and any promotional materials.

Visa also requested that Centra Tech "identify the bank or financial institution it is working with (if any) to issue a purported VISA payment card product."

       f.  In response to the October 10 Letter, SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, provided Visa with an acknowledgment that he had received the October 10 Letter, but did not identify any financial institutions with which Centra Tech was working to issue a Visa payment card product.

    24.  Based on my review of records provided by Centra Tech to the SEC, and which were provided to me in connection with this investigation, I have learned, in substance and in part, the following:

       a.  On or about October 10, 2017, SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, using the email address "sam@centra.tech," emailed a response to Visa's October 10 Letter, stating:

> This matter has been brought to my attention. I will have this matter rectified in 48 hours. We are currently in the process of finalizing our Co-branded Prepaid Card Program, but might not meet the Nov 1st lock out deadlines for submission from our issuing bank whom is an authorized visa issuer for card design approval, So can see where this issue might of came from.
>
> However, I have immediately contacted my web developers to remove all issues and I will have this document [a cease and desist acknowledgment] signed and returned within 48 hours.
>
> Thank you,
> Sam Sharma

    b. On or about October 11, 2017, Visa responded to SHARMA's email, and requested that he "advise of the Visa issuing bank you are working with."

    c. On or about October 12, 2017, SHARMA responded again via email using the "sam@centra.tech" email account and stated: "As far as the issuing bank we have an MNDA in place currently. VISA will soon get our information for Card Design approval and

program specs from our future issuing bank in the US."  SHARMA
signed the email, "Thank you, Sam."  Based on my training and
experience, I believe SHARMA was claiming that he had a Mutual
Non-Disclosure Agreement with the purported issuing bank in this
email and that he therefore could not disclose its identity.

     d. On or about October 14, 2017, Visa responded to
SHARMA's email, noting that Centra Tech was still using the Visa
trademark and Visa name in its promotional materials, including
in videos in which SHARMA appeared, and reiterated its demand
that Centra Tech stop using the Visa name.  Visa also repeated
its request that SHARMA identify the bank that Centra Tech was
"allegedly working with."

     e. Based on my conversations with Witness-3, I have
learned that, in response to Visa's multiple requests for Centra
Tech to identify the Visa card issuing bank with which it
purported to have a relationship, neither SHARMA nor anyone at
Centra Tech identified such an issuing bank.

     25.  Based on my conversations with a representative of
MasterCard ("Witness-4"), I have learned, in substance and in
part, that MasterCard's internal records of licensing agreements
and relationships with card-issuing banks and other third
parties contains no record of any relationship, either direct or
indirect, with Centra Tech.

     26.  Based on my review of the current version of the
Centra Tech Website and a white paper published via the Centra
Tech Website, as of March 26, 2018, I have learned that Centra
Tech is not currently using the Bancorp, Visa or MasterCard
names or logos.

     27.  As described in paragraph 17.c.vii., above, White
Paper-1 represented that Centra Tech held licenses "under
categories of Money Transmitter, Sales of Checks, Electronic
Money Transfers, and Seller of Payment Instruments," in 38
listed states (the "State Licensing List").  Based on my review,
on or about March 12, 2018, of a database maintained by the
Nationwide Multistate Licensing System, a financial services
industry online registration and licensing database, and my
review of certain state licensing databases, I have learned, in
substance and in part, that the following states on the State
Licensing List have no current record for Centra Tech based on
available public searches:  Arizona, Connecticut, Delaware,
Florida, New Jersey, New York or South Dakota.

### "Michael Edwards"

28.   As described in paragraph 17.c.viii, above, White Paper-1 listed "Michael Edwards" as Centra Tech's "CEO & Co-Founder."  White Paper-1 also included a picture of "Michael Edwards."  Based on open source searches of this image, I have learned that the picture of "Michael Edwards" in White Paper-1 is actually a picture associated with an individual by a different name who is a Canadian physiology professor.

29.   Based on my review of records provided by the SEC, I have learned, in substance and in part, that, on or about August 3, 2017, a user profile page appeared on LinkedIn, a business- and employment-oriented social networking service that operates via websites and mobile apps, for "Michael Edwards."  The LinkedIn page stated that "Michael Edwards" had "launched Centra Tech with the mission to design the world's first multi-blockchain asset debit card" and had managed various aspects of Centra Tech's Centra Card and Centra Wallet programs, including "[e]stablished licensing and partnership terms with Visa & MasterCard."  The LinkedIn page also stated that "Michael Edwards" was affiliated with Harvard University.

30.   Based on my review of currently-available content on the LinkedIn website, I have learned that the "Michael Edwards" LinkedIn page no longer exists.

31.   Based on Internet searches for a "Michael Edwards" who is or was a co-founder or CEO of Centra Tech, I have learned that there is limited information about such an individual.  For example, I have found no interviews of "Michael Edwards" in connection with Centra Tech or the Centra Tech ICO, and the name "Michael Edwards" no longer appears on the Centra Tech Website or Centra Tech online promotional materials.  Based on the information described above, and based on my training, experience, and participation in this investigation, I believe that a "Michael Edwards" who was at some point "CEO & Co-Founder" of Centra Tech may not exist.

### The Centra Tech ICO Investors

32.   Based on my training, experience, and participation in this investigation, I have learned that companies like Centra Tech that offer cryptocurrency are required to keep a record of identification information—including names and addresses—of individuals purchasing their cryptocurrency.  Based on my review

of records provided by Centra Tech to the SEC, I have learned, in substance and in part, the following:

a.    Centra Tech provided a spreadsheet labeled "Centra Token Sale Details" to the SEC.  The spreadsheet contains several tabs, including tabs labeled "CentraToken," "CentraSale," and "Centra Token Owner."

b.    The CentraToken tab contains information regarding more than 1800 purchases of Centra Tokens from between on or about July 30 to August 26, 2017.  Two of the listed investors reside in New York City, New York, within the Southern District of New York.

c.    The CentraSale tab contains information regarding more than 1700 purchases of Centra Tokens from between on or about September 19 to September 26, 2017.  Three of the listed investors reside in New York City, New York, within the Southern District of New York.

## Extradition Research, Document Destruction, and International Travel

33.    Based on my discussions with representatives of the SEC, I have learned, in substance and in part, that in or about the fourth quarter of 2017 the SEC issued an initial subpoena to Centra Tech for documents and other information, and that SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, are thus aware of the SEC's investigation.

34.    Based on my conversations with an attorney who is employed by a financial regulatory authority ("Witness-5"), I have learned, in substance and in part, the following:

a.    Witness-5 knows an attorney who was until recently employed by Centra Tech ("Employee-1").

b.    Witness-5 had several telephone conversations and electronic communications with Employee-1 on or about March 29 and 30, 2018.

c.    During these communications, Employee-1 told Witness-5 the following, in substance and in part:

i.    Employee-1 learned earlier this week that the SEC has been investigating whether Centra Tech has engaged in fraudulent activity.

         ii.    ROBERT FARKAS, a/k/a "Bob," the defendant, recently asked Employee-1 via email to conduct research regarding foreign extradition laws.

         iii.    After Employee-1 performed this extradition research and reported the results to FARKAS, FARKAS approached Employee-1 in person and stated, in substance and in part, that he had deleted his email asking Employee-1 to perform this extradition research.  Based on FARKAS' demeanor during this interaction and the way in which he made that statement about deleting his email, Employee-1 understood FARKAS to be suggesting that Employee-1 should also delete the copy of that email that Employee-1 had received from FARKAS regarding the extradition research.

         d.    Employee-1 has not seen an individual Employee-1 described to Witness-5 as the "owner" of Centra Tech in over a week -- which I believe, based on my training and experience and participation in the investigation of this case, to be a reference to SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant.

         e.    Employee-1 also learned this week that Centra Tech's bank account has been depleted.

         f.    Employee-1 conveyed that Centra Tech has terminated virtually all of its employees except certain top executives such as SHARMA and FARKAS.

    26.    Based on my review of records provided by Delta Airlines, I have learned that on or about March 27, 2018, ROBERT FARKAS, a/k/a "Bob," the defendant, booked Delta Airlines flights for himself and a co-traveler whose name I recognize to be the name of an employee at Centra Tech ("Employee-2") to fly from Fort Lauderdale, Florida to Incheon, South Korea via a Delta Airlines flight leaving Fort Lauderdale-Hollywood International Airport in Florida on or about April 1, 2018 at approximately 8:00PM, with a stopover at Hartfield-Jackson Atlanta International Airport in Georgia to catch a connecting Delta Airlines flight that will arrive at Incheon International Airport in South Korea on or about April 2, 2018.  According to these records, FARKAS and Employee-2 have also booked return flights that would have them leave from Incheon International Airport in South Korea on or about April 5, 2018 and arrive at Fort Lauderdale-Hollywood International Airport in Florida on or about April 5, 2018.

WHEREFORE, I respectfully request that arrest warrants be issued for SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, and that they be arrested and imprisoned or bailed, as the case may be.


BRANDON RACZ
Special Agent
Federal Bureau of Investigation


Sworn to before me this
31st day of March 2018


HONORABLE JAMES L. COTT
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

25