UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------X

UNITED STATES OF AMERICA, : 18-MJ-2695 (UA)

v. : May 2, 2018

SOHRAB SHARMA, et al., : 500 Pearl Street
: New York, New York

Defendants. :

----------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL HEARING
BEFORE THE HONORABLE DEBRA C. FREEMAN
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government: NEGAR TEKEEI, ESQ.
United States Attorney's Office,
One Saint Andrew's Plaza
New York, New York 10007

For the Defendant: SHARON McCARTHY, ESQ.
Kostelanetz & Fink LLP
7 World Trade Center, 34th Floor
New York, New York 10007

Court Transcriber: SHARI RIEMER, CET-805
TypeWrite Word Processing Service
211 N. Milton Road
Saratoga Springs, New York 12866

Proceedings recorded by electronic sound recording, transcript produced by transcription service

THE CLERK: United States v. Sohrab Sharma. Counsel, please state your name for the record.

MS. TEKEEI: Good afternoon, Your Honor. Negar Tekeei on behalf of the United States.

THE COURT: Good afternoon.

MS. McCARTHY: Your Honor, Sharon McCarthy of Kostelanetz & Fink on behalf of Mr. Sharma.

THE COURT: Good afternoon. All right. So you thought you were going to have more information today than yesterday, maybe.

MS. TEKEEI: We do, Your Honor. However -- and I'm happy to go into the explanations for this, but the Government's position with respect to seeking detention remains the same for reasons that I'm more than happy to walk the Court through.

THE COURT: Okay. So you got access to the digital wallet, electronic -- whatever we call that. And you were able to get to funds?

MS. TEKEEI: Yes, your Honor. If I may --

THE COURT: Go ahead.

MS. TEKEEI: I'm sure the Court -- I know the Court has read our papers, but if I may just have a moment --

THE COURT: The Court has --

MS. TEKEEI: -- to give the Court some --

THE COURT: -- has --

MS. TEKEEI: -- background.

THE COURT: -- read some of your papers. Enough, I hope, to get an understanding as to what's going on here. I may not be familiar with all of the details. So you're seeking detention. I gather there's going to be an argument on that. So let me hear first from you as to why you're seeking detention.

MS. TEKEEI: Thank you, Your Honor. I'm happy to explain all of our reasons. And, Your Honor, before I begin, it's important to note that we do not seek detention lightly in this case. We recognize that there is no presumption here. However, given the nature and circumstances of the offense, the defendant's personal history and characteristics, the massive obstruction of justice that he has perpetrated over the last several months, we seek detention in this case out of our concerns for the defendant's risk of flight, and also for the danger to the community that he poses.

Let me begin with some background, Your Honor, about the circumstances of the offense. As is detailed in the complaint, and in the related complaint against the defendant's co-conspirator, Ray Trapani which the Court has copies of, Mr. Sharma, and his co-conspirators perpetrated a massive fraud in connection with a scheme to induce victims to invest more than $25 million of crypto currency through material misrepresentations and omissions that he made, and

his co-conspirators made, in connection with an Initial Coin Offering by the company that he founded, that he currently still owns, and that he operated, Centra Tech.

Last summer from approximately July through the date of this complaint, Mr. Sharma and his co-conspirators lied repeatedly to investors and the investing public, and as I will explain momentarily, to the SEC, and to law enforcement. Those lies include telling investors that Centra Tech had inexperienced executive team with impressive credentials, including a fake CEO named Mike Edwards that the defendant concocted, that he then told the investing public about, and that he didn't back away from.

The defendant and his co-conspirators told the public that they developed a debit card -- the so-called Centra Card -- that allowed users to spend cryptocurrency of their choice and make purchases using MasterCard and Visa systems. That was false. The defendant and his co-conspirators told investors that they had partnerships with various entities, including a bank called the Bancorp, which did not exist. So that was another lie. And they also told investors that they had state licenses that allowed them to operate in various states throughout the United States. Also a lie. So just to sum it up, and the complaint is very detailed, but at its core the defendant in his co-conspirators created fake people, they created fake documents, they

discussed having fake licenses, and they did all of that to make money. Pure and simple, to make money.

The evidence against the defendant which is described in detail in the complaints, is conclusively strong. It includes his own words, text messages that he sent and that he received, emails that he sent and that he received regarding his lies, and regarding attempts to cover up those lies. It includes marketing materials that the defendant and his co-conspirators prepared and issued and released to the investing public containing the fraudulent representations that I've outlined. And it includes evidence of their continued efforts to conceal their crimes. That's just a synopsis of the offense conduct.

Directly relevant to the issue of bail before this court, is the defendant's obstruction of justice in preventing law enforcement and lying to law enforcement in efforts to secure what is now more than $60 million of investor funds. So let me give The Court some background as to the investor funds that were in the digital wallet.

THE COURT: How much was in there?

MS. TEKEEI: In there were more than $60 million of investor funds.

THE COURT: And you've now been able to secure that money?

MS. TEKEEI: We've now been able to secure that

money. Here is where -- here's the background that Your Honor. After the SEC again investigating the case and issued subpoenas to Centra Tech, Centra Tech arranged with Mr. Sharma to transfer the investor funds into a digital wallet. Mr. Sharma then to purported to provide the passcode to that digital wallet to Centra Tech in this way; he purported to provide that passcode to his codefendant, Robert Farkas. That passcode was reduced to a piece of paper, it was purportedly divided, and one half was kept by Mr. Farkas and one half was kept by the chief compliance officer of Centra Tech, Alan Shut [Ph.]. Those halves were put into a safe deposit box. And so Mr. Sharma and Centra Tech told the SEC, and then later the US attorney's office and the FBI that the passcode to the digital wallet was secure and that the investor funds were secure. That is effectively what Mr. Sharma and counsel for the company represented repeatedly. After Mr. Sharma's arrest --

THE COURT: I'm sorry they were put -- the two halves are put in the same safe deposit box?

MS. TEKEEI: No, Your Honor. In two separate safe-deposit boxes.

THE COURT: Okay

MS. TEKEEI: And Your Honor, if I may just illustrate to the Court what I mean by that. May I approach Your Honor?

THE COURT: You may.

MS. TEKEEI: What I handed to Counsel on what I handed to the Court is one of the fake halves of the fake passcode that Mr. Sharma provided to Mr. Farkas. This is fake. This half has been altered. The other half which I have not reduced to paper, I do not currently have possession of, is similar to this in that there is an alphanumerical sequence that's been divided in half, and there is also, and Your Honor will see, I'm not quite sure how to describe it, it looks like a barcode but it's called a QR code. The QR code and the alphanumerical sequence that are presented on this piece of paper are what would have allowed the FBI to secure the investor funds. This is what we were told was one half of the passcode. We were told that by -- through Mr. Sharma's counsel, we were told that through Centra Tech's counsel. The source of that information was purportedly Mr. Sharma.

When the FBI put this half together with the other half it did not provide access to the digital wallet containing the investor funds. We suspected, and we've since confirmed that the passcode Mr. Sharma provided was altered. And it was altered in multiple ways. One of the ways that it was altered, is that this QR code right here, one of the halves showed a QR code for entirely separate digital wallet, not the wallet that contained the investor funds. And so someone superimposed a fake QR code -- or the QR code to a separate wallet onto this piece of paper.

Another way that it was altered was in the alphanumerical sequence that's listed at the bottom. So in two separate ways this fake passcode was provided to law enforcement as a way of saying here you go, I've given you the investor funds, nothing to worry about. All the while, the actual passcode was taped to the bottom of a drawer in the kitchen of the apartment where Mr. Sharma shared with his girlfriend -- his codefendant's sister. We learned about that yesterday.

And here's how we learned about it. Despite a seizure warrant, despite -- despite multiple efforts over the course of the last several months, for the Government to access the correct keycode -- the correct passkey -- despite multiple representations about Sharma's having provided the correct code, only yesterday did we learn through Ms. McCarthy -- and obviously we credit her for her work in helping us obtain that information -- that Mr. Sharma had taped a piece of paper very similar to this to the bottom of the kitchen drawer -- in a drawer in the kitchen of the apartment where -- that he shared.

And this morning FBI agents went to that apartment, they obtained consent to enter that apartment, and they retrieved a piece of paper that looks very much like this. They were able to access the digital wallet and they transferred the investor funds in the digital wallet which

were 91,000 ether into a secure FBI wallet.

THE COURT: 91,000 what?

MS. TEKEEI: Ether. It's the cryptocurrency, the digital assets that were contained in the wallet. The wallet in its entirety, Your Honor, had 100,000 ether in it. So 100,000 units of this cryptocurrency. Nine thousand of those units of cryptocurrency we have been told our Mr. Sharma's. And therefore, the FBI has not touched, and has left in place the 9,000 units of cryptocurrency that are -- that were in the digital wallet -- and the FBI has only secured the $91,000 -- I'm sorry -- the 91,000 units of cryptocurrency that belong to investors. That means that Mr. Sharma, in U.S. dollars, still has access to more than $6 million of funds and is potentially the reason why he obstructed justice over the course of the last many months to prevent law enforcement from accessing not only his investor -- the investor funds, funds that the innocent public contributed in connection with his Initial Coin Offering, but also his own funds. And that's just what we --

THE COURT: Is there --

MS. TEKEEI: -- know about.

THE COURT: -- is -- you've used different numbers. Is there sort of a conversion rate from ether to dollars?

MS. TEKEEI: There is Your Honor. And it fluctuates daily, and so --

THE COURT: So when you say $60 million and 91,000 ether, that was more than 60 million, but you left some behind?

MS. TEKEEI: Yes, Your Honor. I don't have the currency calculator --

THE COURT: Okay.

MS. TEKEEI: -- at my hands right now. But if I could just rewind for a moment, in connection with raising investor funds for Centra Tech, the defendant and his co-conspirators raised in July through October 2017, 91,000 units of ether. That is a cryptocurrency. The value of ether, much like other denominations in other currencies fluctuates from day-to-day. As it turns out, the value of ether today is worth more than it was almost year ago. And so while at the time, they had raised approximately 25 million or more, that money, that 91,000 ether, today is worth more than $60 million.

THE COURT: I see.

MS. TEKEEI: Yesterday it was worth approximately $59 million. It will continue to fluctuate over time.

THE COURT: I see. That explains why you say defendants raised more than 25 million --

MS. TEKEEI: Yes, Your Honor.

THE COURT: -- and it's worth nearly 60 million --

MS. TEKEEI: And the digital wallet --

THE COURT: -- or over 60 million.

MS. TEKEEI: -- in its entirety had 100,000 ether in it.

THE COURT: Okay.

MS. TEKEEI: We are able to attribute 91,000 of that to the investor funds and the remaining 9,000 we are told our Mr. Sharma's. And we, law enforcement, has not touched that 9,000. That 9,000 remains in the digital wallet. The funds that the FBI has secured are the 91,000 in ether.

Your Honor, it's, you know, it's important to note, that while we are, of course, happy that we have recovered this massive amount of money in investor funds, all of this only goes to underscore the depravity of the defendant's obstruction of justice over the many months leading up to this. Mr. Sharma has been represented by counsel for many months. During the time period of this conspiracy, and while he knew that law enforcement were trying to secure the funds, he was convicted of perjury. He pled guilty to perjury. He lied to a court here in New York City about a DUI. He provided testimony to Judge Statsinger lying about alcohol that he had consumed. And he was convicted for perjury. And while his case was pending, he then perpetrated lies in order to hide assets from the Government.

Those facts are critical to the risk of flight that this defendant poses, and the danger to the community that he

poses. It is not the case that just because the funds are now finally secured, the Government feels comfortable that there are bail conditions that would make it so that he would appear -- reasonably assure that he would appear, or reasonably assure that he doesn't pose a danger to the community. In fact, it only makes our concerns -- it only heightens our concerns at this point.

There are additional facts, I think, as are set forth in our papers, Your Honor, that give the Government serious concerns. We have conveyed to the Court facts related to an ongoing investigation in the Eastern District of New York with the Department of Homeland Security that have revealed that the defendant used the identifying information of an elderly man, a priest, to obtain fraudulent loan documents, to which he obtained approximately $400,000 in funds. The bank was alerted to the fraud. The defendant, at some point repaid those funds that he had fraudulently obtained through the use of the elderly priest's identity, and the bank in that case was whole, but that does not take away, as far as we understand it, from the defendants use of the fraudulent -- of the identity to obtain fraudulent funds and his use of a vulnerable victim's information to perpetrate a fraud even prior to the time period of this conspiracy.

Not a day goes by in this case that we do not learn about a new account, or a new lie, or a new set of

circumstances that give rise to serious concerns as to this defendant. When I say we don't seek detention lightly, I mean that. We have given serious concern to the Government's position in this case -- we have given serious consideration to the Government's position in this case. We engaged in conversations with Ms. McCarthy over a period of time. And I am certain that Ms. McCarthy will provide explanations to this court for all of the Government's concerns. The source of those explanations, Your Honor, is the defendant. And while we have -- take no issue with Ms. McCarthy's advocacy to us, and advocacy before the Court, we question the source of the information, and we question the defendants truthfulness before this court.

An example of that is his failure to tell Pre-trial Services in Florida of his multiple assets, of his more than $6 million in cryptocurrency, that's just one example. An example of that is the fact that this defendant drew down his bank accounts and his cryptocurrency accounts a few weeks before his arrest in this case. We don't know where that money is. We don't know what he's done with that money. There are pools of assets out there that we simply have not yet identified.

And so it is the case that because of the defendant's obstruction of justice, because of the defendant's offense conduct in this case, because of his repeated lies to

law enforcement, and this court, because of his liquidation of his bank accounts, because of the fact that he now faces more serious charges than he has ever faced before we do not believe that there are conditions that can assure his appearance and ensure the safety of the community. I will note that we understand from Ms. McCarthy that in connection with defendant's perjury conviction for which he still pends sentencing, he appeared in court whenever he was required to. Now that was a perjury conviction, that was a perjury case in New York State Court.

Today in front of this court he faces not only sentencing for that conviction at some point, but he also faces the charges in this case, which as we've estimated, knowing what we know today, subject him to a guidelines range of 210 to 262 months. And that's only based on what we know today. He also faces a parallel SEC civil action, which only compounds his legal troubles. This defendant, who is a master of lying, and a master of creating fake people and fake identities, now faces more serious charges than he's ever faced before, and has demonstrated that he cannot be relied upon or trusted. And so, Your Honor, we seek detention in this case in light of all of these circumstances.

THE COURT: Question for clarification. Defendant's codefendant -- was it the Government's understanding that he also had a role in the misdirection of the Government with

respect to the passcode or any of this other obstruction that you've described?

MS. TEKEEI: Your Honor, the defendant's codefendant Mr. Farkas, is that the one that your --

THE COURT: Yes.

MS. TEKEEI: -- referring to?

THE COURT: Is there more than one codefendant?

MS. TEKEEI: There is a defendant who was charge separately.

THE COURT: Mr. Farkas.

MS. TEKEEI: His name is Ray Trapani. But with respect to Mr. Farkas, he was presented last week. The facts that were presented to the Court last week with respect to Mr. Farkas through his counsel are that Mr. Farkas, while he was detained in Florida, pending removal in this case learned that Mr. Sharma had altered the passcode or passkey. Now the Government doesn't know who to believe. And in connection with Mr. Farkas' bail argument, Judge Wang ordered him detained, and ordered him detained absent conditions that were met that are set forth in our papers, Your Honor.

THE COURT: I'm sorry. She set conditions but said they all had to be satisfied before release?

MS. TEKEEI: Yes, Your Honor. She -- let me just be clear, she set conditions of bail but said that they needed to all be satisfied prior to his release. Those conditions are

mirrored in the conditions that we've set forth for the Court here. And one of those conditions is compliance with the seizure warrant. Directly to the Courts question though as to whether Mr. Farkas had anything to do with the alteration of the code, standing here today, we have no way of knowing which individual to believe or not believe given that they are established fraudsters. So --

THE COURT: So you --

MS. TEKEEI: -- either way, the code was altered. And Mr. Sharma --

THE COURT: -- you sought --

MS. TEKEEI: -- had the correct code the whole time.

THE COURT: -- so you sought detention of Mr. Farkas based on a very similar argument to the argument you're making now?

MS. TEKEEI: A similar argument, Your Honor. There are a couple of facts though that exacerbate the case as to Mr. Sharma. One is his prior felony perjury conviction. Two, is that we now have proof that he fraudulently represented to multiple law enforcement agencies the accuracy of the passcode or passkey, which we did not have last week, although we suspected it, we did not have definitive proof of that. And the third is that Mr. Sharma, as is reflected in our papers, had a loaded weapon at the time of his arrest. He is technically in violation of federal criminal law by having a

firearm while pending sentencing for a felony guilty plea, which is a conviction. And so those facts, in addition to his -- the role that he played in this fraud was slightly higher or more of a leadership role than his codefendants. So the arguments that were making now --

THE COURT: So the reason that I --

MS. TEKEEI: -- are similar, but there are some additional facts that we think put him at an even stronger risk of flight and an even stronger risk of danger to the community.

THE COURT: The reason I'm asking is just in terms of the obstruction allegations that you're making here, which of course, are one of the things that can give you the right to argue for detention on a non-violent -- or non-specified kind of crime, I just wanted to get a sense of whether you thought they were working together to obstruct the investigation the way you described, or whether it was mostly Mr. Sharma, or whether you just don't know. So I think you've answered the question of you're not really certain of that. He did say that you understand that an accurate passkey was taped under Mr. Sharma's kitchen drawer. You don't know whether there was also a piece taped under Mr. Farkas' kitchen drawer, for example.

MS. TEKEEI: That is absolute correct. It is certain that Mr. Sharma played a role in altering the passcode

or providing an incorrect passcode or making sure that law enforcement had an incorrect passcode. But we don't know, with certainty, is whether Mr. Farkas also played a role in that.

THE COURT: Okay

MS. TEKEEI: But we know that Mr. Sharma did because the correct passkey he had all along.

THE COURT: Okay. Let me hear from defense counsel.

MS. McCARTHY: Your Honor, I just want to start with the last thing that was just mentioned, which is the loaded firearm found in his apartment. At the time he was arrested on April 1st, Easter Sunday, at his apartment in Miami, he was asked by the arresting agents whether there was a weapon while he was in handcuffs, and he said yes, I have a gun. It's in my night table drawer. I have a license for it. He does. He has a license to carry a firearm in Florida. And he told the agents where to find that. So I argued with the Government sort of until I'm blue in the face about this particular issue, but I don't believe that somebody who has a license to carry a firearm and keeps it in his bedside table constitutes a danger to the community. In addition, I've spoken with his attorney who represented him in the perjury matter in New York County. He was unaware of section 922(g) of Title 18. He did not know that it was a federal offense to possess a firearm after one has entered a guilty plea to a felony, nor did he

understand that one is considered to be convicted at the time of the entry of the guilty plea. So I got that directly from an attorney representing him. So I really would like the Court, if possible, to put that aside in terms of determining whether or not my client presents a danger to the community. I think it's a red herring here. We have plenty to talk about.

As you've just heard, my client was arrested on April 1st. Before his arrest, I can tell you I was representing him in the SEC matters since February. We had no inclination that there -- or inkling that there was a criminal investigation happening. So I want the Court to understand that. That was the first that the defendant became aware that there is a criminal investigation. Up until then, it had been an SEC investigation. He was no longer active in his company as of the entry of his guilty plea in October of 2017, and so he had November 29th is the day the SEC appeared and that is when the passcode situation arose where the SEC was informed that the virtual wallet had been secured and the passcode was in two separate spots. Your Honor, we now know that that was not true. I cannot explain to the Court why that happened. I believe my client was very misguided, taking his own counsel and perhaps others. But that was misguided.

I had my first chance to speak with him face-to-face since he was arrested on April 1st, I met with him for the

first time yesterday when he arrived in New York. Within a very short time of my meeting him, he told me the truth about the passcode, and I immediately told the Government where it could be found and his girlfriend met the FBI this morning and they found it under the kitchen drawer. And I just also want to be clear that she did not know, as far as I understand, that it was there. I can't explain it, but I can tell the Court something that is very unusual about this case. As you've heard, $25 million was raised in the Initial Coin Offering by Centra Tech, the defendants company, and that happened in the summer of 2017. That -- those funds have remained in that virtual wallet until today when the Government took them out. They've also increased in value from 25 million to now I'm hearing $60 million plus. This -- my client didn't do anything in that time when he knew there was an SEC investigation going on to empty that account. He didn't do anything to deplete the investor assets.

Indeed, corporate counsel for his company was in the process of trying to negotiate a settlement with the SEC on behalf of Centra Tech. And as part of that settlement, those investor funds were going to go back to the investors. So I really -- I cannot explain why he did not give the proper passcode. It may be a trust issue, I'm not sure. I'm not here to explain it away, and I'm not here to ask the Court to not take it into account. But it is an unusual circumstance

where the money wasn't touched, and the investors will be made whole and they will have made money off of their investment this company. So I think that the Government overstates his danger as a financial matter.

He has significant ties to the New York area. His mother, his step father live in Port Washington. The stepfather was interviewed yesterday to be a potential cosigner. His father is a doctor in Rochester, New York. He works in the emergency room. I have spoken with him. He is -- he makes a good living. He could cosign a bond. The mother, unfortunately, received a grand jury subpoena yesterday, so the Government wants to put her into the grand jury. So I don't think they will accept her as a cosigner, but I can offer the father and stepfather as cosigners.

Your Honor, Mr. Sharma has known since November 29th that the SEC was investigating the company. It was investigating the ICO, it was investigating these -- all of the same allegations the Government has put into its complaint, has been under discussion with -- by corporate counsel for Centra Tech since that time. He has not done anything to deplete the assets. He has not done anything to try to run away. He's traveled internationally numerous times since that SEC investigation appeared. He's always come back. I have his passport. It's in my possession. He's not going anywhere. He can't get a new passport. As I've said he has

significant ties to the country -- to the United States and to this area as well as to Florida. His girlfriend lives down in Florida.

Your Honor, we ask the Court to also take into consideration that he's now been interviewed by Pre-trial Services in Florida -- where, by the way, although the Government says he wasn't truthful about his assets -- he did tell the Pre-trial Services that he was the owner of Centra Tech, which possessed this wallet with the hundred thousand Ethereum in them. So I don't believe that was a lie to Pre-trial Services. He wasn't hiding anything. I had to explain to the Pre-trial Services officer yesterday when we got the initial Pre-trial Services report after he told her that he had 9,000 of Ethereum that was worth $6 million, she put his net worth down as $29,000. I don't know where that came from. We had to correct that. He was absolutely truthful about the fact that he has $6 million worth of Ethereum in that wallet that the Government got access to yesterday.

Your Honor, we do believe that there are conditions that can reasonably assure Mr. Sharma's appearance in court. The Government seems to be saying that the risk has to be zero. That they have to be absolutely sure that they know where every penny he has is, that they know everything about him before they will be satisfied that he will not present a

risk of flight. And that is not the law Your Honor, as the Court well knows, having to hear these arguments every day.

So we ask that the Court set a reasonable personal recognizance bond, cosigned by his father and his stepfather, with travel restricted to New York and Florida, and with his -- the requirement that he surrender his passport, which I said I've got in my position, that he surrender either to the state of Florida or to Pre-trial Services his firearms license. His girlfriend has the actual license in her possession right now. That he not own firearm, that he not purchase a firearm, that he undergo alcohol treatment, that he not drink. All of the conditions that are in the Pre-trial Services report, Your Honor, I think are, in my view, and I submit to the Court are sufficient to ensure that he will return to court and that he will not present a danger to the community.

THE COURT: I have to Pre-trial Services reports. One from April 2 and one from May 1.

MS. McCARTHY: Your Honor, the one that's from April 2 was in Florida. He had Florida local counsel down there who appeared on his behalf. On April 2nd he did not have that attorney with him when he was brought in for Pre-trial Services interview. And he said that he wanted his attorney there. I don't know why he was not brought back for an interview, but when we found out from the Government and

trying to work out a bail package that this was a concern to them, we asked that another interview be scheduled, and you'll see in the first paragraph of that report and says that he was subsequently interviewed on April 16th, 2018.

THE COURT: So he was detained in Florida and brought here, or he was released in Florida and came here on his own?

MS. McCARTHY: So he was arrested on April 1st, he was presented on April 2nd in Florida. On April 5th, he appeared in court with his counsel and he agreed and consented to removal --

THE COURT: Okay.

MS. McCARTHY: -- and to detention without prejudice so that he could have a bill hearing in New York.

THE COURT: Okay.

MS. McCARTHY: He did not arrive until yesterday.

THE COURT: Right. Okay.

MS. TEKEEI: Your Honor?

THE COURT: Hang on a second. With respect to what you said was his defendant's knowledge and ability to create false persona, do you have any indication that he has himself used aliases, travel on falsified ID, anything of that nature?

MS. TEKEEI: We do not have -- no, we do not have evidence that he has traveled on false identification or that he is used aliases. We do have evidence that he has used at

least one other person's personal identifying information in connection with obtaining fraudulent loan documents. And that's what is conveyed in our papers.

THE COURT: So I'm just looking at the criminal history report. What is this reference to a charge that was dismissed for being out-of-state fugitive? What was the story there? Do we know?

MS. McCARTHY: Yes, I do know, Your Honor. That was -- he was charged with perjury in New York County, but he was living in Florida. And so what happened is that a warrant was issued from New York for his arrest because he was not in New York County. And then when he appeared to -- because he found out he had been indicted for perjury --

THE COURT: Did the authorities --

MS. McCARTHY: -- in New York County --

THE COURT: -- in New York not know that he was in Florida?

MS. McCARTHY: They did, but because it's a local charge anybody not within the district is considered a fugitive. It's a very odd thing. I've dealt with this before with New York County. But that's what happened. It was not because he had fled, he was just in Florida. But it was dismissed at the time he appeared -- after he appeared to answer the charge.

THE COURT: All right. So apart from the offense

that brings us here today, we have the perjury charge to which he pleaded, we have a DWI, we have a -- two years before that we've got some kind of, again, driving under the influence with alcohol and/or marijuana, and then back before a youthful offender status we have a disposition of charges -- I'm not sure exactly how -- some kind -- oh, it was -- I'm sorry, criminal possession of stolen property, which was I guess pleaded down from burglary charges. Any idea with the criminal contempt charge was? It goes back again, but nonetheless, any idea what that was related to?

MS. TEKEEI: Your Honor, we did not notice this on the defendant's rap sheet or criminal history that we ran so we don't have the background on that arrest or the circumstances of that conviction. Perhaps Ms. McCarthy could clarify that.

THE COURT: Do you have any idea what that charge was for criminal contempt?

MS. McCARTHY: Your Honor, my understanding from my client is that when he was held in custody he violated the rules of the prison by having a three-way phone call from the jail and that resulted in this charge. He was out of jail and he helped somebody else get a three-way call who was imprisoned.

THE COURT: Okay. Do you want to add anything after hearing defense counsel's argument?

MS. TEKEEI: Yes, Your Honor, and only briefly. Ms. McCarthy is correct that when she met with Mr. Sharma yesterday morning she then very quickly passed on to us the information related to the correct keycode. Mr. Sharma, however, has been represented by counsel for many, many months. Local counsel in Florida who represented him in connection with this arrest is a prominent white-collar defense attorney who was previously an assistant United States attorney in the Southern District of Florida. And so it is not the case that he was absent access to counsel and therefore didn't know that he had to turn over the passcode or passkey prior to his arrival in this district or a conversation with Ms. McCarthy. So the notion that when counsel here confronted him about it he immediately was truthful, still begs the question as to why he continued to conceal those very important facts for so long. That the money was --

THE COURT: How long was it since the time the Government started asking through his counsel?

MS. TEKEEI: Centra Tech through -- he's the owner of Centra Tech. Counsel for Centra Tech back in late 2017 and early 2018 represented that the digital wallet had been secured through the method that I conveyed, the pieces of the passcode being put into half. I'm sorry.

MS. McCARTHY: I'm sorry.

MS. TEKEEI: I believe Ms. McCarthy would like to speak and I'm sure that she'll have a chance to do that. But counsel for Centra Tech represented -- I think what she wanted me to clarify is that they represented to the SEC that the wallet had been secured. Later when -- after Mr. Sharma was arrested those representations were also made to the U.S. Attorney's Office and to criminal law enforcement. He was arrested on April 1st. We had to get a seizure warrant to affect the seizure, and still even after obtaining the seizure warrant to access the key we were told that we had the correct key, we were even told that we must not have known how to use it and that's why it wasn't working. So it wasn't until it was clear to us that it was altered, and we continued pressing for that information up until yesterday morning that we -- the correct key was handed over.

THE COURT: And just one more thing, just to clarify because I was listening but not taking adequate notes here. The amount of money that the Government is currently aware to which Mr. Sharma would have access if he were released, to your knowledge, totals are approximately what?

MS. TEKEEI: Your Honor, it is at least the 9,000 ether which is now currently worth approximately five or six million U.S. dollars. It includes at least what he is reported to Pre-trial Services which is the sum of approximately $200,000. We also believe, and as we conveyed

in March -- in February and March of this year, he withdrew hundreds of thousands of dollars from his bank accounts and also from cryptocurrency exchange accounts that he held, to a net -- almost entirely liquidated. So in the weeks and days leading up to his arrest, he liquidated more than 100,000 U.S. dollars in digital assets, and in the weeks leading up to his arrest he withdrew or transferred more than $500,000 out of other -- out of bank accounts. That's what we know standing here today. We're attempting to get our arms around all the different shell companies and bank accounts that are tied to him, either directly or through other individuals. But that's what we know about today.

MS. McCARTHY: Your Honor, this is the first time hearing of shell companies. I'm not sure that the Government has -- I'm not sure why that was just thrown in here, so I -- I don't know what that is.

THE COURT: Okay. Hold on a second. You have evidence that significant sums of money were withdrawn from various places and you don't know where they -- the money was transferred to --

MS. TEKEEI: Yes.

THE COURT: -- if it was transferred anywhere?

MS. TEKEEI: Yes, Your Honor. Some of it are withdrawals from bank accounts. We have tried to obtain as many records as we can to do a tracing analysis. We don't

know where all of it has gone. We don't know where much of it has gone. The assets in the digital wallet -- in one of the digital wallets that he held were all liquidated shortly before his arrest. We don't -- we can't tell from the accounting provided to us by Gemini Trust, which is where he held some of his digital assets, where that money went. We're trying to figure it out. I just wanted to --

THE COURT: And what makes you say --

MS. TEKEEI: -- address the Court's questions.

THE COURT: -- there are shell companies?

MS. TEKEEI: If I -- if there is a negative connotation attributed to the word shell, I will simply say companies. Mr. Sharma has set up at least Sharma Tech [Ph.], he set up a company called Revolutions. There's a company called Miami Exotics that he was involved with and had operating authority over. There is Centra Tech.

And, Your Honor, and I failed to mention this -- we learned earlier this week that at least some of the Centra Tech funds -- sorry -- some of the Centra Tech investor funds for investors who have tamed the so-called Centra Card were kept in a wallet -- a digital wallet that was separate from the digital wallet that contained the 91,000 ether. And so there's one or more digital wallets that contain funds from investors who received the so-called Centra Card in order to be able to monetize some of their digital assets. We don't

know what amount is contained there. We don't know who has access to it. We don't know how many wallets there are. But we have learned, as recently as two days ago, that there were separate digital wallets kept with Centra related assets.

THE COURT: Okay.

MS. McCARTHY: Your Honor, I mean, I know that the Government has access to the defendant's bank account at maybe Federal Credit Union. I believe that if they just look they would see that the funds from the Gemini account which was a cryptocurrency account he had, those funds were deposited directly into his bank account. And it may be Federal Credit Union. So I dispute the Government's arguments about, you know, funds being all over the place. I don't know what they're talking about.

But the fact of the matter is what the Court should be interested in is that there are conditions that can be set. The investor funds are safe and secure in the Government's possession. That is what is at issue in this case. And the Government is not going to get 100 percent certainty that they're going to know where every single penny that the defendant has access to is located. I'm not hearing anything about risk of ties overseas or anything of that nature. Perhaps now I'll plant that seed and that will be said next.

Really, the goal posts keep getting move, Your Honor. The primary concern that the Government said was the

reason they were seeking detention was the inability to access the virtual wallet. They've done that now. They've done it because my client gave them the correct information. It was late in coming, and I don't make excuses for it, and it was a bad thing that it took so long. I agree. However, they have it now. Enough. We should set bail conditions. He should be released. He's been in jail since April 1st and it is time for him to now be permitted back into the community.

THE COURT: Okay. Here's what I've got. I've got a sufficient basis for the Government to be heard because I have an argument about flight risk and also an argument about obstruction. And under 18 U.S.C. 3142(f)(2), the Government can seek detention in a case that involves either a serious risk the person will flee, or a serious risk the person will obstruct or attempt to obstruct justice. Also a serious risk the person will threaten or intimidate a witness or juror. I don't have that, but I do have an alleged history of obstruction and concerns expressed by the Government that I will take as concerns about continuing obstruction. That may be a stretch. But I do also have concerns about risk of flight. So I'm going to entertain this request for detention. I'm just saying that as a threshold matter because the Government doesn't get to seek detention in every case. But I think they've met the threshold.

And so then what do I have in terms of flight risk?

I have someone who has not seemingly tried to flee in the past. Apparently, I gather, has made court dates, it is also not inspired confidence with his ability to be honest and forthright with investigators, the Government, law enforcement, the Court as witnessed by perjury issues, as witnessed by the statements about this passcode and so on. So we have a lack -- a history of lack of honesty. We also have a history of moving some funds, unclear why, unclear to where, but enough funds that would enable someone to travel, should he wish to, and with access still apparently to 5- to $6 million in this account and other monies elsewhere. That raises some concern because one of the issues about flight risk is whether there are means to flee.

In terms of incentive it's generally thought that simply severity of the charges is not enough to suggest flight risk. We look at factors in their totality. I don't know about ties to other countries. I have, from Pre-trial Services that defendant is a naturalized citizen and that he has traveled internationally for business and for leisure purposes. I don't have any particular place outside the country where he seems to frequent, has property, has family members, anything of that nature. That's not shown. In terms of passport turned over, that's good with respect to travel. I don't have history of using falsified travel documentation or anything of that nature, but I do have one proffered by the

Government regarding using somebody else's identifying information and also in connection with dishonesty, willingness or ability to create false identities for purposes of perpetrating fraud. I don't know if that translates to traveling on a false identity or alias. It's not so evident to me. But there's at least something there, again, in connection with lack of honesty and using someone else's identity for some purpose that gives cause to some concern -- gives rise to some concern.

The firearm issue, I think is a bit of a side issue. I certainly could set a condition that would require surrender of firearms and not being permitted to have any. It does give some -- [inaudible] some concern about danger but I don't think that is the main issue here by any stretch of the imagination. So I'm mostly concerned, when it comes down to it with the reported history of dishonesty including to various and assorted authorities, including a court, including law enforcement, serious dishonesty from what the Government's relating, and the amount of money that defendant would still have available to him and the fact that he was recently taking a lot of money out of accounts, moving it to where, it's unclear, and for what purpose is unclear. It may be just to pay counsel, but it's unclear. With respect to defendants stated income and assets, you said you didn't think this was correct and there was a need for correction in what was

reported to pretrial or what was understood by pretrial?

MS. McCARTHY: So originally pretrial had his account holding only 20,000 in his virtual wallet being worth $9,000. When he told them that he had 9,000 Ethereum worth $6 million.

THE COURT: So ether and Ethereum is the plural or something like that?

MS. McCARTHY: I don't actually know.

MS. TEKEEI: And Your Honor, ether is the asset. Ethereum is the platform on which it can be exchanged.

THE COURT: Oh. Okay

MS. McCARTHY: Ether. So, yeah, that was what had to change. Your Honor, just -- I want to make sure that you understand --

THE COURT: So the actual -- the actual assets -- I mean Counsel has talked about hundreds of thousands of dollars being taken out of bank accounts. I don't see that here on the financial information. I see $20,000 and then I see the virtual wallet which will call 5- to 6 million instead of 9,000.

MS. McCARTHY: Okay. So I can't answer for all of the withdrawals from his account. I know that some of that money was used to pay some of the Centra Tech-related expenses. He is the owner of Centra Tech. I believe some of it was used to pay a former employee a severance, you know,

money -- Centra Tech itself did not have a lot of money in its bank account so there were times when my client's bank account was used to pay for Centra Tech expenses. But I certainly, by no stretch, do I have an accounting that I can present to the Court at this time. If the Court would require that, we can certainly, you know, strive to do that. And come up with more of a roadmap as to where all of the funds went.

But I want the Court to understand the Centra Tech itself is no longer a going concern. That once this case was public and now on April 1st -- April 2nd when the complaints were announced and published to the world, the business essentially started to wind down. But part of what Mr. Sharma did when he was in prison was he authorized the General Counsel of Centra Tech to basically just turnover to the Government all of Centra Tech's computers and any -- all of its data. So the Government now has everything from Centra Tech in its possession. So he -- it couldn't have happened if he had said no. And he authorized that without the Government having to go through obtaining any sort of court order to do that. And I think that's also significant -- a significant fact that has not been raised with the Court.

MS. TEKEEI: Your Honor, as to that, he was required to do so, and the company was required to provide information pursuant to legal process -- a subpoena. And so it is not the case that he voluntarily handed over Centra Tech's computers.

There was a subpoena. They were required to comply with it by law, and they chose to comply with the by turning all of the equipment over rather than doing their own review. So there was no voluntary turning over. They were required to do so.

MS. McCARTHY: A subpoena for documents. Subpoena is counsel reviews the materials and turns over what's responsive to the subpoena. Mr. Sharma said turn over everything to the Government. That is in fact what happened.

MS. TEKEEI: Your Honor, as to the reported income, I would just like to note that -- and this is our letter -- Mr. Sharma, in connection with the funds that he had in Gemini Trust back in October of 2017, they noticed exchanges in and out of his Gemini Trust cryptocurrency account, such that it raised a red flag in their systems. And so they emailed him, and they said to him can you provide us with some more information. And that email is attached to our papers, I'm happy to hand up another copy. In response to that inquiry from Gemini Trust, Mr. Sharma told Gemini Trust that he already -- he wrote, I already earn over 350K a year from my W-2 employment and I have a large amount of money still invested into cryptocurrencies. That was merely a few months ago, Your Honor. It's not that long ago that he told someone else that he made more than $350,000 a year, whereas he's now told Pre-trial Services that he makes far less than that and that he described that he had a large amount of money still

invested into cryptocurrencies. I just want to point that out with respect to the income that's reported to Pre-trial Services.

THE COURT: Well the income reported to Pre-trial Services as initially here at 100,000 but then his salary was modified to 26,000 a year. Before then, he worked earning 125,000 a year in his next earlier job.

MS. TEKEEI: And so -- and so he's told other people that he earned more than 350,000 only a matter of a few months ago. So there are still discrepancies -- there are still discrepancies with respect to his income and his assets.

MS. McCARTHY: Your Honor, all I can say is that when he stepped down as an officer of Centra Tech when he took his plea to perjury, I think this is, you know, this isn't IBM, this is a company -- he's the owner, he's 27 years old. He -- money came to him out of Centra Tech when he needed. It was his money that went into make the company. So I can't answer for how it was given to him, whether it was, you know, return of capital, or it was return of a loan, or repayment of a loan, but is a small company. You know, we don't -- I can't answer the question of what his actual salary was. He told the -- to Pre-trial Services essentially what he was claiming as salary. The rest of it is a tax issue frankly, as to whether or not he was taking back out of the company that he had invested.

THE COURT: All right. The last thing I will just say is I am just thinking out loud about what I'm hearing before making a decision, is that of course every individual is entitled to an individualized bail determination and no two people necessarily need to be treated the same way. But on the other hand we strive for some consistency of analysis and logic for not only the appearance but the actuality of fairness.

And so I am looking at what happened with the codefendant to try to understand what the differences are -- the individualized differences are between them. I gather that one of the conditions that was set for bail for Mr. Farkas was that the digital wallet be made available to the Government and the transfer of those assets be made available. So it may have been, I mean I'm obviously -- I'm not judge Wang -- we look -- we've had different arguments in front of us. But one thing she may have been thinking was that is a significant issue and he's going to be held until that issue is dealt with, which now seems to have been dealt with.

In truth, the only issues that I really have here with respect to flight risk or risk of obstruction are -- I'm not seeing so much future danger to the community if this business has been shut down, but what I'm seeing is a history of being less than truthful. I suspect that they have

continued through this interview by pretrial, although I can't know for sure. But the amounts of money look -- even apart from ether versus dollars, putting that issue aside -- the other amounts of assets strike me as not terribly plausible based on what the Government has said about removing hundreds of thousands of dollars from accounts relatively recently. This email counsel has, the history reported to pretrial, it looks a little questionable. They -- $26,000 salary seems a little hard to swallow, I don't know.

But I have a history of lack of candor. I have a significant history of keeping the Government from these assets it was trying to recover including by providing information that seems to have been knowingly false -- likely to have been knowingly false. Again, I'm not making an ultimate determination on that but having something taped to your drawer that's different from what's provided to the Government is at least of great concern. So I have a lack of candor, I have a lack of candor with the Government, and at least with the state court, I have a lack of candor to the Court prior to the perjury plea.

And I have money that is of concern. I mean, I also note with respect to the conditions set for Mr. Farkas there was a prohibition against accessing or transferring any funds out of the digital wallet. That may have been because he said none of those funds were his own. You know, I don't know if

the Government would be taking the position here that even if he says 5- to $6 million as his he should not be able to get that money.

MS. TEKEEI: Your Honor, let me just be completely clear, and we've conveyed this to Ms. McCarthy. We do not -- we are not touching that money. It is -- we do not currently have information, probable cause to allow us to seize those funds, and so we've conveyed to Ms. McCarthy that what needs to be done is for those funds to be transferred to another secure digital wallet. The government is not, at this time, is not seeking to seize those funds.

THE COURT: So as far as the Government's concerned, if this defendant is out, you would have no basis for seeking the condition that he could not have access to those funds?

MS. TEKEEI: That's correct, as it stands today. Obviously, our investigation is ongoing and so if we learn additional facts that we would -- we could present in order to have access or seize those funds, we certainly will. But as it stands today, those funds would be his.

THE COURT: Counsel, I'm not sure -- I'm willing to consider setting conditions but I'm not sure how I deal with this access to money and not having a sense of how much it is and not having a sense of what's real or not real with respect to wherewithal and ability to flee. Because if he has $6 million, let's say roughly, or more than that, if there are

other accounts and other monies, I could say post $3 million in, you know, collateral for a bond. But there's still another intentionally $3 million. You can do a lot with $3 million. So it is of concern to have someone who has seemingly been this dishonest to have access to this much money with, you know, facing serious charges. It's of concern.

MS. McCARTHY: I hear Your Honor. I think that there are ways to satisfy the Court on that. And one of the ways would be essentially to transfer those -- the ether -- into a wallet as to which the defendant has no access. And it would be that we would have to essentially appoint somebody as a trustee or somebody to be sort of -- I work at a tax firm, I can hopefully figure this out with one of my partners on how we could accomplish this, that you would get somebody not related to him who would agree for a fee -- a small fee or whatever, to be the person who is in charge of those funds --

THE COURT: A fiduciary?

MS. McCARTHY: -- a fiduciary essentially, and that we could arrange so that his housing expenses are paid, his food is paid, his legal fees are paid, his travel expenses back and forth to New York are paid and that --

THE COURT: I would be a lot more comfortable if I had some understanding of other sources of money too and was really there. Because I'm looking at this Pre-trial Services

report, and I don't know what to trust. The Government's talking about --

MS. McCARTHY: Your Honor, I think if the Court would -- perhaps we can -- if that is the Court's primary concern, then I would ask for some time to sit down with my client, speak to former counsel --

THE COURT: Figure out --

MS. McCARTHY: -- about --

THE COURT: -- try to figure out the money?

MS. McCARTHY: Figure out the money for you because I do believe there was a fair bit of from his account back to Centra, from Centra back to his account and various things that were done on behalf of the company through both accounts.

THE COURT: All right.

MS. McCARTHY: And I haven't had time --

THE COURT: I've got the following three things --

MS. McCARTHY: Okay.

THE COURT: -- okay. I've got serious charges with potential serious exposure. I have a serious history of lack of candor to authorities. And I have serious concerns about how much money there is available to him that he might use to try to avoid these charges. A person who has not demonstrated himself to be trustworthy. I'm not guaranteeing where I go with us --

MS. McCARTHY: I understand.

THE COURT: -- but if I can get a little more clarity with respect to what there is available to him, and what you would propose to do about that I could at least have some greater comfort that I, you know, that I'm cutting through some of what may be dishonesty here and understanding what the real situation is. I'm not saying that this report is dishonest, but what I'm saying is it makes me raise an eyebrow, like something seems missing based on what the Government's been saying.

MS. McCARTHY: All right.

THE COURT: I'm going to continue Mr. Sharma's detention for the time being. I am only on duty this week, however, I have some time, I believe on my own calendar now on Friday of next week. I don't know if that's enough time to sort things out. Other than that, you can contact my chambers and see. I don't know that it makes sense at this point to put this in front of another magistrate judge. My calendar is pretty tight, Friday opened up next week, otherwise I'm not sure.

MS. McCARTHY: Your Honor, I think that it makes sense to keep it before Your Honor since you've heard extensive argument --

THE COURT: I think so too.

MS. McCARTHY: -- of --

THE COURT: Am just telling you my civil calendar is

pretty crowded.

MS. McCARTHY: I understand.

THE COURT: So sometimes things cancel and that's what happened next week Friday and something else might as well. But --

MS. McCARTHY: I understand.

THE COURT: I don't have a lot of blocks of time.

MS. McCARTHY: So should we put a control date --

THE COURT: Now I can put you --

MS. McCARTHY: -- on your calendar for the 11th?

THE COURT: -- I can put you down on the 11th in front of me in my courtroom at -- call at 2:00 -- Friday is the -- Friday is day that opened up. So the 11th -- May 11th I can put in my courtroom at 2:00 as a control. Once again, I don't want you if there's nothing new to share, but if you talk to each other and provide information and say look these withdrawals, this is what this was, this is where this went, this is how much there is, this is what he's agreeing not to have access to. This is our proposal for how we put it in some escrow somewhere, some trust somewhere --

MS. TEKEEI: I understand.

THE COURT: -- or whatever, I think that might be -- I think that might be helpful. I do have concern. I do have concern about flight risk and obstruction here. There -- I am persuaded -- given that flight risk is only a preponderance --

I'm persuaded that there's been enough in the past that should give me concern. But I'm still open to hearing about this money and that really, we can deal with these issues. Okay.

MS. McCARTHY: That's all we ask for your honor to do --

THE COURT: Okay.

MS. McCARTHY: -- and we appreciate your --

THE COURT: No promises.

MS. McCARTHY: -- willingness to do this.

THE COURT: No guarantees.

MS. McCARTHY: I understand. I understand.

THE COURT: Okay.

MS. McCARTHY: Thank you.

THE COURT: All right.

MS. TEKEEI: Thank you, Your Honor.

THE COURT: You're welcome.

* * * * *

I certify that the foregoing is a court transcript from an electronic sound recording of the proceedings in the above-entitled matter.

Shari Riemer, CET-805

Dated May 8, 2018