UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x
                                                                    :

UNITED STATES OF AMERICA

                                                                     :

         - v. -

                                                                         :     18 Cr. 340 (LGS)

SOHRAB SHARMA, et al.,

                                                                       :

                       Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   x

## GOVERNMENT's SUBMISSION IN OPPOSITION TO
## DEFENDANT SHARMA's MOTION TO SUPPRESS EVIDENCE

CRAIG STEWART
Attorney for the United States
Acting Under 28 U.S.C. § 515
Southern District of New York

Samson Enzer
Negar Tekeei
Assistant United States Attorneys
    *- Of Counsel -*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................. 1

BACKGROUND ................................................................................................. 4

    A.    The Criminal Fraud Charges Against Sharma ....................................... 4

    B.    Sharma's Scheme to Defraud Centra Tech Investors ............................ 5

    C.    Evidence of Probable Cause Gathered Prior to Sharma's Arrest ..................... 11

    D.    The FBI Obtains a Warrant to Arrest Sharma ..................................... 17

    E.    The FBI Seizes Sharma's Devices While Executing His Arrest Warrant .......... 18

    F.    The FBI Obtains a Warrant to Search the Subject Devices During the Period While Sharma was Prohibited from Possessing the Devices .......................... 25

    G.    The FBI Case Agents Diligently Advanced the Investigation Between the Seizure of the Subject Devices and the Issuance of the Warrant to Search The Devices ......... 26

ARGUMENT ................................................................................................... 28

    I.    The FBI Lawfully Seized Sharma's Electronic Devices While Executing A Valid Warrant For His Arrest ........................................ 28

    A.    Applicable Law ............................................................................. 29

    B.    Discussion ................................................................................... 34

    II.    Any Delay in Obtaining a Warrant to Search the Subject Devices Was Not Constitutionally Unreasonable ................................................ 43

    A.    Applicable Law ............................................................................. 44

    B.    Discussion ................................................................................... 45

    III.    Suppression Is Not Warranted In Any Event Because Law Enforcement Relied In Good Faith on the Warrant to Search the Subject Devices .............................. 51

    IV.    Sharma's Conclusory Motion Papers Are Insufficient to Warrant a Hearing Let Alone the Extraordinary Remedy of Suppression of Evidence .......................... 56

CONCLUSION ................................................................................................ 59

## PRELIMINARY STATEMENT

The Government respectfully files this submission in opposition to defendant Sohrab Sharma's motion (Dkt. 116) to suppress evidence recovered from two iPhones and a laptop computer (collectively, the "subject devices") that special agents of the Federal Bureau of Investigation ("FBI") seized in the course of arresting him pursuant to a valid arrest warrant, and then searched after obtaining a search warrant allowing them to do so.   Based on five bare-bones paragraphs of conclusory factual allegations without any supporting witness affidavits, Sharma's motion claims that the evidence recovered from his devices should be suppressed because law enforcement's seizure of the devices allegedly violated his Fourth Amendment rights, or in the alternative, because the delay in obtaining a warrant to search the devices was supposedly unreasonable in violation of the Fourth Amendment.   These claims are meritless and should be rejected without a hearing.

*First*, the arresting FBI agents lawfully seized the subject devices during the course of arresting Sharma at his apartment.   The arresting agents were lawfully at Sharma's apartment to execute a valid warrant for his arrest on securities and wire fraud charges approved by a federal magistrate judge.   Based on months of investigation by the FBI in advance of Sharma's arrest, the FBI had become aware of overwhelming evidence that was more than sufficient to furnish probable cause to believe that such electronic devices contained incriminating evidence of Sharma's participation in the charged fraud offenses.   As such, the arresting agents properly seized the subject devices to ensure that they were not concealed or destroyed, and to enable law enforcement to later obtain a warrant to search them.   In particular, the agents properly seized an iPhone that Sharma was holding in his hand incident to his arrest, and appropriately seized his other iPhone and laptop after seeing them in plain view in his bedroom while the agents were

lawfully in the bedroom with the voluntary consent of Sharma and his girlfriend, who also lived in the apartment.

*Second*, the three-months that elapsed between the seizure of the subject devices and the issuance of a warrant to search them was not constitutionally unreasonable under the circumstances present in this case.   Additionally, Sharma has not identified any undue prejudice that he suffered as a result of this delay.   During that entire three-month period, Sharma was prohibited from possessing the devices as a result of being detained in jail or released on stringent bail conditions, and the search warrant was obtained before the devices could have been returned to him.   In addition, because of the overwhelming likelihood that the subject devices contained evidence of the serious federal fraud offenses with which Sharma was charged with committing, law enforcement had a strong interest in retaining the devices following their seizure without returning them to Sharma.   Furthermore, the delay was not due to a lack of diligence by the investigating agents.   On the contrary, that three-month period represented an exceptionally busy phase in the investigation of this case in which the agents tirelessly pursued both their investigation into Sharma and his confederates and the preparation of a detailed, 24-page warrant affidavit (accompanied by 135 pages of supporting exhibits) thoroughly explaining the evidence developed by that investigation furnishing probable cause for a warrant to search the subject devices for evidence relating to the charged fraud offenses.   Accordingly, this is not a case where the delay in obtaining the search warrant for the subject devices was so unreasonable as to require exclusion of the evidence recovered from them.

*Third*, even if law enforcement's seizure of the subject devices or delay in obtaining a warrant to search them was unreasonable in violation of the Fourth Amendment — which is not

the case — the good faith exception to the exclusionary rule applies here.   In applying to a neutral magistrate judge for the search warrant, one of the case agents in charge of the investigation of this case submitted a thorough and detailed supporting affidavit that disclosed all of the pertinent information needed for the magistrate to assess whether any of the claimed constitutional violations precluded issuance of the warrant.   After reviewing the affidavit, which included the date and details of the seizure of the subject devices, the magistrate judge approved the requested search warrant.   The case agent acted in good faith in disclosing that information to the magistrate judge in seeking the search warrant, and in relying on the warrant approved by the magistrate judge, after her review of such disclosures, to search the devices.   Under these circumstances, suppression of the evidence that law enforcement obtained in good faith reliance on that search warrant is not appropriate.

*Finally*, based on the facts set forth below, the claims on which Sharma's motion to suppress rests fail as a matter of law and should be rejected on the papers without a hearing.   All or nearly all of the facts that the Government relies on in opposing Sharma's motion were set forth in warrant affidavits, documents, and other materials that were disclosed to or available to Sharma long before the deadline set by this Court for Sharma's pretrial motions such as the instant motion to suppress.   If Sharma had wished to dispute any of those facts, he was given more than an ample opportunity to come forward with competent proof doing so within the timetable set by the Court-ordered motions deadline.   Nevertheless, Sharma based his motion to suppress on five threadbare paragraphs of conclusory factual allegations without any supporting witness affidavits from anyone with personal knowledge of the facts relevant to the motion.   Because the facts set forth below establish that Sharma's motion to suppress rests on claims that are meritless, and because

3

Sharma's conclusory moving papers have failed to create a genuine dispute as to any of the facts that are material to the outcome of his motion, his motion should be denied without a hearing.

For these reasons and those set forth below, defendant Sharma's motion to suppress evidence should be denied without a hearing.[1]

## BACKGROUND

Aside from the conclusory factual allegations set forth in paragraphs 1 through 5 of Sharma's motion to suppress (MTS (¶¶ 1-5) at 1-2), Sharma has not disputed any of the facts set forth below.[2]

### A.  The Criminal Fraud Charges Against Sharma

The Indictment in this case charges the co-founders of a startup company called Centra Tech, Inc. ("Centra Tech") — namely, defendants Sohrab Sharma, Robert Farkas and Raymond

---

[1] "Dkt. [Number]" refers to a docket entry in this case; "MTS" refers to the instant motion to suppress evidence filed by Sharma (Dkt. 116); "Ind." refers to the Indictment in this case; "Ex. A" refers to the arrest warrants and criminal complaint against Sharma and Farkas in this case; "Ex. B" refers to the criminal complaint against Trapani in this case; "Ex. C" refers to a search warrant authorizing the FBI to search specified "Slack.com" workspaces and supporting affidavit; "Ex. D" refers to a cellphone location tracking warrant and supporting affidavit; "Ex. E" refers to an FBI Form FD-302 report concerning the seizure of the subject devices during the course of Sharma's arrest; "Ex. F" refers to a search warrant authorizing the FBI to search the subject devices and supporting affidavit; "Ex. G" refers to a seizure warrant and supporting affidavit; and "Ex. H" refers to an announcement that Centra Tech published on the internet on or about July 30, 2017; and "Ex. I" refers to an email chain involving Sharma that Centra Tech produced to the United States Securities and Exchange Commission ("SEC") prior to Sharma's arrest in this case; "Ex. J" refers to the cover letter under which Centra Tech through its outside counsel produced that email chain to the SEC; "Ex. K" refers to two versions of a Centra Tech whitepaper that were downloaded from Centra Tech's internet website on or about July 31, 2017 and August 3, 2017, respectively.

[2]  Unless otherwise indicated, the statements of fact set forth below followed by a citation are based on the cited source materials, and the Government proffers the other statements of fact below based on the Government's interviews of witnesses with knowledge of the proffered facts.

Trapani — with conspiring to commit, and committing, securities and wire fraud in connection with a scheme to induce victims to invest more than $25 million in assets for the purchase of unregistered securities, styled as digital tokens issued by Centra Tech as part of a so-called "initial coin offering" or "ICO," through fraudulent misrepresentations and omissions, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. §§ 240.10b-5, and 18 U.S.C. §§ 371, 1343, 1349 and 2.

### B.  Sharma's Scheme to Defraud Centra Tech Investors

In or about July 2017, Sharma co-founded a startup company with Farkas and Trapani in Miami, Florida called Centra Tech that claimed to offer a purported cryptocurrency debit card that supposedly allowed users to spend various types of cryptocurrency to make purchases at any establishments that accept Visa or Mastercard payment cards.   (Ex. F ¶¶ 12-13; Ex. A ¶¶ 10, 15-18.)   Sharma served in various roles at Centra Tech, including as the company's president and chief technology officer until approximately late October 2017; Trapani served as the company's chief operating officer until approximately late October 2017; and Farkas served in various roles at the company, including as the company's chief marketing officer until approximately late October 2017, and then as the company's chief operating officer.   (Ind. ¶¶ 3-5.)

From at least on or about July 30, 2017 through at least in or about April 2018, Sharma, Farkas and Trapani engaged in a scheme to induce victims to invest digital funds worth millions of dollars for the purchase of unregistered securities, in the form of digital tokens issued by Centra Tech in connection with the company's "initial coin offering" or "ICO," through a series of material misrepresentations and omissions.[3]   (Ex. F ¶ 12(b).)   Through this fraudulent scheme,

---

[3] An "initial coin offering" or "ICO" is a type of fundraising even in which an entity offers participants a unique digital "coin" or "token" in exchange for consideration.   (Ind. ¶ 9.)   The

Sharma, Farkas and Trapani solicited digital funds (including more than 90,000 units of a cryptocurrency called "Ether") worth more than $25 million from investors who purchased digital tokens issued by Centra Tech.   (*Id.*)

As part of the scheme, Sharma, Farkas and Trapani made or caused Centra Tech to make the following misstatements in soliciting investments in Centra Tech, among others (*id.* ¶ 12(c)):

- Sharma, Farkas and Trapani claimed to investors that Centra Tech had developed a debit card that enabled users to spend various cryptocurrencies to make purchases at any stores that accept Visa or Mastercard payment cards, and that Centra Tech had partnerships with Bancorp, Visa and Mastercard to issue Centra Tech debit cards.   (*Id.* ¶¶ 12(c)(i) & n.2.) In fact, Centra Tech had no such partnerships with Bancorp, Visa or Mastercard.   (*Id.*)

- Sharma, Farkas and Trapani claimed to investors that Centra Tech's executive team included a purported Chief Executive Officer named "Michael Edwards" and a purported Chief Financial Officer named "Jessica Robinson" who had impressive work histories and academic credentials.   (*Id.* ¶ 12(c)(ii).)   In fact, neither "Michael Edwards" nor "Jessica Robinson" was a real person.   (*Id.*)

- Sharma, Farkas and Trapani claimed to investors that Centra Tech held money transmitter and other relevant licenses in 38 states.   (*Id.* ¶ 12(c)(iii).)   In fact, Centra Tech did not have such licenses in a number of those states.   (*Id.*)

Because Sharma, Farkas and Trapani raised funds in the form of digital assets from Centra

---

consideration often comes in the form of "digital currency" or "cryptocurrency," as opposed to "fiat currency," which is a term used to describe currency that a government has declared to be legal tender, such as the U.S. dollar.   (*Id.*)   "Digital currency" or "cryptocurrency" is a digital representation of value that can be digitally traded and functions as (1) a medium of exchange, (2) a unit of account, or (3) a store of value, but does not have legal tender status.   (*Id.*)   Unlike fiat currency, digital currency is not issued by any jurisdiction and functions only by agreement within the community of users of that particular currency.   (*Id.*)   Examples of digital currencies are "Bitcoin" and "Ether," both of which are issued and distributed on their own "blockchains."   (*Id.*) A "blockchain" is a digitalized, decentralized, cryptographically-secured ledger that allows market participants to keep track of digital currency transactions without central recordkeeping.   (*Id.*) The tokens or coins issued in an ICO are issued and distributed on a blockchain.   (*Id.* ¶ 10.) Tokens are often also listed and traded on online internet platforms, typically called digital currency exchanges, and they usually trade for other assets.   (*Id.*)   Often, tokens are listed and tradeable immediately after they are issued.   (*Id.*)

Tech investors through this fraudulent scheme via an initial offering of digital coins or tokens issued by Centra Tech called "CTR" or "Centra" tokens, the scheme necessarily involved the use of electronic devices capable of performing the functions of a computer.  For instance, during Centra Tech's ICO, the company published various whitepapers via the company's internet website to solicit investors to purchase digital CTR tokens issued by Centra Tech in exchange for units of the digital currency known as "Ether," and numerous Centra Tech investors in fact exchanged tens of thousands of Ether units in exchange for Centra tokens issued during as part of the company's ICO.   (Ex. F ¶ 12(b); Ex. G ¶¶ 14-22.)   "Ether" or "ETH" is a digital currency, or cryptocurrency, whose transactions are stored on an internet-based platform called the Ethereum blockchain.[4]  (Ex. G ¶ 22(a).)  In order to facilitate the exchange of investors' Ether units for CTR tokens issued by Centra Tech, the company had to program (or code) the key terms of its ICO (including, for example, the maximum number of CTR tokens that it intended to sell to investors) into electronic "smart contracts" that were available on the Ethereum blockchain.   (*Id.* ¶¶ 22(a)-(j); Decl. of A. Shutt at ¶ 14 (*Rensel* v. *Centra Tech, Inc. et al.*, 17 Civ. 24500 (JLK), Dkt. 26-1 (S.D.Fl. Feb. 2, 2018)); Ex. H.)   When an investor sent Ether units from the investor's digital wallet to Centra Tech at a digital wallet address associated with the relevant smart contract, the smart contract automatically distributed the appropriate number of CTR tokens to the investor in

---

[4] The Ethereum blockchain is a continuously growing list of records, called blocks, which are linked and secured using cryptography.  (Ex. G ¶ 22(a).)  The blockchain records transactions between parties in a matter that is verifiable and resistant to modification.  (*Id.*)  By inspecting the blockchain, anyone can review any Ether transaction ever made, although the identities of the participants in the transaction are anonymized and cannot be discerned without additional information.  (*Id.*)  Records of Ether transactions on the Ethereum blockchain are viewable by the public at various websites available on the internet, including a website called Etherscan (available at https://etherscan.io) that is an Ethereum blockchain explorer.  (*Id.*)

exchange.   (Decl. of A. Shutt at ¶ 15; Ex. H.)   Centra Tech published various marketing materials via the company's website, social media websites such as Facebook, Twitter and YouTube, and press releases via various internet publications soliciting investors to exchange Ether units for the purchase CTR tokens via Centra Tech smart contracts at wallet addresses that were included in those solicitation materials.[5]   (Ex. H; Ex. K; Ex. C ¶¶ 18(a)-(h).)   Setting up and conducting such a digital fund-raising process necessarily involved the use of electronic devices with the computing capabilities.

Sharma, Farkas and Trapani caused Centra Tech to make several of those false claims through (among other things) various promotional videos that were posted on the YouTube website on the internet; various white papers that were disseminated to investors via the internet; and various LinkedIn profiles that were posted on the LinkedIn social networking website.   (Ex. F ¶ 12(d).)   Sharma also reiterated several of those false claims during (among other things) an interview on an internet podcast relating to the cryptocurrency industry.   (*Id.*)

Cellphone text message conversations between Sharma, Farkas and Trapani, found in a cellphone recovered from Trapani (the "Trapani Cellphone"),[6] show that they were well aware of

---

[5]   For example, on or about July 30, 2017, Centra Tech published an announcement via the internet that "Starting today July 30, 2017 the Centra Token (CTR) will be available to purchase . . . . from our website . . . or our Smart Contract" at a specified digital wallet address, and that investors could buy CTR tokens by sending Ether units from their "personal wallets" after which "CTR tokens will be sent immediately from smart-contract to the wallet from which the ETH arrived."   (Ex. H.)

[6]   The Trapani Cellphone was recovered from Trapani following his surrender on or about October 5, 2017 on a perjury indictment obtained by the Manhattan District Attorney's Office. (Ex. F ¶ 12(e) n.3.)   By way of background, in July 2017, while Sharma was preparing for Centra Tech's ICO, Sharma proceeded to trial in Manhattan Criminal Court on charges stemming from an incident in March 2016 in which he was arrested for driving while intoxicated ("DWI") in

the falsity of the above-described claims (*id.* ¶ 12(e)):

- For example, with respect to the purported partnerships that Centra Tech claimed to have with Bancorp, Visa, and Mastercard, Sharma engaged in a text message conversation with Trapani on or about July 31, 2017 in which they discussed Centra Tech's lack of actual partnerships with banks or credit card companies. (*Id.* ¶ 12(e)(i).) During that exchange, Sharma, via a cellphone assigned a call number ending with "3138" (the "Sharma Cellphone-1"), wrote: "Should write down a list of places to call tomorrow," "For the conbranded [*sic*] card." (*Id.*) Later in the exchange, Sharma wrote: "Gotta get it going on the banks today plz." (*Id.*) Sharma also subsequently wrote: "We just need to get s [*sic*] banking license," "Need our direct agreement with visa," "Or MasterCard," "That's the move," "Cut out the middle man," "I wish we just knew someone." (*Id.*)

- With respect to Centra Tech's purported CEO "Michael Edwards" and purported CFO "Jessica Robinson," Sharma (via the Sharma Cellphone-1) text-messaged Trapani on or about July 29, 2017 that they "Need to find someone who looks like Michael," "Team photos," "He's real lol," "Everyone real," "Except Jessica," "And Mike." (*Id.* ¶ 12(e)(ii).) Later that day, Sharma (via the Sharma Cellphone-1) text-messaged Trapani: "Gonna kill both Ceo and her," "Gonna say they were married and got into an accident." (*Id.*)

- With respect to Centra Tech's purported money transmitter and other licenses in 38 states, Sharma had a text message conversation with Farkas and Trapani on or about August 30, 2017 about applying for state licenses that Centra Tech had previously represented it already held in 38 states. (*Id.* ¶ 12(e)(iii).) For example, Sharma wrote in one message on or about August 30, 2017 to Farkas and Trapani: "Gotta apply for all licenses," "Should I even say this." (*Id.*)

---

Manhattan while driving home after drinking too much alcohol at a dinner with several friends at a restaurant in Manhattan. During Sharma's DWI trial in July 2017, Sharma and Trapani both falsely testified that Sharma had only one glass of wine at the dinner before driving home and getting arrested, even though they both knew that Trapani was not at the dinner and that Sharma had in fact consumed multiple glasses of alcohol at the dinner. Despite their false testimony, Sharma was still convicted at the DWI trial. On or about September 19, 2017, while the Centra Tech ICO was underway, the Manhattan District Attorney's Office obtained an indictment charging Sharma and Trapani with perjury in the first degree in violation of New York Penal Law § 210.15, a Class D felony. Toward the end of the Centra Tech ICO, Sharma was arrested on or about October 3, 2017 in Florida and Trapani surrendered on or about October 5, 2017 at the Manhattan District Attorney's Office on that perjury indictment. On the date of Trapani's surrender, he signed a consent form giving that District Attorney's Office and the New York City Police Department his "voluntary consent to a complete search" of the Trapani Cellphone. Pursuant to that consent form, the Trapani Cellphone was searched on or about October 17, 2017, the cellphone's contents were copied into an extraction report containing more than 14,000 pages of materials, and device was returned to Trapani.

- With respect to false claims in a white paper that Centra Tech published to investors on the company's website, Sharma had a text message conversation with Farkas and Trapani on or about September 29, 2017 about taking down (among other things) the version of the white paper that was on the company's website at the time. (*Id.* ¶ 12(e)(iv).) During this conversation, Sharma, via a cellphone assigned a call number ending with "6091" (the "Sharma Cellphone-2") sent text messages to Farkas and Trapani in which Sharma wrote (among other things): "I rather cut any fufu," "Off right own," "Now," "Then worry," "Anything that doesn't exist current," "We need to remove," "Have them do it asap." (*Id.*) Later in the same conversation, Sharma (via the Sharma Cellphone-2) wrote: "I want a product page like [another company]," "Theirs is so nice." (*Id.*) Trapani wrote "Lol yeah no real product." (*Id.*) Sharma wrote: "Yea but it doesn't say much," "And looks good," "We don't have a real product either right now," "So I wanna tighten up ship asap." (*Id.*)

Sharma also sent and received email communications showing that he was well aware of

the falsity of the aforementioned claims by Centra Tech in soliciting investments in Centra Tech

(*id.* ¶ 12(f)):

- For example, with respect to Centra Tech's claimed partnership with Bancorp for the issuance of Centra Tech debit cards licensed by Visa and Mastercard, Sharma on or about August 30, 2017 forwarded to Farkas, among others, an email that Sharma had received from Bancorp directing Centra Tech to "CEASE AND DESIST FROM REPRESENTING THAT THE BANCORP BANK HAS ANY CONNECTION WITH, OR IS THE ISSUER OF ANY CARD PRODUCTS RELATED TO CENTRA TECH." (*Id.* ¶ 12(f))(i).)

- On or about the same day, Sharma (via the Sharma Cellphone-1) engaged in a text message conversation with Farkas and Trapani concerning the cease-and-desist notice from Bancorp. (*Id.* ¶ 12(f))(ii).) During this exchange, Sharma wrote: "Google Bitset and Centra," "And contact anyone that has that image," "And ask them to remove it . . . .  Or that language," "Saying we work Bancorp," "Od bad," "Their lawyer reached out." (*Id.* ¶ 12(f))(ii).) Later that day, Farkas text-messaged Sharma and Trapani: "No Bancorp on it." (*Id.*) Sharma responded: "In the bottom? . . . .  U sure," "I thought I saw," "On press releases." (*Id.*) Farkas wrote: "Just checked them all," "No Bancorp." Sharma responded: "Okay," "We gotta get that shit removed everywhere and blame freelancers lol . . . ." (*Id.*)

- In addition, on or about October 13, 2017, Farkas, via one of his personal email accounts sent an email to Sharma, via one his work email accounts and one of his personal email accounts attaching Farkas' edits to an investor pitch deck dated August 15, 2017, promoting Centra Tech and its ICO. (*Id.* ¶ 12(f))(iii).) The pitch deck contained several misleading claims, including, among other things, that: (i) the Centra Card was "issued"

by "Mastercard and Visa;" and (ii) Centra in January 2017 had a "Major Banking Partnership and license agreement signed with VISA USA Inc." (*Id.*)

**C. Evidence of Probable Cause Gathered Prior to Sharma's Arrest**

On April 1, 2018, Sharma was arrested on a criminal complaint filed in the Southern District of New York for securities and wire fraud charges for participating in the above-described scheme to defraud Centra Tech investors. Those charges were brought based on evidence that was amassed over the course of several months of investigation by the FBI in advance of Sharma's arrest.

By way of background, in approximately the fourth quarter of 2017, the SEC initiated an investigation of Centra Tech co-founders Sharma, Farkas and Trapani and their company. (Ex. G ¶¶ 15(a)-(b).) As part of this investigation, the SEC issued subpoenas on or about November 29, 2017 and February 28, 2018 to Centra Tech, care of the company's outside counsel at the law firm of Ballard Spahr LLP, compelling Centra Tech to produce a variety of documents, including various documents relating to Sharma, Farkas and Trapani. In response, Centra Tech through its outside counsel began making productions of documents to the SEC.

In January 2018, the Government (through this Office) and the FBI's New York Field Division opened a parallel criminal investigation of Centra Tech's co-founders. From January through March 2018, the Government and FBI New York Special Agents Brandon Racz and Kristin Allain (together, the "Case Agents"), the Case Agents with primary responsibility for this criminal investigation, collectively (among other things): (a) interviewed multiple witnesses, including, for example, representatives of Bancorp, Visa and Mastercard who had become aware of various false representations by Centra Tech during its ICO concerning purported partnerships with those entities and had alerted Centra Tech to the falsity of such representations; (b) received

from the SEC copies of voluminous productions of documents that Centra Tech had provided to the SEC and searched those productions for relevant documents; (c) served numerous grand jury subpoenas for a variety of documents and reviewed documents and other materials received in response; (d) gathered evidence through internet searches of publicly available materials such as investor-solicitation materials that Centra Tech had published via various social media websites; and (e) prepared a 35-page affidavit in support of an application for a search warrant that was sworn out on March 30, 2018 seeking judicial authorization to obtain and search several digital workspaces used by Centra Tech via an internet-based digital platform called "Slack" that is maintained by a company called Slack Technologies, Inc.[7]

From these and other steps taken during the phase of the investigation before Sharma's arrest, FBI Case Agents Racz and Allain became aware of an overwhelming body of facts showing that Sharma and his confederates had used electronic devices — such as the smartphones and laptop that were seized in connection with his arrest — in connection with his commission of the charged securities and wire fraud offenses.  For example, prior to Sharma's arrest, the Case Agents and the FBI had become aware of the following (among other things):

*First*, Case Agent Racz had reviewed documents and other materials establishing probable cause to believe that as part of the charged scheme to defraud investors, Sharma and his confederates had (a) co-founded Centra Tech as a startup company that purported to offer a cryptocurrency debit card that would rely in part on mobile smartphone application software; (b)

---

[7]  In the Government's memorandum of law filed contemporaneously herewith in opposition to the other pretrial motions by defendants Sharma and Farkas, the Government has provided background details on how Sharma and his confederates used Slack workspaces to communicate with Centra Tech investors and on the warrant to search several of those Slack workspaces.

raised funds by soliciting investors to use various internet-based websites and platforms to exchange digital assets (such as units of the cryptocurrency currency known as "Ether") for digital tokens issued by Centra Tech called "CTR" or "Centra" tokens as part of the company's ICO; and (c) solicited such investments via marketing materials that were disseminated to investors via the internet.[8]   (Ex. A ¶¶ 10-13, 15-32; Ex. C ¶¶ 8-36; Ex. K.)   Based on the foregoing, it was obvious that the use of electronic devices with computing capabilities (such as laptops or smartphones) would have been necessary to create and operate virtually every aspect of Centra Tech's ICO, from setting up the digital fund-raising process that Centra Tech used to receive digital assets from investors in exchange for digital Centra tokens, to orchestrating the internet-based marketing campaign that Centra Tech used to publish fraudulent solicitations for such funds.[9]

*Second*, Case Agent Racz had reviewed documents that Centra Tech produced to the SEC establishing probable cause to believe that Sharma had used at least one smartphone and at least one laptop or desktop computer to correspond via email communications about the charged scheme

---

[8]   For example, Case Agent Racz had reviewed documents and other materials furnishing probable cause to believe that during the ICO, Sharma and his confederates used the internet to publish various marketing materials containing materially misleading representations, including, for example, various versions of a whitepaper advertising the ICO that were published on Centra Tech's website; a LinkedIn profile for Centra Tech's fictitious CEO "Michael Edwards" that had been posted on the LinkedIn social networking website; press releases that Centra Tech paid to be published on the websites of various cryptocurrency-related media outlets such as "cointelegraph.com" and "Bitcoin.com"; and an interview of Sharma on an internet podcast called Neocash Radio relating to the cryptocurrency industry.   (Ex. A ¶¶ 10-13, 15-32; Ex. C ¶¶ 8-36.)

[9]   Indeed, as the Case Agent Racz later explained in a search warrant affidavit, based on his training and experience and participation in this investigation, he was aware that materials such as "white papers . . . and LinkedIn profiles are frequently created or edited through the use of computers (including laptops . . .) and electronic data relating to such materials are frequently stored on such computers."   (Ex. F ¶ 18.)

to defraud Centra Tech investors. These documents included, for example, a series of email communications during the ICO between Sharma and a purported attorney named "Eric Pope" concerning Centra Tech.[10]   (Ex. I (cited in Ex. A).)   In one of these emails, Sharma (via a personal Gmail email account) forwarded on or about August 30, 2017 to "Eric Pope" as well as Farkas and Trapani a message from the General Counsel of Bancorp stating in relevant part:   "Mr. Sharma: I left a *voicemail on your phone*, but I am following up here as well.   CENTRA TECH IS HEREBY DIRECTED TO CEASE AND DESIST FROM REPRESENTING THAT THE BANCORP BANK HAS ANY CONNECTION WITH, OR IS THE ISSUER OF ANY CARD PRODUCTS RELATED TO CENTRA TECH."   (Ex. I (italics added).)   Other examples of those emails include an August 30, 2017 email from Sharma (via a personal Gmail email account) stating:   "We are awaiting metropolitan commercial banks [*sic*] contract to finish up this week

---

[10]   As explained in Case Agent Racz's affidavit seeking a search warrant for the subject devices that were seized in connection with Sharma's arrest, during the period of Centra Tech's ICO, Sharma engaged in communications with a purported attorney who identified himself as "Eric Pope" concerning whether the ICO qualified as a securities offering subject to the jurisdiction of the SEC and applicable federal securities laws and regulations.   (Ex. F ¶ 18(e) n.6.)   "Eric Pope" was actually a college student named John Lambert who was fraudulently posing as a licensed attorney even though he was not, and Lambert has since been charged in a criminal complaint by this Office with wire fraud offenses.   (*See United States* v. *John Lambert*, 19 Mag. 3608, Dkt. 1 (S.D.N.Y. Apr. 11, 2019).)   In or about November 2017, the SEC made Centra Tech aware of the SEC's parallel investigation of Centra Tech and its co-founders by serving a subpoena demanding the production of specified documents and materials on Centra Tech, care of Centra Tech's outside counsel at the law firm of Ballard Spahr LLP, which was retained to represent Centra Tech in connection with the SEC investigation. (Ex. F ¶ 18(e) n.6.)   Through Centra Tech's outside counsel at Ballard Spahr, Centra Tech produced such communications with "Eric Pope" to the SEC and expressly waived any potential claim of attorney-client privilege over such communications.   (*Id.* ¶ 18(e) n.6; Ex. J (January 16, 2018 production cover letter from Ballard Spahr on behalf of Centra Tech noting that this "production consists of communications and other documents showing Centra's relationship with a purported attorney named Eric Pope" and "[t]o the extent these documents are protected by attorney-client privilege, Centra has agreed to waive the privilege as to the subject matter of these documents only").

which will allow us to list MasterCard as our official card" with a footer ("Sent from my iPhone"), and other emails from same account without such a footer. (Ex. I.)   Based on these and other documents like them, Case Agent Racz had probable cause to believe that Sharma had used at least one smartphone (specifically, an iPhone) and at least one laptop or desktop computer to correspond via email communications about the charged scheme.   Furthermore, based on Case Agent Racz's training and experience, he had "learned that email communications are frequently sent and received via computers, including via laptops . . ., and via smartphones" (Ex. F ¶18(e) (internal quotation marks omitted).)

*Third*, Case Agent Racz had reviewed documents produced by Centra Tech to the SEC furnishing probable cause to believe that Sharma had used a cellphone assigned a particular call number ending with "3138" (namely, the Sharma Cellphone-1) to communicate about Centra Tech during the ICO.   (Ex. D ¶ 14; Ex. F ¶ 12(e).)   These documents included an email chain from August 2017 in which a *NewsWatch* reporter emailed Sharma at Sharma's Centra Tech email account to ask if Sharma would be interested in being interviewed on *NewsWatch* about Centra Tech, and Sharma responded "Call my cell:   [call number for Sharma Cellphone-1]."   (*Id.* ¶ 14.) Thus, Case Agent Racz knew that Sharma had used the Sharma Cellphone-1 to communicate about Centra Tech during the period of the charged fraud scheme.

*Fourth*, Case Agent Racz had reviewed computer-generated documents that Centra Tech produced to the SEC establishing probable cause to believe that Sharma had used at least one laptop or desktop computer to create or maintain documents constituting evidence of the charged scheme to defraud Centra Tech investors.   (Ex. A ¶ 32; Ex. G ¶ 15.)   For example, these documents included an excel spreadsheet that Centra Tech produced through its outside counsel

on or about January 18, 2018 to the SEC purporting to identify all the investors who purchased any digital tokens issued by Centra Tech, along with (among other things) each investor's contact information, the amount of digital funds each investor provided for the purchase of Centra tokens, the digital wallet addresses identifying the digital wallets used by each investor to purchase Centra tokens, the transaction hash number identifying each purchase, and the digital wallet addresses identifying the digital wallets used by Centra Tech to receive digital funds from each investor. (Ex. A ¶ 32; Ex. G ¶ 15.)

*Lastly*, from his training and experience, Case Agent Racz had learned (a) that individuals who engage in financial crimes and fraud-related offenses, such as the securities and wire fraud offenses that Sharma has been charged with committing, frequently store records relating to their illegal activity and to their co-conspirators on electronic devices such as smartphones and laptops; (b) that such records frequently include, for example, text messages with co-conspirators or victims, logs of online "chats" with co-conspirators or victims, email correspondence with co-conspirators or victims; contact information of co-conspirators, including telephone numbers, email address, and identifiers for instant messaging and social media accounts, and records of illegal transactions; and (c) that individuals engaged in such criminal behavior often store such records in order to, among other things, keep track of co-conspirators' contact information and keep an accounting of illegal proceeds for purposes of dividing those proceeds with co-conspirators.   (Ex. F ¶ 19.)

Accordingly, prior to Sharma's arrest in this case, the Case Agents and the FBI had gathered overwhelming evidence — and certainly, at least probable cause to believe — that Sharma had used electronic devices such as smartphones and laptops to commit the charged fraud

16

offenses, and that any electronic devices belonging to Sharma were likely to contain evidence of Sharma's participation in the charged scheme to defraud Centra Tech investors.

**D.  The FBI Obtains a Warrant to Arrest Sharma**

Over the weekend of the Easter and Passover holidays from (Saturday March 31 through Sunday April 1) in 2018, law enforcement obtained and executed a warrant for Sharma's arrest in this case as a result of information received on the preceding Friday afternoon that raised concerns that Sharma and Farkas were making arrangements to flee or dissipate victim-investor assets. (Ex. A; Ex. F ¶¶ 14-16.)

In the afternoon on Friday March 30, 2018, Case Agents Racz and Allain were made aware of information showing, in substance and in part, that:   (a) one of Centra Tech's co-founders, Farkas, had asked an in-house attorney at the company to conduct research regarding foreign extradition laws at some point after the company and its co-founders had been made aware of the SEC's parallel investigation in this matter; (b) Farkas had booked airline flights for himself and a co-traveler to fly from Florida to South Korea in or about the evening on Sunday April 1, 2018; (c) the in-house attorney had not seen the "owner" of Centra Tech (believed to be a reference to Sharma) in over a week; (d) the in-house attorney learned that Centra Tech's bank account had been depleted and that the company had terminated virtually all of its employees except certain executives such as Sharma and Farkas; and (e) the in-house attorney brought several of the foregoing facts to the attention of an attorney at a financial regulatory authority.   (Ex. A ¶ 25; Ex. F ¶¶ 14-16.)

On Saturday March 31, 2018, Case Agent Racz swore out a criminal complaint before United States Magistrate Judge James L. Cott in the Southern District of New York charging

Sharma and Farkas with conspiring to commit, and committing, securities and wire fraud offenses for defrauding Centra Tech investors, and Judge Cott signed arrest warrants authorizing the FBI to arrest Sharma and Farkas based on those charges.   (Ex. A.)   Judge Cott also signed a warrant and order directing the service provider for the Sharma Cellphone-1 to provide cellphone location information to the FBI that was issued based on the facts set forth in a supporting warrant affidavit. (Ex. D.)

On Sunday April 1, 2018, Sharma was arrested pursuant to the arrest warrant by FBI agents from the FBI's Miami Field Office in an apartment where Sharma resided with his girlfriend, Brielle Farkas, who is a sister of Sharma's co-defendant, Robert Farkas.   (Ex. F ¶ 16.) Specifically, Sharma resided with Brielle Farkas in apartment 1011 (the "Apartment"), a two-bedroom, duplex apartment with an entrance on the tenth floor of a multistory luxury condominium apartment building at 17111 Biscayne Boulevard in North Miami Beach, Florida 33160 (the "Apartment Building").   (*Id.* ¶ 16.)

### E.  The FBI Seizes Sharma's Devices While Executing His Arrest Warrant

After obtaining the arrest warrant for Sharma on Saturday March 31, 2018 in the Southern District of New York, Case Agent Racz and other FBI agents from the FBI's New York Field Office arranged for FBI agents from the FBI's Miami Field Office in the Southern District of Florida, where Sharma resided with his girlfriend, Brielle Farkas, in the Apartment, to execute the arrest warrant for Sharma.[11]   (*Id.* ¶¶ 16-16(a).)   In making these arrangements, Case Agent Racz

---

[11]   The attached FBI Form FD-302 report (Ex. E), which was prepared shortly after Sharma's arrest in this case by the FBI Miami agents who participated in making the arrest and in seizing the subject devices in connection with his arrest, provides a detailed account of what occurred during the arrest and of the seizure of those devices.   As explained more fully below, the pertinent

advised the Acting Supervisory Special Agent and others from the FBI's Miami Field Office, in substance and part, that it was Case Agent Racz's belief (based on his participation in the investigation of this case, as described above at 11-17) that Sharma committed the charged securities and wire fraud offenses through the use of various electronic devices and electronic communications, and that any such devices belonging to Sharma that were found in connection with his arrest should be seized so that the FBI could subsequently apply for a warrant to search any such devices.   (*Id.*)

On Sunday April 1, 2018, cellphone location data received by the FBI pursuant to the cellphone location warrant indicated that the Sharma Cellphone-1 was in the vicinity of the Apartment Building in which Sharma and Brielle Farkas resided, and the Acting Supervisory Agent in Miami and several other FBI agents from the FBI's Miami Field Office went to the Apartment Building to locate and arrest Sharma pursuant to the arrest warrant.   (*Id.* ¶ 16(b).)   One of the Miami agents observed Sharma's Maserati bearing Florida license plate number HMFY12 in the parking garage of the building.   (Ex. E at 1.)

Upon arriving at the Apartment Building, several of the agents met with the condominium manager of the Apartment Building (the "Manager") at the front desk on the ground floor of the Apartment Building.   (Ex. ¶ F 16(c); Ex. E at 1-2.)   The Manager confirmed to the agents, in substance and in part, that Sharma's girlfriend, Brielle Farkas, resided in the Apartment on the tenth floor of the Apartment Building.   (Ex. ¶ F 16(c); Ex. E at 1.)

---

circumstances of the arrest and seizure were also summarized in the attached warrant affidavit (Ex. F ¶¶ 14-16(a)-(m) & n.4) of Case Agent Racz applying for the warrant to search those devices. As part of the Government's productions of discovery materials pursuant to Federal Rule of Criminal Procedure 16(a) in this case, the Government produced that FD-302 report and warrant affidavit to defendant Sharma on June 29 and July 3, 2018, respectively.

The Acting Supervisory Agent and several other FBI agents went to the front door of the Apartment on the tenth floor of the Apartment Building.  (Ex. ¶ F 16(d); Ex. E at 1.)   While these agents were in the hallway on the tenth floor approaching the Apartment, shortly after their arrival on the tenth floor, several of them heard the front door to the Apartment lock (as though the occupants of the Apartment had locked the front door upon noticing the agents approaching).  (Ex. ¶ F 16(d); Ex. E at 1.)   According to an audio recording of a telephone call that Sharma made from a jail in Florida following his arrest in this case, Sharma, in describing his arrest, stated in substance an in relevant part:   "There was fucking, a bing bang on my door, bro. . . .   I thought I was about to get robbed, bro.   I looked in my peep hole.   It was fucking, it was them . . . .   I was freaking out."  (Ex. ¶ F 16(d).)

For approximately three to five minutes, the agents loudly and repeatedly knocked on the front door to the Apartment and announced themselves as FBI agents with an arrest warrant for Sharma, but no one opened the front door or otherwise answered.  (Ex. ¶ F 16(e); Ex. E at 1.) While these agents were in the hallway outside the Apartment repeatedly knocking and announcing themselves, the Acting Supervisory Agent called the Sharma Cellphone-1 and heard a brief ring tone from inside the Apartment that was quickly silenced.   (Ex. ¶ F 16(e); Ex. E at 1.)   The Acting Supervisory Agent made further calls to the Sharma Cellphone-1 that went directly to that cellphone's voicemail.   (Ex. ¶ F 16(e); Ex. E at 1.)

While those FBI agents were repeatedly knocking on the front door to the Apartment and announcing themselves, an additional FBI agent came to the front door to the Apartment along with the Manager, who provided the agents with a key to open the front door to the Apartment. (Ex. ¶ F 16(f); Ex. E at 1.)   As the front door to the Apartment was being unlocked by the agents,

Sharma and his girlfriend, Brielle Farkas, were observed walking down a staircase within the Apartment and were ordered to join the agents in the hallway outside the front door to the Apartment.   (Ex. ¶ F 16(f); Ex. E at 1.)

Sharma and Brielle Farkas stepped into the hallway near the front door to the Apartment as directed, where each of them was patted down by FBI agents for any weapons as a safety precaution and handcuffed.   (Ex. ¶ F 16(g); Ex. E at 2.)   As the agents later advised Sharma and Brielle Farkas, Sharma was handcuffed for arrest pursuant to the arrest warrant issued in this case, whereas Brielle Farkas was handcuffed as a temporary safety measure until the Apartment had been subjected to a protective sweep and determined to be free of any safety hazards.   (Ex. ¶ F 16(g); Ex. E at 2.)

While Sharma was being patted down for safety reasons and handcuffed in the hallway, the following occurred, in substance and in part.   *First*, the Acting Supervisory Agent observed that Sharma was holding a black iPhone (later identified as the Sharma Cellphone-1) in one of his hands.   (Ex. F ¶¶ 16(h), 17 & n.5; Ex. E at 2.)   Sharma was directed to hand the cellphone to the agents, and did so as directed.   (Ex. F ¶¶ 16(h); Ex. E at 2.)   *Second*, Sharma was asked "if he had any firearms" (Ex. F ¶¶ 16(h); Ex. E at 2).   In response, Sharma said that he had a 9mm handgun, and further volunteered that this firearm was "near the nightstand" inside the Apartment. (Ex. F ¶¶ 16(h); Ex. E at 2.)

In the hallway, after Sharma and Brielle Farkas had been patted down and handcuffed, the agents advised them that Brielle Farkas was not being arrested but that Sharma was being arrested pursuant to an arrest warrant and would be transported to jail later that day.   (Ex. E at 2.)   Sharma and Brielle Farkas said they understood and wanted to cooperate to avoid issues with the agents.

21

(*Id.*)   Sharma asked the FBI agents for permission to enter the Apartment to retrieve his shoes (as he was wearing only socks).   (Ex. F ¶¶ 16(i); Ex. E at 2.)   The agents responded, in substance and in part, that after several of the agents conducted a protective sweep of the Apartment to ensure no one else was in the Apartment, the agents would permit Brielle Farkas (accompanied by agents) to retrieve Sharma's shoes and any other necessary items for Sharma.   (Ex. F ¶¶ 16(i); Ex. E at 2.)

The Acting Supervisory Agent along with other FBI agents conducted a protective sweep of the Apartment to ensure there were no additional persons in the Apartment, while a few of the FBI agents waited in the hallway with Sharma and Brielle Farkas.   (Ex. F ¶¶ 16(j); Ex. E at 2.) The protective sweep found no additional persons in the Apartment.   (Ex. F ¶¶ 16(j); Ex. E at 2.) The agents removed Brielle Farkas' handcuffs, while Sharma remained handcuffed.   (Ex. F ¶ 16(j); Ex. E at 2.)

After that protective sweep, in order to retrieve several items in the Apartment for Sharma at his request (specifically, a pair of shoes to wear and a screwdriver needed to remove a gold bracelet that he was wearing), Brielle Farkas went with a few of the FBI agents into a bedroom in the upstairs section of the Apartment to retrieve the requested items for Sharma, while other agents waited in the hallway with Sharma.   (Ex. E at 2.)   Brielle Farkas obtained the requested items and returned with those agents to the hallway, where Sharma was given the shoes and used the screwdriver to remove his bracelet, which was given to Brielle Farkas for safekeeping.   (*Id.*)

The following occurred next, in substance and in part.   (*Id.*)   In order to determine whether the agents needed to seize Sharma's handgun, the agents asked Sharma whether he had any prior felony convictions (which would make it illegal for him to possess the gun), to which

22

Sharma responded "not yet" and explained that he had a pending criminal case in which he had

been charged with perjury but was unsure of the final outcome of the case.   (Ex. F ¶ 16(k); Ex. E

at 2.)   After the Acting Supervisory Agent called one of the New York case agents, namely Case

Agent Racz, for guidance on how to proceed, Case Agent Racz called back and advised the Acting

Supervisory Agent that she and the other arresting agents with her should seize the firearm for the

time being until it could be determined whether Sharma had a felony conviction barring him from

possessing the firearm.   (Ex. F ¶ 16(k) & n.4; Ex. E at 2.)   In fact, as Case Agent Racz later

confirmed, Sharma had sustained a felony conviction based on his guilty plea several months

earlier to a felony perjury charge in state court, and thus was prohibited from possessing the

firearm.[12]   (Ex. F ¶ 16(k) n.4.)

Several of the FBI agents accompanied Brielle Farkas into the Apartment again, this time

to locate and seize Sharma's firearm from the nightstand in the Apartment where Sharma had said

---

[12]   As Case Agent Racz later confirmed, Sharma had been a convicted felon for purposes of Title
18, United States Code, Section 922(g)(1) since his guilty plea in February 2018 in New York
County Supreme Court to a felony perjury offense, notwithstanding that he has not yet been
sentenced for this crime, and accordingly was subject to Section 922(g)(1)'s prohibition against
possession of firearms by convicted felons.   (Ex. F ¶ 16(k) n.4.)   Section 922(g)(1) states in
pertinent part that "It shall be unlawful for any person — (1) who has [previously] been convicted
in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to . . .
possess . . . any firearm or ammunition . . . ."   For purposes of Section 922(g)(1), the question of
"[w]hat constitutes a conviction of such a crime shall be determined in accordance with the law of
the jurisdiction in which the [prior criminal] proceedings were held."   18 U.S.C. § 921(a)(20); *see
also Burrell* v. *United States*, 384 F.3d 22, 28 (2004).   Under the law of New York — which is
the jurisdiction in which Sharma pleaded guilty in February 2018 to a class D felony offense for
first degree perjury in violation of New York Penal Law § 210.15 (Ex. F ¶ 16(k) n.4) — conviction
occurs upon a guilty plea or verdict.   *See Matter of David*, 145 A.D.2d 150, 537 (N.Y. App. Div.
1st Dep't 1989), citing N.Y. C.P.L. § 1.20(13).   Section 1.20(13) of the New York Criminal
Procedure Law states in relevant part that "'[c]onviction' means the entry of a plea of guilty to, or
a verdict of guilty upon, an accusatory instrument . . . or to one or more counts of such instrument."

that it was stored, while the Acting Supervisory Agent and other agents waited with Sharma.   (Ex. F ¶ 16(l); Ex. E at 3.)   Brielle Farkas led these agents to the same bedroom in the upstairs section of the Apartment.   (Ex. F ¶ 16(l); Ex. E at 3.)   The agents observed an additional iPhone and a laptop in plain view on the bed in the bedroom, near the nightstand that Sharma had referenced.  (Ex. F ¶ 16(l); Ex. E at 3.)   One of the agents asked Brielle Farkas if those two devices were Sharma's, and she confirmed that both belonged to Sharma.   (Ex. F ¶ 16(l); Ex. E at 3.)   The agents then seized Sharma's firearm from the nightstand, and Sharma's iPhone and laptop from the bed.[13]   (Ex. F ¶ 16(l); Ex. E at 3.)   After seizing those items, the agents and Brielle Farkas returned to the area where the Acting Supervisory Agent and other agents were waiting with Sharma.   (Ex. F ¶ 16(l); Ex. E at 3.)   The agents advised Sharma that his electronic devices were being seized, and Sharma again advised that he wished to cooperate with law enforcement.   (Ex. E at 3.)

In the evening on April 1, 2018, following his arrest and the seizure of those devices at his Apartment, Sharma was transported to Broward County Jail in Florida to be detained pending his initial presentment in this case in the United States District Court for the Southern District of Florida and removal to the Southern District of New York for prosecution here.   (Ex. F ¶ 16(m); Dkt. 77 at 4.)   The subject devices were subsequently sent to the Case Agents at the FBI's New York Field Division in the Southern District of New York, where they arrived on or about April

---

[13]   Although agents had previously seen this iPhone and laptop in plain view on the bed when they accompanied Brielle Farkas to retrieve shoes and a screwdriver for Sharma from the bedroom, the agents did not have confirmation at that time that those devices belonged to Sharma and thus did not seize them at that time.   (Ex. E at 2-3.)

18, 2018.[14]

### F. The FBI Obtains a Warrant to Search the Subject Devices During the Period While Sharma was Prohibited from Possessing the Devices

From April 1, 2018 through June 7, 2018, Sharma was detained at several jails in connection with the federal criminal charges in this case — initially at Broward County Jail and then the Miami Detention Center in the Southern District of Florida, followed by the Metropolitan Correctional Center in the Southern District of New York.   (Dkt. 77 at 4-5.)   Inmates detained on federal charges at such facilities are prohibited from possessing their own personal electronic devices such as cellphones or laptop computers.[15]

Following contested bail hearings in May 2018, Sharma was released from federal custody on June 7, 2018 pending trial in this case subject to stringent bail conditions that, among other things, prohibited him from using or having access to computers, smart phones, or the internet and

---

[14] Sharma's then-counsel sent an email to the Government on April 17, 2018 requesting the return of the subject devices, but never filed a motion in the Southern District of Florida or in the Southern District of New York seeking the return of the devices pursuant to Federal Rule of Criminal Procedure 41(g).

[15] *See, e.g.*, 18 U.S.C. § 1791 (making it a federal crime for an inmate of a federal detention facility, or of any facility in which persons are held in custody by direction of or pursuant to a contract or agreement with the United States Attorney General, to possess "contraband" including any "phone or other device used by a commercial mobile service . . . in connection with such service" or "any other object that threatens the order, discipline, or security of a [detention facility], or the life, health, or safety of an individual"); 28 C.F.R. § 541.3 (Federal Bureau of Prisons ("BOP") Code 108) (prohibiting federal detainees from possessing "a hazardous tool . . . or those hazardous to institutional security or personal safety; e.g., . . . portable telephone, pager, or other electronic device"); BOP Legal Resource Guide at 34 (Mar. 2019) (available at https://www.bop.gov/resources/pdfs/legal_guide_march_2019.pdf) ("Inmates are not permitted possession or use of cellphones or electronic communication devices.   Any such possession or use is grounds for disciplinary action and possible criminal prosecution.").

barred him having any contact with Centra Tech investors.   (Dkt. 13; Dkt. 33; Dkt. 77 at 5-6.)
The bail conditions prohibiting him from using or accessing computers, smartphones, or the
internet remained in place until July 11, 2018.   (Dkt. 77 at 6.)

On July 2, 2018, during the period while Sharma was still prohibited from using or
accessing computers or smartphones, Case Agent Racz submitted an affidavit to United States
Magistrate Judge Ona T. Wang in the Southern District of New York requesting, pursuant to Rule
41 of the Federal Rules of Criminal Procedure, a search warrant to search the two iPhones and
laptop belonging to Sharma that were seized in connection with his arrest.   (Ex. F.)   After
reviewing the agent's affidavit, Judge Wang approved the requested search warrant based upon
her finding that the agent's affidavit set forth sufficient facts establishing probable cause to believe
that Sharma had committed the charged securities and wire fraud offenses and that the subject
devices likely contained evidence, fruits, or instrumentalities of those crimes.   (*Id.*)

### G.  The FBI Case Agents Diligently Advanced the Investigation Between the Seizure of the Subject Devices and the Issuance of the Warrant to Search The Devices

The three-month period that elapsed between the seizure of the subject devices in
connection with Sharma's arrest on April 1, 2018 and the issuance of the warrant to search those
devices on July 2, 2018 was an exceptionally busy phase in the investigation in this case.   During
this period, the Case Agents worked diligently to advance the investigation by performing, among
other things, the following tasks:

- In response to a grand jury subpoena served on the Manhattan District Attorney's Office, Case Agents Racz and Allain received a more than 14,000-page report of data (Ex. B ¶¶ 20(d) & n.7) extracted from the cellphone of Sharma's co-conspirator, Trapani, during a consensual search of Trapani's cellphone that occurred in connection with a prior arrest of Trapani in the perjury case against him and Sharma as described above (at 8 & n.6).

- Case Agent Racz reviewed incriminating text messages in that report and other evidence

against Trapani (who had not been charged or arrested on April 1, 2018 with Sharma and Farkas), prepared and swore out a 38-page criminal complaint (Ex. B) charging Trapani with securities and wire fraud offenses, and coordinated with FBI Miami agents to have Trapani arrested.

- Case Agent Racz prepared for and presented detailed testimony to the federal grand jury in this District that returned the 28-page Indictment (Dkt. 14) against Sharma, Farkas and Trapani in this case.

- Case Agents Racz and Allain assisted the Government in preparing for a total of three lengthy, contested bail hearings for Sharma and Farkas (that are described at Ex. G ¶¶ 15(l)-(p)), and one or both of those Case Agents attended each of those hearings.

- Case Agent Allain prepared and swore out a 14-page affidavit accompanied by more than 50 pages of exhibits (Ex. G ¶ 3 (attaching affidavit as Ex. A thereto)) in support of a warrant to seize assets then worth about $59 million that Sharma and his co-defendants had raised from victims of the charged fraud offenses (Dkt. 77 at 5-6, 9-14; Ex. G. ¶¶ 3, 12-15, 24).

- Case Agent Racz was involved in time-consuming efforts to identify the actual passcode needed to effectuate the seizure of those assets that Sharma attempted to obstruct by furnishing a fake passcode and related lies as described at length in prior submissions to this Court (*see, e.g.*, Dkt. 77 at 5-6, 9-14; *see also* Ex. G. ¶¶ 3, 12-15, 24).[16]

- At the request of Centra Tech through its outside counsel, Case Agent Racz arranged for

---

[16] As detailed in prior submissions (Dkt. 77 at 5-6, 9-14), because Sharma had falsely represented through counsel to the SEC and to law enforcement that the purported passcode needed to retrieve those victim-investor assets had been fragmented into two pieces, one of which was in a safe deposit box in Miami and the other of which was in the possession of a Centra Tech executive in Miami, Case Agent Racz coordinated with FBI agents in Miami to obtain those fragments from the executive and through the Miami agents' execution of a judicially authorized search warrant on the safe deposit box.   After Case Agent Racz attempted to use the fake passcode yielded by combining those fragments to seize those assets without success, the Government argued in connection with Sharma's and Farkas's contested bail hearings that they should be detained at least until those assets had been seized and secured pursuance the seizure warrant.   When it became clear to Sharma that he could be detained in jail in connection with his refusal to provide the actual passcode to the $59 million in victim-investor assets, Sharma complied with the seizure warrant by admitting that he had previously lied about the passcode and that the true passcode was taped on a piece of paper taped underneath a drawer in the kitchen of the Apartment where Sharma and his girlfriend resided in Miami.   Case Agent Racz coordinated with FBI agents in Miami to seize this passcode from the Apartment with the voluntary consent of Sharma and his girlfriend, and then used the passcode to successfully transfer the funds to a secure location pursuant to the seizure warrant.

the FBI to receive numerous computers, drives and cellphones and certain hard copy documents from Centra Tech's office space in Florida before the company was evicted (Dkt. 31), in order to prevent the destruction of those devices and documents while the company arranged to respond to grand jury subpoenas served on Centra Tech after Sharma's arrest.

- Case Agents Racz and Allain collectively prepared for and conducted multiple interviews and proffers of a variety of witnesses, including lengthy proffers of several former executives of Centra Tech, as well as at least one witness whom they traveled out of state to approach and interview.

- Case Agent Racz also diligently prepared and swore out a 24-page affidavit (Ex. F), accompanied by 135 pages of supporting exhibits, providing extensive detail on facts gathered during the investigation in support of the FBI's request for a warrant to search the electronic devices at issue.

## ARGUMENT

**I.     The FBI Lawfully Seized Sharma's Electronic Devices While Executing A Valid Warrant For His Arrest**

Sharma claims that when FBI agents seized both of his iPhones and his laptop computer from his Apartment during the course of his arrest in this case, the arresting agents violated the Fourth Amendment's prohibition against unreasonable searches and seizures.   This claim fails.

The arresting agents were lawfully at Sharma's Apartment to execute a valid warrant for his arrest on securities and wire fraud charges set forth in a criminal complaint that had been approved by a neutral magistrate judge.   Based on months of investigation by the FBI in advance of Sharma's arrest, the FBI had become aware of overwhelming evidence that was at least sufficient to furnish probable cause to believe that such electronic devices contained incriminating evidence of Sharma's participation in the charged fraud offenses.   As such, the arresting agents properly seized the iPhone that Sharma was holding in his hand incident to his arrest, and appropriately seized his other iPhone and laptop after seeing them in plain view in his bedroom while the agents were lawfully in the bedroom with the voluntary consent of Sharma and his

girlfriend to locate and seize a firearm (which Sharma was barred from possessing) from the bedroom.

### A. Applicable Law

#### 1. Probable Cause

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts." *United States* v. *Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004). "It's focus is on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Id.* "Thus, probable cause exists where the facts and circumstances within . . . [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that evidence of a crime will be found in the place to be searched." *Id.* "[E]xperience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not." *Id.* at 457. Moreover, probable cause does not dissipate because an innocent explanation for any one, if not all, of the component facts. *See United States* v. *Arvizu*, 534 U.S. 266, 274-75 (2002); *Krause* v. *Bennett*, 887 F.2d 362, 372 (2d Cir. 1989).

Under the collective knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation. *See United States* v. *Hensley*, 469 U.S. 221, 230-33 (1985), cited with approval by *United States* v. *Colon*, 250 F.3d 130, 135-36 (2d Cir. 2001); *see also United States* v. *Canieso,* 470 F.2d 1224, 1230 n. 7 (2d Cir. 1972). Furthermore, "application of the imputed knowledge doctrine requires that at some point along the line, some law enforcement official—or perhaps some agglomeration of such officials—involved must

29

possess sufficient information to permit the conclusion that a search or arrest is justified." *Colon*, 250 F.3d 130, 135-36.    The collective knowledge doctrine does not require that the agents involved in an investigation specifically communicate the facts constituting probable cause to the individual agent who orders or makes an arrest, as such a requirement would defeat the doctrine's very purpose.    *Id*. at 136 n.3.    Instead, the collective knowledge doctrine imputes to the arresting officer the facts known by his fellow agents, so long as those agents are working closely together and in communication with him.

### 2.  Plain View

"It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced into evidence." *Harris* v. *United States*, 390 U.S. 234, 236 (1968).    Under the plain view doctrine, a law enforcement officer may seize items without a warrant if (1) the officer observes the items in plain view, (2) it is "immediately apparent" to the officer that the items constitute evidence or fruit of a crime, and (3) the officer has lawful access to the place from which the items can be plainly viewed. *See Horton* v. *California*, 496 U.S. 128, 136 (1990).    The doctrine applies to seemingly innocuous objects that are not contraband, as long as the incriminating nature of the relevant object is "immediately apparent," meaning only that there must be "probable cause to associate the property with criminal activity," not that "a police officer 'know' that certain items are contraband or evidence of a crime."    *Texas* v. *Brown*, 460 U.S. 730, 741-42 (1983) (emphasis and internal quotation marks omitted); *see also United States* v. *$557,933.89, More or Less, in U.S. Funds*, 287 F.3d 66, 82-83 (2d Cir. 2002).    When an officer, during a justified intrusion, encounters incriminating evidence, "[t]he doctrine serves to supplement the prior justification — whether it be a warrant for another object, hot pursuit, search incident to lawful arrest, or some other

30

legitimate reason for being present unconnected with a search directed against the accused — and permits the warrantless seizure." *Horton*, 496 U.S. at 135-36.  The Supreme Court has categorically held "that if, while lawfully engaged in an activity in a particular place, police officers perceive a suspicious object, they may seize it immediately." *Brown*, 460 U.S. at 739.

When law enforcement agents have probable cause to believe that electronic devices such as cellphones or laptops have been used for criminal activity, the agents are permitted to seize the devices under the plain view doctrine.  *See, e.g.*, *United States* v. *Babilonia*, 854 F.3d 163, 180-81 (2d Cir. 2017) (collecting cases).

### 3. Search Incident to Arrest

It is well-established that that, as part of a valid search incident to arrest, a law enforcement officer is permitted, without a warrant, to "search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction" as well as to "search the person for any weapons." *Chimel* v. *California*, 395 U.S. 752, 763 (1969); *United States* v. *Robinson*, 414 U.S. 218, 224 (1973).   A lawful search incident to arrest may take place after the defendant has been taken into custody and has been moved from the immediate location of his arrest.  *See United States* v. *Edwards*, 415 U.S. 800, 804 (1974).[17]   The Supreme Court explained the parameters of this exception as follows:

> When an arrest is made, it is reasonable for the arresting officer to search the person
> arrested in order to remove any weapons that the latter might seek to use in order

---

[17] Courts have upheld the validity of searches incident to arrest in a variety of situations, even where the item searched has been out of defendant's reach or the defendant has been handcuffed. *See United States* v. *Hernandez*, 941 F.2d 133, 135-37 (2d Cir. 1991) (allowing search between the mattress and box spring of a bed after suspects were handcuffed); *see also United States* v. *Nelson*, 102 F.3d 1344, 1347 (4th Cir. 1996) (allowing search of defendant's shoulder bag after agents had removed it from his body and taken defendant to another room for questioning); *United States* v. *Fleming*, 677 F.2d 602, 607 (7th Cir. 1982) (allowing search of paper bags seized and searched after the defendants were handcuffed and placed under arrest).

to resist arrest or effect his escape.   Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated.   In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.   And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. . . .   There is ample justification, therefore, for a search of the arrestee's person and the area within his immediate control—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

*Chimel*, 395 U.S. at 762-63 (internal quotation marks and citations omitted).

### 4.   Consent to Search

It is lawful for law enforcement to conduct a search of a home with the voluntary consent of a person authorized to give such consent.   *United States* v. *Cushnie*, No. 14 Cr. 119 (PGG), 2014 WL 7447149, at *10 (S.D.N.Y. Dec. 31, 2014) (citing *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 219 (1973)).   Consent need not be explicit; "it is well settled that consent may be inferred from an individual's words, gestures, or conduct."   *United States* v. *Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981) (citation omitted); *accord United States* v. *Garcia*, 56 F.3d 418, 424 (2d Cir. 1995) ("'consent . . . can be found from an individual's words, acts or conduct'" (citation omitted; ellipsis in original)).   Accordingly, "a search may be lawful even if the person giving consent does not recite the talismanic phrase:   'You have my permission to search.'" *Buettner-Janusch*, 646 F.2d at 764; *see also, e.g., United States* v. *Camilo*, 287 F. Supp. 2d 446, 451 (S.D.N.Y. 2003) ("valid consent need not be expressed through any particular phrase, and it 'can be found from an individual's words, acts or conduct'" (citation omitted)).

Accordingly, consent to enter an apartment has been inferred from a defendant's conduct even where he did not give explicit consent.   *See, e.g., United States* v. *Simmons*, 543 F. App'x 101 (2d Cir. 2013) ("We affirm the district court's determination that the seizure of the firearm from [defendant] Simmons's room did not violate the Fourth Amendment because Simmons gave

implied consent to the seizure."); *United States* v. *Reynolds*, 646 F.3d 63, 73 (1st Cir. 2011) (affirming that defendant "gave the police officer implied consent to search the headboard" by "gestur[ing] to the headboard when answering 'yes' to whether she had weapons" as this behavior "demonstrated that [she] understood the police officer intended not only to learn of the existence of the weapons, but also to find them").   The "standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida* v. *Jimeno*, 500 U.S. 248, 251 (1991); *cf. United States* v. *Elliott*, 50 F.3d 180, 186 (2d Cir. 1995) (even if search exceeded scope of the consent given, "an officer's objectively reasonable belief that the search was within the scope of that consent is sufficient to validate the search"). To determine whether the objective reasonableness standard has been met, courts consider "the totality of all the circumstances."   *United States* v. *Sanchez*, 635 F.2d 47, 58 (2d Cir. 1980) (internal quotations omitted).

The Second Circuit has made it clear that an individual claiming that consent was not voluntarily given must make a very substantial showing of coercive conditions:

> [T]he presence of [multiple] law enforcement officers [does not] lend significant support to a claim of coercion.   Consent to search has been found despite formal arrest, and such aggravating circumstances as handcuffing of a suspect, the presence of six law enforcement officers in his home and their assurance that they would remain indefinitely and secure a search warrant if consent were withheld.

*United States* v. *Garcia*, 56 F.3d 418, 423 (2d Cir. 1995).   That a defendant was under arrest and in custody, or even handcuffed, does not as a matter of law require a finding of coercion, *United States* v. *Watson*, 423 U.S. 411, 424 (1976), and law enforcement officers do not have "an affirmative duty to advise a suspect that he may refuse his consent to an apartment search,"

*United States* v. *Crespo*, 834 F.2d 267, 271-272 (2d Cir. 1987).

A warrantless search of a defendant's home is permissible if it is "conducted pursuant to the consent, voluntarily given, of another person who has authority to consent," *United States* v. *McGee*, 564 F.3d 136, 139-40 (2d Cir. 2009).   In order to provide valid consent, a person must have "common authority over or other sufficient relationship to the premises."   *United States* v. *Matlock*, 415 U.S. 164, 171 (1974).   Even if the person giving consent lacked actual authority to do so, "the consent may nonetheless validate the search if the person reasonably appeared to the police to possess authority to consent to the search."   *McGee*, 564 F.3d at 140.   Apparent authority "must be judged against an objective standard:   would the facts available to the officer at the moment. . . warrant a man of reasonable caution in the belief that the consenting authority had authority over the premises?"   *Illinois* v. *Rodriguez*, 497 U.S. 177, 188 (1990).

### B.  Discussion

In his motion to suppress, Sharma does not dispute that the FBI agents who arrested him had probable cause to take him into federal custody for conspiring to commit, and committing, securities and wire fraud by defrauding Centra Tech investors pursuant to a validly issued arrest warrant.   While arresting Sharma pursuant this judicially authorized arrest warrant, it was lawful and reasonable for the agents to seize the iPhone that he was holding in one of his hands incident to his arrest, because the agents had probable cause to believe that this cellphone likely contained evidence of the charged fraud offenses.   *See, e.g.*, *United States* v. *Meregildo*, 11 Cr. 576 (WHP), 2012 WL 4378047, at *3-4 (S.D.N.Y. Sep. 24, 2012) (law enforcement properly seized defendant's iPhone and iPod touch located on dresser within three feet of the defendant as a result of a search incident to arrest, because the items were within the defendant's reaching distance and

there was probable cause to believe they contained evidence of a crime); *Cushnie*, 2014 WL 7447149 at *10-12 (law enforcement properly seized defendant's cell phone, keys, and wallet incident to his arrest where there was probable cause to believe these items provided evidence of a crime).

There can be no serious dispute that the arresting FBI agents had at least probable cause to believe that this iPhone — along with any other electronic devices with computing capabilities — likely contained evidence of Sharma's participation in the charged scheme to defraud Centra Tech investors.   As an initial matter, as detailed above (at 11-17), it was obvious that the use by Sharma of such electronic devices would have been necessary to virtually every aspect of the fraudulent scheme, from setting up the digital fund-raising process that Centra Tech used to solicit and receive millions of dollars in digital assets from investors as part of the company's ICO, to orchestrating the internet-based marketing campaign that Centra Tech used to publish fraudulent solicitations for such investments.   Furthermore, as part of the investigation by FBI Case Agents Racz and Allain that resulted in Sharma's arrest, the FBI had reviewed documents produced by Centra Tech establishing probable cause to believe that Sharma (a) had corresponded via email communications about the scheme to defraud Centra Tech investors using at least one smartphone and at least one laptop or desktop computer; (b) had used the particular iPhone in his hand (namely, the Sharma Cellphone-1) to communicate about Centra Tech during the ICO; and (c) had used at least one laptop or desktop computer to create or maintain documents constituting evidence of charged scheme to defraud Centra Tech investors.   (*See supra* at at 11-17.)   Furthermore, from law enforcement training and experience, the FBI was aware that financial fraud offenders such as Sharma frequently store records relating to their illegal activity and to their co-conspirators on

35

electronic devices such as smartphones and laptop.   (*See supra* at 15-17.)

Given the strong likelihood that this iPhone contained incriminating evidence of his participation in the Centra Tech fraud, it was reasonable and lawful for the arresting agents to seize that cellphone from Sharma's hand while arresting him pursuant to a valid arrest warrant, in order to prevent the device from being concealed or destroyed.   *See Chimel*, 395 U.S. at 762-63 ("it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction").

The agents were also permitted to seize Sharma's other iPhone and laptop from the bedroom of the Apartment where he and his girlfriend resided pursuant to the plain view doctrine because the agents had lawfully entered the bedroom with the voluntary consent of both Sharma and his girlfriend, in order to locate and seize the firearm that Sharma illegally possessed.   As noted, under the plain view doctrine, a law enforcement officer may seize items without a warrant if (1) the officer observes the items in plain view, (2) it is "immediately apparent" to the officer that the items constitute evidence or fruit of a crime, and (3) the officer has lawful access to the place from which the items can be plainly viewed.   *See Horton*, 496 U.S. at 136.   All three of these conditions are met here.

*First*, Sharma does not dispute that when the arresting agents went with his girlfriend into the bedroom of their Apartment to recover his firearm, his laptop and second iPhone were in plain view on top of the bed, or that his girlfriend told the agents that the devices belonged to Sharma.

*Second*, because months of investigation by the FBI in advance of Sharma's arrest had uncovered powerful proof that Sharma committed the fraud offenses for which Sharma was being arrested using such electronic devices, the incriminating nature of those devices was immediately

36

apparent to the agents once Sharma's girlfriend confirmed that the devices belonged to him.  *See, e.g.*, *United States* v. *Kirk Tang Yuk*, 885 F.3d 57, 79-80 (2d Cir. 2018) (officers arresting defendant in the bedroom of his apartment properly seized two cellphones found in adjoining room under plain view doctrine where pre-arrest investigation had given the officers "probable cause to seize the cell phones as likely connected with his criminal activity").   Although the presence in a defendant's home of "everyday objects" such as cellphones or laptops is not incriminating in a vacuum, the seizure of such objects in plain view is justified where, as in this case, the arresting "officers have probable cause to believe the objects contain or constitute evidence" of a crime. *See Babilonia*, 854 F.3d at 180-81 (agents properly seized cell phones, an iPad and an address book under the plain view doctrine where prior investigation had revealed that the defendant's criminal activities involved the use of cell phones and knew from experience that address books usually contain contact information for criminal associates (collecting cases)); *United States* v. *Chervin*, No. 10 Cr. 918 (RPP), 2011 WL 4373928, at *5 (S.D.N.Y. Sept. 20, 2011), (upholding plain-view seizure of a cell phone during arrest of defendant at his home where pre-arrest investigation captured defendant "on cell phone wiretaps discussing the activities of the alleged fraud").[18]

> *Lastly*, the agents had lawful access to the bedroom where they observed and seized those

---

[18] *See also United States* v. *Walters*, 678 F. App'x 44, 46-47 (2d Cir. 2017) (agents properly seized laptop bag in plain view in hotel room where they had probable cause to believe "based on their observations, the circumstances, and their experience" that a laptop may have been used in defendant's criminal activities); *United States* v. *Delva*, 858 F.3d 135, 147 (2d Cir. 2017) (upholding plain-view seizure of cellphone and letters from defendant's bedroom); *Meregildo*, 2012 WL 4378047, at *4 ("Because law enforcement suspected [defendant's] involvement in racketeering and narcotics conspiracies—whose members used cellular phones and social media to facilitate their criminal acts—the iPhone and iPod Touch . . . were immediately identifiable as evidence of criminal conduct.").

electronic devices in plain view because Sharma and his girlfriend had given the agents consent to enter the bedroom to seize the firearm that Sharma illegally possessed.

As an initial matter, Sharma does not dispute that it was illegal for him to possess the firearm following his felony perjury conviction (which was entered upon his guilty plea in state court several months before his arrest in this case), and he does not deny that the arresting agents had probable cause to seize the firearm as contraband.[19]   Nor could he, as law enforcement is permitted to seize a firearm found in plain view in a defendant's home upon discovering that the defendant is barred from possessing the firearm due to a prior felony conviction.   *See, e.g., United States* v. *Blakeney*, 753 F.2d 152, 153-55 (D.C. Cir. 1985) (officers properly seized firearms observed in plain view while they executed narcotics search warrant at defendant's home once officers learned, by going through defendant's papers in search for narcotics, that defendant had previously been convicted of a felony).

As to the issue of consent, Sharma's and his girlfriend's cooperative behavior in helping the arresting agents locate and seize the firearm from their bedroom demonstrates that they

---

[19]   The circumstances of the arresting agent's seizure of Sharma's firearm is similar to those that were upheld as lawful in *United States* v. *Wells,* 98 F.3d 808 (4th Cir.1996).   In that case, one of several agents executing a search warrant to search the defendant's home for evidence of bank fraud found a loaded firearm in plain view.   *Id.* at 809.   The warrant did not authorize a search for weapons, and the agent who came upon the gun did not have a basis to believe its possession to be criminal.   *Id.*   The agent nevertheless reported his discovery to a fellow agent who was supervising the search.   *Id.*   The supervising agent was aware that the defendant had a felony record, and that his possession of the firearm was therefore unlawful under Title 18, United States Code, Section 922(g).   *Id.*   Accordingly, the supervisor instructed the agent who had discovered the weapon to seize it.   *Id.*   The Fourth Circuit upheld the seizure of the weapon under the plain view doctrine, reasoning that "although the agent who actually seized the weapon pursuant to the supervising agent's instructions had no personal knowledge that [the defendant] was a convicted felon, it is sufficient that the agents collectively had probable cause to believe the weapon was evidence of a crime at the time of its seizure."   *Id.* at 810.

voluntarily consented to the agents' entry into the bedroom to do so.   As set forth above, while the agents were handcuffing Sharma in the hallway outside of his Apartment and patting him down for the agents' safety, the agents asked Sharma if he had any firearms.[20]   In response, Sharma not only divulged that he had a firearm, but further volunteered the precise location where the firearm was stored:   near the nightstand in his Apartment.   After the agents advised Sharma and his girlfriend that Sharma was being placed under arrest for transport to a jail but that his girlfriend was not under arrest, both Sharma and his girlfriend advised that they understood and wanted to cooperate with the agents (a sentiment that Sharma later reiterated).   With no handcuffs or other physical restraints on her, Sharma's girlfriend voluntarily escorted the agents to and from the bedroom at Sharma's request to retrieve shoes to wear and another item that Sharma had requested. This was not only consensual, but appropriate as law enforcement officers who enter a defendant's home to effectuate an arrest warrant have a duty to find clothing for the defendant to wear or to

---

[20]   It was lawful and appropriate for the arresting agents to ask Sharma whether he had any firearms while they were in the process of frisking him for their safety and placing him under arrest.   Consistent with *New York* v. *Quarles,* 467 U.S. 649, 655-56 (1984), the Second Circuit has recognized that "*Miranda* warnings need not precede questions reasonably prompted by a concern for the public safety or for the safety of the arresting officers" and the arrestee's answers to such questions may "be admitted as evidence of his guilt."   *United States* v. *Newton,* 369 F.3d 659, 677 (2d Cir. 2004) (internal quotation marks and citation omitted).   In *Newton*, officers asked the defendant whether he had any "contraband" in his apartment, without *Miranda* warnings, after handcuffing him when he answered the front door, and the Second Circuit held that the defendant's statements in response that he kept a gun in a box in the apartment, and the gun seized as a result of his statements, were lawfully obtained and properly admitted against him at trial.   *Id.* 663-64, 678-79.   Furthermore, because such safety-related questions by arresting officers are "framed spontaneously in dangerous situations" in which "[p]recision crafting cannot be expected," limited questioning beyond what is strictly necessary to ensure the safety of the officers is also permissible. *United States* v. *Simmons*, 661 F.3d 151, 156 (2d Cir. 2011) (internal quotation marks and citations omitted) (limited questioning about whether defendant had a license for the gun in his apartment was permitted during pre-*Miranda*, safety-related questioning by arresting officers about the whether defendant had a gun in the apartment and where if so).

permit the defendant to do so before taking the defendant into custody, and courts in this Circuit have denied motions to suppress evidence found in plain view in the course of complying with that duty.  *See United States* v. *DiStefano*, 555 F.2d 1094, 1097, 1101 (2d Cir. 1977); *Meregildo*, 2012 WL 4378047 at *3; *Chervin*, 2011 WL 4373928, at *4.

After Sharma's girlfriend and the agents obtained the items that Sharma had requested, she then accompanied the agents into the bedroom a second time when they went to seize the firearm. During the course of this encounter, Sharma and his girlfriend never demanded that the agents obtain a search warrant before entering or reentering the bedroom, never objected to the agents seizing the firearm or questioned their authority to do so, and never asked to speak with an attorney. Moreover, neither Sharma nor his girlfriend can plausibly claim that either of them lacked the education or sophistication to voluntarily and intelligently consent to the seizure of the firearm given their educational and professional backgrounds and Sharma's prior experience with the criminal justice system and law enforcement.[21]

By voluntarily informing the arresting agents of the exact location of the firearm in his bedroom, and doing nothing to discourage his girlfriend from escorting the agents into their bedroom to retrieve the firearm, Sharma consented to the agents' seizure of the firearm from their bedroom.  *See United States* v. *Simmons*, 861 F. Supp. 2d 307, 311 (S.D.N.Y. 2012) (defendant

---

[21] As to Sharma, his background shows that he was well aware of his constitutional rights:  he was almost 27 years old, had enrolled in college at Saint John's University before dropping out, had co-founded a startup technology company that raised millions of dollars from investors (albeit through fraud), and had previously been arrested by law enforcement and convicted of various crimes including a felony perjury offense for lying under oath in his own defense at a criminal trial.  As to his girlfriend, she was in her mid-20s, had graduated in 2016 from Florida Atlantic University with a bachelor of business administration, and was employed at an advertising agency, according to her LinkedIn profile (available at https://www.linkedin.com/in/brielle-farkas (last visited May 20, 2019)).

gave implied consent to seizure of gun from his apartment bedroom where he volunteered that the gun was located under the papers on the chair by his bed in response to an arresting officer's question about whether he had a gun in the apartment:  "[Defendant's] statements constituted implied consent to the officer's entering his bedroom and securing the gun" because "[i]nforming the police of the precise but concealed location of the gun—under papers and on a particular chair—had no purpose other than to facilitate the immediate seizure of the weapon" (internal quotation marks and citation omitted)), *aff'd*, 543 F. App'x 101 (2d Cir. 2013).[22]

In any event, even if Sharma did not consent to the seizure of the firearm — which he clearly did — his girlfriend's cooperative behavior, including her voluntary efforts in escorting the agents into their bedroom to seize the firearm, demonstrates that the agents entered the bedroom on that occasion with her implied consent.  Moreover, because Sharma's girlfriend was in the Apartment with him when the agents arrived there, and because the manager of the apartment building had told the agents that Sharma's girlfriend resided in the Apartment, the agents

---

[22] *See also United States* v. *Winston*, 444 F.3d 115, 121 (1st Cir. 2006) (finding implied consent to search dresser when defendant was asked for identification and he pointed officers to dresser); *United States* v. *Gordon*, 173 F.3d 761, 765-66 (10th Cir. 1999) (finding implied consent to search a locked duffel bag where defendant removed key from pocket and gave it to officer in response to question, "[c]an you open that?"); *United States* v. *Ramirez-Chilel*, 289 F.3d 744 (11th Cir. 2002) (finding implied consent where the defendant yielded the right of way to the police); *United States* v. *Carter*, 378 F.3d 584, 588 (6th Cir. 2004) (finding implied consent where the police asked to enter and the defendant stepped back, letting them in); *United States* v. *Rosi*, 27 F.3d 409, 413-14 (9th Cir. 1994) (finding consent where agents suggested that they go inside defendant's apartment and defendant did not answer but followed agents into the apartment (citing *United States* v. *Impink*, 728 F.2d 1228, 1232 (9th Cir. 1984) ("courts will infer consent from the cooperative attitude of a defendant"))); *United States* v. *Garcia*, 997 F.2d 1273, 1281 (9th Cir. 1993) (finding implied consent where officers asked to talk to defendant, defendant said "ok," and defendant stepped back, thereby clearing way for officers to enter).

reasonably believed that she had actual or apparent authority to give such consent.  It is well-settled that where a cohabitant has "joint access or control for most purposes," he or she "has the right to permit [a search] in his own right and that the other [has] assumed the risk" that he or she may do so. *Matlock*, 415 at 171 n.7.  *See also McGee*, 564 F.3d at 136 (upholding consent of girlfriend who lived in defendant's house at his invitation); *United States* v. *Gambina,* 122 F.3d 1058, 1059 (2d Cir. 1997) (upholding consent of girlfriend who reportedly "stayed in the apartment at times," maintained keys, and kept personal belongings there); *United States* v. *Hudson*, 405 F.3d 425, 442 (6th Cir. 2005) (upholding consent of girlfriend who stated she lived at defendant's apartment and provided information about places therein where the defendant hid drugs).[23]

---

[23]   Sharma's attacks (MTS at 3-4) on the validity of the arresting agents' protective sweep of his apartment after he was handcuffed in the hallway outside the entrance to his apartment are beside the point.  The agents did not seize any of the subject devices during that protective sweep, the Government is not relying on that sweep to justify the seizure of those devices, and both Sharma and his girlfriend voluntarily consented to the subsequent search of their bedroom for a firearm that resulted in the plain-view seizure of the devices as described above.  But for the avoidance of any doubt, the agents' protective sweep was appropriate because Sharma and his girlfriend had locked the front door to the apartment when the agents initially approached, avoided answering the door after the agents repeatedly knocked and announced themselves, forced the agents to secure the assistance of a building manager to open the door, and were initially observed walking down a staircase from the upper section of the apartment once the door was opened — a collection of suspicious circumstances that would lead a reasonable law enforcement officer to be concerned about the danger of an attack or spolitation of evidence from others inside the apartment.  *See United States* v. *Oguns*, 921 F.2d 442, 446-47 (2d Cir. 1990) (upolding protective sweep of apartment following arrest outside two-family house containing the apartment); *United States* v. *Lauter*, 57 F.3d 212, 216-17 (2d Cir. 1995) (upholding protective sweep of two-bedroom apartment following arrest "in the first room" near doorway); *United States* v. *Coughman*, 116 F.3d 1472 (Table), 1997 WL 349501, at *2 (2d Cir. 1997) (upholding protective sweep of entire apartment following arrest "in the doorway").

## II.     Any Delay in Obtaining a Warrant to Search the Subject Devices Was Not Constitutionally Unreasonable

Sharma also claims that even if the seizure of his iPhones and his laptop was lawful, law enforcement's three-month delay in obtaining a warrant to search those devices was unreasonable in violation of his Fourth Amendment rights.   This delay claim, like his seizure claim, is baseless and should be rejected.

As explained more fully below, the delay in obtaining the warrant to search Sharma's electronic devices was not constitutionally unreasonable under the circumstances present in this case, and he has not identified any undue prejudice that he suffered as a result of the delay.   During the entire three-month period between the seizure of the subject devices and the issuance of the warrant to search them, Sharma was prohibited from possessing the subject devices as a result of being detained in jail or released on stringent bail conditions due the charged securities and wire fraud offenses in this case, and the search warrant was obtained before the devices could have been returned to him.   In addition, because of the overwhelming likelihood that these devices contained evidence of serious federal fraud offenses arising from Sharma's participation in a scheme that duped numerous victims out of tens of millions of dollars in assets, law enforcement had a strong interest in retaining the devices following their seizure without returning them to Sharma. Furthermore, the delay was not due to a lack of diligence by the investigating agents.   On the contrary, the three-month period in which the delay occurred represented an exceptionally busy phase in the investigation of this case in which the Case Agents tirelessly pursued both their investigation into Sharma and his confederates and the preparation of a detailed 24-page warrant affidavit accompanied by 135 pages of exhibits thoroughly explaining the evidence developed by that investigation furnishing probable cause for a warrant to search those devices for evidence of

Sharma's participation in the charged fraud offenses.

## A.  Applicable Law

Where law enforcement authorities have probable cause to believe that a property contains "contraband or evidence of a crime, but have not secured a warrant," the Fourth Amendment permits "seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present." *United States* v. *Martin*, 157 F.3d 46, 53 (2d Cir. 1998) (internal quotation marks and citations omitted) (where police had probable cause to believe that UPS package contained contraband, warrantless seizure of package pending the subsequent issuance of a warrant to search it was justified because delivery of the package to the defendant "would have risked the loss or destruction of suspected contraband" (internal quotation marks and citation omitted)); *Brown,* 460 U.S. at 749-50 (Stevens, J., concurring) (container may be seized if there is probable cause to believe it contains contraband, but container may not be searched without warrant issued by neutral magistrate).

"Where, as here, a warrantless seizure is followed by a delay in securing a search warrant, [courts] must conclude whether such delay is constitutionally unreasonable." *United States* v. *Okparaeke*, 17 Cr. 225 (NSR), 2018 WL 4003021, at *11 (S.D.NY. Aug. 21, 2018).   There is "no bright line past which a delay becomes unreasonable." *United States* v. *Burgard*, 675 F.3d 1029, 1033 (7th Cir. 2012).   Rather, courts engage in a totality-of-the-circumstances inquiry in which courts "assess the reasonableness of a seizure by weighing the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Id.* (internal quotation marks and citation omitted).

"In determining the reasonableness of the government's delay in seeking a search warrant after a valid seizure, a court looks to various factors, including the length of time for which the individual was deprived of her or his property, any diminished interest in the property that the individual may have had, and whether the seizure affected the individual's liberty interests, for example, where an officer seizes a traveler's luggage and thereby disrupts that individual's travel plans." *United States v. Howe*, 545 Fed. App'x 64, 65-66 (2d Cir. 2013).

Courts then balance these considerations with the Government's interests in seizing the property, including whether the seizure was based on probable cause as opposed to mere reasonable suspicion and whether law enforcement diligently pursued its investigation. *See, e.g.*, *Burgard*, 675 F.3d at 1033 ("The state has a stronger interest in seizures made on the basis of probable cause than in those resting only on reasonable suspicion. All else being equal, the Fourth Amendment will tolerate greater delays after probable cause seizures."). For example, "among other factors, [courts] consider the nature and complexity of the investigation[,] . . . the quality of the warrant application and the amount of time we expect such a warrant would take to prepare, and any other evidence proving or disproving law enforcement's diligence in obtaining the warrant." *United States v. Laist*, 702 F.3d 608, 613 (11th Cir. 2012).

### B. Discussion

Under the circumstances present in this securities and wire fraud case, the three-month delay between the seizure of Sharma's electronic devices in connection with his arrest (on April 1, 2018) and the issuance of a warrant to search those devices (on July 2, 2018) was not constitutionally unreasonable.

*First*, because of the overwhelming likelihood that these devices contained evidence of

45

serious federal securities and wire fraud offenses arising from Sharma's participation in a scheme that duped numerous victims out of tens of millions of dollars in assets, law enforcement had a strong interest in retaining the devices following their seizure without returning them to Sharma. *See United States* v. *Howe*, 545 F. App'x 64, 66 (2d Cir. 2013) (13-month delay in obtaining warrant to search laptop for child pornography was not unreasonable because, among other reasons, "Howe's possessory interest in the laptop was diminished by the fact that [an officer] had viewed a folder on that computer containing [a] lascivious thumbnail image" when the laptop was seized and "[t]hat image provided the government with a strong interest in retaining the laptop and not returning it to Howe").   As shown above, the devices were seized in connection with Sharma's arrest on federal securities and wire fraud charges arising from a scheme to defraud victim-investors of millions of dollars in assets, pursuant to an arrest warrant that issued based on a neutral magistrate judge's determination that those charges were supported by sufficient evidence to justify Sharma's arrest. Furthermore, as described above, based on the proof uncovered by the months of investigation by the FBI that resulted in Sharma's arrest, there was an exceptionally strong likelihood that these devices contained incriminating evidence of Sharma's participation in that fraudulent scheme.   As a result, there was a strong law enforcement interest in seizing and retaining the devices until a warrant could be obtained to search them, and a diminished need for the prompt return of the devices to Sharma.   *See Howe*, 545 F. App'x at 66; *Burgard*, 675 F.3d at 1033 ("The state has a stronger interest in seizures made on the basis of probable cause than in those resting only on reasonable suspicion.   All else being equal, the Fourth Amendment will tolerate greater delays after probable cause seizures.").

*Second*, Sharma's possessory interest in the subject devices was also diminished by the fact

46

that he was prohibited from possessing those devices during the entire period between their seizure on April 1, 2018 and the issuance of the warrant to search them on July 2, 2018 as a result of being detained or released on stringent bail conditions.   *See United States* v. *Conley*, 342 F. Supp. 3d 247, 269 (D. Conn. 2018) (three-month delay in securing warrant to search cellphone was reasonable because, among other things, "Conley had a diminished possessory interest in the cell phone because Conley was detained at Wyatt Detention Facility following the arrest, and Wyatt does not permit its inmates to possess cell phones" (collecting cases)).   From April 1, 2018 through June 7, 2018, Sharma was detained on the federal criminal charges in this case at various jails that prohibit inmates such as him from possessing such devices.   From Sharma's release on bail on June 7, 2018 through a date after the issuance of the search warrant on July 2, 2018, Sharma's release from federal custody was subject to stringent bail conditions prohibiting him from accessing or using such devices.   As a result, even if Sharma had wanted to receive or use the devices during the period from April 1 through July 2, 2018, he would not have been able to do so.

*Third*, this is not a case where the seizure of Sharma's electronic devices effectively restrained his liberty, as is the case where law enforcement officers seize a traveler's luggage at an airport to search it for contraband and thereby disrupt the traveler's travel plans.   *See Martin*, 157 F.3d at 54 (delay in securing warrant to search package seized from UPS was not unreasonable because, among other things, "this is not a case where seizure of property would effectively restrain the liberty interests of the person from whom the property was seized, as is the case where officers seize a traveler's luggage and thereby cause 'disruption of his travel plans'" (quoting and distinguishing *United States* v. *Place,* 462 U.S. 696, 708 (1983) (warrantless seizure of traveler's

47

luggage without probable cause for 90 minutes was constitutionally unreasonable because it effectively restrained traveler's liberty)); *United States* v. *Mathews*, No. 18 Cr. 124 (JPO), 2018 WL 2277839, at *3 (S.D.N.Y. May 17, 2018) (15- to 17-day delay in securing warrant to search cellphone was not unreasonable because, among other things, the "seizure of the cell phone had little or no impact on Defendant's liberty interests"); *Conley*, 342 F. Supp. 3d at 269 (in weighing the factors relevant to determining the reasonableness of law enforcement delay in obtaining a warrant to search an item that was previously seized, "courts have held that deprivation of a cell phone or a laptop has little or no effect on an individual's liberty interests" (citing cases)).

*Finally*, there can be no question that the investigating Case Agents diligently pursued both their investigation into Sharma and the preparation of a search warrant in the three months that elapsed between the seizure of his electronic devices and the issuance of the warrant to search them. *See Howe*, 545 F. App'x at 65 (13-month delay in seeking warrant to search laptop "was quite lengthy" but "was not constitutionally unreasonable" where, among other things, the delay was not due to "a lack of diligence in pursuing a search warrant"); *Okparaeke*, 2018 WL 4003021 at *12 (42-day delay in securing warrant to search envelopes seized from mail was not unreasonable where case "agents diligently investigated the case" during the 42-day delay by conducting surveillance, executing a premises search warrant, and interviewing witnesses, among other activities). As shown above, that three-month period was an exceptionally busy phase in the investigation in this case in which the Case Agents worked tirelessly to advance the investigation by collectively, among other things: (a) receiving and reviewing a more than 14,000-page report of data extracted from the cellphone of Sharma's co-conspirator, Trapani, during a consensual search of Trapani's cellphone; (b) in reliance on text messages found in that

48

report and other evidence, prepared and swore out a 38-page criminal complaint charging Trapani with securities and wire fraud offenses and coordinated with FBI Miami agents to have him arrested; (c) prepared for and presented testimony to the federal grand jury that returned the Indictment against Sharma, Farkas and Trapani in this case; (d) assisted the Government in preparing for and attended several lengthy, contested bail hearings of Sharma and Farkas; (e) prepared and swore out a 14-page affidavit accompanied by 50 pages of exhibits in support of a warrant to seize millions of dollars in assets that Sharma and his co-defendants raised from victims of the charged fraud offenses; (f) engaged in time-consuming efforts to identify the actual passcode needed to effectuate the seizure of those assets that Sharma attempted to obstruct by furnishing a fake passcode and related lies; (g) coordinated the FBI's receipt of numerous computers, drives, cellphones and hard copy documents from Centra Tech's sole office space that likely contained materials responsive to grand jury subpoenas served on Centra Tech so that those devices and documents were not lost or destroyed in the course of Centra Tech's eviction from its office space; and (h) prepared for and conducted multiple interviews and proffers of a variety of witnesses.   In addition to those and other demands during that period, Case Agent Racz also diligently prepared and swore out a 24-page affidavit accompanied by 135 pages of exhibits providing extensive detail on facts gathered during the investigation in support of the FBI's request for a warrant to search the electronic devices at issue.   *See Laist*, 702 F.3d at 614 (identifying as a factor "the quality of the warrant application and the amount of time we expect such a warrant would take to prepare").

For all of these reasons, the three-month delay between the seizure of the subject devices and the issuance of a warrant to search them was not constitutionally unreasonable under the circumstances present in this case.

The main cases that Sharma relies on (MTS at 4-5) are not to the contrary.   In one of those cases, *United States* v. *Smith*, No. 17-2466, 2019 WL 114404 (2d Cir. Jan. 7, 2019), the Second Circuit did not find that law enforcement had unconstitutionally delayed in their application for a search warrant; rather, the Circuit ordered a limited remand for further district court proceedings to develop the record on that issue because the district court had inadequately addressed the issue in only a conclusory fashion.   *Id.* at *63-65.[24]   In the remainder of those cases, *United States* v. *Mitchell*, 565 F.3d 1347 (11th Cir. 2009) and *United States* v. *Pratt*, 915 F.3d 266 (4th Cir. 2019), law enforcement had seized devices from suspects who were not charged or arrested at the time of the relevant seizure, delayed for substantial periods of time in applying for warrants to search the devices, and offered no reasonable or credible justification for the delay.[25]   The concerns that

---

[24] In *Smith*, a state trooper found the defendant passed out drunk in the driver's seat of the car on the side of a highway and a tablet computing device sitting on the passenger's seat.   2019 WL 114404 at *63-65.   During an ensuing search of the vehicle, the trooper seized the tablet after noticing that it was displaying in plain view what he believed was child pornography.   *Id.*   About 31 days later, the trooped applied for and obtained a warrant to search the tablet, a resulting search of the tablet revealed videos and images of child pornography, and the defendant was subsequently indicted for possession of child pornography.   *Id.*   In denying a motion by the defendant to suppress that evidence based on (among other claims) a contention that the police had unconstitutionally delayed in applying for the search warrant, the district court addressed the delay claim in what the Second Circuit described as "a sparse, two-sentence footnote" (*id.* at 65). Because the record on the delay issue was not adequately developed, the Second Circuit ordered a limited remand for the district court to determine "whether the state's actions were reasonable and then set forth the basis for its conclusions," following which the parties would be able to restore jurisdiction over the appeal to the Circuit.   *Id.*

[25] *Mitchell*, 565 F.3d at 1348-53 (where agents went to home of suspected recipient of child pornography for a "knock and talk" and made a warrantless seizure of his computer hard drive without charging or arresting him, 21-day delay in applying for warrant to search the drive was constitutionally unreasonable because the record demonstrated that "[n]o effort was made to obtain a warrant within a reasonable time because law enforcement officers simply believed that there was no rush"); *Pratt*, 915 F.3d at 270-72 (where agents approached suspected sex trafficker in a hotel parking and made a warrantless seizure of his cellphone without charging or arresting him, 31-day delay in applying for a warrant to search the cellphone was constitutionally unreasonable

motivated the courts in *Mitchell* and *Pratt* to condemn the delays in those cases as unreasonable are not present in a case such as this, where:   (a) the devices in question were seized from Sharma while law enforcement agents were arresting him pursuant to a validly issued arrest warrant that was approved based on a neutral magistrate judge's determination that there was sufficient cause to believe that Sharma had committed serious federal crimes; (b) after months of prior investigation, law enforcement had developed overwhelming evidence (and at a minimum, probable cause to believe) that the devices contained incriminating proof of Sharma's participation in those crimes; and (c) law enforcement has proffered reasonable and credible justifications for the delay in obtaining a warrant to search the devices.

In sum, this is not a case where the delay in obtaining a warrant to search a defendant's electronic devices — which were lawfully seized because of the strong likelihood that they contain incriminating evidence against the defendant — was so unreasonable as to require exclusion of the evidence found on those devices.

III.   **Suppression Is Not Warranted In Any Event Because Law Enforcement Relied In Good Faith on the Warrant to Search the Subject Devices**

Even if law enforcement's seizure of Sharma's electronic devices or delay in obtaining a warrant to search them was unreasonable in violation of the Fourth Amendment — which is not the case — the good faith exception to the exclusionary rule applies here.   In applying to a neutral magistrate judge for the search warrant, one of the case agents in charge of the investigation of this case submitted a 24-page supporting affidavit that disclosed all of the pertinent information needed for the magistrate to assess whether any such constitutional violation precluded issuance

_____

because the "government's only explanation" for the delay was that the suspect "committed crimes in both North Carolina and South Carolina and agents had to decide where to seek a warrant")

of the warrant (in addition to the facts establishing probable cause to believe that a search of the devices would uncover evidence of the charged securities and wire fraud offenses by Sharma and his confederates).   This information included the date upon which the subject devises were seized and relevant details surrounding the circumstances of the seizure.   After reviewing the affidavit, the magistrate judge granted the application and approved the requested search warrant.   The case agent acted in good faith in disclosing that information to the magistrate judge in seeking the search warrant, and in relying on the warrant issued by the magistrate judge, after her review of such disclosures, to search the devices.   Under these circumstances, suppression of the evidence that law enforcement obtained in good faith reliance on that search warrant is not appropriate.

The remedy of excluding evidence "exacts a heavy toll on both the judicial system and society at large" by requiring "courts to ignore reliable, trustworthy evidence bearing on guilt or innocence," and "its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment."   *Davis* v. *United States*, 564 U.S. 229, 237 (2011) (internal citations omitted).   Accordingly, suppression is a remedy of "last resort."  *Id.*   It is appropriate only when necessary to deter deliberate police misconduct.   *Id.* at 237-40, 246; *United States* v. *Leon*, 468 U.S. 897, 916 (1984).   Courts should not "suppress evidence obtained as a result of nonculpable, innocent police conduct."  *Davis*, 564 U.S. at 240.   "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  *Herring* v. *United States*, 555 U.S. 135, 144 (2009).

The logic of the "good faith exception" to the exclusionary rule is simple: "the nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance

on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Leon*, 468 U.S. at 922; *see also United States* v. *Ross*, 456 U.S. 798, 823 n.32 (1982) ("a warrant issued by a magistrate normally suffices to establish" that an agent has "acted in good faith in conducting the search").   This is because the application of the exclusionary rule is "particularly" inappropriate when "an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope."   *Leon*, 468 U.S. at 920.   "In most such cases, there is no police illegality and thus nothing to deter."   *Id.* at 920-21.   Once a judge signs a warrant, "there is literally nothing more the policeman can do in seeking to comply with the law." *Id.* at 921.   If officers are objectively reasonable in relying upon a warrant, suppression should be denied even if the warrant is subsequently invalidated.   *Id.* at 922.

Although the Government carries the burden to demonstrate the objective reasonableness of the officers' good faith reliance on an invalidated warrant, the Supreme Court has "signaled that most searches conducted pursuant to a warrant would likely fall within this [good faith] protection."   *United States* v. *Clark*, 638 F.3d 89, 100 (2d Cir. 2011) (quoting *Leon*, 468 U.S. at 922).   This "presumption of reasonableness" applies unless:   (1) the issuing magistrate has been knowingly misled; (2) the issuing magistrate wholly abandoned his or her judicial role; (3) the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; or (4) the warrant is so facially deficient that reliance upon it is unreasonable.   *Clark*, 638 F.3d at 100 (internal quotation marks and citation omitted).

Even if law enforcement unlawfully seized or retained an electronic device in violation of the Fourth Amendment, the Second Circuit has held that such a constitutional violation will not justify suppression of evidence obtained during the execution of a later-obtained warrant to search

the device when law enforcement acts in good faith by disclosing in the application for the warrant enough information for the reviewing magistrate judge to determine whether the constitutional violation should preclude issuance of the warrant.  *See United States* v. *Ganias*, 824 F.3d 199, 200, 221-24 (2d Cir. 2016) (en banc).

In *Ganias*, federal agents obtained a warrant to search the office of a tax advisor for (among other things) electronic and physical evidence of financial crimes by certain of his clients.  *Id.* 200-08.  During the execution of the warrant at the tax advisor's office, the agents made full forensic copies of several hard drives for later off-site review for materials responsive to the warrant.  *Id.*  After the search of the forensic copies for responsive materials was complete, law enforcement retained the forensic copies, which included data both responsive and non-responsive to the warrant.  *Id.*  Several years later, federal agents opened a tax evasion investigation of the tax advisor, obtained a new warrant to search the forensic copies that law enforcement had retained for evidence of tax crimes, searched the forensic copies (including the retained non-responsive data), and obtained an indictment charging him with tax evasion crimes that he was convicted of following a jury trial.  *Id.*  The tax advisor challenged his conviction based on claims that the Government violated his Fourth Amendment rights by improperly retaining for years and then searching the non-responsive data pursuant to the later search warrant.  *Id.*  Because the law enforcement agent's affidavit seeking this search warrant "provided sufficient information to apprise the magistrate judge of the pertinent facts regarding the retention of the [forensic copies] of [the tax advisor's] hard drives—the alleged constitutional violation on which he relies" (*id.* at 224), the Second Circuit found that the magistrate "had sufficient information on which to determine whether such retention precluded the issuance of the [challenged] warrant" (*id.*).   As a

54

result, the Second Circuit agreed that law enforcement's reliance on this warrant, which law enforcement obtained after disclosing to the magistrate judge all relevant facts regarding the alleged constitutional violation, fit squarely within the traditional good faith exception to the exclusionary rule for conduct taken in reliance on a search warrant issued by a neutral magistrate judge.  *Id.* at 221.

That is equally true in this case.  Here, Case Agent Racz's affidavit applying to United States Magistrate Judge Ona T. Wang for a warrant to search Sharma's electronic devices disclosed:  (a) that the devices had been seized without a search warrant in connection with this arrest at his apartment in Miami, Florida on April 1, 2018 pursuant to an arrest warrant (Ex. F ¶¶ 14-16); (b) a detailed account of the pertinent circumstances of the seizure of each device, including that one of the devices was seized from his hand incident when he was initially handcuffed near the entrance to his apartment, and that the other devices were seized when the agents reentered the apartment to seize his firearm after the conclusion of a protective sweep (*id.* ¶¶ 16(a)-(m) & n.4); and (c) that the date of the application — July 2, 2018 — was three months after the seizure of the devices (*id.* at 24 (signature page)).  Case Agent Racz's affidavit thus provided Judge Wang with sufficient information to apprise her of whether law enforcement's seizure of the devices or delay in applying for the warrant to search them violated the Fourth Amendment, as Sharma now claims.  Case Agent Racz acted in good faith in disclosing that information to Judge Wang, and in relying on the warrant approved by Judge Wang, after having been apprised of those disclosures, to search Sharma's electronic devices.  As in *Ganias*, this is not a case where this Court should resort to the "bitter pill" of suppressing the evidence found in

55

good faith reliance on that search warrant.   824 F.3d at 200, 221, 223-24 (internal quotation marks and citation omitted).

Furthermore, there is nothing in the record here to overcome the presumption that Case Agent Racz's good faith reliance on the search warrant was reasonable.   *Clark*, 638 F.3d at 100. In particular, Sharma has not claimed, and there is nothing in the record to suggest, that Case Agent Racz knowingly misled Judge Wang in applying for the warrant; that Judge Wang wholly abandoned her judicial role; that the warrant application was so lacking in indicia of probable cause as to render reliance upon it unreasonable; or that the warrant application was so facially deficient that reliance upon it was unreasonable.   *Clark*, 638 F.3d at 100.

Accordingly, even if evidence was recovered from Sharma's electronic devices as a result of the claimed Fourth Amendment violations that he cites, law enforcement acted reasonably in relying on the search warrant issued by Judge Wang to search those devices, and it would be inappropriate to suppress the evidence recovered pursuant to the warrant.

**IV.    Sharma's Conclusory Motion Papers Are Insufficient to Warrant a Hearing Let Alone the Extraordinary Remedy of Suppression of Evidence**

Based on the facts set forth above, the claims on which Sharma's motion to suppress evidence recovered from his electronic devices fail as a matter of law and should be rejected on the papers without a hearing.   If Sharma wished to dispute any of those facts, he was given more than an ample opportunity to do so in advance of the deadline set by this Court of April 29, 2019 for submitting pretrial motions such as the instant motion to suppress.   Long before that deadline was set by this Court, the Government produced Rule 16(a) discovery materials documenting all of the facts relied on by the Government to oppose Sharma's claim that his devices were unlawfully seized, and virtually all of the above-described facts cited by the Government as justifications for

the delay between the seizure and the issuance of the warrant have been marshalled and are discernable from public filings and proceedings in this case that occurred well in advance of Sharma's pretrial motions deadline or from Rule 16(a) discovery materials that were produced well in advance of that deadline.[26]   Nevertheless, Sharma based his motion to suppress on five bare-bones paragraphs of conclusory factual allegations without any supporting witness affidavits from anyone with personal knowledge of the facts relevant to the motion (such as, for example, an affidavit from Sharma or from his girlfriend concerning the seizure of his devices during his arrest). Because the facts set forth above establish that Sharma's motion to suppress is meritless, and because Sharma's conclusory moving papers have failed to create a genuine dispute as to any of the facts that are material to the outcome of his motion, his motion should be denied without a hearing.   That is especially true here, where Sharma's moving papers did not request a hearing or leave to supplement their threadbare factual allegations with witness affidavits.

A defendant moving for the suppression of evidence is not entitled to an evidentiary hearing unless the motion is supported with "moving papers [that] are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the [challenged] search are in question."  *Kirk Tang Yuk*, 885 F.3d at 77,

---

[26] Specifically, after the Indictment was returned on May 14, 2018 against defendant Sharma and his co-defendants in this case, they received Rule 16(a) discovery materials from the Government that included a discovery production on June 29, 2018 providing the FBI Form FD-302 report detailing the circumstances of law enforcements' seizure of his devices, and a discovery production on July 3, 2018 providing the warrant to search those devices and supporting warrant affidavit.   Furthermore, virtually all of the above-described facts justifying the delay between the seizure and the issuance of the warrant have been marshalled and are discernable from public filings and proceedings in this case that occurred well in advance of Sharma's pretrial motions deadline, or from warrant affidavits and documents provided in Rule 16(a) discovery well advance of that deadline.

79-80 (affirming denial of motion to suppress evidence recovered as a result of warrantless seizure of cellphones without a suppression hearing (internal quotation marks and citation omitted)). Ordinarily, the disputed issue of fact must arise from affidavits that are based on personal knowledge of the facts.  *See United States* v. *Gillette*, 383 F.2d 843, 848 (2d Cir. 1967) (defense counsel's affidavit in support of suppression motion was insufficient to raise an issue of material fact); *see also Giannullo* v. *City of New York*, 322 F.3d 139, 142 (2d Cir. 2003) (memorandum of law "is not evidence at all"); *United States* v. *Richards*, No. S1 13 Cr. 818 (LAK), 2014 WL 3765712, at *2 (S.D.N.Y. July 29, 2014) ("Mere argument by counsel is insufficient.").   Even if an affidavit is submitting in support of a motion to suppress, the district court may deny the motion without a hearing if the affidavit fails to set forth in sufficient detail the circumstances that would justify suppression.  *See, e.g.*, *United States* v. *Getto*, 729 F.3d 221, 226 n.6 (2d Cir. 2013).

The late Judge Edward Weinfeld's decision in *United States* v. *Gregory*, 611 F. Supp. 1033 (S.D.N.Y. 1985) is instructive.   In that case, the defendant moved to suppress evidence found in a folder pursuant to a search warrant after the folder was delivered to law enforcement officials by a private party.  *Id.* at 1043-44.   The defendant argued in his motion papers that the private party denied delivering the evidence, could only have been acting at the request of law enforcement, and therefore must be viewed a *de facto* government agent who retrieved the folder in violation of the defendant's Fourth Amendment rights.   *Id.*   But the defendant failed to support this argument by an affidavit from the private party or anyone having personal knowledge of the circumstances under which the evidence was delivered to law enforcement.   *Id.*   For lack of such support, Judge Weinfeld refused to suppress the evidence, finding that the defendant "failed to raise a factual issue concerning the validity of the seizure" as required to warrant a suppression hearing, and "failed to

58

meet his initial burden of making specific factual allegations of illegality" as required to suppress the evidence.  *Id.*

The same is true here.  Sharma's motion to suppress fails on the papers because it rests entirely on sweeping, conclusory factual allegations that the challenged seizure of his electronic devices and delay in obtaining a warrant to search them were constitutionally unreasonable without any supporting witness affidavits.  Such threadbare allegations are not "sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the [challenged] search are in question."  *Kirk Tang Yuk*, 885 F.3d at 77, 79-80 (internal quotation marks and citation omitted).  As such, Sharma's motion to suppress should be denied without a hearing.

## CONCLUSION

For the reasons set forth above, defendant Sharma's motion to suppress evidence recovered from three electronic devices that were seized in connection with his arrest should be denied without a hearing.

Respectfully submitted,

CRAIG STEWART
Attorney for the United States
Acting Under 28 U.S.C. § 515

By: _____/s_____
Samson Enzer / Negar Tekeei
Assistant United States Attorneys
(212) 637-2342 / -2482

Dated: May 20, 2019
        New York, New York

59