# Exhibit F

18 MAG 5701

AO 93 (SDNY Rev. 01/17) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of New York

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   18 Cr. 340 (LGS) |
| Electronic Devices Seized in Connection with the Arrest of SOHRAB SHARMA on April 1, 2018 | ) ) ) | |

## SEARCH AND SEIZURE WARRANT

To:   Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Southern _____ District of _____ New York _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment A.

The search and seizure are related to violation(s) of *(insert statutory citations)*:

Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 371, 1343, 1349, and 2.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____ July 15, 2018 _____
*(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.      ☐ at any time in the day or night as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to the Clerk of the Court. _____
☐ Upon its return, this warrant and inventory should be filed under seal by the Clerk of the Court. _____
*USMJ Initials*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30)*.
☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   July 2, 2018
5:27pm                                    _____
*Judge's signature*

City and state:   New York, New York _____          THE HONORABLE ONA T. WANG, U.S.M.J.
*Printed name and title*

USAO_SDNY_00011874

AO 93  (SDNY Rev. 01/17) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.:<br>18 Cr. 340 (LGS) | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the Court.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

**Attachment A**

**I. Devices Subject to Search and Seizure**

The devices that are the subject of this search and seizure warrant are described as follows: (a) a black Apple iPhone Model A1661 seized from SOHRAB SHARMA, a/k/a "Sam Sharma," in connection with his arrest on April 1, 2018 ("Subject Device-1"); (b) a silver Apple iPhone X in a protective case, which is attached to what appears to be a PopSocket expanding grip and stand bearing a Centra Tech logo of a gold "C" surrounded by a gold circle, that was seized from the apartment in which SHARMA was arrested on April 1, 2018 ("Subject Device-2"); and (c) a silver Apple MacBook Pro laptop computer, bearing serial number C02V41ZVHTD6, that was seized from the apartment in which SHARMA was arrested on April 1, 2018 ("Subject Device-3") (collectively, the "Subject Devices").

**II. Review of ESI on the Subject Devices**

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the Government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained on the Subject Devices for evidence, fruits, and instrumentalities of conspiracy to commit securities fraud (in violation of 18 U.S.C. § 371), securities fraud (in violation of 15 U.S.C. §§ 78j(b) & 78ff; 17 C.F.R. § 240.10b-5; and 18 U.S.C. § 2), conspiracy to commit wire fraud (in violation of 18 U.S.C. § 1349), and wire fraud (in violation of 18 U.S.C. §§ 1343 and 2) (collectively, the "Subject Offenses") described as follows:

1.     Evidence regarding any of the allegations set forth in the criminal Complaint numbered 18 Mag. 2695 against SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "RJ," a/k/a "Bob," the criminal Complaint numbered 18 Mag. 3271 against RAYMOND TRAPANI, a/k/a "Ray," the criminal Indictment numbered 18 Cr. 340 (LGS) against SHARMA, TRAPANI and FARKAS, and the civil Amended Complaint numbered 18 Civ. 2909 (DLC) against SHARMA TRAPANI and FARKAS filed in the Southern District of New York (collectively, the "Charging Documents").

2.     Evidence of the Subject Offenses including a scheme to solicit victims to exchange digital funds (such as units of a cryptocurrency known as "Ether") for the purchase of unregistered securities, in the form of digital tokens issued by Centra Tech, Inc. ("Centra Tech"), based on: (a) misrepresentations and omissions such as those identified in the Charging Documents, including misrepresentations and omissions about (i) Centra Tech's purported business partnerships and relationships with payment card issuers such as Bancorp, Visa, and Mastercard; (ii) the purported makeup, identities and qualifications of Centra Tech's executive team, including the company's purported CEO "Michael Edwards" and purported CFO "Jessica Robinson"; (iii) Centra Tech's purported money transmitter and other licenses in 38 states; and (b) manipulative trading to artificially inflate the price per token of the digital tokens issued by Centra Tech.

3.     Photographs of Centra Tech's executives and employees, including its purported CEO "Michael Edwards" and its purported CFO "Jessica Robinson."

2017.08.02

4.      Evidence of the receipt, transfer, disposition or location of funds raised from victims of the Subject Offenses in connection with their purchases of digital tokens issued by Centra Tech.

5.      Communications and documents relating to the actual or claimed performance of Centra Tech or of its purported products, including its purported debit and prepaid cards, its purported wallet application, and its purported currency conversation engine.

6.      Association evidence of the relationships between and among SHARMA, TRAPANI and FARKAS, including photographs of SHARMA, TRAPANI and FARKAS with each other.

7.      Evidence of efforts by SHARMA, TRAPANI, FARKAS or Centra Tech to avoid detection by the United States Securities and Exchange Commission or law enforcement in connection with the Subject Offenses.

8.      Evidence of preparation for the Subject Offenses, such as documents and communications relating to the establishment of corporate entities such as Centra Tech, the creation of marketing materials to solicit investments such as white papers, promotional videos, and press releases, the creation and management of digital wallets and bank accounts to receive funds solicited from victims of the Subject Offenses, and financial, banking and tax records relating to the Subject Offenses.

9.      Evidence, including documents and communications, reflecting state of mind of co-conspirators such as SHARMA, TRAPANI and FARKAS with respect to the commission of the Subject Offenses, including electronic communications among co-conspirators.

10.     Evidence concerning the identities and locations of co-conspirators or victims of the Subject Offenses.

11.     Evidence revealing the location of other evidence of the Subject Offenses, including electronic messages and communications reflecting registration of other online accounts or bank accounts potentially containing relevant evidence.

12.     Evidence revealing the passwords or other information of co-conspirators (such as SHARMA, TRAPANI and FARKAS) of the Subject Offenses needed to access the user's computer or other online accounts.

13.     Evidence concerning secondary trading of any digital tokens issued by Centra Tech, including any documents or communications between SHARMA, TRAPANI, FARKAS or Centra Tech and any cryptocurrency or securities exchanges.

Additionally, review of the items described in this Attachment shall be conducted pursuant to established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege. When appropriate, the procedures shall include use of a designated "filter team," separate and apart from the prosecution team working on the investigation and prosecution in this case, in order to address potential privileges.

2017.08.02

USAO_SDNY_00011877

AO 106 (SDNY Rev. 01/17) Application for a Search Warrant

## UNITED STATES DISTRICT COURT
### for the
Southern District of New York

ORIGINAL

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) |
| Electronic Devices Seized in Connection with the Arrest of SOHRAB SHARMA on April 1, 2018 | ) |
| | ) |

**18 MAG 5701**

Case No.  18 Cr. 340 (LGS)

### APPLICATION FOR A SEARCH AND SEIZURE WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attached Affidavit and its Attachment A

located in the _____ Southern _____ District of _____ New York _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attached Affidavit and its Attachment A

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section(s)* | *Offense Description(s)* |
|---|---|
| Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 371, 1343, 1349, and 2. | Conspiracy to commit securities fraud; conspiracy to commit wire fraud; securities and wire fraud; and aiding and abetting such crimes. |

The application is based on these facts:

See Attached Affidavit and its Attachment A

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

BRANDON S. RACZ, Special Agent, F.B.I.
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/2/2018

*Judge's signature*

City and state: New York, New York

THE HONORABLE ONA T. WANG, U.S.M.J.
*Printed name and title*

**18 MAG 5701**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of the Application of the United
States of America for a Search Warrant for
Electronic Devices Seized in Connection with the
Arrest of SOHRAB SHARMA on April 1, 2018,
USAO Reference No. 2018R00088

**TO BE FILED UNDER SEAL**

**Agent Affidavit in Support of
Application for Search and Seizure
Warrant**

SOUTHERN DISTRICT OF NEW YORK) ss.:

BRANDON S. RACZ, being duly sworn, deposes and says:

## I.  Introduction

### A.  Affiant

1.       I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for approximately three years.  I am currently assigned to an FBI squad that investigates complex financial crimes, including crimes involving securities fraud, wire fraud, and other white-collar crimes, including complex financial frauds.  During my tenure with the FBI, I have participated in the investigations of numerous frauds, and have conducted physical and electronic surveillance, the execution of search warrants (including warrants to search electronic devices such as cellphones and computers), debriefings of informants, reviews of taped conversations and electronic communications such as emails and text messages, and arrests.  Through my training, education, and experience, I have become familiar with the manner in which securities and wire frauds are perpetrated, and the manner in which electronic devices such as cellphones and computers are used in connection with such criminal activities.

2.       As detailed below, this case stems from an investigation of a startup company called Centra Tech, Inc. ("Centra Tech") and its co-founders, SOHRAB SHARMA, a/k/a "Sam Sharma" ("SHARMA"), RAYMOND TRAPANI, a/k/a "Ray" ("TRAPANI"), and ROBERT FARKAS,

2017.08.02

USAO_SDNY_00011713

a/k/a "RJ," a/k/a "Bob" ("FARKAS") for soliciting investment funds for Centra Tech through fraudulent representations and omissions.  I am one of the FBI case agents from the FBI's New York Field Office with primary responsibility for the investigation of this case.

    3.    I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the electronic devices specified below (the "Subject Devices") for the items and information described in Attachment A.  This Affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; my conversations with representatives of the United States Securities and Exchange Commission ("SEC") in charge of a parallel investigation by the SEC of Centra Tech and its co-founders; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of electronically stored information ("ESI").  Because this Affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### B.  The Subject Devices

    4.    The Subject Devices are particularly described as the following, each of which was seized on April 1, 2018 in connection with the arrest of SHARMA on securities and wire fraud related charges as set forth in more detail below:

        a.    A black Apple iPhone Model A1661 seized from SHARMA on April 1, 2018 ("Subject Device-1");

        b.    A silver Apple iPhone X in a protective case, which is attached to what appears to be a PopSocket expanding grip and stand bearing a Centra Tech logo of a gold

2

USAO_SDNY_00011714

## C.  The Subject Offenses

8.      For the reasons detailed below, I respectfully submit that there is probable cause to believe that the Subject Devices contain evidence, fruits, and instrumentalities of conspiracy to commit securities fraud (in violation of 18 U.S.C. § 371), securities fraud (in violation of 15 U.S.C. §§ 78j(b) & 78ff; 17 C.F.R. § 240.10b-5; and 18 U.S.C. § 2), conspiracy to commit wire fraud (in violation of 18 U.S.C. § 1349), and wire fraud (in violation of 18 U.S.C. §§ 1343 and 2) (collectively, the "Subject Offenses").

## II.  Probable Cause

### A.  Probable Cause Regarding the Subject Offenses

9.      On or about March 31, 2018, United States Magistrate Judge James L. Cott of the Southern District of New York approved a criminal complaint, numbered 18 Mag. 2695, charging SOHRAB SHARMA, a/k/a "Sam Sharma" and ROBERT FARKAS, a/k/a "RJ," a/k/a "Bob," two co-founders of a startup company called Centra Tech, with the Subject Offenses of conspiring to commit, and the commission of, securities and wire fraud in connection with a scheme to induce victims to invest digital funds worth millions of dollars for the purchase of unregistered securities, in the form of digital tokens issued by Centra Tech, through fraudulent misrepresentations and omissions (the "Complaint-1").  The Complaint-1 is attached as Exhibit A and incorporated by reference as though fully set forth herein.

10.     On or about April 18, 2018, United States Magistrate Judge Stewart D. Aaron of the Southern District of New York approved a criminal complaint, numbered 18 Mag. 3271, charging RAYMOND TRAPANI, a/k/a "Ray," a third co-founder of Centra Tech, with the same Subject Offenses (the "Complaint-2").  The Complaint-2 is attached as Exhibit B and incorporated by reference as though fully set forth herein.

2017.08.02

USAO_SDNY_00011715

11.     On or about May 14, 2018, a Grand Jury in the Southern District of New York returned an Indictment, numbered 18 Cr. 340 (LGS), charging SHARMA, FARKAS and TRAPANI with the same Subject Offenses (the "Indictment"). The Indictment is attached as Exhibit C and incorporated by reference as through fully set forth herein.

12.     Based on the facts set forth in the Complaint-1, the Complaint-2, and the Indictment (collectively, the "Criminal Charging Documents"), there is probable cause to believe the following, in substance and in part:

a.     In or about July 2017, SHARMA, TRAPANI, and FARKAS co-founded a startup company called Centra Tech that purported to offer cryptocurrency-related financial products.

b.     From at least on or about July 30, 2017 through at least in or about April 2018, SHARMA, TRAPANI and FARKAS engaged in a scheme to induce victims to invest digital funds worth millions of dollars for the purchase of unregistered securities, in the form of digital tokens issued by Centra Tech in connection with the company's so-called "initial coin offering" ("ICO"), through a series of material misrepresentations and omissions. Through this fraudulent scheme, SHARMA, TRAPANI and FARKAS solicited digital funds (including at least 91,000 units of a cryptocurrency called "Ether") worth more than $25 million from investors who purchased digital tokens issued by Centra Tech.

c.     As part of the scheme, SHARMA, TRAPANI and FARKAS made or caused Centra Tech to make the following misstatements in soliciting investments in Centra Tech, among others:

i.  SHARMA, TRAPANI and FARKAS claimed to investors that Centra Tech had developed a debit card that enabled users to spend various

5

2017.08.02

USAO_SDNY_00011716

cryptocurrencies to make purchases at any stores that accept Visa or Mastercard payment cards, and that Centra Tech had partnerships with Bancorp, Visa, and Mastercard to issue Centra Tech debit cards.[2] In fact, Centra Tech had no such partnerships with Bancorp, Visa or Mastercard.

    ii.    SHARMA, TRAPANI and FARKAS claimed to investors that Centra Tech's executive team included a purported Chief Executive Officer named "Michael Edwards" and a purported Chief Financial Officer named "Jessica Robinson" who had impressive work histories and academic credentials. In fact, neither "Michael Edwards" nor "Jessica Robinson" was a real person.

    iii.    SHARMA, TRAPANI and FARKAS claimed to investors that Centra Tech held money transmitter and other relevant licenses in 38 states. In fact, Centra Tech did not have such licenses in a number of those states.

    d.    SHARMA, TRAPANI and FARKAS caused Centra Tech to make several of those false claims through (among other things) various promotional videos that were posted on the YouTube website; various white papers that were disseminated to investors via the internet; and various LinkedIn profiles that were posted on the LinkedIn social networking website. SHARMA also reiterated several of those false claims during (among other things) an interview on an internet podcast relating to the cryptocurrency industry.

    e.    Cellphone text message conversations between SHARMA, TRAPANI and FARKAS, found in a cellphone recovered from TRAPANI (the "TRAPANI Cellphone"),[3] show that they were well aware of the falsity of the above-described claims:

---

[2]    As set forth in the Criminal Charging Documents, "Visa" refers to Visa Inc., a multinational financial services corporation headquartered in California that (among other things) facilitates electronic funds transfers throughout the world through "Visa"-branded credit cards and debit cards; "Mastercard" refers to Mastercard Incorporated, a multinational services corporation headquartered in New York that (among other things) processes payments between the banks of merchants and the card issuing banks or credit unions of the purchasers who use "Mastercard"-branded debit and credit cards; and "Bancorp" refers to The Bancorp, Inc., a Delaware-based financial services company that (among other things) issues debit and prepaid card by virtue of contractual partnerships with other financial services companies such as Visa and Mastercard, among others.

[3]    As set forth in the Complaint-2, the TRAPANI Cellphone was recovered from TRAPANI following his surrender on or about October 5, 2017 on a perjury indictment obtained by the

2017.08.02

USAO_SDNY_00011717

i.   For example, with respect to the purported partnerships that Centra Tech claimed to have with Bancorp, Visa, and Mastercard, SHARMA engaged in a text message conversation with TRAPANI on or about July 31, 2017 in which they discussed Centra Tech's lack of actual partnerships with banks or credit card companies. During that exchange, SHARMA (via a cellphone assigned a call number ending with "3138" that is referred to as the "SHARMA Cellphone-1" in the Complaint-2) wrote: "Should write down a list of places to call tomorrow," "For the conbranded [*sic*] card." Later in the exchange, SHARMA wrote: "Gotta get it going on the banks today plz." SHARMA also subsequently wrote: "We just need to get s [*sic*] banking license," "Need our direct agreement with visa," "Or MasterCard," "That's the move," "Cut out the middle man," "I wish we just knew someone."

ii.  With respect to Centra Tech's purported CEO "Michael Edwards" and purported CFO "Jessica Robinson," SHARMA (via the SHARMA Cellphone-1) text-messaged TRAPANI on or about July 29, 2017, that they "Need to find someone who looks like Michael," "Team photos," "He's real lol," "Everyone real," "Except Jessica," "And Mike." Later that day, SHARMA (via the SHARMA Cellphone-1) text messaged TRAPANI: "Gonna kill both Ceo and her," "Gonna say they were married and got into an accident."

iii. With respect to Centra Tech's purported money transmitter and other licenses in 38 states, SHARMA had a text message conversation with TRAPANI and FARKAS on or about August 30, 2017 about applying for state licenses that Centra Tech had previously represented it already held in 38 states. For example, SHARMA wrote in one message on or about August 30, 2017 to TRAPANI and FARKAS: "Gotta apply for all licenses," "Should I even say this."

iv.  With respect to false claims in a white paper that Centra Tech published to investors on the company's website, SHARMA had a text message conversation with TRAPANI and FARKAS on or about September 29, 2017 about taking down (among other things) the version of the white paper

---

District Attorney's Office for New York County. On the date of this surrender, TRAPANI signed a consent form giving that District Attorney's Office and the New York City Police Department his "voluntary consent to a complete search" of the TRAPANI Cellphone, and he also wrote the password to access the TRAPANI Cellphone on the consent form. Pursuant to that consent form, the TRAPANI Cellphone was searched on or about October 17, 2017, the TRAPANI's Cellphone's contents were copied into an extraction report containing more than 14,000 pages of materials, and the TRAPANI Cellphone was returned to TRAPANI. I have reviewed the extraction report and documentation generated as result of this consensual search. The dates and times of particular text messages reported in the Criminal Charging Documents and herein are as they appear in the extraction report, without conversion to Eastern Standard Time.

2017.08.02

USAO_SDNY_00011718

that was on the company's website at the time. During this conversation, SHARMA (via a cellphone assigned a call number ending with "6091" that is referred to as the "SHARMA Cellphone-2" in the Complaint-2) sent text messages to TRAPANI and FARKAS in which SHARMA (among other things): "I rather cut any fufu," "Off right own," "Now," "Then worry," "Anything that doesn't exist current," "We need to remove," "Have them do it asap." Later in the same conversation, SHARMA (via the SHARMA Cellphone-2) wrote: "I want a product page like [another company]," "Theirs is so nice." TRAPANI wrote "Lol yeah no real product." SHARMA wrote: "Yea but it doesn't say much," "And looks good," "We don't have a real product either right now," "So I wanna tighten up ship asap."

f.       As detailed in the Criminal Charging Documents, SHARMA also sent and received email communications showing that he was well aware of the falsity of the aforementioned claims by Centra Tech in soliciting investments in Centra Tech:

i.    For example, with respect to Centra Tech's claimed partnership with Bancorp for the issuance of Centra Tech debit cards licensed by Visa and Mastercard, SHARMA on or about August 30, 2017 forwarded to FARKAS, among others, an email that SHARMA had received from Bancorp directing Centra Tech to "CEASE AND DESIST FROM REPRESENTING THAT THE BANCORP BANK HAS ANY CONNECTION WITH, OR IS THE ISSUER OF ANY CARD PRODUCTS RELATED TO CENTRA TECH."

ii.   On or about the same day, SHARMA (via the SHARMA Cellphone-1) engaged in a text message conversation with TRAPANI and FARKAS concerning the cease-and-desist notice from Bancorp. During this exchange, SHARMA wrote: "Google Bitsset and Centra," "And contact anyone that has that image," "And ask them to remove it . . . . Or that language," "Saying we work Bancorp," "Od bad," "Their lawyer reached out." Later that day, FARKAS text messaged SHARMA and TRAPANI: "No Bancorp on it." SHARMA responded: "In the bottom? . . . . U sure," "I thought I saw," "On press releases." FARKAS wrote: "Just checked them all," "No Bancorp." SHARMA responded: "Okay," "We gotta get that shit removed everywhere and blame freelancers lol . . . ."

iii.  In addition, on or about October 13, 2017, FARKAS, via one of his personal email accounts ("rjfarkas6@gmail.com") sent an email to SHARMA, via one his work email accounts ("sam@centra.tech") and one of his personal email accounts ("ssharma491@gmail.com") attaching FARKAS' edits to an investor pitch deck dated August 15, 2017, promoting Centra Tech and its ICO. The pitch deck contained several misleading claims, including,

8

USAO_SDNY_00011719

among other things, that: (i) the Centra Card gives users "[a]ccess to more than 36 Million Points of Sale wherever Visa and/or Mastercard is accepted"; (ii) the Centra Card was "issued" by "Mastercard and Visa;" and (iii) Centra in January 2017 had a "Major Banking Partnership and license agreement signed with VISA USA Inc."

13.    I have reviewed documents and other evidence provided by the SEC that were gathered by the SEC during the SEC's parallel investigation of Centra Tech and its co-founders, I have spoken with representatives of the SEC who worked on that SEC investigation, and I have reviewed an amended complaint filed on or about April 20, 2018 by the SEC against SHARMA, TRAPANI and FARKAS in the Southern District of New York charging the three of them with civil federal securities law violations arising from Centra Tech's ICO (the "SEC Complaint") based upon the evidence gathered by the SEC during its investigation. The SEC Complaint against SHARMA, TRAPANI and FARKAS (who are referred to as the "Defendants" in the SEC Complaint) is attached as Exhibit D and incorporated by reference as though fully set forth herein. According to the SEC Complaint (at ¶¶ 65-68), in addition to making fraudulent misrepresentations and omissions to solicit investors to purchase digital tokens (called "Centra Tokens" or "CTRs") issued by Centra Tech during its ICO, SHARMA, TRAPANI and FARKAS also engaged in a scheme to manipulate the market price of Centra tokens on various digital asset trading exchanges. Paragraphs 65 through 68 of the SEC Complaint state the following:

> 65. Defendants also manipulated the price of the Centra Token in the weeks leading up to the ICO. Defendants' manipulative trading was intended to generate interest in the company and to ensure that prospective investors were not discouraged by the Centra Token price — which was then trading on public exchanges between approximately $.15 and $.50 per token on limited trading volume — or by public comments that were negative of Centra and its purported products. As Sharma explained to Trapani in late August 2017, "[c]an't have more FUD [fear, uncertainty and doubt] . . . There's FUD around[.]  Mainly about price." Defendants undertook this manipulative trading knowingly, recklessly, or negligently.

9

USAO_SDNY_00011720

66. As one example of Defendants' manipulations, over August 26 and 27 Sharma and Trapani engaged in a concerted effort to manipulate the CTR Token price higher. On August 27, 2017, for example, Sharma instructed Trapani to artificially increase the Centra Token price: "Ray keep bumping the price. Do [larger] buys." Trapani responded "what size," to which Sharma explained "10 ETH plus" and Trapani agreed. Later that same day, Sharma again instructed Trapani to make additional large purchases, to which Trapani responded "yeah I am doing big buys." That evening, Sharma noted with approval that "we already pushed the price higher By doing that pump[.] Naturally We gotta keep doing that[.] Price is rising." The next day when Sharma noticed that Trapani was making additional large purchases, he directed Trapani to make the purchases at higher prices: "Gotta do higher than 60," Sharma instructed, and then made clear that he should make the buys at $0.80 per token. Trapani agreed, after which Sharma responded that they should "[g]et . . . [r]eady for the pump Lol."

67. When the pump was completed, Sharma messaged Trapani that they had "[b]urned through like 250 ETH" – or approximately $75,000 – and moved "the price higher by 30%."

68. Based on publicly available market data, Trapani and Sharma's efforts to manipulate the Centra Token price were successful. During August 26 – 28, 2017, the price of the Centra Token went from approximately $0.50 per token to over $1, and on August 27 the closing price was $6.91 – which represents the highest closing price ever recorded for Centra Tokens. In addition, while trade volume in early August ranged anywhere from 2,000 to 50,000 transactions per day, on August 26, 2017 the trade volume increased to well over one million tokens traded.

(SEC Complaint's brackets and alterations.)

## B. Probable Cause Regarding the Subject Devices

The Seizure of the Subject Devices in connection with SHARMA's Arrest

14. In or about the afternoon on or about Friday, March 30, 2018, I and others at the FBI were made aware of information (set forth in the Complaint-1) showing, in substance and in part, that: (a) one of Centra Tech's co-founders, FARKAS, had asked an in-house attorney at the company to conduct research regarding foreign extradition laws at some point after the company and its co-founders had been made aware of the SEC's parallel investigation in this matter; (b) FARKAS had booked Delta Airline flights for himself and a co-traveler to fly from Florida to South Korea in or about the evening on or about Sunday April 1, 2018 (and return flights several

10

days later); (c) the in-house attorney had not seen the "owner" of Centra Tech (believed to be a reference to SHARMA) in over a week; and (d) the in-house attorney brought several of the foregoing facts to the attention of an attorney at a financial regulatory authority.

15.     On or about Saturday, March 31, 2018, United States Magistrate Judge James L. Cott of the Southern District of New York signed arrest warrants authorizing the FBI to arrest SHARMA and FARKAS based on the charges set forth in the Complaint-1, and Judge Cott also signed a warrant and order directing the service provider for the SHARMA Cellphone-1 to provide cellphone location information to the FBI (the "Location Warrant") that was issued based on the facts set forth in a supporting warrant affidavit (the "Location Warrant Affidavit"). The Location Warrant and Location Warrant Affidavit are attached as Exhibits E and F, respectively, and are incorporated by reference as though fully set forth herein.

16.     On or about Sunday, April 1, 2018, SHARMA was arrested pursuant to an arrest warrant by FBI agents from the FBI's Miami Field Office in an apartment where SHARMA resided with his girlfriend, Brielle Farkas ("Girlfriend"), who is a sister of SHARMA's co-defendant, FARKAS. Specifically, the apartment in which SHARMA was arrested was apartment 1011 (the "Apartment"), a two-bedroom, duplex apartment with an entrance on the tenth floor of a multistory luxury condominium apartment building at 17111 Biscayne Boulevard in North Miami Beach, Florida 33160 (the "Apartment Building"). Based on my review of reports prepared by several of those arresting agents concerning SHARMA's arrest, and my conversations with an acting supervisory special agent who participated in the arrest (the "Acting Supervisory Agent"), as well as my participation in this investigation, I have learned, in substance and in part, the following:

11

2017.08.02

a.   After obtaining an arrest warrant for SHARMA on or about Saturday, March 31, 2018 in the Southern District of New York, I and other FBI agents from the FBI's New York Field Office with primary responsibility for the investigation of this case arranged for FBI agents from the FBI's Miami Field Office in the Southern District of Florida, where SHARMA resided, to execute the arrest warrant for SHARMA. In making these arrangements, I advised the Acting Supervisory Agent and others from the FBI's Miami Field Office, in substance and part, that based on my participation in the investigation of this case, it was my belief that SHARMA committed the Subject Offenses through the use of various electronic devices and electronic communications, and that any such devices belonging to SHARMA that were found in connection with his arrest should be seized so that the FBI could subsequently apply for a warrant to search any such devices.

b.   On or about Sunday, April 1, 2018, cellphone location data received by the FBI pursuant to the Location Warrant indicated that the SHARMA Cellphone-1 was in the vicinity of the Apartment Building, and the Acting Supervisory Agent and several other FBI agents from the FBI's Miami Field Office went to the Apartment Building to locate and arrest SHARMA pursuant to the arrest warrant.

c.   Upon arriving at the Apartment Building, several of the agents met with the with the condominium manager of the Apartment Building (the "Manager") at the front desk on the ground floor of the Apartment Building. The Manager confirmed to the agents, in substance and part, that SHARMA's Girlfriend resided in the Apartment on the tenth floor of the Apartment Building.

d.   The Acting Supervisory Agent and several other FBI agents went to the front door of the Apartment on the tenth floor of the Apartment Building. While these

12

USAO_SDNY_00011723

agents were in the hallway on the tenth floor approaching the Apartment, shortly after their arrival on the tenth floor, several of them heard the front door to the Apartment lock (as though the occupants of the Apartment had locked the front door upon noticing the agents approaching). (Based on my review of a draft transcription of an audio recording of a telephone call that SHARMA made from Broward County Jail in Florida following his arrest in this case, I know that SHARMA, in describing his arrest, stated in substance an in relevant part: "There was fucking, a bing bang on my door, bro. . . . I thought I was about to get robbed, bro. I looked in my peep hole. It was fucking, it was them . . . . I was freaking out.")

       e.     For approximately three to five minutes, the agents loudly and repeatedly knocked on the front door to the Apartment and announced themselves as FBI agents with an arrest warrant for SHARMA, but no one opened the front door or otherwise answered. While these agents were in the hallway outside the Apartment repeatedly knocking and announcing themselves, the Acting Supervisory Agent called the call number for the SHARMA Cellphone-1 (which, as detailed below, is believed to be the Subject Device-1) and heard a brief ring tone from inside the Apartment that was quickly silenced. The Acting Supervisory Agent made further calls to the call number for the SHARMA Cellphone-1 that went directly to that cellphone's voicemail.

       f.     While those FBI agents were repeatedly knocking on the front door to the Apartment and announcing themselves on the tenth floor of the Apartment Building, an additional FBI agent came to the tenth floor along with the Manager, who provided the agents with a key to open the front door to the Apartment. As the front door to the Apartment was being unlocked by the agents, SHARMA and his Girlfriend were observed

2017.08.02

USAO_SDNY_00011724

walking down a staircase within the Apartment (as though they were walking downstairs from the second floor of the Apartment to the first floor of the Apartment) and were ordered to join the agents in the hallway outside the front door to the Apartment.

g.       SHARMA and his Girlfriend stepped into the hallway as directed, where each of them was patted down by FBI agents for any weapons as a safety precaution and handcuffed.  As the agents later advised SHARMA and his Girlfriend, SHARMA was handcuffed for arrest pursuant to an arrest warrant, whereas his Girlfriend was handcuffed as a temporary safety measure until the Apartment had been subjected to a protective sweep and determined to be free of any additional persons who might present a safety hazard.

h.       While SHARMA was being patted down and handcuffed in the hallway, the following occurred, in substance and in part. *First*, the Acting Supervisory Agent observed that SHARMA was holding a black Apple iPhone (namely, the Subject Device-1) in one of his hands.  SHARMA was directed to hand the Subject Device-1 to the agents, and he did so as directed. *Second*, SHARMA was asked if he had any firearms, and SHARMA advised that he had a 9mm handgun (the "Firearm") near the nightstand in the Apartment.

i.       In the hallway, after SHARMA and his Girlfriend had been patted down and handcuffed, SHARMA asked the FBI agents for permission to enter the Apartment to retrieve his shoes (as he was wearing only socks).  The agents advised SHARMA and his Girlfriend, in substance and in part, that after several of the agents conducted a protective sweep of the Apartment to ensure no one else was in the Apartment, the agents would permit SHARMA's Girlfriend (accompanied by agents) to retrieve SHARMA's shoes and any other necessary items for SHARMA.

14

USAO_SDNY_00011725

j.      The Acting Supervisory Agent along with other FBI agents conducted a protective sweep of the Apartment to ensure there were no additional persons in the Apartment, while a few of the FBI agents waited in the hallway with SHARMA and his Girlfriend.    The protective sweep found no additional persons in the Apartment. SHARMA's Girlfriend's handcuffs were removed, while SHARMA remained handcuffed.

k.      After that protective sweep, the following occurred, in substance and in part. In order to determine whether the agents needed to seize the Firearm, the agents asked SHARMA whether he had any prior felony convictions (which would make it illegal for him to possess the Firearm), to which SHARMA responded "not yet" and explained that he had a pending criminal case in which he had been charged with perjury but was unsure of the final outcome of the case.    After the Acting Supervisory Agent called me for guidance on how to proceed, I advised the Acting Supervisory Agent that she and the other agents with her should seize the Firearm for the time being until it could be determined whether SHARMA was barred from possessing the Firearm.[4]

---

[4]      I have since learned that SHARMA has been a convicted felon for purposes of Title 18, United States Code, Section 922(g)(1) since his guilty plea in February 2018 in New York Count Supreme Court to a felony offense, notwithstanding that he has not yet been sentenced for this crime, and accordingly is subject to Section 922(g)(1)'s prohibition against possession of firearms by convicted felons.    Section 922(g)(1) states in pertinent part that "It shall be unlawful for any person — (1) who has [previously] been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess . . . any firearm or ammunition . . . ."    For purposes of Section 922(g)(1), the question of "[w]hat constitutes a conviction of such a crime shall be determined in accordance with the law of the jurisdiction in which the [prior criminal] proceedings were held."    18 U.S.C. § 921(a)(20); *see also Burrell* v. *United States*, 384 F.3d 22, 28 (2004).    Under the law of New York, which is the jurisdiction in which SHARMA pleaded guilty in or about February 2018 to a class D felony offense for first degree perjury in violation of New York Penal Law § 210.15, conviction occurs upon a guilty plea.    *See Matter of David*, 145 A.D.2d 150, 537 (N.Y. App. Div. 1st Dep't 1989), citing N.Y. C.P.L. § 1.20(13). Section 1.20(13) of the New York Criminal Procedure Law states in relevant part that "'[c]onviction' means the entry of a plea of guilty to, or a verdict of guilty upon, an accusatory instrument . . . or to one or more counts of such instrument."

2017.08.02

USAO_SDNY_00011726

l.    Several of the agents accompanied SHARMA's Girlfriend into the Apartment to locate and seize the Firearm from the nightstand in the Apartment where SHARMA said it was stored, while the Acting Supervisory Agent and other agents waited with SHARMA.  SHARMA's Girlfriend led these agents to a bedroom in the upstairs section of the Apartment.  Agents observed the Subject Device-2 and Subject Device-3 in plain view on the bed in the bedroom, near the nightstand that SHARMA had referenced.  One of these agents asked SHARMA's Girlfriend if the Subject Device-2 and Subject Device-3 belonged to SHARMA, and his Girlfriend answered in the affirmative.  Agents then seized the Firearm from the nightstand, and the Subject Device-2 and Subject Device-3 from the bed.  After seizing those items, agents and SHARMA's Girlfriend returned to the area where the Acting Supervisory Agent and other agents and SHARMA were waiting.

m.    In the evening on or about Sunday April 1, 2018, after SHARMA was arrested at the Apartment and the Subject Devices were seized at the Apartment as described above, SHARMA was transported to the Broward County Jail in Florida to be detained pending his initial presentment the next day on the Complaint-1 in the United States District Court for the Southern District of Florida.

<u>Probable Cause to Search the Subject Devices</u>

17.    As set forth in the Criminal Charging Documents and the SEC Complaint (collectively, the "Charging Documents"), and based on my review of text messages and other data found in the TRAPANI Cellphone that was recovered from TRAPANI, I respectfully submit that there is probable cause to believe that SHARMA used various cellphones to engage in text message conversations with TRAPANI and FARKAS regarding the Subject Offenses.  For example, as described above and in the Charging Documents, SHARMA sent multiple text

16

2017.08.02

messages via the SHARMA Cellphone-1 or the SHARMA Cellphone-2 to TRAPANI and FARKAS concerning Centra Tech's misleading claims to victim-investors that Centra Tech had partnerships with Bancorp, Visa and Mastercard to issue Centra Tech debit cards licensed by Visa and Mastercard; that Centra Tech's executive team included experienced senior executives named "Michael Edwards" and "Jessica Robinson"; and that Centra Tech had money transmitter and other licenses in 38 states.    Furthermore, based on the facts set forth above and in the Charging Documents, there is probable cause to believe that at least one of the Subject Devices (namely, the Subject Device-1) is the SHARMA Cellphone-1 used by SHARMA to engage in text message conversations with his co-defendants, TRAPANI and FARKAS, regarding the Subject Offenses.[5]

18.    Based on the facts set forth in the Charging Documents and herein, I respectfully submit that there is probable cause to believe that SHARMA used email communications and one or more computers (including one or more laptops) to commit, or to communicate about, the Subject Offenses:

d.    Based on the facts set forth in the Charging Documents, there is probable cause to believe that SHARMA and others committed the Subject Offenses and that the Subject Offenses were committed through (among other means) the creation of misleading materials that were disseminated via the internet, including, for example, misleading videos posted on the YouTube website; misleading LinkedIn profiles for fictitious Centra Tech

---

[5]    As set forth above, on the night of SHARMA's arrest, location data for the SHARMA Cellphone-1 provided to the FBI pursuant to the Location Warrant showed that the SHARMA Cellphone-1 was located in the vicinity of the Apartment Building in which SHARMA was arrested; SHARMA was holding the Subject Device-1 in one of his hands when he was arrested; and shortly before SHARMA was arrested, while a team of FBI agents were in the hallway outside the front door to the Apartment where SHARMA was arrested, one of the agents called the SHARMA Cellphone-1 and heard a brief ring tone from inside the Apartment that was quickly silenced. Based on these and the other facts set forth above, there is probable cause to believe that the Subject Device-1 is one and the same as the SHARMA Cellphone-1.

2017.08.02

USAO_SDNY_00011728

senior executives "Michael Edwards" and "Jessica Robinson" that were disseminated via LinkedIn's professional networking website; and white papers containing misleading statements and omissions about Centra Tech that were disseminated via Centra Tech's internet website. In addition, as set forth above and in the Charging Documents, SHARMA received an email from FARKAS containing FARKAS' edits to an investor pitch deck containing misleading claims about Centra Tech. Furthermore, according to the SEC Complaint, SHARMA "oversaw and was intimately involved in all aspects of Centra's operations, including its website, marketing, and strategy"; "often directed various design and technology employees of Centra to make changes to the company's website and White Papers"; "frequently communicated with investors and prospective investors in the Centra ICO"; "served as an administrator for certain Centra social media accounts"; and "also oversaw the payment of Centra's expenses." Based on my training and experience, and my participation in the investigation of this case, I have learned that investor pitch decks, white papers, YouTube videos and LinkedIn profiles are frequently created or edited through the use of computers (including laptops such as the Subject Device-3) and electronic data relating to such materials are frequently stored on such computers.

      e.    Based on the facts set forth in the Charging Documents, there is probable cause that SHARMA used email communications to communicate about the Subject Offenses. For example, as set forth above and in the Charging Documents, with respect to Centra Tech's claimed partnership with Bancorp for the issuance of Centra Tech debit cards licensed by Visa and Mastercard, SHARMA on or about August 30, 2017 forwarded to FARKAS, among others, an email that SHARMA had received from Bancorp directing Centra Tech to "CEASE AND DESIST FROM REPRESENTING THAT THE

18

USAO_SDNY_00011729

BANCORP BANK HAS ANY CONNECTION WITH, OR IS THE ISSUER OF ANY

CARD PRODUCTS RELATED TO CENTRA TECH."[6]  In addition, as set forth above

and in the Charging Documents, SHARMA on or about October 13, 2017, via his one his

work email accounts ("sam@centra.tech") and one of his personal email accounts

("ssharma491@gmail.com"), received an email from FARKAS attaching FARKAS' edits

to an investor pitch deck dated August 15, 2017 containing several misleading claims about

Centra Tech.  Based on my training and experience, and my participation in the

investigation of this case, I have learned that email communications are frequently sent and

---

[6]     From my participation in this investigation, I have learned, in substance and in part, the following.  During the period from in or about July 2017 through in or about October 2017 in which Centra Tech solicited victim-investors to purchase digital tokens issued by Centra Tech as part of its ICO, representatives of Centra Tech engaged in communications with a purported attorney who identified himself as "Eric Pope" concerning whether the ICO qualified as a securities offering subject to the jurisdiction of the SEC and applicable federal securities laws and regulations.  (Although not relevant for present purposes, I note that I am aware from my investigation in this case of evidence showing that "Eric Pope" was actually a college student with a different name who was not a licensed attorney.)  In or about November 2017, the SEC made Centra Tech aware of the SEC's parallel investigation of Centra Tech and its co-founders by serving a subpoena demanding the production of specified documents and materials on Centra Tech, care of Centra Tech's outside counsel at the law firm of Ballard Spahr LLP, which was retained to represent Centra Tech in connection with the SEC investigation. Through Centra Tech's outside counsel, Centra Tech produced such communications with "Eric Pope" to the SEC and expressly waived any potential claim of attorney-client privilege over such communications. Based on my review of documents that Centra Tech produced to the SEC, I know that the August 30, 2017 email quoted above in paragraph 18(e) of this Affidavit was sent by SHARMA (via his personal email account "ssharma491@gmail.com") to the purported attorney "Eric Pope" (via his email account "epope@hlineconsulting.com"), and that SHARMA copied FARKAS and TRAPANI on the email.  As explained below, because it is possible that the Subject Devices might contain communications between SHARMA and bona fide attorneys such as Centra Tech's outside counsel at Ballard Spahr, the review of evidence seized from the Subject Devices pursuant to the warrant sought herein will be conducted pursuant to established screening procedures to ensure that the law enforcement personnel involved in this investigation collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege.

USAO_SDNY_00011730

received via computers, including via laptops such as the Subject Device-3, and via "smartphones" such as the Subject Device-1 and Subject Device-2.

      f.     Based on the facts set forth in the SEC Complaint and above, and my review of text messages and other data recovered from the TRAPANI Cellphone, there is probable cause to believe that SHARMA used at least one laptop to engage in the above-described scheme to manipulate the market price of digital Centra tokens issued by Centra Tech to induce investors to purchase Centra ICO with valuable digital assets such as units of "Ether" (also known as "ETH" units). As set forth in the SEC Complaint, in order to effectuate this scheme, SHARMA and his co-defendants, TRAPANI and FARKAS, made purchases of Centra tokens on various digital asset trading exchanges to artificially inflate the market price of Centra Tokens on such exchanges. For example, according to the SEC Complaint, SHARMA and TRAPANI engaged in a concerted effort to manipulate the Centra token price higher on or about August 26 and 27, 2017, and through this effort, caused the per-token price of Centra tokens to rise by more than double during the period from approximately August 26 through August 28, 2017. Based on my review of text messages and other data recovered from the TRAPANI Cellphone, my training and experience, and my participation in the investigation of this case, I believe that SHARMA, via the SHARMA Cellphone-1, engaged in a text message conversation with TRAPANI on or about August 27, 2017 in which SHARMA made statements about using a laptop in relation to this market manipulation scheme. For example, during this conversation, SHARMA instructed TRAPANI to use a trading account with Centra tokens and to sell those tokens to himself via another trading account using Ether units to make purchases of Centra tokens ("All you need to do is," "Have one account," "Selling it," "And you making

20

USAO_SDNY_00011731

.0001 buys," "And buy and sell yourself . . . .") SHARMA then asked TRAPANI to send

SHARMA, via an online communications platform operated by a company called "Slack,"

the information needed for SHARMA to use his laptop to send Ether units to the trading

account that TRAPANI would use to make such purchases ("Send me the one with ETH,"

"I'm gonna top you off," "I'll send you 20 ETH," "Yea," "Send it in slack," "I'm gonna

hop on now," "Ok," "Let me get my laptop.").

19.     Based on my training and experience, my conversations with other law enforcement

officials and representatives of the SEC, and my participation in the investigation of this case, I

have learned the following, in substance and in part. Like individuals engaged in any other kind

of activity, individuals who engage in financial crimes and fraud-related offenses such as the

Subject Offenses frequently store records relating to their illegal activity and to persons involved

with them in that activity on electronic devices such as the Subject Devices. Such records can

include, for example, text messages with co-conspirators or victims; logs of online "chats" with

co-conspirators or victims; email correspondence with co-conspirators or victims; contact

information of co-conspirators, including telephone numbers, email addresses, and identifiers for

instant messaging and social medial accounts; and records of illegal transactions including bank

records and other financial records. Individuals engaged in criminal activity often store such

records in order to, among other things, keep track of co-conspirator's contact information; keep

a record of illegal transactions for future reference; keep an accounting of illegal proceeds for

purposes of, among other things, dividing those proceeds with co-conspirators; and store stolen

data for future exploitation.

20.     Computer files or remnants of such files can be recovered months or even years

after they have been created or saved on an electronic device such as the Subject Devices. Even

2017.08.02

USAO_SDNY_00011732

when such files have been deleted, they can often be recovered, depending on how the relevant device's drive has subsequently been used, months or years later with forensics tools. Thus, the ability to retrieve from information from the Subject Devices depends less on when the information was first created or saved than on a particular user's device configuration, storage capacity, and computer habits.

21.     Based on the foregoing, I respectfully submit there is probable cause to believe that SHARMA has engaged in the Subject Offenses of conspiring to commit, and committing, securities and wire fraud, and that evidence of this criminal activity is likely to be found on the Subject Devices.

## III.  Procedures for Searching ESI

### A.  Review of ESI

22.     Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the Government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained on the Subject Devices for information responsive to the warrant sought herein.

23.     In conducting this review, law enforcement may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses.  Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

2017.08.02

USAO_SDNY_00011733

- "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of search terms related to the subject matter of the investigation. (Keyword searches alone are typically inadequate to detect all information subject to seizure. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.)

24.     Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant. Depending on the circumstances, however, law enforcement may need to conduct a complete review of all the ESI from the Subject Devices to locate all data responsive to the warrant.

25.     Additionally, because it is possible that SHARMA might have used the Subject Devices to communicate with bona fide attorneys as explained above, the review of evidence seized from the Subject Devices will be conducted pursuant to established screening procedures to ensure that the law enforcement personnel involved in the investigation and prosecution of this case, including attorneys for the Government, collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege. When appropriate, the procedures will include use of a designated "filter team," separate and apart from the prosecution team involved in the investigation and prosecution of this case, in order to review potentially privileged communications and determine which communications to release to the prosecution team.

## B.  Return of the Subject Devices

26.     If the Government determines that the Subject Devices are no longer necessary to retrieve and preserve the data on the devices, and that the Subject Devices are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return the Subject Devices, upon request. Computer data that is encrypted or unreadable will not be returned unless

2017.08.02

USAO_SDNY_00011734

law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

## IV.  Conclusion and Ancillary Provisions

1.     Based on the foregoing, I respectfully request the Court to issue the enclosed Search and Seizure Warrant to search the items and information specified in Attachment A to this Affidavit and to the Search and Seizure Warrant.

BRANDON S. RACZ
Special Agent
Federal Bureau of Investigation

Sworn to before me on
July 2, 2018

THE HONORABLE ONA T. WANG
UNITED STATES MAGISTRATE JUDGE

24

2017.08.02

## Attachment A

### I. Devices Subject to Search and Seizure

The devices that are the subject of this search and seizure warrant are described as follows: (a) a black Apple iPhone Model A1661 seized from SOHRAB SHARMA, a/k/a "Sam Sharma," in connection with his arrest on April 1, 2018 ("Subject Device-1"); (b) a silver Apple iPhone X in a protective case, which is attached to what appears to be a PopSocket expanding grip and stand bearing a Centra Tech logo of a gold "C" surrounded by a gold circle, that was seized from the apartment in which SHARMA was arrested on April 1, 2018 ("Subject Device-2"); and (c) a silver Apple MacBook Pro laptop computer, bearing serial number C02V41ZVHTD6, that was seized from the apartment in which SHARMA was arrested on April 1, 2018 ("Subject Device-3") (collectively, the "Subject Devices").

### II. Review of ESI on the Subject Devices

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the Government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the ESI contained on the Subject Devices for evidence, fruits, and instrumentalities of conspiracy to commit securities fraud (in violation of 18 U.S.C. § 371), securities fraud (in violation of 15 U.S.C. §§ 78j(b) & 78ff; 17 C.F.R. § 240.10b-5; and 18 U.S.C. § 2), conspiracy to commit wire fraud (in violation of 18 U.S.C. § 1349), and wire fraud (in violation of 18 U.S.C. §§ 1343 and 2) (collectively, the "Subject Offenses") described as follows:

      1.     Evidence regarding any of the allegations set forth in the criminal Complaint numbered 18 Mag. 2695 against SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "RJ," a/k/a "Bob," the criminal Complaint numbered 18 Mag. 3271 against RAYMOND TRAPANI, a/k/a "Ray," the criminal Indictment numbered 18 Cr. 340 (LGS) against SHARMA, TRAPANI and FARKAS, and the civil Amended Complaint numbered 18 Civ. 2909 (DLC) against SHARMA TRAPANI and FARKAS filed in the Southern District of New York (collectively, the "Charging Documents").

      2.     Evidence of the Subject Offenses including a scheme to solicit victims to exchange digital funds (such as units of a cryptocurrency known as "Ether") for the purchase of unregistered securities, in the form of digital tokens issued by Centra Tech, Inc. ("Centra Tech"), based on: (a) misrepresentations and omissions such as those identified in the Charging Documents, including misrepresentations and omissions about (i) Centra Tech's purported business partnerships and relationships with payment card issuers such as Bancorp, Visa, and Mastercard; (ii) the purported makeup, identities and qualifications of Centra Tech's executive team, including the company's purported CEO "Michael Edwards" and purported CFO "Jessica Robinson"; (iii) Centra Tech's purported money transmitter and other licenses in 38 states; and (b) manipulative trading to artificially inflate the price per token of the digital tokens issued by Centra Tech.

      3.     Photographs of Centra Tech's executives and employees, including its purported CEO "Michael Edwards" and its purported CFO "Jessica Robinson."

2017.08.02

4.   Evidence of the receipt, transfer, disposition or location of funds raised from victims of the Subject Offenses in connection with their purchases of digital tokens issued by Centra Tech.

5.   Communications and documents relating to the actual or claimed performance of Centra Tech or of its purported products, including its purported debit and prepaid cards, its purported wallet application, and its purported currency conversation engine.

6.   Association evidence of the relationships between and among SHARMA, TRAPANI and FARKAS, including photographs of SHARMA, TRAPANI and FARKAS with each other.

7.   Evidence of efforts by SHARMA, TRAPANI, FARKAS or Centra Tech to avoid detection by the United States Securities and Exchange Commission or law enforcement in connection with the Subject Offenses.

8.   Evidence of preparation for the Subject Offenses, such as documents and communications relating to the establishment of corporate entities such as Centra Tech, the creation of marketing materials to solicit investments such as white papers, promotional videos, and press releases, the creation and management of digital wallets and bank accounts to receive funds solicited from victims of the Subject Offenses, and financial, banking and tax records relating to the Subject Offenses.

9.   Evidence, including documents and communications, reflecting state of mind of co-conspirators such as SHARMA, TRAPANI and FARKAS with respect to the commission of the Subject Offenses, including electronic communications among co-conspirators.

10.   Evidence concerning the identities and locations of co-conspirators or victims of the Subject Offenses.

11.   Evidence revealing the location of other evidence of the Subject Offenses, including electronic messages and communications reflecting registration of other online accounts or bank accounts potentially containing relevant evidence.

12.   Evidence revealing the passwords or other information of co-conspirators (such as SHARMA, TRAPANI and FARKAS) of the Subject Offenses needed to access the user's computer or other online accounts.

13.   Evidence concerning secondary trading of any digital tokens issued by Centra Tech, including any documents or communications between SHARMA, TRAPANI, FARKAS or Centra Tech and any cryptocurrency or securities exchanges.

Additionally, review of the items described in this Attachment shall be conducted pursuant to established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege.  When appropriate, the procedures shall include use of a designated "filter team," separate and apart from the prosecution team working on the investigation and prosecution in this case, in order to address potential privileges.

2

USAO_SDNY_00011737

# EXHIBIT A

USAO_SDNY_00011738

Approved: _____
          NEGAR TEKEEI / SAMSON ENZER
          Assistant United States Attorneys

Before:   HONORABLE JAMES L. COTT
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - -  x
                                 :
                                 :    **SEALED COMPLAINT**
UNITED STATES OF AMERICA         :
                                 :    Violations of
         - v. -                  :    15 U.S.C. §§ 78j(b), 78ff;
                                 :    17 C.F.R. §§ 240.10b-5; 18
SOHRAB SHARMA,                   :    U.S.C. §§ 371, 1343, 1349
   a/k/a "Sam Sharma," and       :    and 2
Robert Farkas,                   :
   a/k/a "Bob,"                  :    COUNTY OF OFFENSES:
                                 :    New York
              Defendants.        :
                                 x

- - - - - - - - - - - - - - - -

SOUTHERN DISTRICT OF NEW YORK, ss.:

     BRANDON RACZ, being duly sworn, deposes and says that he is
a Special Agent with the Federal Bureau of Investigation ("FBI")
and charges as follows:

### COUNT ONE
### (Conspiracy To Commit Securities Fraud)

     1.   From at least in or about July 2017, up to and
including the date of this Complaint, in the Southern District
of New York and elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma,"
and ROBERT FARKAS, a/k/a "Bob," the defendants, and others known
and unknown, willfully and knowingly did combine, conspire,
confederate, and agree together and with each other to commit
offenses against the United States, to wit, securities fraud, in
violation of Title 15, United States Code, Sections 78j(b) and
78ff, and Title 17, Code of Federal Regulations, Section
240.10b-5.

     2.   It was a part and object of the conspiracy that SOHRAB
SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the
defendants, and others known and unknown, willfully and

knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, and of the facilities of national securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, to wit, the defendants and others known and unknown participated in a scheme to defraud purchasers of Centra Tech, Inc. ("Centra Tech") cryptocurrencies by making material misrepresentations about Centra Tech, its purported partnerships with Bancorp, Visa and Mastercard, its products, its licensing in various states, and its executive personnel, causing investors to purchase more than $25 million worth of Centra Tech cryptocurrencies, which function as unregistered securities, during the time period of Centra Tech's initial coin offering.

### Overt Acts

3.    In furtherance of the conspiracy and to effect its illegal object, SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, and others known and unknown, commmitted the following overt acts, among others, in the Southern District of New York and elsewhere:

a.    On or about August 14, 2017, SHARMA, in an interview by a cryptocurrency podcast, made material misrepresentations about an initial coin offering for the digital assets and cryptocurrency company Centra Tech, for which he was a founder, President, and Chief Technology officer at various times.

b.    On or about September 6, 2017, FARKAS, a chief marketing officer for Centra Tech, sent an email to an individual at a marketing company describing Centra Tech's currency conversion capabilities as "allow[ing] real time conversion of all supported cyrptocurrencies to give the user the ability to spend their assets in real time anywhere in the world that accepts Visa or Mastercard."

2

c.   On or about November 28, 2017, FARKAS attended a blockchain technology conference in New York City, New York, on behalf of Centra Tech, a sponsor of the conference, for the purpose of promoting Centra Tech and its products.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Securities Fraud)

4.   From at least in or about July 2017, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, and of the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, the defendants and others known and unknown participated in a scheme to defraud purchasers of Centra Tech cryptocurrencies by making material misrepresentations about Centra Tech, its purported partnerships with Bancorp, Visa and Mastercard, its products, its licensing in various states, and its executive personnel, causing investors to purchase more than $25 million worth of Centra Tech cryptocurrencies, which function as unregistered securities, during the time period of Centra Tech's initial coin offering.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT THREE
### (Conspiracy To Commit Wire Fraud)

5.   From at least in or about July 2017, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma,"

3

and ROBERT FARKAS, a/k/a "Bob," the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343.

6.    It was a part and an object of the conspiracy that SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, the defendants and others known and unknown participated in a scheme to defraud purchasers of Centra Tech cryptocurrencies by making material misrepresentations about Centra Tech, its purported partnerships with Bancorp, Visa and Mastercard, its products, its licensing in various states, and its executive personnel.

(Title 18, United States Code, Section 1349.)

## COUNT FOUR
### (Wire Fraud)

7.    From at least in or about July 2017, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, the defendants and others known and unknown participated in a scheme to defraud purchasers of Centra Tech cryptocurrencies by making material misrepresentations about Centra Tech, its purported partnerships with Bancorp, Visa and Mastercard, its products, its licensing in various states, and its executive personnel, and in the course of executing such scheme, caused interstate and international wires to be sent, including emails between New

4

York, New York and Florida and a location outside of the United States.

(Title 18, United States Code, Section 1343 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

8. I have been a Special Agent with the FBI for approximately two and a half years. I am currently assigned to a squad that investigates white collar crimes, including complex financial frauds and conduct within the regulatory jurisdiction of the U.S. Securities and Exchange Commission ("SEC"). I have participated in investigations of such offenses, and have made and participated in arrests of individuals who have committed such offenses.

9. The information contained in this Complaint is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources, including, but not limited to: (a) business records and other documents, such as trading records, bank records, telephone records, and records of electronic communications, including text messages; (b) publicly available documents; (c) conversations with, and reports of interviews with, non-law-enforcement witnesses; (d) conversations with, and reports prepared by, other agents; and (e) conversations with representatives from the U.S. Securities and Exchange Commission ("SEC"). Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions and statements of and conversations with others are reported herein, they are reported in substance and in part. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

## The Defendants and Relevant Entities

10. Based on my review of publicly available information and records provided by Centra Tech to representatives of the SEC, I have learned the following, in substance and in part:

a. Centra Tech is a Delaware corporation based in Miami Beach, Florida. Centra Tech advertises itself through its website, https://centra.tech (the "Centra Tech Website"), press releases, and statements on the Internet as a company that

5

offers various methods to store and spend digital assets such as cryptocurrencies. For example, the Centra Tech Website currently advertises that Centra Tech "offers blockchain products such as a Wallet to store digital assets, a Prepaid Card to spend the digital assets, and three soon to be released products and services, which include a Marketplace to buy goods with the digital assets, a cryptocurrency Exchange Platform to buy, sell and trade digital assets, and a open-source hyper speed DPoS Blockchain."

      b.   The following individuals, among others, are or have been employed at Centra Tech:

      i.   SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, was a founder of Centra Tech, its President, and its Chief Technology Officer. On October 31, 2017, Centra Tech announced that SHARMA was "stepping aside to support the continued growth of the company," and announced a "reconstituted executive management team" that did not include SHARMA.

      ii.   ROBERT FARKAS, a/k/a "Bob," has held various positions at Centra Tech, including as its chief marketing officer and chief operating officer.

      c.   The Bancorp, Inc. ("Bancorp") is a Delaware-based financial services company with offices throughout the United States. Bancorp provides a variety of financial services to companies and individuals, including issuing debit and prepaid cards, and payments processing, which it does by virtue of contractual partnerships with other financial services companies such as Visa and Mastercard, among others.

      d.   Visa Inc. ("Visa") is a U.S.-based multinational financial services corporation headquartered in Foster City, California. Visa facilitates electronic funds transfers throughout the world, most commonly through "Visa"-branded credit cards and debit cards.

      e.   Mastercard Incorporated ("Mastercard") is a U.S.-based multinational financial services corporation headquartered in Purchase, New York. Mastercard's principal business is to process payments between the banks of merchants and the card issuing banks or credit unions of the purchasers who use the "Mastercard" brand debit and credit cards to make purchases.

USAO_SDNY_00011744

## Relevant Regulatory Background and Definitions

11.   An "initial coin offering" ("ICO") is a type of fundraising event in which an entity offers participants a unique digital "coin" or "token" in exchange for consideration. The consideration often comes in the form of "virtual currency" or "cryptocurrency," but can also be "fiat currency," which is currency, like the U.S. dollar and the Euro, that a government has declared to be legal tender, but is not backed by a physical commodity. "Virtual currency" or "cryptocurrency" is a digital representation of value that can be digitally traded and functions as (1) a medium of exchange, (2) a unit of account, and/or (3) a store of value, but does not have legal tender status.  Unlike fiat currency, like the U.S. dollar and the Euro, virtual currency is not issued by any jurisdiction and functions only by agreement within the community of users of that particular currency.  Examples of virtual currency are Bitcoin and Ether.[1]

12.   The tokens or coins issued in an ICO are issued and distributed on a "blockchain" or cryptographically-secured ledger.  Tokens often are also listed and traded on online platforms, typically called virtual currency exchanges, and they usually trade for other digital assets or fiat currencies. Often, tokens are listed and tradeable immediately after they are issued.

13.   ICOs are typically announced and promoted through the Internet and e-mail.  Issuers usually release a "whitepaper" or "white paper" describing the project and the terms of the ICO. In order to participate in the ICO, investors are generally required to transfer funds to the issuer.  After the completion of the ICO, the issuer will distribute its unique "coin" or "token" to the participants.  The tokens may entitle the holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, and/or voting rights.  These tokens may also be listed on online platforms, often called virtual currency exchanges, and be tradable for virtual currencies.

---

[1] Based on my training, experience, and participation in this investigation, I have learned that "Ether" is a cryptocurrency whose blockchain is generated by the Ethereum platform, and the term "Ether" is sometimes used interchangeably with "Ethereum."

USAO_SDNY_00011745

14. Under Section 2(a)(1) of the Securities Act of 1933, a security includes "an investment contract." 15 U.S.C. § 77b. An "investment contract" is a contract, transaction or scheme "whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *S.E.C.* v. *W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* at 301. Importantly, the economic realities of the transaction or product and not its name determine whether the instrument is a security. *United Hous. Found, Inc.* v. *Forman*, 421 U.S. 837, 851 (1975). Pursuant to Sections 5(a) and 5(c) of the Securities Act, a company or individual conducting an offer or sale of securities to the public must file a registration statement with the SEC. 15 U.S.C. § 77e(a) and (c).

## Overview of the Scheme to Defraud

15. From at least July 2017 up to and including the day of this Complaint, SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, and others known and unknown, participated in a scheme to defraud purchasers of Centra Tech cryptocurrencies by making material misrepresentations about Centra Tech, its purported partnerships with Bancorp, Visa, and Mastercard, its products, its licensing in various states, and its executive personnel. Through these misrepresentations, SHARMA and FARKAS caused investors to purchase more than $25 million worth of Centra Tech cryptocurrencies, which function as unregistered securities, during the time period of Centra Tech's initial coin offering.

## The Centra Tech ICO

16. As set forth in greater detail below, based on my participation in this investigation and my review of reports and records prepared by others, from in or about July 2017 through in or about October 2017, Centra Tech raised capital, by offering unregistered securities via an ICO, to operate what Centra Tech advertised would be the world's first multi-blockchain debit card (the "Centra Tech ICO"). In sum, Centra Tech accepted digital currency from investors in exchange for Centra Tokens that Centra Tech stated could be "exchange[d] . . . on the Cryptocurrency exchanges for a profit" and would "allow[] users to join [Centra Tech's] success and mission *while generating a profit*." (emphasis added). In doing so, Centra Tech made multiple false statements, including on the Centra Tech Website and in materials posted to the Centra Tech Website,

8

USAO_SDNY_00011746

regarding, among other things, (a) the "Centra Card" or the "Centra Debit Card," a debit card that was falsely advertised as one that would allow users to make purchases using any blockchain currency of choice and would work at any location that accepted Visa or Mastercard, (b) Centra Tech's partnerships with Bancorp, Visa, and Mastercard, which did not exist, (c) individual state licenses held by Centra Tech, at least some of which did not exist, and (d) the identity of one of Centra Tech's executives, who does not appear to exist.

17.   Based on my review of publicly available information and records provided by Centra Tech to representatives of the SEC, among other sources, I have learned the following, in substance and in part:

a.   On or about July 23, 2017, Centra Tech issued a press release that it paid to be published on the website "cointelegraph.com" (the "July 23 Press Release"). In the July 23 Press Release, Centra Tech described the Centra Tech ICO as "truly a ground floor opportunity to be part of a global solution to the blockchain currency dilemma that offers a comprehensive rewards program for both token and card holders while giving the ability to spend your cryptocurrency in real time with no fees." The July 23 Press Release also touted Centra Tech's products: (1) the "Centra Debit Card" which purported to "enable[] users to make purchases using their blockchain currency of choice," and "work[] anywhere that accepts Visa or MasterCard," (2) the "Centra Wallet App," which "makes it easy for people to register for the Centra Debit Card, store their cryptocurrency assets, as well as control its functions," and (3) "cBay," the "world's first Amazon type of marketplace created especially for cryptocurrency acceptance." The July 23 Press Release also advertised Centra Tech's "Currency Conversion Engine" as allowing users "the ability to spend their assets anywhere in the world that accepts Visa and/or MasterCard."

b.   On or about July 25, 2017, Centra Tech issued a press release that it paid to be published on the website Bitcoin.com (the "July 25 Press Release"). In the July 25 Press Release, Centra Tech described the Centra Tech ICO as "truly a ground floor opportunity to be part of a global solution to the blockchain currency dilemma that offers a comprehensive rewards program for both token and card holders while giving the ability to spend your cryptocurrency in real time with no fees." The July 25 Press Release also touted Centra Tech's products: (1) the "Centra Debit Card" which purported to "enable[] users to

9

USAO_SDNY_00011747

make purchases using their blockchain currency of choice," and "work[] anywhere that accepts Visa or MasterCard," (2) the "Centra Wallet App," which "makes it easy for people to register for the Centra Debit Card, store their cryptocurrency assets, as well as control its functions," and (3) "cBay," the "world's first Amazon type of marketplace created especially for cryptocurrency acceptance."   The July 25 Press Release also advertised Centra Tech's "Currency Conversion Engine," as allowing users "the ability to spend their assets anywhere in the world that accepts Visa and/or MasterCard."

        c.    Centra Tech also posted several different versions of a white paper advertising the Centra Tech ICO on the Centra Tech Website.  A version of the ICO White Paper that was downloaded from the Centra Tech Website on or about August 3, 2017 and labeled "FINAL DRAFT" ("White Paper-1") contained several statements describing the ICO and the Centra Card using terminology indicative of a securities offering.  For example:

        i.  White Paper-1 described the Centra Tech ICO as a token offering for which 400 Centra Tokens, or "CTR"s, would be sold for 1 ETH.  Based on my training, experience, and participation in this investigation, I have learned that "ETH" is the currency code for Ether, a cryptocurrency whose blockchain is generated by the Ethereum platform.

        ii.  Centra Tech stated that it would be offering "68% of all [Centra] Tokens to be created for purchase in our crowd sale to the public" and would "allocate 20% of all [Centra] Tokens created to distribution of bug bounty, business development, community projects, market expansion, and more" while "[t]he remaining 12% will be distributed to Centra Techs founders, early investors, and employees as an incentive to create a long lasting mutual interest and dedication to the tokens and their prolonged value."

        iii.  In providing details about the Centra Card and the Centra Tech ICO,  White Paper-1 referenced different levels of investment opportunity:

        1. The "Centra Black Card founders edition" was to be issued to "our first 500 ICO backers whom purchase with 100+ ETH" and would carry with it an "enhanced rewards program."

        2. The "Centra Gold Card limited edition" would be "allocated to our first 1000 contributors whom purchase CTR

10

Tokens with 30+ ETH," and would also carry an "enhanced rewards program."

       3. The "Centra Blue & Virtual Card" would be the "signature and traditional card."

       iv. White Paper-1 advertised multiple "rewards" programs for Centra Token holders. For example, White Paper-1 advertised that Centra Token holders would receive a ".8% ETH" reward for every transaction in the "network" (the "Network Rewards Program"). This was in contrast to another rewards program advertised in White Paper-1, which offered "Card rewards of up to 2% of your purchases made on the Centra card." Based on my review of White Paper-1, and representations made by SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, as described in paragraph 30.e., below, explaining that "through our revenue share we actually give .8 percent of that away to token holders as part of our program to join the Centra Tokens," I believe the Network Rewards Program functions like a dividend in that it is offering a share – .8% ETH – of Centra Tech's revenue.

       v. Although it claimed that holders of the Centra Token "by no means own any securities or interest in Centra Tech," and that the Centra Tokens "are not securities nor shares," White Paper-1 promised that Centra Token purchasers would "be able to place their wallet to use on Centra Debit card, or exchange them [the Centra Tokens] on the Cryptocurrency exchanges for a profit." White Paper-1 also claimed that the Centra Card and Centra Wallet were "already live in beta," and that Centra Tech was "offering our initial crowd sale of tokens to appropriately fund the vision of Centra Tech's future." It further claimed that Centa Tech's "initial coin offering allows users to join our success and mission *while generating a profit*." (emphasis added).

       vi. White Paper-1 also contained several misrepresentations, as described further in paragraphs 34 through 43, below, about Centra Tech's relationships with financial services institutions. For example:

       1. In describing the Centra Card, White Paper-1 stated: "For our United States clients the Centra Card will be a Visa card while for international users the Centra card issued will be a MasterCard. . . . The Centra Card allows all supported cryptocurrencies to become spendable in real time based on the government fiat being used at the time the card is used at a participating location that accepts Visa or MasterCard."

11

2. White Paper-1 contained multiple images of Centra Cards with the "Visa" logo.

3. White Paper-1 also stated that one benefit and advantage of the Centra Card was "Access to 36+ Million Points of Sale where Visa and/or Master-Card is accepted in 200+ countries."

4. A product comparison table in White Paper-1 reported that the issuers of the Centra Card were "MasterCard and Visa."

5. White Paper-1 contained a timeline of Centra Tech's "milestone items," including a "Major Banking Partnership signed and license agreement with VISA USA Inc formulated" in January 2017, and a "Beta Launch of Centra Black Card and Centra Wallet App Live" in March 2017.

6. White Paper-1 also used the logos of Bancorp, Visa and Mastercard when describing Centra Tech's partners.

vii.   White Paper-1 stated that "Centra Tech holds individual licenses in 38 states namely Alabama, Arizona, Alaska, Arkansas, Connecticut, Delaware, District of Columbia, Florida, Georgia, Idaho, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Mississippi, Nevada, Nebraska, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, Oregon, Rhode Island, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, and West Virginia." It further stated that the licenses "are held under categories of Money Transmitter, Sales of Checks, Electronic Money Transfers, and Seller of Payment Instruments."

viii.   White Paper-1 advertised the "Centra Tech Team" as comprising, among other individuals, SHARMA as the "CTO & Co-Founder"; FARKAS as the "CMO"; and "Michael Edwards" as the "CEO & Co-Founder."

### SHARMA's Representations in Connection with the Centra Tech ICO

18.   On or about August 14, 2017, SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, was interviewed by Neocash Radio, a cryptocurrency podcast, about the Centra Tech ICO.  Based on my

USAO_SDNY_00011750

review of a recording of the interview, I have learned that SHARMA stated, among other things, the following:[2]

      a.    "[I]nternationally, we currently have our license with Mastercard, to service international clients. Domestically, we do have the Visa partnership, so we are able to issue Visa cards domestically and Mastercards internationally."

      b.    "Right now we are currently in our live Beta stage, which we have members of our internal organization as well as some external that have gotten our Centra Black Founder cards recently.  We're going through . . . pretty much a phase two of testing right now where we are just going through daily transactions, testing volume, etc., and we've gotten really good results so far on it."

      c.    SHARMA also stated that Centra Tech had "pretty much a successful test rate in terms of errors, in terms of proof processes and the whole flow of the card attaching to the app," when discussing the Centra Wallet.

      d.    SHARMA identified "Mike Edwards" as a "VP and co-founder" who was an early investor in Centra Tech.

      e.    In describing the rewards system for purchasers in the ICO, SHARMA stated:  "The rewards percentage that we get from Visa and Mastercard through our revenue share we actually give .8 percent of that away to token holders as part of our program to join the Centra tokens."

      f.    "[R]ight now is a great time to join our system, we have a token sale that is going on, it finishes on October 5th . . . we're currently a little bit north of $10 million raised in our first eight days of our crowd sale so I definitely want to thank all of my contributors and anyone who is listening for joining that as well."

      g.    SHARMA stated that there was currently a 20% token bonus on top of the current token sale that "can be redeemed via email."

---

[2] The summaries and transcript of the recorded interview set forth herein is based on a preliminary draft transcription and remains subject to revision.

13

h.   "We have a couple of large deals we're working on right now with a few companies so we should be over by I would say early September."

i.   SHARMA directed listeners to the Centra Tech website, www.centra.tech, to find out more about the Centra Tech ICO:  "You can go to our website, www.centra.tech, and you can click the token sale page as well as our white paper is on there and you can just get an insight of everything from A to Z."

j.   SHARMA stated that while Centra Tech was licensed in 38 states, "the states that we are operating in currently for licensing purposes is just so the ability to withdraw and transmit your Bitcoins.  As far as actually utilizing the card itself to the wallet and spending the cryptocurrencies, that's available in all states."

k.   SHARMA also stated that he was able to work through the U.S. licensing issues with a contact he knew at Metropolitan Commercial Bank.  SHARMA stated that "our system is connected to the bank and we're connected to the clients."

## Additional Representations by FARKAS

19.  Based on my review of records provided by Centra Tech to the SEC, and which were provided to me in connection with this investigation, I have learned, in substance and in part, the following:

a.   On or about August 30, 2017, SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, sent an email to an individual not at Centra Tech, and copied ROBERT FARKAS, a/k/a "Bob," the defendant, to the email.  In that email, SHARMA conveyed a message that SHARMA had received from Bancorp stating the following:

> Mr. Sharma:  I left a voicemail on your phone, but I am following up here as well.  CENTRA TECH IS HEREBY DIRECTED TO CEASE AND DESIST FROM REPRESENTING THAT THE BANCORP BANK HAS ANY CONNECTION WITH, OR IS THE ISSUER OF ANY CARD PRODUCTS RELATED TO CENTRA TECH.  YOU ARE ALSO DIRECTED TO CEASE AND DESIST USING OUR LOGO OR OTHER IMAGES IN CONNECTION WITH THE MARKETING OF ANY CARD PRODUCTS OR WALLETS YOU OFFER.  Please REMOVE any and all references to The Bancorp Bank or The Bancorp Inc. from

14

>     any and all websites, marketing materials or
>     other communications, including blogs as this
>     has not been authorized by The Bancorp.    I
>     expect you will be hearing from federal
>     banking regulators as well.

     b.    On or about September 6, 2017, FARKAS exchanged
emails with an individual at a company that provides a search
engine allowing users to look up, confirm, and validate
transactions that have taken place on the Ethereum blockchain
("Company-1").   In the emails, FARKAS inquired about how to
obtain advertising space on Company-1's website, and stated, in
substance and in part, the following:

>     I know there are some past issues but we are now
>     complete on our Pre-ICO raised over 10M in ETH and
>     have been verified by all of our staff on Token Market
>     . . .
>
>     We have ad space everywhere else except here.   Please
>     let me know if you need any identifying documents or
>     anything to proceed with our ad space.

FARKAS also provided the advertising text that he wanted
Company-1 to post"   "Centra Card ® & Centra Wallet ® Now
available Worldwide!"   FARKAS signed the email "Robert Farkas
CMO."   After receiving a response from Company-1 that it was
"not able to cater to [Centra Tech's] advertising needs at this
point [in] time," FARKAS forwarded the emails to
"ssharma491@gmail.com," an email address used by SHARMA.[3]

     c.    In or about early September 2017, FARKAS, using
the email address "support@centra.tech," and at times signing
his name "Bob," or "Robert Farkas CMO Centra," exchanged a
series of emails with an individual at a marketing company
seeking to write promotional materials and/or articles about
Centra Tech ("Individual-1").   On or about September 6, 2017,
FARKAS described Centra Tech as follows:

>     The biggest problem in the crypto world is
>     being able to spend your cryptocurrency

---

[3] Based on records provided to the FBI by Google, I have learned
that SHARMA is listed as the subscriber for the email address
"ssharma491@gmail.com."   In addition, based on my review of
records produced by Centra Tech to the SEC, I have learned that
SHARMA uses the email address "ssharma491@gmail.com."

USAO_SDNY_00011753

> effortlessly.   The Centra Card and Centra
> Wallet app are the solution.   Our Currency
> Conversion Engine Module (CCE Module) allows
> real  time  conversion  of·  all  supported
> cyrptocurrencies to give the user the ability
> to spend their assets in real time anywhere in
> the world that accepts Visa or Mastercard.
>
> ...
>
> Thanks,
> Bob

On or about September 13, 2017, Individual-1 appears to have
provided FARKAS with a draft of written materials related to
Centra Tech and, later that same day, FARKAS responded with
edits, including the following:

> Title: Can we change it too: This company
> has brought cryptocurrency into the real
> world
> reason being is that our card is live and
> working and has been shipped to clients
> already ☺
> . . .
> Thanks,
> Bob

    20.   From approximately in or about September 2017 through
in or about December 2017, FARKAS received and responded to
multiple emails either directly or through the
"support@centra.tech" email account from individuals interested
in participating in the Centra Tech ICO, interested in
purchasing Centra Tokens, or otherwise seeking information about
Centra Tech.

    21.   Based on my review of records provided by Centra Tech
to the SEC, I have learned, in substance and in part, that, in
or about October 2017, FARKAS registered Centra Tech as a
sponsor of "Consensus: Invest 2017," a blockchain technology
summit or conference that took place on or about November 28,
2017 in New York City, New York.   I have reviewed a video posted
to Centra Tech's YouTube channel on or about January 5, 2018
entitled "Centra Consensus NYC Cryptocurrency Blockckain Expo
Invest."   The video depicts what appears to be people and
activities at the "Consensus" Invest 2017," including a Centra

16

Tech booth or table at the conference, and shows FARKAS engaging in conversations with various people during the conference. Based on the foregoing, I believe that FARKAS was in New York City, New York, on or about November 28, 2017, and engaged in promotional and marketing activities for Centra Tech at the "Consensus: Invest 2017" conference.

## The Fraudulent Partnerships with Bancorp, Visa, and Mastercard

22.   Based on my conversations with a representative of Bancorp ("Witness-1") and my review of documents provided by Bancorp, I have learned, in substance and in part, the following:

a.   In approximately August 2017, Witness-1 learned from Bancorp's marketing group that a potential investor or purchaser of Centra Tech tokens had inquired as to whether Bancorp had a business relationship with Centra Tech, as was represented by Centra Tech in its marketing materials at the time.

b.   In investigating the inquiry in approximately August 2017, Witness-1 reviewed the Centra Tech Website and a white paper posted on the Centra Tech Website.  Witness-1 discovered that Bancorp's issuer statement, a statement regarding who the card issuer is any time a Visa or Mastercard image is displayed, was being used on the Centra Tech Website. Witness-1 knew by looking at the Centra Tech Website and white paper that Bancorp would not ever work with a company such as Centra Tech by virtue of the risk level of the product Centra Tech was offering.

c.   Witness-1 reviewed Bancorp internal databases, to include Bancorp's list of entities with which it had card issuance relationships and entities involved in Bancorp's co-branded incentive card program, to see whether Bancorp had any sort of relationship with Centra Tech.  Through this process, Witness-1 confirmed that Bancorp did not have any relationships with Centra Tech.

d.   Witness-1 took screenshots of the Centra Tech Website, including a page that misrepresented Bancorp's issuer statement.

e.   One screenshot that Witness-1 retained stated, among other things:

17

USAO_SDNY_00011755

> The Centra Card Visa Debit Card is issued by
> The Bancorp Bank, member FDIC, pursuant to a
> license from Visa U.S.A. Inc.  "The
> Bankcorp"[4] and "The Bancorp Bank" are
> registered trademarks of The Bankcorp Bank ©
> 2014.  Use of the Card is subject to the
> terms and conditions of the applicable
> Cardholder Agreement and fee schedule, if
> any.

> The Centra Card Mastercard® Debit Card is
> issued by The Bancorp Bank, member FDIC,
> pursuant to a license from Mastercard
> International Incorporated.  "The Bankcorp"
> and "The Bancorp Bank" are registered
> trademarks of The Bankcorp Bank © 2014. Use
> of the Card is subject to the terms and
> conditions of the applicable Cardholder
> Agreement and fee schedule, if any.

f.    As described above, Witness-1 reviewed a white paper that was posted to the Centra Tech Website in August 2017. Witness-1 recalled that the white paper contained multiple misrepresentations, including about Centra Tech's purported relationship with Bancorp.

g.    In approximately August 2017, Witness-1 attempted to reach individuals at Centra Tech through, among other methods, the "Contact Us" portion of the Centra Tech Website to request that Centra Tech remove the Bancorp logo and the false statements regarding Centra Tech's purported relationship with Bancorp.  Witness-1 did not receive a response from Centra Tech.

h.    Based on my conversations with another representative of Bancorp ("Witness-2") and my review of documents provided by Bancorp, I have learned, in substance and in part, that, on or about August 30, 2017, Bancorp sent a cease and desist notice to Centra Tech to which Centra Tech did not respond.

23.    Based on my conversations with a representative of Visa ("Witness-3") and my review of documents provided by Visa, I have learned, in substance and in part, the following:

---

[4] This excerpt from the Centra Tech Website has not been altered to correct spelling or other errors.  In this excerpt, "Bancorp" is also spelled "Bankcorp."

18

USAO_SDNY_00011756

a.   On or about October 10, 2017, Visa became aware that Centra Tech was using the Visa name and logo on marketing materials in connection with the Centra Card and the Centra Tech ICO.

b.   Visa employees researched whether Visa had any relationship, direct or indirect, with Centra Tech.   Visa determined that it had no relationship with Centra Tech.

c.   Visa employees took screenshots of portions of the Centra Tech Website using and showing the Visa name and trademark, including of purported Centra Cards with the Visa logo.

d.   On or about October 10, 2017, Visa's Legal Department sent an email to Centra Tech, at support@centra.tech, attaching a cease and desist letter (the "October 10 Letter"). In the October 10 Letter, Visa stated, in part:

> It has come to our attention that Centra
> Tech ("Centra") is using the Visa-Owned
> Marks on its site https://www.centra.tech as
> well as on its various social media sites
> (e.g., Facebook, Twitter, Instagram,
> YouTube) and other mediums. It appears
> Centra is purporting to be an authorized
> distributor of VISA payment cards utilizing
> cryptocurrency technology. . . . However, to
> the best of our knowledge and good faith
> belief, Centra is not authorized to use the
> Visa-Owned Marks in this manner, nor is it
> authorized to issue, sell, or otherwise
> distribute VISA payment cards. If this is
> not the case, please advise and explain
> immediately, i.e., if Centra is working with
> an authorized Visa Issuing bank.

Visa attached to the October 10 Letter multiple screenshots from the Centra Tech Website in which Centra Tech had misappropriated the Visa trademark.

e.   In the October 10 Letter, Visa requested that Centra Tech cease and desist from using Visa's trademarks and "promoting that it is an authorized distributor of VISA payment cards," and for Centra Tech to remove all references to Visa from the Centra Tech Website and any promotional materials.

19

USAO_SDNY_00011757

Visa also requested that Centra Tech "identify the bank or
financial institution it is working with (if any) to issue a
purported VISA payment card product."

        f.   In response to the October 10 Letter, SOHRAB
SHARMA, a/k/a "Sam Sharma," the defendant, provided Visa with an
acknowledgment that he had received the October 10 Letter, but
did not identify any financial institutions with which Centra
Tech was working to issue a Visa payment card product.

     24.  Based on my review of records provided by Centra Tech
to the SEC, and which were provided to me in connection with
this investigation, I have learned, in substance and in part,
the following:

        a.   On or about October 10, 2017, SOHRAB SHARMA,
a/k/a "Sam Sharma," the defendant, using the email address
"sam@centra.tech," emailed a response to Visa's October 10
Letter, stating:

> This matter has been brought to my
> attention. I will have this matter rectified
> in 48 hours. We are currently in the process
> of finalizing our Co-branded Prepaid Card
> Program, but might not meet the Nov 1st lock
> out deadlines for submission from our
> issuing bank whom is an authorized visa
> issuer for card design approval, So can see
> where this issue might of came from.
>
> However, I have immediately contacted my web
> developers to remove all issues and I will
> have this document [a cease and desist
> acknowledgment] signed and returned within
> 48 hours.
>
> Thank you,
> Sam Sharma

     b. On or about October 11, 2017, Visa responded to
SHARMA's email, and requested that he "advise of the Visa
issuing bank you are working with."

     c. On or about October 12, 2017, SHARMA responded again
via email using the "sam@centra.tech" email account and stated:
"As far as the issuing bank we have an MNDA in place currently.
VISA will soon get our information for Card Design approval and

USAO_SDNY_00011758

program specs from our future issuing bank in the US." SHARMA signed the email, "Thank you, Sam." Based on my training and experience, I believe SHARMA was claiming that he had a Mutual Non-Disclosure Agreement with the purported issuing bank in this email and that he therefore could not disclose its identity.

d. On or about October 14, 2017, Visa responded to SHARMA's email, noting that Centra Tech was still using the Visa trademark and Visa name in its promotional materials, including in videos in which SHARMA appeared, and reiterated its demand that Centra Tech stop using the Visa name. Visa also repeated its request that SHARMA identify the bank that Centra Tech was "allegedly working with."

e. Based on my conversations with Witness-3, I have learned that, in response to Visa's multiple requests for Centra Tech to identify the Visa card issuing bank with which it purported to have a relationship, neither SHARMA nor anyone at Centra Tech identified such an issuing bank.

25. Based on my conversations with a representative of MasterCard ("Witness-4"), I have learned, in substance and in part, that MasterCard's internal records of licensing agreements and relationships with card-issuing banks and other third parties contains no record of any relationship, either direct or indirect, with Centra Tech.

26. Based on my review of the current version of the Centra Tech Website and a white paper published via the Centra Tech Website, as of March 26, 2018, I have learned that Centra Tech is not currently using the Bancorp, Visa or MasterCard names or logos.

27. As described in paragraph 17.c.vii., above, White Paper-1 represented that Centra Tech held licenses "under categories of Money Transmitter, Sales of Checks, Electronic Money Transfers, and Seller of Payment Instruments," in 38 listed states (the "State Licensing List"). Based on my review, on or about March 12, 2018, of a database maintained by the Nationwide Multistate Licensing System, a financial services industry online registration and licensing database, and my review of certain state licensing databases, I have learned, in substance and in part, that the following states on the State Licensing List have no current record for Centra Tech based on available public searches: Arizona, Connecticut, Delaware, Florida, New Jersey, New York or South Dakota.

USAO_SDNY_00011759

## "Michael Edwards"

28.   As described in paragraph 17.c.viii, above, White Paper-1 listed "Michael Edwards" as Centra Tech's "CEO & Co-Founder."  White Paper-1 also included a picture of "Michael Edwards."  Based on open source searches of this image, I have learned that the picture of "Michael Edwards" in White Paper-1 is actually a picture associated with an individual by a different name who is a Canadian physiology professor.

29.   Based on my review of records provided by the SEC, I have learned, in substance and in part, that, on or about August 3, 2017, a user profile page appeared on LinkedIn, a business- and employment-oriented social networking service that operates via websites and mobile apps, for "Michael Edwards."  The LinkedIn page stated that "Michael Edwards" had "launched Centra Tech with the mission to design the world's first multi-blockchain asset debit card" and had managed various aspects of Centra Tech's Centra Card and Centra Wallet programs, including "[e]stablished licensing and partnership terms with Visa & MasterCard."  The LinkedIn page also stated that "Michael Edwards" was affiliated with Harvard University.

30.   Based on my review of currently-available content on the LinkedIn website, I have learned that the "Michael Edwards" LinkedIn page no longer exists.

31.   Based on Internet searches for a "Michael Edwards" who is or was a co-founder or CEO of Centra Tech, I have learned that there is limited information about such an individual.  For example, I have found no interviews of "Michael Edwards" in connection with Centra Tech or the Centra Tech ICO, and the name "Michael Edwards" no longer appears on the Centra Tech Website or Centra Tech online promotional materials.  Based on the information described above, and based on my training, experience, and participation in this investigation, I believe that a "Michael Edwards" who was at some point "CEO & Co-Founder" of Centra Tech may not exist.

## The Centra Tech ICO Investors

32.   Based on my training, experience, and participation in this investigation, I have learned that companies like Centra Tech that offer cryptocurrency are required to keep a record of identification information—including names and addresses—of individuals purchasing their cryptocurrency.  Based on my review

22

of records provided by Centra Tech to the SEC, I have learned, in substance and in part, the following:

        a.    Centra Tech provided a spreadsheet labeled "Centra Token Sale Details" to the SEC.  The spreadsheet contains several tabs, including tabs labeled "CentraToken," "CentraSale," and "Centra Token Owner."

        b.    The CentraToken tab contains information regarding more than 1800 purchases of Centra Tokens from between on or about July 30 to August 26, 2017.  Two of the listed investors reside in New York City, New York, within the Southern District of New York.

        c.    The CentraSale tab contains information regarding more than 1700 purchases of Centra Tokens from between on or about September 19 to September 26, 2017.  Three of the listed investors reside in New York City, New York, within the Southern District of New York.

### Extradition Research, Document Destruction, and International Travel

33.    Based on my discussions with representatives of the SEC, I have learned, in substance and in part, that in or about the fourth quarter of 2017 the SEC issued an initial subpoena to Centra Tech for documents and other information, and that SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, are thus aware of the SEC's investigation.

34.    Based on my conversations with an attorney who is employed by a financial regulatory authority ("Witness-5"), I have learned, in substance and in part, the following:

        a.    Witness-5 knows an attorney who was until recently employed by Centra Tech ("Employee-1").

        b.    Witness-5 had several telephone conversations and electronic communications with Employee-1 on or about March 29 and 30, 2018.

        c.    During these communications, Employee-1 told Witness-5 the following, in substance and in part:

            i.    Employee-1 learned earlier this week that the SEC has been investigating whether Centra Tech has engaged in fraudulent activity.

USAO_SDNY_00011761

    ii. ROBERT FARKAS, a/k/a "Bob," the defendant, recently asked Employee-1 via email to conduct research regarding foreign extradition laws.

    iii. After Employee-1 performed this extradition research and reported the results to FARKAS, FARKAS approached Employee-1 in person and stated, in substance and in part, that he had deleted his email asking Employee-1 to perform this extradition research.  Based on FARKAS' demeanor during this interaction and the way in which he made that statement about deleting his email, Employee-1 understood FARKAS to be suggesting that Employee-1 should also delete the copy of that email that Employee-1 had received from FARKAS regarding the extradition research.

    d. Employee-1 has not seen an individual Employee-1 described to Witness-5 as the "owner" of Centra Tech in over a week -- which I believe, based on my training and experience and participation in the investigation of this case, to be a reference to SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant.

    e. Employee-1 also learned this week that Centra Tech's bank account has been depleted.

    f. Employee-1 conveyed that Centra Tech has terminated virtually all of its employees except certain top executives such as SHARMA and FARKAS.

  26. Based on my review of records provided by Delta Airlines, I have learned that on or about March 27, 2018, ROBERT FARKAS, a/k/a "Bob," the defendant, booked Delta Airlines flights for himself and a co-traveler whose name I recognize to be the name of an employee at Centra Tech ("Employee-2") to fly from Fort Lauderdale, Florida to Incheon, South Korea via a Delta Airlines flight leaving Fort Lauderdale-Hollywood International Airport in Florida on or about April 1, 2018 at approximately 8:00PM, with a stopover at Hartfield-Jackson Atlanta International Airport in Georgia to catch a connecting Delta Airlines flight that will arrive at Incheon International Airport in South Korea on or about April 2, 2018.  According to these records, FARKAS and Employee-2 have also booked return flights that would have them leave from Incheon International Airport in South Korea on or about April 5, 2018 and arrive at Fort Lauderdale-Hollywood International Airport in Florida on or about April 5, 2018.

24

WHEREFORE, I respectfully request that arrest warrants be issued for SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, and that they be arrested and imprisoned or bailed, as the case may be.

BRANDON RACZ
Special Agent
Federal Bureau of Investigation

Sworn to before me this
31st day of March 2018

HONORABLE JAMES L. COTT
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

25

# EXHIBIT B

USAO_SDNY_00011764

Approved: _____

        SAMSON ENZER / NEGAR TEKEEI
        Assistant United States Attorneys

Before:   THE HONORABLE STEWART D. AARON
        United States Magistrate Judge
        Southern District of New York

- - - - - - - - - - - - - - - - x

  UNITED STATES OF AMERICA

        - v. -

  RAYMOND TRAPANI,
     a/k/a "Ray,"

        Defendant.

- - - - - - - - - - - - - - - - x

# 18 MAG 3271

**SEALED COMPLAINT**

Violations of
15 U.S.C. §§ 78j(b), 78ff;
17 C.F.R. §§ 240.10b-5;
18 U.S.C. §§ 371, 1343, 1349
and 2

COUNTY OF OFFENSES:
New York

SOUTHERN DISTRICT OF NEW YORK, ss.:

     BRANDON RACZ, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation and charges as follows:

## COUNT ONE
### (Conspiracy to Commit Securities Fraud)

    1.   From at least in or about July 2017, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, RAYMOND TRAPANI, a/k/a "Ray," the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

    2.   It was a part and object of the conspiracy that RAYMOND TRAPANI, a/k/a "Ray," the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, and of the facilities of national securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of

securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, to wit, TRAPANI and his co-conspirators participated in a scheme to solicit digital funds worth more than $25 million from purchasers of unregistered securities, in the form of digital currency tokens issued by a startup company called Centra Tech, Inc. ("Centra Tech") as part of a so-called "initial coin offering" or "ICO," through fraudulent misrepresentations and omissions.

Overt Acts

3.    In furtherance of the conspiracy and to effect its illegal object, RAYMOND TRAPANI, a/k/a "Ray," the defendant, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.    In approximately 2017, RAYMOND TRAPANI, a/k/a "Ray," the defendant, and his co-conspirators, Sohrab Sharma, a/k/a "Sam Sharma," and Robert Farkas, a/k/a "RJ," a/k/a "Bob," co-founded Centra Tech, Inc. ("Centra Tech"), a startup company purporting to offer cryptocurrency financial products.

b.    In approximately July 2017, Centra Tech was incorporated in Delaware, TRAPANI was appointed as the company's Chief Operating Officer, Sharma was appointed as a Director and the President of the company, and Farkas was appointed as the company's Chief Marketing Officer.

c.    In approximately August 2017, TRAPANI and his co-conspirators, Sharma and Farkas, caused Centra Tech to publish a white paper via the internet containing fraudulent misrepresentations and omissions in connection with Centra Tech's unregistered offering to investors of securities, in the form of digital currency tokens issued by Centra Tech.

d.    On or about August 28, 2017, after a prospective investor asked Sharma for proof to verify representations that Centra Tech had a contract with a particular investment venture capital firm, Sharma sent text messages to TRAPANI and Farkas in which Sharma wrote that "I'm worried about getting these guys the

2

fufu . . . [c]ontract" for the investment firm, "because they can verify it," and that he was going to tell the prospective investor that "I'm gonna say our [Non-Disclosure Agreement] is very tight," "We can't share the contract." In response, TRAPANI wrote "Get any worry out of your mind your a fucking closer," and Farkas wrote "Dance," "Do what you do."

      e.   TRAPANI was featured in a promotional video for Centra Tech containing false representations that was available to the public via the internet as of on or about September 22, 2017 but has since been removed from the internet. During a group text message conversation on or about September 22, 2017 among TRAPANI and his co-conspirators, Sharma and Farkas, about removing the video from the internet, Sharma wrote "[t]ake it off," "I don't wanna get sued."

      f.   On or about September 29, 2017, during a group text message conversation among TRAPANI and his co-conspirators, Sharma and Farkas, Sharma asked TRAPANI, in substance and in part, to have Centra Tech's white paper taken down from its website because it contained false statements.  TRAPANI responded "I think we should have white paper up but maybe just take it down and reword it."  SHARMA replied ""I rather cut any fufu," "Off right own," "Now," "Then worry," "Anything that doesn't exist current," "We need to remove," "Have them do it asap."

      g.   On or about October 5, 2017, while TRAPANI was in New York, New York to surrender in a criminal case in which he had been indicted for perjury (and was later convicted by way of his guilty plea), TRAPANI exchanged text messages with other employees of Centra Tech concerning a site-visit at Centra Tech's headquarters by an individual who was "trying to make sure Centra is real."

      h.   On or about November 28, 2017, Farkas, one of TRAPANI's co-conspirators, attended a blockchain technology conference in New York, New York, on behalf of Centra Tech, a sponsor of the conference, for the purpose of promoting Centra Tech and its products.

             (Title 18, United States Code, Section 371.)

## COUNT TWO
### (Securities Fraud)

      4.   From at least in or about July 2017, up to and including the date of this Complaint, in the Southern District of New York

3

and elsewhere, RAYMOND TRAPANI, a/k/a "Ray," the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, and of the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, TRAPANI and his co-conspirators participated in a scheme to solicit digital funds worth more than $25 million from purchasers of unregistered securities, in the form of digital currency tokens issued by Centra Tech as part of its initial coin offering, through fraudulent misrepresentations and omissions.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT THREE
### (Conspiracy to Commit Wire Fraud)

5.    From at least in or about July 2017, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, RAYMOND TRAPANI, a/k/a "Ray," the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343.

6.    It was a part and an object of the conspiracy that RAYMOND TRAPANI, a/k/a "Ray," the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, TRAPANI and his co-conspirators participated in a scheme to solicit digital assets worth more than $25 million from purchasers of unregistered

4

securities, in the form of digital currency tokens issued by Centra Tech as part of its initial coin offering, through fraudulent misrepresentations and omissions, and employed the use of telephones, email communications, and other wire communications in connection with the scheme.

(Title 18, United States Code, Section 1349.)

## COUNT FOUR
### (Wire Fraud)

7.     From at least in or about July 2017, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, RAYMOND TRAPANI, a/k/a "Ray," the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, TRAPANI and his co-conspirators participated in a scheme to solicit digital assets worth more than $25 million from purchasers of unregistered securities, in the form of digital currency tokens issued by Centra Tech as part of its initial coin offering, through fraudulent misrepresentations and omissions, and employed the use of telephones, email communications, and other wire communications in connection with the scheme.

(Title 18, United States Code, Section 1343 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

8.     I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for approximately two and a half years.  I am currently assigned to an FBI squad that investigates white collar crimes, including complex financial frauds and conduct within the regulatory jurisdiction of the United States Securities and Exchange Commission ("SEC").    I have participated in investigations of such offenses, and have made and participated in arrests of individuals who have committed such offenses.

9.     I am one of the case agents from the FBI's New York Field Office with primary responsibility for the criminal investigation in this matter of the co-founders of a company called Centra Tech, Inc., including RAYMOND TRAPANI, a/k/a "Ray," the defendant

5

charged by this criminal complaint (this "Complaint"), and Sohrab Sharma, a/k/a "Sam Sharma," and Robert Farkas, a/k/a "RJ," a/k/a "Bob" (hereinafter, the "co-conspirators"), both of whom were charged as defendants in a prior criminal complaint, numbered 18 Mag. 2695, that was approved on March 31, 2018 by United States Magistrate Judge James L. Cott in the Southern District of New York (the "Prior Complaint") and is incorporated by reference as though fully set forth herein.  The information contained in this Complaint is based upon my personal knowledge, as well as information obtained during this criminal investigation, directly or indirectly, from other sources, including, but not limited to: (a) business records and other documents, such as records of electronic communications, including email communications and text messages; (b) publicly available information and documents, including information and documents that have been disseminated to the public via the internet; (c) conversations with, and reports of interviews with, non-law-enforcement witnesses; (d) conversations with, and reports prepared by, other law enforcement agents; and (e) conversations with representatives of the SEC concerning information, documents, and other evidence gathered by the SEC as part of a parallel investigation by the SEC of Centra Tech, Inc. and its co-founders.  Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions and statements of and conversations with others are reported herein, they are reported in substance and in part.  Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

## RELEVANT BACKGROUND

### A.  Centra Tech and its Co-Founders

10.  I have reviewed publicly available information about Centra Tech, Inc. ("Centra Tech") and its co-founders, and documents produced by Centra Tech to the SEC in connection with the SEC's parallel investigation of Centra Tech and its co-founders, including Centra Tech's certification of incorporation and documents memorializing actions taken by written consent of Centra Tech's board of directors.  Based on my review of those materials and my participation in the investigation of this case, I have learned the following, in substance and in part:

a.  Centra Tech was incorporated on or about July 27, 2017 in Delaware and was headquartered in Miami Beach, Florida.

USAO_SDNY_00011770

b.     Centra Tech and its co-founders advertised Centra Tech primarily through internet-based marketing, including via the company's website, https://centra.tech (the "Centra Tech Website"), as well as press releases, white papers, social media postings on social media websites such as Twitter and Facebook, promotional videos posted on YouTube's website, internet podcast interviews, and other materials containing solicitations and statements that were disseminated to the public via the internet.

c.     As explained below, Centra Tech made various representations portraying itself as a company that offered various cryptocurrency-related products such as, for example, a purported Centra Tech debit card that supposedly allowed users to spend cryptocurrencies such as "Bitcoin" and "Ether" to make purchases in real-time at various stores and other establishments that were part of the networks of merchant locations that accept Visa-payment cards and Mastercard-payment cards.

d.     Centra Tech and its co-founders raised digital assets worth more than $25 million from investors through a so-called "initial coin offering" to investors of unregistered securities, in the form of digital tokens issued by Centra Tech, known as "Centra tokens" or "CTR tokens," that have since been traded on various cryptocurrency exchanges.   This "initial coin offering" or "ICO" took place during the period from approximately on or about July 30, 2017 through on or about October 5, 2017.

11.   As set forth below, Centra Tech's co-founders include RAYMOND TRAPANI, a/k/a "Ray," the defendant, as well as his co-conspirators, Sohrab Sharma, a/k/a "Sam Sharma," and Robert Farkas, a/k/a "RJ," a/k/a "Bob."  Based on my review of publicly available information about Centra Tech and its co-founders, documents that Centra Tech has produced to the SEC, documents and other materials provided by the District Attorney's Office of New York County ("DANY"), and criminal history records of TRAPANI, Sharma and Farkas, I have learned following, in substance and in part:

a.     TRAPANI, who is now 27-years old, was a co-founder of Centra Tech.  TRAPANI served as Centra Tech's Chief Operating Officer until in or about late October 2017.   According to TRAPANI's profile on a professional networking website that was available to the public via the internet in 2017, TRAPANI reportedly worked as the Chief Executive Officer of a luxury car rental company called "Miami Exotics" in Florida (among other jobs) before co-founding Centra Tech.

7

b.    Sharma, who is now 27-years old, was also a co-founder of Centra Tech.  Sharma served in various roles at Centra Teach, including as a Director of Centra Tech and as Centra Tech's President and Chief Technology Officer until approximately late October 2017.   According to Sharma's profile on a professional networking website that was available to the public via the internet in 2017, Sharma reportedly worked as the Director of Finance at Miami Exotics in Florida (among other jobs) before co-founding Centra Tech.

c.    Farkas, who is now 31 years old, was another co-founder of Centra Tech.  Farkas served in various roles at Centra Tech, including as Centra Tech's Chief Marketing Officer until approximately late October 2017.   Since late October 2017, Farkas has served in various roles at Centra Tech, including as a Director and as the Chief Operating Officer of Centra Tech.   According to a *Business Insider* article that was published on the internet on or about November 7, 2017, Farkas served as a Vice President of Miami Exotics in Florida before co-founding Centra Tech.

d.    During the ICO from on or about July 30, 2017 through on or about October 5, 2017, in which Centra Tech raised more than $25 million worth of digital assets from investors, a New York County Grand Jury returned an indictment on or about September 19, 2017 charging Sharma and TRAPANI with committing perjury in the first degree, a class D felony in violation of Section 210.15 of the New York Penal Law.  This perjury indictment charged Sharma and TRAPANI with giving materially false testimony under oath in July 2017 as defense witnesses for Sharma in a criminal trial before New York County Criminal Court Judge Steven M. Statsinger in which Sharma was being prosecuted by DANY for driving while intoxicated in March 2016.   Based on that perjury indictment, Sharma was arrested and TRAPANI surrendered in or about October 2017, and both were subsequently released from state custody (Sharma on bail, and TRAPANI on his own recognizance).  For lying under oath in that criminal trial, both Sharma and TRAPANI pleaded guilty on or about February 21, 2018 in New York County Supreme Court to perjury in the first degree.

e.    On or about October 27, 2017, the *New York Times* published an article about Centra Tech and its co-founders on the internet raising questions about their qualifications and the accuracy of their representations to investors, and reporting that "For now, the bigger problem facing Mr. Sharma and Mr. Trapani is the perjury indictment by a Manhattan grand jury [unsealed] on Oct. 5, just a few days after Centra finished fund-raising" in the company's ICO.

8

USAO_SDNY_00011772

f.    On  or  about  October  27,  2017,  Sharma  signed corporate resolutions:  (a) removing himself from his positions as a Director and President of Centra Tech;  (b) appointing TRAPANI's grandfather, William Hagner, as a Director and President of Centra Tech; and (c) appointing Farkas as a director of Centra Tech and as  corporate  secretary  and  treasurer  of  Centra  Tech  with  full authority to control the company bank accounts.   On or about October 31, 2017, Farkas was also appointed as the Chief Operating Officer of Centra Tech.

g.    On or about October 31, 2017, Centra Tech issued a public statement via the internet stating, in relevant part, that "Co-Founders Sam Sharma and Ray Trapani are stepping aside to support the continued growth of the Company," and "to further their vision,  the reconstituted Executive Management team includes," "William Hagner as President" and "Robert Farkas as Chief Operating Officer," among others.

## B.  Entities with which Centra Tech Claimed to Have Partnerships

12.   Based on my review of publicly available information about the entities described below, documents that Centra Tech has produced to the SEC, my interviews of several representatives of the  entities  described  below,  and  my  conversations  with representatives  of  the  SEC  about  their  interviews  of representatives of the entities described below, I have learned the following, in substance and in part:

a.    The Bancorp, Inc. ("Bancorp") is a Delaware-based financial  services  company  with  offices  throughout  the  United States.    Bancorp  provides  a  variety  of  financial  services  to companies and individuals, including issuing debit and prepaid cards,  and  payments  processing,  which  it  does  by  virtue  of contractual partnerships with other financial services companies such as Visa and Mastercard, among others.

b.    Visa Inc.  ("Visa") is a multinational financial services  corporation  headquartered  in  Foster  City,  California. Visa facilitates electronic funds transfers throughout the world, most commonly through "Visa"-branded credit cards and debit cards.

c.    Mastercard    Incorporated    ("Mastercard")    is    a multinational  financial  services  corporation  headquartered  in Purchase, New York.  Mastercard's principal business is to process payments between the banks of merchants and the card issuing banks

9

USAO_SDNY_00011773

or credit unions of the purchasers who use "Mastercard"-branded debit and credit cards to make purchases.

## C. Relevant Regulatory Background

13.  Based on my training and experience and my participation in the investigation of this case, I have learned the following, in substance and in part:

a.  An "initial coin offering" or "ICO" is a type of fundraising event in which an entity offers participants a unique digital "coin" or "token" in exchange for consideration.  The consideration often comes in the form of "digital currency" or "cryptocurrency," but can also be "fiat currency," which is currency, like the U.S. dollar and the Euro, that a government has declared to be legal tender, but is not backed by a physical commodity.  "Digital currency" or "cryptocurrency" is a digital representation of value that can be digitally traded and functions as (1) a medium of exchange, (2) a unit of account, or (3) a store of value, but does not have legal tender status.  Unlike fiat currency, such as the U.S. dollar and the Euro, digital currency is not issued by any jurisdiction and functions only by agreement within the community of users of that particular currency. Examples of digital currencies are "Bitcoin" and "Ether," both of which are issued and distributed on their own "blockchains."  A "blockchain" is a digitalized, decentralized, cryptographically-secured ledger that allows market participants to keep track of digital currency transactions without central recordkeeping.

b.  The tokens or coins issued in an ICO are issued and distributed on a blockchain.  Tokens often are also listed and traded on online platforms, typically called digital currency exchanges, and they usually trade for other assets.  Often, tokens are listed and tradeable immediately after they are issued.

c.  ICOs are typically announced and promoted through the internet and email.  Issuers usually release a "white paper" describing the project and the terms of the ICO.  In order to participate in the ICO, investors are generally required to transfer funds to the issuer.  After the completion of the ICO, the issuer will distribute its unique "coin" or "token" to the participants. The tokens may entitle the holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, or voting rights.  These tokens may also be listed on online digital currency exchanges and be tradable for digital currencies.

USAO_SDNY_00011774

d.   Under Section 2(a)(1) of the Securities Act of 1933, a security includes "an investment contract." 15 U.S.C. § 77b.  An "investment contract" is a contract, transaction or scheme "whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *S.E.C.* v. *W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).  "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* at 301.  Importantly, the economic realities of the transaction or product and not its name determine whether the instrument is a security.  *United Hous. Found, Inc.* v. *Forman*, 421 U.S. 837, 851 (1975).  Pursuant to Sections 5(a) and 5(c) of the Securities Act, a company or individual conducting an offer or sale of securities to the public must file a registration statement with the SEC.  15 U.S.C. § 77e(a) and (c).

## OVERVIEW OF THE SCHEME TO DEFRAUD

14.  Based on the facts detailed below, there is probable cause to believe that RAYMOND TRAPANI, a/k/a "Ray," the defendant, and his co-conspirators, Sohrab Sharma, a/k/a "Sam Sharma," and Robert Farkas, a/k/a "Bob," solicited digital assets worth more than $25 million from investors who purchased unregistered securities issued by Centra Tech (in the form of digital tokens issued by Centra Tech), through the use of material misrepresentations and omissions.  For example, as shown below, in soliciting such investments:

a.   Through Centra Tech, TRAPANI as well as Sharma and Farkas claimed to investors that its executive team included two purported senior executives named "Michael Edwards" and "Jessica Robinson" who supposedly had impressive work histories and academic credentials, and TRAPANI claimed that he had earned a master's degree from the University of California at Los Angeles ("UCLA"), which has one of the top-ranked graduate business schools in the country.  In fact, as shown below, neither "Michael Edwards" nor "Jessica Robinson" is a real person, and TRAPANI never attended UCLA's graduate school of business.

b.   Through Centra Tech, TRAPANI as well as Sharma and Farkas claimed to investors that Centra Tech had developed a debit card that enabled users to use currencies to make purchases at any stores that accept Visa or Mastercard, and that Centra Tech had partnerships with Bancorp, Visa, and Mastercard to issue Centra Tech debit cards.  In fact, as shown below, Centra Tech had no such partnerships with Bancorp, Visa or Mastercard.

11

## CENTRA's UNREGISTERED SECURITIES OFFERING STYLED AS AN "ICO"

15.   Based on my review of publicly available information and documents that Centra Tech has produced to the SEC, I have learned the following, in substance and in part:

a.   From on or about July 30, 2017 through on or about October 5, 2017, Centra Tech raised funds from investors, in the form of digital currency worth more than $25 million, via an ICO for the purported purpose of enabling Centra Tech to operate what Centra Tech advertised would be the world's first multi-blockchain debit card.

b.   During this ICO, Centra Tech accepted digital currency from investors in exchange for "Centra tokens" (also known as "CTR tokens" or "CTRs") that could be traded, or exchanged, on various digital currency exchanges.   In offering these Centra tokens to investors during the ICO in one of the white papers issued by the company, Centra Tech stated that the Centra tokens could be "exchange[d] . . . on the Cryptocurrency exchanges for a profit" and that the purchase of these Centra tokens would "allow[] users to join [Centra Tech's] success and mission *while generating a profit.*"   (Emphasis added).

c.   As shown below, in doing so, Centra Tech made multiple false statements, including on the Centra Tech Website and in materials posted to the Centra Tech Website, regarding, among other things, (a) the identities and qualifications of Centra Tech's team of executives; and (b) the "Centra Card" or "Centra Debit Card," a debit card that was falsely advertised as one that would allow users to make purchases using cryptocurrency at any establishment that accepted Visa or Mastercard as a result of Centra Tech's purported partnerships with Bancorp, Visa, and Mastercard.

16.   Based on my review of publicly available information, documents that Centra Tech has produced to the SEC, and documents gathered by the SEC in connection with the SEC's parallel investigation, among other sources, I have learned the following, in substance and in part:

a.   On or about July 23, 2017, Centra Tech issued a press release that it paid to be published on the website "cointelegraph.com" (the "July 23 Press Release").   In the July 23 Press Release, Centra Tech described Centra Tech's ICO as "truly a ground floor opportunity to be part of a global solution to the blockchain currency dilemma that offers a comprehensive rewards

12

program for both token and card holders while giving the ability to spend your cryptocurrency in real time with no fees." The July 23 Press Release also touted Centra Tech's products: (1) the "Centra Debit Card" which purported to "enable[] users to make purchases using their blockchain currency of choice," and "work[] anywhere that accepts Visa or MasterCard," (2) the "Centra Wallet App," which "makes it easy for people to register for the Centra Debit Card, store their cryptocurrency assets, as well as control its functions," and (3) "cBay," the "world's first Amazon type of marketplace created especially for cryptocurrency acceptance." The July 23 Press Release also advertised Centra Tech's "Currency Conversion Engine" as allowing users "the ability to spend their assets anywhere in the world that accepts Visa and/or MasterCard."

   b. Centra Tech also posted several different versions of a white paper advertising Centra Tech's ICO on the Centra Tech Website. I have reviewed a version of the ICO White Paper, labeled "FINAL DRAFT," that was downloaded from the Centra Tech Website on or about August 3, 2017 ("White Paper-1"). The White Paper-1 contained several statements describing the ICO and the Centra Card using terminology indicative of a securities offering. For example:

   i. The White Paper-1 described Centra Tech's ICO as a token offering for which 400 Centra tokens, or "CTRs," would be sold for one "ETH." Based on my training, experience, and participation in this investigation, I have learned that "ETH" is the currency code for "Ether," a digital currency whose blockchain is generated by the Ethereum platform.

   ii. In the White Paper-1, Centra Tech stated that it would be offering "68% of all [Centra] Tokens to be created for purchase in our crowd sale to the public" and would "allocate 20% of all [Centra] Tokens created to distribution of bug bounty, business development, community projects, market expansion, and more" while "[t]he remaining 12% will be distributed to Centra Techs founders, early investors, and employees as an incentive to create a long lasting mutual interest and dedication to the tokens and their prolonged value."

   iii. In providing details about the Centra Card and the Centra Tech ICO, the White Paper-1 referenced different levels of investment opportunity:

   1. The "Centra Black Card founders edition" was to be issued to "our first 500 ICO backers whom purchase

13

USAO_SDNY_00011777

with 100+ ETH" and would carry with it an "enhanced rewards program."

2.   The "Centra Gold Card limited edition" would be "allocated to our first 1000 contributors whom purchase CTR Tokens with 30+ ETH," and would also carry an "enhanced rewards program."

3.   The "Centra Blue & Virtual Card" would be the "signature and traditional card."

iv.   The White Paper-1 advertised multiple "rewards" programs for Centra Token holders.   For example, the White Paper-1 advertised that Centra Token holders would receive a ".8% ETH" reward for every transaction in the "network" (the "Network Rewards Program").   This was in contrast to another rewards program advertised in White Paper-1, which offered "Card rewards of up to 2% of your purchases made on the Centra card."   In addition, I have reviewed a recording of an interview of Sohrab Sharma, a/k/a "Sam Sharma," one of the co-founders of Centra Tech, on an internet radio podcast on or about August 14, 2017 in which Sharma represented that "through our revenue share we actually give .8 percent of that away to token holders as part of our program to join the Centra Tokens."[1]   Based on those sources, I believe that Centra Tech portrayed its Network Rewards Program as functioning like a dividend, in that it offered a share — .8% ETH — of Centra Tech's revenue.

v.   Although Centra Tech claimed that holders of the Centra Token "by no means own any securities or interest in Centra Tech," and that the Centra tokens "are not securities nor shares," the White Paper-1 promised that Centra Token purchasers would "be able to place their wallet to use on Centra Debit card, or exchange them [the Centra Tokens] on the Cryptocurrency exchanges for a profit."   The White Paper-1 also claimed that the Centra Card and Centra Wallet were "already live in beta," and that Centra Tech was "offering our initial crowd sale of tokens to appropriately fund the vision of Centra Tech's future."   It further claimed that Centa Tech's "initial coin offering allows users to join

---

[1]   The summaries and transcript of the recorded interview set forth herein are based on a preliminary draft transcription and remain subject to revision.

14

our success and mission *while generating a profit*." (Emphasis added).

## FRAUDULENT REPRESENTATIONS ABOUT CENTRA'S EXECUTIVE TEAM

17.  Based on the facts set forth below, there is probable cause to believe that in soliciting assets worth millions of dollars for the purchase of digital tokens issued by Centra Tech, RAYMOND TRAPANI, a/k/a "Ray," the defendant, and his co-conspirators, Sohrab Sharma, a/k/a "Sam Sharma," and Robert Farkas, a/k/a "RJ," a/k/a "Bob," made false statements portraying Centra Tech's executive team as a group of experienced professionals with impressive credentials. For example, as shown below, Centra Tech made false statements that its executive team included two purported senior executives named "Michael Edwards" and "Jessica Robinson," who supposedly had impressive work histories and academic credentials, and TRAPANI made false statements representing that he had had earned a master's degree from UCLA's graduate school of business. In fact, as shown below, both "Michael Edwards" and "Jessica Robinson" are fictional people who do not exist, and TRAPANI never attended UCLA's graduate school of business.

18.  I have reviewed documents provided by Centra Tech to the SEC, including documents reflecting LinkedIn profiles for RAYMOND TRAPANI, a/k/a "Ray," the defendant, and his co-conspirators, Sohrab Sharma, a/k/a "Sam Sharma," and Robert Farkas, a/k/a "RJ," a/k/a "Bob," that were published at various times on the internet via LinkedIn's website.[2] I have also reviewed criminal history records of TRAPANI as well as Sharma and Farkas. Based on my review of such documents, I have learned the following, in substance and in part:

---

[2]   Based on my training and experience and my review of LinkedIn's internet website, I know that LinkedIn is a company that owns and operates a professional-networking website of the same name that allows any internet user to establish his or her own account with LinkedIn, which this user can use to create the user's own profile containing his or her photograph and work and educational history, to publish the profile via LinkedIn's website, to connect accounts with and communicate with other LinkedIn users, and to share news articles with other LinkedIn users. If a user creates a publicly-viewable LinkedIn account and profile in his or her own name, the profile will be viewable to anyone with internet access, including, for example, anyone who conducts an internet search for the user's name.

USAO_SDNY_00011779

a.    During  the  period  from  approximately  July  30 through October 5, 2017, in which Centra Tech raised funds worth more than $25 million through its ICO, TRAPANI and Sharma were both 26 years old, and Farkas was 30 years old. As shown above, before they co-founded Centra Tech, TRAPANI as well as Sharma and Farkas had worked as (among other things) executives of a luxury car rental company called Miami Exotics in Florida.

19.  During the period from approximately July 30 through October 5, 2017, in which Centra Tech raised funds worth more than $25 million through its ICO, Centra Tech made the following representations (among others) about the company's executive team:

a.    The  White  Paper-1,  which  was  available  to  the public via the Centra Tech Website as of on or about August 3, 2017, contained a section entitled "Centra Tech Team" listing: (i) a purported individual named "Michael Edwards" as Centra Tech's "CEO & Co-Founder," along with a supposed picture of "Michael Edwards"; (ii) a purported individual named "Jessica Robinson" as Centra Tech's "CFO," along with a supposed picture of "Jessica Robinson"; (iii) and information about other executives and employees of Centra Tech, including Sohrab Sharma, a/k/a "Sam Sharma," who was listed as Centra Tech's "CTO & Co-Founder," RAYMOND TRAPANI, a/k/a "Ray," who was listed as Centra Tech's "COO," and Robert Farkas, a/k/a "RJ," a/k/a "Bob," who was listed as Centra Tech's "CMO."[3]

b.    On or about August 14, 2017, Sharma was interviewed by Neocash Radio, a cryptocurrency podcast that broadcasts its radio show via the internet, about Centra Tech's ICO.  Based on my

---

3    Although the White Paper-1 listed TRAPANI as the "COO" of Centra Tech with an accompanying photograph, the person featured in that photograph was someone other than TRAPANI.  I have become familiar with TRAPANI's physical appearance from reviewing various photographs of him, including a photograph taken of TRAPANI following a prior arrest by law enforcement.  Based on certain text messages between TRAPANI and Sharma that are quoted below, it appears that TRAPANI's photograph was not included in the White Paper-1 because TRAPANI and Sharma did not have a suitable photograph of TRAPANI when the White Paper-1 was prepared.

16

USAO_SDNY_00011780

review of a recording of the interview,[4] I have learned that when Sharma was asked during the interview how Centra Tech obtained its startup capital, Sharma stated, among other things, that "we have one private investor, whose actually Mike Edwards" and that Edwards is "also our VP and co-founder" who "put up a lot of the capital originally" to establish Centra Tech.[5]

       c.   Based on my review of documents that Centra Tech has produced to the SEC, including documents reflecting LinkedIn profiles that were published at various times on the internet via LinkedIn's website, I have the learned the following, in substance and part:

       i.   During the course of the ICO, LinkedIn profiles were published via the internet for various Centra Tech executives and employees.

       ii.   According to a LinkedIn profile for "Michael Edwards" that was available to the public via the internet as of on or about August 3, 2017, "Michael Edwards" earned a master's in business administration from Harvard University, had more than 20 years of experience in the banking industry as a financial analyst at Bank of America (1993 through 2001), a vice president at Chase (2001 through 2011) and a senior vice president at Wells Fargo (2011 through 2016), and was the "CEO & Co-Founder of Centra Tech" and where he had worked since May 2016 and had "[e]stablished licensing and partnership terms with Visa & Mastercard," among other accomplishments.

       iii.   According to a LinkedIn profile for "Jessica Robinson" that was available to the public via the internet as of in or about August 2017, "Jessica Robinson" had close to five years of experience as the Chief Financial Officer of Johnson Communications before becoming the Chief Financial Officer of Centra Tech, where she had worked since December

---

[4]   The summaries and transcript of the recorded interview set forth herein is based on a preliminary draft transcription and remains subject to revision.

[5]   During the interview, Sharma directed listeners to the Centra Tech website, www.centra.tech, to find out more about the Centra Tech ICO: "You can go to our website, www.centra.tech, and you can click the token sale page as well as our white paper is on there and you can just get an insight of everything from A to Z."

USAO_SDNY_00011781

2016 and had "[c]reated the partnership between Centra and a Major US Bank."

      iv.     According to a LinkedIn profile for RAYMOND TRAPANI, a/k/a "Ray," the defendant, TRAPANI had earned a master's degree in "Operations Management and Supervision" from UCLA in 2015.

    20.  Based on the facts set forth below, there is probable cause to believe that "Michael Edwards" and "Jessica Robinson" of Centra Tech are not real people, that RAYMOND TRAPANI, a/k/a "Ray," the defendant, did not earn a master's degree from UCLA's graduate school of business, and that TRAPANI and his co-conspirators, Sohrab Sharma, a/k/a "Sam Sharma," and Robert Farkas, a/k/a "RJ," a/k/a "Bob," were well aware of these facts:

      a.    Based on open source internet searches, I have learned that the photograph of "Michael Edwards" in the White Paper-1 that purportedly was the "CEO & Co-Founder" of Centra Tech was actually a photograph of an individual by a different name who is a Canadian physiology professor with no business relationship with Centra Tech.  Based on my review of an article about Centra Tech that was published on the internet in early August 2017 by an online blogger, I know that the author of this article also made this observation about a photograph of "Michael Edwards" that had been published by Centra Tech.  According to a subsequent *New York Times* article, "[t]he first cracks" in Centra Tech's ICO "appeared in early August" 2017, when that online blogger "wrote on his blog that Mr. Edwards appeared to be made up," in response to which "Centra initially threatened to sue [the blogger] but then said the bad profiles were the result of freelancers who had hastily put together the company's marketing material."  (As shown below, in responding to a cease-and-desist notice from Bancorp demanding that Centra Tech remove all unauthorized references to Bancorp from Centra Tech's marketing materials, Sharma suggested in a text message to TRAPANI and Farkas that "We gotta get that shit removed everywhere and blame freelancers lol.")

      b.    Based on my review of publicly available information about Centra Tech, including my review of the results of internet searches for a "Michael Edwards" who is or was the CEO of Centra Tech and a "Jessica Robinson" who is or was the CFO of Centra Tech, I have learned that photographs and profiles of "Michael Edwards" and "Jessica Robinson" no longer appear on the Centra Tech Website or the version of Centra Tech's white paper that is currently available on the Centra Tech Website, and the

USAO_SDNY_00011782

LinkedIn profiles for "Michael Edwards" and "Jessica Robinson" of Centra Tech appear to have been deleted.

      c.   On or about April 16, 2018, the Government requested that the National Student Clearinghouse ("NSC"), a service that maintains an up-to-date database of graduation data for thousands of post-secondary educational institutions including UCLA, perform a search of its database to verify whether any student by the name of "Raymond Trapani" with the date of birth listed for TRAPANI in his criminal history records had ever earned a master's degree from UCLA. Based on my review of the results of this search, the NSC has reported that the NSC was informed by UCLA that UCLA has no record of anyone with that name and birthday ever having earned a master's degree from UCLA, and that the NSC was unable to verify a degree for this individual based the information provided to the NSC during the search.[6] In addition, based on information provided by the SEC, I have learned that on or about April 17, 2018, the SEC was informed by an employee of UCLA's registrar's office that UCLA does not offer a master's degree in "Operations Management and Supervision" (which is the type of master's degree that TRAPANI claimed to have earned from UCLA in the LinkedIn profile referenced above).

      d.   Based on my review of text messages and other data found in a cellphone that was recovered from TRAPANI in October 2017 (the "TRAPANI Cellphone"),[7] I have learned the following, in substance and part:

---

[6]    According to the search results provided by the NSC, "[p]ossible reasons" for why the NSC was "unable to verify a degree for this individual" include, among other things, that "[t]he individual never received a degree from the selected school," "[t]he individual never enrolled," and "[t]he individual has chosen to keep his or her student records private."

[7]    Based on my conversations with other law enforcement officials and my review of documents provided by DANY, I have learned, in substance and in part, the following. The TRAPANI Cellphone was recovered from TRAPANI following his surrender on or about October 5, 2017 on the perjury indictment described above. On the date of this surrender, TRAPANI signed a consent form giving DANY and the New York City Police Department his "voluntary consent to a complete search" of the TRAPANI Cellphone, and he also wrote the password to access the TRAPANI Cellphone on the consent form. Pursuant to that consent form, the TRAPANI Cellphone was searched, its contents were copied into an extraction report containing more

19

    i.    On or about July 29, 2017, TRAPANI, via the TRAPANI Cellphone, received several text messages from Sharma, via a cellphone with a call number ending with "3138" (the "SHARMA Cellphone-1"),[8] concerning photographs of Centra Tech's team of executives and employees, including several text messages about Centra Tech's purported Chief Executive Officer "Michael Edwards" and supposed Chief Financial Officer "Jessica Robinson." Each of these text messages was viewed by the user of the TRAPANI Cellphone, according to data recovered from the TRAPANI Cellphone. These text messages were as follows:

    1.    On or about July 29, 2017, starting at approximately 1:18PM, Sharma sent text messages to TRAPANI in which Sharma wrote: "Yo," "Still need a pic asap," "Just any pic without a chain," "Put a polo," "Yea," "And take a good selfie," "Bro it doesn't matter," "Just do it," "No ones gonna care about your cut," and "This pic looks horrible," following which Sharma sent a photograph of TRAPANI accompanied by the name "Raymond Trapani" and the title "COO."

    2.    After sending that photograph, starting at approximately 2:11PM on or about July 29, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote: "Need a better one asap," "Open your eyes," "Lol," "Put a polo on dude," "This is a million dollar project,"

---

than 14,000 pages of materials, and the TRAPANI Cellphone was returned to TRAPANI. I have reviewed the extraction report documentation generated as result of this consensual search. The dates and times of particular text messages reported in this Complaint as they appear in the extraction report, without conversion to eastern standard time.

[8]    Based on my review of the contact information stored in the TRAPANI Cellphone, I know that the call number for the SHARMA Cellphone-1 is identified as that of "Sam Ny," and from my participation in this investigation, I know that "Sam" is one of the aliases of Sohrab Sharma, a/k/a "Sam Sharma," and that Sharma used to live in New York. In addition, I have reviewed documents that Centra Tech has produced to the SEC, including an email chain from August 2017 in which Sharma identified the call number for the SHARMA Cellphone-1 as his cellphone number.

USAO_SDNY_00011784

"I'm labeling you the COO," "Gotta look the part," "Put gel in," "I'll photoshop your shit."

3.    Starting at approximately 2:45PM on or about July 29, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote:   "Need to find someone who looks like Michael," "Team photos," "He's real lol," "Everyone real," "Except Jessica," "And Mike."

4.    Starting at approximately 7:12PM on or about July 29, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote:   "Gonna kill both Ceo and her," "Gonna say they were married and got into an accident."

ii.    On or about July 29, 2017, Sharma, via the SHARMA Cellphone-1, also sent the following text messages to TRAPANI, via the TRAPANI Cellphone, each of which was viewed by the user of the TRAPANI Cellphone, according to data recovered from the TRAPANI Cellphone:

1.    Starting at approximately 1:48AM on or about July 29, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote:    "Send me a good selfie of yourself," "Gonna put you on the site," "Centra blowing up," "I need to put real photos on there," "Of the 'team,'" "Just a good pic it gets edited," "My guy doing all the photos now."

2.    Starting at approximately 1:52AM on or about July 29, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote:  "I had fufu people on there," "And I been getting called out," "So gonna get it corrected," "Lol," "Lol," "Lol," "Just send me a pic lol."  (Based on my review of the results of open source internet searches, my participation in this investigation, and my training and experience, I understand the term "fufu" to be slang for "fake.")

3.    Starting at approximately 1:59AM on or about July 29, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote:  "Someone's gonna be like wtf," "I had one guy literally go through every single little detail," "I just rather cover all tracks now."

4.    Starting at approximately 2:03AM on or about July 29, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote:   "This is gonna pop," "I got 60

21

black card orders lol," "That's like almost a mill right there," "1 paid already," "Before ICO even went live . . . . Internet can be skeptical," "That's why I need to make it as real as possible," "Can't run it on fufu," "Even tho I'm all reality."

5.    Starting at approximately 2:05AM on or about July 29, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote:  "But it's coming to that point," "Where people wanna see whose behind the project," "I had one girl contact me lol," "And said take my picture off your site," "Cause one of her friends saw it cause it's blowing up," "Dead ass od funny," "I kept saying it was an honest mistake."

6.    Starting at approximately 2:05AM on or about July 29, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote:  "U know anyone," "That looks like this guy," following which Sharma sent a photograph of "Michael Edwards" (which I recognize to be the same photograph of "Michael Edwards" that was included in the White Paper-1) accompanied by the name "Michael Edwards" and the title "CEO & Co-Founder."  Sharma then wrote "I need someone who kind looks like him," "I can't just change him now," "People are gonna be like wtf."

iii.    On or about July 30, 2017, Sharma, via the SHARMA Cellphone-1, sent several text messages to TRAPANI, via the TRAPANI Cellphone, concerning setting up a LinkedIn profile for TRAPANI.  Each of these text messages was viewed by the user of the TRAPANI Cellphone, according to data recovered from the TRAPANI Cellphone.  These text messages were as follows:

1.    On or about July 30, 2017, starting at approximately 12:40AM, Sharma sent text messages to TRAPANI in which Sharma wrote:  "Go make a linked in," "And add as many connections as you can," "Add yourself to centra tech," "As Coo," "And add connections," "Google," "Coo linked in profiles," "And get all the info," "Put precious jobs," "Like banks etc."

2.    Starting at approximately 1:39AM on or about July 30, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote:  "December," "2016," "Take Harvard out," "Do Like university of Georgia," "It would too

22

suspect everyone from hRvard,"[9]   "Add a construction company prior."[10]

iv.   On or about September 13 and 14, 2017, TRAPANI, via the TRAPANI Cellphone-1, participated in a group text message conversation with Sharma, via the SHARMA Cellphone-1, and Farkas, via a cellphone with a call number ending with "6826" (the "FARKAS Cellphone-1"),[11] while Sharma was on a business trip for the purpose of soliciting investments in Centra Tech from a company called Bitsset.[12] The user of the TRAPANI Cellphone viewed all of the text messages received in this conversation, according to data recovered from the TRAPANI Cellphone.   During this group conversation, starting at approximately 12:10AM on or about September 14, 2017, TRAPANI sent a text message to Sharma and Farkas in which TRAPANI wrote "Just gotta close this shit with Bitsset get that ETH," and Sharma responded "We need to remove mike Edwards and "Jessica asap," "After ICO."

---

[9]   Throughout this Complaint, this and other misspellings in text messages recovered from the TRAPANI Cellphone have been quoted without correction unless otherwise noted.

[10]   According to a LinkedIn profile for TRAPANI that was available to the public via the internet as of in or about August 2017, TRAPANI reportedly started working as "COO" at Centra Tech in December 2016 and prior to that worked as a general foreman at "one of the largest construction companies in the US."

[11]   Based on my review of the contact information stored in the TRAPANI Cellphone, I know that the call number for the FARKAS Cellphone-1 is identified as that of "RJ," and from my participation in this investigation, I know that "RJ" is one of the aliases of Robert Farkas, a/k/a "RJ," a/k/a "Bob."   In addition, I have reviewed documents that Centra Tech has produced to the SEC, including a merchant application dated September 26, 2017 listing mobile cellphone numbers for several Centra Tech employees, including "Robert Farkas," and identifying the call number for the FARKAS Cellphone-1 as Farkas' cellphone number.

[12]   Based on my review of publicly available information about Centra Tech, my conversations with representatives of the SEC, and my participation in this investigation, I have learned that Bitsett later invested approximately 40,000 Ether units for the purchase of digital tokens issued by Centra Tech in its ICO, and that 40,000 Ether units would be worth approximately $20 million as of on or about April 17, 2018.

23

**FRAUDULENT REPRESENTATIONS ABOUT PURPORTED PARTNERSHIPS**

21.   Based on the facts set forth below, there is probable cause to believe that in soliciting assets worth millions of dollars for the purchase of digital tokens issued by Centra Tech, RAYMOND TRAPANI, a/k/a "Ray," the defendant, and his co-conspirators, Sohrab Sharma, a/k/a "Sam Sharma," and Robert Farkas, a/k/a "RJ," a/k/a "Bob," made false statements that Centra Tech had developed a debit card (the "Centra Debit Card" or "Centra Card") that allowed users to spend cryptocurrency to make purchases at any establishment that accepts Visa or Mastercard, and that Centra Tech had formed partnerships with Bancorp, Visa, and Mastercard to issue Centra Debit Cards licensed by Visa (for domestic transactions in the United States) and Centra Debit Cards licensed by Mastercard (for international transactions outside of the United States).   In fact, as shown below, Centra Tech had no such partnerships with Bancorp, Visa, or Mastercard.

22.   During the period from approximately July 30, 2017 through October 5, 2017, in which Centra Tech raised funds worth more than $25 million through its ICO, Centra Tech made the following representations (among others) about the company's purported partnerships with Bancorp, Visa and Mastercard:

a.   Centra Tech's White Paper-1, which was available to the public via the internet as of on or about August 3, 2017, contained various statements touting Centra Tech's claimed partnerships with Bancorp, Visa and Mastercard.   For example:

i.   The White Paper-1 stated: "With market cap of cryptocurrencies exceeding $100 billion, the time is ripe to introduce a cryptocurrency-based marketplace where customers can use Centra Debit Card anywhere in the world that accepts Visa."

ii.   In describing the Centra Debit Card, the White Paper-1 stated: "For our United States clients the Centra Card will be a Visa card while for international users the Centra card issued will be a MasterCard. . . .   The Centra Card allows all supported cryptocurrencies to become spendable in real time based on the government fiat being used at the time the card is used at a participating location that accepts Visa or MasterCard."

iii.   The White Paper-1, under a heading entitled "Centra Tech Partners," displayed the logos of Bancorp, Visa and Mastercard.

24

USAO_SDNY_00011788

iv.    The White Paper-1 contained a section entitled "Centra Status" stating that "[a]s of July 2017: . . . Worldwide Debit Card Partnership for both United States and International," followed by a diagram containing an image of a Centra Card with a "Visa" logo on it, among other images.

v.    The White Paper-1 contained a section entitled "Centra Tech Road Map" with a diagram listing "milestone items" in Centra Tech's development since its formation, including a milestone stating that in January 2017 "Major Banking Partnership signed and license agreement with VISA USA Inc formulated."

vi.    The White Paper-1 contained multiple images of a Centra Debit Cards with "Visa" and "Mastercard" logos displayed on the cards next to Centra Tech's own logo — a gold coin with a "C" in the middle.

vii.    The White Paper-1 also stated that one benefit of the Centra Debit Card was "Access to 36+ Million Points of Sale where Visa and/or Master-Card is accepted in 200+ countries."

viii.    A product comparison table in the White Paper-1 reported that the issuers of the Centra Card were "MasterCard and Visa."

b.    Based on my interview of a representative of Bancorp (the "Bancorp Witness-1") and my review of documents provided by Bancorp, I have learned, in substance and in part, that after becoming aware in approximately August 2017 that the Centra Tech Website contained false representations about a purported partnership between Centra Tech and Bancorp, the Bancorp Witness took screenshots of the Centra Tech Website, including a page that misrepresented Bancorp's issuer statement.    One screenshot that the Bancorp Witness retained stated, among other things:

> The Centra Card Visa Debit Card is issued by The Bancorp Bank, member FDIC, pursuant to a license from Visa U.S.A. Inc.  "The Bankcorp"[13] and "The Bancorp Bank" are registered

---

[13]    This excerpt from the Centra Tech Website has not been altered to correct spelling or other errors.  In this excerpt, "Bancorp" is also spelled "Bankcorp."

25

> trademarks of The Bankcorp Bank © 2014. Use
> of the Card is subject to the terms and
> conditions of the applicable Cardholder
> Agreement and fee schedule, if any.
>
> The Centra Card Mastercard® Debit Card is
> issued by The Bancorp Bank, member FDIC,
> pursuant to a license from Mastercard
> International Incorporated. "The Bankcorp"
> and "The Bancorp Bank" are registered
> trademarks of The Bankcorp Bank © 2014. Use of
> the Card is subject to the terms and
> conditions of the applicable Cardholder
> Agreement and fee schedule, if any.

     c.   In his interview on the internet podcast Neocash Radio on or about August 14, 2017, referenced above, Sohrab Sharma, a/k/a "Sam Sharma," stated, among other things, the following about Centra Tech's purported partnerships with Visa and Mastercard for the issuance of Centra Debit Cards: "[I]nternationally, we currently have our license with Mastercard, to service international clients. Domestically, we do have the Visa partnership, so we are able to issue Visa cards domestically and Mastercards internationally."

     d.   Based on my review of documents that Centra Tech has produced to the SEC, I have learned that on or about October 13, 2017, Farkas, via his email account "rjfarkas6@gmail.com," sent to an email to Sharma, via his email accounts "sam@centra.tech" and "ssharma491@gmail.com," attaching FARKAS' edits to an investor pitch deck dated August 15, 2017, promoting Centra Tech and its ICO. The pitch deck stated, among other things, that: (i) the Centra Card gives users "[a]ccess to more than 36 Million Points of Sale wherever Visa and/or Mastercard is accepted"; (ii) the Centra Card was "issued" by "Mastercard and Visa;" and (iii) Centra in January 2017 had a "Major Banking Partnership and license agreement signed with VISA USA Inc."

     23.  Based on the facts set forth below, there is probable cause to believe that above-described representations by Centra Tech about its purported partnerships with Bancorp, Visa and Mastercard were false:

     a.   Based on my conversations with the Bancorp Witness-1 and another representative of Bancorp (the "Bancorp Witness-2"), and my review of documents provided by Bancorp, I have learned, in substance and in part, that after Bancorp became aware in

USAO_SDNY_00011790

approximately August 2017 that Centra Tech had published marketing materials in connection with its ICO claiming that Bancorp had agreed with Centra Tech to issue Centra Debit Cards licensed by Visa and Mastercard, Bancorp researched whether Bancorp had any such relationship with Centra Tech. Through this research, Bancorp confirmed that Bancorp did not have any such relationship with Centra Tech.

b.    Based on my conversations with a representative of Visa (the "Visa Witness") and my review of documents provided by Visa, I have learned, in substance and in part, that after Visa became aware in approximately October 2017 that Centra Tech was using the Visa name and logo on marketing materials in connection with the Centra Debit Card and Centra Tech's ICO, Visa researched whether Visa had any relationship, direct or indirect, with Centra Tech. Through this research, Visa determined that Visa had no such relationship with Centra Tech.

c.    Based on my conversations with a representative of MasterCard (the "Mastercard Witness"), I have learned, in substance and in part, that MasterCard's internal records of licensing agreements and relationships with card-issuing banks and other third parties contains no record of any relationship, either direct or indirect, with Centra Tech.

24.    Based on the facts set forth below, there is probable cause to believe that RAYMOND TRAPANI, a/k/a "Ray," the defendant, and his co-conspirators, Sohrab Sharma, a/k/a "Sam Sharma," and Robert Farkas, a/k/a "RJ," a/k/a "Bob," were well aware that Centra Tech's representations about its purported partnerships with Bancorp, Visa and Mastercard were false and misleading:

a.    Based on my review of text messages and other data recovered from the TRAPANI Cellphone, I have learned the following, in substance and part. On or about July 31, 2017, Sharma, via the SHARMA Cellphone-1, sent several text messages to TRAPANI, via the TRAPANI Cellphone, concerning plans to make calls to obtain licensing agreements with Visa or Mastercards (agreements that the White-Paper-1 represented were already in place). These text messages, each of which was viewed by the user of the TRAPANI Cellphone according to data recovered from the TRAPANI Cellphone, were as follows:

i.    Starting at approximately 2:54AM on or about July 31, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote: "Should write down a list of places to call tomorrow," "For the conbranded card."

27

ii.     Starting at approximately 1:12PM on or about July 31, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote:  "Gotta get it going on the banks today plz."

iii.    Starting at approximately 11:16PM on or about July 31, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote:  "We just need to get s banking license," "Need our direct agreement with visa," "Or MasterCard," "That's the move," "Cut out the middle man," "I wish we just knew someone."

b.    Based on my review of documents that Centra Tech has produced to the SEC and documents provided by Bancorp, and my conversations with the Bancorp Witness-2, I have learned, in substance and in part, that on or about August 30, 2017, Bancorp sent a cease-and-desist notice to Sharma stating that "CENTRA TECH IS HEREBY DIRECTED TO CEASE AND DESIST FROM REPRESENTING THAT THE BANCORP BANK HAS ANY CONNECTION WITH, OR IS THE ISSUER OF ANY CARD PRODUCTS RELATED TO CENTRA TECH . . . [and from] USING OUR LOGO OR OTHER IMAGES IN CONNECTION WITH THE MARKETING OF ANY PRODUCT OR WALLETS YOU OFFER."

c.    Based on my review of text messages and other data recovered from the TRAPANI Cellphone, I have learned, in substance and part, that on or about August 30, 2017, TRAPANI, via the Trapani Cellphone, participated in a group text message conversation with Sharma, via the SHARMA Cellphone-1, and Farkas, via the FARKAS Cellphone-1, in which the three of them exchanged various text messages about taking down (among other things) images of the Bancorp logo that had been posted on the the Centra Tech Website.  The user of the TRAPANI Cellphone-1 viewed each of the text messages received during this group conversation, according to data recovered from the TRAPANI Cellphone-1.  During this group conversation, the following occurred, in substance and in part:

i.    Starting at approximately 4:21PM on or about August 30, 2017, Sharma sent text messages to TRAPANI and Farkas in which SHARMA wrote:  "Yo," "One of you login to," "Medium/@centra asap," "And remove that thumbnail," "For us," "And Bitset," "Image," "Asap," "Bankcorp reached out." Farkas responded "What's login."  Sharma wrote:  "You click sign in by email," "And it'll send support and email . . . . I don't have wifi," "Just remove the picture r," "In that article."

28

ii. At approximately 4:23PM on or about August 30, 2017, TRAPANI sent a text message to Sharma and Farkas in which TRAPANI wrote: "Will in 30 mins at hospital." Sharma responded "Do it asap rocky." Farkas wrote "Done." TRAPANI responded "Good shit RJ."

iii. Starting at 4:33PM on or about August 30, 2017, Sharma sent text messages to TRAPANI and Farkas in which Sharma wrote: "RJ," "Google Bitsset and Centra," "And contact anyone that has that image," "And ask them to remove it . . . . . Or that language," "Saying we work Bancorp," "Od bad," "Their lawyer reached out."

iv. Starting at approximately 4:35PM on or about August 30, 2017, Farkas sent a text message to TRAPANI and Sharma in which Farkas wrote "No Bancorp on it." Sharma responded: "In the bottom? . . . . U sure," "I thought I saw," "On press releases." FARKAS wrote: "Just checked them all," "No Bancorp." Sharma responded: "Okay," "We gotta get that shit removed everywhere and blame freelancers lol," "Fuck," "One fucking faggot," "Caused so much . . . [r]uckess."

d. Based on my review of text messages recovered from the TRAPANI Cellphone, I believed and respectfully submit that there is probable cause to believe that RAYMOND TRAPANI, a/k/a "Ray," the defendant, participated in a video promoting Centra Tech containing false representations about Bancorp, that was available to the public via the internet as of on or about September 22, 2017 but has since been deleted. I have not been able to recover or view the video itself, but there are references to the video during a group text message conversation on or about September 22, 2017 among TRAPANI, via the TRAPANI Cellphone, Sharma, via the SHARMA Cellphone-1, and Farkas, via the FARKAS Cellphone-1. During this group conversation, Farkas wrote: "Says Bancorp on your video ray is that ok." TRAPANI responded: "Gotta get it edited but we have been saying Bancorp." Sharma wrote "What video," "Fake it off," "I don't wanna get sued."

e. Based on my review of text messages recovered from and other data recovered from the TRAPANI Cellphone, I have learned the following, in substance and part. On or about September 24, 2017, TRAPANI, via the TRAPANI Cellphone, received several text messages from Sharma, via the SHARMA Cellphone-1, concerning why Centra Tech needed to bring an individual known to both as them as "Ryan" into Centra Tech because his family had connections with the owners of Visa and Mastercard (connections that Centra Tech

29

presumably would not have needed if it had already formed the partnerships with Visa and Mastercard that Centra Tech had claimed to have in the White Paper-1). For example, starting at approximately 5:03AM on or about September 24, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote: "We gotta get Ryan in [h]is family knows the owners of visa and amstecsd," "Mastercard," "Word praying," "Od loll," "It's like in our face." Each of these text messages was viewed by the user of the TRAPANI Cellphone, according to data recovered from the TRAPANI Cellphone.

       f.   Based on my review of the SEC's website, I know that on or about September 29, 2017, the SEC issued a press release announcing that it had filed a complaint in the Eastern District of New York charging a company called "RECoin" and the company's founder, among others, with defrauding investors in an unregistered offering of securities styled as an initial coin offering. Based on my review of text messages recovered and other data from the TRAPANI Cellphone, I have learned, in substance and part, that on or about September 29, 2017, during a group text message conversation among TRAPANI, via the Trapani Cellphone, Sharma, via a cellphone with a call number ending with "6091" ("SHARMA Cellphone-2"),[14] and FARKAS, via a cellphone with a call number ending with "2656" ("FARKAS Cellphone-2"),[15] the three of them exchanged various text messages about taking down (among other things) the version of Centra Tech's white paper listed on the

---

[14]   Based on my review of the contact information stored in the TRAPANI Cellphone, I know that the call number for the SHARMA Cellphone-2 is identified as that of "Sammmmm," and from my participation in this investigation, I know that "Sam" is one of the aliases of Sohrab Sharma, a/k/a "Sam Sharma." In addition, I have reviewed documents that Centra Tech has produced to the SEC, including an email chain from October 2017 in which Sharma identified the call number for the SHARMA Cellphone-2 as his "direct line."

[15]   Based on my review of the contact information stored in the TRAPANI Cellphone, I know that the call number for the FARKAS Cellphone-2 is identified as that of "RJ Work," and from my participation in this investigation, I know that "RJ" is one of the aliases of Robert Farkas, a/k/a "RJ," a/k/a "Bob." In addition, I have reviewed documents that Centra Tech has produced to the SEC, including an email chain from October 2017 in which Farkas stated he could be contacted at the call number for the FARKAS Cellphone-2.

USAO_SDNY_00011794

Centra Tech Website at the time.  During this group conversation, the following occurred, in substance and in part:

i.       Starting at 5:34PM on or about September 29, 2017, Sharma sent text messages to TRAPANI and Farkas in which Sharma wrote:  "Ray . . . .  Can u have Javier remove the card with the visa logo on it . . .  On centa Tech website," "On the bottom," "And also remove white paper from website for now . . . .  I think it's best to take the white paper offline like Monaco did."[16]

ii.      TRAPANI responded "What's up" at approximately 5:34PM on or about September 29, 2017.

iii.     Sharma wrote "Yea let's take that bitch down asap" at approximately 5:36PM on or about September 29, 2017. Farkas responded "No good?"

iv.      TRAPANI wrote "I think we should have white paper up but maybe just take it down and reword it as proper as possible then put back up with the bonus structure everything" at approximately 5:37PM on or about September 29, 2017.

v.       Starting at approximately 5:38PM on or about September 29, 2017, Sharma wrote:  "I rather cut any fufu," "Off right own," "Now," "Then worry," "Anything that doesn't exist current," "We need to remove," "Have them do it asap."

vi.      Starting at 11:54PM on or about September 29, 2017, Sharma sent text messages to TRAPANI and Farkas in which Sharma wrote:   "Sec just shut down REcoin," "Read the article," "We gotta clean up every single thing that we can't do," "And can't offer today," "Google SEC REcoin." TRAPANI responded "I peep" at approximately 11:54PM on or about September 29, 2017.

vii.     Starting at approximately 11:55PM on or about September 29, 2017, Sharma sent text messages to TRAPANI and

---

16      According to a *Bloomberg News* article published via the internet on or about October 2, 2017, Monaco Technology was a company that claimed to investors in May 2017 that it had introduced a Visa-branded payment card for spending cryptocurrencies at merchant locations in Visa's network, but at the time, "Monaco didn't have a deal with Visa."

31

Farkas in which Sharma wrote:   "Delete all the cards have shipped info," "Everything gotta get cleaned up," "RJ can u jump on that . . . on our pages."

viii.    TRAPANI   responded   "They   were   pitching   a straight security" at approximately 11:55Pm on or about September 29, 2017.   Sharma wrote "Yea," "I know," "But fill fraud can be a word thrown around," "Especially with the card limits."   TRAPANI responded "Word" at approximately 11:55PM on or about September 29, 2017.

ix.    Starting at approximately 11:55PM on or about September 29, 2017, Sharma sent text messages to TRAPANI and Farkas in which Sharma wrote:   "I want a product page like monacos," "Theirs is so nice."   TRAPANI wrote "Lol yeah no real product."   Sharma wrote: "Yea but it doesn't say much," "And looks good," "We don't have a real product either right now," "So I wanna tighten up ship asap."   TRAPANI wrote "Feel you."

x.    Starting at 11:57PM on or about September 29, 2017, Sharma sent text messages to TRAPANI and Farkas in which Sharma wrote:   "All we really need to do," "Is remove the limits." Farkas responded "Delete everything on our chats that say cards have shipped?"   Sharma wrote "Yea."   Farkas wrote "Ok."   Sharma wrote "Let's play on the safe side," "Our price is way to high for us to slip." TRAPANI wrote "Agreed." Farkas wrote "Ok thx."

25.  Based on my conversations with a representative of Visa (the "Visa Witness") and my review of documents provided by Visa, I have learned, in substance and in part, the following.   On or about October 10, 2017, after Visa became aware that Centra Tech's promotional materials contained false representations about a purported partnership between Centra and Visa, Visa's Legal Department sent an email to Centra Tech, via the email address "support@centra.tech," attaching a cease-and-desist letter (the "October 10 Letter").   In the October 10 Letter, Visa stated, in part:

It has come to our attention that Centra Tech ("Centra") is using the Visa-Owned Marks on its site https://www.centra.tech as well as on its   various   social   media   sites   (e.g., Facebook, Twitter, Instagram, YouTube) and other   mediums.   It   appears   Centra   is purporting to be an authorized distributor of

32

VISA payment cards utilizing cryptocurrency
technology. . . . However, to the best of our
knowledge and good faith belief, Centra is not
authorized to use the Visa-Owned Marks in this
manner, nor is it authorized to issue, sell,
or otherwise distribute VISA payment cards.
If this is not the case, please advise and
explain immediately, i.e., if Centra is
working with an authorized Visa Issuing bank.

a.    Visa attached to the October 10 Letter multiple
screenshots from the Centra Tech Website in which Centra Tech had
misappropriated the Visa trademark.    In the October 10 Letter,
Visa requested that Centra Tech cease and desist from using Visa's
trademarks and "promoting that it is an authorized distributor of
VISA payment cards," and for Centra Tech to remove all references
to Visa from the Centra Tech Website and any promotional materials.
Visa also requested that Centra Tech "identify the bank or
financial institution it is working with (if any) to issue a
purported VISA payment card product."

b.    In response to the October 10 Letter, Sohrab
Sharma, a/k/a "Sam Sharma," provided Visa with an acknowledgment
that he had received the October 10 Letter, but did not identify
any financial institutions with which Centra Tech was working to
issue a Visa payment card product.

26.    Based on my review of documents that Centra Tech has
produced to the SEC, I have learned, in substance and in part, the
following:

a.    On or about October 10, 2017, Sohrab Sharma, a/k/a
"Sam Sharma," using the email address "sam@centra.tech," emailed
a response to Visa's October 10 Letter, stating:

This matter has been brought to my attention.
I will have this matter rectified in 48 hours.
We are currently in the process of finalizing
our Co-branded Prepaid Card Program, but might
not meet the Nov 1st lock out deadlines for
submission from our issuing bank whom is an
authorized visa issuer for card design
approval, So can see where this issue might of
came from.

However, I have immediately contacted my web
developers to remove all issues and I will

33

have this document [a cease and desist acknowledgment] signed and returned within 48 hours.

Thank you,
Sam Sharma

b.   On or about October 11, 2017, Visa responded to Sharma's email, and requested that he "advise of the Visa issuing bank you are working with."

c.   On or about October 12, 2017, Sharma responded again via email, using his "sam@centra.tech" email account, and stated:   "As far as the issuing bank we have an MNDA in place currently.   VISA will soon get our information for Card Design approval and program specs from our future issuing bank in the US."   Sharma signed the email, "Thank you, Sam."   Based on my training and experience, I believe Sharma was claiming that he had a Mutual Non-Disclosure Agreement with the purported issuing bank in this email and that he therefore could not disclose its identity.   (Based on my review of text messages and other data recovered from the TRAPANI Cellphone, I have learned that on another occasion, after a prospective investor in Centra Tech asked Sharma for proof to verify representations by Centra Tech that Centra Tech had a contract with a particular investment venture capital firm, Sharma, via the SHARMA Cellphone-1, sent text messages on or about August 28, 2017 to TRAPANI, via the TRAPANI Cellphone, and to Farkas, via the FARKAS Cellphone-1, in which Sharma stated that "I'm worried about getting these guys the fufu contest," "Contract," for the investment firm "because they can verify it," and that he was going to tell the prospective investor that "I'm gonna say our NDA [Non-Disclosure Agreement] is very tight," "We can't share the contract."   In response, TRAPANI wrote "Get any worry out of your mind your a fucking closer," and Farkas wrote "Dance," "Do what you do.")

d.   On or about October 13, 2017, Visa responded to Sharma's email, noting that despite Sharma's assurances "[w]e are very concerned to still find many continuing unauthorized uses of the VISA trademark connected to your alleged card product that Visa has not authorized."   Visa's October 13 response email (the "October 13 Email") attached a document containing screenshots of various videos that had been posted on YouTube's website displaying Centra Cards with the Visa logo on them, and hyperlinks to where those videos could be found on YouTube's website at the time. Visa's October 13 Email further stated:

34

Please see the attached document for representative examples only of the many unauthorized uses we've found on your site and on other sites through a simple Google search.   We note especially the blatant uses in many informational and "how-to-use/how-it-works" Centra card videos (e.g., by you and Ray Tripani [i.e., RAYMOND TRAPANI, a/k/a "Ray," the defendant] for instance and many others).  We must therefore reiterate our demands that ANY and ALL unauthorized uses of the VISA trademark be taken down on an IMMEDIATE basis, whether it be Centra sourced or where Centra has distributed or allowed content to be published to third parties (i.e., third party site news feeds/articles, press releases).   Without any authorization to use the VISA brand in connection with the functioning or promotion of its card product, Centra may not directly or indirectly promote or mislead others that its product is a VISA product or works with Visa, that its product is endorsed or backed by Visa, that its product functions with the VISA network, or that it is associated with the highly valued and high-profile VISA brand.

e.   Based on the October 13 Email and the other facts set forth herein, there is probable cause to believe that RAYMOND TRAPANI, a/k/a "Ray," the defendant, participated in videos promoting Centra Tech containing false representations about Visa that were available to the public via YouTube's internet website as of on or about October 13, 2017 but have since been removed from the YouTube website.   I recently attempted to access the YouTube videos referenced in Visa's October 13 Email using the hyperlinks set forth in the attachment to the October 13 Email, and from doing so, I have learned that several of the videos have been removed from YouTube's website.   Although I have not been able to recover or view such promotional videos featuring TRAPANI, Visa's October 13 Email notes "especially the blatant uses in many informational and "how-to-use/how-it-works" Centra card videos (e.g., by you [i.e., Sharma] and Ray Tripani [i.e., TRAPANI] for instance and many others)."

f.   Visa's October 13 Email to Sharma also reiterated Visa's request that Sharma identify the bank that Centra Tech was "allegedly working with."  Based on my conversations with the Visa Witness, I have learned that, in response to Visa's multiple requests for Centra Tech to identify the Visa card issuing bank

35

with which it purported to have a relationship, neither Sharma nor anyone at Centra Tech identified such an issuing bank.

27.   On or about March 26, 2018, I reviewed the Centra Tech Website and a white paper published via the Centra Tech Website as of that date.  Based on this review I have learned that as of March 26, 2018, Centra Tech was not using the Bancorp, Visa or MasterCard names or logos.

## RELEVANT ACTIVITES IN THE SOUTHERN DISTRICT OF NEW YORK

28.   From my review of documents provided by DANY and criminal history records of RAYMOND TRAPANI, a/k/a "Ray," the defendant, and my conversations with other law enforcement officials, I have learned that on or about October 5, 2017, TRAPANI surrendered in New York, New York on the perjury indictment described above that had been filed in New York County Supreme Court.  From my review of text messages recovered and other data from the TRAPANI Cellphone, I have learned that while he was in New York, New York within the confines of the Southern District of New York to surrender in that perjury case, TRAPANI participated in a group text message conversation with one of his co-conspirators, Robert Farkas, a/k/a "RJ," a/k/a "Bob," and an employee of Centra Tech (the "Centra Employee"), concerning a site-visit of Centra Tech's offices by an individual seeking to confirm that Centra Tech was a real company.   During this group conversation, the following occurred, in substance and in part.  On or about October 5, 2017, starting at approximately 10:32AM, TRAPANI sent text messages to Farkas and the Centra Employee in which TRAPANI wrote:  "Guys just found out reading through some stuff some you tube guy is going to come to the office tomorrow.  Trying to make sure Centra is real. Just make sure you tell him me and Sam are in Asia with majority of the team."   (As shown herein, TRAPANI was not in Asia with "Sam," as TRAPANI had suggested, but rather was in New York, New York preparing to surrender.)   Shortly thereafter, at approximate 11:36AM on or about October 5, 2017, TRAPANI wrote "Someone please answer me before I turn my self in.   I told security if anything they can walk him through the office but no pictures."  The Centra Employee, who was in Florida, responded:  "Sorry I was in shower. I will make sure he gets to see us and I will handle."   TRAPANI then wrote:  "Okay . . . .  I should be out by midday let you know when I'll be jumping on a flight back and be there in the morning." About an hour later, at approximately 12:56PM on or about October 5, 2017, TRAPANI wrote:  "Walking up to turn my self in if I stop answering I'm cuffed."  At approximately 2:55PM, TRAPANI asked if "that guy came," and Farkas responded "Not yet brotha."

36

USAO_SDNY_00001800

29.   Based on my review of documents that Centra Tech has produced to the SEC, I have learned, in substance and in part, that in or about October 2017, Robert Farkas, a/k/a "RJ," a/k/a "Bob," registered Centra Tech as a sponsor of "Consensus: Invest 2017," a blockchain technology summit or conference that took place on or about November 28, 2017 in New York, New York within the confines of the Southern District of New York.   I have reviewed a video posted to Centra Tech's YouTube channel on or about January 5, 2018 entitled "Centra Consensus NYC Cryptocurrency Blockckain Expo Invest."   The video depicts what appears to be people and activities at the "Consensus" Invest 2017," including a Centra Tech booth or table at the conference, and shows Farkas engaging in conversations with various people during the conference.   Based on the foregoing, I believe that Farkas was in New York, New York, on or about November 28, 2017, and engaged in promotional and marketing activities for Centra Tech at the "Consensus: Invest 2017" conference.

30.   Based on my training, experience, and participation in this investigation, I have learned that companies like Centra Tech that offer cryptocurrency are required to keep a record of identification information—including names and addresses—of individuals purchasing their cryptocurrency.   Based on my review of records provided by Centra Tech to the SEC, I have learned, in substance and in part, the following:

a.   Centra Tech provided a spreadsheet labeled "Centra Token Sale Details" to the SEC.   The spreadsheet contains several tabs, including tabs labeled "CentraToken," "CentraSale," and "Centra Token Owner."

b.   The CentraToken tab contains information regarding more than 1800 purchases of Centra Tokens from between on or about July 30 to August 26, 2017.   Two of the listed investors reside in New York, New York, within the confines of the Southern District of New York.

c.   The CentraSale tab contains information regarding more than 1700 purchases of Centra Tokens from between on or about September 19 to September 26, 2017.   Three of the listed investors reside in New York, New York, within the confines of the Southern District of New York.

37

WHEREFORE, I respectfully request that an arrest warrant be issued for RAYMOND TRAPANI, a/k/a "Ray," the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

BRANDON RACZ
Special Agent
Federal Bureau of Investigation

Sworn to before me this
18th day of April 2018

THE HONORABLE STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

38

USAO_SDNY_00011802

# EXHIBIT C

USAO_SDNY_00011803

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA          :          INDICTMENT
                                  :
         - v. -                   :
                                  :          18 Cr. _____
SOHRAB SHARMA,                    :
     a/k/a "Sam Sharma,"          :
RAYMOND TRAPANI,                  :
     a/k/a "Ray," and             :
ROBERT FARKAS,                    :
     a/k/a "RJ,"                  :
                                  :
              Defendants.         :
                                  :

- - - - - - - - - - - - - - - X

### COUNT ONE
#### (Conspiracy to Commit Securities Fraud)

The Grand Jury charges:

#### Centra Tech and the Defendants

1.   At all times relevant to this Indictment, Centra Tech,
Inc. ("Centra Tech") was a company headquartered in Miami Beach,
Florida, that purported to offer various cryptocurrency-related
financial products. For example, Centra Tech claimed to have a
Centra Tech debit card that allowed users to spend cryptocurrencies
such as "Bitcoin" and "Ether" to make purchases in real-time at
various stores and other establishments that were part of the
networks of merchant locations that accept payment cards from
Master Card and Visa, two companies described in more detail in
paragraphs 7 and 8 of this Indictment.

2.   SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, founded Centra Tech in or about July 2017.

3.   SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, served in various roles at Centra Teach, including as a Director of Centra Tech and as Centra Tech's President and Chief Technology Officer until approximately late October 2017.  Before SHARMA co-founded Centra Tech with RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, SHARMA and TRAPANI worked together at a luxury car rental company in Florida.

4.   RAYMOND TRAPANI, a/k/a "Ray," the defendant, served as Centra Tech's Chief Operating Officer until in or about late October 2017.

5.   ROBERT FARKAS, a/k/a "RJ," the defendant, served in various roles at Centra Tech, including as Centra Tech's Chief Marketing Officer, until approximately late October 2017, and then subsequently as a Director and the Chief Operating Officer of Centra Tech.

### Additional Relevant Entities

6.   The Bancorp, Inc. ("Bancorp") is a Delaware-based financial services company with offices throughout the United States.  Bancorp provides a variety of financial services to companies and individuals, including issuing debit and prepaid cards, and payments processing, which it does by virtue of

2

contractual partnerships with other financial services companies such as Visa and Mastercard, among others.

7.    Visa Inc. ("Visa") is a multinational financial services corporation headquartered in California.    Visa facilitates electronic funds transfers throughout the world, most commonly through "Visa"-branded credit cards and debit cards.

8.    Mastercard    Incorporated    ("Mastercard")    is    a multinational financial services corporation headquartered in New York.    Mastercard's principal business is to process payments between the banks of merchants and the card issuing banks or credit unions of the purchasers who use "Mastercard"-branded debit and credit cards to make purchases.

### Background on Initial Coin Offerings

9.    An "initial coin offering" or "ICO" is a type of fundraising event in which an entity offers participants a unique digital "coin" or "token" in exchange for consideration.    The consideration often comes in the form of "digital currency" or "cryptocurrency," but can also be "fiat currency," which is a term used to describe currency that a government has declared to be legal tender, such as the U.S. dollar or the Euro, but is not backed by a physical commodity.    "Digital currency" or "cryptocurrency" is a digital representation of value that can be digitally traded and functions as (1) a medium of exchange, (2) a unit of account, or (3) a store of value, but does not have legal

3

tender status.   Unlike fiat currency, digital currency is not issued by any jurisdiction and functions only by agreement within the community of users of that particular currency.   Examples of digital currencies are "Bitcoin" and "Ether," both of which are issued and distributed on their own "blockchains."   A "blockchain" is a digitalized, decentralized, cryptographically-secured ledger that allows market participants to keep track of digital currency transactions without central recordkeeping.

10.   The tokens or coins issued in an ICO are issued and distributed on a blockchain.   Tokens often are also listed and traded on online platforms, typically called digital currency exchanges, and they usually trade for other assets.   Often, tokens are listed and tradeable immediately after they are issued.

11.   ICOs are typically announced and promoted through the internet and email.   Issuers usually release a "white paper" describing the project and the terms of the ICO.   In order to participate in the ICO, investors are generally required to transfer funds to the issuer.   After the completion of the ICO, the issuer will distribute its unique "coin" or "token" to the participants.   The tokens may entitle the holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, or voting rights.   These tokens may also be listed on online digital currency exchanges and be tradable for digital

4

currencies.

12. · Pursuant to Sections 5(a) and 5(c) of the Securities Act of 1933, a company or individual conducting an offer or sale of securities to the public must file a registration statement with the SEC or must qualify for an exemption from the registration requirements. 15 U.S.C. § 77e(a) and (c). Under Section 2(a)(1) of the Securities Act, a security includes "an investment contract." 15 U.S.C. § 77b.

13. On or about July 25, 2017, the United States Securities and Exchange Commission (the "SEC") issued a public report with respect to its investigation of an ICO in which the SEC explained that initial and other digital coin offerings can be, and often are, offerings of "securities" under the federal securities laws that must be registered with the SEC or must qualify for an exemption from the registration requirements (the "SEC ICO Report").

### Overview of the Scheme to Defraud

14. From at least on or about July 30, 2017 through at least in or about April 2018, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, engaged in a scheme to defraud investors in Centra Tech's ICO through a series of material misrepresentations and omissions. Through this fraudulent scheme, SHARMA, TRAPANI and FARKAS solicited digital funds worth more than $25 million from

USAO_SDNY_00011808

investors who purchased digital coins issued by Centra Tech.

15.   As part of the scheme, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, made and, caused to be made, the following misstatements, among others, in soliciting investments in Centra Tech:

a.   SHARMA, TRAPANI and FARKAS claimed to investors that Centra Tech had developed a debit card that enabled users to spend cryptocurrencies to make purchases at any stores that accept Visa or Mastercard payment cards, and that Centra Tech had partnerships with Bancorp, Visa, and Mastercard to issue Centra Tech debit cards.   In fact, Centra Tech had no such partnerships with Bancorp, Visa or Mastercard.

b.   SHARMA, TRAPANI and FARKAS claimed to investors that Centra Tech's executive team included two purported senior executives named "Michael Edwards" and "Jessica Robinson" who had impressive work histories and academic credentials.   In fact, neither "Michael Edwards" nor "Jessica Robinson" was a real person.

c.   SHARMA, TRAPANI and FARKAS claimed to investors that Centra Tech held money transmitter and other relevant licenses in 38 states.   In fact, Centra Tech did not have such licenses in a number of those states.

USAO_SDNY_00011809

**Centra Tech's ICO and the Issuance of**
**Unregistered Securities in the Form of Centra Tokens**

16.  From on or about July 30, 2017 through on or about
October 5, 2017, Centra Tech raised funds from investors, in the
form of digital funds worth more than $25 million, via an ICO for
the purported purpose of enabling Centra Tech to operate what
Centra Tech advertised would be the world's first multi-blockchain
debit card.  During this ICO, Centra Tech accepted digital funds
from investors in exchange for unregistered securities in the form
of digital tokens issued by Centra Tech, known as "Centra tokens,"
also known as "CTR tokens" or "CTRs." that could be traded, or
exchanged, on various digital currency exchanges.  At no time did
Centra Tech register its ICO with the SEC.

17.  As part of the ICO, Centra Tech posted several different
versions of a white paper advertising Centra Tech's ICO on the
Centra Tech Website.  A version of the ICO White Paper, labeled
"FINAL DRAFT," that was available on the Centra Tech Website at
least as of August 3, 2017 ("White Paper-1") contained several
statements describing the Centra Tech ICO and Centra tokens.  The
characteristics of the Centra Tech ICO and the Centra tokens, as
described by Centra Tech, rendered the Centra tokens securities
and therefore subject to the provisions of Sections 5 of the
Securities Act of 1933.  For example:

7

USAO_SDNY_00011810

a.   In White Paper-1, Centra Tech stated that it would be offering "68% of all [Centra] Tokens to be created for purchase in our crowd sale to the public" and would "allocate 20% of all [Centra] Tokens created to distribution of bug bounty, business development, community projects, market expansion, and more" while "[t]he remaining 12% will be distributed to Centra Techs founders, early investors, and employees as an incentive to create a long lasting mutual interest and dedication to the tokens and their prolonged value."

b.   White Paper-1 advertised multiple "rewards" programs for Centra Token holders.   For example, White Paper-1 advertised that Centra Token holders would receive a ".8% ETH" reward for every transaction in the "network" (the "Network Rewards Program").   During an interview of Centra Tech co-founder SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, on an internet radio podcast on or about August 14, 2017, SHARMA represented that "through our revenue share we actually give .8 percent of that away to token holders as part of our program to join the Centra Tokens."   Through such representations, Centra Tech portrayed its Network Rewards Program as functioning like a dividend, in that it offered a share — .8% ETH — of Centra Tech's revenue.

c.   Although Centra Tech claimed that holders of the Centra Token "by no means own any securities or interest in Centra Tech," and that the Centra tokens "are not securities nor shares,"

8

White Paper-1 promised that Centra Token purchasers would "be able to place their wallet to use on Centra Debit card, or exchange them [the Centra Tokens] on the Cryptocurrency exchanges for a profit."

### Fraudulent Representations Concerning Centra Tech's Purported Corporate Partnerships

18.  In soliciting investor funds during Centra Tech's ICO, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, made repeated fraudulent representations to potential investors that Centra Tech had developed a debit card (the "Centra Debit Card" or "Centra Card") that allowed users to spend cryptocurrency to make purchases at any establishment that accepts Visa or Mastercard, and that Centra Tech had formed partnerships with Bancorp, Visa, and Mastercard to issue Centra Debit Cards licensed by Visa and Mastercard.

19.  SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, caused false statements related to these purported partnerships to be made in white papers issued by Centra Tech with respect to the ICO.  For example, the version of Centra Tech's white paper that was available on the Centra Tech Website in or about July 2017 ("White Paper-2") contained a diagram listing "milestone items" in Centra Tech's development, and referenced that in January 2017:

9

"Major Banking Partnership signed and license agreement with VISA USA Inc formulated."   Under a heading entitled "Centra Tech Partners," White Paper-2 displayed the logos of Bancorp, Visa and Mastercard.   White Paper-2 also contained images of Centra Debit Cards with "Visa" and "Mastercard" logos displayed on the cards next to Centra Tech's own logo — a gold coin with a "C" in the middle.

20.   SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, also caused similar false statements to be made directly on the Centra Tech Website.   For example, in or about August 2017, the Centra Tech Website included a page claiming:

> The Centra Card Visa Debit Card is issued by The Bancorp Bank, member FDIC, pursuant to a license from Visa U.S.A. Inc.   "The Bankcorp" [sic] and "The Bancorp Bank" are registered trademarks of The Bankcorp Bank © 2014.   Use of the Card is subject to the terms and conditions of the applicable Cardholder Agreement and fee schedule, if any.

21.   On or about August 14, 2017, SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, during an interview on an internet podcast relating to cryptocurrency, stated, among other things, the following about Centra Tech's purported partnerships with Visa and Mastercard for the issuance of Centra Debit Cards: "[I]nternationally, we currently have our license with Mastercard, to service international clients.   Domestically, we do have the

10

USAO_SDNY_00011813

Visa partnership, so we are able to issue Visa cards domestically and Mastercards internationally."

22.   On or about October 13, 2017, ROBERT FARKAS, a/k/a "RJ," the defendant, sent an email to SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, attaching FARKAS' edits to an investor pitch deck for Centra Tech, dated August 15, 2017.   The pitch deck stated, among other things, that: (i) the Centra Card gives users "[a]ccess to more than 36 Million Points of Sale wherever Visa and/or Mastercard is accepted"; (ii) the Centra Card was "issued" by "Mastercard and Visa;" and (iii) Centra in January 2017 had a "Major Banking Partnership and license agreement signed with VISA USA Inc."

23.   As SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, well knew, the above-described representations about Centra Tech's purported partnerships with Bancorp, Visa and Mastercard were false.   In fact, Centra Tech had not entered into any partnerships with Bancorp, Visa or Mastercard.

24.   On or about July 31, 2017, SOHRAB SHARMA, a/k/a "Sam Sharma" and RAYMOND TRAPANI, a/k/a "Ray," the defendants, engaged in a cellphone text message conversation in which they discussed Centra Tech's lack of actual partnerships with banks or credit card companies. During that exchange, SHARMA wrote: "Should write down a list of places to call tomorrow," "For the conbranded [sic]

11

card." Later in the exchange, SHARMA wrote: "Gotta get it going on the banks today plz." SHARMA also subsequently wrote: "We just need to get s [sic] banking license," "Need our direct agreement with visa," "Or MasterCard," "That's the move," "Cut out the middle man," "I wish we just knew someone."

25. On or about August 30, 2017, Bancorp sent a cease-and-desist notice to SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, stating, in all capital text, that "CENTRA TECH IS HEREBY DIRECTED TO CEASE AND DESIST FROM REPRESENTING THAT THE BANCORP BANK HAS ANY CONNECTION WITH, OR IS THE ISSUER OF ANY CARD PRODUCTS RELATED TO CENTRA TECH . . . [and from] USING OUR LOGO OR OTHER IMAGES IN CONNECTION WITH THE MARKETING OF ANY PRODUCT OR WALLETS YOU OFFER."

26. On or about August 30, 2017, during a group cellphone text message conversation between SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, the three discussed Bancorp's cease-and-desist notice. At approximately 4:21PM, SHARMA wrote: "Yo," "One of you login to," "Medium/@centra asap," "And remove that thumbnail," "Asap," "Bankcorp reached out." At approximately 4:23PM, TRAPANI wrote: "Will in 30 mins at hospital." SHARMA responded "Do it asap rocky." FARKAS wrote "Done." TRAPANI responded "Good shit RJ." FARKAS subsequently wrote: "No Bancorp on it." SHARMA responded: "In the bottom? . . . . U sure," "I thought I saw," "On press releases." FARKAS wrote: "Just checked

12

them all," "No Bancorp." SHARMA responded: "Okay," "We gotta get that shit removed everywhere and blame freelancers lol . . . ."

27. During Centra Tech's ICO, RAYMOND TRAPANI, a/k/a "Ray," the defendant, participated in a video promoting Centra Tech. The video contained false representations about Centra Tech's purported partnership with Bancorp. This video was available to the public via the internet as of on or about September 22, 2017 but was subsequently removed. On or about September 22, 2017, during a group cellphone text message conversation among TRAPANI and SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "RJ," the defendants, FARKAS wrote: "Says Bancorp on your video ray is that ok." TRAPANI responded: "Gotta get it edited but we have been saying Bancorp." SHARMA wrote "What video," "Fake it off," "I don't wanna get sued."

28. On or about September 29, 2017, during a group cellphone text message conversation between SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, the three discussed taking down (among other things) the version of Centra Tech's white paper available on the Centra Tech Website at the time. In one message, SHARMA wrote: "I rather cut any fufu," "Off right own," "Now," "Then worry," "Anything that doesn't exist current," "We need to remove," "Have them do it asap." In another, SHARMA wrote: "Delete all the cards have shipped info," "Everything gotta get cleaned up," "RJ can u

13

jump on that . . . on our pages." At approximately 11:55PM, SHARMA wrote: "I want a product page like [another company]," "Theirs is so nice." TRAPANI wrote "Lol yeah no real product." SHARMA wrote: "Yea but it doesn't say much," "And looks good," "We don't have a real product either right now," "So I wanna tighten up ship asap." TRAPANI wrote "Feel you."

29. On or about October 10, 2017, after Visa became aware that Centra Tech's promotional materials contained false representations about a purported partnership between Centra Tech and Visa, Visa's Legal Department sent an email to Centra Tech, via the email address "support@centra.tech," attaching a cease-and-desist letter (the "October 10 Letter"). In the October 10 Letter, Visa stated, in part:

> It has come to our attention that Centra Tech ("Centra") is using the Visa-Owned Marks on its site https://www.centra.tech as well as on its various social media sites (e.g., Facebook, Twitter, Instagram, YouTube) and other mediums. It appears Centra is purporting to be an authorized distributor of VISA payment cards utilizing cryptocurrency technology. . . . However, to the best of our knowledge and good faith belief, Centra is not authorized to use the Visa-Owned Marks in this manner, nor is it authorized to issue, sell, or otherwise distribute VISA payment cards. If this is not the case, please advise and explain immediately, i.e., if Centra is working with an authorized Visa Issuing bank.

30. On or about October 10, 2017, SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, using the email address "sam@centra.tech," emailed a response to Visa's October 10 Letter, stating:

14

This matter has been brought to my attention.    I
will have this matter rectified in 48 hours.    We
are currently in the process of finalizing our Co-
branded Prepaid Card Program, but might not meet
the Nov 1st lock out deadlines for submission from
our issuing bank whom is an authorized visa issuer
for card design approval, So can see where this
issue might of came from.

However,  I  have  immediately  contacted  my  web
developers to remove all issues and I will have
this document [a cease and desist acknowledgment]
signed and returned within 48 hours.

Thank you,
Sam Sharma

31.   On or about October 11, 2017, Visa responded to the email

from reply by SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant,

and requested that he "advise of the Visa issuing bank you are

working with."  On or about October 12, 2017, SHARMA responded

again via email, using his "sam@centra.tech" email account, and

stated:   "As far as the issuing bank we have an MNDA [Mutual Non-

Disclosure Agreement] in place currently.  VISA will soon get our

information for Card Design approval and program specs from our

future issuing bank in the US."  SHARMA signed the email, "Thank

you, Sam."

32.   On a different occasion, after a prospective investor in

Centra Tech asked SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant,

for proof to verify representations by Centra Tech that Centra

Tech had a contract with a particular venture capital firm, SHARMA

sent cellphone text messages on or about August 28, 2017 to RAYMOND

15

USAO_SDNY_00011818

TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, in which SHARMA stated that "I'm worried about getting these guys the fufu contest," "Contract," for the investment firm "because they can verify it," and that he was going to tell the prospective investor that "I'm gonna say our NDA [Non-Disclosure Agreement] is very tight," "We can't share the contract."  In response, TRAPANI wrote "Get any worry out of your mind your a fucking closer," and FARKAS wrote "Dance," "Do what you do."

### Fraudulent Representations Concerning Centra Tech's Purported Executive Team

33.   In soliciting investor funds during Centra Tech's ICO, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, made fraudulent statements and omissions concerning Centra Tech's executive team. These fraudulent representations included reference to two purported senior executives at Centra Tech named "Michael Edwards" and "Jessica Robinson."  In fact, both "Michael Edwards" and "Jessica Robinson" did not exist.

34.   White Paper-1, for example, contained a section entitled "Centra Tech Team" listing: (i) a purported individual named "Michael Edwards" as Centra Tech's "CEO & Co-Founder," along with a supposed picture of "Michael Edwards"; and (ii) a purported individual named "Jessica Robinson" as Centra Tech's "CFO," along with a supposed picture of "Jessica Robinson."

16

35.   On or about August 14, 2017, SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, was interviewed on a cryptocurrency podcast about Centra Tech's ICO.  When SHARMA was asked during the interview how Centra Tech obtained its startup capital, SHARMA stated, among other things, that "we have one private investor, who's actually Mike Edwards" and that Edwards is "also our VP and co-founder" who "put up a lot of the capital originally" to establish Centra Tech.

36.   During the course of the ICO, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, caused profiles for various Centra Tech executives to be published on LinkedIn's professional networking website, including the following:

37.   According to a LinkedIn profile for "Michael Edwards" that was available to the public via the internet as of on or about August 3, 2017, "Michael Edwards" earned a master's in business administration from Harvard University, had more than 20 years of experience in the banking industry as a financial analyst at Bank of America (1993 through 2001), a vice president at Chase (2001 through 2011) and a senior vice president at Wells Fargo (2011 through 2016), and was the "CEO & Co-Founder of Centra Tech," where he had worked since May 2016 and had "[e]stablished licensing and partnership terms with Visa & Mastercard," among other accomplishments.

17

38. According to a LinkedIn profile for "Jessica Robinson" that was available to the public via the internet as of in or about August 2017, "Jessica Robinson" had close to five years of experience as the Chief Financial Officer of Johnson Communications before becoming the Chief Financial Officer of Centra Tech, where she had worked since December 2016 and had "[c]reated the partnership between Centra and a Major US Bank."

39. In fact, and as SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, well knew, "Michael Edwards" and "Jessica Robinson" of Centra Tech were not real people. With respect to "Michael Edwards," his purported photograph in White Paper-1 was actually a publically accessible photograph of an individual by a different name with no relationship with Centra Tech or the defendants. According to a *New York Times* article published shortly after Centra Tech's ICO, "The first cracks" in Centra Tech's ICO "appeared in early August" 2017, when an online blogger "wrote on his blog that Mr. Edwards appeared to be made up," in response to which "Centra initially threatened to sue [the blogger] but then said the bad profiles were the result of freelancers who had hastily put together the company's marketing material."

40. SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, took active steps to conceal the fact that "Michael Edwards" and

18

USAO_SDNY_00011821

"Jessica Robinson" did not exist.  For example, on or about July 29, 2017, during a cellphone text message conversation between SHARMA and TRAPANI, SHARMA wrote to TRAPANI:  "Need to find someone who looks like Michael," "Team photos," "He's real lol," "Everyone real," "Except Jessica," "And Mike."  Similarly, SHARMA later wrote during that same exchange:  "Gonna kill both Ceo and her," "Gonna say they were married and got into an accident."

41.  On or about September 13 and 14, 2017, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, participated in a group cellphone text message conversation while SHARMA was on a business trip in South Korea for the purpose of soliciting investments in Centra Tech from a particular company (the "South Korean Company"). During this group conversation, TRAPANI sent a text message to SHARMA and FARKAS in which TRAPANI wrote "Just gotta close this shit with [the South Korean Company] get that ETH."  SHARMA responded "We need to remove mike Edwards and "Jessica asap," "After ICO."

### Fraudulent Representations Concerning
### Centra Tech's Purported Licenses in 38 States

42.  In soliciting investor funds during Centra Tech's ICO, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, fraudulently claimed that Centra Tech held money transmitter and other licenses

19

in 38 states.  In fact, and as the defendants well knew, Centra Tech did not have such licenses in a number of those states.

43.  Specifically, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, caused Centra Tech to represent in White Paper-1 that: "Centra Tech holds individual licenses in 38 states namely Alabama, Arizona, Alaska, Arkansas, Connecticut, Delaware, District of Columbia, Florida, Georgia, Idaho, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Mississippi, Nevada, Nebraska, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, Oregon, Rhode Island, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, and West Virginia" and that the licenses "are held under categories of Money Transmitter, Sales of Checks, Electronic Money Transfers, and Seller of Payment Instruments."

44.  In fact, Centra Tech did not hold such licenses in a number of those states.  For example, a review on or about March 12, 2018 of a database maintained by the Nationwide Multistate Licensing System, a financial services industry online registration and licensing database, and of certain state licensing databases, revealed that seven of the states where Centra Tech claimed to hold licenses (namely, Arizona, Connecticut, Delaware, Florida, New Jersey, New York or South Dakota) had no record for Centra Tech.  Moreover, while Centra Tech took efforts

20

USAO_SDNY_00011823

to begin the licensing process, those efforts did not begin until October 2017, months after Centra Tech began its ICO.

45. SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, were well aware of the falsity of their representations with respect to Centra Tech holding money transmitter and other licenses in 38 states. For example, during a group cellphone text message conversation that took place on or about August 30, 2017, between SHARMA, TRAPANI and FARKAS, SHARMA sent text messages to TRAPANI and FARKAS about applying for state licenses for Centra Tech (licenses that Centra Tech had represented it already held in 38 states). For example, SHARMA wrote in one message: "Gotta apply for all licenses," "Should I even say this."

### Statutory Allegations

46. From at least in or about July 2017, up to and including in or about April 2018, in the Southern District of New York and elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

21

47.  It was a part and object of the conspiracy that SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, and of the facilities of national securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### Overt Acts

48.  In furtherance of the conspiracy and to effect its illegal object, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

22

a.   In approximately July and August 2017, SHARMA, TRAPANI and FARKAS caused Centra Tech to publish white papers on the internet containing fraudulent misrepresentations and omissions in connection with Centra Tech's unregistered offering of securities to investors, in the form of digital currency tokens issued by Centra Tech.

b.   On or about August 14, 2017, SHARMA made fraudulent misrepresentations and omissions about Centra Tech's unregistered securities offering during an interview on Neocash Radio, a cryptocurrency podcast that broadcasts its radio show via the internet.

c.   Between on or about July 30, 2017 and on or about September 26, 2017, SHARMA, TRAPANI and FARKAS obtained digital funds for the purchase of Centra Tech tokens from at least five investors who resided in New York, New York.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Securities Fraud)

The Grand Jury further charges:

49.   The allegations contained in paragraphs 1 through 45 and 48 of this Indictment are repeated and realleged as if fully set forth herein.

50.   From at least in or about July 2017, up to and including in or about April 2018, in the Southern District of New York and

23

elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, and of the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, the defendants participated in a scheme to solicit digital funds worth more than $25 million for investments in unregistered securities, in the form of digital currency tokens issued by Centra Tech, through fraudulent misrepresentations and omissions.

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Section 240.10b-5; and
Title 18, United States Code, Section 2.)

24

## COUNT THREE
### (Conspiracy to Commit Wire Fraud)

The Grand Jury further charges:

51.   The allegations contained in paragraphs 1 through 45 and

48 of this Indictment are repeated and realleged as if fully set

forth herein.

52.   From at least in or about July 2017, up to and including

in or about April 2018, in the Southern District of New York and

elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI,

a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, and

others known and unknown, willfully and knowingly combined,

conspired, confederated, and agreed together and with each other

to commit an offense against the United States, to wit, wire fraud,

in violation of Title 18, United States Code, Section 1343.

53.   It was a part and an object of the conspiracy that SOHRAB

SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and

ROBERT FARKAS,  a/k/a  "RJ,"  the  defendants,  willfully  and

knowingly, having devised and intending to devise a scheme and

artifice to defraud, and for obtaining money and property by means

of false and fraudulent pretenses, representations, and promises,

would and did transmit and cause to be transmitted by means of

wire,  radio,  and  television  communication  in  interstate  and

foreign commerce, writings, signs, signals, pictures, and sounds

for the purpose of executing such scheme and artifice, in violation

25

of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

## COUNT FOUR
### (Wire Fraud)

The Grand Jury further charges:

54.   The allegations contained in paragraphs 1 through 45 and 48 of this Indictment are repeated and realleged as if fully set forth herein.

55.   From at least in or about July 2017, up to and including in or about April 2018, in the Southern District of New York and elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, the defendants participated in a scheme to solicit digital funds worth more than $25 million for investments in unregistered securities, in the form of digital currency tokens issued by Centra Tech, through fraudulent misrepresentations and omissions, and employed the use of telephones, email communications, and other wire

26

communications in connection with the scheme.

(Title 18, United States Code, Sections 1343 and 2.)

### FORFEITURE ALLEGATIONS

56.   As a result of committing one or more of the offenses charged in Counts One through Four of this Indictment, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses that the defendants personally obtained and the following specific property: 91,000 Ether units, seized by law enforcement from a digital wallet with the public address 0xda6f983076725cb2899205a16e16d1ed60a0067a on or about May 2, 2018.

### Substitute Assets Provision

57.   If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

27

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853;
Title 28, United States Code, Section 2461.)

FOREPERSON

ROBERT KHUZAMI
*Attorney for the United States, Acting Under Authority of 28 U.S.C. § 515*

28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

SOHRAB SHARMA,
a/k/a "Sam Sharma,"
RAYMOND TRAPANI,
a/k/a "Ray," and
ROBERT FARKAS,
a/k/a "RJ,"

Defendants.

## INDICTMENT

18 Cr. _____

(15 U.S.C. §§ 78j(b), 78ff;
17 C.F.R. §§ 240.10b-5;
18 U.S.C. §§ 371, 1343, 1349 and 2.)

A TRUE BILL

_____
FOREPERSON

_____
ROBERT KHUZAMI
*Attorney for the United States, Acting
Under Authority of 28 U.S.C. § 515*

# EXHIBIT D

USAO_SDNY_00011833

Robert A. Cohen
Valerie A. Szczepanik
Lucas M. Fitzgerald
Jon A. Daniels
Alison R. Levine
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0069 (Fitzgerald)
Email: fitzgeraldl@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x

**SECURITIES AND EXCHANGE COMMISSION,**

                                  **Plaintiff,**

                      - against -

**SOHRAB ("SAM") SHARMA, ROBERT FARKAS,**
**and RAYMOND TRAPANI,**

                             **Defendants.**

-----------------------------------------------------------------------x

18 Civ. 02909 (DLC)

**AMENDED**
**COMPLAINT**

**JURY TRIAL**
**DEMANDED**

      Plaintiff Securities and Exchange Commission (the "Commission"), for its complaint

against Defendants Sohrab "Sam" Sharma ("Sharma"), Robert Farkas ("Farkas"), and Raymond

Trapani ("Trapani") (together, the "Defendants"), alleges as follows:

### SUMMARY

      1.     From approximately July 30, 2017 through October 5, 2017, Defendants raised at

least $32 million from thousands of investors through the sale of unregistered securities issued

by Centra Tech, Inc. ("Centra"), an entity controlled primarily by Defendants. The Centra

securities were issued in a so-called "initial coin offering" ("ICO"), a term that is meant to

describe the offer and sale of digital assets issued and distributed on a blockchain. Defendants sold the Centra token ("Centra Token" or "CTR Token"), an ERC20 token issued on the Ethereum blockchain, in Centra's ICO. Defendants promoted the Centra ICO by touting nonexistent relationships between Centra and well-known financial institutions, including Visa, Mastercard and The Bancorp.

2.       Defendants, individually and through Centra, engaged in an illegal unregistered securities offering and, in connection with the offering, engaged in fraudulent conduct and made material misstatements and omissions designed to deceive investors in connection with the offer and sale of securities in the Centra ICO. By doing so, Defendants violated and aided and abetted Centra's violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act"), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.

3.       The Centra ICO was an illegal offering of securities for which no registration statement was filed with the Commission or was then in effect, and as to which no exemption from registration was available. The Centra ICO was a generalized solicitation made using statements posted on the internet and distributed throughout the world, including in the United States, and the securities were offered and sold to the general public, including to United States investors, in this district and elsewhere.

4.       Centra raised funds from investors to create the "Centra Line" of products, a purported financial services system that would enable holders of various hard-to-spend "cryptocurrencies" to convert their assets easily into legal tender, such as U.S. dollars, and spend "cryptocurrencies" in real time with the Visa- and Mastercard-backed "Centra Card."

USAO_SDNY_00006679

USAO_SDNY_00011835

5.      Specifically, Defendants claimed in promotional materials on Centra's website, in various social media platforms, and in other Centra offering materials, that Centra offered a physical "crypto debit card" backed by Visa and Mastercard that was connected to a virtual "smart wallet" via an Apple or Android smartphone application.

6.      Defendants also claimed that – through Centra's "partnerships" with Visa, Mastercard, and The Bancorp – the Centra wallet, debit card and application would allow users to exchange, withdraw, or spend "cryptocurrencies" anywhere in the world that accepts Visa and Mastercard.

7.      Defendants created, reviewed, and distributed marketing materials promoting Centra and the ICO, which claimed that the CEO and Co-Founder of Centra was an experienced businessman named "Michael Edwards," and Sharma stated in a public interview that "Edwards" invested "a lot of capital originally" to help establish Centra.

8.      Defendants also claimed directly and through Centra's marketing materials that the "Centra Token Rewards Program" entitled investors to share in Centra's future earnings. Specifically, Defendants claimed that token holders would be paid "rewards" or a "dividend reward" of 0.8% of the total revenue that Centra earned through its "revenue share" agreement with Visa and Mastercard.

9.      Contrary to Defendants' false representations, and as Defendants knew or recklessly disregarded:  (i) Centra did not have any "partnership" or other relationship with Visa, Mastercard, or The Bancorp; (ii) "Michael Edwards" and other Centra executives pictured in its promotional materials were fictional, and the photographs used to identify the fictional executives were photos taken from the internet or pictures of other individuals; and (iii) investors

3

USAO_SDNY_00006680

USAO_SDNY_00011836

who purchased Centra Tokens would *not* receive future payments or "revenue share" from agreements with Visa or Mastercard.

10.     The foregoing false and misleading statements, as well as additional false and misleading statements described below, appeared variously on the company's website and in versions of white papers ("White Papers") issued and updated by Defendants in connection with the offer and sale of its securities during the Centra ICO, as well as in numerous other online fora such as social media, websites, and press releases.

## VIOLATIONS

11.     By engaging in the conduct set forth in this Complaint, Defendants engaged in and are engaged in ongoing securities fraud in violation of Section 17(a)(1)-(3) of the Securities Act [15 U.S.C. § 77q(a)(1)-(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a)-(c) thereunder [17 C.F.R. § 240.10b-5(a)-(c)], and, without a registration statement being in effect or filed, Defendants engaged and are engaged in the unlawful sale and offer to sell securities in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

12.     The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

13.     Through this action, Commission seeks a judgment: (a) permanently enjoining Defendants from engaging in acts, practices and courses of business alleged herein; (b) ordering Defendants to disgorge their ill-gotten gains and to pay prejudgment interest thereon; (c) imposing civil money penalties on Defendants pursuant to Section 20(d) of the Securities Act [15

4

U.S.C § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d)

prohibiting Defendants, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and

Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or

director of any public company; and (e) prohibiting Defendants, pursuant to Section 21(d)(5) of

the Exchange Act [15 U.S.C. § 78u(d)(5)], from participating in any offering of digital or other

securities.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and

22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e),

and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].  Defendants, directly or

indirectly, have made use of the means or instruments of transportation or communication in, and

the means or instrumentalities of, interstate commerce, or of the mails, in connection with the

transactions, acts, practices, and courses of business alleged herein.

15.     Each of the investments offered in the Centra ICO as described in this Complaint

is an investment contract and, therefore, a "security" as that term is defined under Securities Act

Section 2(a)(1) [15 U.S.C. § 77b(a)(1)] and Exchange Act Section 3(a)(10) [5 U.S.C.

§ 78c(a)(10)].

16.     Venue is proper in the Southern District of New York pursuant to Section 27 of

the Exchange Act [15 U.S.C. § 78aa].  Several victims of Defendants' scheme reside in the

Southern District, and Defendants utilized a digital asset exchange located in the Southern

District to exchange digital assets fraudulently obtained in the Centra ICO for U.S. dollars.

USAO_SDNY_00006682

USAO_SDNY_00011838

## FACTS

### I.     Defendants

17.     **Sohrab "Sam" Sharma**, age 26, resides in Florida, and is a founder of Centra
and held various titles at the company including President and Chief Technology Officer.  On
October 31, 2017, Centra announced that Sharma was resigning in an official capacity to
"support the continued growth of the Company."  At the time of its formation, Sharma had a
100% ownership interest in Centra.  Sharma was arrested by agents of the Federal Bureau of
Investigation ("FBI") on April 1, 2018.

18.     **Robert Farkas**, age 31, resides in Florida, and is a founder of Centra and held
various titles at the company including Chief Operating Officer and Chief Marketing Officer.
On Centra's website and other promotional materials as well as his personal LinkedIn profile,
Farkas described his role at Centra as being "[r]esponsible for keeping the public informed of
each and every move involved with the Centra Card, Centra Wallet, cBay.io and the Currency
Conversion Engine (CCE) Module."  Farkas was arrested by agents of the FBI on April 1, 2018.

19.     **Raymond Trapani**, age 26, resides in Florida, and is a founder of Centra and
held various titles at the company including Chief Operating Officer and "Strategic Manager."
On October 31, 2017, Centra announced that Trapani was resigning in an official capacity to
"support the continued growth of the Company," but Trapani is still listed as an "Adviser" to the
company on his LinkedIn profile.  Trapani was arrested by agents of the FBI on April 20, 2018.

### II.    Other Relevant Entities

20.     **Centra Tech, Inc.** was incorporated under the laws of Delaware in July 2017,
with its stated principal place of business in Miami, Florida.  Neither Centra nor its securities are
registered with the Commission.

6

USAO_SDNY_00006683


USAO_SDNY_00011839

### III.   Background on ICOs

21.   An ICO is a fundraising event in which an entity offers participants a unique digital asset, often referred to as a "coin" or "token," in exchange for consideration (often in the form of other digital assets – most commonly Bitcoin and Ether – or fiat currency). The tokens are issued on a "blockchain" or cryptographically-secured ledger.[1]

22.   Generally, a token may entitle its holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain products or services provided by the issuer, and/or voting rights. These tokens may also be listed on online platforms, often called exchanges, and are tradable for other digital assets or fiat currencies. Often, the tokens are immediately tradable.

23.   ICOs are typically announced and promoted through public online channels. Issuers usually release a "white paper" describing the project and the terms of the ICO. To participate, investors are generally required to transfer funds (often Bitcoin or Ether) to the issuer's digital address, online wallet, or other account. After the completion of the ICO, the issuer will distribute its unique "tokens" to the participants' unique address on the blockchain.

---

[1] A blockchain is a type of distributed ledger, or peer-to-peer database spread across a network, that records all transactions in the network in theoretically unchangeable, digitally-recorded data packages called blocks. Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, linking the blocks together in a chain. The system relies on cryptographic techniques for secure recording of transactions. A blockchain can be shared and accessed by anyone with appropriate permissions. Blockchains or distributed ledgers can also record what are called smart contracts, which essentially are computer programs designed to execute the terms of a contract when certain triggering conditions are met.

USAO_SDNY_00006684

USAO_SDNY_00011840

IV.     **Defendants Fraudulently Raise Funds Through the Centra ICO**

A.      **Background**

24.     In July 2017, Sharma caused Centra to be incorporated.  At the time, he was the sole Director of Centra and was also authorized to issue shares of capital stock of Centra in his sole discretion.  Shortly after its incorporation, Sharma launched Centra's website, https://centra.tech/.

25.     Sharma, Farkas, and Trapani, co-founded Centra.

26.     Sharma oversaw and was intimately involved in all aspects of Centra's operations, including its website, marketing, and strategy.  For example, Sharma often directed various design and technology employees of Centra to make changes to the company's website and White Papers.  Sharma frequently communicated with investors and prospective investors in the Centra ICO and served as the primary public face for the company, often giving interviews with influential cryptoasset bloggers.

27.     In this capacity, Sharma made misrepresentations to Centra investors and prospective investors, including by directing investors to the Centra promotional materials which he knew contained numerous false statements concerning the company and its purported business.

28.     Sharma also oversaw the payment of Centra's expenses.  Prior to the company establishing its own bank account, Sharma paid certain costs out of an account for a business he had previously created, Sharma Technology.  Sharma also served as an administrator for certain Centra social media accounts, including the company's Facebook page.

29.     Farkas was responsible for marketing the Centra ICO and helped oversee Centra's social media presence as well as the Centra Token's listing on various digital asset exchanges.

8

USAO_SDNY_00006685

USAO_SDNY_00011841

Farkas also assisted Sharma with general management of the company, including the administration of Centra's email address for responding to questions and complaints from Centra Token investors. Farkas also oversaw specific edits to certain Centra promotional materials.

30.     Trapani was involved in all aspects of Centra, including the promotional campaigns designed to help sell its unregistered securities. Trapani was responsible for a variety of issues relating to the fraudulent offering, including managing the distribution of Centra Tokens to investors and responding to individual investors' questions and complaints concerning the offering. In this capacity, Trapani made misrepresentations to prospective and actual investors, and also directed them to the Centra website, which he knew – or was reckless or negligent in not knowing – contained additional false statements.

31.     Trapani also directed specific revisions to Centra's website and other marketing materials, and helped manage day-to-day activities of Centra, including hiring employees; obtaining office space; and handling various other operational tasks.

32.     As such, Sharma, Farkas, and Trapani were the masterminds behind the Centra fraud, including the creation of Centra, the marketing and promoting of the Centra ICO, and supervising virtually all actions taken by the company relating to the Centra Token offering.

**B.     The Fraudulent Centra ICO**

33.     Centra's unregistered securities offering began on approximately July 30, 2017, shortly after the company was incorporated, and continued through approximately October 5, 2017. The Centra ICO took place after the Commission's DAO Report of Investigation, which warned the industry that digital securities can be, and often are, securities. Report of Investigation Pursuant To Section 21(a) Of The Securities Exchange Act of 1934: The DAO, (Exchange Act Rel. No. 81207) (July 25, 2017).

9

USAO_SDNY_00006686

USAO_SDNY_00011842

34.     The Centra ICO included a so-called "pre-sale" of tokens in July and August, and

an "official" or "public" sale that ran through September and October.

35.     The White Papers described the Centra ICO as a token offering for which 400

Centra Tokens would be sold for 1 Ether.  As a result of the offering, Centra and Defendants

raised at least $32 million from thousands of investors, and its unregistered securities were

distributed throughout the world, including to investors located in the United States, in the

Southern District of New York, and elsewhere.

36.     The Centra Token began trading on various digital asset exchanges as early as

August 2017, well before the ICO was complete.  The Centra Token initially traded on one such

exchange at only approximately $0.15 per token, but as the company's promotional campaign

drove increasing investor interest to the ICO, the Centra Token became listed on 8 to 10 different

exchanges and the token price peaked at more than $6 per token in August 2017.  Since its peak,

the price of the Centra Token has traded down, and it was listed at approximately $0.30 per

token at the time of Sharma's and Farkas' arrests.  It currently lists at approximately $0.017 per

token.

37.     According to the White Papers, the purpose of the Centra ICO was to raise capital

to enable Centra to complete and operate what it termed the "world's first Multi-Blockchain

Debit Card and Smart and Insured Wallet," a financial system that would, purportedly, allow

holders of various hard-to-spend "cryptocurrencies" to easily convert their assets into legal

tender, and spend these "cryptocurrencies" in "real time" using a Visa or Mastercard backed

"Centra Card."

38.     According to the Centra website, White Papers, and other marketing materials,

Centra purported to have developed an "integrated Cryptocurrency Marketplace & Commerce

USAO_SDNY_00006687

USAO_SDNY_00011843

Solution," using a "Centra Card," a "cBay Marketplace," a Centra Wallet, and a "Currency Conversion Engine & Exchange Platform."

39.     Centra claimed to offer a financial services system that enables users to safely store most major "cryptocurrencies," convert them into legal tender such as U.S. dollars, and spend them in "real time." The services included "a Crypto debit card for Bitcoin, Ethereum & more." The debit card was to be connected to a smart wallet that supports multiple digital assets, and users would have the ability to access the wallet and digital assets via a smartphone application. All assets stored on the Centra wallet would be "safe, secure" and "fully insured."

40.     Through Centra's claimed partnerships with Visa, Mastercard, and The Bancorp, the wallet, debit card, and smart phone applications allowed users to exchange, withdraw, or spend digital assets in the U.S. and all over the world in real time, with zero fees and no exchange rate. The marketing materials also claimed that Centra's future services would include a platform called Coin Bay, which will be "the world's first Amazon style superstore designed to make crypto currency acceptable."

41.     According to its marketing materials, at the time of the ICO Centra was also in the "final stages" of launching its Centra Network Exchange, which would allow users the ability to "buy/sell/trade" all supported digital assets, including Centra's own CTR Token.

42.     Once the ICO had launched, prominently displayed near the top of the Centra's website was a button that transferred users to the "Token Sale," where they were urged to "BUY TOKENS NOW INSTANTLY." Several links throughout the website also transferred users to the White Papers and encouraged them to read the document.

43.     Clicking on the "Token Sale" button led users to a page through which they could transfer funds to Centra using the digital assets Ether, Bitcoin, and Litecoin.

11

44.     The link to the White Papers led to a PDF document that contained additional statements about the supposed Centra Token.  For example, the White Papers described the purchase of the Centra Token as a chance to "join our success and mission while generating a profit."

45.     The investments offered during the Centra ICO were "securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

*Centra White Papers and Social Media Posts*

46.     To generate investor interest in Centra's line of products and its ICO, almost immediately after Centra was formed and its website created, Defendants began publicly releasing various versions of so-called White Papers promoting Centra and the ICO to investors. The White Papers were made publicly available to investors on the Centra website, and by linking to the White Paper from various social media platforms promoting Centra or ICOs generally.

47.     At various times, each Defendant directed investors, potential investors, and potential business partners to the White Papers, or to Centra's website, which prominently featured the White Papers and promoted the ICO.  Sharma and Farkas also circulated copies of the White Papers to exchanges on which Centra hoped to list the Centra Token.

48.     Sharma controlled the White Papers, and was involved at every level in editing and revising each version, as well as when Centra posted a particular draft of the White Papers or took them down.  He was also involved in even the minute details of editing the White Papers, including selecting graphics, fonts and typefaces and the colors used.

USAO_SDNY_00006689

USAO_SDNY_00011845

49.     Sharma likewise oversaw the development and revision of Centra's website, including, for example, directing the developers to make edits, and checking whether links worked.

50.     Farkas was also involved in reviewing and editing the Centra website as well as in Centra's social media presence, by, among other things, directing the developers to make specific revisions to the website and improve the appearance of Centra's Twitter posts.

51.     Trapani was also involved in reviewing and editing the White Papers, the Centra website, and the various social media platforms Defendants used to promote Centra. For example, Trapani directed Centra's developers to create and revise the website and White Papers and to make specific changes to how the information was presented.

52.     Defendants began promoting the Centra ICO as early as July 2017 through press releases and posts to social media, among other formats. For example, in a press release posted to Bitcoin.com entitled *PR: Centra Tech Announces ICO, Centra Card, & Insured Wallet*, Defendants claimed that the "Centra Card works anywhere that accepts Visa and Mastercard," and touted the Centra ICO as "truly a ground floor opportunity."

53.     Defendants also aggressively touted the Centra ICO on various social media platforms, including Twitter, Instagram, and Facebook. For example, in an attempt to generate interest in the upcoming ICO "pre-sale," which reportedly ran from approximately July 30, 2017 through August 5, 2017, Centra posted to Twitter on July 22, 2017 via its handle (@centra_card), "I just published 'How to Participate in the Centra ICO?'" and linked to instructions about how to purchase the Centra Token. On July 30, 2017, Centra tweeted "The Centra Tech Public Pre-Sale ICO is now open. Contribute between now and 8/5/2017 to get a 25% Bonus!"

13

USAO_SDNY_00006690

USAO_SDNY_00011846

54.     As part of these promotions, Defendants created pseudonymous online identities and used them in online chat rooms or bulletin-board forums such as Reddit to promote the Centra ICO or to harass or bully posters critical of Centra.  For example, in a text message conversation with Sharma on or about August 13, 2017, Trapani discussed his response to critical online commenters and explained that he was using a pseudonym for his posts: "I'm kingbit26 they don't know who that is."  When users started posting additional comments critical of Centra on August 26, Sharma texted Trapani to "[h]op in the ethe[r] delta chat and shut people up," to which Trapani responded "Ok."  Sharma later directed Trapani to use the "mike" pseudonym with another critic of Centra, which Trapani did.

55.     Defendants also paid for positive commentary on their marketing materials to generate additional hype for the offering.  In September 2017, for example, Sharma texted Trapani and Farkas: "When one of you guys wake up plz boost our video.  Buy likes comments. The most we can Let's get it pumping."  Farkas responded that he was "[o]n it," and later boasted that his efforts had "[b]oosted the f[***] out of it."

56.     Defendants also tried to intimidate online critics with threats – or instead bribe them with Centra Tokens – to remove unfavorable posts or videos.  In August 2017, for example, Defendants discussed by text message a critical video that had been posted about Centra.  Farkas asked whether Sharma had successfully bribed the poster to remove the post, and Sharma responded "Yea 2k CTR [Tokens]."  Sharma explained the nature of this bribe: "To him it's 2 racks.  To us its air Lol."

57.     At this time Centra Tokens traded on various exchanges at approximately $1 per token, meaning Sharma paid the poster roughly $2,000 to remove the critical post.  And, as part

14

USAO_SDNY_00006691

USAO_SDNY_00011847

of the ICO, Centra issued 100 million tokens, meaning Defendants had an abundant supply of Centra Tokens with which they could bribe critics of the company.

58.     Similarly, on September 3, 2017, Trapani threatened to sue an individual for trademark infringement if he did not take down a YouTube video critical of the company.  When his threats were unsuccessful, Trapani instead complained to the poster that the YouTube videos were "detrimental to new contributors as your video comes up right after ours" on YouTube, and offered to pay the poster to remove the video.  The poster agreed to the payment, and removed the video critical of Centra.

*Centra's "Bounty Program"*

59.     To generate additional interest in the ICO, Defendants also created a so-called "Bounty Program" to entice third-party promoters to tout the Centra ICO in social media, including on Reddit and similar bulletin board channels dedicated to digital assets, ICOs and blockchain.

60.     Centra promised to compensate bounty participants in Centra Tokens for successful articles, "quality reviews," posts, "likes," and similar activity touting Centra and its ICO, and reserved a "Bounty Pool" which reportedly represented 2% of the total Centra Tokens issued by Centra, or 2 million tokens, for this purpose.

61.     Trapani was primarily responsible for overseeing important aspects of the Bounty Program, including verifying that bounty participants actually touted the ICO, and delivering the Centra Tokens in payment for the promotions.

*Paid Celebrity Promotions*

62.     Defendants also paid celebrities to promote Centra's ICO on social media, which they did at various times over September and October 2017, just before and contemporaneous

15

USAO_SDNY_00006692

USAO_SDNY_00011848

with the so-called "public" ICO offering of CTR Tokens.  On September 18, 2017, for example, one celebrity Centra promotor tweeted:  "Centra's (CTR) ICO starts in a few hours.  Get yours before they sell out, I got mine," which Centra re-tweeted on its official Twitter handle.    These celebrity posts – which generated significant interest in the ICO – did not disclose that Centra paid the celebrities significant compensation in exchange for their promotion of the offering.

63.    When he was contacted by a Fortune magazine reporter about the celebrity promotions of Centra, Trapani claimed that two well-known celebrities had each been hired as a "managing partner" of Centra.  When the reporter asked whether several posts to social media by one celebrity were part of a sponsorship or paid advertisement, Trapani responded, falsely: "No [he] is an official brand ambassador and managing partner of Centra Tech now."  In reliance on this false claim, on September 28, 2017, Fortune published an article quoting Trapani and reporting that these well-known celebrities had each been hired by Centra as a "managing partner."

64.    Shortly thereafter, Farkas tweeted "another one!!" on Centra's official Twitter feed, and linked to the Fortune article.

*Market Manipulation*

65.    Defendants also manipulated the price of the Centra Token in the weeks leading up to the ICO.  Defendants' manipulative trading was intended to generate interest in the company and to ensure that prospective investors were not discouraged by the Centra Token price – which was then trading on public exchanges between approximately $.15 and $.50 per token on limited trading volume – or by public comments that were negative of Centra and its purported products.  As Sharma explained to Trapani in late August 2017, "[c]an't have more

16

FUD [fear, uncertainty and doubt] . . . There's FUD around[.] Mainly about price." Defendants

undertook this manipulative trading knowingly, recklessly, or negligently.

66.     As one example of Defendants' manipulations, over August 26 and 27 Sharma

and Trapani engaged in a concerted effort to manipulate the CTR Token price higher. On

August 27, 2017, for example, Sharma instructed Trapani to artificially increase the Centra

Token price: "Ray keep bumping the price. Do [larger] buys." Trapani responded "what size," to

which Sharma explained "10 ETH plus" and Trapani agreed. Later that same day, Sharma again

instructed Trapani to make additional large purchases, to which Trapani responded "yeah I am

doing big buys." That evening, Sharma noted with approval that "we already pushed the price

higher By doing that pump[.] Naturally We gotta keep doing that[.] Price is rising." The next

day when Sharma noticed that Trapani was making additional large purchases, he directed

Trapani to make the purchases at higher prices: "Gotta do higher than 60," Sharma instructed,

and then made clear that he should make the buys at $0.80 per token. Trapani agreed, after

which Sharma responded that they should "[g]et . . . [r]eady for the pump Lol."

67.     When the pump was completed, Sharma messaged Trapani that they had

"[b]urned through like 250 ETH" – or approximately $75,000 – and moved "the price higher by

30%."

68.     Based on publicly available market data, Trapani and Sharma's efforts to

manipulate the Centra Token price were successful. During August 26 – 28, 2017, the price of

the Centra Token went from approximately $0.50 per token to over $1, and on August 27 the

closing price was $6.91 – which represents the highest closing price ever recorded for Centra

Tokens. In addition, while trade volume in early August ranged anywhere from 2,000 to 50,000

17

transactions per day, on August 26, 2017 the trade volume increased to well over one million tokens traded.

## V.   Defendants' Material Misrepresentations and Omissions Regarding Centra

69.     In addition to their failure to register the Centra ICO with the Commission as a securities offering, Defendants also made false and misleading statements and omissions in the promotional materials accompanying Centra's ICO.  Defendants made these misleading statements and omissions knowingly, recklessly, or negligently.

70.     Specifically, Defendants made numerous false or misleading representations and omissions regarding: (1) Centra's partnerships with credit card companies and relationships with other key financial institutions; (2) Centra's state licenses; (3) certain Centra executives; and (4) a profit-sharing "reward" paid to investors in the form of a dividend.

### A.   Defendants' Fraudulent Claims Regarding Key Financial Institutions

*False Claimed "Partnership" with Visa and Mastercard*

71.     Much of Centra's initial appeal – and a significant source of potential value to prospective investors and investors – was due to the company's claim that the Centra Card would operate on the Visa and Mastercard networks and allow users to make "real time" transactions with their "cryptocurrency" holdings.  As a result, these digital assets could then be utilized around the world by anyone with a Centra Card.

72.     To emphasize this connection, Defendants displayed images of the Centra Card emblazoned with the Visa logo throughout its website, White Papers, social media accounts, and other fora, and frequently referenced the company's purported relationship with Visa and MasterCard in public statements and marketing materials.

18

USAO_SDNY_00006695

USAO_SDNY_00011851

73. For example, a White Paper publicly available on the Centra website in July 2017 (the "July White Paper") prominently touted Defendants' claimed "partnership" with Visa and Mastercard. The July White Paper contained:

    a. a statement that: "For our United States clients, the Centra Card will be a Visa card, while for international users the Centra card issued will be a Mastercard," and that, "[w]ith a market cap of cryptocurrencies exceeding $100 billion, the time is ripe to introduce a cryptocurrency-based marketplace where customers can use Centra Debit Card anywhere in the world that accepts Visa."

    b. a "Centra Tech Road Map" detailing Centra's "milestones" and accomplishments to date. Among other milestones, the roadmap stated that in January 2017 Centra "signed [a] licensing agreement with Visa USA" and formed a "major banking partnership."

    c. images of a Centra Card with the Visa and Mastercard logos boldly displayed next to Centra's own logo—a gold coin with a "C" in the middle. It also devoted a full half-page to a large graphic displaying the Visa, Mastercard and The Bancorp logos under the heading, "Centra Tech Partners."

    d. Statements that the Centra Black Card "founders edition" – Centra's exclusive card purportedly reserved for the first 500 ICO investors who invested at least 100 Ether (approximately $25,000 as of July 2017) – (i) was "backed by Visa;" (ii) entitled the card holder to "rental coverage by Visa;" and (iii) had "protec-tion [sic] 50K by Visa."

19

74.     In an interview on the podcast "Neocash Radio" on August 14, 2017, Sharma

touted Centra's relationships with Visa and Mastercard, explaining that: "Internationally we

currently have our license with Mastercard to service international clients, domestically we have

a Visa partnership, so we're able to issue Visa cards domestically, and Mastercards

internationally."  Sharma's personal Twitter account also falsely linked the Centra Card to Visa

by displaying a picture of a black Centra Card with a Visa logo.

75.     Farkas similarly touted the connection between the Centra Card and Visa and

Mastercard.  As part of his attempt to purchase several promotional articles from an online

marketer, on or about September 6, 2017, Farkas emailed the promoter that Centra's currency

conversion module "give[s] the user the ability to spend their assets in real time anywhere in the

world that accepts Visa or Mastercard."

76.     On October 13, 2017, Farkas emailed Sharma his edits to an investor pitch deck

dated August 15, 2017, promoting Centra and its ICO.  The pitch deck stated, among other

things, that:  (i) the Centra Card gives users "[a]ccess to more than 36 Million Points of Sale

wherever Visa and/or Mastercard is accepted"; (ii) the Centra Card was "issued" by "Mastercard

and Visa;" and (iii) Centra in January 2017 had a "Major Banking Partnership and license

agreement signed with VISA USA Inc."

77.     When responding to individual investor questions, Trapani also knowingly misled

investors into thinking that the "Centra Card" and other financial services purportedly offered by

Centra were real.  He directed investors to visit Centra's website, which claimed prominently

that the Centra Cards were issued by Visa and Mastercard.  In addition, in August 2017 an

investor emailed Trapani asking whether the Centra Smart Wallet – purportedly an application

downloadable from Apple and elsewhere that was linked to the Centra Card and allowed users to

20

transfer and spend digital assets – had been launched yet. Despite knowing that no Centra

applications or products existed, Trapani responded, falsely, "it's launched" and "I use my app

and Centra Card for everything I do."

78.     Neither Visa nor Mastercard, however, had any relationship or partnership with

Centra, and certainly none where Centra was authorized to issue, sell, or otherwise distribute

Visa or Mastercard credit or other payment cards.

79.     Defendants were aware, were reckless in not knowing, or were negligent in not

knowing that Centra had no relationship with Visa or Mastercard at the time of the Centra ICO.

Indeed, the Defendants acknowledged amongst themselves the extent of their deception in late

September 2017 after the Commission filed an ICO-related enforcement action charging

violations of the securities offering registration and anti-fraud provisions in *SEC v. REcoin*

*Group Foundation, LLC et al.*, 17-civ-05725 (E.D.N.Y., filed Sep. 29, 2017).   That day, Sharma

sent a series of text messages to Trapani and Farkas making clear that Centra had no agreement

or other relationship with Visa specifically, and directing Trapani and Farkas to clean the

company's promotional materials of various false claims including all references to Visa.

80.     For example, prompted by the announcement of the *REcoin* action, Sharma texted

Trapani and Farkas that the "Sec just shut down REcoin.  Read the article.  We gotta clean up

every single thing that we can't do [a]nd can't offer today … Delete all the cards have shipped

info" – a reference to Defendants' false marketing claims that Centra Cards had already been

shipped to investors – "Everything gotta get cleaned up."  As part of this "cleanup," Sharma later

texted Trapani and Farkas to "remove the card with the visa logo on it" from the Centra website,

and "also remove white paper from website for now . . . I think it's best to take the white paper

offline."  When Trapani suggested that "we should have white paper up but maybe just take it

21

down and reword it as proper as possible," Sharma responded that "I rather cut any fufu Off right [now] Then worry.[2] Anything that doesn't exist current[ly] we need to remove […] do it asap."

81.     Nonetheless, as of October the Centra website continued to prominently display the Visa logos and tout Centra's purported relationship with Visa.

82.     Indeed, on October 10, 2017, Visa sent Centra and Sharma a cease-and-desist notice directing Centra to "**cease-and-desist from using the Visa-Owned Marks and from promoting that it is an authorized distributor of VISA payment cards [and] that any and all uses or references to VISA-Owned Marks or any reference to Visa be immediately taken down from the [Centra website] or from any other online mediums (including social media sites and press releases)."** (Emphasis in original.)

83.     Upon his receipt of the Visa cease-and-desist notice, Sharma immediately responded that, "[t]his matter has been brought to my attention.  I will have this matter rectified in 48 hours."  Forty-eight hours later, on October 14, Visa issued a second notice to Sharma, stating that "[d]espite your signed acknowledgment and agreement, we are very concerned to still find many continuing unauthorized uses of the VISA trademark connected to your alleged card product that Visa has not authorized … Without any authorization to use the VISA brand in connection with the function or promotion of its card products, Centra may not directly or indirectly promote or mislead others that its product is a VISA product or works with Visa, that its product is endorsed or backed by Visa, that its product functions with the VISA network, or that it is associated with the highly valued and high-profile VISA brand."

84.     The October 14, 2017 Visa cease-and-desist demand also included a collection of recent screenshots taken of Centra's website, which continued to prominently display the Visa

---

[2] According to www.urbandictionary.com, "fufu" means "fake, not real, not genuine."

USAO_SDNY_00006699

USAO_SDNY_00011855

logo and tout Centra's purported relationship with Visa. For example, the material included an October 10, 2017 screenshot of a Centra webpage proclaiming that the Centra "Currency Conversion Engine Module (CCE Module) allows real time conversation of all supported cryptocurrencies to give the used the ability to spend their assets in real time anywhere in the world that accepts Visa or MasterCard."

*False Claimed Relationship with The Bancorp*

85.    In addition to false statements touting its nonexistent relationships with Visa and Mastercard, Defendants also claimed in Centra marketing material that The Bancorp was issuing the Visa- and Mastercard-backed "Centra Card."

86.    For example, Centra claimed in a press release on prdnewswire.com on August 25, 2017 that the "Centra Card Visa® Debit Card is issued by The Bancorp Bank, member FDIC, pursuant to a license from Visa, U.S.A. Inc. 'The Bankcorp' [sic] and 'The Bancorp Bank' are registered trademarks of The Bankcorp [sic] Bank © 2014."

87.    Defendants' claims concerning The Bancorp were also false and misleading because The Bancorp had no agreement of any kind with Centra.

88.    Indeed, when The Bancorp became aware of Centra's false claims that it would issue the Centra Card, the bank issued a strongly worded cease-and-desist dated August 30, 2017 directing Sharma and Centra to "CEASE AND DESIST FROM REPRESENTING THAT THE BANCORP BANK HAS ANY CONNECTION WITH, OR IS THE ISSUER OF ANY CARD PRODUCTS RELATED TO CENTRA TECH . . . [and from] USING OUR LOGO OR OTHER IMAGES IN CONNECTION WITH THE MARKETING OF ANY PRODUCT OR WALLETS YOU OFFER." (Emphasis in original.)

USAO_SDNY_00006700

USAO_SDNY_00011856

89.     Sharma immediately sent The Bancorp cease-and-desist notice to Farkas and Trapani, urgently directing that "[w]e gotta get that s[***] [relating to The Bancorp] removed everywhere and blame freelancers lol." Shortly thereafter, Sharma sent an email to The Bancorp confirming that he had no relationship with the bank, claiming that it was mistake, and that his "free lancers had dropped the ball on this."

90.     Notwithstanding their explicit knowledge that there was no agreement of any kind for The Bancorp to issue any Visa cards or MasterCard cards in conjunction with Centra, and in fact that Centra had never been a customer or client of the bank, Sharma submitted a forged and fictional Bancorp agreement – complete with a fraudulent signature from a nonexistent Bancorp officer – to a potential large investor in Centra. Specifically, in the process of negotiating an investment from a third-party investment company, Sharma emailed what purported to be a contract representing Centra's banking relationship and agreement with The Bancorp. This investment company subsequently became Centra's largest investor, investing approximately 40,000 Ether – approximately $14 million at the time of the investment – in the company.

91.     Further, at the time Sharma was attempting to persuade the investment company to invest in Centra, Sharma explicitly acknowledged in private messages to Farkas and Trapani that The Bancorp agreement was fabricated. Sharma texted, for example, that he was "worried about getting these guys the fufu [fake] . . . contract [] because [they] can verify it."

92.     Defendants thus knew, were reckless in not knowing, or were negligent in not knowing that Centra had no relationship with The Bancorp, and that the statements made in Centra's promotional materials and in communications with prospective investors regarding such a relationship were materially false and misleading.

USAO_SDNY_00006701

USAO_SDNY_00011857

93.    Centra's alleged relationships with these entities were material to the investment decisions of investors who participated in Centra's ICO.

94.    For example, The Bancorp received numerous phone calls from third parties asking whether the representations on Centra's website were accurate regarding the company's purported relationship with The Bancorp.  Similarly, on October 27, 2017 the *New York Times* printed an article concerning the Centra ICO.  This article suggested, among other things, that although the Centra Card claimed to operate on the Visa and Mastercard networks, neither company had approved a relationship. (https://www.nytimes.com/2017/10/27/technology/how-floyd-mayweather-helped-two-young-guys-from-miami-get-rich.html.)  Subsequently, Visa also received numerous calls from concerned Centra ICO investors.  In addition, on November 2, 2017, a Centra investor emailed Sharma and demanded a refund of his ICO contributions "based upon your misrepresentation of your association with VISA and Mastercard."

*False Claim that Centra would be Listed for Sale on a Digital Asset Exchange*

95.    Centra also claimed in marketing materials and in communications with prospective investors that its token would be listed on a popular digital asset exchange (the "Exchange"), a statement that was material to investors because listing on a well-known, high-volume trading platform would facilitate secondary trading of the Centra Token and improve the likelihood of its value increasing.  For example, on August 25, 2017, in a public chat forum, Sharma told investors "we will be in [the Exchange] […] 21 days post ICO."  Sharma repeated this misrepresentation to multiple other investors throughout the offering.

96.    In fact, Defendants knew that the Exchange had not agreed to list the Centra Tokens, and that it had no plans to list it in the future.  For example, in an internal chat conversation between Sharma and Trapani on August 29, 2017, Sharma confirmed that Centra

25

was not listed on the Exchange, and that he did not think it would be listed on the Exchange in the future.  Later in September 2017, Trapani again sought to have Centra listed on the Exchange.  Trapani texted Sharma, "I need you to cook me up a bill that says I live at 4611 [referencing a residential address].  For [the Exchange].  Matches my ID."  Sharma responded "Don't text me that s[***] lol.  Delete."  As such, Sharma and Trapani were each aware that Centra had no relationship with the Exchange at the time investors were being told that Centra had an agreement to be listed on the Exchange.

97.     This statement was material to investors, one of whom complained to Sharma that he had been duped into understanding that Centra had an agreement with the Exchange to list the Centra Token at $2, and now that he had discovered this was a false statement, he did not wish to participate in the ICO and requested a refund.

### B.     Fraudulent Claim that Centra Held State Licenses

98.     Centra claimed in its White Papers and other public statements that "Centra Tech holds individual licenses in 38 states" and then proceeded to list the specific locations. According to the White Paper, "[t]hese licenses are held under categories of Money Transmitter, Sales of Checks, Electronic Money Transfers, and Seller of Payment Instruments."  In his interview with Neocash Radio on August 14, 2017, Sharma confirmed that the company had licenses in 38 states.  In a public chat forum on August 31, 2017, Sharma stated that "[w]e're licensed in 38 states or 36 I have to double check."  In fact, at the time of the ICO, Centra held none of the claimed licenses in any of the 38 states.

99.     This misrepresentation was material because Defendants claimed that Centra had a suite of financial services, including those that enabled users to exchange various digital assets into U.S. dollars and spend them in "real time" using the Centra Card or Centra Wallet.  By

USAO_SDNY_00006703

USAO_SDNY_00011859

accepting digital assets and exchanging these assets for dollars or other digital assets, Centra's claimed system would likely be subject to federal and state money transmitter licensing requirements, which are required in nearly every state in which money transmission activity takes place. Without the licenses, Centra could not operate as promised.

100.    Centra's claim to have obtained money transmitter licenses in 38 states was false and misleading because they did not have licenses in even a single state. Indeed, Defendants complained to each other that they did not have state licenses – and discussed the difficulty of obtaining such licenses – throughout the ICO. At the outset of the company's marketing – and just a week before Centra started offering the Centra Tokens to investors – Sharma texted Trapani that the "licenses are hard to get with my name just cause I have a DUI. Other issue is net worth. Some states want you to be over 100k...." And on September 2, 2017 – more than a month after the start of the offering – when the company still had no licenses, Trapani sent a message complaining that "[a]ll it is, is like we gotta get money transmuting [sic] bonds for all countries and all states . . ."

101.    Defendants' deception regarding the state licenses continued even after the offering had ended. In mid-October, for example, Defendants attempted to persuade a small regional bank to issue pre-paid or debit "Centra Cards." As part of the due diligence process, Centra provided a series of documents purporting to show that Centra held – or had applied to hold – numerous state-issued money transmitter licenses, when it did not hold licenses from any state.

102.    For example, to make it appear as though Centra held a license from the state of Delaware, Sharma submitted a forged document to the bank – replete with the official state seal

27

USAO_SDNY_00006704

USAO_SDNY_00011860

and signature of the State Bank Commissioner – that purported to grant Centra a Delaware
money transmitter license.

    **C.**    **Defendants Used Fictional Executive Biographies to Promote Centra**

    103.    In order to make the Centra ICO more attractive to prospective investors,
Defendants listed in Centra's White Papers and on its website several key executives with
impressive work histories and advanced degrees from well-known schools.

    104.    "Michael Edwards" was listed as the Chief Executive Officer and Co-Founder of
Centra. Edwards's LinkedIn profile stated that he had an M.B.A. from Harvard University and
an extensive career in banking, first as a Financial Analyst at Bank of America, then as a VP of
Business Banking at Chase Bank, and most recently as a Senior VP at Wells Fargo.

    105.    "Jessica Robinson" was listed as the Chief Financial Officer, and she had
purportedly served most recently as the CFO at Johnson Communications for nearly five years.

    106.    Neither Edwards nor Robinson is a real person. A photo of Edwards used in
earlier iterations on Centra's website and in a published White Paper was that of a Canadian
professor with no relationship to the company. The picture of Robinson in early iterations on the
website and in a published White Paper appears to be a stock photograph, *i.e.*, of an actor. Centra
also created fake LinkedIn profiles for Edwards and Robinson, both of which were deleted after
an online blogger raised questions regarding the two executives and whether they existed.

    107.    Defendants knew, were reckless in not knowing, or were negligent in not knowing
that neither Edwards nor Robinson was a real person and that neither worked for Centra.

    108.    Shortly after Centra was incorporated and started marketing the offering, on July
29, 2017, Sharma sent a text message to Trapani noting that he "need[ed] to put real photos on
there [the website]. Of the 'team'." Sharma explained that the website "had fufu [fake] people

USAO_SDNY_00006705

USAO_SDNY_00011861

on there" and had "been getting called out" by a "troller" online who had raised concerns that team members on Centra's website were not real. As a result, Sharma wanted to "[j]ust rather cover all tracks now" and "fix all my flaws."

109.    That same day, Sharma sent Trapani another message that he "had one girl contact me lol [and] said take my picture off your site." Sharma then sent Trapani the picture of "Edwards" used in the early White Papers and website and asked: "U know anyone [t]hat looks like this guy . . . I need someone who kinda looks like him[.] I can't just change him now People are gonna be like wtf." Later that same day, Sharma reiterated to Trapani that he "need[ed] to find someone who looks like Michael" for the "[t]eam photos." Soon after, he described the team members on the website to Trapani: "Everyone real Except Jessica And Mike." Several hours later, Sharma asked Trapani: "Who do we know looks like Jessica Robinson"? Later that evening, Sharma said to Trapani: "Gonna kill both Ceo and her[.] Gonna say they were married and got into an accident."

110.    Trapani caused the image in the White Paper purporting to depict Centra's fictional CEO "Michael Edwards" to be changed from a photograph of the Canadian professor to a photograph of an unidentified third party.

111.    Despite knowing that neither Edwards nor Robinson was a real person, Defendants continued to reference Edwards or Robinson in the White Papers and promotional materials, which they had access to and control over, through at least mid-September.

112.    For example, Sharma stated in an interview on or about August 14, 2017, that "Edwards" had invested "a lot of capital originally" to help establish Centra, and also referred to Edwards as a "silent partner" at the company in an email sent to a *New York Times* reported.

USAO_SDNY_00006706

USAO_SDNY_00011862

113.    Farkas was connected to the LinkedIn profile for "Edwards" prior its deletion.
Farkas also edited a version of the Centra investor pitch deck on or about August 15, 2017, that
listed "Edwards" as the "VP/Co-Founder" and Robinson as the CFO, and the Defendants were
all responsible for several versions of the White Paper published on the Centra website that listed
"Edwards" and "Robinson" as members of the Centra team.

114.    Even after online commenters raised concerns regarding the legitimacy of
"Edwards" and "Robinson," Defendants continued to affirm that these executives were real
people. On August 3, 2017, for example, one Centra critic suggested in a public chat forum that
"the pictures on website are not real," to which Sharma responded "[w]e are 100% Real . . .We
are real lol we went live on facebook and said hello." Several days later, one commenter asked
Sharma to "please address the issue on michael edwards picture, the photo just changed today . .
." Sharma blamed the change on a "misclarification from the development team that we were
working with" and claimed that "[f]reelancers dropped the ball." Sharma then promised a live
video to demonstrate the legitimacy of the executives: "Myself, Ray, Mike, Jessica, and Robert
will be together this evening. I promise you that."

115.    Sharma doubled down on his deception several days later when he claimed that
Robinson would answer questions in a live online video: "Our CFO will explain in a long
detailed interview . . . See this is why I want our CFO to explain. She will say it clearer...Let
Jessica explain it." In the same public chat forum, Sharma continued to respond to investors
over the following week by claiming that the company's CFO would be able to answer various
questions. On August 17, Sharma noted that "Jessica has updated the website! Over 12.7M
Raised!" After Sharma stated in the public chat forum that Centra would announce a new CEO

30

in mid-August, one commenter asked "what will mike do?" Sharma responded that "Mike will be a Co-Founder and VP."

116.    In addition to fake LinkedIn profiles of "Edwards" and "Robinson" that Defendants used to promote Centra, Trapani – with encouragement and direction from Sharma – also fabricated his own online profile at a time when he knew potential investors were reviewing the Centra "team," including Trapani, when deciding whether to invest.

117.    In late July 2017, as the Centra promotional campaign for the ICO began, Trapani, with Sharma's assistance, built a fictional online profile of himself that included fake educational and professional accomplishments. Sharma texted Trapani to "[g]o make a linked in [profile] And add as many connections as you can[.] Add yourself to centra tech As COo [sic] And add connections." Sharma then instructed Trapani to "Google Coo linked in profiles And get all the info," and also to "[p]ut precious [sic] jobs Like banks etc." After Trapani apparently listed Harvard University under the "Education" section of his profile, Sharma directed him to "[t]ake Harvard out Do [l]ike university of Georgia. It would [be] too suspect everyone from hRvard [sic]."[3] Sharma also told Trapani to "[a]dd a construction company prior[.] I'm putting you as foreman." In a later series of text messages, Sharma wrote to Trapani that they "[s]hould look into signing up with Harvard Or remove from linked in[.] Don't want any issues Like centra didn't do due deligence [sic] On own employees[.] We gotta make sure we cover our asses any way possible."

118.    Trapani's LinkedIn profile from August 2017 reflected that he received a Master's Degree in Operations Management and Supervision from the University of California, Los Angeles ("UCLA") from 2010-2015. In fact, UCLA has never offered a Master's Degree in

---

[3] As noted above, the fake LinkedIn profile for "Michael Edwards" showed that he had obtained an M.B.A. from Harvard University as well.

31

USAO_SDNY_00006708

USAO_SDNY_00011864

this subject. Moreover, Trapani's profile also reflected that he served as General Foreman of the New York-based construction company Safway Atlantic during roughly the same period (January 2011 – October 2016) as when he was purportedly in Los Angeles.

119.   A later version of Trapani's profile from November had eliminated all references to UCLA, and his work history at Safway Atlantic continued only to October 2014.

120.   In short, at Sharma's direction and with his assistance, Trapani created a fraudulent public profile touting nonexistent accomplishments and degrees at a time when they were aware that prospective investors would be evaluating Trapani and his background when deciding whether to invest in the Centra ICO.

### D.   Defendants Falsely Claimed that Investors Would be Paid a Dividend

121.   In the White Papers and in other marketing materials, Defendants touted Centra's spectacular growth potential. For example, one such White Paper stated that "the market capitalization of cryptocurrencies reached a new high of $102 Billion as of 15 June, 2017, an increase of 1363% since Feb. 19, 2016" and that "[o]ne of the major customer groups of Centra Tech are cryptocurrency holders [who] face difficulty shopping and executing transactions only using cryptocurrencies. They are frequently international shoppers [who would be] taking the most advantage of Centra's CCE (Currency Clearance Engine) and its ability to offer them the best exchange rate instantly." Thus, according to the White Paper, "the time is ripe to introduce a cryptocurrency-based marketplace where customers can use Centra Debit Card anywhere in the world that accepts Visa." The October 2017 pitch deck edited by Farkas and circulated to Sharma also highlighted Centra's strong growth potential and suggested that company revenues would grow to nearly $12 million by 2021.

32

USAO_SDNY_00006709

USAO_SDNY_00011865

122.    In connection with touting Centra's growth potential and the benefits of investing in Centra's ICO, the White Papers promised that Centra investors "will receive a 0.8% Eth" – a reference to the digital currency Ether – "reward for every transaction in the network."  When Sharma was asked what this meant in a publicly available interview posted to YouTube in August 2017, he responded that, of the money Centra earned from its "revenue share" agreement with Visa and Mastercard, Centra would pay 0.8% back to token holders.  In a public chat forum on August 31, 2017, Farkas listed as the first item in "Centra's 5-point Advantage" the fact that "Centra tokens will give .8% returns in Eth quarterly to all CTR [Centra Token] holders based on network usage (not personal purchases)."  As such, similar to a dividend, Centra investors were promised a percent of Centra's future revenue stream from its purported partnership with Visa and Mastercard.

123.    Defendants knew that the White Papers' claims that Centra intended to pay a dividend-like "reward" to investors were false.  For example, in early September 2017, Sharma explicitly acknowledged to a large CTR Token investor that Centra would not pay token holders a 0.8% "dividend reward."  In a series of messages between Sharma and the large investor dated September 6, 2017, the investor complained that he relied on this promised 0.8% reward when purchasing CTR Tokens, and stated that he intended to sell all of his Centra Tokens as a result of Sharma and Centra's decision to withhold the 0.8% dividend-like revenue payout.

124.    In the exchange, Sharma did not dispute that Centra would not pay the 0.8% dividend, and instead offered to pay the dividend, but only to the investor in a confidential side-deal.  Sharma stated, "i will extend my offer: My deal to you, and only you since you have been here since the beginning was to extend the whole network reward program to you … this will guarantee you 0.8% for the whole network as individual program specifically designed for you in

USAO_SDNY_00006710

USAO_SDNY_00011866

confidence and NDA … you would get he [sic] 0.8% as if it was a dividend reward." The investor refused the side-deal and promised payout, and instead sold his Centra Tokens on an exchange.

125.    Sharma later forwarded his entire exchange with the investor to Farkas and Trapani. Thus, as of September 6, 2017, all Defendants knew that: (i) the claim in the White Paper that Centra would pay a 0.8% dividend-like reward to investors was false; and (ii) when this particular investor learned the truth, he decided to sell all of his Centra Tokens.

## VI.    Actions upon Learning of Commission Investigation

126.    On or about February 9, 2018, Sharma received a subpoena from the Commission requesting certain documents relating to Centra, including the Centra ICO. On or about February 13, 2018, Farkas received a subpoena from the Commission requesting documents relating to Centra, including the Centra ICO. On or about February 14, 2018, Trapani received a subpoena from the Commission requesting documents relating to Centra, including the Centra ICO. As a result, by mid-February 2018, Defendants knew that the Commission was investigating their activities in connection with the Centra ICO and promotion of Centra products.

127.    As of March 30, 2018, Centra's bank accounts were depleted and most of its employees had been terminated. Upon information and belief, a digital address holding digital assets raised in the ICO had not been depleted.

128.    Farkas made flight reservations to leave the United States on or about April 1, 2018. Before Farkas was able to board his flight, he was arrested by United States criminal authorities.

129.    Sharma was also arrested on April 1, 2018.

130.    Trapani was arrested on April 20, 2018

34

USAO_SDNY_00006711

USAO_SDNY_00011867

**FIRST CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5(a)-(c)**
**Against all Defendants**

131.    The Commission realleges and incorporates by reference paragraphs 1 through 130 of its Complaint.

132.    By virtue of the foregoing, Defendants, directly or indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, employed devices, schemes, or artifices to defraud, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and courses of business which operate or would operate as a fraud or deceit.

133.    By virtue of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a)-(c) [17 C.F.R. § 240.10b-5(a)-(c)], promulgated thereunder.

**SECOND CLAIM FOR RELIEF**
**Violations of Section 17(a)(1)-(3) of the Securities Act**
**Against all Defendants**

134.    The Commission realleges and incorporates by reference paragraphs 1 through 130 of its Complaint.

135.    By virtue of the foregoing, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, Defendants: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances

35

USAO_SDNY_00006712

USAO_SDNY_00011868

under which they were made, not misleading; and/or (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

136.    By reason of the conduct described above, Defendants, directly or indirectly violated and, unless enjoined will again violate, Securities Act Section 17(a)(1)-(3) [15 U.S.C. § 77q(a)(1)-(3)].

**THIRD CLAIM FOR RELIEF**
**Violations of Sections 5(a) and 5(c) of the Securities Act**
**Against all Defendants**

137.    The Commission realleges and incorporates by reference paragraphs 1 through 130 of its Complaint.

138.    By virtue of the foregoing, (a) without a registration statement in effect as to that security, Defendants, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use of means of a prospectus, and (b) made use of the means and instruments of transportation or communication in interstate commerce and of the mails to offer to sell through the use of a prospectus, securities as to which no registration statement had been filed.

139.    By reason of the conduct described above, Defendants, directly or indirectly violated and, unless enjoined will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and e(c)].

USAO_SDNY_00006713

USAO_SDNY_00011869

## FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Centra's Violations of Sections 5(a), 5(c), and 17(a)
### of the Securities Act, and Section 10(b) of the Exchange Act
### and Rule 10b-5 Thereunder
### Against all Defendants

140.   The Commission realleges and incorporates by reference paragraphs 1 through

130 of its Complaint.

141.   By virtue of the foregoing, Defendants provided knowing or reckless substantial

assistance to Centra, which, directly or indirectly, singly or in concert with others, in connection

with the purchase or sale of a security, with scienter, used the means or instrumentalities of

interstate commerce, or of the mails, to make untrue statements of material fact and omitted to

state material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading, and without a registration statement in effect as to

that security, directly and indirectly, made use of the means and instruments of transportation or

communications in interstate commerce and of the mails to sell securities through the use of

means of a prospectus.

142.   By virtue of the foregoing, Defendants aided and abetted and, unless restrained

and enjoined, will continue aiding and abetting, violations of Sections 5(a), 5(c), and 17(a)(1)-(3)

of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1)-(3)], Section 10(b) of the Exchange

Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a)-(c) [17 C.F.R. § 240.10b-5(a)-(c)] promulgated

thereunder, in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

USAO_SDNY_00006714

USAO_SDNY_00011870

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court grant the following relief, a Final Judgment:

**I.**

Permanently restraining and enjoining the Defendants, and each of their respective agents, servants, employees, attorneys and other persons in active concert or participation with each of them who receive actual notice of the injunction by personal service or otherwise from any future direct or indirect participation in any offering of unregistered securities, from any future violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), 77e(c)], and from any future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] issued thereunder;

**II.**

Directing each of the Defendants to disgorge all ill-gotten gains, including prejudgment interest thereon;

**III.**

Directing each of the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

**IV.**

Permanently barring each of the Defendants from serving as an officer or director of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

USAO_SDNY_00006715


USAO_SDNY_00011871

**V.**

Permanently prohibiting each of the Defendants from participating in any offering of

digital or other securities; and

**VI.**

Such other and further relief as this Court deems just and appropriate.

Dated: New York, New York
      April 20, 2018

SECURITIES AND EXCHANGE COMMISSION

By: _____
     Robert A. Cohen
     Chief, Cyber Unit
     Division of Enforcement

     Valerie A. Szczepanik
     Lucas M. Fitzgerald
     Jon A. Daniels
     Alison R. Levine
     Attorneys for the Plaintiff
     SECURITIES AND EXCHANGE
     COMMISSION
     New York Regional Office
     200 Vesey Street, Suite 400
     New York, New York 10281-1022
     (212) 336-0069 (Fitzgerald)
     Email: fitzgeraldl@sec.gov

USAO_SDNY_00006716

USAO_SDNY_00011872

USAO_SDNY_00011873