# Exhibit G

# 18 MAG 9989

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X
9,000   ETHER   FROM   ETHER   WALLET   :
ADDRESS "0xdA6F983076725cB2899205   :
A16E16d1ed60a0067A,"   :
                                  :
- - - - - - - - - - - - - - - - X

**WARRANT OF SEIZURE**
**PURSUANT TO 18 U.S.C. § 981**

TO:   ANY LAW ENFORCEMENT OFFICER AUTHORIZED BY LAW

An Affidavit having been made before me by Brandon S. Racz, a Special Agent with the Federal Bureau of Investigation, that he has reason to believe that the above-captioned property is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), and as I am satisfied that there is probable cause to believe that the property so described is subject to seizure and forfeiture pursuant to said statute,

YOU ARE HEREBY COMMANDED AND AUTHORIZED to seize the property described below by effectuating an electronic or digital transfer over the internet, or by serving a copy of this warrant of seizure upon any person or entity presently in possession or control of the property and directing them to effectuate such a transfer:

9,000   ETHER   FROM   ETHER   WALLET   ADDRESS "0xdA6F983076725cB2899205A16E16d1ed60a0067A"

YOU ARE FURTHER COMMANDED AND AUTHORIZED to prepare a written inventory of the property seized and promptly return this warrant and inventory before this Court as required by law.

Dated:   New York, New York
         October 22, 2018

SO ORDERED:

_Katharine H. Parker_

HONORABLE KATHARINE H. PARKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

**18 MAG    8989**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

     - v. -

9,000 ETHER FROM ETHER WALLET
ADDRESS "0xdA6F983076725cB2899205
A16E16d1ed60a0067A,"

         Defendant-In-Rem.

- - - - - - - - - - - - - - - - - x

**TO BE FILED UNDER SEAL**

AFFIDAVIT IN SUPPORT
OF SEIZURE WARRANT
PURSUANT TO
18 U.S.C. § 981

STATE OF NEW YORK      )
COUNTY OF NEW YORK    ) ss.:
SOUTHERN DISTRICT OF NEW YORK )

BRANDON S. RACZ, being duly sworn, deposes and says:

### INTRODUCTION

1. I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for approximately three years. I am currently assigned to a squad within the FBI responsible for investigating complex financial crimes, including crimes involving wire fraud, bank fraud, securities fraud, money laundering, and other white-collar crimes. During my tenure with the FBI, I have participated in investigations of numerous frauds, and have conducted physical and electronic surveillance, the execution of search warrants (including warrants to search electronic devices such as cellphones and computers), debriefings of informants, reviews of taped conversations and electronic communications such

as emails and text messages, and arrests.  I have also participated in efforts to seize and recover funds raised from victims of fraud, including analyses to determine whether funds constitute proceeds of fraud subject to seizure and the judicially authorized seizure of proceeds of fraud.   Through my training, education, and experience, I have become familiar with the manner in which securities and wire frauds are perpetrated.

2.    I am one of the FBI case agents from the FBI's New York Field Office with primary responsibility for an investigation of a startup company called Centra Tech, Inc. ("Centra Tech") and its co-founders, SOHRAB SHARMA ("SHARMA"), RAYMOND TRAPANI ("TRAPANI") and ROBERT FARKAS ("FARKAS") for soliciting investment funds for Centra Tech through fraudulent representations and omissions.  As explained below, based upon such conduct, Centra Tech co-founders SHARMA, TRAPANI and FARKAS have been charged in an Indictment, captioned *United States v. Sohrab Sharma et al.*, 18 Cr. 340 (LGS) pending before United States District Judge Lorna G. Schofield in the Southern District of New York (the "Criminal Case"), with conspiracy to commit securities fraud (in violation of 18 U.S.C. § 371), securities fraud (in violation of 15 U.S.C. §§ 78j(b) & 78ff; 17 C.F.R. § 240.10b-5; and 18 U.S.C. § 2), conspiracy to commit wire fraud (in violation of 18 U.S.C. § 1349), and wire

fraud (in violation of 18 U.S.C. §§ 1343 and 2) (collectively, the "Subject Offenses").

3.      As explained below, on or about May 2, 2018, the FBI seized approximately 91,000 units of a digital currency called "Ether" or "ETH" (the "Original Subject Property") that was on deposit in a digital wallet assigned a unique address that is accessible via the internet, namely the digital wallet with an address of "0xdA6F983076725cB2899205A16E16d1ed60a0067A" (the "Seizure Wallet"), pursuant to a seizure warrant signed by United States Magistrate Judge Robert W. Lehrburger of the Southern District of New York (the "Prior Seizure Warrant").      Judge Lehrburger issued the Prior Seizure Warrant based upon a supporting warrant affidavit citing representations made by Centra Tech through its outside counsel and other facts that furnished probable cause to believe that the 91,000 Ether units represent proceeds of the Subject Offenses.  At the time of the seizure, the 91,000 Ether units were worth more than $60 million in U.S. dollars.  The Prior Seizure Warrant and supporting warrant affidavit are attached as Exhibit A and incorporated by reference as though fully set forth herein.

4.      As shown in Exhibit A, "Ether" or "ETH" is a digital currency that is stored on the internet in applications referred to as digital wallets.  Each digital wallet is assigned a unique

3

alphanumerical identifier known as an address, and each digital wallet can only be accessed using a unique alphanumerical string known as a private key or passcode.

5.    This  Affidavit  is  submitted  in  support  of  the Government's application for the issuance of a warrant to seize and  forfeit  approximately  9,000  Ether  units  that  were  left  to remain in the Seizure Wallet when the Prior Seizure Warrant was executed  (the  "Remaining  Subject  Property").[1]   At  the  current Ether-to-dollar  exchange  rate,  the  9,000  Ether  units  are  worth more than $1,850,000 in U.S. dollars.  Based on the facts set forth below,  I  respectfully  submit  that  there  is  probable  cause  to believe  that  the  Remaining  Subject  Property  is  subject  to forfeiture to the United States of America as the proceeds of the Subject Offenses.

6.    The  information  contained  in  this  Affidavit  is  based upon my personal knowledge and involvement in the investigation of this matter, as well as information obtained from other sources, including  conversations  with  others,  as  well  as  my  review  of documents  gathered  during  the  course  of  this  investigation. Because this Affidavit is being submitted for the limited purpose

---

[1]  As  a  result  of  transaction  fees  incurred  when  the  Prior Seizure Warrant was executed on the Seizure Wallet, the precise amount of Ether left in the Seizure Wallet comprising the Remaining Subject Property was 8,999.996566 Ether units.  For ease of reference, this sum is referred to as 9,000 Ether units throughout this Affidavit.

of establishing probable cause to seize criminal proceeds, it does not include every fact that I have learned during the course of the investigation. Where the contents of documents and actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## PROBABLE CAUSE

### A. Probable Cause Regarding the Subject Offenses

7.    On or about March 31, 2018, United States Magistrate Judge James L. Cott of the Southern District of New York approved a criminal complaint, numbered 18 Mag. 2695, charging SOHRAB SHARMA and ROBERT FARKAS, two of Centra Tech's co-founders, with the Subject Offenses of conspiring to commit, and the commission of, securities and wire fraud in connection with a scheme to induce victims to invest digital funds worth millions of dollars for the purchase of unregistered securities, in the form of digital tokens issued by Centra Tech, through fraudulent misrepresentations and omissions (the "Complaint-1"). The Complaint-1 is attached as Exhibit B and incorporated by reference as though fully set forth herein.

8.    On or about April 18, 2018, United States Magistrate Judge Stewart D. Aaron of the Southern District of New York approved a criminal complaint, numbered 18 Mag. 3271, charging

5

RAYMOND TRAPANI, a third co-founder of Centra Tech, with the same Subject Offenses (the "Complaint-2"). The Complaint-2 is attached as Exhibit C and incorporated by reference as though fully set forth herein.

9.    On or about May 14, 2018, a Grand Jury in the Southern District of New York returned an Indictment, numbered 18 Cr. 340 (LGS), charging SHARMA, FARKAS and TRAPANI with the same Subject Offenses (the "Indictment") in the Criminal Case. The Indictment is attached as Exhibit D and incorporated by reference as through fully set forth herein.

10.   Based on the facts set forth in the Complaint-1, the Complaint-2, and the Indictment (collectively, the "Criminal Charging Documents"), there is probable cause to believe the following, in substance and in part:

a.    In or about July 2017, SHARMA, TRAPANI and FARKAS co-founded a startup company called Centra Tech that purported to offer cryptocurrency-related financial products.   For example, Centra Tech claimed to have a Centra Tech debit card that allowed users to spend cryptocurrencies such as "Bitcoin" and "Ether" to make purchases in real-time at various stores and other establishments that were part of the networks of merchant locations that accept payment cards from Mastercard and Visa as a result of

purported partnerships between Centra Tech and Bancorp, Mastercard and Visa.[2]  Centra Tech was headquartered in Miami Beach, Florida.

   b.    From at least on or about July 30, 2017 through at least in or about April 2018, SHARMA, TRAPANI and FARKAS engaged in a scheme to induce victims to invest digital funds worth millions of dollars for the purchase of unregistered securities, in the form of digital tokens issued by Centra Tech in connection with the company's so-called "initial coin offering" ("ICO"), through a series of material misrepresentations and omissions.[3]

----

[2]    As set forth in the Criminal Charging Documents, "Visa" refers to Visa Inc., a multinational financial services corporation headquartered in California that (among other things) facilitates electronic funds transfers throughout the world through "Visa"-branded credit cards and debit cards; "Mastercard" refers to Mastercard Incorporated, a multinational services corporation headquartered in New York that (among other things) processes payments between the banks of merchants and the card issuing banks or credit unions of the purchasers who use "Mastercard"-branded debit and credit cards; and "Bancorp" refers to The Bancorp, Inc., a Delaware-based financial services company that (among other things) issues debit and prepaid card by virtue of contractual partnerships with other financial services companies such as Visa and Mastercard, among others.

[3]    As set forth in the Criminal Charging Documents, an "initial coin offering" or "ICO" is a type of fundraising event in which an entity offers participants a unique digital "coin" or "token" in exchange for consideration. The consideration often comes in the form of "digital currency" or "cryptocurrency," but can also be "fiat currency," which is a term used to describe currency that a government has declared to be legal tender, such as the U.S. dollar or the Euro, but is not backed by a physical commodity. "Digital currency" or "cryptocurrency" is a digital representation of value that can be digitally traded and functions as (1) a medium of exchange, (2) a unit of account, or (3) a store of value, but does

Through this fraudulent scheme, SHARMA, TRAPANI and FARKAS solicited digital funds that included thousands of units of a cryptocurrency called "Ether" worth more than $25 million from investors who purchased digital tokens issued by Centra Tech.

      c.   As part of the scheme, SHARMA, TRAPANI and FARKAS made or caused Centra Tech to make the following misstatements in soliciting investments in Centra Tech, among others:

      i.   SHARMA, TRAPANI and FARKAS claimed to investors that Centra Tech had developed a debit card that enabled users to spend various cryptocurrencies to make purchases at any stores that accept Visa or Mastercard payment cards, and that Centra Tech had partnerships with Bancorp, Visa, and Mastercard to issue Centra Tech debit cards. In fact, Centra Tech had no such partnerships with Bancorp, Visa or Mastercard.

      ii.   SHARMA, TRAPANI and FARKAS claimed to investors that Centra Tech's executive team included a purported Chief Executive Officer named "Michael Edwards" and a purported Chief Financial Officer named "Jessica Robinson" who had impressive work histories and academic credentials. In fact, neither "Michael Edwards" nor "Jessica Robinson" was a real person.

---

not have legal tender status. Unlike fiat currency, digital currency is not issued by any jurisdiction and functions only by agreement within the community of users of that particular currency. Examples of digital currencies are "Bitcoin" and "Ether," both of which are issued and distributed on their own "blockchains." A "blockchain" is a digitalized, decentralized, cryptographically-secured ledger that allows market participants to keep track of digital currency transactions without central recordkeeping. The digital tokens or coins issued in an ICO are issued and distributed on a blockchain. Tokens often are also listed and traded on online platforms, typically called digital currency exchanges, and they usually trade for other assets.

8

iii.     SHARMA, TRAPANI and FARKAS claimed to investors that Centra Tech held money transmitter and other relevant licenses in 38 states.   In fact, Centra Tech did not have such licenses in a number of those states.

iv.     SHARMA, TRAPANI and FARKAS caused Centra Tech to make several of those false claims through (among other things) various promotional videos that were posted on the YouTube website; various white papers that were disseminated to investors via the internet; and various LinkedIn profiles that were posted on the LinkedIn social networking website. SHARMA also reiterated several of those false claims during (among other things) an interview on an internet podcast relating to the cryptocurrency industry.

d.     Cellphone   text   message   conversations   between SHARMA, TRAPANI and FARKAS, found in a cellphone recovered from TRAPANI (the "TRAPANI Cellphone"),[4] show that they were well aware of the falsity of the above-described claims:

i.     For   example,   with   respect   to   the   purported partnerships that Centra Tech claimed to have with Bancorp, Visa, and Mastercard, SHARMA engaged in a text message conversation with TRAPANI on or about July 31, 2017 in which

---

[4]     As set forth in the Complaint-2, the TRAPANI Cellphone was recovered from TRAPANI following his surrender on or about October 5, 2017 on a perjury indictment obtained by the District Attorney's Office for New York County.  On the date of this surrender, TRAPANI signed a consent form giving that District Attorney's Office and the New York City Police Department his "voluntary consent to a complete search" of the TRAPANI Cellphone, and he also wrote the password to access the TRAPANI Cellphone on the consent form. Pursuant to that consent form, the TRAPANI Cellphone was searched on or about October 17, 2017, the TRAPANI's Cellphone's contents were copied into an extraction report containing more than 14,000 pages of materials, and the TRAPANI Cellphone was returned to TRAPANI.  I have reviewed the extraction report and documentation generated as result of this consensual search.  The dates and times of particular text messages reported in the Criminal Charging Documents and herein are as they appear in the extraction report, without conversion to Eastern Standard Time.

they discussed Centra Tech's lack of actual partnerships with banks or credit card companies. During that exchange, SHARMA (via a cellphone assigned a call number ending with "3138" that is referred to as the "SHARMA Cellphone-1" in the Complaint-2) wrote: "Should write down a list of places to call tomorrow," "For the conbranded [sic] card." Later in the exchange, SHARMA wrote: "Gotta get it going on the banks today plz." SHARMA also subsequently wrote: "We just need to get s [sic] banking license," "Need our direct agreement with visa," "Or MasterCard," "That's the move," "Cut out the middle man," "I wish we just knew someone."

ii.    With respect to Centra Tech's purported CEO "Michael Edwards" and purported CFO "Jessica Robinson," SHARMA (via the SHARMA Cellphone-1) text-messaged TRAPANI on or about July 29, 2017, that they "Need to find someone who looks like Michael," "Team photos," "He's real lol," "Everyone real," "Except Jessica," "And Mike." Later that day, SHARMA (via the SHARMA Cellphone-1) text messaged TRAPANI: "Gonna kill both Ceo and her," "Gonna say they were married and got into an accident."

iii.   With respect to Centra Tech's purported money transmitter and other licenses in 38 states, SHARMA had a text message conversation with TRAPANI and FARKAS on or about August 30, 2017 about applying for state licenses that Centra Tech had previously represented it already held in 38 states. For example, SHARMA wrote in one message on or about August 30, 2017 to TRAPANI and FARKAS: "Gotta apply for all licenses," "Should I even say this."

iv.    With respect to false claims in a white paper that Centra Tech published to investors on the company's website, SHARMA had a text message conversation with TRAPANI and FARKAS on or about September 29, 2017 about taking down (among other things) the version of the white paper that was on the company's website at the time. During this conversation, SHARMA (via a cellphone assigned a call number ending with "6091" that is referred to as the "SHARMA Cellphone-2" in the Complaint-2) sent text messages to TRAPANI and FARKAS in which SHARMA wrote (among other things): "I rather cut any fufu," "Off right own," "Now," "Then worry," "Anything that doesn't exist current," "We need to remove," "Have them do it asap." Later in the same conversation, SHARMA (via the SHARMA Cellphone-2) wrote: "I want a product page like [another

10

company]," "Theirs is so nice."  TRAPANI wrote "Lol yeah no real product."  SHARMA wrote: "Yea but it doesn't say much," "And looks good," "We don't have a real product either right now," "So I wanna tighten up ship asap."

e.  As detailed in the Criminal Charging Documents, SHARMA also sent and received email communications showing that he was well aware of the falsity of the aforementioned claims by Centra Tech in soliciting investments in Centra Tech:

i.  For example, with respect to Centra Tech's claimed partnership with Bancorp for the issuance of Centra Tech debit cards licensed by Visa and Mastercard, SHARMA on or about August 30, 2017 forwarded to FARKAS, among others, an email that SHARMA had received from Bancorp directing Centra Tech to "CEASE AND DESIST FROM REPRESENTING THAT THE BANCORP BANK HAS ANY CONNECTION WITH, OR IS THE ISSUER OF ANY CARD PRODUCTS RELATED TO CENTRA TECH."

ii.  On or about the same day, SHARMA (via the SHARMA Cellphone-1) engaged in a text message conversation with TRAPANI and FARKAS concerning the cease-and-desist notice from Bancorp.  During this exchange, SHARMA wrote:  "Google Bitsset and Centra," "And contact anyone that has that image," "And ask them to remove it . . . . Or that language," "Saying we work Bancorp," "Od bad," "Their lawyer reached out."  Later that day, FARKAS text messaged SHARMA and TRAPANI: "No Bancorp on it."  SHARMA responded:  "In the bottom? . . . . U sure," "I thought I saw," "On press releases."  FARKAS wrote:  "Just checked them all," "No Bancorp."  SHARMA responded:  "Okay," "We gotta get that shit removed everywhere and blame freelancers lol . . . ."

iii.  In addition, on or about October 13, 2017, FARKAS, via one of his personal email accounts ("rjfarkas6@gmail.com") sent an email to SHARMA, via one his work email accounts ("sam@centra.tech") and one of his personal email accounts ("ssharma491@gmail.com") attaching FARKAS' edits to an investor pitch deck dated August 15, 2017, promoting Centra Tech and its ICO.  The pitch deck contained several misleading claims, including, among other things, that: (i) the Centra Card gives users "[a]ccess to more than

11

36 Million Points of Sale wherever Visa and/or Mastercard is accepted"; (ii) the Centra Card was "issued" by "Mastercard and Visa;" and (iii) Centra in January 2017 had a "Major Banking Partnership and license agreement signed with VISA USA Inc."

11.   I have reviewed documents and other evidence provided by the United States Securities and Exchange Commission (the "SEC") that were gathered by the SEC during a parallel SEC investigation of Centra Tech and its co-founders, and I have reviewed an amended complaint filed on or about April 20, 2018 by the SEC against SHARMA, TRAPANI and FARKAS in the Southern District of New York charging the three of them with civil federal securities law violations arising from Centra Tech's ICO (the "SEC Complaint") based upon evidence gathered by the SEC during its parallel investigation.   The SEC Complaint against SHARMA, TRAPANI and FARKAS (who are referred to as the "Defendants" in the SEC Complaint) is attached as Exhibit E and incorporated by reference as though fully set forth herein.   According to the SEC Complaint (at ¶¶ 65-68), in addition to making fraudulent misrepresentations and omissions to solicit investors to purchase digital tokens (called "Centra Tokens" or "CTRs") issued by Centra Tech during its ICO, SHARMA, TRAPANI and FARKAS also engaged in a scheme to manipulate the market price of Centra tokens on various digital asset trading exchanges.   Paragraphs 65 through 68 of the SEC Complaint state the following:

12

65. Defendants also manipulated the price of the Centra Token in the weeks leading up to the ICO. Defendants' manipulative trading was intended to generate interest in the company and to ensure that prospective investors were not discouraged by the Centra Token price — which was then trading on public exchanges between approximately $.15 and $.50 per token on limited trading volume — or by public comments that were negative of Centra and its purported products. As Sharma explained to Trapani in late August 2017, "[c]an't have more FUD [fear, uncertainty and doubt] . . . There's FUD around[.] Mainly about price." Defendants undertook this manipulative trading knowingly, recklessly, or negligently.

66. As one example of Defendants' manipulations, over August 26 and 27 Sharma and Trapani engaged in a concerted effort to manipulate the CTR Token price higher. On August 27, 2017, for example, Sharma instructed Trapani to artificially increase the Centra Token price: "Ray keep bumping the price. Do [larger] buys." Trapani responded "what size," to which Sharma explained "10 ETH plus" and Trapani agreed. Later that same day, Sharma again instructed Trapani to make additional large purchases, to which Trapani responded "yeah I am doing big buys." That evening, Sharma noted with approval that "we already pushed the price higher By doing that pump[.] Naturally We gotta keep doing that[.] Price is rising." The next day when Sharma noticed that Trapani was making additional large purchases, he directed Trapani to make the purchases at higher prices: "Gotta do higher than 60," Sharma instructed, and then made clear that he should make the buys at $0.80 per token. Trapani agreed, after which Sharma responded that they should "[g]et . . . [r]eady for the pump Lol."

67. When the pump was completed, Sharma messaged Trapani that they had "[b]urned through like 250 ETH" — or approximately $75,000 — and moved "the price higher by 30%."

68. Based on publicly available market data, Trapani and Sharma's efforts to manipulate the Centra Token price were successful. During August 26 – 28, 2017, the

13

price of the Centra Token went from approximately $0.50 per token to over $1, and on August 27 the closing price was $6.91 — which represents the highest closing price ever recorded for Centra Tokens.   In addition, while trade volume in early August ranged anywhere from 2,000 to 50,000 transactions per day, on August 26, 2017 the trade volume increased to well over one million tokens traded.

(Exhibit E at ¶¶ 65-68 (SEC's brackets and alterations).)

12.   From my review of transcripts of various proceedings in the Criminal Case, my participation in this investigation, and my conversations with other law enforcement officials working on this investigation, I have learned the following, in substance and in part:

a.   In April 2018, SHARMA and FARKAS were arrested on the Complaint-1 and TRAPANI was arrested on the Complaint-2, and all three of them were charged in May 2018 in the Indictment in the Criminal Case against them before United States District Judge Lorna G. Schofield in the Southern District of New York.

b.   As relevant for present purposes, SHARMA and FARKAS were arrested on or about April 1, 2018 in the Southern District of Florida on the Complaint-1 in connection with the Criminal Case. Both of them were presented on the Complaint-1 before United States Magistrate Judge Lurana S. Snow in the Southern District of Florida on or about April 2, 2018.   SHARMA and FARKAS subsequently consented to their detention and removal to the Southern District

14

of New York for further proceedings on the Complaint-1, without prejudice to their ability to apply for their releases on bail upon their arrival in the Southern District of New York. After SHARMA and FARKAS were removed to the Southern District of New York, each of them had separate contested bail hearings in May 2018 at which the Office of the United States Attorney for the Southern District of New York (the "Government") sought to have both of them detained pending trial. Transcripts of these bail hearings are attached as Exhibits F, G and H, respectively, and incorporated by reference as though fully set forth herein. SHARMA and FARKAS were ultimately ordered to be released on specified bail conditions but only upon satisfaction of those bail conditions. SHARMA and FARKAS were both eventually released from custody on bail.

c.   TRAPANI has also been released from custody on judicially approved bail conditions that were agreed upon between him and the Government.

**B. Probable Cause as to the Remaining Subject Property**

13.   Based on the facts set forth herein, I respectfully submit that there is probable cause to believe that the Remaining Subject Property constitutes proceeds of the Subject Offenses and is subject to forfeiture to the United States of America.

15

**Overview**

14.    Based on the facts set forth below, there is probable
cause to believe:

a.    During Centra Tech's ICO, which took place from
approximately on or about July 30, 2017 through on or about October
5, 2017 (the "ICO Period"), purchasers of Centra Tech tokens
provided funds in the form of digital currency (including thousands
of units in a digital currency known as "Ether" or "ETH") in
exchange for Centra Tech tokens.  Based on the facts set forth in
the Criminal Charging Documents, there is probable cause to believe
that all such Ether units were solicited from Centra Tech token
purchasers through fraudulent misrepresentations and omissions by
Centra Tech and its co-founders SHARMA, TRAPANI and FARKAS as part
of their commission of the Subject Offenses, and thus that all
such Ether units represent proceeds of the Subject Offenses.

b.    After the SEC made Centra Tech aware of the SEC's
investigation of Centra Tech by serving a subpoena on Centra Tech
in late November 2017, Centra Tech transferred approximately
100,000 Ether units to the Seizure Wallet, a digital wallet with
a unique passcode that was possessed only by Centra Tech co-founder
SHARMA.

c.    According to representations of Centra Tech through
its outside counsel and representations of SHARMA through his

16

individual counsel, 91,000 of the 100,000 Ether units in the Seizure Wallet (*i.e.*, the Original Subject Property) were raised from purchasers of Centra tokens during the ICO Period in connection with Centra Tech's ICO.  Through his own counsel and through Centra Tech's outside counsel, SHARMA claimed that the remaining 9,000 Ether units in the Seizure Wallet (*i.e.*, the Remaining Subject Property), were proceeds of SHARMA's own cryptocurrency trading activities.

        d.    Based in large part on such representations, which were memorialized in the warrant affidavit submitted in support of the Government's application for the Prior Seizure Warrant to seize 91,000 of the Ether units in the Seizure Wallet, the FBI obtained the Prior Seizure Warrant and in May 2018 transferred those funds into a secure digital wallet maintained by the FBI pursuant to the Prior Seizure Warrant.

        e.    As shown below, as a result of the continuing investigation in this matter, I and others at the FBI have become aware of facts, which are described below, that I respectfully submit furnish probable cause to believe that the remaining 9,000 Ether units in the Seizure Wallet also represent ICO proceeds of the Subject Offenses and that the representations by Centra Tech and SHARMA to the contrary were false and misleading.

**The Seizure of 91,000 Ether Units from the Seizure Wallet**

15.   I have reviewed materials available to the public via the internet concerning Centra Tech, documents gathered by law enforcement as part of this investigation (including text messages recovered from the TRAPANI Cellphone), documents provided by the SEC that the SEC gathered as part of its parallel investigation, and transcripts of proceedings in the Criminal Case against Centra Tech's co-founders in the Southern District of New York.   I have also gathered information through conversations with other law enforcement officials familiar with this matter, conversations with representatives of the Government concerning representations by Centra Tech and its co-founders through their respective counsel, and conversations with representatives of the SEC concerning information and evidence gathered by the SEC's parallel investigation.   Based on the foregoing sources, I have learned the following, in substance and in part:

a.   From on or about July 30, 2017 through on or about October 5, 2017, Centra Tech raised funds from investors, primarily in the form of units of the digital currency called "Ether" or "ETH," via the company's ICO.   During this ICO, Centra Tech accepted digital funds from investors, including Ether units, in exchange for digital tokens issued by Centra Tech, known as "Centra

18

tokens" or "CTR tokens" or "CTRs" that could be traded, or exchanged, on various digital currency exchanges.  The Ether units that Centra Tech raised from investors can be grouped into two broad categories:  thousands of Ether units provided by a company in South Korea called Bitsett in exchange for Centra tokens, and thousands of Ether units raised from a wide variety of other investors in exchange for Centra tokens.

b.   In or about the fourth quarter of 2017, the SEC initiated an investigation of Centra Tech.  As part of that investigation, the SEC issued a subpoena on or about November 29, 2017 to Centra Tech, care of Centra Tech's outside counsel at the law firm of Ballard Spahr LLP, which has been retained to represent Centra Tech.  The subpoena compelled Centra Tech to produce a variety of documents, including various documents relating to Centra Tech co-founders SOHRAB SHARMA, RAYMOND TRAPANI and ROBERT FARKAS, documents sufficient to identify all digital and other assets held by or on behalf of Centra Tech, and documents sufficient to identify all investors who purchased any tokens offered by Centra Tech, among other categories of documents and information.

c.   During Centra Tech's outside counsel's representation of Centra Tech, the outside counsel engaged in several conversations with representatives of the SEC working on

19

the SEC's investigation.   Centra Tech's outside counsel also had separate conversations with representatives of the Government and the FBI with respect to the parallel criminal investigation relating to Centra Tech.   During these conversations, the following occurred, in substance and in part:

   i.   On or about November 29, 2017, during a telephone call between representatives of the SEC and Centra Tech's outside counsel, the following occurred, in substance and in part.   The SEC inquired about the location and status of funds raised by Centra Tech from its investors during the company's ICO and about whether the company had taken any measures to ensure that such funds were not at risk of being dissipated. Centra Tech represented through its outside counsel that those funds were intact but undertook to confirm as much.

   ii.   On or about November 30, 2017, during a telephone call between representatives of the SEC and Centra Tech's outside counsel, Centra Tech represented the following, in substance and in part, through its outside counsel.   In response to the concerns raised by the SEC the day before, all of the Ether units raised by Centra Tech through its ICO had been transferred to a digital wallet (namely, the digital wallet referred to herein as the Seizure Wallet) with a unique passcode.   As a result, the Seizure Wallet contained a total of approximately 100,000 Ether units (then worth more than $40 million in U.S. dollars).   The passcode to the Seizure Wallet had been in the possession of Centra Tech co-founder SHARMA, but had been reduced to a piece of paper that was divided into halves that were given to Centra Tech executive FARKAS and Centra Tech's General Counsel Allan Shutt, respectively.   The combination of those halves of the paper supposedly represented the only copy of the passcode to the Seizure Wallet.   The half of the paper given to FARKAS, containing part of the purported passcode, was placed in a safe deposit box in FARKAS' name; and the other half of the paper given to Shutt, containing the remainder of the purported passcode, was placed in a safe deposit box in Shutt's name.

iii.    On or about January 18, 2018, Centra Tech through its outside counsel provided a letter to the SEC (the "January 18 Letter") enclosing a summary spreadsheet ("Summary Spreadsheet") in response to specified document requests in the SEC's November 29, 2017 subpoena to Centra Tech. According to the subpoena, the document requests at issue (namely, document requests numbered 6, 7 and 9 in the subpoena) sought (among other things) documents sufficient to identify all investors who purchased any digital token issued by Centra Tech, documents sufficient to disclose the amounts and dates of payments for each investor, and documents sufficient to identify all cryptocurrency digital wallet addresses that were used to send assets to Centra Tech in connection with any digital token sold by Centra Tech. According to the January 18 Letter, the Summary Spreadsheet was created to respond to those document requests in that SEC subpoena, the Summary Spreadsheet was "not a pre-existing document;" and "[s]hould it be determined that there are any errors in the compilation of information, we will provide a revised spreadsheet."

iv.    Based on my review of the January 18 Letter and the Summary Spreadsheet, I have learned that the Summary Spreadsheet purports to show, in substance and in part, that Centra Tech received a total of approximately 91,000 Ether units in exchange for Centra tokens issued by Centra Tech during the ICO Period as part of the company's ICO: a total of approximately 40,000 Ether units from so-called "Korea Partners," a reference to Bitsset,[5] and a total of approximately 51,000 Ether units from hundreds of individual Centra token purchasers named in the Summary Spreadsheet.

v.    On or about January 30, 2018, during a telephone call between representatives of the SEC and Centra Tech's

---

[5]   The Summary Spreadsheet refers to Bitsset as "Korea Partners," rather than mentioning Bitsset by name. However, as detailed herein, Centra Tech has made representations through its outside counsel showing that it was the Korea-based company Bitsset that provided the 40,000 Ether units attributed to "Korea Partners" in the Summary Spreadsheet. Accordingly, based on such representations and other facts set forth in this Affidavit, I believe that "Korea Partners" is synonymous with Bitsset.

21

outside counsel, Centra Tech represented through its outside
counsel, in substance and in part, the following.   Centra
Tech represented that of the 100,000 Ether units that Centra
Tech had transferred into the Seizure Wallet, approximately
40,000 of those Ether units had been raised from Bitset and
approximately 51,000 of those Ether units had been raised
from other Centra token purchasers during Centra Tech's ICO
(for a total of 91,000 Ether units that are collectively
referred to herein as the Original Subject Property).  Centra
Tech further claimed that the remaining 9,000 Ether units
(referred to herein as the Remaining Subject Property)
belonged to SHARMA and were proceeds and profits of his
personal cryptocurrency trading unrelated to Centra Tech, and
were not funds raised during Centra Tech's ICO from purchasers
of Centra tokens.

       d.    Centra  Tech  co-founders  SHARMA  and  FARKAS  were

arrested in the Southern District of Florida on or about April 1,

2018 based on the Complaint-1 charging them with the Subject

Offenses of conspiring to commit, and the commission of, securities

and wire fraud, in connection with their solicitation of millions

of dollars worth of digital assets (including Ether units) raised

from investors in exchange for Centra tokens issued by Centra Tech

based on fraudulent misrepresentations and omissions.   SHARMA and

FARKAS were presented on the Complaint-1 in the Southern District

of Florida on or about April 2, 2018 and subsequently consented to

their detention and removal to the Southern District of New York

for further proceedings on the Complaint-1, without prejudice to

their ability to apply for their releases on bail upon their

arrival in the Southern District of New York.

e.   On or about April 10, 2018, Centra Tech's General Counsel, Allan Shutt, provided his half of what was purported to be the passcode to the Seizure Wallet to FBI agents in the Southern District of Florida in response to grand jury subpoenas that were previously served on Centra Tech.

f.   On or about April 11, 2018, FBI agents in the Southern District of Florida retrieved FARKAS' half of what was purported to be the passcode to the Seizure Wallet pursuant to a judicially authorized search warrant issued by United States Magistrate Judge Barry S. Seltzer of that District.

g.   After FBI agents in the Southern District of Florida gained possession of both Schutt's and FARKAS' halves of paper containing what was purported to be the passcode to the Seizure Wallet containing 100,000 Ether units (namely, the 91,000 Ether units that Centra Tech represented had been raised from Bitset and other Centra token purchasers and the remaining 9,000 Ether units that Centra Tech represented belonged to SHARMA), those agents in the Southern District of Florida sent images of that purported passcode to myself and another FBI agent in the Southern District of New York who has significant training and experience in investigations of crimes involving digital currencies.

h.   On or about April 11, 2018, based on the presence of exigent circumstances described in Exhibit A, I and another FBI

23

agent attempted to use the purported passcode (documented on the paper fragments that had been possessed by Shutt and FARKAS) to transfer the 91,000 Ether units that indisputably represented proceeds of the Subject Offenses from the Seizure Wallet set up by Centra Tech to a secure digital wallet maintained by the FBI, pursuant to Title 18, United States Code, Section 981(b)(2)(B)(ii).

      i.   After attempting to use the purported passcode to access the Seizure Wallet, I learned that the passcode formed by combining both Schutt's and FARKAS' halves of paper did not work and was unable to provide access to the funds contained in the Seizure Wallet.

      j.   On or about April 13, 2018, United States Magistrate Judge Robert W. Lehrburger of the Southern District of New York signed the Prior Seizure Warrant authorizing the FBI to seize the Original Subject Property consisting of 91,000 Ether units then on deposit in the Seizure Wallet by serving a copy of the Seizure Warrant upon any person or entity in possession or control of the Original Subject Property and directing them to effectuate a transfer of the Original Subject Property to the FBI. The Prior Seizure Warrant was approved by Judge Lehrburger based upon a supporting warrant affidavit detailing evidence furnishing probable cause to believe that the 91,000 Ether units that

represent proceeds of the Subject Offenses, including representations of Centra Tech through its outside counsel acknowledging that the 91,000 Ether units were raised from Bitset and other Centra token purchasers during Centra Tech's ICO. The Prior Seizure Warrant was subsequently served on (among others) SHARMA via his original individual counsel at the law firm of Konstelantz & Fink LLP (which was retained by SHARMA to represent him in the Criminal Case), and on FARKAS via his original individual counsel at the law firm of McLaughlin & Stern LLP (which was retained by FARKAS to represent him in the Criminal Case).

k. After SHARMA and FARKAS, who had been detained following their arrests in the Southern District of Florida in this case, were removed to the Southern District of New York, each of them had separate bail hearings in May 2018 at which the Government sought to have both of them detained pending trial.

l. On or about May 1, 2018, the Government and FARKAS and his original counsel appeared for a bail hearing before United States Magistrate Judge Ona T. Wang of the Southern District of New York. At the bail hearing, the Government reported that efforts by the FBI to access the Seizure Wallet containing 100,000 Ether units (including at least 91,000 Ether units of victim-investor funds) using the purported passcode obtained from Centra Tech had failed, and that neither SHARMA nor FARKAS had effectuated

25

the transfer of 91,000 of those Ether units to the FBI as required by the Prior Seizure Warrant.    FARKAS represented through his counsel that the purported passcode to the Seizure Wallet had been provided (to FARKAS and Shutt) by SHARMA after the SEC inquired about the Seizure Wallet, that FARKAS believed in good faith that the purported passcode was in fact the actual passcode to the Seizure Wallet, and that FARKAS had learned while he and SHARMA were incarcerated as a result of this Criminal Case that SHARMA had altered the actual passcode before providing it to FARKAS and Shutt in response to the SEC's inquiries.    Judge Wang ordered FARKAS detained until a specific set of conditions were met, including the successful transfer to the FBI of the Original Subject Property of 91,000 Ether units pursuant to the Prior Seizure Warrant.

        m.   On or about May 1, 2018, the day before SHARMA's first bail hearing, SHARMA's original counsel reported to the Government that the actual passcode to the Seizure Wallet was on a piece of paper taped underneath a drawer in the kitchen of an apartment in Miami, Florida where SHARMA lived with his girlfriend. FBI agents from the FBI's Miami Field Office went to that apartment on or about May 2, 2018, and, with the consent of SHARMA's girlfriend, the agents searched the kitchen of the apartment and recovered a piece of paper with what appeared to be a passcode to

a digital wallet such as the Seizure Wallet.  On or about May 2, 2018, using this passcode, the FBI successfully transferred the Original Subject Property of 91,000 Ether units from the Seizure Wallet to a secure digital wallet maintained by the FBI pursuant to the Prior Seizure Warrant.  As explained below, because law enforcement had not become aware at that point in this investigation of evidence contradicting representations by Centra Tech that the remaining 9,000 Ether units were proceeds of SHARMA's cryptocurrency trading that were not raised from Centra Tech investors, the 9,000 Ether units were left in the Seizure Wallet.

n.   On or about May 2, 2018, the Government and SHARMA and his original counsel appeared for the first of two bail hearings before United States Magistrate Judge Debra C. Freeman of the Southern District of New York.  At the first bail hearing, SHARMA through his counsel admitted that SHARMA had previously provided a false passcode to the Seizure Wallet in response to inquiries by the SEC.  For example, according to the transcript of this bail hearing, SHARMA's counsel stated the following on behalf of SHARMA on the record before Judge Freeman:

As you've just heard, my client was arrested on April 1st [in 2018].  Before his arrest, I can tell you I was representing him in the SEC matters since February [2018]. . . .  That was the first that the defendant became aware that there is a criminal investigation.  Up until then, it had been an SEC

27

investigation.   He was no longer active in his
company as of . . . October of 2017, and so he had
November 29th is the day the SEC appeared and that
is when the passcode situation arose where the SEC
was informed that the virtual wallet [i.e., the
Seizure Wallet] had been secured and the passcode
was in two separate spots.  Your Honor, we now know
that that was not true.   I cannot explain to the
Court why that happened.   I believe my client was
very misguided, taking his own counsel and perhaps
others.  But that was misguided.

I had my first chance to speak with him face-to-
face since he was arrested on April 1st, I met with
him for the first time yesterday when he arrived in
New York.  Within a very short time of my meeting
him, he told me the truth about the passcode, and
I immediately told the Government where it could be
found and his girlfriend met the FBI this morning
and they found it under the kitchen drawer. . . .
So I really — I cannot explain why he did not give
the proper passcode.  It may be a trust issue, I'm
not sure.

(Exhibit G at 19-20.)

o.   At SHARMA's first bail hearing on or about May 2,

2018, SHARMA also represented through his original counsel to Judge

Freeman that the remaining 9,000 Ether units in the Seizure Wallet

(then worth about $6 million in U.S. dollars) belonged to SHARMA

and were not raised from Centra Tech investors.   The Government

explained that it was not aware at that time of evidence

establishing probable cause to seize the remaining 9,000 Ether

units, but noted that the Government's investigation remains

ongoing and that if the Government later learned of facts

establishing probable cause to seize those funds, the Government

28

would seek to do so.  After Judge Freeman expressed concerns that SHARMA could use those funds to flee if he were released on bail, SHARMA's counsel proposed placing the 9,000 Ether units in a different digital wallet that would be controlled by a trustee appointed on behalf of SHARMA and would not be accessible to SHARMA.  To give SHARMA and his counsel enough time to prepare a bail package addressing Judge Freeman's concerns, Judge Freeman continued SHARMA's detention pending a further bail hearing, which took place on or about May 11, 2018.

p.   At SHARMA's second bail hearing on or about May 11, 2018, SHARMA through his counsel proposed a bail package to Judge Freeman that would include a requirement that remaining 9,000 Ether units in the Seizure Wallet (among other assets) be placed in a trust, to be managed by a trustee, that would permit the trustee to use funds in the trust solely for enumerated expenses such as, for example, legal fees and living expenses for SHARMA, pursuant to a trust agreement to be approved by the Government and the Court.  SHARMA's counsel reiterated on behalf of SHARMA that the 9,000 Ether units "is Mr. Sharma's money" (Exhibit R at 7-8 ("as the Court knows, there . . . is a virtual wallet, which still contains 9,000 of ether which is valued right now today a little bit over $6 million that is Mr. Sharma's money")), and further that "although he would be the beneficiary of the trust, [he] would

29

have no ability to invade the trust" (Exhibit H at 8-9).   Judge Freeman ordered that SHARMA be released on specified bail conditions and that he be detained until those bail conditions had been satisfied, including a bail condition requiring that SHARMA's assets in the Seizure Wallet "containing his funds (9,000 in ether, which the Court understands to be currently valued at approx. $6 million) to be placed in trust, with a trust agreement to be reviewed by the [Government] and found acceptable."

16.   I have reviewed transcripts of proceedings and other publicly available court filings in *Jacob Zowie Thomas Rensel* v. *Centra Tech, Inc. et al.*, 17 Civ. 24500 (JLK), a putative class securities fraud action by a lead plaintiff on behalf of Centra Tech investors against defendants Centra Tech, SHARMA, TRAPANI, and FARKAS, among others, that is pending before United States District Judge James L. King of the Southern District of Florida (the "Private Class Action").   Based these sources, I have learned the following, in substance and in part.   After the FBI seized 91,000 of the 100,000 Ether units in the Seizure Warrant, the defendants in the Private Class Action initially consented to the entry of a preliminary injunction freezing all 100,000 of the Ether units in the Seizure Wallet, even though the defendants contended that the remaining funds of about 9,000 Ether units in the Seizure Wallet belonged to Centra Tech but were supposedly unrelated to

its ICO. (See ECF 17 Civ. 24500 (JLK), Docket Entry No. 79 at 15 n.10.)   The defendants in the Private Class Action, however, subsequently revoked their consent to the seizure of the remaining 9,000 Ether units in the Seizure Wallet, and Judge King issued a preliminary injunction on or about September 25, 2018 that imposes an asset freeze over the 91,000 Ether units that are currently held in a digital wallet controlled by law enforcement but does not freeze or otherwise protect the remaining 9,000 Ether units in the Seizure Wallet.  (ECF 17 Civ. 24500 (JLK), Docket Entry No. 95.)

### The Remaining 9,000 Ether Units in the Seizure Wallet

17.   Since SHARMA's bail hearings in May 2018, as a result of the continuing investigation in this matter, I and others at the FBI have become aware of facts, which are described below, that I respectfully submit furnish probable cause to believe that the remaining 9,000 Ether units in the Seizure Wallet represent proceeds of the Subject Offenses, and that the representations by Centra Tech and SHARMA to contrary were false and misleading.

18.   As shown below, I respectfully submit that there is probable cause to believe the following:  (a) Centra Tech raised at least 100,000 Ether units during it ICO from investors who purchased Centra tokens, not 91,000 Ether units as claimed by Centra Tech and SHARMA;  (b) the 100,000 Ether units that Centra

31

Tech transferred to the Seizure Wallet, including the 9,000 Ether units that remain in the Seizure Wallet after the seizure of the other 91,000 Ether units pursuant to the Prior Seizure Warrant, are traceable in whole or substantial part to funds raised by Centra Tech during and as part of its ICO; and (c) there is evidence described below establishing probable cause to believe that the remaining 9,000 Ether units in the Seizure Wallet are traceable, in whole or substantial part, to transactions in which Centra Tech raised 7,500 Ether units from Bitset and 2,500 Ether units from an investor referred to by SHARMA as "Shin" in exchange for Centra tokens during the ICO Period, and both of these transactions are not included in the 91,000-Ether-unit-figure that Centra Tech has claimed represents the total of all the funds raised through its ICO.

19. Based on the following facts, I respectfully submit that there is probable cause to believe that Centra Tech raised at least 100,000 units of "Ether" or "ETH" from investors who purchased Centra tokens during Centra Tech's ICO, not 91,000 Ether units as previously claimed by Centra Tech and SHARMA:

a. As set forth in the Criminal Charging Documents, during Centra Tech's ICO, Centra Tech published various whitepapers via the company's internet website to solicit investors to purchase Centra tokens in exchange for units of Ether.

Based on my review of a whitepaper that was downloaded from Centra Tech's website on or about August 3, 2017, I have learned the following, in substance and in part. According to this whitepaper, Centra Tech created a total of 100 million Centra tokens ("Issuance of Centra Tokens[:]   100,000,000*"), and planned to offer 68 million of the tokens to investors in exchange for units of Ether during the ICO ("[w]e will be offering 68% of all [100 million] CTR Tokens to be created for purchase in our crowd sale to the public"), and planned to allocate the remaining 32 million of the tokens for specified business purposes and for distribution to Centra Tech's founders and others as incentive compensation ("[w]e will allocate 20% of all [100 million] CTR Tokens created to distribution of bug bounty, business development, community projects, market expansion, and more" and "[t]he remaining 12% will be distributed to Centra Techs founders, early investors, and employees as an incentive"). This whitepaper further provided that the Centra tokens would be offered at an exchange rate of 400 Centra tokens per unit of Ether ("Token Exchange Rate[:] 400 CTR = 1 ETH"), yielding a total of 170,000 Ether units if Centra sold 68 million Centra tokens at that exchange rate ("Total Sale Goal [:] 170,000 ETH").

b.   Based on my review of text messages and other data recovered from the TRAPANI Cellphone, I have learned the following, in substance and in part:

i.   On or about September 24, 2017, SHARMA, via the SHARMA Cellphone-1, engaged in a text message conversation with TRAPANI, via the TRAPANI Cellphone.   Starting at approximately 6:18PM on or about September 24, 2017, TRAPANI text-messaged SHARMA:   "We Gucci tunchi hitting 100k ETH." SHARMA responded:   "Amazing."

ii.   On or about September 26, 2017, SHARMA, via the SHARMA Cellphone-2 engaged in a text message conversation with TRAPANI, via the TRAPANI Cellphone.   Starting at approximately 12:13AM on or about September 26, 2017, TRAPANI text-messaged SHARMA:   "Niggas said 100k ETH," "Wild how we did that."   SHARMA responded:   "Nigga what," "I'm going to Korea to get us 26k more," "We gonna have 100K sitting . . . And 20K liquidated."   TRAPANI wrote:   "It's crazy Brodie lol."

iii.   On or about October 2, 2017, SHARMA, via the SHARMA Cellphone-2, engaged in a group text message conversation with TRAPANI, via the TRAPANI Cellphone, and FARKAS, via a cellphone with a call number ending with "2656" (the "FARKAS Cellphone").   Starting at approximately 12:47PM on or about October 2, 2017, SHARMA text-messaged TRAPANI and FARKAS:   "I did mad job stuff over the weekend," "Also got us 100k in ETH in the account . . . . And we still have 28.9M ctr left." TRAPANI wrote:   "Good shit . . . . Was just watching it as you where moving it wondering what you where doing lol," "Perfect."   Later in the group conversation, at approximately 12:48PM on or about October 2, 2017, SHARMA wrote:   "Made it 100K in ETH for storage."   Furthermore, starting at approximately 12:49PM on or about October 2, 2017 during this group conversation, SHARMA wrote:   "I wanna flip like 5M of CTR," "Actually like 8.5M," "And hold 20M CTR and 100k ETH." TRAPANI responded:   "Word."[6]

---

[6]   In the Private Class Action, Centra Tech publicly filed a declaration of its general counsel Allan Shutt (ECF Docket No. 17 Civ. 24500 (JLK), Docket Entry No. 26-1) making conclusory assertions that "Centra Tech's business records from its ICO demonstrate that, in total, Centra Tech ultimately raised a total of approximately 51,068,675 ETH from Centra token purchasers in addition to 40,000 ETH raised from Bitsset and that the remaining sum of close

20.  Based on the foregoing and the facts set forth below, I respectfully submit that there is probable cause to believe that the 9,000 Ether units that were left in the Seizure Wallet when the Prior Seizure Warrant was executed are traceable to proceeds of the Subject Offenses raised from investors who purchased Centra tokens during Centra Tech's ICO.

21.  As set forth above, Centra Tech transferred approximately 100,000 Ether units into the Seizure Wallet on or about November 29, 2017 in response to inquiries from the SEC; Centra Tech on or about January 18, 2018 provided the SEC with the Summary Spreadsheet purporting to show that Centra Tech raised a total of approximately 91,000 Ether units (40,000 Ether units from the "Korea Partners," a reference to Bitsset, and 51,000 Ether units from other investors) in exchange for Centra tokens issued during Centra Tech's ICO; and the FBI on or about May 2, 2018 transferred 91,000 of those Ether units to a digital wallet

---

to 9,000 ETH "represents funds outside of the ICO belonging to Centra Tech." This declaration does not disclose or address the above-quoted text messages to the contrary, does not state which business records support these conclusory assertions, does not state whether Shutt performed any Ether tracing analysis to support these conclusory assertions, and does not state whether Shutt relied on others at Centra Tech (such as SHARMA) to form these conclusory assertions. As shown in this Affidavit, there is cause to believe that various records created by Centra Tech such as the January 18 Letter and Summary Spreadsheet purporting to disclose the sources of Centra Tech's ICO proceeds do not fully account for all of the ICO proceeds. For these reasons and based on the other facts set forth in this Affidavit, Shutt's declaration does not alter my belief that there is probable cause that Centra Tech raised at least 100,000 Ether units in the ICO and that the Remaining Subject Property represents proceeds of the Subject Offenses.

maintained by the FBI pursuant to the Prior Seizure Warrant based on a judicial determination that there was probable cause to believe that the 91,000 Ether units was subject to seizure and forfeiture as proceeds of the Subject Offenses.

22.   Based on my review of text messages recovered from the TRAPANI Cellphone and records of Ether transactions that are publicly available via the internet as described below, I respectfully submit that there is probable cause to believe that (a) there are transactions in which more than 9,000 Ether units were raised from Centra investors during the ICO that are not accounted for in the Summary Spreadsheet that Centra Tech created in response to inquiries from the SEC; and (b) that a substantial portion, if not all, of the 9,000 Ether units that comprise the Remaining Subject Property are traceable to such transactions. This belief is based on the following:

a.   Based on my training and experience and my participation in this investigation, I have learned, in substance and in part, the following about transactions in Ether. "Ether" or "ETH" is a digital currency, or cryptocurrency, whose transactions are stored on an internet-based platform called the Ethereum blockchain.  The Ethereum blockchain is a continuously growing list of records, called blocks, which are linked and secured using cryptography.  The blockchain records transactions

36

between parties in a manner that is verifiable and resistant to modification. By inspecting the blockchain, anyone can review any Ether transaction ever made, although the identities of the participants in the transaction are anonymized and cannot be discerned without additional information. Records of Ether transactions on the Ethereum blockchain are viewable by the public at various websites available on the internet, including a website called Etherscan (available at https://etherscan.io) that is an Ethereum block explorer (the "Etherscan Website").

b.   I have used the Etherscan Website to review and analyze transactions associated with digital wallet addresses that were used to receive or send Ether raised by Centra Tech during its ICO. As part of this analysis, I have also reviewed documents in which Centra Tech identified various digital wallets owned and controlled by Centra Tech, including the January 18 Letter and Summary Spreadsheet that Centra Tech created in response to inquires from the SEC. From these sources and my analysis based upon them, I have learned, in substance and in part, the following:

i.   The Seizure Wallet received a total of approximately 100,000 Ether units on or about November 29, 2017. Those funds originated from several digital wallets that Centra Tech has acknowledged belonged to it and were routed, via several intermediate digital wallets that (as shown below) are associated with Centra Tech, to the Seizure Wallet. The final routing wallet that transmitted the 100,000 Ether units to the Seizure Wallet on or about November 29, 2017 was a digital wallet with an address of

"0x494C7f57396CE9ef51A49B1377d40c3e095b206F"                    ("Centra Routing Wallet 1").

ii.     Centra  Routing  Wallet  1  received  a  total  of approximately 100,000 Ether units on or about October 17, 2017  from  a  digital  wallet  with  an  address of "0x2fA49Bd15512aA4a549b4ddB2181cA7edeAb14B4" ("Centra Routing Wallet 2").

iii.    Centra  Routing  Wallet  2  received  a  total  of approximately 102,000 Ether units, of which approximately 75,000 Ether units were received on or about October 17, 2017 from  a  digital  wallet  with  an  address  of "0x71e5A90eDA0834bd0AaAAE51314929BFd1ea4294"        ("Centra Routing Wallet 3") and approximately 27,000 Ether units were received on or about October 14, 2017 from a digital wallet with          an          address          of "0x55107767B83A18b15258BfAf12ecB0dbe468DbE5"        ("Centra Routing Wallet 4").

iv.     Centra  Routing  Wallet  3  received  approximately 90,000 Ether units on or about October 8, 2017 from a digital wallet        with        an        address        of "0x0E730C2731c875e4542c0Da2425F5119175FF6d0"        ("Centra Routing  Wallet  5").   Centra  Routing  Wallet  4  received approximately 15,000 Ether units from Centra Routing Wallet 3 on or about October 10, 2017, and received approximately 10,000 Ether units from Centra Routing Wallet 5 on or about October 8, 2017.

v.      Centra  Routing  Wallet  5  received  approximately 90,000 Ether units from a digital wallet with an address of "0x38874083663D11C952a7812acaf689Bc3595588c"        ("Centra Routing Wallet 6") on or about September 27, 2017.

vi.     Centra Routing Wallet 6 received more than 130,000 Ether  units  from  a  digital  wallet  with  an  address  of "0x387792f7d2AA6e7Fa1312261cF36F5F6f6b97c00"        through        a series  of  transfers  from  on  or  about  September  19  through September 26, 2017.  According to the January 18 Letter that Centra Tech provided to the SEC, Centra Tech has identified this wallet address as the "Centra Token Owner" wallet (the "Centra Token Owner Wallet") and has represented that the Centra Token Owner Wallet was one of several wallet addresses used by Centra Tech to receive Ether from Centra token

purchasers during Centra Tech's ICO, along with the "Centra Token" wallet with an address of "0x96a65609a7b84e8842732deb08f56c3e21ac6f8a" (the "Centra Token Wallet"), the "Centra White List" wallet with an address of "0x5d268508179db4dA44De9057792758bFf280E3ed" (the "Centra White List Wallet"), and the "Centra Sale" wallet with an address of "0xbDB45d02D8eF8dc5E59aa58B26b99A4af3806bAa" (the "Centra Sale Wallet").   With respect to the 40,000 Ether units that Centra Tech received from "Korea Partners" (which, as set forth above, is a reference to Bitset) in exchange for Centra tokens during Centra Tech's ICO, Centra Tech's January 18 Letter to the SEC further provides, in substance and in part, that Centra Tech received 3,000 of those Ether units using the Centra Token Owner Wallet and received the remaining 37,000 of those Ether units using a digital wallet with an address of "0x0445335f74da6e2119c648b79af8cc299474586f" ("Centra Bitsset Wallet").   According to the Etherscan Website, virtually all of the Ether in the Centra Bitsset Wallet was transferred to the Centra Sale Wallet and the Centra Routing Wallet 6 via a series of transfers on or about September 23, 2017.

vii.   From my review of the Summary Spreadsheet that Centra Tech created in response to in inquiries from the SEC and Centra Tech's accompanying January 18 Letter to the SEC, I have learned the following, in substance and in part.  These documents purport to show that during Centra Tech's ICO (a) Centra Tech received approximately 18,356 Ether units via the Centra Token wallet, approximately 8,365 Ether units via the Centra White List Wallet, approximately 15,079 Ether units via the Centra Sale Wallet, and approximately 9,267 Ether units via the Centra Token Owner Wallet, for a total of approximately 51,000 Ether units, from a variety of Centra token purchasers identified in the Summary Spreadsheet; and (b) Centra Tech received approximately 40,000 Ether units via the Centra Token Owner Wallet and the Centra Bitsset Wallet from Centra token purchasers referred to as "Korea Partners," which is a reference to Bitset.

c.   For the following reasons, I respectfully submit that there is probable cause to believe that the Centra Routing Wallets 1 through 6 ("collectively, the "Centra Routing Wallets")

were owned and controlled by Centra Tech. *First*, from my review
of the Etherscan Website, I have learned, in substance and in part,
that the Centra Token Wallet, the Centra White List Wallet and the
Centra Sale Wallet forwarded virtually all of the Ether that they
received during Centra Tech's ICO to the Centra Token Owner Wallet.
*Second*, as shown above, most of the Ether in the Centra Token Owner
Wallet was forwarded, through the Centra Routing Wallets, to the
Seizure Wallet.  Because the Centra Routing Wallets both received
Ether funds sent from the Centra Token Owner Wallet and sent such
funds on toward the Seizure Wallet, which Centra Tech set up, I
respectfully submit that there is probable cause to believe that
the Centra Routing Wallets were owned and controlled by Centra
Tech.

       d.    On or about October 2, 2018, SHARMA, via the SHARMA
Cellphone-2, engaged in a group text message conversation with
TRAPANI, via the TRAPANI Cellphone, and FARKAS, via the FARKAS
Cellphone.  As noted above, starting at approximately 12:47PM on
or about October 2, 2017, SHARMA text-messaged TRAPANI and FARKAS:
"I did mad job stuff over the weekend," "Also got us 100K in ETH
in the account . . . . And we still have 28.9M ctr left."  TRAPANI
wrote:  "Good shit . . . . Was just watching it as you where
moving it wondering what you where doing lol," "Perfect." SHARMA

then responded:   "Sold 7500 to bit set," "Moved 2500 over from

that dude Shin."[7]

       e.   Based on my review of records of Ether transactions

that are publicly available via the Etherscan website, I have

learned, in substance and in part, the following.  On or about

October 2, 2017, which was the date on which SHARMA text-messaged

TRAPANI and FARKAS that he had "Sold 7500 to bit set," a total of

approximately 7,500 Ether units were transferred via two

transactions from a digital wallet associated with Bitsset

---

[7]   With respect to the above-quoted text messages between SHARMA
and his co-conspirator TRAPANI during Centra Tech's ICO indicating
that Centra Tech raised 7,500 Ether units from Bitsset and 2,500
Ether units from "Shin," I have been informed by representatives
of the Government that during recent communications between them
and SHARMA's current counsel, SHARMA has claimed through his
counsel that SHARMA was lying to TRAPANI in these text messages
about the source of those funds because, according to SHARMA, he
was worried that if he had told TRAPANI that these funds came from
SHARMA's personal cryptocurrency trading activities, TRAPANI would
have asked SHARMA to borrow all or a portion of those funds.  As
set forth in the Criminal Charging Documents and above, SHARMA has
previously been convicted of perjury, made numerous fraudulent
misrepresentations to dupe investors into providing funds to
Centra Tech, and attempted to obstruct the SEC's parallel
investigation by providing a false passcode to the Seizure Wallet
after the SEC sought assurances from Centra Tech that victim-
investor funds raised through the Subject Offenses were secure in
the Seizure Wallet.  Given SHARMA's record of perjury and history
of deception and a lack of candor, and the timing and the self-
serving nature of his claims denying the veracity of those
contemporaneous text messages, I respectfully submit that there is
probable cause to believe that these self-serving claims are false.

("Bitset Wallet 1"),[8] to the Centra Routing Wallet 5 associated

with Centra Tech.   On that same date, approximately 3,562,500

Centra tokens were transferred from the Centra Routing Wallet 5 to

the Bitset Wallet 1.   As shown above, most of the 100,000 Ether

units that Centra Tech later transferred to the Seizure Wallet are

traceable to the Centra Routing Wallet 5.[9]

---

[8]    The Bitset Wallet 1 refers to a digital wallet address of
"0x9f51ca6a19c650555be53206b6a20d91681da7f6."   According to the
Summary Spreadsheet that Centra Tech created in response to
inquiries from the SEC, Centra Tech received 3,000 Ether units
through three transactions on or about August 30, 2017 from the
"Korea Partners" via the digital wallet referred to herein as the
Bitset Wallet 1, and a transfer of 37,000 Ether units on or about
September 23, 2017 from the "Korea Partners" via a digital wallet
with an address of "0x65190d08f1f241cf2361e7c70a40c1d59400736b"
("Bitset Wallet 2").   Based on the foregoing and the other facts
set forth in this Affidavit, I believe that the Bitset Wallet 1
and Bitset Wallet 2 were associated with Bitset.

[9]    I have been informed by representatives of the Government
that during recent communications between them and SHARMA's
current counsel, SHARMA has claimed through his counsel that the
3,562,500 Centra tokens transferred from the Centra Routing Wallet
5 to the Bitset Wallet 1 were left in the Bitset Wallet 1 until
a few days after SHARMA's arrest on or about April 1, 2018 in this
case, and that this demonstrates that the Bitset Wallet 1 was
actually controlled by Centra Tech and not an external investor
such as Bitset.   Although requested to do so by the Government,
SHARMA has not provided any corroborating evidence that the Bitset
Wallet 1 was owned or controlled by Centra Tech, although he has
asserted that he had passcodes to various digital wallets that
would have corroborated his claims but lost those passcodes as a
result of cyber-hacks of various of his electronic devices.   Since
SHARMA and FARKAS were both arrested and detained on or about April
1, 2018, it is doubtful that they had the capacity to transfer or
liquidate millions of Centra tokens from the Bitset Wallet 1 a
few days later while there were jailed.   Moreover, from my training
and experience and participation in this investigation, I

42

f.   The Summary Spreadsheet that Centra Tech created for the SEC discloses four transactions in which Centra Tech raised a total of 40,000 Ether units from Bitset:  three transactions on or about August 30, 2017 in which Centra Tech received a total of 3,000 Ether units from the Bitset Wallet 1, and a transaction on or about September 23, 2017 in which Centra Tech received a total of 37,000 Ether units from the Bitset Wallet 2.   The Summary Spreadsheet does not disclose any transfers of Ether from Bitset to Centra Tech after September 23, 2017, let alone a transaction in which the Centra Routing Wallet 5 received 7,500 Ether units that are traceable to a transfer on or about October 2, 2017 from the Bitset Wallet 1.

g.   Based on the foregoing, I respectfully submit that there is probable cause to believe that Centra Tech has not accounted in the Summary Spreadsheet for the likelihood that the 9,000 Ether units that remain in the Seizure Wallet are traceable, in whole or in part, to the 7,500 Ether units that Centra Tech raised on or about October 2, 2017 from Bitset.

respectfully submit that it is not uncommon for investors who purchase securities (such as, in this case, Centra tokens) to hold them for substantial periods of time in the hope that they will appreciate.  For these reasons and based upon the other evidence set forth in this Affidavit, I respectfully submit that there is probable cause to believe that the Bitset Wallet 1 was, in fact, owned and controlled by Bitset.

43

h.   In addition, from my review of the Etherscan Website, I know that on or about October 2, 2017, which was the date on which SHARMA text-messaged TRAPANI and FARKAS that SHARMA had "Moved 2500 over from that dude Shin," approximately 2,500 Ether units were transferred from the Centra Routing Wallet 4 to the Centra Routing Wallet 5.   A day earlier, the Centra Routing Wallet 4 received 5,200 Ether units from a digital wallet associated with Bitset referred to herein as the "Bitset Routing Wallet 1,"[10] and the Bitset Routing Wallet 1 received approximately 1,742,000 Centra tokens.   As shown above, of the 100,000 Ether units that Centra Tech later transferred to the Seizure Wallet, a substantial portion (approximately 27,000 Ether units) are traceable to the Centra Routing Wallet 4, and most are traceable to the Centra Routing Wallet 5.

i.   The Summary Spreadsheet that Centra Tech created for the SEC does not disclose any transactions in which the Centra

---

[10]   The Bitset Routing Wallet 1 is a digital wallet with an address of "0xcb7b1fd4d3a097a796bb3bced863b1fd5e90a3cf," which received 5,219 Ether units from a digital wallet with an address of "0xcE7fD61737092Ac648fBC982Efc39b628a8713F9" the same day ("Bitset Routing Wallet 2"), which in turn received thousands of Ether units from, and sent thousands of Ether units to, the Bitset Wallet 1 during a series of transactions from on or about September 30 through October 1, 2017.   Based on the foregoing, I respectfully submit that there is probable cause to believe that the Bitset Routing Wallet 1 and Bitset Routing Wallet 2 are associated with the Bitset Wallet 1.

Routing Wallet 4 received Ether units from a Centra token purchaser, and does not disclose any transfers of Ether from Bitset to Centra Tech after September 23, 2017, let alone a transaction in which a digital wallet associated with Centra Tech received 2,500 Ether units that are traceable to a transfer on or about October 1, 2017 from the Bitset Routing Wallet 1.

      j.    Based on the foregoing, there is probable cause to believe that Centra Tech has not accounted in the Summary Spreadsheet for the likelihood that the 9,000 Ether units that remain in the Seizure Wallet are traceable, in part, to 5,200 Ether units that Centra Tech raised on or about October 1, 2017 from an individual referred to by SHARMA as "Shin" who may be affiliated with Bitset.[11]

---

[11]    I have been informed by representatives of the Government that during recent communications between the Government and SHARMA's current counsel, SHARMA has claimed through his counsel that specified trading records of SHARMA's cryptocurrency trading activities (via a cryptocurrency exchange called Coinbase) before Centra Tech's ICO began in late July 2017 support SHARMA's claims that the 9,000 Ether units remaining in the Seizure Wallet are actually proceeds of his pre-ICO cryptocurrency trading, and not ICO proceeds of the charged Subject Offenses. From my review of these records, I have learned that these records reveal the following, in substance and in part. During the period from on or about May 23, 2017, when SHARMA opened a Coinbase account in his name, through the end of July 2017, which is the month in which Centra Tech's ICO began, SHARMA deposited about $111,040 into his Coinbase account, acquired a total of approximately 471 Ether units, and acquired a total of approximately 10.7 Bitcoin units (worth about 131 Ether units as of or about July 26, 2017). While this arguably shows that SHARMA had acquired 471 Ether units and

45

23.   By viewing the Etherscan Website earlier today, I was able to confirm that the Remaining Subject Property consisting of approximately 9,000 Ether units were in the Seizure Wallet as of this morning, and that the estimated value of the Remaining Subject Property is more than $1,855,000 at the current Ether-to-dollar exchange rate.

24.   Based on the facts set forth above, my participation in this investigation, and my consultations with other FBI agents, including one with significant training and experience in investigations of crimes involved digital currencies, I believe and respectfully submit that as long as the Remaining Subject Property was retrievable via the Seizure Wallet, there existed a significant danger that the Remaining Subject Property could be dissipated.   For example, as set forth above, SHARMA initially provided a false passcode to the Seizure Wallet, and although he eventually made the actual passcode to the Seizure Wallet available

---

other assets worth about 131 Ether units before Centra Tech's ICO began, it does not show that he possessed 9,000 Ether units before the ICO.   Furthermore, although requested to do so by the Government, SHARMA has not produced or identified any records of Ether transactions tracing SHARMA's pre-ICO Ether holdings to the 9,000 Ether units in the Seizure Warrant.   For these reasons and based on the other facts set forth in this Affidavit, these Coinbase trading records do not alter my belief that there is probable cause to believe that the remaining 9,000 Ether units in the Seizure Wallet are ICO proceeds of the charged Subject Offenses.

46

to the FBI after his co-defendant FARKAS was detained until the Prior Seizure Warrant was complied with, it is possible that he has retained a copy of the actual passcode to the Seizure Wallet. If SHARMA secretly maintained a copy of the actual passcode to the Seizure Wallet, he or an associate could use that copy of the passcode to dissipate the Remaining Subject Property via any computer with internet access.

25.   I have been informed by representatives of the Government that during a telephone call earlier today between them and SHARMA's current counsel, the following occurred in substance and in part. The Government notified SHARMA through his counsel that the Government has uncovered evidence furnishing probable cause to seize the Remaining Subject Property (which SHARMA's counsel may have intended to use to cover his legal fees for representing SHARMA) and intended to seize the Remaining Subject Property. The Government asked SHARMA's counsel whether SHARMA possessed a copy of the passcode or other means of accessing the 9,000 Ether units that had been left in the Seizure Wallet, and SHARMA's counsel stated that he could not confirm or deny that without divulging privileged communications between himself and his client.

26.   Based on the presence of exigent circumstances as long as the Remaining Subject Property was contained in the Seizure

47

Wallet (including (a) the significant danger that SHARMA could easily and swiftly dissipate the Remaining Subject Property using a copy of the passcode to retrieve the Remaining Subject Property from the Seizure Wallet, and (b) the fact that SHARMA's counsel was notified earlier today that the Government plans to seize the Remaining Subject Property from the Seizure Wallet), I transferred the Remaining Subject Property from the Seizure Wallet to a secure digital wallet maintained by the FBI earlier today, pursuant to Title 18, United States Code, Section 981(b)(2)(B)(ii).

27.    Accordingly, I respectfully request that the instant warrant be granted to authorize this seizure of the Remaining Subject Property and to permit the FBI to retain the Remaining Subject Property in an FBI-maintained digital wallet until further order of the Court in order to preserve the Remaining Subject Property for forfeiture to the United States.

### SEIZURE AND FORFEITURE AUTHORITY

28.    The statutory provisions pursuant to which the Remaining Subject Property is subject to seizure and forfeiture are as follows:

29.    Title 18, United States Code, Section 981(a)(1)(C) subjects to civil forfeiture:

> [a]ny property, real or personal, which constitutes or
> is derived from proceeds traceable to . . . any offense
> constituting 'specified unlawful activity' (as defined

in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

18 U.S.C. § 1956(c)(7)(A) provides that the term "specified unlawful activity" includes "any act or activity constituting an offense listed in section 1961(1) of this title". Section 1961(1), in turn, includes "section 1343 (relating to wire fraud)," and "fraud in the sale of securities." In the case of "illegal goods, illegal services, and unlawful activities," 18 U.S.C. § 981(a)(2)(A) defines the term "proceeds" as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto." Accordingly, the Remaining Subject Property is subject to civil forfeiture to the United States of America pursuant to 18 U.S.C. §§ 981(a)(1)(C) as proceeds of the crimes of conspiracy to commit, and the commission of, securities fraud and wire fraud.

30. Section 981(b)(1) of Title 18 provides that any property subject to civil forfeiture to the United States under 18 U.S.C. § 981(a) may be seized by the Attorney General. Section 981(b)(2) provides that such a seizure may be made "pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure."

31.   In addition, Section 981(b)(3) of Title 18 provides that, notwithstanding the provisions of Federal Rule of Criminal Procedure 41(a), a seizure warrant may be issued pursuant to Section 981(b) by a judicial officer in any district in which a forfeiture action against the property may be filed under Title 28, United States Code, Section 1355(b).   Under Section 1355(b)(1)(A), a forfeiture action or proceeding may be brought in the district in which any of the acts or omissions giving rise to the forfeiture occurred.   Section 981(b)(3) further provides a seizure warrant "may be executed in any district in which the property is found."

32.   For the foregoing reasons, the Remaining Subject Property is subject to both seizure and forfeiture, and a warrant for its seizure may be issued in the Southern District of New York, the district where some of the acts and omissions giving rise to the forfeiture occurred.

## CONCLUSION

33.   For the reasons set forth above, I respectfully request that the Court issue a seizure warrant pursuant to 18 U.S.C. § 981 for the Remaining Subject Property.

34.   Although the Indictment against three of Centra Tech co-founders SHARMA, TRAPANI and FARKAS has been unsealed, the full scope of the ongoing criminal investigation in this matter has not

been made public, including ongoing law enforcement efforts to determine whether any other co-conspirators involved in the Subject Offenses should be charged with criminal offenses and law enforcement efforts to identify any proceeds of the Subject Offenses, separate from and in addition to the Original Subject Property and the Remaining Subject Property, that are subject to forfeiture to the United States.

35.   Accordingly, I also respectfully request that this Affidavit be sealed until further order of the Court so as not to jeopardize the ongoing investigation of this matter, except that the Government may without further order from this Court produce this Affidavit in the Criminal Case and in any other criminal or forfeiture proceedings as necessary to comply with any discovery and disclosure obligations.

Dated:      New York, New York
            October 22, 2018

BRANDON S. RACZ
Special Agent
Federal Bureau of Investigation

Sworn to before me this
22nd day of October, 2018:

HONORABLE KATHARINE H. PARKER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

**It is hereby ORDERED that this Affidavit shall remain under seal until further Order of the Court (subject to the exceptions set forth in paragraph 35 above).**

SO ORDERED

HONORABLE KATHARINE H. PARKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF NEW YORK

52

# Exhibit A

# Exhibit A

# 18 MAG 3177

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x
91,000 ETHER CURRENTLY ON DEPOSIT  :
IN    ETHER    WALLET    ADDRESS  :
0xdA6F983076725cB2899205A16E16d1e  :
d60a0067A                          :
- - - - - - - - - - - - - - - - X

**WARRANT OF SEIZURE**
**PURSUANT TO 18 U.S.C. § 981**

TO:   ANY LAW ENFORCEMENT OFFICER AUTHORIZED BY LAW

An Affidavit having been made before me by Kristin Allain, a Special Agent with the Federal Bureau of Investigation, that she has reason to believe that the above-captioned property is subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), and as I am satisfied that there is probable cause to believe that the property so described is subject to seizure and forfeiture pursuant to said statute,

YOU ARE HEREBY COMMANDED AND AUTHORIZED to seize the property described below by effectuating an electronic or digital transfer over the internet, or by serving a copy of this warrant of seizure upon any person or entity presently in possession or control of the property and directing them to effectuate such a transfer:

91,000 ETHER CURRENTLY ON DEPOSIT IN ETHER WALLET ADDRESS 0xdA6F983076725cB2899205A16E16d1ed60a0067A

YOU ARE FURTHER COMMANDED AND AUTHORIZED to prepare a written inventory of the property seized and promptly return this warrant and inventory before this Court as required by law.

Dated:   New York, New York
         April 13, 2018

SO ORDERED:

THE HONORABLE ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

**18 MAG    3177**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x
                                    :
    UNITED STATES OF AMERICA        :      TO BE FILED UNDER SEAL
                                    :
              - v. -                :      AFFIDAVIT IN SUPPORT
                                    :      OF SEIZURE WARRANT
    91,000 ETHER CURRENTLY ON DEPOSIT :    PURSUANT TO
    IN     ETHER    WALLET    ADDRESS :    18 U.S.C. § 981
    0xdA6F983076725cB2899205A16E16d1e :
    d60a0067A,                        :
                                    :
              Defendant-In-Rem.      :
                                    :
- - - - - - - - - - - - - - - - x

STATE OF NEW YORK          )
COUNTY OF NEW YORK         ) ss.:
SOUTHERN DISTRICT OF NEW YORK )

        KRISTIN ALLAIN, being duly sworn, deposes and says:

        1.    I am a Special Agent with the Federal Bureau of
Investigation ("FBI"), and have been employed by the FBI since
July 2017.  Prior to joining the FBI, I earned a bachelor's of
science degree in chemistry, a master's degree in business
administration, and a juris doctorate, as well as a license to
practice law in Florida.  I am currently assigned to a squad within
the FBI responsible for investigating complex financial crimes,
including crimes involving wire fraud, bank fraud, securities
fraud, money laundering, and other white-collar crimes.  At the
FBI, I have participated in several investigations of such
offenses.

2.  This affidavit is submitted in support of the Government's application for the issuance of a warrant to seize and forfeit:

> 91,000 ETHER CURRENTLY ON DEPOSIT IN AN ETHER WALLET THAT HAS BEEN ASSIGNED THE ADDRESS 0xdA6F983076725cB2899205A16E16d1ed60a0067A (the "Subject Property").

3.  As more fully described below, "Ether" is a digital currency that is stored on the internet in applications referred to as digital wallets. Each digital wallet is assigned a unique alphanumerical identifier known as an address, and each digital wallet can only be accessed using a unique alphanumerical string known as a private key or passcode. The Subject Property is subject to forfeiture to the United States of America as the proceeds of unlawful activity, namely a conspiracy to commit, and the commission of, securities fraud and wire fraud.

4.  The information contained in this Affidavit is based upon my personal knowledge and involvement in the investigation of this matter, as well as information obtained from other sources, including conversations with others, as well as my review of documents gathered during the course of this investigation. Because this Affidavit is being submitted for the limited purpose of seizing criminal proceeds, it does not include every fact that I have learned during the course of the investigation. Where the

2

USAO_SDNY_00009195

contents of documents and actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## PROBABLE CAUSE

### A. Probable Cause as to the Commission of the Subject Offenses

5.   On or about March 31, 2018, United States Magistrate Judge James L. Cott of the Southern District of New York signed a criminal complaint (the "Criminal Complaint") charging SOHRAB SHARMA and ROBERT FARKAS with the crimes of conspiracy to commit securities fraud, securities fraud, conspiracy to commit wire fraud, and wire fraud (the "Subject Offenses"); arrest warrants authorizing their arrests based on the charges set forth in the Criminal Complaint; and also warrants and orders directing the service providers for a cellphone associated with SHARMA and a cellphone associated with FARKAS to provide cellphone location information to the FBI that were issued based on the facts set forth in a supporting warrant affidavit (the "Warrant Affidavit"). Copies of the Criminal Complaint and Warrant Affidavit are attached hereto as Exhibits A and B and are incorporated by reference as though fully set forth herein.

6.   Based on the facts detailed in the Criminal Complaint and the Warrant Affidavit, I respectfully submit that there is probable cause to believe the following, in substance and in part:

3

a. From at least in or about July 2017 through in or about March 2018, SOHRAB SHARMA and ROBERT FARKAS, two co-founders of Centra Tech, Inc. ("Centra Tech"), began soliciting investors to purchase Centra Tech tokens, a cryptocurrency that functions as an unregistered security in Centra Tech, through a so-called "initial coin offering" or "ICO." As part of this effort, SHARMA and FARKAS, in oral and written offering materials that were disseminated via the internet, represented that Centra Tech had developed a debit card, namely the so-called "Centra Card," that allowed users to spend the cryptocurrency of their choice to make purchases at any establishment that accepts Visa or Mastercard.

b. In soliciting investors to purchase unregistered securities in the form of Centra Tech tokens, SHARMA and FARKAS represented that Centra Tech had formed a partnership with Bancorp to have Bancorp issue Centra Cards licensed by Visa or Mastercard, and that Centra Tech held financial servicing licenses in 38 states, among other claims. Based in part on these claims, victims provided funds worth more than $25 million in investments for the purchase of Centra Tech tokens.

c. The claims that SHARMA and FARKAS made to help secure these investments, however, were false. In fact, Centra Tech had no such relationships with Bancorp, Visa, or Mastercard, and at least seven of those 38 states have no record of any such licenses being issued to Centra Tech.

7.   Following the issuance of the Criminal Complaint, SHARMA and FARKAS were arrested on or about April 1, 2018, in the Southern District of Florida, and both were presented on the Criminal Complaint before United States Magistrate Judge Lurana S. Snow in the Southern District of Florida on or about April 2, 2018. SHARMA and FARKAS subsequently consented to their detention and removal to the Southern District of New York for further proceedings on

4

the Criminal Complaint, without prejudice to their ability to apply for their releases on bail upon their arrival in the Southern District of New York.

**B. Probable Cause as to the Subject Property**

8.     There is probable cause to believe that the Subject Property constitutes proceeds of the Subject Offenses and is subject to forfeiture to the United States of America.   Based on the facts set forth in the Criminal Complaint and Warrant Affidavit, as well as other information I have learned as part of this investigation, including my conversations with my fellow case agent from the FBI and other law enforcement officials familiar with this matter, my conversations with my fellow FBI case agent about his conversations with representatives of the United States Securities and Exchange Commission ("SEC") concerning information and evidence gathered by the SEC as part of the SEC's parallel investigation of Centra Tech, and information that I have received from SEC, I have learned the following, in substance and in part:

a. In or about the fourth quarter of 2017, the SEC initiated an investigation of Centra Tech.  As part of that investigation, the SEC issued a subpoena on or about November 29, 2017 to Centra Tech, care of Centra Tech's outside counsel at a law firm that was retained to represent Centra Tech.  The subpoena compelled Centra Tech to produce a variety of documents, including various documents relating to two of Centra Tech's co-founders, SOHRAB SHARMA and ROBERT FARKAS.

5

b. During Centra Tech's outside counsel's representation of Centra Tech, the outside counsel engaged in several conversations with representatives of the SEC working on the SEC's investigation. Centra Tech's outside counsel also had separate conversations with representatives of the United States Attorney's Office for the Southern District of New York and the FBI with respect to the parallel criminal investigation relating to Centra Tech. During these conversations, Centra Tech's outside counsel represented the following, in substance and in part, on behalf of Centra Tech:

   i. During Centra Tech's offering of Centra Tech tokens to members of the public during the period from approximately July 2017 through October 2017, purchasers of Centra Tech tokens provided funds in the form of digital currency (specifically, approximately 91,000 units in a digital currency known as "Ether") in exchange for Centra Tech tokens (namely, the Subject Property). The Subject Property, consisting of funds totaling approximately 91,000 Ether units, and other digital assets, were placed in a particular digital wallet, which was only accessible via a passcode possessed by SOHRAB SHARMA, one of the co-cofounders of Centra Tech. (Based on the facts set forth in the Criminal Complaint, there is probable cause to believe that the 91,000 Ether units comprising the Subject Property were solicited through fraudulent misrepresentations and omissions by SOHRAB SHARMA and ROBERT FARKAS, two co-founders of Centra Tech, as part of their commission of the Subject Offenses, and thus that those funds represent proceeds and fruits of the Subject Offenses.)

   ii. After the SEC made Centra Tech aware of the SEC's investigation of Centra Tech by serving a subpoena on Centra Tech, Centra Tech transferred all of the digital assets in that digital wallet, including the Subject Property, to a different digital wallet with its own unique passcode (the "Digital Wallet"). According to representations

USAO_SDNY_00009199

of Centra Tech through its outside counsel, the purported passcode to access this Digital Wallet was written on a piece of paper that was divided into halves that were given to Centra Tech's Chief Operating Officer, ROBERT FARKAS, and Centra Tech's General Counsel and Chief Compliance Officer, Allan Shutt, respectively. According to representations by Centra Tech through its outside counsel, the combination of those halves of the paper supposedly represents the only copy of the passcode to the Digital Wallet. The half of the paper given to FARKAS, containing part of the purported passcode, was placed in a safe deposit box in FARKAS' name at a bank; and the other half of the paper given to Shutt, containing the remainder of the purported passcode, was placed in a safe deposit box in Shutt's name in a different bank.

c. On or about April 10, 2018, Centra Tech's General Counsel and Chief Compliance Officer, Allan Shutt, provided his half of what was purported to be the passcode to the Digital Wallet to FBI agents in the Southern District of Florida in response to grand jury subpoenas that were previously served on Centra Tech.

d. On or about April 11, 2018, FBI agents in the Southern District of Florida retrieved FARKAS' half of what was purported to be the passcode to the Digital Wallet pursuant to a judicially authorized search warrant issued by United States Magistrate Judge Barry S. Seltzer of that District that was issued based on the facts set forth in a supporting warrant affidavit (the "Search Warrant Affidavit"). The Search Warrant Affidavit is attached as Exhibit C and incorporated by reference as though fully set forth herein.

e. Last week, during the period between the arrest of FARKAS on or about April 1, 2018 on the charges set forth in the Criminal Complaint and the FBI's recovery of FARKAS' half of the purported passcode to the Digital Wallet on or about April 11, 2018, an unidentified female called the bank branch in which FARKAS kept his portion of what was purported to be the passcode in a safe deposit box and demanded access

7

to the safe deposit box, claiming that she had a power of attorney signed by FARKAS giving her authorization to access and retrieve the contents of the safe deposit box.  This demand was denied by the bank.

9.    After FBI agents in the Southern District of Florida gained possession of both Schutt's and FARKAS' halves of paper containing what was purported to be the passcode to the Digital Wallet containing the Subject Property, the agents sent images of that purported passcode to other FBI agents in the Southern District of New York who have been working on this investigation, including an FBI agent who has significant training and experience in investigations of crimes involved digital currencies.  Based on the presence of exigent circumstances as long as the Subject Property is contained in the Digital Wallet set up by Centra Tech, including the significant danger that the Subject Property could easily and swiftly be dissipated if any of the Centra Tech co-founders charged in the Criminal Complaint has a copy of the actual passcode to retrieve the Subject Property, the FBI attempted to use the purported passcode (documented on the paper fragments that had been possessed by Shutt and FARKAS) to transfer the Subject Property from the Digital Wallet set up by Centra Tech to a secure digital wallet maintained by the FBI, pursuant to Title 18, United States Code, Section 981(b)(2)(B)(ii).  After attempting to use the purported passcode to access the Digital Wallet containing the

USAO_SDNY_00009201

Subject Property, I learned that the passcode formed by combining both Schutt's and FARKAS' halves of paper did not work and was unable to provide access to the Subject Property.

10.   Although that purported passcode to the Digital Wallet did not work, by viewing publicly available Ether software earlier today, I have been able to confirm that the Subject Property consisting of approximately 91,000 Ether units, and other digital assets, are presently in the Digital Wallet, and that the estimated value of the Subject Property is approximately $46 million (and the estimated value of all of the digital assets in the Digital Wallet is approximately $51 million).

11.   Based on the facts set forth above, my participation in this investigation, and my consultations with other FBI agents, including one with significant training and experience in investigations of crimes involved digital currencies, I believe and respectfully submit that as long as the Subject Property is retrievable via a passcode that is unknown to the FBI, there exists a significant danger that the Subject Property could be dissipated. For example, Centra Tech's representations that the passcode in the possession of Schutt and FARKAS provided access to the Subject Property in the Digital Wallet have turned out to be inaccurate, and there is no way to confirm with certainty whether anyone else has access to the actual passcode to the Digital Wallet either

USAO_SDNY_00009202

directly or indirectly.  If one of the Centra Tech co-founders charged in the Criminal Complaint secretly maintained a copy of the actual passcode to the Digital Wallet, he or an associate could use that copy of the passcode to dissipate the Subject Property via any computer with internet access.

12.  Accordingly, I respectfully request that the instant warrant be granted to allow the FBI and other authorized law enforcement agents to effectuate an electronic or digital transfer over the internet to move the Subject Property into an FBI-maintained digital wallet until further order of the Court in order to preserve the Subject Property for forfeiture to the United States.  Because without a passcode, the FBI will be unable to effectuate such a transfer, and because the passcode obtained from Schutt's and FARKAS' halves of paper did not work to provide access to the Subject Property, I further request that the instant warrant command any person or entity presently in possession or control of the Subject Property to effectuate such a transfer to the FBI or other authorized law enforcement agents.

## SEIZURE AND FORFEITURE AUTHORITY

13.  The statutory provisions pursuant to which the Subject Property is subject to seizure and forfeiture are as follows:

14.  Title 18, United States Code, Section 981(a)(1)(C) subjects to civil forfeiture:

10

> [a]ny property, real or personal, which constitutes or
> is derived from proceeds traceable to . . . any offense
> constituting 'specified unlawful activity' (as defined
> in section 1956(c)(7) of this title), or a conspiracy to
> commit such offense.

18 U.S.C. § 1956(c)(7)(A) provides that the term "specified unlawful activity" includes "any act or activity constituting an offense listed in section 1961(1) of this title". Section 1961(1), in turn, includes "section 1343 (relating to wire fraud)," and "fraud in the sale of securities." In the case of "illegal goods, illegal services, and unlawful activities," 18 U.S.C. § 981(a)(2)(A) defines the term "proceeds" as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto." Accordingly, the Subject Property is subject to civil forfeiture to the United States of America pursuant to 18 U.S.C. §§ 981(a)(1)(C) as proceeds of the crimes of conspiracy to commit, and the commission of, securities fraud and wire fraud.

15.   Section 981(b)(1) of Title 18 provides that any property subject to civil forfeiture to the United States under 18 U.S.C. § 981(a) may be seized by the Attorney General. Section 981(b)(2) provides that such a seizure may be made "pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure."

USAO_SDNY_00009204

16.  In addition, Section 981(b)(3) of Title 18 provides that, notwithstanding the provisions of Federal Rule of Criminal Procedure 41(a), a seizure warrant may be issued pursuant to Section 981(b) by a judicial officer in any district in which a forfeiture action against the property may be filed under Title 28, United States Code, Section 1355(b).    Under Section 1355(b)(1)(A), a forfeiture action or proceeding may be brought in the district in which any of the acts or omissions giving rise to the forfeiture occurred.    Section 981(b)(3) further provides a seizure warrant "may be executed in any district in which the property is found."

17. For the foregoing reasons, the Subject Property is subject to both seizure and forfeiture, and a warrant for its seizure may be issued in the Southern District of New York, the district where some of the acts and omissions giving rise to the forfeiture occurred.

12

## **CONCLUSION**

18.   For the reasons set forth above, I respectfully request that the Court issue a seizure warrant pursuant to 18 U.S.C. § 981 for the Subject Property.

19.   Although the Criminal Complaint against two of Centra Tech's co-founders has been unsealed, the full scope of the ongoing criminal investigation in this matter has not been made public, including law enforcement efforts to determine whether any co-conspirators in the Subject Offenses should also be charged with criminal offenses and law enforcement efforts to identify any proceeds of the Subject Offenses, separate and apart from the Subject Property, subject to forfeiture to the United States.

USAO_SDNY_00009206

20. Accordingly, I also respectfully request that this Affidavit be sealed until further order of the Court so as not to jeopardize the ongoing investigation of this matter, except that the Government may without further order from this Court produce this Affidavit in any criminal or forfeiture proceedings as necessary to comply with any discovery and disclosure obligations.

Dated:   New York, New York
          April 13, 2018

KRISTIN ALLAIN
Special Agent
Federal Bureau of Investigation

Sworn to before me this
13th day of April, 2018:

HONORABLE ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

It is hereby ORDERED that this Affidavit shall remain under seal until further Order of the Court (subject to the exceptions set forth above in paragraph 20).

SO ORDERED

HONORABLE ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

14

USAO_SDNY_00009207

# EXHIBIT A

USAO_SDNY_00009208

Approved: _____

NEGAR TEKEEI / SAMSON ENZER
Assistant United States Attorneys

Before:   HONORABLE JAMES L. COTT
          United States Magistrate Judge
          Southern District of New York

```
- - - - - - - - - - - - - - - - x
                                 :
                                 :   SEALED COMPLAINT
                                 :
UNITED STATES OF AMERICA         :   Violations of
                                 :   15 U.S.C. §§ 78j(b), 78ff;
        - v. -                   :   17 C.F.R. §§ 240.10b-5; 18
                                 :   U.S.C. §§ 371, 1343, 1349
SOHRAB SHARMA,                   :   and 2
    a/k/a "Sam Sharma," and      :
Robert Farkas,                   :
    a/k/a "Bob,"                 :   COUNTY OF OFFENSES:
                                 :   New York
                                 :
            Defendants.          :
                                 :
- - - - - - - - - - - - - - - - x
```

SOUTHERN DISTRICT OF NEW YORK, ss.:

BRANDON RACZ, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

## COUNT ONE
### (Conspiracy To Commit Securities Fraud)

1.    From at least in or about July 2017, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

2.    It was a part and object of the conspiracy that SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, and others known and unknown, willfully and

knowingly, directly and indirectly, by use of the means and
instrumentalities of interstate commerce and of the mails, and
of the facilities of national securities exchanges, would and
did use and employ manipulative and deceptive devices and
contrivances in connection with the purchase and sale of
securities, in violation of Title 17, Code of Federal
Regulations, Section 240.10b-5, by (a) employing devices,
schemes, and artifices to defraud; (b) making untrue statements
of material fact and omitting to state material facts necessary
in order to make the statements made, in the light of the
circumstances under which they were made, not misleading; and
(c) engaging in acts, practices, and courses of business which
operated and would operate as a fraud and deceit upon persons,
in violation of Title 15, United States Code, Sections 78j(b)
and 78ff, to wit, the defendants and others known and unknown
participated in a scheme to defraud purchasers of Centra Tech,
Inc. ("Centra Tech") cryptocurrencies by making material
misrepresentations about Centra Tech, its purported partnerships
with Bancorp, Visa and Mastercard, its products, its licensing
in various states, and its executive personnel, causing
investors to purchase more than $25 million worth of Centra Tech
cryptocurrencies, which function as unregistered securities,
during the time period of Centra Tech's initial coin offering.

<u>Overt Acts</u>

3.    In furtherance of the conspiracy and to effect its
illegal object, SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT
FARKAS, a/k/a "Bob," the defendants, and others known and
unknown, committed the following overt acts, among others, in
the Southern District of New York and elsewhere:

a.    On or about August 14, 2017, SHARMA, in an
interview by a cryptocurrency podcast, made material
misrepresentations about an initial coin offering for the
digital assets and cryptocurrency company Centra Tech, for which
he was a founder, President, and Chief Technology officer at
various times.

b.    On or about September 6, 2017, FARKAS, a chief
marketing officer for Centra Tech, sent an email to an
individual at a marketing company describing Centra Tech's
currency conversion capabilities as "allow[ing] real time
conversion of all supported cryptocurrencies to give the user
the ability to spend their assets in real time anywhere in the
world that accepts Visa or Mastercard."

USAO_SDNY_00009210

c.   On or about November 28, 2017, FARKAS attended a blockchain technology conference in New York City, New York, on behalf of Centra Tech, a sponsor of the conference, for the purpose of promoting Centra Tech and its products.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Securities Fraud)

4.   From at least in or about July 2017, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, and of the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, the defendants and others known and unknown participated in a scheme to defraud purchasers of Centra Tech cryptocurrencies by making material misrepresentations about Centra Tech, its purported partnerships with Bancorp, Visa and Mastercard, its products, its licensing in various states, and its executive personnel, causing investors to purchase more than $25 million worth of Centra Tech cryptocurrencies, which function as unregistered securities, during the time period of Centra Tech's initial coin offering.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT THREE
### (Conspiracy To Commit Wire Fraud)

5.   From at least in or about July 2017, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma,"

USAO_SDNY_00009211

and ROBERT FARKAS, a/k/a "Bob," the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343.

6.    It was a part and an object of the conspiracy that SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, the defendants and others known and unknown participated in a scheme to defraud purchasers of Centra Tech cryptocurrencies by making material misrepresentations about Centra Tech, its purported partnerships with Bancorp, Visa and Mastercard, its products, its licensing in various states, and its executive personnel.

(Title 18, United States Code, Section 1349.)

## COUNT FOUR
### (Wire Fraud)

7.    From at least in or about July 2017, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, the defendants and others known and unknown participated in a scheme to defraud purchasers of Centra Tech cryptocurrencies by making material misrepresentations about Centra Tech, its purported partnerships with Bancorp, Visa and Mastercard, its products, its licensing in various states, and its executive personnel, and in the course of executing such scheme, caused interstate and international wires to be sent, including emails between New

4

York, New York and Florida and a location outside of the United States.

(Title 18, United States Code, Section 1343 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

8.    I have been a Special Agent with the FBI for approximately two and a half years. I am currently assigned to a squad that investigates white collar crimes, including complex financial frauds and conduct within the regulatory jurisdiction of the U.S. Securities and Exchange Commission ("SEC"). I have participated in investigations of such offenses, and have made and participated in arrests of individuals who have committed such offenses.

9.    The information contained in this Complaint is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources, including, but not limited to: (a) business records and other documents, such as trading records, bank records, telephone records, and records of electronic communications, including text messages; (b) publicly available documents; (c) conversations with, and reports of interviews with, non-law-enforcement witnesses; (d) conversations with, and reports prepared by, other agents; and (e) conversations with representatives from the U.S. Securities and Exchange Commission ("SEC"). Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions and statements of and conversations with others are reported herein, they are reported in substance and in part. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

## The Defendants and Relevant Entities

10.    Based on my review of publicly available information and records provided by Centra Tech to representatives of the SEC, I have learned the following, in substance and in part:

a.    Centra Tech is a Delaware corporation based in Miami Beach, Florida. Centra Tech advertises itself through its website, https://centra.tech (the "Centra Tech Website"), press releases, and statements on the Internet as a company that

5

offers various methods to store and spend digital assets such as cryptocurrencies. For example, the Centra Tech Website currently advertises that Centra Tech "offers blockchain products such as a Wallet to store digital assets, a Prepaid Card to spend the digital assets, and three soon to be released products and services, which include a Marketplace to buy goods with the digital assets, a cryptocurrency Exchange Platform to buy, sell and trade digital assets, and a open-source hyper speed DPoS Blockchain."

b.   The following individuals, among others, are or have been employed at Centra Tech:

i.   SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, was a founder of Centra Tech, its President, and its Chief Technology Officer. On October 31, 2017, Centra Tech announced that SHARMA was "stepping aside to support the continued growth of the company," and announced a "reconstituted executive management team" that did not include SHARMA.

ii.   ROBERT FARKAS, a/k/a "Bob," has held various positions at Centra Tech, including as its chief marketing officer and chief operating officer.

c.   The Bancorp, Inc. ("Bancorp") is a Delaware-based financial services company with offices throughout the United States. Bancorp provides a variety of financial services to companies and individuals, including issuing debit and prepaid cards, and payments processing, which it does by virtue of contractual partnerships with other financial services companies such as Visa and Mastercard, among others.

d.   Visa Inc. ("Visa") is a U.S.-based multinational financial services corporation headquartered in Foster City, California. Visa facilitates electronic funds transfers throughout the world, most commonly through "Visa"-branded credit cards and debit cards.

e.   Mastercard Incorporated ("Mastercard") is a U.S.-based multinational financial services corporation headquartered in Purchase, New York. Mastercard's principal business is to process payments between the banks of merchants and the card-issuing banks or credit unions of the purchasers who use the "Mastercard" brand debit and credit cards to make purchases.

USAO_SDNY_00009214

## Relevant Regulatory Background and Definitions

11.  An "initial coin offering" ("ICO") is a type of fundraising event in which an entity offers participants a unique digital "coin" or "token" in exchange for consideration. The consideration often comes in the form of "virtual currency" or "cryptocurrency," but can also be "fiat currency," which is currency, like the U.S. dollar and the Euro, that a government has declared to be legal tender, but is not backed by a physical commodity.  "Virtual currency" or "cryptocurrency" is a digital representation of value that can be digitally traded and functions as (1) a medium of exchange, (2) a unit of account, and/or (3) a store of value, but does not have legal tender status.  Unlike fiat currency, like the U.S. dollar and the Euro, virtual currency is not issued by any jurisdiction and functions only by agreement within the community of users of that particular currency.  Examples of virtual currency are Bitcoin and Ether.[1]

12.  The tokens or coins issued in an ICO are issued and distributed on a "blockchain" or cryptographically-secured ledger.  Tokens often are also listed and traded on online platforms, typically called virtual currency exchanges, and they usually trade for other digital assets or fiat currencies. Often, tokens are listed and tradeable immediately after they are issued.

13.  ICOs are typically announced and promoted through the Internet and e-mail.  Issuers usually release a "whitepaper" or "white paper" describing the project and the terms of the ICO. In order to participate in the ICO, investors are generally required to transfer funds to the issuer.  After the completion of the ICO, the issuer will distribute its unique "coin" or "token" to the participants.  The tokens may entitle the holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, and/or voting rights.  These tokens may also be listed on online platforms, often called virtual currency exchanges, and be tradable for virtual currencies.

---

[1] Based on my training, experience, and participation in this investigation, I have learned that "Ether" is a cryptocurrency whose blockchain is generated by the Ethereum platform, and the term "Ether" is sometimes used interchangeably with "Ethereum."

USAO_SDNY_00009215

14.   Under Section 2(a)(1) of the Securities Act of 1933, a security includes "an investment contract." 15 U.S.C. § 77b. An "investment contract" is a contract, transaction or scheme "whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *S.E.C.* v. *W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* at 301.   Importantly, the economic realities of the transaction or product and not its name determine whether the instrument is a security.   *United Hous. Found, Inc.* v. *Forman*, 421 U.S. 837, 851 (1975).   Pursuant to Sections 5(a) and 5(c) of the Securities Act, a company or individual conducting an offer or sale of securities to the public must file a registration statement with the SEC.   15 U.S.C. § 77e(a) and (c).

## Overview of the Scheme to Defraud

15.   From at least July 2017 up to and including the day of this Complaint, SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, and others known and unknown, participated in a scheme to defraud purchasers of Centra Tech cryptocurrencies by making material misrepresentations about Centra Tech, its purported partnerships with Bancorp, Visa, and Mastercard, its products, its licensing in various states, and its executive personnel.   Through these misrepresentations, SHARMA and FARKAS caused investors to purchase more than $25 million worth of Centra Tech cryptocurrencies, which function as unregistered securities, during the time period of Centra Tech's initial coin offering.

## The Centra Tech ICO

16.   As set forth in greater detail below, based on my participation in this investigation and my review of reports and records prepared by others, from in or about July 2017 through in or about October 2017, Centra Tech raised capital, by offering unregistered securities via an ICO, to operate what Centra Tech advertised would be the world's first multi-blockchain debit card (the "Centra Tech ICO").   In sum, Centra Tech accepted digital currency from investors in exchange for Centra Tokens that Centra Tech stated could be "exchange[d] on the Cryptocurrency exchanges for a profit" and would "allow[] users to join [Centra Tech's] success and mission *while generating a profit.*"   (emphasis added).   In doing so, Centra Tech made multiple false statements, including on the Centra Tech Website and in materials posted to the Centra Tech Website,

USAO_SDNY_00009216

regarding, among other things, (a) the "Centra Card" or the "Centra Debit Card," a debit card that was falsely advertised as one that would allow users to make purchases using any blockchain currency of choice and would work at any location that accepted Visa or Mastercard, (b) Centra Tech's partnerships with Bancorp, Visa, and Mastercard, which did not exist, (c) individual state licenses held by Centra Tech, at least some of which did not exist, and (d) the identity of one of Centra Tech's executives, who does not appear to exist.

17.   Based on my review of publicly available information and records provided by Centra Tech to representatives of the SEC, among other sources, I have learned the following, in substance and in part:

a.   On or about July 23, 2017, Centra Tech issued a press release that it paid to be published on the website "cointelegraph.com" (the "July 23 Press Release").  In the July 23 Press Release, Centra Tech described the Centra Tech ICO as "truly a ground floor opportunity to be part of a global solution to the blockchain currency dilemma that offers a comprehensive rewards program for both token and card holders while giving the ability to spend your cryptocurrency in real time with no fees."  The July 23 Press Release also touted Centra Tech's products: (1) the "Centra Debit Card" which purported to "enable[] users to make purchases using their blockchain currency of choice," and "work[] anywhere that accepts Visa or MasterCard," (2) the "Centra Wallet App," which "makes it easy for people to register for the Centra Debit Card, store their cryptocurrency assets, as well as control its functions," and (3) "cBay," the "world's first Amazon type of marketplace created especially for cryptocurrency acceptance."  The July 23 Press Release also advertised Centra Tech's "Currency Conversion Engine" as allowing users "the ability to spend their assets anywhere in the world that accepts Visa and/or MasterCard."

b.   On or about July 25, 2017, Centra Tech issued a press release that it paid to be published on the website Bitcoin.com (the "July 25 Press Release").  In the July 25 Press Release, Centra Tech described the Centra Tech ICO as "truly a ground floor opportunity to be part of a global solution to the blockchain currency dilemma that offers a comprehensive rewards program for both token and card holders while giving the ability to spend your cryptocurrency in real time with no fees."  The July 25 Press Release also touted Centra Tech's products: (1) the "Centra Debit Card" which purported to "enable[] users to

9

make purchases using their blockchain currency of choice," and "work[] anywhere that accepts Visa or MasterCard," (2) the "Centra Wallet App," which "makes it easy for people to register for the Centra Debit Card, store their cryptocurrency assets, as well as control its functions," and (3) "cBay," the "world's first Amazon type of marketplace created especially for cryptocurrency acceptance."   The July 25 Press Release also advertised Centra Tech's "Currency Conversion Engine," as allowing users "the ability to spend their assets anywhere in the world that accepts Visa and/or MasterCard."

      c.   Centra Tech also posted several different versions of a white paper advertising the Centra Tech ICO on the Centra Tech Website.  A version of the ICO White Paper that was downloaded from the Centra Tech Website on or about August 3, 2017 and labeled "FINAL DRAFT" ("White Paper-1") contained several statements describing the ICO and the Centra Card using terminology indicative of a securities offering.  For example:

      i. White Paper-1 described the Centra Tech ICO as a token offering for which 400 Centra Tokens, or "CTR"s, would be sold for 1 ETH.  Based on my training, experience, and participation in this investigation, I have learned that "ETH" is the currency code for Ether, a cryptocurrency whose blockchain is generated by the Ethereum platform.

      ii. Centra Tech stated that it would be offering "68% of all [Centra] Tokens to be created for purchase in our crowd sale to the public" and would "allocate 20% of all [Centra] Tokens created to distribution of bug bounty, business development, community projects, market expansion, and more" while "[t]he remaining 12% will be distributed to Centra Techs founders, early investors, and employees as an incentive to create a long lasting mutual interest and dedication to the tokens and their prolonged value."

      iii. In providing details about the Centra Card and the Centra Tech ICO, White Paper-1 referenced different levels of investment opportunity:

      1. The "Centra Black Card founders edition" was to be issued to "our first 500 ICO backers whom purchase with 100+ ETH" and would carry with it an "enhanced rewards program."

      2. The "Centra Gold Card limited edition" would be "allocated to our first 1000 contributors whom purchase CTR

10

Tokens with 30+ ETH," and would also carry an "enhanced rewards program."

        3. The "Centra Blue & Virtual Card" would be the "signature and traditional card."

        iv. White Paper-1 advertised multiple "rewards" programs for Centra Token holders. For example, White Paper-1 advertised that Centra Token holders would receive a ".8% ETH" reward for every transaction in the "network" (the "Network Rewards Program"). This was in contrast to another rewards program advertised in White Paper-1, which offered "Card rewards of up to 2% of your purchases made on the Centra card." Based on my review of White Paper-1, and representations made by SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, as described in paragraph 30.e., below, explaining that "through our revenue share we actually give .8 percent of that away to token holders as part of our program to join the Centra Tokens," I believe the Network Rewards Program functions like a dividend in that it is offering a share — .8% ETH — of Centra Tech's revenue.

        v. Although it claimed that holders of the Centra Token "by no means own any securities or interest in Centra Tech," and that the Centra Tokens "are not securities nor shares," White Paper-1 promised that Centra Token purchasers would "be able to place their wallet to use on Centra Debit card, or exchange them [the Centra Tokens] on the Cryptocurrency exchanges for a profit." White Paper-1 also claimed that the Centra Card and Centra Wallet were "already live in beta," and that Centra Tech was "offering our initial crowd sale of tokens to appropriately fund the vision of Centra Tech's future." It further claimed that Centa Tech's "initial coin offering allows users to join our success and mission *while generating a profit.*" (emphasis added).

        vi. White Paper-1 also contained several misrepresentations, as described further in paragraphs 34 through 43, below, about Centra Tech's relationships with financial-services institutions. For example:

        1. In describing the Centra Card, White Paper-1 stated: "For our United States clients the Centra Card will be a Visa card while for international users the Centra card issued will be a MasterCard. . . . The Centra Card allows all supported cryptocurrencies to become spendable in real time based on the government fiat being used at the time the card is used at a participating location that accepts Visa or MasterCard."

USAO_SDNY_00009219

2. White Paper-1 contained multiple images of Centra Cards with the "Visa" logo.

3. White Paper-1 also stated that one benefit and advantage of the Centra Card was "Access to 36+ Million Points of Sale where Visa and/or Master-Card is accepted in 200+ countries."

4. A product comparison table in White Paper-1 reported that the issuers of the Centra Card were "MasterCard and Visa."

5. White Paper-1 contained a timeline of Centra Tech's "milestone items," including a "Major Banking Partnership signed and license agreement with VISA USA Inc formulated" in January 2017, and a "Beta Launch of Centra Black Card and Centra Wallet App Live" in March 2017.

6. White Paper-1 also used the logos of Bancorp, Visa and Mastercard when describing Centra Tech's partners.

vii.    White Paper-1 stated that "Centra Tech holds individual licenses in 38 states namely Alabama, Arizona, Alaska, Arkansas, Connecticut, Delaware, District of Columbia, Florida, Georgia, Idaho, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Mississippi, Nevada, Nebraska, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, Oregon, Rhode Island, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, and West Virginia."  It further stated that the licenses "are held under categories of Money Transmitter, Sales of Checks, Electronic Money Transfers, and Seller of Payment Instruments."

viii.    White Paper-1 advertised the "Centra Tech Team" as comprising, among other individuals, SHARMA as the "CTO & Co-Founder"; FARKAS as the "CMO"; and "Michael Edwards" as the "CEO & Co-Founder."

SHARMA's Representations in Connection with the Centra Tech ICO

18. On or about August 14, 2017, SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, was interviewed by Neocash Radio, a cryptocurrency podcast, about the Centra Tech ICO. Based on my

12

review of a recording of the interview, I have learned that SHARMA stated, among other things, the following:[2]

    a.   "[I]nternationally, we currently have our license with Mastercard, to service international clients. Domestically, we do have the Visa partnership, so we are able to issue Visa cards domestically and Mastercards internationally."

    b.   "Right now we are currently in our live Beta stage, which we have members of our internal organization as well as some external that have gotten our Centra Black Founder cards recently. We're going through . . . pretty much a phase two of testing right now where we are just going through daily transactions, testing volume, etc., and we've gotten really good results so far on it."

    c.   SHARMA also stated that Centra Tech had "pretty much a successful test rate in terms of errors, in terms of proof processes and the whole flow of the card attaching to the app," when discussing the Centra Wallet.

    d.   SHARMA identified "Mike Edwards" as a "VP and co-founder" who was an early investor in Centra Tech.

    e.   In describing the rewards system for purchasers in the ICO, SHARMA stated:  "The rewards percentage that we get from Visa and Mastercard through our revenue share we actually give .8 percent of that away to token holders as part of our program to join the Centra tokens."

    f.   "[R]ight now is a great time to join our system, we have a token sale that is going on, it finishes on October 5th . . . we're currently a little bit north of $10 million raised in our first eight days of our crowd sale so I definitely want to thank all of my contributors and anyone who is listening for joining that as well."

    g.   SHARMA stated that there was currently a 20% token bonus on top of the current token sale that "can be redeemed via email."

---

[2] The summaries and transcript of the recorded interview set forth herein is based on a preliminary draft transcription and remains subject to revision.

h.   "We have a couple of large deals we're working on right now with a few companies so we should be over by I would say early September."

i.   SHARMA directed listeners to the Centra Tech website, www.centra.tech, to find out more about the Centra Tech ICO: "You can go to our website, www.centra.tech, and you can click the token sale page as well as our white paper is on there and you can just get an insight of everything from A to Z."

j.   SHARMA stated that while Centra Tech was licensed in 38 states, "the states that we are operating in currently for licensing purposes is just so the ability to withdraw and transmit your Bitcoins.  As far as actually utilizing the card itself to the wallet and spending the cryptocurrencies, that's available in all states."

k.   SHARMA also stated that he was able to work through the U.S. licensing issues with a contact he knew at Metropolitan Commercial Bank.  SHARMA stated that "our system is connected to the bank and we're connected to the clients."

**Additional Representations by FARKAS**

19.  Based on my review of records provided by Centra Tech to the SEC, and which were provided to me in connection with this investigation, I have learned, in substance and in part, the following:

a.   On or about August 30, 2017, SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, sent an email to an individual not at Centra Tech, and copied ROBERT FARKAS, a/k/a "Bob," the defendant, to the email.  In that email, SHARMA conveyed a message that SHARMA had received from Bancorp stating the following:

> Mr. Sharma:  I left a voicemail on your phone, but I am following up here as well.  CENTRA TECH IS HEREBY DIRECTED TO CEASE AND DESIST FROM REPRESENTING THAT THE BANCORP BANK HAS ANY CONNECTION WITH, OR IS THE ISSUER OF ANY CARD PRODUCTS RELATED TO CENTRA TECH.  YOU ARE ALSO DIRECTED TO CEASE AND DESIST USING OUR LOGO OR OTHER IMAGES IN CONNECTION WITH THE MARKETING OF ANY CARD PRODUCTS OR WALLETS YOU OFFER.  Please REMOVE any and all references to The Bancorp Bank or The Bancorp Inc. from

14

any and all websites, marketing materials or
other communications, including blogs as this
has not been authorized by The Bancorp.   I
expect you will be hearing from federal
banking regulators as well.

b.   On or about September 6, 2017, FARKAS exchanged
emails with an individual at a company that provides a search
engine allowing users to look up, confirm, and validate
transactions that have taken place on the Ethereum blockchain
("Company-1").   In the emails, FARKAS inquired about how to
obtain advertising space on Company-1's website, and stated, in
substance and in part, the following:

I know there are some past issues but we are now
complete on our Pre-ICO raised over 10M in ETH and
have been verified by all of our staff on Token Market
. . .

We have ad space everywhere else except here.   Please
let me know if you need any identifying documents or
anything to proceed with our ad space.

FARKAS also provided the advertising text that he wanted
Company-1 to post" "Centra Card ® & Centra Wallet ® Now
available Worldwide!"   FARKAS signed the email "Robert Farkas
CMO."   After receiving a response from Company-1 that it was
"not able to cater to [Centra Tech's] advertising needs at this
point [in] time," FARKAS forwarded the emails to
"ssharma491@gmail.com," an email address used by SHARMA.[3]

c.   In or about early September 2017, FARKAS, using
the email address "support@centra.tech," and at times signing
his name "Bob," or "Robert Farkas CMO Centra," exchanged a
series of emails with an individual at a marketing company
seeking to write promotional materials and/or articles about
Centra Tech ("Individual-1").   On or about September 6, 2017,
FARKAS described Centra Tech as follows:

The biggest problem in the crypto world is
being able to spend your cryptocurrency

_____

[3] Based on records provided to the FBI by Google, I have learned
that SHARMA is listed as the subscriber for the email address
"ssharma491@gmail.com."   In addition, based on my review of
records produced by Centra Tech to the SEC, I have learned that
SHARMA uses the email address "ssharma491@gmail.com."

15

> effortlessly.   The Centra Card and Centra
> Wallet app are the solution.  Our Currency
> Conversion Engine Module (CCE Module) allows
> real   time   conversion   of   all   supported
> cyrptocurrencies to give the user the ability
> to spend their assets in real time anywhere in
> the world that accepts Visa or Mastercard.
>
> ...
>
> Thanks,
> Bob

On or about September 13, 2017, Individual-1 appears to have
provided FARKAS with a draft of written materials related to
Centra Tech and, later that same day, FARKAS responded with
edits, including the following:

> Title: Can we change it too: This company
> has brought cryptocurrency into the real
> world
> reason being is that our card is live and
> working and has been shipped to clients
> already ☺
> . . .
> Thanks,
> Bob

20.   From approximately in or about September 2017 through
in or about December 2017, FARKAS received and responded to
multiple emails either directly or through the
"support@centra.tech" email account from individuals interested
in participating in the Centra Tech ICO, interested in
purchasing Centra Tokens, or otherwise seeking information about
Centra Tech.

21.   Based on my review of records provided by Centra Tech
to the SEC, I have learned, in substance and in part, that, in
or about October 2017, FARKAS registered Centra Tech as a
sponsor of "Consensus: Invest 2017," a blockchain technology
summit or conference that took place on or about November 28,
2017 in New York City, New York.  I have reviewed a video posted
to Centra Tech's YouTube channel on or about January 5, 2018
entitled "Centra Consensus NYC Cryptocurrency Blockckain Expo
Invest."  The video depicts what appears to be people and
activities at the "Consensus" Invest 2017," including a Centra

16

USAO_SDNY_00009224

Tech booth or table at the conference, and shows FARKAS engaging in conversations with various people during the conference. Based on the foregoing, I believe that FARKAS was in New York City, New York, on or about November 28, 2017, and engaged in promotional and marketing activities for Centra Tech at the "Consensus: Invest 2017" conference.

## The Fraudulent Partnerships with Bancorp, Visa, and Mastercard

22. Based on my conversations with a representative of Bancorp ("Witness-1") and my review of documents provided by Bancorp, I have learned, in substance and in part, the following:

a. In approximately August 2017, Witness-1 learned from Bancorp's marketing group that a potential investor or purchaser of Centra Tech tokens had inquired as to whether Bancorp had a business relationship with Centra Tech, as was represented by Centra Tech in its marketing materials at the time.

b. In investigating the inquiry in approximately August 2017, Witness-1 reviewed the Centra Tech Website and a white paper posted on the Centra Tech Website. Witness-1 discovered that Bancorp's issuer statement, a statement regarding who the card issuer is any time a Visa or Mastercard image is displayed, was being used on the Centra Tech Website. Witness-1 knew by looking at the Centra Tech Website and white paper that Bancorp would not ever work with a company such as Centra Tech by virtue of the risk level of the product Centra Tech was offering.

c. Witness-1 reviewed Bancorp internal databases, to include Bancorp's list of entities with which it had card issuance relationships and entities involved in Bancorp's co-branded incentive card program, to see whether Bancorp had any sort of relationship with Centra Tech. Through this process, Witness-1 confirmed that Bancorp did not have any relationships with Centra Tech.

d. Witness-1 took screenshots of the Centra Tech Website, including a page that misrepresented Bancorp's issuer statement.

e. One screenshot that Witness-1 retained stated, among other things:

17

The Centra Card Visa Debit Card is issued by
The Bancorp Bank, member FDIC, pursuant to a
license from Visa U.S.A. Inc.  "The
Bankcorp"[4] and "The Bancorp Bank" are
registered trademarks of The Bankcorp Bank ©
2014.  Use of the Card is subject to the
terms and conditions of the applicable
Cardholder Agreement and fee schedule, if
any.

The Centra Card Mastercard® Debit Card is
issued by The Bancorp Bank, member FDIC,
pursuant to a license from Mastercard
International Incorporated.  "The Bankcorp"
and "The Bancorp Bank" are registered
trademarks of The Bankcorp Bank © 2014. Use
of the Card is subject to the terms and
conditions of the applicable Cardholder
Agreement and fee schedule, if any.

      f.    As described above, Witness-1 reviewed a white
paper that was posted to the Centra Tech Website in August 2017.
Witness-1 recalled that the white paper contained multiple
misrepresentations, including about Centra Tech's purported
relationship with Bancorp.

      g.    In approximately August 2017, Witness-1 attempted
to reach individuals at Centra Tech through, among other
methods, the "Contact Us" portion of the Centra Tech Website to
request that Centra Tech remove the Bancorp logo and the false
statements regarding Centra Tech's purported relationship with
Bancorp.  Witness-1 did not receive a response from Centra Tech.

      h.    Based on my conversations with another
representative of Bancorp ("Witness-2") and my review of
documents provided by Bancorp, I have learned, in substance and
in part, that, on or about August 30, 2017, Bancorp sent a cease
and desist notice to Centra Tech to which Centra Tech did not
respond.

      23.   Based on my conversations with a representative of
Visa ("Witness-3") and my review of documents provided by Visa,
I have learned, in substance and in part, the following:

      [4] This excerpt from the Centra Tech Website has not been altered
to correct spelling or other errors.  In this excerpt, "Bancorp"
is also spelled "Bankcorp."

18

a.    On or about October 10, 2017, Visa became aware that Centra Tech was using the Visa name and logo on marketing materials in connection with the Centra Card and the Centra Tech ICO.

b.    Visa employees researched whether Visa had any relationship, direct or indirect, with Centra Tech.  Visa determined that it had no relationship with Centra Tech.

c.    Visa employees took screenshots of portions of the Centra Tech Website using and showing the Visa name and trademark, including of purported Centra Cards with the Visa logo.

d.    On or about October 10, 2017, Visa's Legal Department sent an email to Centra Tech, at support@centra.tech, attaching a cease and desist letter (the "October 10 Letter"). In the October 10 Letter, Visa stated, in part:

> It has come to our attention that Centra Tech ("Centra") is using the Visa-Owned Marks on its site https://www.centra.tech as well as on its various social media sites (e.g., Facebook, Twitter, Instagram, YouTube) and other mediums. It appears Centra is purporting to be an authorized distributor of VISA payment cards utilizing cryptocurrency technology. . . . However, to the best of our knowledge and good faith belief, Centra is not authorized to use the Visa-Owned Marks in this manner, nor is it authorized to issue, sell, or otherwise distribute VISA payment cards. If this is not the case, please advise and explain immediately, i.e., if Centra is working with an authorized Visa Issuing bank.

Visa attached to the October 10 Letter multiple screenshots from the Centra Tech Website in which Centra Tech had misappropriated the Visa trademark.

e.    In the October 10 Letter, Visa requested that Centra Tech cease and desist from using Visa's trademarks and "promoting that it is an authorized distributor of VISA payment cards," and for Centra Tech to remove all references to Visa from the Centra Tech Website and any promotional materials.

19

Visa also requested that Centra Tech "identify the bank or
financial institution it is working with (if any) to issue a
purported VISA payment card product."

      f.   In response to the October 10 Letter, SOHRAB
SHARMA, a/k/a "Sam Sharma," the defendant, provided Visa with an
acknowledgment that he had received the October 10 Letter, but
did not identify any financial institutions with which Centra
Tech was working to issue a Visa payment card product.

     24.  Based on my review of records provided by Centra Tech
to the SEC, and which were provided to me in connection with
this investigation, I have learned, in substance and in part,
the following:

      a.   On or about October 10, 2017, SOHRAB SHARMA,
a/k/a "Sam Sharma," the defendant, using the email address
"sam@centra.tech," emailed a response to Visa's October 10
Letter, stating:

> This matter has been brought to my
> attention. I will have this matter rectified
> in 48 hours. We are currently in the process
> of finalizing our Co-branded Prepaid Card
> Program, but might not meet the Nov 1st lock
> out deadlines for submission from our
> issuing bank whom is an authorized visa
> issuer for card design approval, So can see
> where this issue might of came from.
>
> However, I have immediately contacted my web
> developers to remove all issues and I will
> have this document [a cease and desist
> acknowledgment] signed and returned within
> 48 hours.
>
> Thank you,
> Sam Sharma

     b. On or about October 11, 2017, Visa responded to
SHARMA's email, and requested that he "advise of the Visa
issuing bank you are working with."

     c. On or about October 12, 2017, SHARMA responded again
via email using the "sam@centra.tech" email account and stated:
"As far as the issuing bank we have an MNDA in place currently.
VISA will soon get our information for Card Design approval and

USAO_SDNY_00009228

program specs from our future issuing bank in the US."  SHARMA
signed the email, "Thank you, Sam."  Based on my training and
experience, I believe SHARMA was claiming that he had a Mutual
Non-Disclosure Agreement with the purported issuing bank in this
email and that he therefore could not disclose its identity.

d. On or about October 14, 2017, Visa responded to
SHARMA's email, noting that Centra Tech was still using the Visa
trademark and Visa name in its promotional materials, including
in videos in which SHARMA appeared, and reiterated its demand
that Centra Tech stop using the Visa name.  Visa also repeated
its request that SHARMA identify the bank that Centra Tech was
"allegedly working with."

e. Based on my conversations with Witness-3, I have
learned that, in response to Visa's multiple requests for Centra
Tech to identify the Visa card issuing bank with which it
purported to have a relationship, neither SHARMA nor anyone at
Centra Tech identified such an issuing bank.

25.   Based on my conversations with a representative of
MasterCard ("Witness-4"), I have learned, in substance and in
part, that MasterCard's internal records of licensing agreements
and relationships with card-issuing banks and other third
parties contains no record of any relationship, either direct or
indirect, with Centra Tech.

26.   Based on my review of the current version of the
Centra Tech Website and a white paper published via the Centra
Tech Website, as of March 26, 2018, I have learned that Centra
Tech is not currently using the Bancorp, Visa or MasterCard
names or logos.

27.   As described in paragraph 17.c.vii., above, White
Paper-1 represented that Centra Tech held licenses "under
categories of Money Transmitter, Sales of Checks, Electronic
Money Transfers, and Seller of Payment Instruments," in 38
listed states (the "State Licensing List").  Based on my review,
on or about March 12, 2018, of a database maintained by the
Nationwide Multistate Licensing System, a financial services
industry online registration and licensing database, and my
review of certain state licensing databases, I have learned, in
substance and in part, that the following states on the State
Licensing List have no current record for Centra Tech based on
available public searches:  Arizona, Connecticut, Delaware,
Florida, New Jersey, New York or South Dakota.

21

### "Michael Edwards"

28.   As described in paragraph 17.c.viii, above, White Paper-1 listed "Michael Edwards" as Centra Tech's "CEO & Co-Founder."  White Paper-1 also included a picture of "Michael Edwards."  Based on open source searches of this image, I have learned that the picture of "Michael Edwards" in White Paper-1 is actually a picture associated with an individual by a different name who is a Canadian physiology professor.

29.   Based on my review of records provided by the SEC, I have learned, in substance and in part, that, on or about August 3, 2017, a user profile page appeared on LinkedIn, a business- and employment-oriented social networking service that operates via websites and mobile apps, for "Michael Edwards."  The LinkedIn page stated that "Michael Edwards" had "launched Centra Tech with the mission to design the world's first multi-blockchain asset debit card" and had managed various aspects of Centra Tech's Centra Card and Centra Wallet programs, including "[e]stablished licensing and partnership terms with Visa & MasterCard."  The LinkedIn page also stated that "Michael Edwards" was affiliated with Harvard University.

30.   Based on my review of currently-available content on the LinkedIn website, I have learned that the "Michael Edwards" LinkedIn page no longer exists.

31.   Based on Internet searches for a "Michael Edwards" who is or was a co-founder or CEO of Centra Tech, I have learned that there is limited information about such an individual.  For example, I have found no interviews of "Michael Edwards" in connection with Centra Tech or the Centra Tech ICO, and the name "Michael Edwards" no longer appears on the Centra Tech Website or Centra Tech online promotional materials.  Based on the information described above, and based on my training, experience, and participation in this investigation, I believe that a "Michael Edwards" who was at some point "CEO & Co-Founder" of Centra Tech may not exist.

### The Centra Tech ICO Investors

32.   Based on my training, experience, and participation in this investigation, I have learned that companies like Centra Tech that offer cryptocurrency are required to keep a record of identification information—including names and addresses of individuals purchasing their cryptocurrency.  Based on my review

USAO_SDNY_00009230

of records provided by Centra Tech to the SEC, I have learned, in substance and in part, the following:

    a.    Centra Tech provided a spreadsheet labeled "Centra Token Sale Details" to the SEC.  The spreadsheet contains several tabs, including tabs labeled "CentraToken," "CentraSale," and "Centra Token Owner."

    b.    The CentraToken tab contains information regarding more than 1800 purchases of Centra Tokens from between on or about July 30 to August 26, 2017.  Two of the listed investors reside in New York City, New York, within the Southern District of New York.

    c.    The CentraSale tab contains information regarding more than 1700 purchases of Centra Tokens from between on or about September 19 to September 26, 2017.  Three of the listed investors reside in New York City, New York, within the Southern District of New York.

### Extradition Research, Document Destruction, and International Travel

    33.  Based on my discussions with representatives of the SEC, I have learned, in substance and in part, that in or about the fourth quarter of 2017 the SEC issued an initial subpoena to Centra Tech for documents and other information, and that SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, are thus aware of the SEC's investigation.

    34.  Based on my conversations with an attorney who is employed by a financial regulatory authority ("Witness-5"), I have learned, in substance and in part, the following:

    a.    Witness-5 knows an attorney who was until recently employed by Centra Tech ("Employee-1").

    b.    Witness-5 had several telephone conversations and electronic communications with Employee-1 on or about March 29 and 30, 2018.

    c.    During these communications, Employee-1 told Witness-5 the following, in substance and in part:

    i.    Employee-1 learned earlier this week that the SEC has been investigating whether Centra Tech has engaged in fraudulent activity.

USAO_SDNY_00009231

        ii.    ROBERT FARKAS, a/k/a "Bob," the defendant, recently asked Employee-1 via email to conduct research regarding foreign extradition laws.

        iii.    After Employee-1 performed this extradition research and reported the results to FARKAS, FARKAS approached Employee-1 in person and stated, in substance and in part, that he had deleted his email asking Employee-1 to perform this extradition research.  Based on FARKAS' demeanor during this interaction and the way in which he made that statement about deleting his email, Employee-1 understood FARKAS to be suggesting that Employee-1 should also delete the copy of that email that Employee-1 had received from FARKAS regarding the extradition research.

        d.    Employee-1 has not seen an individual Employee-1 described to Witness-5 as the "owner" of Centra Tech in over a week -- which I believe, based on my training and experience and participation in the investigation of this case, to be a reference to SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant.

        e.    Employee-1 also learned this week that Centra Tech's bank account has been depleted.

        f.    Employee-1 conveyed that Centra Tech has terminated virtually all of its employees except certain top executives such as SHARMA and FARKAS.

        26.  Based on my review of records provided by Delta Airlines, I have learned that on or about March 27, 2018, ROBERT FARKAS, a/k/a "Bob," the defendant, booked Delta Airlines flights for himself and a co-traveler whose name I recognize to be the name of an employee at Centra Tech ("Employee-2") to fly from Fort Lauderdale, Florida to Incheon, South Korea via a Delta Airlines flight leaving Fort Lauderdale-Hollywood International Airport in Florida on or about April 1, 2018 at approximately 8:00PM, with a stopover at Hartfield-Jackson Atlanta International Airport in Georgia to catch a connecting Delta Airlines flight that will arrive at Incheon International Airport in South Korea on or about April 2, 2018.  According to these records, FARKAS and Employee-2 have also booked return flights that would have them leave from Incheon International Airport in South Korea on or about April 5, 2018 and arrive at Fort Lauderdale-Hollywood International Airport in Florida on or about April 5, 2018.

USAO_SDNY_00009232

WHEREFORE, I respectfully request that arrest warrants be issued for SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, and that they be arrested and imprisoned or bailed, as the case may be.

BRANDON RACZ
Special Agent
Federal Bureau of Investigation

Sworn to before me this
31st day of March 2018

HONORABLE JAMES L. COTT
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

25

# EXHIBIT B

USAO_SDNY_00009234

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: Warrants and Orders For Prospective and Historical Location Information and Pen Register Information for the Cellphones Assigned Call Numbers "305-619-2656" and "516-724-3138," USAO Reference No. 2018R00088 | **APPLICATION**<br><br>_____ Mag. _____ |

## Application for Warrant and Order
### for Cellphone Location and Pen Register Information

The United States of America, by its attorney, Geoffrey S. Berman, United States Attorney

for the Southern District of New York, Samson Enzer, Assistant United States Attorney, of

counsel, respectfully requests that the Court issue the accompanying proposed Warrants and

Orders for prospective and historical location information and pen register information for

specified cellphones. As grounds for this Application, the Government relies on the following

facts and authorities.

## I. Introduction

1. I am an Assistant United States Attorney in the United States Attorney's Office for the

Southern District of New York. This Application is submitted in conjunction with the

accompanying affidavit of a law enforcement agent ("Agent Affidavit"), to be sworn before this

Court, and incorporated by reference herein. I make this Application based on information and

belief, including the Agent Affidavit, my review of other documents in the case, and information

received from investigative personnel.

2. The Investigating Agency, Target Cellphones, Target Subjects, Service Providers,

Target Offenses, and Successor Service Providers referenced in this Application are as specified

in the Agent Affidavit.

## II. Legal Authority

### A. Prospective Location Information

3. The Government seeks to obtain both precision location information and cell site data for the Target Cellphones on a prospective basis (the "Prospective Location Information") for a period of 45 days from the date of this order — the same period of time for which a warrant for a tracking device may be granted under Rule 41(e)(2)(C). It bears noting, however, that while the Prospective Location Information may permit "tracking" the users of the phones in the colloquial sense, this is not an application for a warrant for a "tracking device" as defined in Fed. R. Crim. P. 41(a)(2)(E) and 18 U.S.C. § 3117(b). Those provisions only apply where an agent is seeking to physically install a tracking device on a given object. Instead, the Prospective Location Information will be obtained by requiring the Service Providers to provide the information.

4. The authority for this application is found in 18 U.S.C. §§ 2703(c)(1), which authorizes a court of competent jurisdiction to require any electronic communication service provider (which includes a cellular telephone service provider[1]) to disclose any "record or other information pertaining to a subscriber" other than the "contents of communications," when the government obtains, *inter alia*, a warrant under the procedures of Rule 41. *See* 18 U.S.C. § 2703(c)(1)(A).[2]

---

[1] *See* 18 U.S.C. § 2711(1) (incorporating by cross-reference statutory definitions set forth in 18 U.S.C. § 2510); 18 U.S.C. § 2510(15) (defining "electronic communication service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications").

[2] Another provision of 18 U.S.C. § 2703(c)(1), specifically, § 2703(c)(1)(B), enables the Government to compel an electronic communication service provider to disclose non-content information pertaining to a subscriber by obtaining an order issued under 18 U.S.C. § 2703(d), instead of a warrant. Rather than requiring a showing of probable cause, a § 2703(d) order requires only a showing that there are reasonable grounds to believe that the information sought is relevant and material to an ongoing criminal investigation. However, given that continued monitoring of an individual's specific location through precision location information arguably implicates Fourth Amendment interests, *see United States* v. *Jones*, 132 S.Ct. 945, 964-65 (2012) (Alito, J.,

USAO_SDNY_00009236

Because data concerning a subscriber's location, such as precision location information and cell site data, constitutes "information pertaining to a subscriber" that does not include the "contents of communications," that data is among the types of information available under § 2703(c)(1)(A).[3] Further, as specified in 18 U.S.C. § 2711(3), this Court is a court of competent jurisdiction under the Stored Communications Act because it has jurisdiction over the Target Offenses.

5.   The Government's request for cell site data also implicates the pen register statute, because such data constitutes signaling information used by the Service Providers to route communications to and from the Target Cellphones.  In order to collect such data, a valid pen register order is required.[4]  Accordingly, I hereby certify pursuant to 18 U.S.C. § 3122 that such signaling information is relevant to an ongoing investigation being conducted by the Investigating Agency into suspected violations of the Target Offenses by the Target Subjects.

_____

concurring in the judgment), the Government here seeks to obtain the Precision Location Information sought herein by a § 2703(c) warrant rather than a § 2703(d) order.

[3] *See In re Application*, 460 F. Supp. 2d 448, 459–60 & n. 55 (S.D.N.Y. 2006) (Kaplan, J.) (cellphone location information falls within § 2703(c)(1)); *accord, e.g., United States* v. *Caraballo*, 963 F. Supp. 2d 341, 361 (D.Vt. 2013); *In re Order*, 632 F. Supp. 2d 202, 207 (E.D.N.Y. 2008); *In re Application*, 405 F. Supp. 2d 435, 444-45 (S.D.N.Y. 2005).  *But see In re Application*, 849 F. Supp. 2d 526, 574 (D.Md. 2011) (rejecting view that cellular location data falls within the scope of the SCA and finding that phone must be treated as "tracking device" for purposes of Rule 41 where used to collect location data); *In re Application*, 2009 WL 159187, at *5-*6 (S.D.N.Y. Jan.13, 2009) (McMahon, J.) (same).

[4] *See* 18 U.S.C. § 3121 (prohibiting use of pen register or trap and trace device without an order under the pen register statute); 3127(3)&(4) (defining pen register and trap and trace device to include devices or processes that record, *inter alia*, signaling information). Although cell site data constitutes "signaling" information within the meaning of the pen register statute, a separate statute precludes the Government from relying "solely" on the authority provided by the pen register statute to ascertain a subscriber's location.  47 U.S.C. § 1002(a).  Here, the Government seeks to obtain such data pursuant to 18 U.S.C. § 2703(c) as well as the pen register statute, rather than "solely" under the latter statute. *See In re Application*, 460 F. Supp. 2d at 456-59.

2018-03-31

**B.  Historical Location Information**

6.  The Government also seeks historical cell site data for the Target Cellphones for the period from March 1, 2018 to the present (the "Historical Location Information").  Because such data constitutes non-content information concerning a subscriber, the Court is authorized to order the Service Providers to provide this data pursuant to a warrant application under 18 U.S.C. § 2703(c) or an application for an order under 18 U.S.C. § 2703(d).  *See* 18 U.S.C. § 2703(c)(1)(B).  Pursuant to 18 U.S.C. § 2703(d), I respectfully submit that the Agent Affidavit offers specific and articulable facts showing that there are reasonable grounds to believe that the Historical Location Information is relevant and material to an ongoing criminal investigation.  Further, although a warrant for the Historical Location Information is not required, I respectfully submit that the same probable cause supporting the Government's request for a warrant to obtain the Prospective Location Information requested above also supports the issuance of a warrant under § 2703(c) for the Historical Location Information.[5]  In addition, the Government seeks toll records for the same period as the Historical Location Information is requested, which the Government is also authorized to obtain pursuant to 18 U.S.C. § 2703(d).

---

[5] A warrant is not required to obtain historical cell site information.  Individuals do not have a reasonable expectation of privacy in historical cell site information because individuals voluntarily convey that information to third-party service providers. *See, e.g., United States* v. *Graham*, ___ F.3d ___, 2016 WL 3068018, at *3 (4th Cir. May 31, 2016) *(en banc); United States v. Davis*, 785 F.3d 498, 511-13 (11th Cir. 2015) *(en banc); In re Application of U.S. for Historical Cell Site Data*, 724 F.3d 600, 614-15 (5th Cir. 2013); *United States* v. *Caraballo*, 963 F. Supp. 2d 341, 360 (D. Vt. 2013); *see also United States* v. *Pascual*, 502 F. App'x 75, 80 & n.6 (2d Cir. 2012), *cert. denied*, 134 S. Ct. 231 (2013) ("general principles" of third-party doctrine "point[]" toward this conclusion regarding cell-site records).  Moreover, because historical cell site information does not enable law enforcement to conduct live monitoring of a person's location within private spaces such as "the interior of the [person's] home," it is not comparable to prospective precision location information, for which a warrant is arguably required. *See In re Application of U.S. for Order Directing Provider of Elec. Commc'n Serv. to Disclose Records to Gov't*, 620 F.3d 304, 312-15 (3d Cir. 2010).

2018-03-31

### C.   Pen Register Information

7.   Finally, the Government seeks an order pursuant to 18 U.S.C. §§ 3121-26 authorizing the use of a pen register on the Target Cellphones for a period of 60 days from the date of this order.  Specifically, the Government seeks an order directing the Service Providers to furnish any information, facilities, and technical assistance necessary to operate, unobtrusively and with minimum disruption of service, a pen register and trap and trace device to capture all dialing, routing, addressing, or signaling information associated with each call transmitted to or from the Target Cellphones, as specified further in the proposed Warrants and Orders (the "Pen Register Information").

8.   I hereby certify pursuant to 18 U.S.C. § 3122 that the Pen Register Information is relevant to an ongoing investigation being conducted by the Investigating Agency into suspected violations of the Target Offenses by the Target Subjects.

### D.   Sealing and Non-Disclosure Order to Service Provider

9.   When the Government obtains records or information under § 2703(c), it is not required to notify the subscriber or customer.  18 U.S.C. § 2703(c)(3).  Additionally, the Government may obtain an order precluding the Service Providers from notifying the subscriber or any other third-party of the warrant or order obtained, for such period as the Court deems appropriate, where there is reason to believe that such notification will result in endangering the life or physical safety of an individual, flight from prosecution, destruction of or tampering with evidence, or intimidation of potential witnesses, or will otherwise seriously jeopardize the investigation.  18 U.S.C. § 2705(b).

10.   Further, 18 U.S.C. § 3123(d) provides that an order directing installation of a pen register or trap and trace device shall direct the pertinent service provider "not to disclose the

2018-03-31

existence of the pen register or trap and trace device or the existence of the investigation to the listed subscriber, or to any other person unless or until otherwise ordered by the Court."

11. Accordingly, as explained further in the Agent Affidavit, in light of the confidential nature of the continuing criminal investigation and the adverse consequences expected in the event of premature notification, the Government respectfully requests that the Court direct the Service Providers not to notify the Subscribers or any other person of the Warrants and Orders sought herein for a period of 180 days, subject to extension upon application to the Court, if necessary.

12. For similar reasons, I respectfully request that the proposed Warrants and Orders, this Application, and the accompanying Agent Affidavit, be maintained under seal until the Court orders otherwise, except that the Government be permitted without further order of this Court to serve this Warrants and Orders on the Service Provider; provide copies of the Warrants and Orders or the supporting Application and Agent Affidavit as need be to personnel assisting the Government in the investigation and prosecution of this matter; and disclose these materials as necessary to comply with discovery and disclosure obligations in any prosecutions related to this matter.

14. No prior request for the relief requested herein has been made.

Dated: New York, New York
       March 31, 2018

Sampson A. Enzer
Assistant United States Attorney
Tel.:212-637-2342

2018-03-31

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: Warrants and Orders For Prospective and Historical Location Information and Pen Register Information for the Cellphones Assigned Call Numbers "305-619-2656" and "516-724-3138," USAO Reference No. 2018R00088 | **AGENT AFFIDAVIT** <br><br> _____ Mag. _____ |

**Agent Affidavit in Support of Warrant and Order
for Cellphone Location and Pen Register Information**

STATE OF NEW YORK      )
                                         ) ss.
COUNTY OF NEW YORK  )

BRANDON RACZ, being duly sworn, deposes and states:

## I.  Introduction

1.  I am a Special Agent with the Federal Bureau of Investigation (the "FBI" or the "Investigating Agency") and am one of the law enforcement agents with primary responsibility for the investigation of this case.  During my tenure with the FBI, I have participated in the investigations of numerous frauds, and have conducted physical and electronic surveillance, the execution of search warrants, debriefings of informants, and reviews of taped conversations. Through my training, education, and experience, I have become familiar with the manners in which securities and wire frauds are perpetrated.

2.  **Requested Information.**  I respectfully submit this Affidavit pursuant to 18 U.S.C. §§ 2703(c) and (c)(1)(A) and the applicable procedures of Federal Rule of Criminal Procedure 41; 18 U.S.C. §§ 2703(d) & 2705; and 18 U.S.C. §§ 3121-3126, in support of Warrants and Orders for prospective location information, historical location information, toll records, and pen register

information, for the Target Cellphones identified below (collectively, the "Requested Information").

3. **Basis for Knowledge.** The criminal investigation in this matter is being conducted by the FBI. The information contained in this Affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources and agents, including documents and information provided to me by representatives of the United States Securities and Exchange Commission ("SEC") conducting a parallel investigation relating to this matter, and my examination of reports and records. Because this Affidavit is being submitted for the limited purpose of establishing probable cause to obtain the Requested Information, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated. Where dates, figures, and calculations are set forth herein, they are approximate.

4. **Target Cellphones, Target Subjects, and Service Providers.** The Target Cellphones referenced in this Affidavit are: (a) the cellphone assigned call number "305-619-2656" (the "Target Cellphone-1"), with service provided by Verizon Wireless (the "Service Provider-1"); and (b) the cellphone assigned call number "516-724-3138" (the "Target Cellphone-2"), with service provided by AT&T / New Cingular Wireless PCS, LLC (the "Service Provider-2"). Hereinafter, the Target Cellphone-1 and Target Cellphone-2 are referred to collectively as the "Target Cellphones," and the Service Provider-1 and the Service Provider-2 are referred to collectively as the "Service Providers." Based on the information set forth below, I respectfully submit that there is probable cause to believe that the Target Cellphone-1 has been used and is being used by ROBERT FARKAS, a/k/a "Bob" (the "Target Subject-1"), and that the Target Cellphone-2 has

2

USAO_SDNY_00009242

been and is being used by SOHRAB SHARMA, a/k/a "Sam Sharma" (the "Target Subject-2") (both target subjects collectively, the "Target Subjects").

5. **Precision Location Capability.** Cellphone service providers have technical capabilities that allow them to collect at least two kinds of information about the locations of the cellphones to which they provide service: (a) precision location information, also known as E-911 Phase II data, GPS data, or latitude-longitude data, and (b) cell site data, also known as "tower/face" or "tower/sector" information. Precision location information provides relatively precise location information about a cellphone, which a provider can typically collect either via GPS tracking technology built into the phone or by triangulating the device's signal as received by the provider's nearby cell towers. Cell site data, by contrast, reflects only the cell tower and sector thereof utilized in routing any communication to and from the cellphone, as well as the approximate range of the cellphone from the tower during the communication (sometimes referred to as "per-call measurement" ("PCM") or "round-trip time" ("RTT") data). Because cell towers are often a half-mile or more apart, even in urban areas, and can be ten or more miles apart in rural areas, cell site data is typically less precise than precision location information. Based on my training and experience, I know that the Service Providers have the technical ability to collect precision location information from any cellphone on its network, including by initiating a signal on the Service Providers' network to determine the phone's location. I further know that cell site data is routinely collected by the Service Providers in the course of routing calls placed to or from any cellphone on its network.[1]

---

[1] Toll records are sometimes necessary or helpful in order to obtain or interpret historical cell site data and are therefore also requested herein.

3

USAO_SDNY_00009243

6. **Successor Service Providers.**  Because it is possible that the Target Subjects may change cellphone service providers during the course of this investigation, it is requested that the warrant and investigative order requested apply without need for further order to any Successor Service Providers who may provide service to the Target Cellphones during the time frames at issue herein.

## II.   Facts Establishing Probable Cause

7.  Although I understand that probable cause is not necessary to obtain all of the Requested Information, I respectfully submit that probable cause exists to believe that the Requested Information will permit law enforcement to locate and arrest ROBERT FARKAS, a/k/a "Bob," and SOHRAB SHARMA, a/k/a "Sam Sharma," the Target Subjects, for whom the Government is seeking arrest warrants based on an accompanying criminal complaint (the "Criminal Complaint") that is being filed simultaneously herewith charging FARKAS and SHARMA with securities fraud (in violation of 15 U.S.C. §§ 78j(b) & 78ff; 17 C.F.R. § 240.10b-5; and 18 U.S.C. § 2) and wire fraud (in violation of 18 U.S.C. §§ 1343 and 2) and conspiring to commit these offenses (in violation of 18 U.S.C. §§ 371 and 1349) (collectively, the "Target Offenses").

## Probable Cause as to the Target Offenses

8.  The Criminal Complaint seeking warrants for the arrests of ROBERT FARKAS, a/k/a "Bob," and SOHRAB SHARMA, a/k/a "Sam Sharma," the Target Subjects, and the facts sworn to in my Affidavit contained in the Criminal Complaint, are respectfully incorporated by reference as though fully set forth herein.  Based on the facts detailed in the Criminal Complaint, I respectfully submit that there is probable cause to believe that during the period from in or about July 2017 through in or about March 2018, FARKAS and SHARMA used Centra Tech, Inc. ("Centra Tech"), a cryptocurrency exchange company founded by SHARMA and others, to engage

4

USAO_SDNY_00009244

in a scheme to raise tens of millions of dollars' worth of capital by offering unregistered securities to the public, and in doing so, made multiple fraudulent misstatements and omissions to the public about, among other things, the purported technology and products offered by Centra Tech, and its purported partnerships with certain financial institutions. As set forth in the Criminal Complaint, at various times FARKAS has served as Centra Tech's Chief Operating Officer and SHARMA has served as Centra Tech's President.

9. Based on my discussions with representatives of the SEC conducting a parallel investigation of Centra Tech and its senior executives, including ROBERT FARKAS, a/k/a "Bob," and SOHRAB SHARMA, a/k/a "Sam Sharma," I have learned, in substance and in part, that in or about the fourth quarter of 2017, the SEC issued a subpoena to Centra Tech for documents and other information, and that Centra Tech and its founders are thus aware of the SEC's parallel investigation and have been making productions of documents to the SEC in response.

10. During several telephone conversations and communications on or about March 29 and 30, 2018, an in-house attorney at Centra Tech (the "In-House Attorney") reported information to an attorney at a financial regulatory authority (the "Regulatory Attorney") that has led the In-House Attorney to believe that Centra Tech's Chief Operating Officer, ROBERT FARKAS, a/k/a "Bob" may be planning to flee from the United States. Based on my interview of the Regulatory Attorney about those conversations with the Centra Tech In-House Attorney on or about March 29 and 30, 2018, I have learned that during those conversations, the Centra Tech In-House Attorney stated the following, in substance and in part:

    a. The Centra Tech In-House Attorney learned earlier this week that the SEC has been investigating whether Centra Tech has engaged in fraudulent activity.

    b. ROBERT FARKAS recently asked the In-House Attorney via email to conduct research regarding foreign extradition laws.

5

2018-03-31

c.  After the In-House Attorney performed this extradition research and reported the results to FARKAS, FARKAS approached the In-House Attorney in person and stated, in substance and in part, that he had deleted his email asking the In-House Attorney to perform this extradition research. Based on FARKAS' demeanor during this interaction and the way in which he made that statement about deleting his email, the In-House Attorney understood FARKAS to be suggesting that the In-House Attorney should also delete the copy of that email that the In-House Attorney had received from FARKAS regarding the extradition research.

d.  The In-House Attorney reported to the Regulatory Attorney that the In-House Attorney has not seen the "owner" of Centra Tech in over a week — which I believe, based on my training and experience and participation in the investigation of this case, to be a reference to SOHRAB SHARMA, a/k/a "Sam Sharma," who has served at various times as the President of Centra Tech.

e.  The In-House Attorney also learned this week that Centra Tech's bank account has been depleted, and that FARKAS is planning to fly from Florida to Korea on or about Monday April 2, 2018.

f.  The In-House Attorney also conveyed that Centra Tech has terminated virtually all of its employees except certain top executives such as FARKAS and SHARMA.

11. Based on my review of records provided by Delta Airlines, I have learned that on or about March 27, 2018, ROBERT FARKAS, booked Delta Airlines flights for himself and a co-traveler identified as "Daniel Gonzalez," which is the name of an individual who is believed to be employed by Centra Tech, to fly from Fort Lauderdale, Florida to Incheon, South Korea via a Delta Airlines flight leaving Fort Lauderdale-Hollywood International Airport in Florida on or about Sunday April 1, 2018 at approximately 8:00PM, with a stopover at Hartfield-Jackson Atlanta International Airport in Georgia to catch a connecting Delta Airlines flight that will arrive at Incheon International Airport in South Korea on or about Monday April 2, 2018.[2] According to

---

[2]  Delta Airlines has also been asked to provide records about any flights booked for SOHRAB SHARMA, a/k/a "Sam Sharma." Delta Airlines has informed me on or about March 30, 2018 that Delta Airlines has not been able to find any record of a current booking scheduling SHARMA for any upcoming international flights out of the United States, but Delta Airlines has not yet produced any records of any historical bookings for any past international travel by SHARMA in response to this request.

2018-03-31

USAO_SDNY_00009246

these records, FARKAS and his co-traveler, "Daniel Gonzalez," have also booked return flights that would have them leave from Incheon International Airport in South Korea and arrive at Fort Lauderdale-Hollywood International Airport in Florida on or about April 5, 2018.

12. Based on my training and experience, my conversations with other law enforcement officials, and my review of documents and information maintained by the Department of Justice's Office of International Affairs, I have learned that although the Republic of Korea in South Korea has entered into an extradition treaty with the United States, South Korea is a location from which a fugitive can travel to numerous countries that do not have an extradition treaty with the United States.

## Probable Cause as to the Target Cellphones

13. Based on the following information, I respectfully submit that that there is probable cause to believe that the Target Cellphone-1, with service provided by the Service Provider-1, has been and is being used by ROBERT FARKAS, a/k/a "Bob":

    a.  I have reviewed documents produced by Centra Tech to the SEC in connection with the SEC's parallel investigation of Centra Tech and its senior executives, including an email chain from October 2017 in which ROBERT FARKAS used his Centra Tech email account ("Robert Farkas <robert@centra.tech>") to communicate with a *New York Times* reporter seeking to interview him about Centra Tech.  This email chain includes an email dated October 10, 2017 from the reporter to FARKAS in which the reporter asked "What number can I reach you at?", to which FARKAS responded by email the same day "305 619 2656," which is the call number for the Target Cellphone-1.

    b.  Based on my review of records provided by Delta Airlines, I have learned that in booking the travel arrangements on or about March 27, 2018 to fly on or about Sunday April 1, 2018 from Fort Lauderdale, Florida to arrive in South Korea on or about Monday April 2, 2018, ROBERT FARKAS provided "3056192656" (which, as noted, is the call number for the Target Cellphone-1) as his current telephone number, and the email address "robert@centra.tech" as his current email address.[3]

---

[3] Based on my review of law enforcement databases, I have learned that Service Provider-1 is the service provider for the Target Cellphone-1.

2018-03-31

USAO SDNY_00009247

14. Based on the following information, I respectfully submit that that there is probable cause to believe that the Target Cellphone-2, with service provided by the Service Provider-2, has been and is being used by SOHRAB SHARMA, a/k/a "Sam Sharma":

    a.   I have reviewed documents produced by Centra Tech to the SEC in connection with the SEC's parallel investigation of Centra Tech and its senior executives, including an email chain from August 2017 in which SOHRAB SHARMA, a/k/a "Sam Sharma," used his Centra Tech email account ("Sam Sharma <sam@centra.tech>) to communicate with a *NewsWatch* reporter seeking to interview him about Centra Tech.  This email chain includes an email dated August 22, 2017 from the reporter to SHARMA in which the reporter asked SHARMA to contact him if he was interested in being interviewed on *NewsWatch*, to which SHARMA responded by an email dated August 24, 2017 "Call my cell: 516-724-3138," which is the call number for the Target Cellphone-2.

    b.   Based on my review of records provided by the Service Provider-2 for the Target Cellphone-2, I have learned that the Target Cellphone-2 is reportedly subscribed to a "Rakesh Sharma," who appears to be a relative of SOHRAB SHARMA, a/k/a "Sam Sharma," and also that the Target Cellphone-2 (believed to be used by SOHRAB SHARMA, a/k/a "Sam Sharma") has received several calls from the Target Cellphone-1 (believed to be used by ROBERT FARKAS, a/k/a "Bob"), including several calls on or about January 31, 2018.

    c.   Based on information provided by a representative of the Service Provider-2 on or about March 30, 2018, the Target Cellphone-2 was active as of that date.

15. Based on the foregoing, I respectfully submit that there is probable cause to believe that the Target Cellphones have been and are being used by ROBERT FARKAS, a/k/a "Bob," and SOHRAB SHARMA, a/k/a "Sam Sharma," the Target Subjects, and that the Requested Information will assist law enforcement in locating them to enable law enforcement to arrest them based on the charges set forth in the Criminal Complaint.  Furthermore, based on my training and experience, I respectfully submit that there is probable cause to believe that the requested historical location information for the Target Cellphones will enable law enforcement to identify any locations that the Target Subjects have frequented in the past month in order to aid law enforcement

2018-03-31

USAO_SDNY_00009248

in identifying locations where FARKAS and SHARMA may return so that they can be apprehended.  Similarly, based on my training and experience, I respectfully submit that the requested prospective location information for the Target Cellphones will aid law enforcement in identifying the location of each of FARKAS and SHARMA in real time to arrest each of them.

### III.  Request for Warrant and Order

16. Based on the foregoing, I respectfully request that the Court require the Service Providers to provide the Requested Information as specified further in the Warrants and Orders proposed herewith, including prospective precision location and cell site data for a period of 45 days from the date of the Orders, historical cell site data and toll records for the period from March 1, 2018, through the date of the Orders, and pen register information for a period of 60 days from the date of the Orders.

9

2018-03-31

17. Nondisclosure.  ROBERT FARKAS, a/k/a "Bob," and SOHRAB SHARMA, a/k/a "Sam Sharma," the Target Subjects, are currently at liberty.  The existence of this ongoing criminal investigation into their involvement in the Target Offenses have not been made public.  As a result, premature public disclosure of this Affidavit or the requested Warrants and Orders could alert the Target Subjects of this investigation, causing them to stop using or destroy the Target Cellphones to prevent law enforcement from using them to locate the Target Subjects or to destroy other evidence, flee from prosecution, or otherwise seriously jeopardize the investigation.  Accordingly, I respectfully request that the Service Providers be directed not to notify the subscriber or others of the existence of the Warrants and Orders for a period of 180 days, and that the Warrants and Orders and all supporting papers be maintained under seal until the Court orders otherwise, as specified in the Application submitted in conjunction with this Affidavit.

BRANDON RACZ
Special Agent
Federal Bureau of Investigation

Sworn to before me this
31st of March 2018

HONORABLE JAMES L. COTT
United States Magistrate Judge
Southern District of New York

10

USAO_SDNY_00009250

# EXHIBIT C

17

USAO_SDNY_00009251

AO 106 (SDNY Rev. 01/17)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

The Safe Deposit Box described in the Attachment
AI and any Closed Containers/Items Stored Therein.

Case No. 18-mj-2532-CMM

## APPLICATION FOR A SEARCH AND SEIZURE WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attached Affidavit and its Attachment AI

located in the _____ Southern _____ District of _____ Florida _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attached Affidavit and its Attachment AII.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section(s) | Offense Description(s) |
|---|---|
| Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 371, 1343, 1349, and 2. | Conspiracy to commit securities fraud; conspiracy to commit wire fraud; securities and wire fraud; and aiding and abetting such crimes. |

The application is based on these facts:

See Attached Affidavit and its Attachments AI and AII.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent DAnne Murphy, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 4-10-18

_____
*Judge's signature*

City and state: Miami, FL 33128

Hon. Chris M. McAliley, U.S. Magistrate Judge
*Printed name and title*

USAO_SDNY_00009252

## AFFIDAVIT

I, DAnne Murphy, a Special Agent with the Federal Bureau of Investigation ("FBI")

being duly sworn, hereby depose and state as follows:

## I.  Introduction

### A.  Affiant

1.      I am currently employed as a Special Agent with the Federal Bureau of
Investigation ("FBI") and have been so employed since December 2004. I am currently assigned
to the FBI's corporate securities fraud squad within the FBI's Miami Field Office, which
investigates complex financial crimes, including crimes involving securities fraud, wire fraud,
bank fraud, money laundering, and other white-collar crimes.  During my tenure with the FBI, I
have participated in numerous investigations, I have conducted physical and electronic
surveillance, I have participated in the execution of search warrants, debriefings of informants,
and several arrests.

2.      I make this Affidavit in support of an application pursuant to Rule 41 of the Federal
Rules of Criminal Procedure for a warrant to search the premises specified below and in
Attachment AI (the "Subject Premises") for, and to seize, the items and information described in
Attachment AII, as part of a criminal investigation by the FBI of certain members of a
cryptocurrency startup company called Centra Tech, Inc. ("Centra Tech" or "Centra"), including
two of Centra Tech's co-founders, SOHRAB SHARMA and ROBERT FARKAS, for conspiring
to commit, and the commission of, securities and wire fraud in connection with a scheme to induce
victims to invest more than $25 million in investments in Centra Tech through fraudulent
misrepresentations and omissions.

3.      I am one of several FBI agents from the FBI's Miami Field Office assisting the case
agents from the FBI's New York Field Office, which has primary responsibility for the

investigation in this matter.   This Affidavit is based upon my personal knowledge; my conversations with other law enforcement personnel, including one of the case agents from the FBI's New York Field Office with primary responsibility for the investigation of this matter ("Case Agent-1"); my review of documents and other evidence; and my training, experience and advice received concerning the use of computers, technology, and the internet in criminal activity and the forensic analysis of electronically stored information.  Because this Affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

**B.  The Subject Premises**

4.       The premises to be searched are more fully described as follows:  A Citibank safe deposit box, assigned a unique account number (namely, Account No. 688498160370000057), located in the Citibank Branch at 2750 Aventura Boulevard, Aventura, Florida 33180, including any closed and locked cabinets and containers found inside of this safe deposit box (the "Subject Premises"), as set forth in Attachment A1.  As shown below, the safe deposit box referred to herein as the Subject Premises was opened in the name of "Robert J. Farkas," one of the Centra Tech co-founders who has been charged by criminal complaint in the Southern District of New York with conspiring to commit, and the commission of, securities and wire fraud, and is believed to contain, among other things, half of a piece of paper with part of an access code to a digital wallet containing millions of dollars' worth of digital assets that were raised from victims of the charged fraud offenses.

C. **The Subject Offenses**

5.      For the reasons detailed below, there is probable cause to believe that the Subject Premises contains evidence, fruits, and instrumentalities of conspiracy to commit securities fraud in violation of Title 18, United States Code, Section 371, securities fraud and aiding and abetting the same, in violation of Title 15, United States Code, Section 78j(b) and 78ff and Title 18, United States Code, Section 2, conspiracy to commit wire fraud in violation of Title 18, United States Code, Section 1349, and wire fraud and aiding and abetting the same in violation of Title 18, United States Code, Sections 1343 and 2 (collectively, the "Subject Offenses").

## II.  Probable Cause

### A.  Probable Cause Regarding Commission of the Subject Offenses

6.      On or about March 31, 2018, United States Magistrate Judge James L. Cott of the Southern District of New York signed: (1) a criminal complaint charging SOHRAB SHARMA and ROBERT FARKAS with the Subject Offenses (the "Criminal Complaint"); (2) arrest warrants authorizing their arrests based on the charges set forth in the Criminal Complaint; and (3) warrants and orders directing the service providers for a cellphone associated with SHARMA and a cellphone associated with FARKAS to provide cellphone location information to the FBI that was issued based on the facts set forth in a supporting warrant affidavit (the "Warrant Affidavit"). Copies of the Criminal Complaint and Warrant Affidavit are attached hereto as Exhibits A and B and are incorporated by reference as though fully set forth herein.

7.      Based on the facts detailed in the Criminal Complaint and the Warrant Affidavit, I respectfully submit that there is probable cause to believe the following, in substance and in part:

   a.      From at least in or about July 2017 through in or about March 2018, SOHRAB SHARMA and ROBERT FARKAS, two co-founders of Centra Tech, began soliciting investors to purchase Centra Tech tokens, a cryptocurrency that functions as an unregistered security in Centra Tech, through a so-called "initial coin offering" or "ICO." As part of this effort, SHARMA and FARKAS, in oral and written offering

materials that were disseminated via the internet, represented that Centra Tech had developed a debit card, namely the so-called "Centra Card," that allowed users to spend the cryptocurrency of their choice to make purchases at any establishment that accepts Visa or Mastercard.

     b.     In soliciting investors to purchase unregistered securities in the form of Centra Tech tokens, SHARMA and FARKAS represented that Centra Tech had formed a partnership with Bancorp to have Bancorp issue Centra Cards licensed by Visa or Mastercard, and that Centra Tech held financial servicing licenses in 38 states, among other claims. Based in part on these claims, victims provided funds worth more than $25 million in investments for the purchase of Centra Tech tokens.

     c.     The claims that SHARMA and FARKAS made to help secure these investments, however, were false. In fact, Centra Tech had no such relationships with Bancorp, Visa, or Mastercard, and at least seven of those 38 states have no record of any such licenses being issued to Centra Tech.

8.     Based on my involvement in assisting the case agents on this matter, and my conversations with the Case Agent-1, I have learned that SHARMA and FARKAS were arrested on or about April 1, 2018, in the Southern District of Florida based upon the charges set forth in the Criminal Complaint. Both were presented on the Criminal Complaint before United States Magistrate Judge Lurana S. Snow in the Southern District of Florida on or about April 2, 2018. SHARMA and FARKAS subsequently consented to their detention and removal to the Southern District of New York for further proceedings on the Criminal Complaint, without prejudice to their ability to apply for their releases on bail upon their arrival in the Southern District of New York.

**B. Probable Cause Justifying Search of the Subject Premises**

9.     For the reasons described below, there is probable cause to believe that: (a) millions of dollars' worth of funds raised from victims based on the fraudulent scheme charged in the Criminal Complaint have been placed by Centra Tech in a digital wallet that can only be accessed with a unique passcode; (b) those victim funds, which represent proceeds and fruits of the Subject Offenses charged in the Criminal Complaint, are presently in the digital wallet; (c) the passcode to access the digital wallet was written on a piece of paper that was subsequently divided into

halves, with one half kept by Centra Tech's Chief Operating Officer, ROBERT FARKAS, and the

other half kept by Centra Tech's General Counsel and Chief Compliance Officer, Allen Shutt; (d)

the half of the paper given to FARKAS, containing part of the passcode, was placed in the Subject

Premises, which, as described above, is a Citibank safe deposit box in FARKAS' name located in

a Citibank branch in Aventura, Florida; (e) the other half of the paper given to Shutt, containing

the remainder of the passcode, was placed in a safe deposit box in Shutt's name at a Well Fargo

bank located in Florida; and (f) the Subject Premises therefore contains evidence, fruits, and

instrumentalities of the Subject Offenses, as more fully described in Section II of Attachment A to

the proposed warrant sought by this Affidavit.

10.     Based on my review of the Criminal Complaint and Warrant Affidavit, and my

conversations with the Case Agent-1 about information that he has received as part of the criminal

investigation in this matter, and about Case Agent-1's conversations with other law enforcement

and SEC officials working on this criminal investigation and a related securities investigation, I

have learned the following, in substance and in part:

    a.     In or about the fourth quarter of 2017, the SEC initiated an investigation of
Centra Tech.  As part of that investigation, the SEC issued a subpoena on or about
November 29, 2017 to Centra Tech, care of Centra Tech's outside counsel at a law firm
that was retained to represent Centra Tech.  The subpoena compelled Centra Tech to
produce a variety of documents, including various documents relating to two of Centra
Tech's co-founders, SOBRAH SHARMA and ROBERT FARKAS.

    b.     During Centra Tech's outside counsel's representation of Centra Tech, the
outside counsel engaged in several conversations with representatives of the SEC working
on the SEC's investigation. Centra Tech's outside counsel also had separate conversations
with representatives of the United States Attorney's Office for the Southern District of New
York and the FBI with respect to the parallel criminal investigation relating to Centra Tech.
During these conversations, Centra Tech's outside counsel represented the following, in
substance and in part, on behalf of Centra Tech:

        i.     During Centra Tech's offering of Centra Tech tokens to members of the
public during the period from approximately July 2017 through October 2017,
purchasers of Centra Tech tokens provided funds in the form of digital currency

(such as funds in a cryptocurrency known as "Ether") in exchange for Centra Tech tokens. (Based on the facts set forth in the Criminal Complaint, there is probable cause to believe that these funds were solicited through fraudulent misrepresentations and omissions by SOHRAB SHARMA and ROBERT FARKAS, two co-founders of Centra Tech, as part of their commission of the Subject Offenses, and thus that those funds represent proceeds and fruits of the Subject Offenses .)

       ii.    Centra Tech subsequently placed digital funds raised from investors in a particular digital wallet, which can only be accessed with a unique passcode.[1] The passcode to access this digital wallet has been written on a piece of paper that was divided into halves that were given to Centra Tech's Chief Operating Officer, ROBERT FARKAS, and Centra Tech's General Counsel and Chief Compliance Officer, Allen Shutt, respectively. The combination of those halves of the paper represents the only copy of the passcode. If part of the passcode were lost, there would be no way to access the digital wallet or retrieve the funds that have been stored in the digital wallet.

       iii.    The half of the paper given to FARKAS, containing part of the passcode, was placed in a safe deposit box in FARKAS' name at a bank; and the other half of the paper given to Shutt, containing the remainder of the passcode, was placed in a safe deposit box in Shutt's name in a different bank.

       iv.    One of these safe deposit boxes is at a Citibank branch in Florida, and the other is at a Wells Fargo branch in Florida.[2] (For the reasons explained below, it is believed that the safe deposit box at Citibank is for FARKAS, and the safe deposit box at Wells Fargo is for Shutt.)

       c.    Citibank has provided the following information to the Case Agent-1, in substance and in part:

       i.    The Citibank Branch at 2750 Aventura Boulevard, Aventura, Florida 33180 has a safe deposit, opened in the name of a "Robert J. Farkas" with a date of birth of October 8, 1986, that has been assigned a unique account number (namely, Account No. 68849816037000057). As set forth above, this safe deposit box has

---

[1] Based on my training and experience, I know that a "digital wallet" is an electronic system that allows its user to engage in digital transactions by, for example, securely storing the user's money and permitting the user to access the user's money to engage in transactions. The money stored in such a digital wallet is typically "digital currency" or "cryptocurrency," which refer to a digital representation of value that be digitally traded, such as "Bitcoin" or "Ether."

[2] I have been informed by the Case Agent-1 that Centra Tech, through its outside counsel and its General Counsel and Chief Compliance Officer, Allen Shutt, are working to provide law enforcement authorities with voluntary, consensual access to the safe deposit box maintained at Wells Fargo.

been defined and referred to herein as the "Subject Premises." (Based on my review of criminal history records of the ROBERT FARKAS charged in the Criminal Complaint, I have learned that FARKAS has the same date of birth and the same middle initial as the "Robert J. Farkas" who opened that Citibank safe deposit box, and thus, there is probable cause to believe that FARKAS is the person who opened that Citibank safe deposit box.) Citibank has no record of any other safe deposit boxes opened in the name of ROBERT FARKAS, and has no record of any safe deposit boxes opened in the name of Allen Shutt.

ii.  Last week, following the arrest of FARKAS on or about April 1, 2018 on the charges set forth in the Criminal Complaint, an unidentified female called the Citibank branch in which the Subject Premises is located and demanded access to the Subject Premises, claiming that she had a power of attorney signed by ROBERT FARKAS giving her authorization to access and retrieve the contents of the Subject Premises. This demand was denied by Citibank because, among other reasons, only FARKAS himself is authorized to access the Subject Premises.

d.  Based on the foregoing, I respectfully submit that there is probable cause to believe that the Subject Premises is the safe deposit box containing the paper fragment given to FARKAS containing a portion of the passcode needed to access the digital wallet containing funds raised from investors who purchased Centra Tech tokens based on the fraudulent misrepresentations and omissions detailed in the Criminal Complaint.

e.  According to Case Agent-1, the digital funds contained in the digital wallet were worth approximately $39,652,000.00 as of April 9, 2018.

11.  Based on the foregoing, my training and experience, the facts set forth in the Criminal Complaint and Warrant Affidavit, my involvement in assisting the case agents from FBI's New York Regional Office on this investigation, and my conversations with the Case Agent-1, I believe and respectfully submit that there is probable cause to believe that: (a) millions of dollars' worth of digital funds raised from victims of the Subject Offenses that SOHRAB SHARMA and ROBERT FARKAS have been charged with committing by the Criminal Complaint, representing the proceeds and fruits of the Subject Offenses, are contained in the above-described digital wallet; (b) given FARKAS' association with and control of the Subject

Premises, the recovery from the Subject Premises of a paper fragment containing a portion of the passcode to access that digital wallet and retrieve the victim funds from it would constitute evidence of the Subject Offenses, including, for example, proof of FARKAS' control of those victim funds; and (c) the victim funds in that digital wallet are both evidence and fruits of the Subject Offenses, and the recovery by law enforcement of the portion of the passcode in the Subject Premises is a prerequisite that is necessary to enable law enforcement to access that digital wallet and seize those victim funds both as evidence in this matter and to prevent their dissipation.

12. Furthermore, based on the foregoing and on my training and experience, I know that individuals involved in criminal activity often use safe deposit boxes such as the Subject Premises to hide proceeds of criminal activity such as the Subject Offenses and also evidence of criminal activity such as the Subject Offenses. It is not uncommon for a criminal to hide a record of incriminating information, such as a handheld digital device, or a thumb drive containing data concerning the operation of an illegal scheme, in a safe deposit box such as the Subject Premises, as well as documents showing the criminal's control of and association with the incriminating evidence kept in the box.

## III. Conclusion

13. Based on the foregoing, I respectfully submit that there is probable cause to believe that SOHRAB SHARMA and ROBERT FARKAS committed the Subject Offenses as charged in the Criminal Complaint, and that evidence, contraband, fruits, and instrumentalities, as described in Attachment AII, of the Subject Offenses, will be found during a search of the Subject Premises, which is further described above and in Attachment AI to this Affidavit.

14.     Accordingly, I respectfully request that the Court issue a warrant to search the

Subject Premises and seize the items and information specified in Attachment AII to this Affidavit

and to the proposed search and seizure warrant.

DANNE MURPHY
Special Agent
Federal Bureau of Investigation

Sworn to before me on
April 10, 2018

HON. CHRIS M. MCALILEY
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF FLORIDA

AO 93 (SDNY Rev. 01/17) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

The Safe Deposit Box described in Attachment AI and
any Closed Containers/Items Stored Therein.

)
)
)
)
)
)

Case No. 18-mj-2532-cMM

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____Southern_____ District of _____Florida_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment AI

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property
to be seized)*:

See Attachment AII

The search and seizure are related to violation(s) of *(insert statutory citations)*:

Title 15, United States Code, Sections 78j(b) and 78ff; Title 18, United States Code, Sections 371, 1343, 1349, and 2.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or
property.

**YOU ARE COMMANDED** to execute this warrant on or before _____April 24, 2018_____
                                                                                                        *(not to exceed 14 days)*

☑ in the daytime  6:00 a.m. to 10 p.m.        ☐ at any time in the day or night as I find reasonable cause has been
                                                                          established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property
taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the
place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an
inventory as required by law and promptly return this warrant and inventory to the Clerk of the Court.

☐ Upon its return, this warrant and inventory should be filed under seal by the Clerk of the Court.
                                                                                                                        USMJ Initials

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay
of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be
searched or seized *(check the appropriate box)*  ☐ for _____ days *(not to exceed 30)*.
                                                                    ☐ until, the facts justifying, the later specific date of _____.

                                                                                                     4:40 p.m.

Date and time issued:  April 10, 2018                        _____
                                                                                               *Judge's signature*

City and state:      Miami, Fla                          Hon. Chris M. McAliley, U.S. Magistrate Judge
                              33128                                   *Printed name and title*

USAO_SDNY_00009262

AO 93  (SDNY Rev. 01/17) Search and Seizure Warrant (Page 2)

| | Return | |
|---|---|---|
| Case No.: 18-MJ-2532-CMM | Date and time warrant executed: 04/11/2018   9:15AM | Copy of warrant and inventory left with: Ana Teresa Rivera |

Inventory made in the presence of : .
SA Mark D. Christenson

Inventory of the property taken and name of any person(s) seized:

See receipt for Property dated 04/11/2018 executed at Citibank NA

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the Court.

Date:  04/11/2018

_____
Executing officer's signature

SA DAnne Murphy
Printed name and title

## ATTACHMENT A

### I.  Premises to be Searched—Subject Premises

The premises to be searched (the "Subject Premises") are described as follows, and include all locked and closed containers found therein:

A Citibank safe deposit box, assigned a unique account number (namely, Account No. 68849816037000057), opened in the name of "Robert J. Farkas," located in the Citibank Branch at 2750 Aventura Boulevard, Aventura, Florida 33180.

### II.  Items to Be Seized

#### A.  Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from the Subject Premises include the following evidence, fruits, and instrumentalities of conspiracy to commit securities fraud in violation of Title 18, United States Code, Section 371, securities fraud and aiding and abetting the same, in violation of Title 15, United States Code, Section 78j(b) and 78ff and Title 18, United States Code, Section 2, conspiracy to commit wire fraud in violation of Title 18, United States Code, Section 1349, and wire fraud and aiding and abetting the same in violation of Title 18, United States Code, Sections 1343 and 2 (collectively, the "Subject Offenses") described as follows:

1.      Any documents reflecting or concerning the passcode to a digital wallet containing funds raised from investors by Centra Tech, Inc. ("Centra Tech") and its co-founders, including Sohrab Sharma and Robert Farkas, in connection with Centra Tech's offering of unregistered securities in the form of Centra Tech tokens as part of a so-called "initial coin offering" ("ICO") that took place during the period from in or about July 2017 through October 2017, including the original paper fragment containing a portion of that passcode.

2.      Any documents showing that Farkas, Sharma, or anyone else affiliated with Centra Tech has or had access to, or control of, the Subject Premises or any of the items contained in it.

# Exhibit B

# Exhibit B

Approved: _____
NEGAR TEKEEI / SAMSON ENZER
Assistant United States Attorneys

Before:   HONORABLE JAMES L. COTT
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - x
                                :
                                :   **SEALED COMPLAINT**
UNITED STATES OF AMERICA        :
                                :   Violations of
        - v. -                  :   15 U.S.C. §§ 78j(b), 78ff;
                                :   17 C.F.R. §§ 240.10b-5; 18
                                :   U.S.C. §§ 371, 1343, 1349
SOHRAB SHARMA,                  :   and 2
    a/k/a "Sam Sharma," and     :
Robert Farkas,                  :
    a/k/a "Bob,"                :   COUNTY OF OFFENSES:
                                :   New York
           Defendants.          :
                                :
- - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

    BRANDON RACZ, being duly sworn, deposes and says that he is
a Special Agent with the Federal Bureau of Investigation ("FBI")
and charges as follows:

## COUNT ONE
### (Conspiracy To Commit Securities Fraud)

    1.   From at least in or about July 2017, up to and
including the date of this Complaint, in the Southern District
of New York and elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma,"
and ROBERT FARKAS, a/k/a "Bob," the defendants, and others known
and unknown, willfully and knowingly did combine, conspire,
confederate, and agree together and with each other to commit
offenses against the United States, to wit, securities fraud, in
violation of Title 15, United States Code, Sections 78j(b) and
78ff, and Title 17, Code of Federal Regulations, Section
240.10b-5.

    2.   It was a part and object of the conspiracy that SOHRAB
SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the
defendants, and others known and unknown, willfully and

knowingly, directly and indirectly, by use of the means and
instrumentalities of interstate commerce and of the mails, and
of the facilities of national securities exchanges, would and
did use and employ manipulative and deceptive devices and
contrivances in connection with the purchase and sale of
securities, in violation of Title 17, Code of Federal
Regulations, Section 240.10b-5, by (a) employing devices,
schemes, and artifices to defraud; (b) making untrue statements
of material fact and omitting to state material facts necessary
in order to make the statements made, in the light of the
circumstances under which they were made, not misleading; and
(c) engaging in acts, practices, and courses of business which
operated and would operate as a fraud and deceit upon persons,
in violation of Title 15, United States Code, Sections 78j(b)
and 78ff, to wit, the defendants and others known and unknown
participated in a scheme to defraud purchasers of Centra Tech,
Inc. ("Centra Tech") cryptocurrencies by making material
misrepresentations about Centra Tech, its purported partnerships
with Bancorp, Visa and Mastercard, its products, its licensing
in various states, and its executive personnel, causing
investors to purchase more than $25 million worth of Centra Tech
cryptocurrencies, which function as unregistered securities,
during the time period of Centra Tech's initial coin offering.

### Overt Acts

3.     In furtherance of the conspiracy and to effect its
illegal object, SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT
FARKAS, a/k/a "Bob," the defendants, and others known and
unknown, committed the following overt acts, among others, in
the Southern District of New York and elsewhere:

a.     On or about August 14, 2017, SHARMA, in an
interview by a cryptocurrency podcast, made material
misrepresentations about an initial coin offering for the
digital assets and cryptocurrency company Centra Tech, for which
he was a founder, President, and Chief Technology officer at
various times.

b.     On or about September 6, 2017, FARKAS, a chief
marketing officer for Centra Tech, sent an email to an
individual at a marketing company describing Centra Tech's
currency conversion capabilities as "allow[ing] real time
conversion of all supported cyrptocurrencies to give the user
the ability to spend their assets in real time anywhere in the
world that accepts Visa or Mastercard."

c.   On or about November 28, 2017, FARKAS attended a blockchain technology conference in New York City, New York, on behalf of Centra Tech, a sponsor of the conference, for the purpose of promoting Centra Tech and its products.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Securities Fraud)

4.   From at least in or about July 2017, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, and of the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, the defendants and others known and unknown participated in a scheme to defraud purchasers of Centra Tech cryptocurrencies by making material misrepresentations about Centra Tech, its purported partnerships with Bancorp, Visa and Mastercard, its products, its licensing in various states, and its executive personnel, causing investors to purchase more than $25 million worth of Centra Tech cryptocurrencies, which function as unregistered securities, during the time period of Centra Tech's initial coin offering.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT THREE
### (Conspiracy To Commit Wire Fraud)

5.   From at least in or about July 2017, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma,"

and ROBERT FARKAS, a/k/a "Bob," the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343.

6.   It was a part and an object of the conspiracy that SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, the defendants and others known and unknown participated in a scheme to defraud purchasers of Centra Tech cryptocurrencies by making material misrepresentations about Centra Tech, its purported partnerships with Bancorp, Visa and Mastercard, its products, its licensing in various states, and its executive personnel.

(Title 18, United States Code, Section 1349.)

## COUNT FOUR
### (Wire Fraud)

7.   From at least in or about July 2017, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, the defendants and others known and unknown participated in a scheme to defraud purchasers of Centra Tech cryptocurrencies by making material misrepresentations about Centra Tech, its purported partnerships with Bancorp, Visa and Mastercard, its products, its licensing in various states, and its executive personnel, and in the course of executing such scheme, caused interstate and international wires to be sent, including emails between New

York, New York and Florida and a location outside of the United States.

(Title 18, United States Code, Section 1343 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

8.    I have been a Special Agent with the FBI for approximately two and a half years. I am currently assigned to a squad that investigates white collar crimes, including complex financial frauds and conduct within the regulatory jurisdiction of the U.S. Securities and Exchange Commission ("SEC"). I have participated in investigations of such offenses, and have made and participated in arrests of individuals who have committed such offenses.

9.    The information contained in this Complaint is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources, including, but not limited to: (a) business records and other documents, such as trading records, bank records, telephone records, and records of electronic communications, including text messages; (b) publicly available documents; (c) conversations with, and reports of interviews with, non-law-enforcement witnesses; (d) conversations with, and reports prepared by, other agents; and (e) conversations with representatives from the U.S. Securities and Exchange Commission ("SEC"). Because this Complaint is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions and statements of and conversations with others are reported herein, they are reported in substance and in part. Where figures, calculations, and dates are set forth herein, they are approximate, unless stated otherwise.

## The Defendants and Relevant Entities

10.    Based on my review of publicly available information and records provided by Centra Tech to representatives of the SEC, I have learned the following, in substance and in part:

a.    Centra Tech is a Delaware corporation based in Miami Beach, Florida. Centra Tech advertises itself through its website, https://centra.tech (the "Centra Tech Website"), press releases, and statements on the Internet as a company that

5

offers various methods to store and spend digital assets such as cryptocurrencies. For example, the Centra Tech Website currently advertises that Centra Tech "offers blockchain products such as a Wallet to store digital assets, a Prepaid Card to spend the digital assets, and three soon to be released products and services, which include a Marketplace to buy goods with the digital assets, a cryptocurrency Exchange Platform to buy, sell and trade digital assets, and a open-source hyper speed DPoS Blockchain."

    b.   The following individuals, among others, are or have been employed at Centra Tech:

    i.   SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, was a founder of Centra Tech, its President, and its Chief Technology Officer. On October 31, 2017, Centra Tech announced that SHARMA was "stepping aside to support the continued growth of the company," and announced a "reconstituted executive management team" that did not include SHARMA.

    ii.   ROBERT FARKAS, a/k/a "Bob," has held various positions at Centra Tech, including as its chief marketing officer and chief operating officer.

    c.   The Bancorp, Inc. ("Bancorp") is a Delaware-based financial services company with offices throughout the United States. Bancorp provides a variety of financial services to companies and individuals, including issuing debit and prepaid cards, and payments processing, which it does by virtue of contractual partnerships with other financial services companies such as Visa and Mastercard, among others.

    d.   Visa Inc. ("Visa") is a U.S.-based multinational financial services corporation headquartered in Foster City, California. Visa facilitates electronic funds transfers throughout the world, most commonly through "Visa"-branded credit cards and debit cards.

    e.   Mastercard Incorporated ("Mastercard") is a U.S.-based multinational financial services corporation headquartered in Purchase, New York. Mastercard's principal business is to process payments between the banks of merchants and the card issuing banks or credit unions of the purchasers who use the "Mastercard" brand debit and credit cards to make purchases.

### Relevant Regulatory Background and Definitions

11. An "initial coin offering" ("ICO") is a type of fundraising event in which an entity offers participants a unique digital "coin" or "token" in exchange for consideration. The consideration often comes in the form of "virtual currency" or "cryptocurrency," but can also be "fiat currency," which is currency, like the U.S. dollar and the Euro, that a government has declared to be legal tender, but is not backed by a physical commodity. "Virtual currency" or "cryptocurrency" is a digital representation of value that can be digitally traded and functions as (1) a medium of exchange, (2) a unit of account, and/or (3) a store of value, but does not have legal tender status. Unlike fiat currency, like the U.S. dollar and the Euro, virtual currency is not issued by any jurisdiction and functions only by agreement within the community of users of that particular currency. Examples of virtual currency are Bitcoin and Ether.[1]

12. The tokens or coins issued in an ICO are issued and distributed on a "blockchain" or cryptographically-secured ledger. Tokens often are also listed and traded on online platforms, typically called virtual currency exchanges, and they usually trade for other digital assets or fiat currencies. Often, tokens are listed and tradeable immediately after they are issued.

13. ICOs are typically announced and promoted through the Internet and e-mail. Issuers usually release a "whitepaper" or "white paper" describing the project and the terms of the ICO. In order to participate in the ICO, investors are generally required to transfer funds to the issuer. After the completion of the ICO, the issuer will distribute its unique "coin" or "token" to the participants. The tokens may entitle the holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, and/or voting rights. These tokens may also be listed on online platforms, often called virtual currency exchanges, and be tradable for virtual currencies.

---

[1] Based on my training, experience, and participation in this investigation, I have learned that "Ether" is a cryptocurrency whose blockchain is generated by the Ethereum platform, and the term "Ether" is sometimes used interchangeably with "Ethereum."

14.   Under Section 2(a)(1) of the Securities Act of 1933, a security includes "an investment contract." 15 U.S.C. § 77b. An "investment contract" is a contract, transaction or scheme "whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *S.E.C.* v. *W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* at 301. Importantly, the economic realities of the transaction or product and not its name determine whether the instrument is a security. *United Hous. Found, Inc.* v. *Forman*, 421 U.S. 837, 851 (1975). Pursuant to Sections 5(a) and 5(c) of the Securities Act, a company or individual conducting an offer or sale of securities to the public must file a registration statement with the SEC. 15 U.S.C. § 77e(a) and (c).

## Overview of the Scheme to Defraud

15.   From at least July 2017 up to and including the day of this Complaint, SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, and others known and unknown, participated in a scheme to defraud purchasers of Centra Tech cryptocurrencies by making material misrepresentations about Centra Tech, its purported partnerships with Bancorp, Visa, and Mastercard, its products, its licensing in various states, and its executive personnel. Through these misrepresentations, SHARMA and FARKAS caused investors to purchase more than $25 million worth of Centra Tech cryptocurrencies, which function as unregistered securities, during the time period of Centra Tech's initial coin offering.

## The Centra Tech ICO

16.   As set forth in greater detail below, based on my participation in this investigation and my review of reports and records prepared by others, from in or about July 2017 through in or about October 2017, Centra Tech raised capital by offering unregistered securities via an ICO, to operate what Centra Tech advertised would be the world's first multi-blockchain debit card (the "Centra Tech ICO"). In sum, Centra Tech accepted digital currency from investors in exchange for Centra Tokens that Centra Tech stated could be "exchange[d] on the Cryptocurrency exchanges for a profit" and would "allow[] users to join [Centra Tech's] success and mission *while generating a profit*." (emphasis added). In doing so, Centra Tech made multiple false statements, including on the Centra Tech Website and in materials posted to the Centra Tech Website,

regarding, among other things, (a) the "Centra Card" or the "Centra Debit Card," a debit card that was falsely advertised as one that would allow users to make purchases using any blockchain currency of choice and would work at any location that accepted Visa or Mastercard, (b) Centra Tech's partnerships with Bancorp, Visa, and Mastercard, which did not exist, (c) individual state licenses held by Centra Tech, at least some of which did not exist, and (d) the identity of one of Centra Tech's executives, who does not appear to exist.

17.  Based on my review of publicly available information and records provided by Centra Tech to representatives of the SEC, among other sources, I have learned the following, in substance and in part:

a.  On or about July 23, 2017, Centra Tech issued a press release that it paid to be published on the website "cointelegraph.com" (the "July 23 Press Release").  In the July 23 Press Release, Centra Tech described the Centra Tech ICO as "truly a ground floor opportunity to be part of a global solution to the blockchain currency dilemma that offers a comprehensive rewards program for both token and card holders while giving the ability to spend your cryptocurrency in real time with no fees."  The July 23 Press Release also touted Centra Tech's products: (1) the "Centra Debit Card" which purported to "enable[] users to make purchases using their blockchain currency of choice," and "work[] anywhere that accepts Visa or MasterCard," (2) the "Centra Wallet App," which "makes it easy for people to register for the Centra Debit Card, store their cryptocurrency assets, as well as control its functions," and (3) "cBay," the "world's first Amazon type of marketplace created especially for cryptocurrency acceptance." The July 23 Press Release also advertised Centra Tech's "Currency Conversion Engine" as allowing users "the ability to spend their assets anywhere in the world that accepts Visa and/or MasterCard."

b.  On or about July 25, 2017, Centra Tech issued a press release that it paid to be published on the website Bitcoin.com (the "July 25 Press Release").  In the July 25 Press Release, Centra Tech described the Centra Tech ICO as "truly a ground floor opportunity to be part of a global solution to the blockchain currency dilemma that offers a comprehensive rewards program for both token and card holders while giving the ability to spend your cryptocurrency in real time with no fees."  The July 25 Press Release also touted Centra Tech's products: (1) the "Centra Debit Card" which purported to "enable[] users to

make purchases using their blockchain currency of choice," and
"work[] anywhere that accepts Visa or MasterCard," (2) the
"Centra Wallet App," which "makes it easy for people to register
for the Centra Debit Card, store their cryptocurrency assets, as
well as control its functions," and (3) "cBay," the "world's
first Amazon type of marketplace created especially for
cryptocurrency acceptance."   The July 25 Press Release also
advertised Centra Tech's "Currency Conversion Engine," as
allowing users "the ability to spend their assets anywhere in
the world that accepts Visa and/or MasterCard."

      c.   Centra Tech also posted several different
versions of a white paper advertising the Centra Tech ICO on the
Centra Tech Website.  A version of the ICO White Paper that was
downloaded from the Centra Tech Website on or about August 3,
2017 and labeled "FINAL DRAFT" ("White Paper-1") contained
several statements describing the ICO and the Centra Card using
terminology indicative of a securities offering.  For example:

      i.  White Paper-1 described the Centra Tech ICO as a
token offering for which 400 Centra Tokens, or "CTR"s, would be
sold for 1 ETH.  Based on my training, experience, and
participation in this investigation, I have learned that "ETH"
is the currency code for Ether, a cryptocurrency whose
blockchain is generated by the Ethereum platform.

      ii.  Centra Tech stated that it would be offering "68%
of all [Centra] Tokens to be created for purchase in our crowd
sale to the public" and would "allocate 20% of all [Centra]
Tokens created to distribution of bug bounty, business
development, community projects, market expansion, and more"
while "[t]he remaining 12% will be distributed to Centra Techs
founders, early investors, and employees as an incentive to
create a long lasting mutual interest and dedication to the
tokens and their prolonged value."

      iii.  In providing details about the Centra Card and
the Centra Tech ICO, White Paper-1 referenced different levels
of investment opportunity:

      1. The "Centra Black Card founders edition" was
to be issued to "our first 500 ICO backers whom purchase with
100+ ETH" and would carry with it an "enhanced rewards program."

      2. The "Centra Gold Card limited edition" would
be "allocated to our first 1000 contributors whom purchase CTR

Tokens with 30+ ETH," and would also carry an "enhanced rewards program."

     3. The "Centra Blue & Virtual Card" would be the "signature and traditional card."

    iv. White Paper-1 advertised multiple "rewards" programs for Centra Token holders. For example, White Paper-1 advertised that Centra Token holders would receive a ".8% ETH" reward for every transaction in the "network" (the "Network Rewards Program"). This was in contrast to another rewards program advertised in White Paper-1, which offered "Card rewards of up to 2% of your purchases made on the Centra card." Based on my review of White Paper-1, and representations made by SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, as described in paragraph 30.e., below, explaining that "through our revenue share we actually give .8 percent of that away to token holders as part of our program to join the Centra Tokens," I believe the Network Rewards Program functions like a dividend in that it is offering a share — .8% ETH — of Centra Tech's revenue.

    v. Although it claimed that holders of the Centra Token "by no means own any securities or interest in Centra Tech," and that the Centra Tokens "are not securities nor shares," White Paper-1 promised that Centra Token purchasers would "be able to place their wallet to use on Centra Debit card, or exchange them [the Centra Tokens] on the Cryptocurrency exchanges for a profit." White Paper-1 also claimed that the Centra Card and Centra Wallet were "already live in beta," and that Centra Tech was "offering our initial crowd sale of tokens to appropriately fund the vision of Centra Tech's future." It further claimed that Centa Tech's "initial coin offering allows users to join our success and mission *while generating a profit*." (emphasis added).

    vi. White Paper-1 also contained several misrepresentations, as described further in paragraphs 34 through 43, below, about Centra Tech's relationships with financial services institutions. For example:

     1. In describing the Centra Card, White Paper-1 stated: "For our United States clients the Centra Card will be a Visa card while for international users the Centra card issued will be a MasterCard. . . . The Centra Card allows all supported cryptocurrencies to become spendable in real time based on the government fiat being used at the time the card is used at a participating location that accepts Visa or MasterCard."

2. White Paper-1 contained multiple images of Centra Cards with the "Visa" logo.

3. White Paper-1 also stated that one benefit and advantage of the Centra Card was "Access to 36+ Million Points of Sale where Visa and/or Master-Card is accepted in 200+ countries."

4. A product comparison table in White Paper-1 reported that the issuers of the Centra Card were "MasterCard and Visa."

5. White Paper-1 contained a timeline of Centra Tech's "milestone items," including a "Major Banking Partnership signed and license agreement with VISA USA Inc formulated" in January 2017, and a "Beta Launch of Centra Black Card and Centra Wallet App Live" in March 2017.

6. White Paper-1 also used the logos of Bancorp, Visa and Mastercard when describing Centra Tech's partners.

vii.   White Paper-1 stated that "Centra Tech holds individual licenses in 38 states namely Alabama, Arizona, Alaska, Arkansas, Connecticut, Delaware, District of Columbia, Florida, Georgia, Idaho, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Mississippi, Nevada, Nebraska, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, Oregon, Rhode Island, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, and West Virginia." It further stated that the licenses "are held under categories of Money Transmitter, Sales of Checks, Electronic Money Transfers, and Seller of Payment Instruments."

viii.   White Paper-1 advertised the "Centra Tech Team" as comprising, among other individuals, SHARMA as the "CTO & Co-Founder"; FARKAS as the "CMO"; and "Michael Edwards" as the "CEO & Co-Founder."

## SHARMA's Representations in Connection with the Centra Tech ICO

18.   On or about August 14, 2017, SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, was interviewed by Neocash Radio, a cryptocurrency podcast, about the Centra Tech ICO.  Based on my

review of a recording of the interview, I have learned that SHARMA stated, among other things, the following:[2]

    a.   "[I]nternationally, we currently have our license with Mastercard, to service international clients. Domestically, we do have the Visa partnership, so we are able to issue Visa cards domestically and Mastercards internationally."

    b.   "Right now we are currently in our live Beta stage, which we have members of our internal organization as well as some external that have gotten our Centra Black Founder cards recently. We're going through . . . pretty much a phase two of testing right now where we are just going through daily transactions, testing volume, etc., and we've gotten really good results so far on it."

    c.   SHARMA also stated that Centra Tech had "pretty much a successful test rate in terms of errors, in terms of proof processes and the whole flow of the card attaching to the app," when discussing the Centra Wallet.

    d.   SHARMA identified "Mike Edwards" as a "VP and co-founder" who was an early investor in Centra Tech.

    e.   In describing the rewards system for purchasers in the ICO, SHARMA stated: "The rewards percentage that we get from Visa and Mastercard through our revenue share we actually give .8 percent of that away to token holders as part of our program to join the Centra tokens."

    f.   "[R]ight now is a great time to join our system, we have a token sale that is going on, it finishes on October 5th . . . we're currently a little bit north of $10 million raised in our first eight days of our crowd sale so I definitely want to thank all of my contributors and anyone who is listening for joining that as well."

    g.   SHARMA stated that there was currently a 20% token bonus on top of the current token sale that "can be redeemed via email."

---

[2] The summaries and transcript of the recorded interview set forth herein is based on a preliminary draft transcription and remains subject to revision.

h.   "We have a couple of large deals we're working on right now with a few companies so we should be over by I would say early September."

i.   SHARMA directed listeners to the Centra Tech website, www.centra.tech, to find out more about the Centra Tech ICO:  "You can go to our website, www.centra.tech, and you can click the token sale page as well as our white paper is on there and you can just get an insight of everything from A to Z."

j.   SHARMA stated that while Centra Tech was licensed in 38 states, "the states that we are operating in currently for licensing purposes is just so the ability to withdraw and transmit your Bitcoins.  As far as actually utilizing the card itself to the wallet and spending the cryptocurrencies, that's available in all states."

k.   SHARMA also stated that he was able to work through the U.S. licensing issues with a contact he knew at Metropolitan Commercial Bank.  SHARMA stated that "our system is connected to the bank and we're connected to the clients."

### Additional Representations by FARKAS

19.   Based on my review of records provided by Centra Tech to the SEC, and which were provided to me in connection with this investigation, I have learned, in substance and in part, the following:

a.   On or about August 30, 2017, SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, sent an email to an individual not at Centra Tech, and copied ROBERT FARKAS, a/k/a "Bob," the defendant, to the email.  In that email, SHARMA conveyed a message that SHARMA had received from Bancorp stating the following:

Mr. Sharma - I left a voicemail on your phone, but I am following up here as well.  CENTRA TECH IS HEREBY DIRECTED TO CEASE AND DESIST FROM REPRESENTING THAT THE BANCORP BANK HAS ANY CONNECTION WITH, OR IS THE ISSUER OF ANY CARD PRODUCTS RELATED TO CENTRA TECH.  YOU ARE ALSO DIRECTED TO CEASE AND DESIST USING OUR LOGO OR OTHER IMAGES IN CONNECTION WITH THE MARKETING OF ANY CARD PRODUCTS OR WALLETS YOU OFFER.   Please REMOVE any and all references to The Bancorp Bank or The Bancorp Inc. from

14

> any and all websites, marketing materials or
> other communications, including blogs as this
> has not been authorized by The Bancorp.   I
> expect you will be hearing from federal
> banking regulators as well.

b.   On or about September 6, 2017, FARKAS exchanged
emails with an individual at a company that provides a search
engine allowing users to look up, confirm, and validate
transactions that have taken place on the Ethereum blockchain
("Company-1").  In the emails, FARKAS inquired about how to
obtain advertising space on Company-1's website, and stated, in
substance and in part, the following:

> I know there are some past issues but we are now
> complete on our Pre-ICO raised over 10M in ETH and
> have been verified by all of our staff on Token Market
> . . .
>
> We have ad space everywhere else except here.   Please
> let me know if you need any identifying documents or
> anything to proceed with our ad space.

FARKAS also provided the advertising text that he wanted
Company-1 to post" "Centra Card ® & Centra Wallet ® Now
available Worldwide!"  FARKAS signed the email "Robert Farkas
CMO."  After receiving a response from Company-1 that it was
"not able to cater to [Centra Tech's] advertising needs at this
point [in] time," FARKAS forwarded the emails to
"ssharma491@gmail.com," an email address used by SHARMA.[3]

c.   In or about early September 2017, FARKAS, using
the email address "support@centra.tech," and at times signing
his name "Bob," or "Robert Farkas CMO Centra," exchanged a
series of emails with an individual at a marketing company
seeking to write promotional materials and/or articles about
Centra Tech ("Individual-1").  On or about September 6, 2017,
FARKAS described Centra Tech as follows:

> The biggest problem in the crypto world is
> being able to spend your cryptocurrency

[3] Based on records provided to the FBI by Google, I have learned
that SHARMA is listed as the subscriber for the email address
"ssharma491@gmail.com."  In addition, based on my review of
records produced by Centra Tech to the SEC, I have learned that
SHARMA uses the email address "ssharma491@gmail.com."

effortlessly.   The Centra Card and Centra
Wallet app are the solution.   Our Currency
Conversion Engine Module (CCE Module) allows
real   time   conversion   of   all   supported
cryptocurrencies to give the user the ability
to spend their assets in real time anywhere in
the world that accepts Visa or Mastercard.

...

Thanks,
Bob

---

On or about September 13, 2017, Individual-1 appears to have
provided FARKAS with a draft of written materials related to
Centra Tech and, later that same day, FARKAS responded with
edits, including the following:

Title: Can we change it too: This company
has brought cryptocurrency into the real
world
reason being is that our card is live and
working and has been shipped to clients
already ☺
. . .
Thanks,
Bob

20.   From approximately in or about September 2017 through
in or about December 2017, FARKAS received and responded to
multiple emails either directly or through the
"support@centra.tech" email account from individuals interested
in participating in the Centra Tech ICO, interested in
purchasing Centra Tokens, or otherwise seeking information about
Centra Tech.

21.   Based on my review of records provided by Centra Tech
to the SEC, I have learned, in substance and in part, that, in
or about October 2017, FARKAS registered Centra Tech as a
sponsor of "Consensus: Invest 2017," a blockchain technology
summit or conference that took place on or about November 28,
2017 in New York City, New York.   I have reviewed a video posted
to Centra Tech's YouTube channel on or about January 5, 2018
entitled "Centra Consensus NYC Cryptocurrency Blockckain Expo
Invest."   The video depicts what appears to be people and
activities at the "Consensus" Invest 2017," including a Centra

16

Tech booth or table at the conference, and shows FARKAS engaging in conversations with various people during the conference. Based on the foregoing, I believe that FARKAS was in New York City, New York, on or about November 28, 2017, and engaged in promotional and marketing activities for Centra Tech at the "Consensus: Invest 2017" conference.

## The Fraudulent Partnerships with Bancorp, Visa, and Mastercard

22.  Based on my conversations with a representative of Bancorp ("Witness-1") and my review of documents provided by Bancorp, I have learned, in substance and in part, the following:

a.  In approximately August 2017, Witness-1 learned from Bancorp's marketing group that a potential investor or purchaser of Centra Tech tokens had inquired as to whether Bancorp had a business relationship with Centra Tech, as was represented by Centra Tech in its marketing materials at the time.

b.  In investigating the inquiry in approximately August 2017, Witness-1 reviewed the Centra Tech Website and a white paper posted on the Centra Tech Website.  Witness-1 discovered that Bancorp's issuer statement, a statement regarding who the card issuer is any time a Visa or Mastercard image is displayed, was being used on the Centra Tech Website. Witness-1 knew by looking at the Centra Tech Website and white paper that Bancorp would not ever work with a company such as Centra Tech by virtue of the risk level of the product Centra Tech was offering.

c.  Witness-1 reviewed Bancorp internal databases, to include Bancorp's list of entities with which it had card issuance relationships and entities involved in Bancorp's co-branded incentive card program, to see whether Bancorp had any sort of relationship with Centra Tech.  Through this process, Witness-1 confirmed that Bancorp did not have any relationships with Centra Tech.

d.  Witness-1 took screenshots of the Centra Tech Website, including a page that misrepresented Bancorp's issuer statement.

e.  One screenshot that Witness-1 retained stated, among other things:

17

The Centra Card Visa Debit Card is issued by
The Bancorp Bank, member FDIC, pursuant to a
license from Visa U.S.A. Inc. "The
Bankcorp"[4] and "The Bancorp Bank" are
registered trademarks of The Bankcorp Bank ©
2014. Use of the Card is subject to the
terms and conditions of the applicable
Cardholder Agreement and fee schedule, if
any.

The Centra Card Mastercard® Debit Card is
issued by The Bancorp Bank, member FDIC,
pursuant to a license from Mastercard
International Incorporated. "The Bankcorp"
and "The Bancorp Bank" are registered
trademarks of The Bankcorp Bank © 2014. Use
of the Card is subject to the terms and
conditions of the applicable Cardholder
Agreement and fee schedule, if any.

   f. As described above, Witness-1 reviewed a white
paper that was posted to the Centra Tech Website in August 2017.
Witness-1 recalled that the white paper contained multiple
misrepresentations, including about Centra Tech's purported
relationship with Bancorp.

   g. In approximately August 2017, Witness-1 attempted
to reach individuals at Centra Tech through, among other
methods, the "Contact Us" portion of the Centra Tech Website to
request that Centra Tech remove the Bancorp logo and the false
statements regarding Centra Tech's purported relationship with
Bancorp. Witness-1 did not receive a response from Centra Tech.

   h. Based on my conversations with another
representative of Bancorp ("Witness-2") and my review of
documents provided by Bancorp, I have learned, in substance and
in part, that, on or about August 30, 2017, Bancorp sent a cease
and desist notice to Centra Tech to which Centra Tech did not
respond.

   23. Based on my conversations with a representative of
Visa ("Witness-3") and my review of documents provided by Visa,
I have learned, in substance and in part, the following:

   4 This excerpt from the Centra Tech Website has not been altered
to correct spelling or other errors. In this excerpt, "Bancorp"
is also spelled "Bankcorp."

a.   On or about October 10, 2017, Visa became aware that Centra Tech was using the Visa name and logo on marketing materials in connection with the Centra Card and the Centra Tech ICO.

b.   Visa employees researched whether Visa had any relationship, direct or indirect, with Centra Tech.   Visa determined that it had no relationship with Centra Tech.

c.   Visa employees took screenshots of portions of the Centra Tech Website using and showing the Visa name and trademark, including of purported Centra Cards with the Visa logo.

d.   On or about October 10, 2017, Visa's Legal Department sent an email to Centra Tech, at support@centra.tech, attaching a cease and desist letter (the "October 10 Letter"). In the October 10 Letter, Visa stated, in part:

> It has come to our attention that Centra Tech ("Centra") is using the Visa-Owned Marks on its site https://www.centra.tech as well as on its various social media sites (e.g., Facebook, Twitter, Instagram, YouTube) and other mediums. It appears Centra is purporting to be an authorized distributor of VISA payment cards utilizing cryptocurrency technology. . . . However, to the best of our knowledge and good faith belief, Centra is not authorized to use the Visa-Owned Marks in this manner, nor is it authorized to issue, sell, or otherwise distribute VISA payment cards. If this is not the case, please advise and explain immediately, i.e., if Centra is working with an authorized Visa Issuing bank.

Visa attached to the October 10 Letter multiple screenshots from the Centra Tech Website in which Centra Tech had misappropriated the Visa trademark.

e.   In the October 10 Letter, Visa requested that Centra Tech cease and desist from using Visa's trademarks and "promoting that it is an authorized distributor of VISA payment cards," and for Centra Tech to remove all references to Visa from the Centra Tech Website and any promotional materials.

19

Visa also requested that Centra Tech "identify the bank or financial institution it is working with (if any) to issue a purported VISA payment card product."

      f.   In response to the October 10 Letter, SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, provided Visa with an acknowledgment that he had received the October 10 Letter, but did not identify any financial institutions with which Centra Tech was working to issue a Visa payment card product.

      24.   Based on my review of records provided by Centra Tech to the SEC, and which were provided to me in connection with this investigation, I have learned, in substance and in part, the following:

      a.   On or about October 10, 2017, SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, using the email address "sam@centra.tech," emailed a response to Visa's October 10 Letter, stating:

> This matter has been brought to my attention. I will have this matter rectified in 48 hours. We are currently in the process of finalizing our Co-branded Prepaid Card Program, but might not meet the Nov 1st lock out deadlines for submission from our issuing bank whom is an authorized visa issuer for card design approval, So can see where this issue might of came from.
>
> However, I have immediately contacted my web developers to remove all issues and I will have this document [a cease and desist acknowledgment] signed and returned within 48 hours.
>
> Thank you,
> Sam Sharma

      b. On or about October 11, 2017, Visa responded to SHARMA's email, and requested that he "advise of the Visa issuing bank you are working with."

      c. On or about October 12, 2017, SHARMA responded again via email using the "sam@centra.tech" email account and stated: "As far as the issuing bank we have an MNDA in place currently VISA will soon get our information for Card Design approval and

program specs from our future issuing bank in the US." SHARMA
signed the email, "Thank you, Sam." Based on my training and
experience, I believe SHARMA was claiming that he had a Mutual
Non-Disclosure Agreement with the purported issuing bank in this
email and that he therefore could not disclose its identity.

d. On or about October 14, 2017, Visa responded to
SHARMA's email, noting that Centra Tech was still using the Visa
trademark and Visa name in its promotional materials, including
in videos in which SHARMA appeared, and reiterated its demand
that Centra Tech stop using the Visa name. Visa also repeated
its request that SHARMA identify the bank that Centra Tech was
"allegedly working with."

e. Based on my conversations with Witness-3, I have
learned that, in response to Visa's multiple requests for Centra
Tech to identify the Visa card issuing bank with which it
purported to have a relationship, neither SHARMA nor anyone at
Centra Tech identified such an issuing bank.

25.   Based on my conversations with a representative of
MasterCard ("Witness-4"), I have learned, in substance and in
part, that MasterCard's internal records of licensing agreements
and relationships with card-issuing banks and other third
parties contains no record of any relationship, either direct or
indirect, with Centra Tech.

26.   Based on my review of the current version of the
Centra Tech Website and a white paper published via the Centra
Tech Website, as of March 26, 2018, I have learned that Centra
Tech is not currently using the Bancorp, Visa or MasterCard
names or logos.

27.   As described in paragraph 17.c.vii., above, White
Paper-1 represented that Centra Tech held licenses "under
categories of Money Transmitter, Sales of Checks, Electronic
Money Transfers, and Seller of Payment Instruments," in 38
listed states (the "State Licensing List"). Based on my review,
on or about March 12, 2018, of a database maintained by the
Nationwide Multistate Licensing System, a financial services
industry online registration and licensing database, and my
review of certain state licensing databases, I have learned, in
substance and in part, that the following states on the State
Licensing List have no current record for Centra Tech based on
available public searches: Arizona, Connecticut, Delaware,
Florida, New Jersey, New York or South Dakota.

**"Michael Edwards"**

28.   As described in paragraph 17.c.viii, above, White
Paper-1 listed "Michael Edwards" as Centra Tech's "CEO & Co-
Founder."  White Paper-1 also included a picture of "Michael
Edwards."  Based on open source searches of this image, I have
learned that the picture of "Michael Edwards" in White Paper-1
is actually a picture associated with an individual by a
different name who is a Canadian physiology professor.

29.   Based on my review of records provided by the SEC, I
have learned, in substance and in part, that, on or about August
3, 2017, a user profile page appeared on LinkedIn, a business-
and employment-oriented social networking service that operates
via websites and mobile apps, for "Michael Edwards." The
LinkedIn page stated that "Michael Edwards" had "launched Centra
Tech with the mission to design the world's first multi-
blockchain asset debit card" and had managed various aspects of
Centra Tech's Centra Card and Centra Wallet programs, including
"[e]stablished licensing and partnership terms with Visa &
MasterCard."  The LinkedIn page also stated that "Michael
Edwards" was affiliated with Harvard University.

30.   Based on my review of currently-available content on
the LinkedIn website, I have learned that the "Michael Edwards"
LinkedIn page no longer exists.

31.   Based on Internet searches for a "Michael Edwards" who
is or was a co-founder or CEO of Centra Tech, I have learned
that there is limited information about such an individual.  For
example, I have found no interviews of "Michael Edwards" in
connection with Centra Tech or the Centra Tech ICO, and the name
"Michael Edwards" no longer appears on the Centra Tech Website
or Centra Tech online promotional materials.  Based on the
information described above, and based on my training,
experience, and participation in this investigation, I believe
that a "Michael Edwards" who was at some point "CEO & Co-
Founder" of Centra Tech may not exist.

**The Centra Tech ICO Investors**

32.   Based on my training, experience, and participation in
this investigation, I have learned that companies like Centra
Tech that offer cryptocurrency are required to keep a record of
identification information-including names and addresses-of
individuals purchasing their cryptocurrency.  Based on my review

22

of records provided by Centra Tech to the SEC, I have learned,
in substance and in part, the following:

      a.    Centra Tech provided a spreadsheet labeled
"Centra Token Sale Details" to the SEC.  The spreadsheet
contains several tabs, including tabs labeled "CentraToken,"
"CentraSale," and "Centra Token Owner."

      b.    The CentraToken tab contains information
regarding more than 1800 purchases of Centra Tokens from between
on or about July 30 to August 26, 2017.  Two of the listed
investors reside in New York City, New York, within the Southern
District of New York.

      c.    The CentraSale tab contains information regarding
more than 1700 purchases of Centra Tokens from between on or
about September 19 to September 26, 2017.  Three of the listed
investors reside in New York City, New York, within the Southern
District of New York.

### Extradition Research, Document Destruction, and International Travel

    33.    Based on my discussions with representatives of the
SEC, I have learned, in substance and in part, that in or about
the fourth quarter of 2017 the SEC issued an initial subpoena to
Centra Tech for documents and other information, and that SOHRAB
SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the
defendants, are thus aware of the SEC's investigation.

    34.    Based on my conversations with an attorney who is
employed by a financial regulatory authority ("Witness-5"), I
have learned, in substance and in part, the following:

      a.    Witness-5 knows an attorney who was until
recently employed by Centra Tech ("Employee-1").

      b.    Witness-5 had several telephone conversations and
electronic communications with Employee-1 on or about March 29
and 30, 2018.

      c.    During these communications, Employee-1 told
Witness-5 the following, in substance and in part:

        i.    Employee-1 learned earlier this week that
the SEC has been investigating whether Centra Tech has engaged
in fraudulent activity.

        ii.    ROBERT FARKAS, a/k/a "Bob," the defendant, recently asked Employee-1 via email to conduct research regarding foreign extradition laws.

        iii.    After Employee-1 performed this extradition research and reported the results to FARKAS, FARKAS approached Employee-1 in person and stated, in substance and in part, that he had deleted his email asking Employee-1 to perform this extradition research.  Based on FARKAS' demeanor during this interaction and the way in which he made that statement about deleting his email, Employee-1 understood FARKAS to be suggesting that Employee-1 should also delete the copy of that email that Employee-1 had received from FARKAS regarding the extradition research.

        d.    Employee-1 has not seen an individual Employee-1 described to Witness-5 as the "owner" of Centra Tech in over a week -- which I believe, based on my training and experience and participation in the investigation of this case, to be a reference to SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant.

        e.    Employee-1 also learned this week that Centra Tech's bank account has been depleted.

        f.    Employee-1 conveyed that Centra Tech has terminated virtually all of its employees except certain top executives such as SHARMA and FARKAS.

      26.    Based on my review of records provided by Delta Airlines, I have learned that on or about March 27, 2018, ROBERT FARKAS, a/k/a "Bob," the defendant, booked Delta Airlines flights for himself and a co-traveler whose name I recognize to be the name of an employee at Centra Tech ("Employee-2") to fly from Fort Lauderdale, Florida to Incheon, South Korea via a Delta Airlines flight leaving Fort Lauderdale-Hollywood International Airport in Florida on or about April 1, 2018 at approximately 8:00PM, with a stopover at Hartfield-Jackson Atlanta International Airport in Georgia to catch a connecting Delta Airlines flight that will arrive at Incheon International Airport in South Korea on or about April 2, 2018.  According to these records, FARKAS and Employee-2 have also booked return flights that would have them leave from Incheon International Airport in South Korea on or about April 5, 2018 and arrive at Fort Lauderdale-Hollywood International Airport in Florida on or about April 5, 2018.

WHEREFORE, I respectfully request that arrest warrants be issued for SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a "Bob," the defendants, and that they be arrested and imprisoned or bailed, as the case may be.

BRANDON RACZ
Special Agent
Federal Bureau of Investigation

Sworn to before me this
31st day of March 2018

HONORABLE JAMES L. COTT
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

25

# Exhibit C

# Exhibit C

Approved: _____
SAMSON ENZER / NEGAR TEKEEI
Assistant United States Attorneys

Before:   THE HONORABLE STEWART D. AARON
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

          - v. -

RAYMOND TRAPANI,
          a/k/a "Ray,"

                    Defendant.

- - - - - - - - - - - - - - - - x

# 18 MAG 3271

**SEALED COMPLAINT**

Violations of
15 U.S.C. §§ 78j(b), 78ff;
17 C.F.R. §§ 240.10b-5;
18 U.S.C. §§ 371, 1343, 1349
and 2

COUNTY OF OFFENSES:
New York

SOUTHERN DISTRICT OF NEW YORK, ss.:

        BRANDON RACZ, being duly sworn, deposes and says that he
is a Special Agent with the Federal Bureau of Investigation and
charges as follows:

## COUNT ONE
### (Conspiracy to Commit Securities Fraud)

        1.   From at least in or about July 2017, up to and including
the date of this Complaint, in the Southern District of New York
and elsewhere, RAYMOND TRAPANI, a/k/a "Ray," the defendant, and
others known and unknown, willfully and knowingly did combine,
conspire, confederate, and agree together and with each other to
commit offenses against the United States, to wit, securities
fraud, in violation of Title 15, United States Code, Sections
78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section
240.10b-5.

        2.   It was a part and object of the conspiracy that RAYMOND
TRAPANI, a/k/a "Ray," the defendant, and others known and unknown,
willfully and knowingly, directly and indirectly, by use of the
means and instrumentalities of interstate commerce and of the
mails, and of the facilities of national securities exchanges,
would and did use and employ manipulative and deceptive devices
and contrivances in connection with the purchase and sale of

securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, to wit, TRAPANI and his co-conspirators participated in a scheme to solicit digital funds worth more than $25 million from purchasers of unregistered securities, in the form of digital currency tokens issued by a startup company called Centra Tech, Inc. ("Centra Tech") as part of a so-called "initial coin offering" or "ICO," through fraudulent misrepresentations and omissions.

## Overt Acts

3.    In furtherance of the conspiracy and to effect its illegal object, RAYMOND TRAPANI, a/k/a "Ray," the defendant, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.    In approximately 2017, RAYMOND TRAPANI, a/k/a "Ray," the defendant, and his co-conspirators, Sohrab Sharma, a/k/a "Sam Sharma," and Robert Farkas, a/k/a "RJ," a/k/a "Bob," co-founded Centra Tech, Inc. ("Centra Tech"), a startup company purporting to offer cryptocurrency financial products.

b.    In approximately July 2017, Centra Tech was incorporated in Delaware, TRAPANI was appointed as the company's Chief Operating Officer, Sharma was appointed as a Director and the President of the company, and Farkas was appointed as the company's Chief Marketing Officer.

c.    In approximately August 2017, TRAPANI and his co-conspirators, Sharma and Farkas, caused Centra Tech to publish a white paper via the internet containing fraudulent misrepresentations and omissions in connection with Centra Tech's unregistered offering to investors of securities, in the form of digital currency tokens issued by Centra Tech.

d.    On or about August 28, 2017, after a prospective investor asked Sharma for proof to verify representations that Centra Tech had a contract with a particular investment-venture capital firm, Sharma sent text messages to TRAPANI and Farkas in which Sharma wrote that "I'm worried about getting these guys the

fufu . . . [c]ontract" for the investment firm, "because they can
verify it," and that he was going to tell the prospective investor
that "I'm gonna say our [Non-Disclosure Agreement] is very tight,"
"We can't share the contract."  In response, TRAPANI wrote "Get
any worry out of your mind your a fucking closer," and Farkas wrote
"Dance," "Do what you do."

     e.   TRAPANI was featured in a promotional video for
Centra Tech containing false representations that was available to
the public via the internet as of on or about September 22, 2017
but has since been removed from the internet.  During a group text
message conversation on or about September 22, 2017 among TRAPANI
and his co-conspirators, Sharma and Farkas, about removing the
video from the internet, Sharma wrote "[t]ake it off," "I don't
wanna get sued."

     f.   On or about September 29, 2017, during a group text
message conversation among TRAPANI and his co-conspirators, Sharma
and Farkas, Sharma asked TRAPANI, in substance and in part, to
have Centra Tech's white paper taken down from its website because
it contained false statements.  TRAPANI responded "I think we
should have white paper up but maybe just take it down and reword
it."  SHARMA replied ""I rather cut any fufu," "Off right own,"
"Now," "Then worry," "Anything that doesn't exist current," "We
need to remove," "Have them do it asap."

     g.   On or about October 5, 2017, while TRAPANI was in
New York, New York to surrender in a criminal case in which he had
been indicted for perjury (and was later convicted by way of his
guilty plea), TRAPANI exchanged text messages with other employees
of Centra Tech concerning a site-visit at Centra Tech's
headquarters by an individual who was "trying to make sure Centra
is real."

     h.   On or about November 28, 2017, Farkas, one of
TRAPANI's co-conspirators, attended a blockchain technology
conference in New York, New York, on behalf of Centra Tech, a
sponsor of the conference, for the purpose of promoting Centra
Tech and its products.

           (Title 18, United States Code, Section 371.)

**COUNT TWO**
**(Securities Fraud)**

    4.   From at least in or about July 2017, up to and including
the date of this Complaint, in the Southern District of New York

and elsewhere, RAYMOND TRAPANI, a/k/a "Ray," the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, and of the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, TRAPANI and his co-conspirators participated in a scheme to solicit digital funds worth more than $25 million from purchasers of unregistered securities, in the form of digital currency tokens issued by Centra Tech as part of its initial coin offering, through fraudulent misrepresentations and omissions.

(Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Sections 240.10b-5; and
Title 18, United States Code, Section 2.)

## COUNT THREE
### (Conspiracy to Commit Wire Fraud)

5.    From at least in or about July 2017, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, RAYMOND TRAPANI, a/k/a "Ray," the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343.

6.    It was a part and an object of the conspiracy that RAYMOND TRAPANI, a/k/a "Ray," the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, TRAPANI and his co-conspirators participated in a scheme to solicit digital assets worth more than $25 million from purchasers of unregistered

4

securities, in the form of digital currency tokens issued by Centra Tech as part of its initial coin offering, through fraudulent misrepresentations and omissions, and employed the use of telephones, email communications, and other wire communications in connection with the scheme.

(Title 18, United States Code, Section 1349.)

## COUNT FOUR
### (Wire Fraud)

7.     From at least in or about July 2017, up to and including the date of this Complaint, in the Southern District of New York and elsewhere, RAYMOND TRAPANI, a/k/a "Ray," the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, and attempting to do so, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, TRAPANI and his co-conspirators participated in a scheme to solicit digital assets worth more than $25 million from purchasers of unregistered securities, in the form of digital currency tokens issued by Centra Tech as part of its initial coin offering, through fraudulent misrepresentations and omissions, and employed the use of telephones, email communications, and other wire communications in connection with the scheme.

(Title 18, United States Code, Section 1343 and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

8.     I have been a Special Agent with the Federal Bureau of Investigation ("FBI") for approximately two and a half years. I am currently assigned to an FBI squad that investigates white collar crimes, including complex financial frauds and conduct within the regulatory jurisdiction of the United States Securities and Exchange Commission ("SEC"). I have participated in investigations of such offenses, and have made and participated in arrests of individuals who have committed such offenses.

9.     I am one of the case agents from the FBI's New York Field Office with primary responsibility for the criminal investigation in this matter of the co-founders of a company called Centra Tech, Inc., including RAYMOND TRAPANI, a/k/a "Ray," the defendant

charged by this criminal complaint (this "Complaint"), and Sohrab
Sharma, a/k/a "Sam Sharma," and Robert Farkas, a/k/a "RJ," a/k/a
"Bob" (hereinafter, the "co-conspirators"), both of whom were
charged as defendants in a prior criminal complaint, numbered 18
Mag. 2695, that was approved on March 31, 2018 by United States
Magistrate Judge James L. Cott in the Southern District of New
York (the "Prior Complaint") and is incorporated by reference as
though fully set forth herein.  The information contained in this
Complaint is based upon my personal knowledge, as well as
information obtained during this criminal investigation, directly
or indirectly, from other sources, including, but not limited to:
(a) business records and other documents, such as records of
electronic communications, including email communications and text
messages; (b) publicly available information and documents,
including information and documents that have been disseminated to
the public via the internet; (c) conversations with, and reports
of interviews with, non-law-enforcement witnesses; (d)
conversations with, and reports prepared by, other law enforcement
agents; and (e) conversations with representatives of the SEC
concerning information, documents, and other evidence gathered by
the SEC as part of a parallel investigation by the SEC of Centra
Tech, Inc. and its co-founders.  Because this Complaint is being
submitted for the limited purpose of establishing probable cause,
it does not include all the facts that I have learned during the
course of my investigation.  Where the contents of documents and
the actions and statements of and conversations with others are
reported herein, they are reported in substance and in part.  Where
figures, calculations, and dates are set forth herein, they are
approximate, unless stated otherwise.

## RELEVANT BACKGROUND

### A.  Centra Tech and its Co-Founders

10.  I have reviewed publicly available information about
Centra Tech, Inc. ("Centra Tech") and its co-founders, and
documents produced by Centra Tech to the SEC in connection with
the SEC's parallel investigation of Centra Tech and its co-
founders, including Centra Tech's certification of incorporation
and documents memorializing actions taken by written consent of
Centra Tech's board of directors.  Based on my review of those
materials and my participation in the investigation of this case,
I have learned the following, in substance and in part:

a.  Centra Tech was incorporated on or about July 27,
2017 in Delaware and was headquartered in Miami Beach, Florida.

b.    Centra Tech and its co-founders advertised Centra Tech primarily through internet-based marketing, including via the company's website, https://centra.tech (the "Centra Tech Website"), as well as press releases, white papers, social media postings on social media websites such as Twitter and Facebook, promotional videos posted on YouTube's website, internet podcast interviews, and other materials containing solicitations and statements that were disseminated to the public via the internet.

c.    As explained below, Centra Tech made various representations portraying itself as a company that offered various cryptocurrency-related products such as, for example, a purported Centra Tech debit card that supposedly allowed users to spend cryptocurrencies such as "Bitcoin" and "Ether" to make purchases in real-time at various stores and other establishments that were part of the networks of merchant locations that accept Visa-payment cards and Mastercard-payment cards.

d.    Centra Tech and its co-founders raised digital assets worth more than $25 million from investors through a so-called "initial coin offering" to investors of unregistered securities, in the form of digital tokens issued by Centra Tech, known as "Centra tokens" or "CTR tokens," that have since been traded on various cryptocurrency exchanges.  This "initial coin offering" or "ICO" took place during the period from approximately on or about July 30, 2017 through on or about October 5, 2017.

11.    As set forth below, Centra Tech's co-founders include RAYMOND TRAPANI, a/k/a "Ray," the defendant, as well as his co-conspirators, Sohrab Sharma, a/k/a "Sam Sharma," and Robert Farkas, a/k/a "RJ," a/k/a "Bob."  Based on my review of publicly available information about Centra Tech and its co-founders, documents that Centra Tech has produced to the SEC, documents and other materials provided by the District Attorney's Office of New York County ("DANY"), and criminal history records of TRAPANI, Sharma and Farkas, I have learned following, in substance and in part:

a.    TRAPANI, who is now 27-years old, was a co-founder of Centra Tech.  TRAPANI served as Centra Tech's Chief Operating Officer until in or about late October 2017.  According to TRAPANI's profile on a professional networking website that was available to the public via the internet in 2017, TRAPANI reportedly worked as the Chief Executive Officer of a luxury car rental company called "Miami Exotics" in Florida (among other jobs) before co-founding Centra Tech.

7

b.  Sharma, who is now 27-years old, was also a co-founder of Centra Tech.  Sharma served in various roles at Centra Teach, including as a Director of Centra Tech and as Centra Tech's President and Chief Technology Officer until approximately late October 2017.  According to Sharma's profile on a professional networking website that was available to the public via the internet in 2017, Sharma reportedly worked as the Director of Finance at Miami Exotics in Florida (among other jobs) before co-founding Centra Tech.

c.  Farkas, who is now 31 years old, was another co-founder of Centra Tech.  Farkas served in various roles at Centra Tech, including as Centra Tech's Chief Marketing Officer until approximately late October 2017.  Since late October 2017, Farkas has served in various roles at Centra Tech, including as a Director and as the Chief Operating Officer of Centra Tech.  According to a *Business Insider* article that was published on the internet on or about November 7, 2017, Farkas served as a Vice President of Miami Exotics in Florida before co-founding Centra Tech.

d.  During the ICO from on or about July 30, 2017 through on or about October 5, 2017, in which Centra Tech raised more than $25 million worth of digital assets from investors, a New York County Grand Jury returned an indictment on or about September 19, 2017 charging Sharma and TRAPANI with committing perjury in the first degree, a class D felony in violation of Section 210.15 of the New York Penal Law.  This perjury indictment charged Sharma and TRAPANI with giving materially false testimony under oath in July 2017 as defense witnesses for Sharma in a criminal trial before New York County Criminal Court Judge Steven M. Statsinger in which Sharma was being prosecuted by DANY for driving while intoxicated in March 2016.  Based on that perjury indictment, Sharma was arrested and TRAPANI surrendered in or about October 2017, and both were subsequently released from state custody (Sharma on bail, and TRAPANI on his own recognizance).  For lying under oath in that criminal trial, both Sharma and TRAPANI pleaded guilty on or about February 21, 2018 in New York County Supreme Court to perjury in the first degree.

e.  On or about October 27, 2017, the *New York Times* published an article about Centra Tech and its co-founders on the internet raising questions about their qualifications and the accuracy of their representations to investors, and reporting that "For now, the bigger problem facing Mr. Sharma and Mr. Trapani is the perjury indictment by a Manhattan grand jury [unsealed] on Oct. 5, just a few days after Centra finished fund-raising" in the company's ICO.

8

f.   On or about October 27, 2017, Sharma signed corporate resolutions: (a) removing himself from his positions as a Director and President of Centra Tech; (b) appointing TRAPANI's grandfather, William Hagner, as a Director and President of Centra Tech; and (c) appointing Farkas as a director of Centra Tech and as corporate secretary and treasurer of Centra Tech with full authority to control the company bank accounts.   On or about October 31, 2017, Farkas was also appointed as the Chief Operating Officer of Centra Tech.

g.   On or about October 31, 2017, Centra Tech issued a public statement via the internet stating, in relevant part, that "Co-Founders Sam Sharma and Ray Trapani are stepping aside to support the continued growth of the Company," and "to further their vision, the reconstituted Executive Management team includes," "William Hagner as President" and "Robert Farkas as Chief Operating Officer," among others.

**B.   Entities with which Centra Tech Claimed to Have Partnerships**

12.   Based on my review of publicly available information about the entities described below, documents that Centra Tech has produced to the SEC, my interviews of several representatives of the entities described below, and my conversations with representatives of the SEC about their interviews of representatives of the entities described below, I have learned the following, in substance and in part:

a.   The Bancorp, Inc. ("Bancorp") is a Delaware-based financial services company with offices throughout the United States.   Bancorp provides a variety of financial services to companies and individuals, including issuing debit and prepaid cards, and payments processing, which it does by virtue of contractual partnerships with other financial services companies such as Visa and Mastercard, among others.

b.   Visa Inc. ("Visa") is a multinational financial services corporation headquartered in Foster City, California. Visa facilitates electronic funds transfers throughout the world, most commonly through "Visa"-branded credit cards and debit cards.

c.   Mastercard Incorporated ("Mastercard") is a multinational financial services corporation headquartered in Purchase, New York.   Mastercard's principal business is to process payments between the banks of merchants and the card issuing banks

9

or credit unions of the purchasers who use "Mastercard"-branded debit and credit cards to make purchases.

## C. Relevant Regulatory Background

13. Based on my training and experience and my participation in the investigation of this case, I have learned the following, in substance and in part:

a. An "initial coin offering" or "ICO" is a type of fundraising event in which an entity offers participants a unique digital "coin" or "token" in exchange for consideration. The consideration often comes in the form of "digital currency" or "cryptocurrency," but can also be "fiat currency," which is currency, like the U.S. dollar and the Euro, that a government has declared to be legal tender, but is not backed by a physical commodity. "Digital currency" or "cryptocurrency" is a digital representation of value that can be digitally traded and functions as (1) a medium of exchange, (2) a unit of account, or (3) a store of value, but does not have legal tender status. Unlike fiat currency, such as the U.S. dollar and the Euro, digital currency is not issued by any jurisdiction and functions only by agreement within the community of users of that particular currency. Examples of digital currencies are "Bitcoin" and "Ether," both of which are issued and distributed on their own "blockchains." A "blockchain" is a digitalized, decentralized, cryptographically-secured ledger that allows market participants to keep track of digital currency transactions without central recordkeeping.

b. The tokens or coins issued in an ICO are issued and distributed on a blockchain. Tokens often are also listed and traded on online platforms, typically called digital currency exchanges, and they usually trade for other assets. Often, tokens are listed and tradeable immediately after they are issued.

c. ICOs are typically announced and promoted through the internet and email. Issuers usually release a "white paper" describing the project and the terms of the ICO. In order to participate in the ICO, investors are generally required to transfer funds to the issuer. After the completion of the ICO, the issuer will distribute its unique "coin" or "token" to the participants. The tokens may entitle the holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, or voting rights. These tokens may also be listed on online digital currency exchanges and be tradable for digital currencies.

d.   Under Section 2(a)(1) of the Securities Act of 1933, a security includes "an investment contract." 15 U.S.C. § 77b.  An "investment contract" is a contract, transaction or scheme "whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *S.E.C.* v. *W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).  "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.* at 301.  Importantly, the economic realities of the transaction or product and not its name determine whether the instrument is a security.  *United Hous. Found, Inc.* v. *Forman*, 421 U.S. 837, 851 (1975).  Pursuant to Sections 5(a) and 5(c) of the Securities Act, a company or individual conducting an offer or sale of securities to the public must file a registration statement with the SEC.  15 U.S.C. § 77e(a) and (c).

## OVERVIEW OF THE SCHEME TO DEFRAUD

14.  Based on the facts detailed below, there is probable cause to believe that RAYMOND TRAPANI, a/k/a "Ray," the defendant, and his co-conspirators, Sohrab Sharma, a/k/a "Sam Sharma," and Robert Farkas, a/k/a "Bob," solicited digital assets worth more than $25 million from investors who purchased unregistered securities issued by Centra Tech (in the form of digital tokens issued by Centra Tech), through the use of material misrepresentations and omissions.  For example, as shown below, in soliciting such investments:

a.   Through Centra Tech, TRAPANI as well as Sharma and Farkas claimed to investors that its executive team included two purported senior executives named "Michael Edwards" and "Jessica Robinson" who supposedly had impressive work histories and academic credentials, and TRAPANI claimed that he had earned a master's degree from the University of California at Los Angeles ("UCLA"), which has one of the top-ranked graduate business schools in the country.  In fact, as shown below, neither "Michael Edwards" nor "Jessica Robinson" is a real person, and TRAPANI never attended UCLA's graduate school of business.

b.   Through Centra Tech, TRAPANI as well as Sharma and Farkas claimed to investors that Centra Tech had developed a debit card that enabled users to use currencies to make purchases at any stores that accept Visa or Mastercard, and that Centra Tech had partnerships with Bancorp, Visa, and Mastercard to issue Centra Tech debit cards.  In fact, as shown below, Centra Tech had no such partnerships with Bancorp, Visa or Mastercard.

## CENTRA's UNREGISTERED SECURITIES OFFERING STYLED AS AN "ICO"

15.  Based on my review of publicly available information and documents that Centra Tech has produced to the SEC, I have learned the following, in substance and in part:

a.  From on or about July 30, 2017 through on or about October 5, 2017, Centra Tech raised funds from investors, in the form of digital currency worth more than $25 million, via an ICO for the purported purpose of enabling Centra Tech to operate what Centra Tech advertised would be the world's first multi-blockchain debit card.

b.  During this ICO, Centra Tech accepted digital currency from investors in exchange for "Centra tokens" (also known as "CTR tokens" or "CTRs") that could be traded, or exchanged, on various digital currency exchanges.  In offering these Centra tokens to investors during the ICO in one of the white papers issued by the company, Centra Tech stated that the Centra tokens could be "exchange[d] . . . on the Cryptocurrency exchanges for a profit" and that the purchase of these Centra tokens would "allow[] users to join [Centra Tech's] success and mission *while generating a profit*."  (Emphasis added).

c.  As shown below, in doing so, Centra Tech made multiple false statements, including on the Centra Tech Website and in materials posted to the Centra Tech Website, regarding, among other things, (a) the identities and qualifications of Centra Tech's team of executives; and (b) the "Centra Card" or "Centra Debit Card," a debit card that was falsely advertised as one that would allow users to make purchases using cryptocurrency at any establishment that accepted Visa or Mastercard as a result of Centra Tech's purported partnerships with Bancorp, Visa, and Mastercard.

16.  Based on my review of publicly available information, documents that Centra Tech has produced to the SEC, and documents gathered by the SEC in connection with the SEC's parallel investigation, among other sources, I have learned the following, in substance and in part:

a.  On or about July 23, 2017, Centra Tech issued a press release that it paid to be published on the website "cointelegraph.com" (the "July 23 Press Release").  In the July 23 Press Release, Centra Tech described Centra Tech's ICO as "truly a ground floor opportunity to be part of a global solution to the blockchain currency dilemma that offers a comprehensive rewards

program for both token and card holders while giving the ability to spend your cryptocurrency in real time with no fees." The July 23 Press Release also touted Centra Tech's products: (1) the "Centra Debit Card" which purported to "enable[] users to make purchases using their blockchain currency of choice," and "work[] anywhere that accepts Visa or MasterCard," (2) the "Centra Wallet App," which "makes it easy for people to register for the Centra Debit Card, store their cryptocurrency assets, as well as control its functions," and (3) "cBay," the "world's first Amazon type of marketplace created especially for cryptocurrency acceptance." The July 23 Press Release also advertised Centra Tech's "Currency Conversion Engine" as allowing users "the ability to spend their assets anywhere in the world that accepts Visa and/or MasterCard."

     b.  Centra Tech also posted several different versions of a white paper advertising Centra Tech's ICO on the Centra Tech Website. I have reviewed a version of the ICO White Paper, labeled "FINAL DRAFT," that was downloaded from the Centra Tech Website on or about August 3, 2017 ("White Paper-1"). The White Paper-1 contained several statements describing the ICO and the Centra Card using terminology indicative of a securities offering. For example:

     i.  The White Paper-1 described Centra Tech's ICO as a token offering for which 400 Centra tokens, or "CTRs," would be sold for one "ETH." Based on my training, experience, and participation in this investigation, I have learned that "ETH" is the currency code for "Ether," a digital currency whose blockchain is generated by the Ethereum platform.

     ii.  In the White Paper-1, Centra Tech stated that it would be offering "68% of all [Centra] Tokens to be created for purchase in our crowd sale to the public" and would "allocate 20% of all [Centra] Tokens created to distribution of bug bounty, business development, community projects, market expansion, and more" while "[t]he remaining 12% will be distributed to Centra Techs founders, early investors, and employees as an incentive to create a long lasting mutual interest and dedication to the tokens and their prolonged value."

     iii.  In providing details about the Centra Card and the Centra Tech ICO, the White Paper-1 referenced different levels of investment opportunity:

     1.  The "Centra Black Card founders edition" was to be issued to "our first 500 ICO backers whom purchase

with 100+ ETH" and would carry with it an "enhanced rewards program."

2.    The "Centra Gold Card limited edition" would be "allocated to our first 1000 contributors whom purchase CTR Tokens with 30+ ETH," and would also carry an "enhanced rewards program."

3.    The "Centra Blue & Virtual Card" would be the "signature and traditional card."

iv.    The White Paper-1 advertised multiple "rewards" programs for Centra Token holders.  For example, the White Paper-1 advertised that Centra Token holders would receive a ".8% ETH" reward for every transaction in the "network" (the "Network Rewards Program").  This was in contrast to another rewards program advertised in White Paper-1, which offered "Card rewards of up to 2% of your purchases made on the Centra card."  In addition, I have reviewed a recording of an interview of Sohrab Sharma, a/k/a "Sam Sharma," one of the co-founders of Centra Tech, on an internet radio podcast on or about August 14, 2017 in which Sharma represented that "through our revenue share we actually give .8 percent of that away to token holders as part of our program to join the Centra Tokens."[1]  Based on those sources, I believe that Centra Tech portrayed its Network Rewards Program as functioning like a dividend, in that it offered a share — .8% ETH — of Centra Tech's revenue.

v.    Although Centra Tech claimed that holders of the Centra Token "by no means own any securities or interest in Centra Tech," and that the Centra tokens "are not securities nor shares," the White Paper-1 promised that Centra Token purchasers would "be able to place their wallet to use on Centra Debit card, or exchange them [the Centra Tokens] on the Cryptocurrency exchanges for a profit."  The White Paper-1 also claimed that the Centra Card and Centra Wallet were "already live in beta," and that Centra Tech was "offering our initial crowd sale of tokens to appropriately fund the vision of Centra Tech's future."  It further claimed that Centra Tech's "initial coin offering allows users to join

---

[1]    The summaries and transcript of the recorded interview set forth herein are based on a preliminary draft transcription and remain subject to revision.

14

our success and mission *while generating a profit.*" (Emphasis added).

**FRAUDULENT REPRESENTATIONS ABOUT CENTRA'S EXECUTIVE TEAM**

17.  Based on the facts set forth below, there is probable cause to believe that in soliciting assets worth millions of dollars for the purchase of digital tokens issued by Centra Tech, RAYMOND TRAPANI, a/k/a "Ray," the defendant, and his co-conspirators, Sohrab Sharma, a/k/a "Sam Sharma," and Robert Farkas, a/k/a "RJ," a/k/a "Bob," made false statements portraying Centra Tech's executive team as a group of experienced professionals with impressive credentials.  For example, as shown below, Centra Tech made false statements that its executive team included two purported senior executives named "Michael Edwards" and "Jessica Robinson," who supposedly had impressive work histories and academic credentials, and TRAPANI made false statements representing that he had had earned a master's degree from UCLA's graduate school of business.  In fact, as shown below, both "Michael Edwards" and "Jessica Robinson" are fictional people who do not exist, and TRAPANI never attended UCLA's graduate school of business.

18.  I have reviewed documents provided by Centra Tech to the SEC, including documents reflecting LinkedIn profiles for RAYMOND TRAPANI, a/k/a "Ray," the defendant, and his co-conspirators, Sohrab Sharma, a/k/a "Sam Sharma," and Robert Farkas, a/k/a "RJ," a/k/a "Bob," that were published at various times on the internet via LinkedIn's website.[2]  I have also reviewed criminal history records of TRAPANI as well as Sharma and Farkas.  Based on my review of such documents, I have learned the following, in substance and in part:

---

[2]    Based on my training and experience and my review of LinkedIn's internet website, I know that LinkedIn is a company that owns and operates a professional-networking website of the same name that allows any internet user to establish his or her own account with LinkedIn, which this user can use to create the user's own profile containing his or her photograph and work and educational history, to publish the profile via LinkedIn's website, to connect accounts with and communicate with other LinkedIn users, and to share news articles with other LinkedIn users.  If a user creates a publicly-viewable LinkedIn account and profile in his or her own name, the profile will be viewable to anyone with internet access, including, for example, anyone who conducts an internet search for the user's name.

a.    During the period from approximately July 30 through October 5, 2017, in which Centra Tech raised funds worth more than $25 million through its ICO, TRAPANI and Sharma were both 26 years old, and Farkas was 30 years old. As shown above, before they co-founded Centra Tech, TRAPANI as well as Sharma and Farkas had worked as (among other things) executives of a luxury car rental company called Miami Exotics in Florida.

19.  During the period from approximately July 30 through October 5, 2017, in which Centra Tech raised funds worth more than $25 million through its ICO, Centra Tech made the following representations (among others) about the company's executive team:

a.    The White Paper-1, which was available to the public via the Centra Tech Website as of on or about August 3, 2017, contained a section entitled "Centra Tech Team" listing: (i) a purported individual named "Michael Edwards" as Centra Tech's "CEO & Co-Founder," along with a supposed picture of "Michael Edwards"; (ii) a purported individual named "Jessica Robinson" as Centra Tech's "CFO," along with a supposed picture of "Jessica Robinson"; (iii) and information about other executives and employees of Centra Tech, including Sohrab Sharma, a/k/a "Sam Sharma," who was listed as Centra Tech's "CTO & Co-Founder," RAYMOND TRAPANI, a/k/a "Ray," who was listed as Centra Tech's "COO," and Robert Farkas, a/k/a "RJ," a/k/a "Bob," who was listed as Centra Tech's "CMO."[3]

b.    On or about August 14, 2017, Sharma was interviewed by Neocash Radio, a cryptocurrency podcast that broadcasts its radio show via the internet, about Centra Tech's ICO.  Based on my

---

[3]    Although the White Paper-1 listed TRAPANI as the "COO" of Centra Tech with an accompanying photograph, the person featured in that photograph was someone other than TRAPANI.  I have become familiar with TRAPANI's physical appearance from reviewing various photographs of him, including a photograph taken of TRAPANI following a prior arrest by law enforcement.  Based on certain text messages between TRAPANI and Sharma that are quoted below, it appears that TRAPANI's photograph was not included in the White Paper-1 because TRAPANI and Sharma did not have a suitable photograph of TRAPANI when the White Paper-1 was prepared.

16

review of a recording of the interview,[4] I have learned that when Sharma was asked during the interview how Centra Tech obtained its startup capital, Sharma stated, among other things, that "we have one private investor, whose actually Mike Edwards" and that Edwards is "also our VP and co-founder" who "put up a lot of the capital originally" to establish Centra Tech.[5]

     c.    Based on my review of documents that Centra Tech has produced to the SEC, including documents reflecting LinkedIn profiles that were published at various times on the internet via LinkedIn's website, I have the learned the following, in substance and part:

       i.    During the course of the ICO, LinkedIn profiles were published via the internet for various Centra Tech executives and employees.

       ii.    According to a LinkedIn profile for "Michael Edwards" that was available to the public via the internet as of on or about August 3, 2017, "Michael Edwards" earned a master's in business administration from Harvard University, had more than 20 years of experience in the banking industry as a financial analyst at Bank of America (1993 through 2001), a vice president at Chase (2001 through 2011) and a senior vice president at Wells Fargo (2011 through 2016), and was the "CEO & Co-Founder of Centra Tech" and where he had worked since May 2016 and had "[e]stablished licensing and partnership terms with Visa & Mastercard," among other accomplishments.

       iii.    According to a LinkedIn profile for "Jessica Robinson" that was available to the public via the internet as of in or about August 2017, "Jessica Robinson" had close to five years of experience as the Chief Financial Officer of Johnson Communications before becoming the Chief Financial Officer of Centra Tech, where she had worked since December

---

[4]    The summaries and transcript of the recorded interview set forth herein is based on a preliminary draft transcription and remains subject to revision.

[5]    During the interview, Sharma directed listeners to the Centra Tech website, www.centra.tech, to find out more about the Centra Tech ICO: "You can go to our website, www.centra.tech, and you can click the token sale page as well as our white paper is on there and you can just get an insight of everything from A to Z."

2016 and had "[c]reated the partnership between Centra and a Major US Bank."

    iv.    According to a LinkedIn profile for RAYMOND TRAPANI, a/k/a "Ray," the defendant, TRAPANI had earned a master's degree in "Operations Management and Supervision" from UCLA in 2015.

    20.  Based on the facts set forth below, there is probable cause to believe that "Michael Edwards" and "Jessica Robinson" of Centra Tech are not real people, that RAYMOND TRAPANI, a/k/a "Ray," the defendant, did not earn a master's degree from UCLA's graduate school of business, and that TRAPANI and his co-conspirators, Sohrab Sharma, a/k/a "Sam Sharma," and Robert Farkas, a/k/a "RJ," a/k/a "Bob," were well aware of these facts:

    a.  Based on open source internet searches, I have learned that the photograph of "Michael Edwards" in the White Paper-1 that purportedly was the "CEO & Co-Founder" of Centra Tech was actually a photograph of an individual by a different name who is a Canadian physiology professor with no business relationship with Centra Tech. Based on my review of an article about Centra Tech that was published on the internet in early August 2017 by an online blogger, I know that the author of this article also made this observation about a photograph of "Michael Edwards" that had been published by Centra Tech. According to a subsequent *New York Times* article, "[t]he first cracks" in Centra Tech's ICO "appeared in early August" 2017, when that online blogger "wrote on his blog that Mr. Edwards appeared to be made up," in response to which "Centra initially threatened to sue [the blogger] but then said the bad profiles were the result of freelancers who had hastily put together the company's marketing material." (As shown below, in responding to a cease-and-desist notice from Bancorp demanding that Centra Tech remove all unauthorized references to Bancorp from Centra Tech's marketing materials, Sharma suggested in a text message to TRAPANI and Farkas that "We gotta get that shit removed everywhere and blame freelancers lol.")

    b.  Based on my review of publicly available information about Centra Tech, including my review of the results of internet searches for a "Michael Edwards" who is or was the CEO of Centra Tech and a "Jessica Robinson" who is or was the CFO of Centra Tech, I have learned that photographs and profiles of "Michael Edwards" and "Jessica Robinson" no longer appear on the Centra Tech Website or the version of Centra Tech's white paper that is currently available on the Centra Tech Website, and the

LinkedIn profiles for "Michael Edwards" and "Jessica Robinson" of Centra Tech appear to have been deleted.

c.      On or about April 16, 2018, the Government requested that the National Student Clearinghouse ("NSC"), a service that maintains an up-to-date database of graduation data for thousands of post-secondary educational institutions including UCLA, perform a search of its database to verify whether any student by the name of "Raymond Trapani" with the date of birth listed for TRAPANI in his criminal history records had ever earned a master's degree from UCLA. Based on my review of the results of this search, the NSC has reported that the NSC was informed by UCLA that UCLA has no record of anyone with that name and birthday ever having earned a master's degree from UCLA, and that the NSC was unable to verify a degree for this individual based the information provided to the NSC during the search.[6] In addition, based on information provided by the SEC, I have learned that on or about April 17, 2018, the SEC was informed by an employee of UCLA's registrar's office that UCLA does not offer a master's degree in "Operations Management and Supervision" (which is the type of master's degree that TRAPANI claimed to have earned from UCLA in the LinkedIn profile referenced above).

d.      Based on my review of text messages and other data found in a cellphone that was recovered from TRAPANI in October 2017 (the "TRAPANI Cellphone"),[7] I have learned the following, in substance and part:

_____

[6]      According to the search results provided by the NSC, "[p]ossible reasons" for why the NSC was "unable to verify a degree for this individual" include, among other things, that "[t]he individual never received a degree from the selected school," "[t]he individual never enrolled," and "[t]he individual has chosen to keep his or her student records private."

[7]      Based on my conversations with other law enforcement officials and my review of documents provided by DANY, I have learned, in substance and in part, the following. The TRAPANI Cellphone was recovered from TRAPANI following his surrender on or about October 5, 2017 on the perjury indictment described above. On the date of this surrender, TRAPANI signed a consent form giving DANY and the New York City Police Department his "voluntary consent to a complete search" of the TRAPANI Cellphone, and he also wrote the password to access the TRAPANI Cellphone on the consent form. Pursuant to that consent form, the TRAPANI Cellphone was searched, its contents were copied into an extraction report containing more

                    i.    On or about July 29, 2017, TRAPANI, via the
TRAPANI Cellphone, received several text messages from
Sharma, via a cellphone with a call number ending with "3138"
(the "SHARMA Cellphone-1"),[8] concerning photographs of Centra
Tech's team of executives and employees, including several
text messages about Centra Tech's purported Chief Executive
Officer "Michael Edwards" and supposed Chief Financial
Officer "Jessica Robinson." Each of these text messages was
viewed by the user of the TRAPANI Cellphone, according to
data recovered from the TRAPANI Cellphone. These text
messages were as follows:

                    1.    On or about July 29, 2017, starting at
approximately 1:18PM, Sharma sent text messages to
TRAPANI in which Sharma wrote: "Yo," "Still need a pic
asap," "Just any pic without a chain," "Put a polo,"
"Yea," "And take a good selfie," "Bro it doesn't matter,"
"Just do it," "No ones gonna care about your cut," and
"This pic looks horrible," following which Sharma sent
a photograph of TRAPANI accompanied by the name "Raymond
Trapani" and the title "COO."

                    2.    After sending that photograph, starting at
approximately 2:11PM on or about July 29, 2017, Sharma
sent text messages to TRAPANI in which Sharma wrote:
"Need a better one asap," "Open your eyes," "Lol," "Put
a polo on dude," "This is a million dollar project,"

---

than 14,000 pages of materials, and the TRAPANI Cellphone was
returned to TRAPANI. I have reviewed the extraction report
documentation generated as result of this consensual search. The
dates and times of particular text messages reported in this
Complaint as they appear in the extraction report, without
conversion to eastern standard time.

[8]    Based on my review of the contact information stored in the
TRAPANI Cellphone, I know that the call number for the SHARMA
Cellphone-1 is identified as that of "Sam Ny," and from my
participation in this investigation, I know that "Sam" is one of
the aliases of Sohrab Sharma, a/k/a "Sam Sharma," and that Sharma
used to live in New York. In addition, I have reviewed documents
that Centra Tech has produced to the SEC, including an email chain
from August 2017 in which Sharma identified the call number for
the SHARMA Cellphone-1 as his cellphone number.

"I'm labeling you the COO," "Gotta look the part," "Put gel in," "I'll photoshop your shit."

3.     Starting at approximately 2:45PM on or about July 29, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote:   "Need to find someone who looks like Michael," "Team photos," "He's real lol," "Everyone real," "Except Jessica," "And Mike."

4.     Starting at approximately 7:12PM on or about July 29, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote:   "Gonna kill both Ceo and her," "Gonna say they were married and got into an accident."

ii.     On or about July 29, 2017, Sharma, via the SHARMA Cellphone-1, also sent the following text messages to TRAPANI, via the TRAPANI Cellphone, each of which was viewed by the user of the TRAPANI Cellphone, according to data recovered from the TRAPANI Cellphone:

1.     Starting at approximately 1:48AM on or about July 29, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote:   "Send me a good selfie of yourself," "Gonna put you on the site," "Centra blowing up," "I need to put real photos on there," "Of the 'team,'" "Just a good pic it gets edited," "My guy doing all the photos now."

2.     Starting at approximately 1:52AM on or about July 29, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote:  "I had fufu people on there," "And I been getting called out," "So gonna get it corrected," "Lol," "Lol," "Lol," "Just send me a pic lol."  (Based on my review of the results of open source internet searches, my participation in this investigation, and my training and experience, I understand the term "fufu" to be slang for "fake.")

3.     Starting at approximately 1:59AM on or about July 29, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote:  "Someone's gonna be like wtf," "I had one guy literally go through every single little detail," "I just rather cover all tracks now."

4.     Starting at approximately 2:03AM on or about July 29, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote:   "This is gonna pop," "I got 60

black card orders lol," "That's like almost a mill right
there," "1 paid already," "Before ICO even went live .
. . . Internet can be skeptical," "That's why I need
to make it as real as possible," "Can't run it on fufu,"
"Even tho I'm all reality."

5.    Starting at approximately 2:05AM on or about
July 29, 2017, Sharma sent text messages to TRAPANI in
which Sharma wrote:  "But it's coming to that point,"
"Where people wanna see whose behind the project," "I
had one girl contact me lol," "And said take my picture
off your site," "Cause one of her friends saw it cause
it's blowing up," "Dead ass od funny," "I kept saying
it was an honest mistake."

6.    Starting at approximately 2:05AM on or about
July 29, 2017, Sharma sent text messages to TRAPANI in
which Sharma wrote:  "U know anyone," "That looks like
this guy," following which Sharma sent a photograph of
"Michael Edwards" (which I recognize to be the same
photograph of "Michael Edwards" that was included in
the White Paper-1) accompanied by the name "Michael
Edwards" and the title "CEO & Co-Founder."  Sharma then
wrote "I need someone who kind looks like him," "I can't
just change him now," "People are gonna be like wtf."

iii.    On or about July 30, 2017, Sharma, via the
SHARMA Cellphone-1, sent several text messages to TRAPANI,
via the TRAPANI Cellphone, concerning setting up a LinkedIn
profile for TRAPANI.  Each of these text messages was viewed
by the user of the TRAPANI Cellphone, according to data
recovered from the TRAPANI Cellphone.  These text messages
were as follows:

1.    On or about July 30, 2017, starting at
approximately 12:40AM, Sharma sent text messages to
TRAPANI in which Sharma wrote:  "Go make a linked in,"
"And add as many connections as you can," "Add yourself
to centra tech," "As Coo," "And add connections,"
"Google," "Coo linked in profiles," "And get all the
info," "Put precious jobs," "Like banks etc."

2.    Starting at approximately 1:39AM on or about
July 30, 2017, Sharma sent text messages to TRAPANI in
which Sharma wrote:  "December," "2016," "Take Harvard
out," "Do Like university of Georgia," "It would too

22

suspect everyone from hRvard,"[9]  "Add a construction company prior."[10]

    iv.    On or about September 13 and 14, 2017, TRAPANI, via the TRAPANI Cellphone-1, participated in a group text message conversation with Sharma, via the SHARMA Cellphone-1, and Farkas, via a cellphone with a call number ending with "6826" (the "FARKAS Cellphone-1"),[11] while Sharma was on a business trip for the purpose of soliciting investments in Centra Tech from a company called Bitsset.[12] The user of the TRAPANI Cellphone viewed all of the text messages received in this conversation, according to data recovered from the TRAPANI Cellphone.  During this group conversation, starting at approximately 12:10AM on or about September 14, 2017, TRAPANI sent a text message to Sharma and Farkas in which TRAPANI wrote "Just gotta close this shit with Bitsset get that ETH," and Sharma responded "We need to remove mike Edwards and "Jessica asap," "After ICO."

---

[9]    Throughout this Complaint, this and other misspellings in text messages recovered from the TRAPANI Cellphone have been quoted without correction unless otherwise noted.

[10]    According to a LinkedIn profile for TRAPANI that was available to the public via the internet as of in or about August 2017, TRAPANI reportedly started working as "COO" at Centra Tech in December 2016 and prior to that worked as a general foreman at "one of the largest construction companies in the US."

[11]    Based on my review of the contact information stored in the TRAPANI Cellphone, I know that the call number for the FARKAS Cellphone-1 is identified as that of "RJ," and from my participation in this investigation, I know that "RJ" is one of the aliases of Robert Farkas, a/k/a "RJ," a/k/a "Bob."  In addition, I have reviewed documents that Centra Tech has produced to the SEC, including a merchant application dated September 26, 2017 listing mobile cellphone numbers for several Centra Tech employees, including "Robert Farkas," and identifying the call number for the FARKAS Cellphone-1 as Farkas' cellphone number.

[12]    Based on my review of publicly available information about Centra Tech, my conversations with representatives of the SEC, and my participation in this investigation, I have learned that Bitsett later invested approximately 40,000 Ether units for the purchase of digital tokens issued by Centra Tech in its ICO, and that 40,000 Ether units would be worth approximately $20 million as of on or about April 17, 2018.

## FRAUDULENT REPRESENTATIONS ABOUT PURPORTED PARTNERSHIPS

21.  Based on the facts set forth below, there is probable cause to believe that in soliciting assets worth millions of dollars for the purchase of digital tokens issued by Centra Tech, RAYMOND TRAPANI, a/k/a "Ray," the defendant, and his co-conspirators, Sohrab Sharma, a/k/a "Sam Sharma," and Robert Farkas, a/k/a "RJ," a/k/a "Bob," made false statements that Centra Tech had developed a debit card (the "Centra Debit Card" or "Centra Card") that allowed users to spend cryptocurrency to make purchases at any establishment that accepts Visa or Mastercard, and that Centra Tech had formed partnerships with Bancorp, Visa, and Mastercard to issue Centra Debit Cards licensed by Visa (for domestic transactions in the United States) and Centra Debit Cards licensed by Mastercard (for international transactions outside of the United States).  In fact, as shown below, Centra Tech had no such partnerships with Bancorp, Visa, or Mastercard.

22.  During the period from approximately July 30, 2017 through October 5, 2017, in which Centra Tech raised funds worth more than $25 million through its ICO, Centra Tech made the following representations (among others) about the company's purported partnerships with Bancorp, Visa and Mastercard:

a.  Centra Tech's White Paper-1, which was available to the public via the internet as of on or about August 3, 2017, contained various statements touting Centra Tech's claimed partnerships with Bancorp, Visa and Mastercard.  For example:

i.  The White Paper-1 stated:  "With market cap of cryptocurrencies exceeding $100 billion, the time is ripe to introduce a cryptocurrency-based marketplace where customers can use Centra Debit Card anywhere in the world that accepts Visa."

ii.  In describing the Centra Debit Card, the White Paper-1 stated:  "For our United States clients the Centra Card will be a Visa card while for international users the Centra card issued will be a MasterCard.  The Centra Card allows all supported cryptocurrencies to become spendable in real-time based on the government-fiat being used at the time the card is used at a participating location that accepts Visa or MasterCard."

iii.  The White Paper-1, under a heading entitled "Centra Tech Partners," displayed the logos of Bancorp, Visa and Mastercard.

24

iv.   The White Paper-1 contained a section entitled "Centra Status" stating that "[a]s of July 2017: . . . Worldwide Debit Card Partnership for both United States and International," followed by a diagram containing an image of a Centra Card with a "Visa" logo on it, among other images.

v.   The White Paper-1 contained a section entitled "Centra Tech Road Map" with a diagram listing "milestone items" in Centra Tech's development since its formation, including a milestone stating that in January 2017 "Major Banking Partnership signed and license agreement with VISA USA Inc formulated."

vi.   The White Paper-1 contained multiple images of a Centra Debit Cards with "Visa" and "Mastercard" logos displayed on the cards next to Centra Tech's own logo — a gold coin with a "C" in the middle.

vii.   The White Paper-1 also stated that one benefit of the Centra Debit Card was "Access to 36+ Million Points of Sale where Visa and/or Master-Card is accepted in 200+ countries."

viii.   A product comparison table in the White Paper-1 reported that the issuers of the Centra Card were "MasterCard and Visa."

b.   Based on my interview of a representative of Bancorp (the "Bancorp Witness-1") and my review of documents provided by Bancorp, I have learned, in substance and in part, that after becoming aware in approximately August 2017 that the Centra Tech Website contained false representations about a purported partnership between Centra Tech and Bancorp, the Bancorp Witness took screenshots of the Centra Tech Website, including a page that misrepresented Bancorp's issuer statement. One screenshot that the Bancorp Witness retained stated, among other things:

The Centra Card Visa Debit Card is issued by The Bancorp Bank, member FDIC, pursuant to a license from Visa U.S.A. Inc. "The Bankcorp"[13] and "The Bancorp Bank" are registered

---

[13]   This excerpt from the Centra Tech Website has not been altered to correct spelling or other errors. In this excerpt, "Bancorp" is also spelled "Bankcorp."

trademarks of The Bankcorp Bank © 2014.  Use
of the Card is subject to the terms and
conditions of the applicable Cardholder
Agreement and fee schedule, if any.

The Centra Card Mastercard® Debit Card is
issued by The Bancorp Bank, member FDIC,
pursuant to a license from Mastercard
International Incorporated.  "The Bankcorp"
and "The Bancorp Bank" are registered
trademarks of The Bankcorp Bank © 2014. Use of
the Card is subject to the terms and
conditions of the applicable Cardholder
Agreement and fee schedule, if any.

     c.  In his interview on the internet podcast Neocash
Radio on or about August 14, 2017, referenced above, Sohrab Sharma,
a/k/a "Sam Sharma," stated, among other things, the following about
Centra Tech's purported partnerships with Visa and Mastercard for
the issuance of Centra Debit Cards: "[I]nternationally, we
currently have our license with Mastercard, to service
international clients.  Domestically, we do have the Visa
partnership, so we are able to issue Visa cards domestically and
Mastercards internationally."

     d.  Based on my review of documents that Centra Tech
has produced to the SEC, I have learned that on or about October
13, 2017, Farkas, via his email account "rjfarkas6@gmail.com,"
sent to an email to Sharma, via his email accounts
"sam@centra.tech" and "ssharma491@gmail.com," attaching FARKAS'
edits to an investor pitch deck dated August 15, 2017, promoting
Centra Tech and its ICO.  The pitch deck stated, among other
things, that: (i) the Centra Card gives users "[a]ccess to more
than 36 Million Points of Sale wherever Visa and/or Mastercard is
accepted"; (ii) the Centra Card was "issued" by "Mastercard and
Visa;" and (iii) Centra in January 2017 had a "Major Banking
Partnership and license agreement signed with VISA USA Inc."

     23.  Based on the facts set forth below, there is probable
cause to believe that above-described representations by Centra
Tech about its purported partnerships with Bancorp, Visa and
Mastercard were false:

     a.  Based on my conversations with the Bancorp Witness-
1 and another representative of Bancorp (the "Bancorp Witness-2"),
and my review of documents provided by Bancorp, I have learned, in
substance and in part, that after Bancorp became aware in

approximately August 2017 that Centra Tech had published marketing materials in connection with its ICO claiming that Bancorp had agreed with Centra Tech to issue Centra Debit Cards licensed by Visa and Mastercard, Bancorp researched whether Bancorp had any such relationship with Centra Tech. Through this research, Bancorp confirmed that Bancorp did not have any such relationship with Centra Tech.

b.   Based on my conversations with a representative of Visa (the "Visa Witness") and my review of documents provided by Visa, I have learned, in substance and in part, that after Visa became aware in approximately October 2017 that Centra Tech was using the Visa name and logo on marketing materials in connection with the Centra Debit Card and Centra Tech's ICO, Visa researched whether Visa had any relationship, direct or indirect, with Centra Tech. Through this research, Visa determined that Visa had no such relationship with Centra Tech.

c.   Based on my conversations with a representative of MasterCard (the "Mastercard Witness"), I have learned, in substance and in part, that MasterCard's internal records of licensing agreements and relationships with card-issuing banks and other third parties contains no record of any relationship, either direct or indirect, with Centra Tech.

24.   Based on the facts set forth below, there is probable cause to believe that RAYMOND TRAPANI, a/k/a "Ray," the defendant, and his co-conspirators, Sohrab Sharma, a/k/a "Sam Sharma," and Robert Farkas, a/k/a "RJ," a/k/a "Bob," were well aware that Centra Tech's representations about its purported partnerships with Bancorp, Visa and Mastercard were false and misleading:

a.   Based on my review of text messages and other data recovered from the TRAPANI Cellphone, I have learned the following, in substance and part. On or about July 31, 2017, Sharma, via the SHARMA Cellphone-1, sent several text messages to TRAPANI, via the TRAPANI Cellphone, concerning plans to make calls to obtain licensing agreements with Visa or Mastercards (agreements that the white-paper I represented were already in place). These text messages, each of which was viewed by the user of the TRAPANI Cellphone according to data recovered from the TRAPANI Cellphone, were as follows:

i.   Starting at approximately 2:54AM on or about July 31, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote: "Should write down a list of places to call tomorrow," "For the conbranded card."

    ii.    Starting at approximately 1:12PM on or about July 31, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote:  "Gotta get it going on the banks today plz."

    iii.    Starting at approximately 11:16PM on or about July 31, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote:  "We just need to get s banking license," "Need our direct agreement with visa," "Or MasterCard," "That's the move," "Cut out the middle man," "I wish we just knew someone."

    b.    Based on my review of documents that Centra Tech has produced to the SEC and documents provided by Bancorp, and my conversations with the Bancorp Witness-2, I have learned, in substance and in part, that on or about August 30, 2017, Bancorp sent a cease-and-desist notice to Sharma stating that "CENTRA TECH IS HEREBY DIRECTED TO CEASE AND DESIST FROM REPRESENTING THAT THE BANCORP BANK HAS ANY CONNECTION WITH, OR IS THE ISSUER OF ANY CARD PRODUCTS RELATED TO CENTRA TECH . . . [and from] USING OUR LOGO OR OTHER IMAGES IN CONNECTION WITH THE MARKETING OF ANY PRODUCT OR WALLETS YOU OFFER."

    c.    Based on my review of text messages and other data recovered from the TRAPANI Cellphone, I have learned, in substance and part, that on or about August 30, 2017, TRAPANI, via the Trapani Cellphone, participated in a group text message conversation with Sharma, via the SHARMA Cellphone-1, and Farkas, via the FARKAS Cellphone-1, in which the three of them exchanged various text messages about taking down (among other things) images of the Bancorp logo that had been posted on the the Centra Tech Website.  The user of the TRAPANI Cellphone-1 viewed each of the text messages received during this group conversation, according to data recovered from the TRAPANI Cellphone-1.  During this group conversation, the following occurred, in substance and in part:

    i.    Starting at approximately 4:21PM on or about August 30, 2017, Sharma sent text messages to TRAPANI and Farkas in which SHARMA wrote:  "Yo," "One of you login to," "Medium/@centra asap," "And remove that thumbnail," "For us," "And Bitsset," "Image," "Asap," "Bancorp reached out." Farkas responded "What's login."  Sharma wrote:  "You click sign in by email," "And it'll send support and email . . . I don't have wifi," "Just remove the picture r," "In that article."

ii.  At approximately 4:23PM on or about August 30, 2017, TRAPANI sent a text message to Sharma and Farkas in which TRAPANI wrote:  "Will in 30 mins at hospital."  Sharma responded "Do it asap rocky."  Farkas wrote "Done."  TRAPANI responded "Good shit RJ."

iii.  Starting at 4:33PM on or about August 30, 2017, Sharma sent text messages to TRAPANI and Farkas in which Sharma wrote:  "RJ," "Google Bitsset and Centra," "And contact anyone that has that image," "And ask them to remove it . . . . . Or that language," "Saying we work Bancorp," "Od bad," "Their lawyer reached out."

iv.  Starting at approximately 4:35PM on or about August 30, 2017, Farkas sent a text message to TRAPANI and Sharma in which Farkas wrote "No Bancorp on it."  Sharma responded:  "In the bottom? . . . .  U sure," "I thought I saw," "On press releases."  FARKAS wrote:  "Just checked them all," "No Bancorp."  Sharma responded:  "Okay," "We gotta get that shit removed everywhere and blame freelancers lol," "Fuck," "One fucking faggot," "Caused so much . . . [r]uckess."

d.  Based on my review of text messages recovered from the TRAPANI Cellphone, I believed and respectfully submit that there is probable cause to believe that RAYMOND TRAPANI, a/k/a "Ray," the defendant, participated in a video promoting Centra Tech containing false representations about Bancorp, that was available to the public via the internet as of on or about September 22, 2017 but has since been deleted.  I have not been able to recover or view the video itself, but there are references to the video during a group text message conversation on or about September 22, 2017 among TRAPANI, via the TRAPANI Cellphone, Sharma, via the SHARMA Cellphone-1, and Farkas, via the FARKAS Cellphone-1.  During this group conversation, Farkas wrote:  "Says Bancorp on your video-ray is that ok."  TRAPANI responded:  "Gotta get it edited but we have been saying Bancorp."  Sharma wrote "What video," "Fake it off," "I don't wanna get sued."

e.  Based on my review of text messages recovered from and other data recovered from the TRAPANI Cellphone, I have learned the following, in substance and part.  On or about September 24, 2017, TRAPANI, via the TRAPANI Cellphone, received several text messages from Sharma, via the SHARMA Cellphone-1, concerning why Centra Tech needed to bring an individual known to both as them as "Ryan" into Centra Tech because his family had connections with the owners of Visa and Mastercard (connections that Centra Tech

presumably would not have needed if it had already formed the partnerships with Visa and Mastercard that Centra Tech had claimed to have in the White Paper-1).   For example, starting at approximately 5:03AM on or about September 24, 2017, Sharma sent text messages to TRAPANI in which Sharma wrote:  "We gotta get Ryan in [h]is family knows the owners of visa and amstecsd," "Mastercard," "Word praying," "Od loll," "It's like in our face." Each of these text messages was viewed by the user of the TRAPANI Cellphone, according to data recovered from the TRAPANI Cellphone.

  f. Based on my review of the SEC's website, I know that on or about September 29, 2017, the SEC issued a press release announcing that it had filed a complaint in the Eastern District of New York charging a company called "RECoin" and the company's founder, among others, with defrauding investors in an unregistered offering of securities styled as an initial coin offering. Based on my review of text messages recovered and other data from the TRAPANI Cellphone, I have learned, in substance and part, that on or about September 29, 2017, during a group text message conversation among TRAPANI, via the Trapani Cellphone, Sharma, via a cellphone with a call number ending with "6091" ("SHARMA Cellphone-2"),[14] and FARKAS, via a cellphone with a call number ending with "2656" ("FARKAS Cellphone-2"),[15] the three of them exchanged various text messages about taking down (among other things) the version of Centra Tech's white paper listed on the

---

[14] Based on my review of the contact information stored in the TRAPANI Cellphone, I know that the call number for the SHARMA Cellphone-2 is identified as that of "Sammmmm," and from my participation in this investigation, I know that "Sam" is one of the aliases of Sohrab Sharma, a/k/a "Sam Sharma." In addition, I have reviewed documents that Centra Tech has produced to the SEC, including an email chain from October 2017 in which Sharma identified the call number for the SHARMA Cellphone-2 as his "direct line."

[15] Based on my review of the contact information stored in the TRAPANI Cellphone, I know that the call number for the FARKAS Cellphone-2 is identified as that of "RJ Work," and from my participation in this investigation, I know that "RJ" is one of the aliases of Robert Farkas, a/k/a "RJ," a/k/a "Bob." In addition, I have reviewed documents that Centra Tech has produced to the SEC, including an email chain from October 2017 in which Farkas stated he could be contacted at the call number for the FARKAS Cellphone-2.

Centra Tech Website at the time.  During this group conversation, the following occurred, in substance and in part:

      i.     Starting at 5:34PM on or about September 29, 2017, Sharma sent text messages to TRAPANI and Farkas in which Sharma wrote:  "Ray . . . .  Can u have Javier remove the card with the visa logo on it . . .  On centa Tech website," "On the bottom," "And also remove white paper from website for now . . . .  I think it's best to take the white paper offline like Monaco did."[16]

      ii.    TRAPANI responded "What's up" at approximately 5:34PM on or about September 29, 2017.

      iii.    Sharma wrote "Yea let's take that bitch down asap" at approximately 5:36PM on or about September 29, 2017. Farkas responded "No good?"

      iv.    TRAPANI wrote "I think we should have white paper up but maybe just take it down and reword it as proper as possible then put back up with the bonus structure everything" at approximately 5:37PM on or about September 29, 2017.

      v.    Starting at approximately 5:38PM on or about September 29, 2017, Sharma wrote:  "I rather cut any fufu," "Off right own," "Now," "Then worry," "Anything that doesn't exist current," "We need to remove," "Have them do it asap."

      vi.    Starting at 11:54PM on or about September 29, 2017, Sharma sent text messages to TRAPANI and Farkas in which Sharma wrote:  "Sec just shut down REcoin," "Read the article," "We gotta clean up every single thing that we can't do," "And can't offer today," "Google SEC REcoin." TRAPANI responded "I peep" at approximately 11:54PM on or about September 29, 2017.

      vii.    Starting at approximately 11:55PM on or about September 29, 2017, Sharma sent text messages to TRAPANI and

---

[16]  According to a *Bloomberg News* article published via the internet on or about October 2, 2017, Monaco Technology was a company that claimed to investors in May 2017 that it had introduced a Visa-branded payment card for spending cryptocurrencies at merchant locations in Visa's network, but at the time, "Monaco didn't have a deal with Visa."

Farkas in which Sharma wrote:  "Delete all the cards have shipped info," "Everything gotta get cleaned up," "RJ can u jump on that . . . on our pages."

viii.    TRAPANI responded "They were pitching a straight security" at approximately 11:55Pm on or about September 29, 2017.  Sharma wrote "Yea," "I know," "But fill fraud can be a word thrown around," "Especially with the card limits."  TRAPANI responded "Word" at approximately 11:55PM on or about September 29, 2017.

ix.    Starting at approximately 11:55PM on or about September 29, 2017, Sharma sent text messages to TRAPANI and Farkas in which Sharma wrote:  "I want a product page like monacos," "Theirs is so nice."  TRAPANI wrote "Lol yeah no real product."  Sharma wrote:  "Yea but it doesn't say much," "And looks good," "We don't have a real product either right now," "So I wanna tighten up ship asap."  TRAPANI wrote "Feel you."

x.    Starting at 11:57PM on or about September 29, 2017, Sharma sent text messages to TRAPANI and Farkas in which Sharma wrote:  "All we really need to do," "Is remove the limits."  Farkas responded "Delete everything on our chats that say cards have shipped?"  Sharma wrote "Yea."  Farkas wrote "Ok."  Sharma wrote "Let's play on the safe side," "Our price is way to high for us to slip."  TRAPANI wrote "Agreed."  Farkas wrote "Ok thx."

25.  Based on my conversations with a representative of Visa (the "Visa Witness") and my review of documents provided by Visa, I have learned, in substance and in part, the following.  On or about October 10, 2017, after Visa became aware that Centra Tech's promotional materials contained false representations about a purported partnership between Centra and Visa, Visa's Legal Department sent an email to Centra Tech, via the email address "support@centra.tech," attaching a cease-and-desist letter (the "October 10 Letter").  In the October 10 Letter, Visa stated, in part:

It has come to our attention that Centra Tech ("Centra") is using the Visa-Owned Marks on its site https://www.centra.tech as well as on its various social media sites (e.g., Facebook, Twitter, Instagram, YouTube) and other mediums.  It appears Centra is purporting to be an authorized distributor of

32

VISA payment cards utilizing cryptocurrency
technology. . . . However, to the best of our
knowledge and good faith belief, Centra is not
authorized to use the Visa-Owned Marks in this
manner, nor is it authorized to issue, sell,
or otherwise distribute VISA payment cards.
If this is not the case, please advise and
explain immediately, i.e., if Centra is
working with an authorized Visa Issuing bank.

a.   Visa attached to the October 10 Letter multiple
screenshots from the Centra Tech Website in which Centra Tech had
misappropriated the Visa trademark.   In the October 10 Letter,
Visa requested that Centra Tech cease and desist from using Visa's
trademarks and "promoting that it is an authorized distributor of
VISA payment cards," and for Centra Tech to remove all references
to Visa from the Centra Tech Website and any promotional materials.
Visa also requested that Centra Tech "identify the bank or
financial institution it is working with (if any) to issue a
purported VISA payment card product."

b.   In response to the October 10 Letter, Sohrab
Sharma, a/k/a "Sam Sharma," provided Visa with an acknowledgment
that he had received the October 10 Letter, but did not identify
any financial institutions with which Centra Tech was working to
issue a Visa payment card product.

26.   Based on my review of documents that Centra Tech has
produced to the SEC, I have learned, in substance and in part, the
following:

a.   On or about October 10, 2017, Sohrab Sharma, a/k/a
"Sam Sharma," using the email address "sam@centra.tech," emailed
a response to Visa's October 10 Letter, stating:

This matter has been brought to my attention.
I will have this matter rectified in 48 hours.
We are currently in the process of finalizing
our Co-branded Prepaid Card Program, but might
not meet the Nov 1st lock out deadlines for
submission from our issuing bank whom is an
authorized visa issuer for card design
approval, so can see where this issue might of
came from.

However, I have immediately contacted my web
developers to remove all issues and I will

33

have this document [a cease and desist
acknowledgment] signed and returned within 48
hours.

Thank you,
Sam Sharma

b.   On or about October 11, 2017, Visa responded to
Sharma's email, and requested that he "advise of the Visa issuing
bank you are working with."

c.   On or about October 12, 2017, Sharma responded
again via email, using his "sam@centra.tech" email account, and
stated:  "As far as the issuing bank we have an MNDA in place
currently.  VISA will soon get our information for Card Design
approval and program specs from our future issuing bank in the
US."  Sharma signed the email, "Thank you, Sam."  Based on my
training and experience, I believe Sharma was claiming that he had
a Mutual Non-Disclosure Agreement with the purported issuing bank
in this email and that he therefore could not disclose its
identity.  (Based on my review of text messages and other data
recovered from the TRAPANI Cellphone, I have learned that on
another occasion, after a prospective investor in Centra Tech asked
Sharma for proof to verify representations by Centra Tech that
Centra Tech had a contract with a particular investment venture
capital firm, Sharma, via the SHARMA Cellphone-1, sent text
messages on or about August 28, 2017 to TRAPANI, via the TRAPANI
Cellphone, and to Farkas, via the FARKAS Cellphone-1, in which
Sharma stated that "I'm worried about getting these guys the fufu
contest," "Contract," for the investment firm "because they can
verify it," and that he was going to tell the prospective investor
that "I'm gonna say our NDA [Non-Disclosure Agreement] is very
tight," "We can't share the contract."  In response, TRAPANI wrote
"Get any worry out of your mind your a fucking closer," and Farkas
wrote "Dance," "Do what you do.")

d.   On or about October 13, 2017, Visa responded to
Sharma's email, noting that despite Sharma's assurances "[w]e are
very concerned to still find many continuing unauthorized uses of
the VISA trademark connected to your alleged card product that
Visa has not authorized."  Visa's October 13 response email (the
"October 13 Email") attached a document containing screenshots of
various videos that had been posted on YouTube's website displaying
Centra Cards with the Visa logo on them, and hyperlinks to where
those videos could be found on YouTube's website at the time.
Visa's October 13 Email further stated:

34

Please see the attached document for representative examples only of the many unauthorized uses we've found on your site and on other sites through a simple Google search.   We note especially the blatant uses in many informational and "how-to-use/how-it-works" Centra card videos (e.g., by you and Ray Tripani [i.e., RAYMOND TRAPANI, a/k/a "Ray," the defendant] for instance and many others).   We must therefore reiterate our demands that ANY and ALL unauthorized uses of the VISA trademark be taken down on an IMMEDIATE basis, whether it be Centra sourced or where Centra has distributed or allowed content to be published to third parties (i.e., third party site news feeds/articles, press releases).   Without any authorization to use the VISA brand in connection with the functioning or promotion of its card product, Centra may not directly or indirectly promote or mislead others that its product is a VISA product or works with Visa, that its product is endorsed or backed by Visa, that its product functions with the VISA network, or that it is associated with the highly valued and high-profile VISA brand.

    e.   Based on the October 13 Email and the other facts set forth herein, there is probable cause to believe that RAYMOND TRAPANI, a/k/a "Ray," the defendant, participated in videos promoting Centra Tech containing false representations about Visa that were available to the public via YouTube's internet website as of on or about October 13, 2017 but have since been removed from the YouTube website.   I recently attempted to access the YouTube videos referenced in Visa's October 13 Email using the hyperlinks set forth in the attachment to the October 13 Email, and from doing so, I have learned that several of the videos have been removed from YouTube's website.   Although I have not been able to recover or view such promotional videos featuring TRAPANI, Visa's October 13 Email notes "especially the blatant uses in many informational and "how-to-use/how-it-works" Centra card videos (e.g., by you [i.e., Sharma] and Ray Tripani [i.e., TRAPANI] for instance and many others)."

    f.   Visa's October 13 Email to Sharma also reiterated Visa's request that Sharma identify the bank that Centra Tech was "allegedly working with."   Based on my conversations with the Visa Witness, I have learned that, in response to Visa's multiple requests for Centra Tech to identify the Visa card issuing bank

with which it purported to have a relationship, neither Sharma nor anyone at Centra Tech identified such an issuing bank.

27.    On or about March 26, 2018, I reviewed the Centra Tech Website and a white paper published via the Centra Tech Website as of that date.  Based on this review I have learned that as of March 26, 2018, Centra Tech was not using the Bancorp, Visa or MasterCard names or logos.

## RELEVANT ACTIVITES IN THE SOUTHERN DISTRICT OF NEW YORK

28.    From my review of documents provided by DANY and criminal history records of RAYMOND TRAPANI, a/k/a "Ray," the defendant, and my conversations with other law enforcement officials, I have learned that on or about October 5, 2017, TRAPANI surrendered in New York, New York on the perjury indictment described above that had been filed in New York County Supreme Court.  From my review of text messages recovered and other data from the TRAPANI Cellphone, I have learned that while he was in New York, New York within the confines of the Southern District of New York to surrender in that perjury case, TRAPANI participated in a group text message conversation with one of his co-conspirators, Robert Farkas, a/k/a "RJ," a/k/a "Bob," and an employee of Centra Tech (the "Centra Employee"), concerning a site-visit of Centra Tech's offices by an individual seeking to confirm that Centra Tech was a real company.  During this group conversation, the following occurred, in substance and in part.  On or about October 5, 2017, starting at approximately 10:32AM, TRAPANI sent text messages to Farkas and the Centra Employee in which TRAPANI wrote:  "Guys just found out reading through some stuff some you tube guy is going to come to the office tomorrow.  Trying to make sure Centra is real. Just make sure you tell him me and Sam are in Asia with majority of the team."   (As shown herein, TRAPANI was not in Asia with "Sam," as TRAPANI had suggested, but rather was in New York, New York preparing to surrender.)  Shortly thereafter, at approximate 11:36AM on or about October 5, 2017, TRAPANI wrote "Someone please answer me before I turn my self in.  I told security if anything they can walk him through the office but no pictures."  The Centra Employee, who was in Florida, responded:  "Sorry I was in shower. I will make sure he gets to see us and I will handle."  TRAPANI then wrote:  "Okay - - - - - I should be out by midday let you know when I'll be jumping on a flight back and be there in the morning." About an hour later, at approximately 12:56PM on or about October 5, 2017, TRAPANI wrote:  "Walking up to turn my self in if I stop answering I'm cuffed."  At approximately 2:55PM, TRAPANI asked if "that guy came," and Farkas responded "Not yet brotha."

29.  Based on my review of documents that Centra Tech has produced to the SEC, I have learned, in substance and in part, that in or about October 2017, Robert Farkas, a/k/a "RJ," a/k/a "Bob," registered Centra Tech as a sponsor of "Consensus: Invest 2017," a blockchain technology summit or conference that took place on or about November 28, 2017 in New York, New York within the confines of the Southern District of New York.  I have reviewed a video posted to Centra Tech's YouTube channel on or about January 5, 2018 entitled "Centra Consensus NYC Cryptocurrency Blockchain Expo Invest."  The video depicts what appears to be people and activities at the "Consensus" Invest 2017," including a Centra Tech booth or table at the conference, and shows Farkas engaging in conversations with various people during the conference.  Based on the foregoing, I believe that Farkas was in New York, New York, on or about November 28, 2017, and engaged in promotional and marketing activities for Centra Tech at the "Consensus: Invest 2017" conference.

30.  Based on my training, experience, and participation in this investigation, I have learned that companies like Centra Tech that offer cryptocurrency are required to keep a record of identification information—including names and addresses—of individuals purchasing their cryptocurrency.  Based on my review of records provided by Centra Tech to the SEC, I have learned, in substance and in part, the following:

a.  Centra Tech provided a spreadsheet labeled "Centra Token Sale Details" to the SEC.  The spreadsheet contains several tabs, including tabs labeled "CentraToken," "CentraSale," and "Centra Token Owner."

b.  The CentraToken tab contains information regarding more than 1800 purchases of Centra Tokens from between on or about July 30 to August 26, 2017.  Two of the listed investors reside in New York, New York, within the confines of the Southern District of New York.

c.  The CentraSale tab contains information regarding more than 1700 purchases of Centra Tokens from between on or about September 19 to September 26, 2017.  Three of the listed investors reside in New York, New York, within the confines of the Southern District of New York.

37

WHEREFORE, I respectfully request that an arrest warrant be issued for RAYMOND TRAPANI, a/k/a "Ray," the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

BRANDON RACZ
Special Agent
Federal Bureau of Investigation

Sworn to before me this
18th day of April 2018

THE HONORABLE STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

# Exhibit D

# Exhibit D

```
JUDGE SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: MAY 1 4 2018
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA            :

      - v. -                            :

                                :

SOHRAB SHARMA,                       :
    a/k/a "Sam Sharma,"             :
RAYMOND TRAPANI,                     :
    a/k/a "Ray," and                :
ROBERT FARKAS,                       :
    a/k/a "RJ,"                     :

              Defendants.         :
                        :

- - - - - - - - - - - - - - - - - X

__INDICTMENT__

18 Cr. _____          **JUDGE SCHOFIELD**

## 18 CRIM 340

## COUNT ONE
### (Conspiracy to Commit Securities Fraud)

The Grand Jury charges:

### Centra Tech and the Defendants

1.    At all times relevant to this Indictment, Centra Tech,
Inc. ("Centra Tech") was a company headquartered in Miami Beach,
Florida, that purported to offer various cryptocurrency-related
financial products. For example, Centra Tech claimed to have a
Centra Tech debit card that allowed users to spend cryptocurrencies
such as "Bitcoin" and "Ether" to make purchases in real-time at
various stores and other establishments that were part of the
networks of merchant locations that accept payment cards from
Master Card and Visa, two companies described in more detail in
paragraphs 7 and 8 of this Indictment.

2.    SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, founded Centra Tech in or about July 2017.

3.    SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, served in various roles at Centra Teach, including as a Director of Centra Tech and as Centra Tech's President and Chief Technology Officer until approximately late October 2017.  Before SHARMA co-founded Centra Tech with RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, SHARMA and TRAPANI worked together at a luxury car rental company in Florida.

4.    RAYMOND TRAPANI, a/k/a "Ray," the defendant, served as Centra Tech's Chief Operating Officer until in or about late October 2017.

5.    ROBERT FARKAS, a/k/a "RJ," the defendant, served in various roles at Centra Tech, including as Centra Tech's Chief Marketing Officer, until approximately late October 2017, and then subsequently as a Director and the Chief Operating Officer of Centra Tech.

## Additional Relevant Entities

6.    The Bancorp, Inc. ("Bancorp") is a Delaware-based financial services company with offices throughout the United States.  Bancorp provides a variety of financial services to companies and individuals, including issuing debit and prepaid cards, and payments processing, which it does by virtue of

contractual partnerships with other financial services companies such as Visa and Mastercard, among others.

7.   Visa Inc. ("Visa") is a multinational financial services corporation headquartered in California.   Visa facilitates electronic funds transfers throughout the world, most commonly through "Visa"-branded credit cards and debit cards.

8.   Mastercard   Incorporated   ("Mastercard")   is   a multinational financial services corporation headquartered in New York.   Mastercard's principal business is to process payments between the banks of merchants and the card issuing banks or credit unions of the purchasers who use "Mastercard"-branded debit and credit cards to make purchases.

### Background on Initial Coin Offerings

9.   An "initial coin offering" or "ICO" is a type of fundraising event in which an entity offers participants a unique digital "coin" or "token" in exchange for consideration.   The consideration often comes in the form of "digital currency" or "cryptocurrency," but can also be "fiat currency," which is a term used to describe currency that a government has declared to be legal tender, such as the U.S. dollar or the Euro, but is not backed by a physical commodity.   "Digital currency" or "cryptocurrency" is a digital representation of value that can be digitally traded and functions as (1) a medium of exchange, (2) a unit of account, or (3) a store of value, but does not have legal

3

tender status.   Unlike fiat currency, digital currency is not issued by any jurisdiction and functions only by agreement within the community of users of that particular currency.   Examples of digital currencies are "Bitcoin" and "Ether," both of which are issued and distributed on their own "blockchains."  A "blockchain" is a digitalized, decentralized, cryptographically-secured ledger that allows market participants to keep track of digital currency transactions without central recordkeeping.

10.   The tokens or coins issued in an ICO are issued and distributed on a blockchain.   Tokens often are also listed and traded on online platforms, typically called digital currency exchanges, and they usually trade for other assets.  Often, tokens are listed and tradeable immediately after they are issued.

11.   ICOs are typically announced and promoted through the internet and email.   Issuers usually release a "white paper" describing the project and the terms of the ICO.   In order to participate in the ICO, investors are generally required to transfer funds to the issuer.  After the completion of the ICO, the issuer will distribute its unique "coin" or "token" to the participants.  The tokens may entitle the holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, or voting rights.  These tokens may also be listed on online digital currency exchanges and be tradable for digital

4

currencies.

12.   Pursuant to Sections 5(a) and 5(c) of the Securities Act of 1933, a company or individual conducting an offer or sale of securities to the public must file a registration statement with the SEC or must qualify for an exemption from the registration requirements.  15 U.S.C. § 77e(a) and (c).  Under Section 2(a)(1) of the Securities Act, a security includes "an investment contract."  15 U.S.C. § 77b.

13.   On or about July 25, 2017, the United States Securities and Exchange Commission (the "SEC") issued a public report with respect to its investigation of an ICO in which the SEC explained that initial and other digital coin offerings can be, and often are, offerings of "securities" under the federal securities laws that must be registered with the SEC or must qualify for an exemption from the registration requirements (the "SEC ICO Report").

<u>Overview of the Scheme to Defraud</u>

14.   From at least on or about July 30, 2017 through at least in or about April 2018, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, engaged in a scheme to defraud investors in Centra Tech's ICO through a series of material misrepresentations and omissions.  Through this fraudulent scheme, SHARMA, TRAPANI and FARKAS solicited digital funds worth more than $25 million from

investors who purchased digital coins issued by Centra Tech.

15.  As part of the scheme, SOHRAB SHARMA, a/k/a "Sam Sharma,"
RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the
defendants, made and, caused to be made, the following
misstatements, among others, in soliciting investments in Centra
Tech:

a.  SHARMA, TRAPANI and FARKAS claimed to investors
that Centra Tech had developed a debit card that enabled users to
spend cryptocurrencies to make purchases at any stores that accept
Visa or Mastercard payment cards, and that Centra Tech had
partnerships with Bancorp, Visa, and Mastercard to issue Centra
Tech debit cards.  In fact, Centra Tech had no such partnerships
with Bancorp, Visa or Mastercard.

b.  SHARMA, TRAPANI and FARKAS claimed to investors
that Centra Tech's executive team included two purported senior
executives named "Michael Edwards" and "Jessica Robinson" who had
impressive work histories and academic credentials.  In fact,
neither "Michael Edwards" nor "Jessica Robinson" was a real person.

c.  SHARMA, TRAPANI and FARKAS claimed to investors
that Centra Tech held money transmitter and other relevant licenses
in 38 states.  In fact, Centra Tech did not have such licenses in
a number of those states.

6

### Centra Tech's ICO and the Issuance of
### Unregistered Securities in the Form of Centra Tokens

16.  From on or about July 30, 2017 through on or about
October 5, 2017, Centra Tech raised funds from investors, in the
form of digital funds worth more than $25 million, via an ICO for
the purported purpose of enabling Centra Tech to operate what
Centra Tech advertised would be the world's first multi-blockchain
debit card.  During this ICO, Centra Tech accepted digital funds
from investors in exchange for unregistered securities in the form
of digital tokens issued by Centra Tech, known as "Centra tokens,"
also known as "CTR tokens" or "CTRs." that could be traded, or
exchanged, on various digital currency exchanges.  At no time did
Centra Tech register its ICO with the SEC.

17.  As part of the ICO, Centra Tech posted several different
versions of a white paper advertising Centra Tech's ICO on the
Centra Tech Website.  A version of the ICO White Paper, labeled
"FINAL DRAFT," that was available on the Centra Tech Website at
least as of August 3, 2017 ("White Paper-1") contained several
statements describing the Centra Tech ICO and Centra tokens.  The
characteristics of the Centra Tech ICO and the Centra tokens, as
described by Centra Tech, rendered the Centra tokens securities
and therefore subject to the provisions of Sections 5 of the
Securities Act of 1933.  For example:

7

a.    In White Paper-1, Centra Tech stated that it would be offering "68% of all [Centra] Tokens to be created for purchase in our crowd sale to the public" and would "allocate 20% of all [Centra] Tokens created to distribution of bug bounty, business development, community projects, market expansion, and more" while "[t]he remaining 12% will be distributed to Centra Techs founders, early investors, and employees as an incentive to create a long lasting mutual interest and dedication to the tokens and their prolonged value."

b.    White  Paper-1  advertised  multiple  "rewards" programs for Centra Token holders.  For example, White Paper-1 advertised that Centra Token holders would receive a ".8% ETH" reward for every transaction in the "network" (the "Network Rewards Program").  During an interview of Centra Tech co-founder SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, on an internet radio podcast on or about August 14, 2017, SHARMA represented that "through our revenue share we actually give .8 percent of that away to token holders as part of our program to join the Centra Tokens."  Through such representations, Centra Tech portrayed its Network Rewards Program as functioning like a dividend, in that it offered a share — .8% ETH — of Centra Tech's revenue.

c.    Although Centra Tech claimed that holders of the Centra Token "by no means own any securities or interest in Centra Tech," and that the Centra tokens "are not securities nor shares,"

White Paper-1 promised that Centra Token purchasers would "be able to place their wallet to use on Centra Debit card, or exchange them [the Centra Tokens] on the Cryptocurrency exchanges for a profit."

### Fraudulent Representations Concerning
### Centra Tech's Purported Corporate Partnerships

18. In soliciting investor funds during Centra Tech's ICO, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, made repeated fraudulent representations to potential investors that Centra Tech had developed a debit card (the "Centra Debit Card" or "Centra Card") that allowed users to spend cryptocurrency to make purchases at any establishment that accepts Visa or Mastercard, and that Centra Tech had formed partnerships with Bancorp, Visa, and Mastercard to issue Centra Debit Cards licensed by Visa and Mastercard.

19. SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, caused false statements related to these purported partnerships to be made in white papers issued by Centra Tech with respect to the ICO. For example, the version of Centra Tech's white paper that was available on the Centra Tech Website in or about July 2017 ("White Paper-2") contained a diagram listing "milestone items" in Centra Tech's development, and referenced that in January 2017:

9

"Major Banking Partnership signed and license agreement with VISA USA Inc formulated." Under a heading entitled "Centra Tech Partners," White Paper-2 displayed the logos of Bancorp, Visa and Mastercard. White Paper-2 also contained images of Centra Debit Cards with "Visa" and "Mastercard" logos displayed on the cards next to Centra Tech's own logo — a gold coin with a "C" in the middle.

20. SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, also caused similar false statements to be made directly on the Centra Tech Website. For example, in or about August 2017, the Centra Tech Website included a page claiming:

> The Centra Card Visa Debit Card is issued by The Bancorp Bank, member FDIC, pursuant to a license from Visa U.S.A. Inc. "The Bankcorp" [sic] and "The Bancorp Bank" are registered trademarks of The Bankcorp Bank © 2014. Use of the Card is subject to the terms and conditions of the applicable Cardholder Agreement and fee schedule, if any.

21. On or about August 14, 2017, SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, during an interview on an internet podcast relating to cryptocurrency, stated, among other things, the following about Centra Tech's purported partnerships with Visa and Mastercard for the issuance of Centra Debit Cards: "[I]nternationally, we currently have our license with Mastercard, to service international clients. Domestically, we do have the

10

Visa partnership, so we are able to issue Visa cards domestically and Mastercards internationally."

22.   On or about October 13, 2017, ROBERT FARKAS, a/k/a "RJ," the defendant, sent an email to SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, attaching FARKAS' edits to an investor pitch deck for Centra Tech, dated August 15, 2017.   The pitch deck stated, among other things, that: (i) the Centra Card gives users "[a]ccess to more than 36 Million Points of Sale wherever Visa and/or Mastercard is accepted"; (ii) the Centra Card was "issued" by "Mastercard and Visa;" and (iii) Centra in January 2017 had a "Major Banking Partnership and license agreement signed with VISA USA Inc."

23.   As SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, well knew, the above-described representations about Centra Tech's purported partnerships with Bancorp, Visa and Mastercard were false.   In fact, Centra Tech had not entered into any partnerships with Bancorp, Visa or Mastercard.

24.   On or about July 31, 2017, SOHRAB SHARMA, a/k/a "Sam Sharma" and RAYMOND TRAPANI, a/k/a "Ray," the defendants, engaged in a cellphone text message conversation in which they discussed Centra Tech's lack of actual partnerships with banks or credit card companies.   During that exchange, SHARMA wrote: "Should write down a list of places to call tomorrow," "For the conbranded [sic]

11

card."  Later in the exchange, SHARMA wrote:  "Gotta get it going

on the banks today plz."   SHARMA also subsequently wrote:   "We

just need to get s [sic] banking license," "Need our direct

agreement with visa," "Or MasterCard," "That's the move," "Cut out

the middle man," "I wish we just knew someone."

25.  On or about August 30, 2017, Bancorp sent a cease-and-

desist notice to SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant,

stating, in all capital text, that "CENTRA TECH IS HEREBY DIRECTED

TO CEASE AND DESIST FROM REPRESENTING THAT THE BANCORP BANK HAS

ANY CONNECTION WITH, OR IS THE ISSUER OF ANY CARD PRODUCTS RELATED

TO CENTRA TECH . . . [and from] USING OUR LOGO OR OTHER IMAGES IN

CONNECTION WITH THE MARKETING OF ANY PRODUCT OR WALLETS YOU OFFER."

26.  On or about August 30, 2017, during a group cellphone

text message conversation between SOHRAB SHARMA, a/k/a "Sam

Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a

"RJ," the defendants, the three discussed Bancorp's cease-and-

desist notice.  At approximately 4:21PM, SHARMA wrote:  "Yo," "One

of you login to," "Medium/@centra asap," "And remove that

thumbnail," "Asap," "Bankcorp reached out."  At approximately

4:23PM, TRAPANI wrote: "Will in 30 mins at hospital."  SHARMA

responded "Do it asap rocky."  FARKAS wrote "Done."  TRAPANI

responded "Good shit RJ."  FARKAS subsequently wrote:  "No Bancorp

on it."  SHARMA responded:  "In the bottom?  U sure," "I

thought I saw," "On press releases."  FARKAS wrote:  "Just checked

12

them all," "No Bancorp."  SHARMA responded:  "Okay," "We gotta get

that shit removed everywhere and blame freelancers lol . . . ."

27.  During Centra Tech's ICO, RAYMOND TRAPANI, a/k/a "Ray,"

the defendant, participated in a video promoting Centra Tech.  The

video  contained  false  representations  about  Centra  Tech's

purported partnership with Bancorp.  This video was available to

the public via the internet as of on or about September 22, 2017

but was subsequently removed.  On or about September 22, 2017,

during a group cellphone text message conversation among TRAPANI

and SOHRAB SHARMA, a/k/a "Sam Sharma," and ROBERT FARKAS, a/k/a

"RJ," the defendants, FARKAS wrote:  "Says Bancorp on your video

ray is that ok."  TRAPANI responded:  "Gotta get it edited but we

have been saying Bancorp."  SHARMA wrote "What video," "Fake it

off," "I don't wanna get sued."

28.  On or about September 29, 2017, during a group cellphone

text  message  conversation  between  SOHRAB  SHARMA,  a/k/a  "Sam

Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a

"RJ," the defendants, the three discussed taking down (among other

things) the version of Centra Tech's white paper available on the

Centra Tech Website at the time.  In one message, SHARMA wrote:

"I rather cut any fufu," "Off right own," "Now," "Then worry,"

"Anything that doesn't exist current," "We need to remove," "Have

them do it asap."  In another, SHARMA wrote:  "Delete all the cards

have shipped info," "Everything gotta get cleaned up," "RJ can u

13

jump on that . . . on our pages." At approximately 11:55PM, SHARMA wrote: "I want a product page like [another company]," "Theirs is so nice." TRAPANI wrote "Lol yeah no real product." SHARMA wrote: "Yea but it doesn't say much," "And looks good," "We don't have a real product either right now," "So I wanna tighten up ship asap." TRAPANI wrote "Feel you."

29. On or about October 10, 2017, after Visa became aware that Centra Tech's promotional materials contained false representations about a purported partnership between Centra Tech and Visa, Visa's Legal Department sent an email to Centra Tech, via the email address "support@centra.tech," attaching a cease-and-desist letter (the "October 10 Letter"). In the October 10 Letter, Visa stated, in part:

> It has come to our attention that Centra Tech ("Centra") is using the Visa-Owned Marks on its site https://www.centra.tech as well as on its various social media sites (e.g., Facebook, Twitter, Instagram, YouTube) and other mediums. It appears Centra is purporting to be an authorized distributor of VISA payment cards utilizing cryptocurrency technology. . . . However, to the best of our knowledge and good faith belief, Centra is not authorized to use the Visa-Owned Marks in this manner, nor is it authorized to issue, sell, or otherwise distribute VISA payment cards. If this is not the case, please advise and explain immediately, i.e., if Centra is working with an authorized Visa Issuing bank.

30. On or about October 10, 2017, SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, using the email address "sam@centra.tech," emailed a response to Visa's October 10 Letter, stating:

14

> This matter has been brought to my attention.  I
> will have this matter rectified in 48 hours.   We
> are currently in the process of finalizing our Co-
> branded Prepaid Card Program, but might not meet
> the Nov 1st lock out deadlines for submission from
> our issuing bank whom is an authorized visa issuer
> for card design approval, So can see where this
> issue might of came from.
>
> However, I have immediately contacted my web
> developers to remove all issues and I will have
> this document [a cease and desist acknowledgment]
> signed and returned within 48 hours.

> Thank you,
> Sam Sharma

31.   On or about October 11, 2017, Visa responded to the email from reply by SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, and requested that he "advise of the Visa issuing bank you are working with."  On or about October 12, 2017, SHARMA responded again via email, using his "sam@centra.tech" email account, and stated:  "As far as the issuing bank we have an MNDA [Mutual Non-Disclosure Agreement] in place currently.  VISA will soon get our information for Card Design approval and program specs from our future issuing bank in the US."  SHARMA signed the email, "Thank you, Sam."

32.   On a different occasion, after a prospective investor in Centra Tech asked SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, for proof to verify representations by Centra Tech that Centra Tech had a contract with a particular venture capital firm, SHARMA sent cellphone text messages on or about August 28, 2017 to RAYMOND

TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, in which SHARMA stated that "I'm worried about getting these guys the fufu contest," "Contract," for the investment firm "because they can verify it," and that he was going to tell the prospective investor that "I'm gonna say our NDA [Non-Disclosure Agreement] is very tight," "We can't share the contract." In response, TRAPANI wrote "Get any worry out of your mind your a fucking closer," and FARKAS wrote "Dance," "Do what you do."

### Fraudulent Representations Concerning
### Centra Tech's Purported Executive Team

33. In soliciting investor funds during Centra Tech's ICO, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, made fraudulent statements and omissions concerning Centra Tech's executive team. These fraudulent representations included reference to two purported senior executives at Centra Tech named "Michael Edwards" and "Jessica Robinson." In fact, both "Michael Edwards" and "Jessica Robinson" did not exist.

34. White Paper-1, for example, contained a section entitled "Centra Tech Team" listing: (i) a purported individual named "Michael Edwards" as Centra Tech's "CEO & Co-Founder," along with a supposed picture of "Michael Edwards"; and (ii) a purported individual named "Jessica Robinson" as Centra Tech's "CFO," along with a supposed picture of "Jessica Robinson."

35.   On or about August 14, 2017, SOHRAB SHARMA, a/k/a "Sam Sharma," the defendant, was interviewed on a cryptocurrency podcast about Centra Tech's ICO.   When SHARMA was asked during the interview how Centra Tech obtained its startup capital, SHARMA stated, among other things, that "we have one private investor, who's actually Mike Edwards" and that Edwards is "also our VP and co-founder" who "put up a lot of the capital originally" to establish Centra Tech.

36.   During the course of the ICO, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, caused profiles for various Centra Tech executives to be published on LinkedIn's professional networking website, including the following:

37.   According to a LinkedIn profile for "Michael Edwards" that was available to the public via the internet as of on or about August 3, 2017, "Michael Edwards" earned a master's in business administration from Harvard University, had more than 20 years of experience in the banking industry as a financial analyst at Bank of America (1993 through 2001), a vice president at Chase (2001 through 2011) and a senior vice president at Wells Fargo (2011 through 2016), and was the "CEO & Co-Founder of Centra Tech," where he had worked since May 2016 and had "[e]stablished licensing and partnership terms with Visa & Mastercard," among other accomplishments.

17

38.   According to a LinkedIn profile for "Jessica Robinson"
that was available to the public via the internet as of in or about
August 2017, "Jessica Robinson" had close to five years of
experience as the Chief Financial Officer of Johnson
Communications before becoming the Chief Financial Officer of
Centra Tech, where she had worked since December 2016 and had
"[c]reated the partnership between Centra and a Major US Bank."

39.   In fact, and as SOHRAB SHARMA, a/k/a "Sam Sharma,"
RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the
defendants, well knew, "Michael Edwards" and "Jessica Robinson" of
Centra Tech were not real people.   With respect to "Michael
Edwards," his purported photograph in White Paper-1 was actually
a publically accessible photograph of an individual by a different
name with no relationship with Centra Tech or the defendants.
According to a *New York Times* article published shortly after
Centra Tech's ICO, "The first cracks" in Centra Tech's ICO
"appeared in early August" 2017, when an online blogger "wrote on
his blog that Mr. Edwards appeared to be made up," in response to
which "Centra initially threatened to sue [the blogger] but then
said the bad profiles were the result of freelancers who had
hastily put together the company's marketing material."

40.   SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI,
a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, took
active steps to conceal the fact that "Michael Edwards" and

"Jessica Robinson" did not exist.   For example, on or about July 29, 2017, during a cellphone text message conversation between SHARMA and TRAPANI, SHARMA wrote to TRAPANI:  "Need to find someone who looks like Michael," "Team photos," "He's real lol," "Everyone real," "Except Jessica," "And Mike."  Similarly, SHARMA later wrote during that same exchange:  "Gonna kill both Ceo and her," "Gonna say they were married and got into an accident."

41.   On or about September 13 and 14, 2017, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, participated in a group cellphone text message conversation while SHARMA was on a business trip in South Korea for the purpose of soliciting investments in Centra Tech from a particular company (the "South Korean Company"). During this group conversation, TRAPANI sent a text message to SHARMA and FARKAS in which TRAPANI wrote "Just gotta close this shit with [the South Korean Company] get that ETH."   SHARMA responded "We need to remove mike Edwards and "Jessica asap," "After ICO."

### Fraudulent Representations Concerning Centra Tech's Purported Licenses in 38 States

42.   In soliciting investor funds during Centra Tech's ICO, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, fraudulently claimed that Centra Tech held money transmitter and other licenses

in 38 states.  In fact, and as the defendants well knew, Centra Tech did not have such licenses in a number of those states.

43.  Specifically, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, caused Centra Tech to represent in White Paper-1 that: "Centra Tech holds individual licenses in 38 states namely Alabama, Arizona, Alaska, Arkansas, Connecticut, Delaware, District of Columbia, Florida, Georgia, Idaho, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Mississippi, Nevada, Nebraska, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, Oregon, Rhode Island, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, and West Virginia" and that the licenses "are held under categories of Money Transmitter, Sales of Checks, Electronic Money Transfers, and Seller of Payment Instruments."

44.  In fact, Centra Tech did not hold such licenses in a number of those states.  For example, a review on or about March 12, 2018 of a database maintained by the Nationwide Multistate Licensing System, a financial services industry online registration and licensing database, and of certain state licensing databases, revealed that seven of the states where Centra Tech claimed to hold licenses (namely, Arizona, Connecticut, Delaware, Florida, New Jersey, New York or South Dakota) had no record for Centra Tech.  Moreover, while Centra Tech took efforts

to begin the licensing process, those efforts did not begin until October 2017, months after Centra Tech began its ICO.

45.   SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, were well aware of the falsity of their representations with respect to Centra Tech holding money transmitter and other licenses in 38 states.   For example, during a group cellphone text message conversation that took place on or about August 30, 2017, between SHARMA, TRAPANI and FARKAS, SHARMA sent text messages to TRAPANI and FARKAS about applying for state licenses for Centra Tech (licenses that Centra Tech had represented it already held in 38 states).   For example, SHARMA wrote in one message:   "Gotta apply for all licenses," "Should I even say this."

### Statutory Allegations

46.   From at least in or about July 2017, up to and including in or about April 2018, in the Southern District of New York and elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

47.   It was a part and object of the conspiracy that SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, and of the facilities of national securities exchanges, would and did use and employ manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

**Overt Acts**

48.   In furtherance of the conspiracy and to effect its illegal object, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.    In approximately July and August 2017, SHARMA, TRAPANI and FARKAS caused Centra Tech to publish white papers on the internet containing fraudulent misrepresentations and omissions in connection with Centra Tech's unregistered offering of securities to investors, in the form of digital currency tokens issued by Centra Tech.

b.    On or about August 14, 2017, SHARMA made fraudulent misrepresentations and omissions about Centra Tech's unregistered securities offering during an interview on Neocash Radio, a cryptocurrency podcast that broadcasts its radio show via the internet.

c.    Between on or about July 30, 2017 and on or about September 26, 2017, SHARMA, TRAPANI and FARKAS obtained digital funds for the purchase of Centra Tech tokens from at least five investors who resided in New York, New York.

(Title 18, United States Code, Section 371.)

## COUNT TWO
### (Securities Fraud)

The Grand Jury further charges:

49.    The allegations contained in paragraphs 1 through 45 and 48 of this Indictment are repeated and realleged as if fully set forth herein.

50.    From at least in or about July 2017, up to and including in or about April 2018, in the Southern District of New York and

23

elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, and of the facilities of national securities exchanges, used and employed manipulative and deceptive devices and contrivances in connection with the purchase and sale of securities in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, to wit, the defendants participated in a scheme to solicit digital funds worth more than $25 million for investments in unregistered securities, in the form of digital currency tokens issued by Centra Tech, through fraudulent misrepresentations and omissions.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT THREE
### (Conspiracy to Commit Wire Fraud)

The Grand Jury further charges:

51.   The allegations contained in paragraphs 1 through 45 and 48 of this Indictment are repeated and realleged as if fully set forth herein.

52.   From at least in or about July 2017, up to and including in or about April 2018, in the Southern District of New York and elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit an offense against the United States, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343.

53.   It was a part and an object of the conspiracy that SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation

of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

### COUNT FOUR
### (Wire Fraud)

The Grand Jury further charges:

54.   The allegations contained in paragraphs 1 through 45 and 48 of this Indictment are repeated and realleged as if fully set forth herein.

55.   From at least in or about July 2017, up to and including in or about April 2018, in the Southern District of New York and elsewhere, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, the defendants participated in a scheme to solicit digital funds worth more than $25 million for investments in unregistered securities, in the form of digital currency tokens issued by Centra Tech, through fraudulent misrepresentations and omissions, and employed the use of telephones, email communications, and other wire

communications in connection with the scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE ALLEGATIONS

56. As a result of committing one or more of the offenses charged in Counts One through Four of this Indictment, SOHRAB SHARMA, a/k/a "Sam Sharma," RAYMOND TRAPANI, a/k/a "Ray," and ROBERT FARKAS, a/k/a "RJ," the defendants, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses that the defendants personally obtained and the following specific property: 91,000 Ether units, seized by law enforcement from a digital wallet with the public address 0xda6f983076725cb2899205a16e16d1ed60a0067a on or about May 2, 2018.

### Substitute Assets Provision

57. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

a.  cannot be located upon the exercise of due diligence;

b.  has been transferred or sold to, or deposited with, a third party;

c.  has been placed beyond the jurisdiction of the court;

d.  has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853;
Title 28, United States Code, Section 2461.)

FOREPERSON

ROBERT KHUZAMI
Attorney for the United
States, Acting Under
Authority of 28 U.S.C. § 515

28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

SOHRAB SHARMA,
a/k/a "Sam Sharma,"
RAYMOND TRAPANI,
a/k/a "Ray," and
ROBERT FARKAS,
a/k/a "RJ,"

Defendants.

INDICTMENT

18 Cr. _____

(15 U.S.C. §§ 78j(b), 78ff;
17 C.F.R. §§ 240.10b-5;
18 U.S.C. §§ 371, 1343, 1349 and 2.)

**A TRUE BILL**

_____
FOREPERSON

_____
ROBERT KHUZAMI
*Attorney for the United States, Acting
Under Authority of 28 U.S.C. § 515*

# Exhibit E

# Exhibit E

Robert A. Cohen
Valerie A. Szczepanik
Lucas M. Fitzgerald
Jon A. Daniels
Alison R. Levine
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0069 (Fitzgerald)
Email: fitzgeraldl@sec.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                             :
SECURITIES AND EXCHANGE COMMISSION,                          :
                                                             :
                              Plaintiff,                     :     18 Civ. 02909 (DLC)
                                                             :
                    - against -                              :     **AMENDED**
                                                             :     **COMPLAINT**
                                                             :
SOHRAB ("SAM") SHARMA, ROBERT FARKAS,                        :     **JURY TRIAL**
and RAYMOND TRAPANI,                                         :     **DEMANDED**
                                                             :
                                                             :
                              Defendants.                    :
-------------------------------------------------------------x

Plaintiff Securities and Exchange Commission (the "Commission"), for its complaint

against Defendants Sohrab "Sam" Sharma ("Sharma"), Robert Farkas ("Farkas"), and Raymond

Trapani ("Trapani") (together, the "Defendants"), alleges as follows:

## SUMMARY

1.   From approximately July 30, 2017 through October 5, 2017, Defendants raised at

least $32 million from thousands of investors through the sale of unregistered securities issued

by Centra Tech, Inc. ("Centra"), an entity controlled primarily by Defendants. The Centra

securities were issued in a so-called "initial coin offering" ("ICO"), a term that is meant to

describe the offer and sale of digital assets issued and distributed on a blockchain.  Defendants

sold the Centra token ("Centra Token" or "CTR Token"), an ERC20 token issued on the

Ethereum blockchain, in Centra's ICO.  Defendants promoted the Centra ICO by touting

nonexistent relationships between Centra and well-known financial institutions, including Visa,

Mastercard and The Bancorp.

2.      Defendants, individually and through Centra, engaged in an illegal unregistered

securities offering and, in connection with the offering, engaged in fraudulent conduct and made

material misstatements and omissions designed to deceive investors in connection with the offer

and sale of securities in the Centra ICO.  By doing so, Defendants violated and aided and abetted

Centra's violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities

Act"), and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule

10b-5 thereunder.

3.      The Centra ICO was an illegal offering of securities for which no registration

statement was filed with the Commission or was then in effect, and as to which no exemption

from registration was available.  The Centra ICO was a generalized solicitation made using

statements posted on the internet and distributed throughout the world, including in the United

States, and the securities were offered and sold to the general public, including to United States

investors, in this district and elsewhere.

4.      Centra raised funds from investors to create the "Centra Line" of products, a

purported financial services system that would enable holders of various hard-to-spend

"cryptocurrencies" to convert their assets easily into legal tender, such as U.S. dollars, and spend

"cryptocurrencies" in real time with the Visa- and Mastercard-backed "Centra Card."

5.      Specifically, Defendants claimed in promotional materials on Centra's website, in various social media platforms, and in other Centra offering materials, that Centra offered a physical "crypto debit card" backed by Visa and Mastercard that was connected to a virtual "smart wallet" via an Apple or Android smartphone application.

6.      Defendants also claimed that – through Centra's "partnerships" with Visa, Mastercard, and The Bancorp – the Centra wallet, debit card and application would allow users to exchange, withdraw, or spend "cryptocurrencies" anywhere in the world that accepts Visa and Mastercard.

7.      Defendants created, reviewed, and distributed marketing materials promoting Centra and the ICO, which claimed that the CEO and Co-Founder of Centra was an experienced businessman named "Michael Edwards," and Sharma stated in a public interview that "Edwards" invested "a lot of capital originally" to help establish Centra.

8.      Defendants also claimed directly and through Centra's marketing materials that the "Centra Token Rewards Program" entitled investors to share in Centra's future earnings. Specifically, Defendants claimed that token holders would be paid "rewards" or a "dividend reward" of 0.8% of the total revenue that Centra earned through its "revenue share" agreement with Visa and Mastercard.

9.      Contrary to Defendants' false representations, and as Defendants knew or recklessly disregarded:  (i) Centra did not have any "partnership" or other relationship with Visa, Mastercard, or The Bancorp; (ii) "Michael Edwards" and other Centra executives pictured in its promotional materials were fictional, and the photographs used to identify the fictional executives were photos taken from the internet or pictures of other individuals; and (iii) investors

who purchased Centra Tokens would *not* receive future payments or "revenue share" from agreements with Visa or Mastercard.

10.    The foregoing false and misleading statements, as well as additional false and misleading statements described below, appeared variously on the company's website and in versions of white papers ("White Papers") issued and updated by Defendants in connection with the offer and sale of its securities during the Centra ICO, as well as in numerous other online fora such as social media, websites, and press releases.

## VIOLATIONS

11.    By engaging in the conduct set forth in this Complaint, Defendants engaged in and are engaged in ongoing securities fraud in violation of Section 17(a)(1)-(3) of the Securities Act [15 U.S.C. § 77q(a)(1)-(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a)-(c) thereunder [17 C.F.R. § 240.10b-5(a)-(c)], and, without a registration statement being in effect or filed, Defendants engaged and are engaged in the unlawful sale and offer to sell securities in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

12.    The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

13.    Through this action, Commission seeks a judgment: (a) permanently enjoining Defendants from engaging in acts, practices and courses of business alleged herein; (b) ordering Defendants to disgorge their ill-gotten gains and to pay prejudgment interest thereon; (c) imposing civil money penalties on Defendants pursuant to Section 20(d) of the Securities Act [15

U.S.C § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d)

prohibiting Defendants, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and

Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or

director of any public company; and (e) prohibiting Defendants, pursuant to Section 21(d)(5) of

the Exchange Act [15 U.S.C. § 78u(d)(5)], from participating in any offering of digital or other

securities.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and

22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e),

and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].  Defendants, directly or

indirectly, have made use of the means or instruments of transportation or communication in, and

the means or instrumentalities of, interstate commerce, or of the mails, in connection with the

transactions, acts, practices, and courses of business alleged herein.

15.     Each of the investments offered in the Centra ICO as described in this Complaint

is an investment contract and, therefore, a "security" as that term is defined under Securities Act

Section 2(a)(1) [15 U.S.C. § 77b(a)(1)] and Exchange Act Section 3(a)(10) [5 U.S.C.

§ 78c(a)(10)].

16.     Venue is proper in the Southern District of New York pursuant to Section 27 of

the Exchange Act [15 U.S.C. § 78aa].  Several victims of Defendants' scheme reside in the

Southern District, and Defendants utilized a digital-asset exchange located in the Southern

District to exchange digital assets fraudulently obtained in the Centra ICO for U.S. dollars.

## FACTS

### I.      Defendants

17.      **Sohrab "Sam" Sharma**, age 26, resides in Florida, and is a founder of Centra and held various titles at the company including President and Chief Technology Officer.  On October 31, 2017, Centra announced that Sharma was resigning in an official capacity to "support the continued growth of the Company."  At the time of its formation, Sharma had a 100% ownership interest in Centra.  Sharma was arrested by agents of the Federal Bureau of Investigation ("FBI") on April 1, 2018.

18.      **Robert Farkas**, age 31, resides in Florida, and is a founder of Centra and held various titles at the company including Chief Operating Officer and Chief Marketing Officer.  On Centra's website and other promotional materials as well as his personal LinkedIn profile, Farkas described his role at Centra as being "[r]esponsible for keeping the public informed of each and every move involved with the Centra Card, Centra Wallet, cBay.io and the Currency Conversion Engine (CCE) Module."  Farkas was arrested by agents of the FBI on April 1, 2018.

19.      **Raymond Trapani**, age 26, resides in Florida, and is a founder of Centra and held various titles at the company including Chief Operating Officer and "Strategic Manager."  On October 31, 2017, Centra announced that Trapani was resigning in an official capacity to "support the continued growth of the Company," but Trapani is still listed as an "Adviser" to the company on his LinkedIn profile.  Trapani was arrested by agents of the FBI on April 20, 2018.

### II.      Other Relevant Entities

20.      **Centra Tech, Inc.** was incorporated under the laws of Delaware in July 2017, with its stated principal place of business in Miami, Florida.  Neither Centra nor its securities are registered with the Commission.

### III.   Background on ICOs

21.     An ICO is a fundraising event in which an entity offers participants a unique digital asset, often referred to as a "coin" or "token," in exchange for consideration (often in the form of other digital assets – most commonly Bitcoin and Ether – or fiat currency). The tokens are issued on a "blockchain" or cryptographically-secured ledger.[1]

22.     Generally, a token may entitle its holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain products or services provided by the issuer, and/or voting rights. These tokens may also be listed on online platforms, often called exchanges, and are tradable for other digital assets or fiat currencies. Often, the tokens are immediately tradable.

23.     ICOs are typically announced and promoted through public online channels. Issuers usually release a "white paper" describing the project and the terms of the ICO. To participate, investors are generally required to transfer funds (often Bitcoin or Ether) to the issuer's digital address, online wallet, or other account. After the completion of the ICO, the issuer will distribute its unique "tokens" to the participants' unique address on the blockchain.

---

[1]  A blockchain is a type of distributed ledger, or peer-to-peer database spread across a network, that records all transactions in the network in theoretically unchangeable, digitally-recorded data packages called blocks. Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, linking the blocks together in a chain. The system relies on cryptographic techniques for secure recording of transactions. A blockchain can be shared and accessed by anyone with appropriate permissions. Blockchains or distributed ledgers can also record what are called smart contracts, which essentially are computer programs designed to execute the terms of a contract when certain triggering conditions are met.

**IV.     Defendants Fraudulently Raise Funds Through the Centra ICO**

    **A.     Background**

    24.     In July 2017, Sharma caused Centra to be incorporated.  At the time, he was the sole Director of Centra and was also authorized to issue shares of capital stock of Centra in his sole discretion.  Shortly after its incorporation, Sharma launched Centra's website, https://centra.tech/.

    25.     Sharma, Farkas, and Trapani, co-founded Centra.

    26.     Sharma oversaw and was intimately involved in all aspects of Centra's operations, including its website, marketing, and strategy.  For example, Sharma often directed various design and technology employees of Centra to make changes to the company's website and White Papers.  Sharma frequently communicated with investors and prospective investors in the Centra ICO and served as the primary public face for the company, often giving interviews with influential cryptoasset bloggers.

    27.     In this capacity, Sharma made misrepresentations to Centra investors and prospective investors, including by directing investors to the Centra promotional materials which he knew contained numerous false statements concerning the company and its purported business.

    28.     Sharma also oversaw the payment of Centra's expenses.  Prior to the company establishing its own bank account, Sharma paid certain costs out of an account for a business he had previously created, Sharma Technology.  Sharma also served as an administrator for certain Centra social media accounts, including the company's Facebook page.

    29.     Farkas was responsible for marketing the Centra ICO and helped oversee Centra's social media presence as well as the Centra Token's listing on various digital asset exchanges.

Farkas also assisted Sharma with general management of the company, including the administration of Centra's email address for responding to questions and complaints from Centra Token investors.  Farkas also oversaw specific edits to certain Centra promotional materials.

30.     Trapani was involved in all aspects of Centra, including the promotional campaigns designed to help sell its unregistered securities.  Trapani was responsible for a variety of issues relating to the fraudulent offering, including managing the distribution of Centra Tokens to investors and responding to individual investors' questions and complaints concerning the offering.  In this capacity, Trapani made misrepresentations to prospective and actual investors, and also directed them to the Centra website, which he knew – or was reckless or negligent in not knowing – contained additional false statements.

31.     Trapani also directed specific revisions to Centra's website and other marketing materials, and helped manage day-to-day activities of Centra, including hiring employees; obtaining office space; and handling various other operational tasks.

32.     As such, Sharma, Farkas, and Trapani were the masterminds behind the Centra fraud, including the creation of Centra, the marketing and promoting of the Centra ICO, and supervising virtually all actions taken by the company relating to the Centra Token offering.

**B.     The Fraudulent Centra ICO**

33.     Centra's unregistered securities offering began on approximately July 30, 2017, shortly after the company was incorporated, and continued through approximately October 5, 2017.  The Centra ICO took place after the Commission's DAO Report of Investigation, which warned the industry that digital securities can be, and often are, securities.  *Report of Investigation Pursuant To Section 21(a) Of The Securities Exchange Act of 1934: The DAO*, (Exchange Act Rel. No. 81207) (July 25, 2017).

34.     The Centra ICO included a so-called "pre-sale" of tokens in July and August, and an "official" or "public" sale that ran through September and October.

35.     The White Papers described the Centra ICO as a token offering for which 400 Centra Tokens would be sold for 1 Ether.  As a result of the offering, Centra and Defendants raised at least $32 million from thousands of investors, and its unregistered securities were distributed throughout the world, including to investors located in the United States, in the Southern District of New York, and elsewhere.

36.     The Centra Token began trading on various digital asset exchanges as early as August 2017, well before the ICO was complete.  The Centra Token initially traded on one such exchange at only approximately $0.15 per token, but as the company's promotional campaign drove increasing investor interest to the ICO, the Centra Token became listed on 8 to 10 different exchanges and the token price peaked at more than $6 per token in August 2017.  Since its peak, the price of the Centra Token has traded down, and it was listed at approximately $0.30 per token at the time of Sharma's and Farkas' arrests.  It currently lists at approximately $0.017 per token.

37.     According to the White Papers, the purpose of the Centra ICO was to raise capital to enable Centra to complete and operate what it termed the "world's first Multi-Blockchain Debit Card and Smart and Insured Wallet," a financial system that would, purportedly, allow holders of various hard-to-spend "cryptocurrencies" to easily convert their assets into legal tender, and spend these "cryptocurrencies" in "real time" using a Visa or Mastercard-backed "Centra Card."

38.     According to the Centra website, White Papers, and other marketing materials, Centra purported to have developed an "Integrated Cryptocurrency Marketplace & Commerce

Solution," using a "Centra Card," a "cBay Marketplace," a Centra Wallet, and a "Currency

Conversion Engine & Exchange Platform."

39.     Centra claimed to offer a financial services system that enables users to safely

store most major "cryptocurrencies," convert them into legal tender such as U.S. dollars, and

spend them in "real time." The services included "a Crypto debit card for Bitcoin, Ethereum &

more." The debit card was to be connected to a smart wallet that supports multiple digital assets,

and users would have the ability to access the wallet and digital assets via a smartphone

application. All assets stored on the Centra wallet would be "safe, secure" and "fully insured."

40.     Through Centra's claimed partnerships with Visa, Mastercard, and The Bancorp,

the wallet, debit card, and smart phone applications allowed users to exchange, withdraw, or

spend digital assets in the U.S. and all over the world in real time, with zero fees and no

exchange rate. The marketing materials also claimed that Centra's future services would include

a platform called Coin Bay, which will be "the world's first Amazon style superstore designed to

make crypto currency acceptable."

41.     According to its marketing materials, at the time of the ICO Centra was also in the

"final stages" of launching its Centra Network Exchange, which would allow users the ability to

"buy/sell/trade" all supported digital assets, including Centra's own CTR Token.

42.     Once the ICO had launched, prominently displayed near the top of the Centra's

website was a button that transferred users to the "Token Sale," where they were urged to "BUY

TOKENS NOW INSTANTLY." Several links throughout the website also transferred users to

the White Papers and encouraged them to read the document.

43.     Clicking on the "Token Sale" button led users to a page through which they could

transfer funds to Centra using the digital assets Ether, Bitcoin, and Litecoin.

44.     The link to the White Papers led to a PDF document that contained additional statements about the supposed Centra Token. For example, the White Papers described the purchase of the Centra Token as a chance to "join our success and mission while generating a profit."

45.     The investments offered during the Centra ICO were "securities" within the meaning of Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].

*Centra White Papers and Social Media Posts*

46.     To generate investor interest in Centra's line of products and its ICO, almost immediately after Centra was formed and its website created, Defendants began publicly releasing various versions of so-called White Papers promoting Centra and the ICO to investors. The White Papers were made publicly available to investors on the Centra website, and by linking to the White Paper from various social media platforms promoting Centra or ICOs generally.

47.     At various times, each Defendant directed investors, potential investors, and potential business partners to the White Papers, or to Centra's website, which prominently featured the White Papers and promoted the ICO. Sharma and Farkas also circulated copies of the White Papers to exchanges on which Centra hoped to list the Centra Token.

48.     Sharma controlled the White Papers, and was involved at every level in editing and revising each version, as well as when Centra posted a particular draft of the White Papers or took them down. He was also involved in even the minute details of editing the White Papers, including selecting graphics, fonts and typefaces and the colors used.

49.     Sharma likewise oversaw the development and revision of Centra's website, including, for example, directing the developers to make edits, and checking whether links worked.

50.     Farkas was also involved in reviewing and editing the Centra website as well as in Centra's social media presence, by, among other things, directing the developers to make specific revisions to the website and improve the appearance of Centra's Twitter posts.

51.     Trapani was also involved in reviewing and editing the White Papers, the Centra website, and the various social media platforms Defendants used to promote Centra.  For example, Trapani directed Centra's developers to create and revise the website and White Papers and to make specific changes to how the information was presented.

52.     Defendants began promoting the Centra ICO as early as July 2017 through press releases and posts to social media, among other formats.  For example, in a press release posted to Bitcoin.com entitled *PR: Centra Tech Announces ICO, Centra Card, & Insured Wallet,* Defendants claimed that the "Centra Card works anywhere that accepts Visa and Mastercard," and touted the Centra ICO as "truly a ground floor opportunity."

53.     Defendants also aggressively touted the Centra ICO on various social media platforms, including Twitter, Instagram, and Facebook.  For example, in an attempt to generate interest in the upcoming ICO "pre-sale," which reportedly ran from approximately July 30, 2017 through August 5, 2017, Centra posted to Twitter on July 22, 2017 via its handle (@centra_card), "I just published 'How to Participate in the Centra ICO?'" and linked to instructions about how to purchase the Centra Token.  On July 30, 2017, Centra tweeted "The Centra Tech Public Pre-Sale ICO is now open.  Contribute between now and 8/5/2017 to get a 25% Bonus!"

13

54.     As part of these promotions, Defendants created pseudonymous online identities and used them in online chat rooms or bulletin-board forums such as Reddit to promote the Centra ICO or to harass or bully posters critical of Centra.  For example, in a text message conversation with Sharma on or about August 13, 2017, Trapani discussed his response to critical online commenters and explained that he was using a pseudonym for his posts:  "I'm kingbit26 they don't know who that is."  When users started posting additional comments critical of Centra on August 26, Sharma texted Trapani to "[h]op in the ethe[r] delta chat and shut people up," to which Trapani responded "Ok."  Sharma later directed Trapani to use the "mike" pseudonym with another critic of Centra, which Trapani did.

55.     Defendants also paid for positive commentary on their marketing materials to generate additional hype for the offering.  In September 2017, for example, Sharma texted Trapani and Farkas: "When one of you guys wake up plz boost our video.  Buy likes comments. The most we can Let's get it pumping."  Farkas responded that he was "[o]n it," and later boasted that his efforts had "[b]oosted the f[***] out of it."

56.     Defendants also tried to intimidate online critics with threats – or instead bribe them with Centra Tokens – to remove unfavorable posts or videos.  In August 2017, for example, Defendants discussed by text message a critical video that had been posted about Centra.  Farkas asked whether Sharma had successfully bribed the poster to remove the post, and Sharma responded "Yea 2k CTR [Tokens]."  Sharma explained the nature of this bribe: "To him it's 2 racks.  To us its air Lol."

57.     At this time Centra Tokens traded on various exchanges at approximately $1 per token, meaning Sharma paid the poster roughly $2,000 to remove the critical post.  And, as part

of the ICO, Centra issued 100 million tokens, meaning Defendants had an abundant supply of Centra Tokens with which they could bribe critics of the company.

58.     Similarly, on September 3, 2017, Trapani threatened to sue an individual for trademark infringement if he did not take down a YouTube video critical of the company.  When his threats were unsuccessful, Trapani instead complained to the poster that the YouTube videos were "detrimental to new contributors as your video comes up right after ours" on YouTube, and offered to pay the poster to remove the video.  The poster agreed to the payment, and removed the video critical of Centra.

*Centra's "Bounty Program"*

59.     To generate additional interest in the ICO, Defendants also created a so-called "Bounty Program" to entice third-party promoters to tout the Centra ICO in social media, including on Reddit and similar bulletin board channels dedicated to digital assets, ICOs and blockchain.

60.     Centra promised to compensate bounty participants in Centra Tokens for successful articles, "quality reviews," posts, "likes," and similar activity touting Centra and its ICO, and reserved a "Bounty Pool" which reportedly represented 2% of the total Centra Tokens issued by Centra, or 2 million tokens, for this purpose.

61.     Trapani was primarily responsible for overseeing important aspects of the Bounty Program, including verifying that bounty participants actually touted the ICO, and delivering the Centra Tokens in payment for the promotions.

*Paid Celebrity Promotions*

62.     Defendants also paid celebrities to promote Centra's ICO on social media, which they did at various times over September and October 2017, just before and contemporaneous

with the so-called "public" ICO offering of CTR Tokens. On September 18, 2017, for example, one celebrity Centra promotor tweeted: "Centra's (CTR) ICO starts in a few hours. Get yours before they sell out, I got mine," which Centra re-tweeted on its official Twitter handle. These celebrity posts – which generated significant interest in the ICO – did not disclose that Centra paid the celebrities significant compensation in exchange for their promotion of the offering.

63.     When he was contacted by a Fortune magazine reporter about the celebrity promotions of Centra, Trapani claimed that two well-known celebrities had each been hired as a "managing partner" of Centra. When the reporter asked whether several posts to social media by one celebrity were part of a sponsorship or paid advertisement, Trapani responded, falsely: "No [he] is an official brand ambassador and managing partner of Centra Tech now." In reliance on this false claim, on September 28, 2017, Fortune published an article quoting Trapani and reporting that these well-known celebrities had each been hired by Centra as a "managing partner."

64.     Shortly thereafter, Farkas tweeted "another one!!" on Centra's official Twitter feed, and linked to the Fortune article.

*Market Manipulation*

65.     Defendants also manipulated the price of the Centra Token in the weeks leading up to the ICO. Defendants' manipulative trading was intended to generate interest in the company and to ensure that prospective investors were not discouraged by the Centra Token price – which was then trading on public exchanges between approximately $.15 and $.50 per token on limited trading volume – or by public comments that were negative of Centra and its purported products. As Sharma explained to Trapani in late August 2017, "[c]an't have more

FUD [fear, uncertainty and doubt] . . . There's FUD around[.]  Mainly about price."  Defendants

undertook this manipulative trading knowingly, recklessly, or negligently.

66.    As one example of Defendants' manipulations, over August 26 and 27 Sharma

and Trapani engaged in a concerted effort to manipulate the CTR Token price higher.  On

August 27, 2017, for example, Sharma instructed Trapani to artificially increase the Centra

Token price: "Ray keep bumping the price. Do [larger] buys."  Trapani responded "what size," to

which Sharma explained "10 ETH plus" and Trapani agreed.  Later that same day, Sharma again

instructed Trapani to make additional large purchases, to which Trapani responded "yeah I am

doing big buys."  That evening, Sharma noted with approval that "we already pushed the price

higher By doing that pump[.]  Naturally We gotta keep doing that[.]  Price is rising."  The next

day when Sharma noticed that Trapani was making additional large purchases, he directed

Trapani to make the purchases at higher prices: "Gotta do higher than 60," Sharma instructed,

and then made clear that he should make the buys at $0.80 per token.  Trapani agreed, after

which Sharma responded that they should "[g]et . . . [r]eady for the pump Lol."

67.    When the pump was completed, Sharma messaged Trapani that they had

"[b]urned through like 250 ETH" – or approximately $75,000 – and moved "the price higher by

30%."

68.    Based on publicly available market data, Trapani and Sharma's efforts to

manipulate the Centra Token price were successful.  During August 26 – 28, 2017, the price of

the Centra Token went from approximately $0.50 per token to over $1, and on August 27 the

closing price was $6.91 – which represents the highest closing price ever recorded for Centra

Tokens.  In addition, while trade volume in early August ranged anywhere from 2,000 to 50,000

transactions per day, on August 26, 2017 the trade volume increased to well over one million tokens traded.

## V.     Defendants' Material Misrepresentations and Omissions Regarding Centra

69.     In addition to their failure to register the Centra ICO with the Commission as a securities offering, Defendants also made false and misleading statements and omissions in the promotional materials accompanying Centra's ICO.  Defendants made these misleading statements and omissions knowingly, recklessly, or negligently.

70.     Specifically, Defendants made numerous false or misleading representations and omissions regarding: (1) Centra's partnerships with credit card companies and relationships with other key financial institutions; (2) Centra's state licenses; (3) certain Centra executives; and (4) a profit-sharing "reward" paid to investors in the form of a dividend.

### A.     Defendants' Fraudulent Claims Regarding Key Financial Institutions

*False Claimed "Partnership" with Visa and Mastercard*

71.     Much of Centra's initial appeal — and a significant source of potential value to prospective investors and investors — was due to the company's claim that the Centra Card would operate on the Visa and Mastercard networks and allow users to make "real time" transactions with their "cryptocurrency" holdings.  As a result, these digital assets could then be utilized around the world by anyone with a Centra Card.

72.     To emphasize this connection, Defendants displayed images of the Centra Card emblazoned with the Visa logo throughout its website, White Papers, social media accounts, and other fora, and frequently referenced the company's purported relationship with Visa and MasterCard in public statements and marketing materials.

73.    For example, a White Paper publicly available on the Centra website in July 2017 (the "July White Paper") prominently touted Defendants' claimed "partnership" with Visa and Mastercard.  The July White Paper contained:

a.  a statement that:  "For our United States clients, the Centra Card will be a Visa card, while for international users the Centra card issued will be a Mastercard," and that, "[w]ith a market cap of cryptocurrencies exceeding $100 billion, the time is ripe to introduce a cryptocurrency-based marketplace where customers can use Centra Debit Card anywhere in the world that accepts Visa."

b.  a "Centra Tech Road Map" detailing Centra's "milestones" and accomplishments to date.  Among other milestones, the roadmap stated that in January 2017 Centra "signed [a] licensing agreement with Visa USA" and formed a "major banking partnership."

c.  images of a Centra Card with the Visa and Mastercard logos boldly displayed next to Centra's own logo—a gold coin with a "C" in the middle.  It also devoted a full half-page to a large graphic displaying the Visa, Mastercard and The Bancorp logos under the heading, "Centra Tech Partners."

d.  Statements that the Centra Black Card "founders edition" – Centra's exclusive card purportedly reserved for the first 500 ICO investors who invested at least 100 Ether (approximately $25,000 as of July 2017) – (i) was "backed by Visa;" (ii) entitled the card holder to "rental coverage by Visa;" and (iii) had "protection [sic] 50K by Visa."

74.     In an interview on the podcast "Neocash Radio" on August 14, 2017, Sharma touted Centra's relationships with Visa and Mastercard, explaining that: "Internationally we currently have our license with Mastercard to service international clients, domestically we have a Visa partnership, so we're able to issue Visa cards domestically, and Mastercards internationally." Sharma's personal Twitter account also falsely linked the Centra Card to Visa by displaying a picture of a black Centra Card with a Visa logo.

75.     Farkas similarly touted the connection between the Centra Card and Visa and Mastercard. As part of his attempt to purchase several promotional articles from an online marketer, on or about September 6, 2017, Farkas emailed the promoter that Centra's currency conversion module "give[s] the user the ability to spend their assets in real time anywhere in the world that accepts Visa or Mastercard."

76.     On October 13, 2017, Farkas emailed Sharma his edits to an investor pitch deck dated August 15, 2017, promoting Centra and its ICO. The pitch deck stated, among other things, that: (i) the Centra Card gives users "[a]ccess to more than 36 Million Points of Sale wherever Visa and/or Mastercard is accepted"; (ii) the Centra Card was "issued" by "Mastercard and Visa;" and (iii) Centra in January 2017 had a "Major Banking Partnership and license agreement signed with VISA USA Inc."

77.     When responding to individual investor questions, Trapani also knowingly misled investors into thinking that the "Centra Card" and other financial services purportedly offered by Centra were real. He directed investors to visit Centra's website, which claimed prominently that the Centra Cards were issued by Visa and Mastercard. In addition, in August 2017 an investor emailed Trapani asking whether the Centra Smart Wallet— purportedly an application downloadable from Apple and elsewhere that was linked to the Centra Card and allowed users to

transfer and spend digital assets – had been launched yet.  Despite knowing that no Centra

applications or products existed, Trapani responded, falsely, "it's launched" and "I use my app

and Centra Card for everything I do."

78.     Neither Visa nor Mastercard, however, had any relationship or partnership with

Centra, and certainly none where Centra was authorized to issue, sell, or otherwise distribute

Visa or Mastercard credit or other payment cards.

79.     Defendants were aware, were reckless in not knowing, or were negligent in not

knowing that Centra had no relationship with Visa or Mastercard at the time of the Centra ICO.

Indeed, the Defendants acknowledged amongst themselves the extent of their deception in late

September 2017 after the Commission filed an ICO-related enforcement action charging

violations of the securities offering registration and anti-fraud provisions in *SEC v. REcoin*

*Group Foundation, LLC et al.*, 17-civ-05725 (E.D.N.Y., filed Sep. 29, 2017).  That day, Sharma

sent a series of text messages to Trapani and Farkas making clear that Centra had no agreement

or other relationship with Visa specifically, and directing Trapani and Farkas to clean the

company's promotional materials of various false claims including all references to Visa.

80.     For example, prompted by the announcement of the *REcoin* action, Sharma texted

Trapani and Farkas that the "Sec just shut down REcoin.  Read the article.  We gotta clean up

every single thing that we can't do [a]nd can't offer today … Delete all the cards have shipped

info" – a reference to Defendants' false marketing claims that Centra Cards had already been

shipped to investors – "Everything gotta get cleaned up."  As part of this "cleanup," Sharma later

texted Trapani and Farkas to "remove the card with the visa logo on it" from the Centra website,

and "also remove white paper from website for now….  I think it's best to take the white paper

offline."  When Trapani suggested that "we should have white paper up but maybe just take it

down and reword it as proper as possible," Sharma responded that "I rather cut any fufu Off right [now] Then worry.[2] Anything that doesn't exist current[ly] we need to remove [...] do it asap."

81.     Nonetheless, as of October the Centra website continued to prominently display the Visa logos and tout Centra's purported relationship with Visa.

82.     Indeed, on October 10, 2017, Visa sent Centra and Sharma a cease-and-desist notice directing Centra to **"cease-and-desist from using the Visa-Owned Marks and from promoting that it is an authorized distributor of VISA payment cards [and] that any and all uses or references to VISA-Owned Marks or any reference to Visa be immediately taken down from the [Centra website] or from any other online mediums (including social media sites and press releases)."** (Emphasis in original.)

83.     Upon his receipt of the Visa cease-and-desist notice, Sharma immediately responded that, "[t]his matter has been brought to my attention.  I will have this matter rectified in 48 hours."  Forty-eight hours later, on October 14, Visa issued a second notice to Sharma, stating that "[d]espite your signed acknowledgment and agreement, we are very concerned to still find many continuing unauthorized uses of the VISA trademark connected to your alleged card product that Visa has not authorized ... Without any authorization to use the VISA brand in connection with the function or promotion of its card products, Centra may not directly or indirectly promote or mislead others that its product is a VISA product or works with Visa, that its product is endorsed or backed by Visa, that its product functions with the VISA network, or that it is associated with the highly-valued and high-profile VISA brand."

84.     The October 14, 2017 Visa cease-and-desist demand also included a collection of recent screenshots taken of Centra's website, which continued to prominently display the Visa

---

[2] According to www.urbandictionary.com, "fufu" means "fake, not real, not genuine."

logo and tout Centra's purported relationship with Visa.  For example, the material included an

October 10, 2017 screenshot of a Centra webpage proclaiming that the Centra "Currency

Conversion Engine Module (CCE Module) allows real time conversation of all supported

cryptocurrencies to give the used the ability to spend their assets in real time anywhere in the

world that accepts Visa or MasterCard."

*False Claimed Relationship with The Bancorp*

85.    In addition to false statements touting its nonexistent relationships with Visa and

Mastercard, Defendants also claimed in Centra marketing material that The Bancorp was issuing

the Visa- and Mastercard-backed "Centra Card."

86.    For example, Centra claimed in a press release on prdnewswire.com on August

25, 2017 that the "Centra Card Visa® Debit Card is issued by The Bancorp Bank, member

FDIC, pursuant to a license from Visa, U.S.A. Inc.  'The Bankcorp' [sic] and 'The Bancorp

Bank' are registered trademarks of The Bankcorp [sic] Bank © 2014."

87.    Defendants' claims concerning The Bancorp were also false and misleading

because The Bancorp had no agreement of any kind with Centra.

88.    . Indeed, when The Bancorp became aware of Centra's false claims that it would

issue the Centra Card, the bank issued a strongly worded cease-and-desist dated August 30, 2017

directing Sharma and Centra to "CEASE AND DESIST FROM REPRESENTING THAT THE

BANCORP BANK HAS ANY CONNECTION WITH, OR IS THE ISSUER OF ANY CARD

PRODUCTS RELATED TO CENTRA TECH . . . [and from] USING OUR LOGO OR OTHER

IMAGES IN CONNECTION WITH THE MARKETING OF ANY PRODUCT OR WALLETS

YOU OFFER." (Emphasis in original.)

89.     Sharma immediately sent The Bancorp cease-and-desist notice to Farkas and Trapani, urgently directing that "[w]e gotta get that s[***] [relating to The Bancorp] removed everywhere and blame freelancers lol." Shortly thereafter, Sharma sent an email to The Bancorp confirming that he had no relationship with the bank, claiming that it was mistake, and that his "free lancers had dropped the ball on this."

90.     Notwithstanding their explicit knowledge that there was no agreement of any kind for The Bancorp to issue any Visa cards or MasterCard cards in conjunction with Centra, and in fact that Centra had never been a customer or client of the bank, Sharma submitted a forged and fictional Bancorp agreement – complete with a fraudulent signature from a nonexistent Bancorp officer – to a potential large investor in Centra. Specifically, in the process of negotiating an investment from a third-party investment company, Sharma emailed what purported to be a contract representing Centra's banking relationship and agreement with The Bancorp. This investment company subsequently became Centra's largest investor, investing approximately 40,000 Ether – approximately $14 million at the time of the investment – in the company.

91.     Further, at the time Sharma was attempting to persuade the investment company to invest in Centra, Sharma explicitly acknowledged in private messages to Farkas and Trapani that The Bancorp agreement was fabricated. Sharma texted, for example, that he was "worried about getting these guys the fufu [fake] . . . contract [] because [they] can verify it.

92.     Defendants thus knew, were reckless in not knowing, or were negligent in not knowing that Centra had no relationship with The Bancorp, and that the statements made in Centra's promotional materials and in communications with prospective investors regarding such a relationship were materially false and misleading.

24

93.     Centra's alleged relationships with these entities were material to the investment decisions of investors who participated in Centra's ICO.

94.     For example, The Bancorp received numerous phone calls from third parties asking whether the representations on Centra's website were accurate regarding the company's purported relationship with The Bancorp.  Similarly, on October 27, 2017 the *New York Times* printed an article concerning the Centra ICO.  This article suggested, among other things, that although the Centra Card claimed to operate on the Visa and Mastercard networks, neither company had approved a relationship. (https://www.nytimes.com/2017/10/27/technology/how-floyd-mayweather-helped-two-young-guys-from-miami-get-rich.html.)  Subsequently, Visa also received numerous calls from concerned Centra ICO investors.  In addition, on November 2, 2017, a Centra investor emailed Sharma and demanded a refund of his ICO contributions "based upon your misrepresentation of your association with VISA and Mastercard."

*False Claim that Centra would be Listed for Sale on a Digital Asset Exchange*

95.     Centra also claimed in marketing materials and in communications with prospective investors that its token would be listed on a popular digital asset exchange (the "Exchange"), a statement that was material to investors because listing on a well-known, high-volume trading platform would facilitate secondary trading of the Centra Token and improve the likelihood of its value increasing.  For example, on August 25, 2017, in a public chat forum, Sharma told investors "we will be in [the Exchange] [...] 21 days post ICO." Sharma repeated this misrepresentation to multiple other investors throughout the offering.

96.     In fact, Defendants knew that the Exchange had not agreed to list the Centra Tokens, and that it had no plans to list it in the future.  For example, in an internal chat conversation between Sharma and Trapani on August 29, 2017, Sharma confirmed that Centra

was not listed on the Exchange, and that he did not think it would be listed on the Exchange in the future. Later in September 2017, Trapani again sought to have Centra listed on the Exchange. Trapani texted Sharma, "I need you to cook me up a bill that says I live at 4611 [referencing a residential address]. For [the Exchange]. Matches my ID." Sharma responded "Don't text me that s[***] lol. Delete." As such, Sharma and Trapani were each aware that Centra had no relationship with the Exchange at the time investors were being told that Centra had an agreement to be listed on the Exchange.

97.     This statement was material to investors, one of whom complained to Sharma that he had been duped into understanding that Centra had an agreement with the Exchange to list the Centra Token at $2, and now that he had discovered this was a false statement, he did not wish to participate in the ICO and requested a refund.

### B.     Fraudulent Claim that Centra Held State Licenses

98.     Centra claimed in its White Papers and other public statements that "Centra Tech holds individual licenses in 38 states" and then proceeded to list the specific locations. According to the White Paper, "[t]hese licenses are held under categories of Money Transmitter, Sales of Checks, Electronic Money Transfers, and Seller of Payment Instruments." In his interview with Neocash Radio on August 14, 2017, Sharma confirmed that the company had licenses in 38 states. In a public chat forum on August 31, 2017, Sharma stated that "[w]e're licensed in 38 states or 36 I have to double check." In fact, at the time of the ICO, Centra held none of the claimed licenses in any of the 38 states.

99.     This misrepresentation was material because Defendants claimed that Centra had a suite of financial services, including those that enabled users to exchange various digital assets into U.S. dollars and spend them in "real time" using the Centra Card or Centra Wallet. By

accepting digital assets and exchanging these assets for dollars or other digital assets, Centra's claimed system would likely be subject to federal and state money transmitter licensing requirements, which are required in nearly every state in which money transmission activity takes place. Without the licenses, Centra could not operate as promised.

100. Centra's claim to have obtained money transmitter licenses in 38 states was false and misleading because they did not have licenses in even a single state. Indeed, Defendants complained to each other that they did not have state licenses – and discussed the difficulty of obtaining such licenses – throughout the ICO. At the outset of the company's marketing – and just a week before Centra started offering the Centra Tokens to investors – Sharma texted Trapani that the "licenses are hard to get with my name just cause I have a DUI. Other issue is net worth. Some states want you to be over 100k…." And on September 2, 2017 – more than a month after the start of the offering – when the company still had no licenses, Trapani sent a message complaining that "[a]ll it is, is like we gotta get money transmuting [sic] bonds for all countries and all states . . ."

101. Defendants' deception regarding the state licenses continued even after the offering had ended. In mid-October, for example, Defendants attempted to persuade a small regional bank to issue pre-paid or debit "Centra Cards." As part of the due diligence process, Centra provided a series of documents purporting to show that Centra held – or had applied to hold – numerous state-issued money transmitter licenses, when it did not hold licenses from any state.

102. For example, to make it appear as though Centra held a license from the state of Delaware, Sharma submitted a forged document to the bank – replete with the official state seal

and signature of the State Bank Commissioner – that purported to grant Centra a Delaware money transmitter license.

**C.    Defendants Used Fictional Executive Biographies to Promote Centra**

103.    In order to make the Centra ICO more attractive to prospective investors, Defendants listed in Centra's White Papers and on its website several key executives with impressive work histories and advanced degrees from well-known schools.

104.    "Michael Edwards" was listed as the Chief Executive Officer and Co-Founder of Centra. Edwards's LinkedIn profile stated that he had an M.B.A. from Harvard University and an extensive career in banking, first as a Financial Analyst at Bank of America, then as a VP of Business Banking at Chase Bank, and most recently as a Senior VP at Wells Fargo.

105.    "Jessica Robinson" was listed as the Chief Financial Officer, and she had purportedly served most recently as the CFO at Johnson Communications for nearly five years.

106.    Neither Edwards nor Robinson is a real person. A photo of Edwards used in earlier iterations on Centra's website and in a published White Paper was that of a Canadian professor with no relationship to the company. The picture of Robinson in early iterations on the website and in a published White Paper appears to be a stock photograph, *i.e.*, of an actor. Centra also created fake LinkedIn profiles for Edwards and Robinson, both of which were deleted after an online blogger raised questions regarding the two executives and whether they existed.

107.    Defendants knew, were reckless in not knowing, or were negligent in not knowing that neither Edwards nor Robinson was a real person and that neither worked for Centra.

108.    Shortly after Centra was incorporated and started marketing the offering, on July 29, 2017, Sharma sent a text message to Trapani noting that he "need[ed] to put real photos on there [the website]. Of the 'team'." Sharma explained that the website "had fufu [fake] people

on there" and had "been getting called out" by a "troller" online who had raised concerns that

team members on Centra's website were not real.  As a result, Sharma wanted to "[j]ust rather

cover all tracks now" and "fix all my flaws."

109.    That same day, Sharma sent Trapani another message that he "had one girl

contact me lol [and] said take my picture off your site."  Sharma then sent Trapani the picture of

"Edwards" used in the early White Papers and website and asked: "U know anyone [t]hat looks

like this guy . . . I need someone who kinda looks like him[.] I can't just change him now People

are gonna be like wtf."  Later that same day, Sharma reiterated to Trapani that he "need[ed] to

find someone who looks like Michael" for the "[t]eam photos."  Soon after, he described the

team members on the website to Trapani: "Everyone real Except Jessica And Mike."  Several

hours later, Sharma asked Trapani: "Who do we know looks like Jessica Robinson"?  Later that

evening, Sharma said to Trapani: "Gonna kill both Ceo and her[.]  Gonna say they were married

and got into an accident."

110.    Trapani caused the image in the White Paper purporting to depict Centra's

fictional CEO "Michael Edwards" to be changed from a photograph of the Canadian professor to

a photograph of an unidentified third party.

111.    Despite knowing that neither Edwards nor Robinson was a real person,

Defendants continued to reference Edwards or Robinson in the White Papers and promotional

materials, which they had access to and control over, through at least mid-September.

112.    For example, Sharma stated in an interview on or about August 14, 2017, that

"Edwards" had invested "a lot of capital originally" to help establish Centra, and also referred to

Edwards as a "silent partner" at the company in an email sent to a *New York Times* reporter.

113.    Farkas was connected to the LinkedIn profile for "Edwards" prior its deletion.

Farkas also edited a version of the Centra investor pitch deck on or about August 15, 2017, that

listed "Edwards" as the "VP/Co-Founder" and Robinson as the CFO, and the Defendants were

all responsible for several versions of the White Paper published on the Centra website that listed

"Edwards" and "Robinson" as members of the Centra team.

114.    Even after online commenters raised concerns regarding the legitimacy of

"Edwards" and "Robinson," Defendants continued to affirm that these executives were real

people.  On August 3, 2017, for example, one Centra critic suggested in a public chat forum that

"the pictures on website are not real," to which Sharma responded "[w]e are 100% Real . . .We

are real lol we went live on facebook and said hello."  Several days later, one commenter asked

Sharma to "please address the issue on michael edwards picture, the photo just changed today . .

."  Sharma blamed the change on a "misclarification from the development team that we were

working with" and claimed that "[f]reelancers dropped the ball."  Sharma then promised a live

video to demonstrate the legitimacy of the executives: "Myself, Ray, Mike, Jessica, and Robert

will be together this evening.  I promise you that."

115.    Sharma doubled down on his deception several days later when he claimed that

Robinson would answer questions in a live online video: "Our CFO will explain in a long

detailed interview . . . See this is why I want our CFO to explain.  She will say it clearer...Let

Jessica explain it."  In the same public chat forum, Sharma continued to respond to investors

over the following week by claiming that the company's CFO would be able to answer various

questions.  On August 17, Sharma noted that "Jessica has updated the website! Over 12.7M

Raised!"  After Sharma stated in the public chat forum that Centra would announce a new CEO

in mid-August, one commenter asked "what will mike do?"  Sharma responded that "Mike will be a Co-Founder and VP."

116.    In addition to fake LinkedIn profiles of "Edwards" and "Robinson" that Defendants used to promote Centra, Trapani – with encouragement and direction from Sharma – also fabricated his own online profile at a time when he knew potential investors were reviewing the Centra "team," including Trapani, when deciding whether to invest.

117.    In late July 2017, as the Centra promotional campaign for the ICO began, Trapani, with Sharma's assistance, built a fictional online profile of himself that included fake educational and professional accomplishments.  Sharma texted Trapani to "[g]o make a linked in [profile] And add as many connections as you can[.]  Add yourself to centra tech As COo [sic] And add connections."  Sharma then instructed Trapani to "Google Coo linked in profiles And get all the info," and also to "[p]ut precious [sic] jobs Like banks etc."  After Trapani apparently listed Harvard University under the "Education" section of his profile, Sharma directed him to "[t]ake Harvard out Do [l]ike university of Georgia.  It would [be] too suspect everyone from hRvard [sic]."[3]  Sharma also told Trapani to "[a]dd a construction company prior[.]  I'm putting you as foreman."  In a later series of text messages, Sharma wrote to Trapani that they "[s]hould look into signing up with Harvard Or remove from linked in[.]  Don't want any issues Like centra didn't do due deligence [sic] On own employees[.]  We gotta make sure we cover our asses any way possible."

118.    Trapani's LinkedIn profile from August 2017 reflected that he received a Master's Degree in Operations Management and Supervision from the University of California, Los Angeles ("UCLA") from 2010-2015.  In fact, UCLA has never offered a Master's Degree in

---

[3] As noted above, the fake LinkedIn profile for "Michael Edwards" showed that he had obtained an M.B.A. from Harvard University as well.

this subject. Moreover, Trapani's profile also reflected that he served as General Foreman of the New York-based construction company Safway Atlantic during roughly the same period (January 2011 – October 2016) as when he was purportedly in Los Angeles.

119.    A later version of Trapani's profile from November had eliminated all references to UCLA, and his work history at Safway Atlantic continued only to October 2014.

120.    In short, at Sharma's direction and with his assistance, Trapani created a fraudulent public profile touting nonexistent accomplishments and degrees at a time when they were aware that prospective investors would be evaluating Trapani and his background when deciding whether to invest in the Centra ICO.

### D.    Defendants Falsely Claimed that Investors Would be Paid a Dividend

121.    In the White Papers and in other marketing materials, Defendants touted Centra's spectacular growth potential. For example, one such White Paper stated that "the market capitalization of cryptocurrencies reached a new high of $102 Billion as of 15 June, 2017, an increase of 1363% since Feb. 19, 2016" and that "[o]ne of the major customer groups of Centra Tech are cryptocurrency holders [who] face difficulty shopping and executing transactions only using cryptocurrencies. They are frequently international shoppers [who would be] taking the most advantage of Centra's CCE (Currency Clearance Engine) and its ability to offer them the best exchange rate instantly." Thus, according to the White Paper, "the time is ripe to introduce a cryptocurrency-based marketplace where customers can use Centra Debit Card anywhere in the world that accepts Visa." The October 2017 pitch deck edited by Farkas and circulated to Sharma also highlighted Centra's strong growth potential and suggested that company revenues would grow to nearly $12 million by 2021.

122.    In connection with touting Centra's growth potential and the benefits of investing

in Centra's ICO, the White Papers promised that Centra investors "will receive a 0.8% Eth" – a

reference to the digital currency Ether – "reward for every transaction in the network."  When

Sharma was asked what this meant in a publicly available interview posted to YouTube in

August 2017, he responded that, of the money Centra earned from its "revenue share" agreement

with Visa and Mastercard, Centra would pay 0.8% back to token holders.  In a public chat forum

on August 31, 2017, Farkas listed as the first item in "Centra's 5-point Advantage" the fact that

"Centra tokens will give .8% returns in Eth quarterly to all CTR [Centra Token] holders based on

network usage (not personal purchases)."  As such, similar to a dividend, Centra investors were

promised a percent of Centra's future revenue stream from its purported partnership with Visa

and Mastercard.

123.    Defendants knew that the White Papers' claims that Centra intended to pay a

dividend-like "reward" to investors were false.  For example, in early September 2017, Sharma

explicitly acknowledged to a large CTR Token investor that Centra would not pay token holders

a 0.8% "dividend reward."  In a series of messages between Sharma and the large investor dated

September 6, 2017, the investor complained that he relied on this promised 0.8% reward when

purchasing CTR Tokens, and stated that he intended to sell all of his Centra Tokens as a result of

Sharma and Centra's decision to withhold the 0.8% dividend-like revenue payout.

124.    In the exchange, Sharma did not dispute that Centra would not pay the 0.8%

dividend, and instead offered to pay the dividend, but only to the investor in a confidential side-

deal.  Sharma stated, "i will extend my offer: My deal to you, and only you since you have been

here since the beginning was to extend the whole network reward program to you … this will

guarantee you 0.8% for the whole network as individual program specifically designed for you in

confidence and NDA ... you would get he [sic] 0.8% as if it was a dividend reward." The investor refused the side-deal and promised payout, and instead sold his Centra Tokens on an exchange.

125.   Sharma later forwarded his entire exchange with the investor to Farkas and Trapani. Thus, as of September 6, 2017, all Defendants knew that: (i) the claim in the White Paper that Centra would pay a 0.8% dividend-like reward to investors was false; and (ii) when this particular investor learned the truth, he decided to sell all of his Centra Tokens.

## VI.   Actions upon Learning of Commission Investigation

126.   On or about February 9, 2018, Sharma received a subpoena from the Commission requesting certain documents relating to Centra, including the Centra ICO. On or about February 13, 2018, Farkas received a subpoena from the Commission requesting documents relating to Centra, including the Centra ICO. On or about February 14, 2018, Trapani received a subpoena from the Commission requesting documents relating to Centra, including the Centra ICO. As a result, by mid-February 2018, Defendants knew that the Commission was investigating their activities in connection with the Centra ICO and promotion of Centra products.

127.   As of March 30, 2018, Centra's bank accounts were depleted and most of its employees had been terminated. Upon information and belief, a digital address holding digital assets raised in the ICO had not been depleted.

128.   Farkas made flight reservations to leave the United States on or about April 1, 2018. Before Farkas was able to board his flight, he was arrested by United States criminal authorities.

129.   Sharma was also arrested on April 1, 2018.

130.   Trapani was arrested on April 20, 2018

### FIRST CLAIM FOR RELIEF
#### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a)-(c)
#### Against all Defendants

131.    The Commission realleges and incorporates by reference paragraphs 1 through 130 of its Complaint.

132.    By virtue of the foregoing, Defendants, directly or indirectly, by the use of the means and instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, knowingly or recklessly, employed devices, schemes, or artifices to defraud, made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and courses of business which operate or would operate as a fraud or deceit.

133.    By virtue of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a)-(c) [17 C.F.R. § 240.10b-5(a)-(c)], promulgated thereunder.

### SECOND CLAIM FOR RELIEF
#### Violations of Section 17(a)(1)-(3) of the Securities Act
#### Against all Defendants

134.    The Commission realleges and incorporates by reference paragraphs 1 through 130 of its Complaint.

135.    By virtue of the foregoing, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, Defendants: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances

35

under which they were made, not misleading; and/or (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

136.   By reason of the conduct described above, Defendants, directly or indirectly violated and, unless enjoined will again violate, Securities Act Section 17(a)(1)-(3) [15 U.S.C. § 77q(a)(1)-(3)].

## THIRD CLAIM FOR RELIEF
### Violations of Sections 5(a) and 5(c) of the Securities Act
### Against all Defendants

137.   The Commission realleges and incorporates by reference paragraphs 1 through 130 of its Complaint.

138.   By virtue of the foregoing, (a) without a registration statement in effect as to that security, Defendants, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use of means of a prospectus, and (b) made use of the means and instruments of transportation or communication in interstate commerce and of the mails to offer to sell through the use of a prospectus, securities as to which no registration statement had been filed.

139.   By reason of the conduct described above, Defendants, directly or indirectly violated and, unless enjoined will again violate, Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and e(c)].

## FOURTH CLAIM FOR RELIEF
### Aiding and Abetting Centra's Violations of Sections 5(a), 5(c), and 17(a)
### of the Securities Act, and Section 10(b) of the Exchange Act
### and Rule 10b-5 Thereunder
### Against all Defendants

140.   The Commission realleges and incorporates by reference paragraphs 1 through 130 of its Complaint.

141.   By virtue of the foregoing, Defendants provided knowing or reckless substantial assistance to Centra, which, directly or indirectly, singly or in concert with others, in connection with the purchase or sale of a security, with scienter, used the means or instrumentalities of interstate commerce, or of the mails, to make untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and without a registration statement in effect as to that security, directly and indirectly, made use of the means and instruments of transportation or communications in interstate commerce and of the mails to sell securities through the use of means of a prospectus.

142.   By virtue of the foregoing, Defendants aided and abetted and, unless restrained and enjoined, will continue aiding and abetting, violations of Sections 5(a), 5(c), and 17(a)(1)-(3) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1)-(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a)-(c) [17 C.F.R. § 240.10b-5(a)-(c)] promulgated thereunder, in violation of Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court grant the following relief, a Final Judgment:

### I.

Permanently restraining and enjoining the Defendants, and each of their respective agents, servants, employees, attorneys and other persons in active concert or participation with each of them who receive actual notice of the injunction by personal service or otherwise from any future direct or indirect participation in any offering of unregistered securities, from any future violations of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), 77e(c)], and from any future violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5] issued thereunder;

### II.

Directing each of the Defendants to disgorge all ill-gotten gains, including prejudgment interest thereon;

### III.

Directing each of the Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

### IV.

Permanently barring each of the Defendants from serving as an officer or director of any public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

## V.

Permanently prohibiting each of the Defendants from participating in any offering of

digital or other securities; and

## VI.

Such other and further relief as this Court deems just and appropriate.

Dated: New York, New York
        April 20, 2018

SECURITIES AND EXCHANGE COMMISSION

By: _____

Robert A. Cohen
Chief, Cyber Unit
Division of Enforcement

Valerie A. Szczepanik
Lucas M. Fitzgerald
Jon A. Daniels
Alison R. Levine
Attorneys for the Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0069 (Fitzgerald)
Email: fitzgeraldl@sec.gov

# Exhibit F

# Exhibit F

```
 1                      UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF NEW YORK
 2

 3       ------------------------------------X
                                            :
 4       UNITED STATES OF AMERICA,
                                            :  18-MJ-02695 (UA)
 5                  Plaintiff,              :
                    v.                      :  April 25, 2018
 6                                          :
         ROBERT FARKAS, et al.,             :  500 Pearl Street
 7                                          :  New York, New York
                    Defendant.              :
 8       ------------------------------------X

 9                 TRANSCRIPT OF CIVIL CAUSE FOR BAIL HEARING
                      BEFORE THE HONORABLE ONA T. WANG
10                      UNITED STATES MAGISTRATE JUDGE

11       APPEARANCES:

12
         For the Plaintiff:       NEGAR TEKEEI, ESQ.
13                                United States Attorney's Office,
                                  One Saint Andrew's Plaza
14                                New York, New York 10007

15
         For the Defendant:       DANIEL JAMES HORWITZ, ESQ.
16                                McLaughlin and Stern, LLP
                                  260 Madison Avenue
17                                New York, New York 10016

18

19       Court Transcriber:       SHARI RIEMER, CET-805
                                  TypeWrite Word Processing Service
20                                211 N. Milton Road
                                  Saratoga Springs, New York 12866
21

22

23

24

25


         Proceedings recorded by electronic sound recording,
         transcript produced by transcription service
```

2

1    THE CLERK:  Good evening.  This is United States v.

2  Farkas, 18-MJ-2695.  Counsel, can I have your appearances for

3  the record please?

4    MS. TEKEEI:  Good evening, Your Honor.  Negar Tekeei

5  on behalf of the United States.  And joining me at counsel's

6  table is Special Agent Brandon Raz [Ph.] with the FBI.

7    THE COURT:  Okay.  Good evening.

8    MR. HORWITZ:  Good evening, Your Honor.  From

9  McLaughlin and Stern, 260 Madison Avenue, New York, New York,

10  10016, by Daniel J. Horwitz, for the defendant for arraignment

11  only.

12    THE COURT:  Okay.  Good evening.  And good evening

13  Mr. Farkas.  Please be seated.  Mr. Farkas, are you able to

14  speak and understand English?

15    THE DEFENDANT:  Yes, your Honor.

16    THE COURT:  Okay.  Can I have the date and time of

17  arrest?

18    MS. TEKEEI:  Your Honor, the defendant arrived here

19  via Marshal's transport either late yesterday evening or early

20  this morning.  He was originally arrested in the Southern

21  District of Florida on April 1st and ordered removed here on

22  April 5, 2018.  He was ordered detained without prejudice to

23  making a future bail application upon arriving here.

24    THE COURT:  Okay.  I am Judge Wang.  You are here

25  because you were charged with certain crimes by a complaint

3

1  supported by an affidavit.  Do you have a copy of the

2  complaint?

3            THE DEFENDANT:  Yes, your Honor.

4            THE COURT:  Okay.  The purpose of today's proceeding

5  is to advise you of certain rights that you have, inform you

6  of the charges against you and consider whether counsel should

7  be appointed for you and decide under what conditions, if any,

8  you shall be released pending bail.

9            I'm now going to explain certain constitutional

10 rights that you have.  You have the right to remain silent.

11 You're not required to make any statements.  Even if you have

12 already made statements to the authorities  you do not need to

13 make any further statements.  Any statements that you do make

14 can be used against you.  You have the right to be released

15 either conditionally or unconditionally pending trial unless I

16 find that there are no conditions that would reasonably assure

17 your presence at future court appearances and the safety of

18 the community.

19           If you're not a United States citizen, you have the

20 right to request that a government attorney or law enforcement

21 official notify a consular officer from your country of origin

22 that you've been arrested.  In some cases a treaty or other

23 agreement may require the United States government to give

24 that notice whether you request it or not.  You have the

25 right to be represented by an attorney during all court

4

1   proceedings including this one, and during all questioning by

2   the authorities.  You have the right to hire your own

3   attorney.  If you cannot afford an attorney I will appoint one

4   today to represent you.  Do you understand your rights as I've

5   just explained them?

6           THE DEFENDANT:  Yes, Your Honor.

7           THE COURT:   And I understand that Mr. Horwitz is

8   retained counsel, is that right?

9           MR. HORWITZ:  Yes, your Honor.

10          THE COURT:  I have before me a complaint containing

11  the charges against you in this case.  The charges include

12  conspiracy to commit securities fraud, securities fraud,

13  conspiracy to commit wire fraud, and wire fraud.  Mr. Horwitz,

14  have you received a copy of the complaint?

15          MR. HORWITZ:  Yes, I have, Your Honor.  I have

16  conferred with my client about it.  We waive the formal

17  reading and enter a plea of not guilty.

18          THE COURT:  Okay.  Mr. Farkas, do you understand the

19  charges against you?

20          THE DEFENDANT:  Yes, your Honor.

21          THE COURT:  Okay.  Mr. Farkas, you have the right to

22  a preliminary hearing in which the Government will have the

23  burden of showing that there is probable cause to believe that

24  the crime for which you are being charged has been committed

25  and that you are the person who committed it.  At the hearing

5

1   you or your counsel would be entitled to cross-examine any

2   witnesses and introduce evidence.  However, a preliminary

3   hearing will not be held if you are indicted by a grand jury

4   before the date of a preliminary hearing.  I will set a

5   preliminary hearing date at the conclusion of these

6   proceedings.

7           Now I understand that we do not have an agreement as

8   to a bail package.  So next I will hear from the Government.

9           MS. TEKEEI:  Thank you, your Honor.  And as set

10  forth in the papers that we submitted earlier today, the

11  Government seeks detention based on the risk of flight this

12  defendant poses and based on economic danger to the community.

13          THE COURT:  Okay.  Can you get into a little bit

14  more, I mean, this is not a presumption case, right?

15          MS. TEKEEI:  That is correct, Your Honor.  And I'm

16  more than happy to.  I think we should start with the nature

17  and circumstances of the defendant's offense.  As is detailed

18  in the complaint against him and the complaint against one of

19  his co-conspirators, Raymond Trapani who was arrested a few

20  weeks after this defendant, the defendant and his co-

21  conspirators, Sohrab Sharma and Ray Trapini perpetrated a

22  massive fraud in connection with a scheme to induce victim

23  investors to invest more than 25 million dollars in crypto

24  currencies through material mis-representations and omissions

25  in connection with an Initial Coin Offering by the defendant's

6

1   company, a company called Centra Tech.  Today, those digital

2   assets are worth more than 55 million dollars.  They sit in a

3   digital wallet that the defendant and his co-defendants

4   previously had access to and it is the Government's belief

5   that they still have access to given that no one has -- bless

6   you, Your Honor --

7          THE COURT:  Sorry.

8          MS. TEKEEI:  -- relinquished control over the assets

9   within that wallet to the Government as required by seizure

10  warrants served on all of the defendants.

11         Let me just go into describing a little bit more

12  about the details of the offense conduct.  To be specific,

13  from approximately July 2017 through the date of the complaint

14  the defendants and his co-conspirators lied to the investing

15  public and the public in multiple ways.  First, they lied

16  about having an experienced executive team with credentials.

17  Including a purported CEO named Michael Edwards who had

18  purportedly more than 20 years of experience in the banking

19  industry.

20         At various times, an individual who is not named

21  Michael Edwards' picture was used in connection with those

22  material misrepresentations.  First, it was a professor, and

23  then subsequently the defendant and his co-conspirators used

24  the picture of the defendant's father as the picture of

25  Michael Edwards in marketing materials that were posted

7

1   throughout the internet in connection with raising investor

2   funds.

3          The defendant and his co-conspirators also lied to

4   the public about developing a debit card -- namely the so-

5   called Centra card -- which they purported would allow users

6   to spend crypto currency of their choice to make a purchase at

7   various establishments using Visa and MasterCard.   The

8   defendant and his co-conspirators also lied about partnerships

9   that they had with financial -- with entities in the financial

10  services sector to include Bancorp, Visa, and MasterCard.

11         And finally, and among other things, the defendant

12  and his co-conspirators also lied about having individual

13  licenses at different states in order to operate.   In sum,

14  they created fake people, they created fake documents, they

15  created fake money at -- excuse me, they created fake licenses

16  all in order to make money.   And they did this using the high

17  speed web, the connections that people make and that people

18  act on in investing and they took advantage of the investing

19  public in doing so.

20         As I said earlier today, more than 25 million

21  dollars that the defendant and his co-conspirators raised

22  during the initial ICO is worth more than 55 million dollars.

23  And those assets sit in a digital wallet that is worth more

24  than 60 million dollars standing here today.   Those are the

25  nature and circumstances of the offense.   And the evidence of

8

1   the defendant's crimes is conclusively strong.

2          We have, as is conveyed in the complaint, against

3   both the defendant and his co-defendant and co-conspirator,

4   Raymond Trapani, the defendant's own text messages and emails

5   and his co-defendants' own text messages and emails that they

6   sent and received regarding their crimes and regarding

7   concealing their crimes, regarding obstructing justice and

8   concealing their crimes from being found.  We have the

9   marketing materials that the defendant and his co-defendants

10  prepared containing the numerous fraudulent representations to

11  the public.  And we have the -- we have various videos of the

12  defendant out there in the public purporting to advertise on

13  behalf of Centra Tech.

14          Your Honor, these factors all give the Government

15  significant concern about the defendant's risk of flight.  And

16  I'll just go into a couple of more pieces of information that

17  are conveyed in our papers.  Your Honor, the defendant was

18  interviewed by Pre-trial Services in florida and he was

19  interviewed by Pre-trial Services here.  And it is the case --

20  and I don't think it is in dispute -- that over the course of

21  the conspiracy, the defendant had access to millions of

22  dollars in crypto currencies.

23          And based on the information that's summarized in

24  the complaint, the defendant had access to those funds.  He

25  engaged in, and he and his co-defendants have engaged in

9

1   concealing those funds.  And it is the case that the 55

2   million dollars of investor funds that remain in the digital

3   wallet, have still been unable to be accessed by law

4   enforcement and secured.  Those, in addition to the facts set

5   forth in the complaint about the defendant's request for

6   extradition research, the defendant's request and intimation

7   that the emails related to extradition research that he had

8   requested a company counsel to perform for him be deleted, all

9   of that gives the Government serious and grave concerns about

10  the defendant's risk of flight and about -- and leading into

11  the defendant's economic danger posed to the community.

12         I'd like to say, Your Honor, that this is not your

13  typical white collar securities fraud and wire fraud case.

14  The amount of money that is held in the digital wallet would

15  take a split second for the people who have the access to the

16  code to transfer for themselves and use for themselves

17  significantly depleting and dissipating investor funds; funds

18  that are owed to the victim investors in this case.

19         As is conveyed in our filing papers and in our

20  letter the Court, company counsel and counsel for various of

21  the individual defendants have represented to us that at the

22  time of the SEC's investigation -- at the time fo the SEC's

23  investigation to Centra Tech became apparent and known by the

24  issuance of a subpoena, the defendant's co-defendant, Sohrab

25  Sharma purported to provide the defendant and compliance

10

1    officer for the company with a copy of the passcode.  Which

2    was then divided in two and held at two separate safe deposit

3    boxes at two separate banks.  Purportedly to keep the wallets

4    in the -- the assets in the digital wallet safe and secure.

5           Now we've learned today from counsel, and I'll let

6    him go into it, the defendant's assertion of facts as to

7    whether he had the actual access and key -- the passcode to

8    the digital wallet to begin with.  But the facts as they stand

9    before the Court today are that this defendant and his co-

10   defendant had access to the digital wallet at some point, have

11   not relinquished access to that wallet to the Government, and

12   in a matter of seconds, the funds in that wallet could be

13   dissipated an the investors will never be able to be made

14   whole.  That gives the Government substantial concern as to

15   the economic danger to the community that the defendant and

16   his co-defendants -- but particularly the defendant for

17   purposes of today's proceeding -- pose.

18          We have been in extensive communication with defense

19   counsel regarding our concerns about the defendant's reporting

20   of his own personal assets or lack there of to the Pre-trial

21   Services office.  We've communicated with defense counsel

22   about the Government's concerns regarding the defendant's

23   access to the digital wallet.  We have raised any number of

24   concerns with defense counsel and we have been engaged in what

25   have been helpful and informative discussions.

11

1     So I will say that since the filing of the letter to

2 the Court, the Government has facts that have been conveyed by

3 defense counsel that it did not previously have.  But, Your

4 Honor, I will also say that the facts that the Government has,

5 that have been conveyed by the defense counsel and I expect

6 Mr. Horwitz will convey to the Court today, are sourced by the

7 defendant.  In other words, the very same person who engaged

8 in creating fake people, the very same person who engaged in

9 fraudulent misrepresentations to the public for many, many,

10 many months, to the tune of being able to access millions of

11 dollars in crypto currency and in real monetized currency in

12 U.S. dollars over the course of the time period of the

13 conspiracy, has -- is the one who is providing the facts to

14 the Court in hopes of being released on bail.

15     We cannot, here today, allow or agree to a release

16 on bail conditions given the nature and circumstances of the

17 offense, the seriousness of the charges, the fact that the

18 defendant now faces up to approximately 210 to 262 months in

19 prison if convicted for these crimes.  And the fact that the

20 assets in the digital wallet remain suspended, remain out

21 there and the only people who had access to the digital wallet

22 still have not relinquished control over that wallet to the

23 Government as required by seizure warrants and other legal

24 process.

25     The lights are turning off which is a signal to me,

12

1  Your Honor --

2          THE COURT:  Oh, boy.

3          MS. TEKEEI:  I am happy to address the Court's

4  questions whatever they  may be after -- now or at the

5  conclusion of defense counsel's argument.  In our letters, we

6  set forth what, at a minimum, we believe, should be any bail

7  conditions if the Court is inclined to grant bail in this

8  case.  And we strongly believe that if the Court is inclined

9  to grant bail, all of those conditions should be met prior to

10 the defendant's release.  Thank you, your Honor.

11         THE COURT:  Okay.  Can I hear from Mr. Horwitz.

12         MR. HORWITZ:  Thank you.

13         THE COURT:  And is there -- I'll ask the CSO, is

14 there anything we can do about the lights to prevent them from

15 turning off?

16         UNIDENTIFIED SPEAKER:  [inaudible]

17         THE COURT:  Thank you.

18         MR. HORWITZ:  Thank you, your Honor.  I want to

19 frame the discussion with appropriate legal standard for

20 detention.  I want to provide the Court with additional facts

21 that pre-date the Government's arrest of my client, which are

22 relevant, particularly with respect to risk of flight.  I want

23 to explain to the Court that while we have had extensive

24 discussions with the Government about bail, there's been a lot

25 of information that was provided to the Government and before

13

1   that there was a lot of information that was provided --

2          THE COURT:  Mr. Horwitz, it's after 8:00.  We're in

3   danger of the lights turning off on us.  Let's skip the

4   preliminaries and get down to the facts that you have in your

5   argument.

6          MR. HORWITZ:  Sure.  I mean, I do think it's

7   important to note that clearly under the Bail Reform Act that,

8   you know, defendant should be released on the least

9   restrictive condition and that for when the Government seeks

10  detention is an extraordinary remedy and there is a

11  presumption for bail.  And clearly the standard, I think what

12  was set for this, was in the Madoff case and the cite there is

13  586 F. Supp, 240.  It's a case that I actually argued in this

14  court for bail when the Government sought detention.

15         THE COURT:  My -- I'm going to interrupt you --

16         MR. HORWITZ:  I --

17         THE COURT:  -- because it is late, but my concern is

18  with the digital wallet and the access to the proceeds there.

19         MR. HORWITZ:  Right.  So let me address that first.

20  So the digital wallet -- the contents of the digital wallet

21  have been and are today available for review by the public.

22  That has always been the case.  It is available on a website.

23  The Government has that information and at no time at all in

24  either the SEC's investigation or since my client's arrest has

25  there been any diminution of those assets.  With respect to

14

1   the digital wallet -- if I may, Your Honor, I do want to

2   address the risk of flight first.  Because I think that's an

3   important --

4           THE COURT:  I think the risk of flight is tied to

5   the access to the digital wallet.  So please do.

6           MR. HORWITZ:  Absolutely.  Absolutely.  So if I may,

7   may I start with that?

8           As the Government has indicated, and I think the

9   Court is aware from the letter, there was, in an SEC

10  investigation, that became known to the defendant and his

11  employer, the company, and the co-defendants sometime either

12  in December of last year or early this year.  The notice of

13  the investigation came by way of a subpoena to the company for

14  a large number of documents.  Company had counsel, Ballard

15  Spahr, they were -- and they negotiated and provided

16  information to the SEC about the documents including

17  information related to the digital wallet and the information

18  I've just relayed to the Court about the contents of the

19  digital wallet.

20          There was a request by the SEC for a code to, if you

21  would, access the digital code.  That information was provided

22  by counsel for the company to the SEC and --

23          THE COURT:  My understanding is it didn't work,

24  right?

25          MR. HORWITZ:  My understanding that it did not work

15

1    when the Government tried to access it.  I don't believe that

2    the information was ever accessed by the SEC

3            THE COURT:  The SEC is the Government, right?

4            MR. HORWITZ:  Well, I mean, I mean, Government

5    meaning -- correct.  But I think we all sort of refer to the

6    Government as the U.S. Attorney's Office --

7            MS. TEKEEI:  I think he means

8            MR. HORWITZ:  -- in [inaudible].

9            MS. TEKEEI:  -- law enforcement, Your Honor.

10           MR. HORWITZ:  Yes.  Correct.

11           MS. TEKEEI:  As opposed to Securities Counsel.

12           THE COURT:  So is there any understanding why the

13   Government or law enforcement was not able to access the

14   digital wallet given the information that was provided by

15   counsel?

16           MR. HORWITZ:  Yes.  But if I may, I just want to

17   finish the -- I want to ask -- obviously I'm going to get --

18   answer the Court's question.  But I do want to --

19           THE COURT:  Well it's 8:10 so let's get to it.

20           MR. HORWITZ:  I know, Your Honor.  And we've all

21   been here -- I've been here since -- I've been here since noon

22   and the defendant's mother and uncle have been waiting

23   patiently, so I truly -- he's been locked up since April 1st.

24   So this is really my first opportunity, and I apologize.

25           So in any event, the short point that I want to make

16

1  is that at no time was there any indication that there was a

2  Government investigation.  And I believe that the predicate

3  for the defendant's arrest at the airport on April 1st when he

4  was supposed to depart for a previously scheduled trip to

5  South Korea was this email that the Government had indicated.

6  The email which purportedly claims to deal with extradition

7  and suggests that Mr. Farkas was seeking to flee the country.

8  In fact, the email, which we provided to the Government today,

9  and I'm happy to share with the Court pursuant to 502(d) of

10  the Federal Rules of Evidence, because it is marked

11  privileged, was from a lawyer to Mr. Farkas.

12          THE COURT:  Is -- who's copy of that email is it?

13  Is it the lawyers or is it Mr. Farkas'?  Because my

14  understanding was that Mr. Farkas deleted his copy.

15          MR. HORWITZ:  This was a copy that I received from

16  the company counsel.  And, again, provided to the Government

17  today.  Although it's in the complaint.  I was under the

18  impression they had it.  What's important about the email is

19  there are two points about the email.  Number one, the email

20  was written on February 5th.  Almost two months before Mr.

21  Farkas' scheduled trip to South Korea.  Number one.  Number

22  two, both before the email was written, but after the SEC's

23  investigation was known, Mr. Farkas traveled overseas for

24  business and returned.  Number three, after February 5th, the

25  date of the email, Mr. Farkas traveled to South Korea at the

17

1  end of February, and he traveled to Canada at the beginning of

2  March and returned each time.

3       So in other words, this email that purportedly, you

4  know, indicates that Mr. Farkas was thinking about fleeing the

5  country when there was no information at all about a criminal

6  investigation that Mr. Farkas had, he went overseas and he

7  returned.  Not once but twice.  And that's why I think it's

8  important before we deal with the wallet, discuss the risk of

9  flight.

10      With respect to the wallet, after the SEC asked for

11  the information -- I'm sorry -- SEC asked for the information,

12  the request was made via company counsel to provide access to

13  this particular wallet.  What I shared with the Government

14  today, and this was the first time, today that I had an

15  opportunity to speak to my client without having a recording

16  because he's been incarcerated since April 1st -- so I was not

17  in a position to learn these facts.  As soon as I learned them

18  today, which I'm about to relate to the Court, I shared them

19  with the Government.  We had a number of conversations this

20  afternoon in the hopes of trying to be able to reach a

21  package.

22      Mr. Farkas was -- Mr. Farkas' co-defendant

23  transmitted an iMessage to him when he was in San Francisco

24  when the SEC's request for the information about the wallet

25  was made.  And that information was printed out.  And it was

18

1  torn in half. Half of the piece of paper with the code was

2  given to company counsel, half was with Mr. Farkas and was put

3  in a safe deposit box.  The Government executed a -- when the

4  criminal case was -- after Mr. Farkas' arrest, the code was

5  provided to the Government.  So in other words, after April

6  1st, Ballard Spahr provided the code either to the SEC or to

7  the Government.  And the code apparently didn't work.  Mr.

8  Farkas believed then, in good faith, that that in fact was the

9  code.  What he did not know however, and learned toward the

10 end of his incarceration in Florida before he came here, was

11 that his co-defendant, Mr. Sohrab had apparently either

12 switched out a number of the digits or indicated or -- or

13 changed the sequencing --

14          THE COURT:  Which --

15          MR. HORWITZ:  -- of the --

16          THE COURT:  -- which co-defendant is that?  Is that

17 Mr. Sharma?

18          MR. HORWITZ:  Correct.  That's Mr. Sharma.

19          THE COURT:  Okay.  Not a Mr. --

20          MR. HORWITZ:  Not Mr. Trapani, no.

21          THE COURT:  Okay.

22          MR. HORWITZ:  And so what I'm reporting to the Court

23 is what I reported to the Government today.  As soon as I

24 learned this from my client, after I spoke to him for the

25 first time and debriefed him about these allegations and

19

1   talked about the things that we needed to talk about in order

2   to make a [inaudible] and bail application either to the Court

3   or to try to convince the Government that there should be a

4   package, the Government and I, Ms. Tekeei, had a number of

5   conversations this afternoon, and I conveyed that information.

6           THE COURT:  Conveyed what information?

7           MR. HORWITZ:  What I just relayed to the Court.  In

8   other words that when the Government executed its seizure

9   warrant and when the Government requested of company counsel -

10  -

11          THE COURT:  Okay.  So nobody has the code as of

12  right now?  Nobody in the Government has the code as of right

13  now.

14          MR. HORWITZ:  Correct.  And Mr. Farkas does not know

15  the code.  He does not have access to the code.  He does not

16  know where the code is stored.  However, as I indicated, the

17  balance of the account is visible.  In other words, everybody

18  can watch the account.  You can go online.  It's not like a

19  bank account where only you have access to it.  [inaudible] --

20          THE COURT:  I understand that.

21          MR. HORWITZ:  So to the extent that A, we submit

22  that there is no risk of flight.  In other words, the entire

23  predicate for the arrest was this canard of an email that

24  suggested that he was about to flee.  And, again, I'm happy to

25  provide a copy of that email to the Court so long as it's

20

1    subject to 502(d) so --

2         THE COURT:  I don't need to see it.

3         MR. HORWITZ:  Yeah.  In any event.  Again, the

4    timing here is so important.  Because this email was written

5    two months before this trip that the Government thought that

6    Mr. Farkas was taking to run away.  And in fact, nothing

7    happened with the wallet.  Nothing has been done with the

8    wallet and so to the extent that again, the concept of risk of

9    flight -- I mean, bail is -- under these circumstances, if you

10   look at the totality of the circumstances -- A, we're not sure

11   that the Government has established risk of flight by

12   preponderance, particularly because of the date of this email.

13   Which is not in dispute.

14        THE COURT:  Let me stop you right there because

15   you're focused on the time difference --

16        MR. HORWITZ:  Yeah.

17        THE COURT:  -- and the fact that Mr. Farkas traveled

18   internationally.  I have some familiarity with the Madoff case

19   as well.  And there were numerous defendants who -- numerous

20   defendants in the asset recovery actions who claimed that they

21   did not have knowledge of the fraud, because why would they

22   leave their money in -- you know, why didn't they pull it out

23   before the date of Mr. Madoff's arrest?  Well that doesn't --

24   that's not dispositive.  It just means that either they chose

25   to leave it in or they didn't get to it in time or anything

21

1  like that.

2          So the fact that he traveled internationally at some

3  time after this email is of far less concern to me than the

4  issue of the digital wallet, who has the code, and who has

5  access to it.  Because as I understand it, the fact that the

6  public can see the value in the digital wallet is of no moment

7  if those assets can be depleted on a moment's notice by

8  somebody who does have the correct code.  And that is my

9  concern here.

10          MR. HORWITZ:  I understand that, and I would again,

11  ask the Court to consider Judge Ellis -- Magistrate Judge

12  Ellis' decision on the issue of detention.  Because in that

13  case, the Government argued when they sought detention that

14  not all of Mr. Madoff's assets were known.  Not all of the

15  whereabouts were known.

16          THE COURT:  But those assets were not movable in the

17  same way that this digital wallet is.

18          MR. HORWITZ:  Well, but again, we're talking about

19  detention.  And what the Court, obviously you understand the

20  standard is, are there no circumstances or no conditions or

21  combination of conditions that could reasonably assure the

22  defendant's return to the Court.  And so if you look at the

23  one, and I do think respectfully that the email is important

24  because it does go in the picture of the total preponderance,

25  number one.  Number two, if you look at the totality of the

22

1   circumstances under a consideration when the Government's
2   requesting bail, one, you've got a defendant who's got no
3   record whatsoever.  Number two, you've got -- clearly the
4   complaint says what it says.  But with respect to whether he
5   was the leader or the organizer or the principal mover, I
6   think a fair reading of the complaint would indicate that his
7   co-defendants were.  He was not.  That's number two.

8          Number three, even if the Court is concerned about
9   access to the wallet, notwithstanding our representation Mr.
10  Farkas does not know what the code is, does not know where to
11  get the code, and doesn't have access to it.  There are
12  conditions that are short of detention that the Court can
13  impose as part of a reasonable bail package.  Including
14  limiting, as the Government indicated in its alternate
15  proposal -- limiting his access to the internet.  Limiting
16  access to who he can call.  He does not need to be in jail
17  detained if the Court is that concerned about access to this
18  wallet -- to these [inaudible].

19         THE COURT:  How do you propose to have that limit of
20  access to the internet and to any calls be maintained on a
21  real-time 24/7 basis?  Because this is what we're talking
22  about?

23         MR. HORWITZ:  Well I mean, I think the Government,
24  there are conditions that Pre-trial Services can monitor
25  internet access.  They can monitor phone calls.  There is a

23

1   way to do that, frankly, Your Honor.  And I think that the

2   proof in the pudding there is that the Government in its

3   alternate package or its proposal for bail, indicated that

4   those are conditions that the Government would want to impose

5   if the Court considered bail.

6            THE COURT:  In addition to the requirements with the

7   April 16th seizure warrant, right?

8            MR. HORWITZ:  Well, I mean, to the extent that was

9   represented to us -- well first of all, I mean, I just want to

10  -- I just feel it's important to put this on the record.  So

11  yes, there was a seizure warrant, number one.  Number two, it

12  was not served on my client because he was in jail in Florida.

13  It was emailed.  And there was -- so, A, we have an issue of

14  serving, but we'll put that aside.  My client was in jail, he

15  didn't have the ability to access the code, number two.

16  Number three, as I've represented to the Court, this is the

17  first opportunity today that I've had to have a conversation -

18  - a confidential conversation with my client that was not

19  monitored by the Broward County Bureau of Prisons or the

20  Federal Bureau of Prisons.

21            So I think that to the extent that the Government

22  has been satisfied that they don't know how the code works, we

23  have exhausted our remedies here.  I can't do more than talk

24  to my client and ask him.  We have no other evidence or no

25  other indication that he's in possession of the code.  If we

24

1  knew where the code was we would tell the Government, which is
2  exactly what we said.  I can't do anything more than that.
3  Whether the Government finds that credible or not, you know,
4  I'm disappointed that at this point, frankly, we've had a lot
5  of discussions and I think they've been carried out very
6  professionally.  The office has given us -- the office has
7  given us, you know, every courtesy to make these arguments.

8       But, frankly, at this point, and particularly and
9  again, I'm sorry to keep coming back to the email but it's so
10 troubling to me that the detention was predicated on an email
11 that was written two months before.  There was never a risk of
12 flight.  We wouldn't be having this conversation if -- and
13 again, I have said, as I've said to the Government, I believe
14 what happened was an email is a bad game of telephone which is
15 worth ten seconds of the Court explaining what happened.  In
16 fact, the Government didn't even see the email until I sent it
17 to them today.

18      My understanding that this email was sent in
19 February.  In March there was an employee at the company who
20 was a lawyer, who, notwithstanding the fact that the email was
21 marked attorney/client privilege and confidential, shared it
22 with somebody else at FINRA.  Somebody at FINRA must have
23 contacted the FBI.  But nobody actually ever saw the email.
24 So the whole predicate to the arrest that Mr. Farkas was about
25 to run away to South Korea and then somehow disappear into one

25

1  of the three, or four, or five countries that we don't have

2  extradition treaties with -- which by the way, the substance

3  of the email, does not even deal with.  In other words, the

4  substance of the email, which came about because of a

5  conversation that this lawyer had with my client about a rap

6  song called Diplomatic Immunity and this lawyer apparently

7  thought that Mr. Farkas was asking about extradition, the

8  substance, of the email has to do with extradition treaties

9  between the United Kingdom and the Cayman Islands, and the

10  United States and the Cayman Islands.

11         It does not in any way indicate you can go to

12  Algeria, or Albania or whatever countries we don't have

13  extradition treaties with.  Which -- and again, I'm sorry to

14  keep harping on this, Your Honor, especially at this late

15  hour, but I do think it's so important that the Court consider

16  was there actually a real risk of flight?  And when you

17  analyze the question about access to the wallet, the risk of

18  flight, I think diminishes -- I'm not saying it's not a

19  concern that, you know, the Government, or the Court should

20  have -- but I do think it diminishes the concern particularly

21  given the information we've provided today about whether Mr.

22  Farkas is, A, going to flee, and is a risk of flight.  And, B,

23  whether or not he's going to access the funds.  And even if he

24  does, you know, he -- there's just not an indication that

25  notwithstanding the funds, that there was a risk of flight

26

1  And the last thing, I would say, Your Honor, and I know you're

2  [inaudible], you're familiar with the Madoff case and more

3  than perhaps before you became a Magistrate Judge --

4          THE COURT:  Much more familiar.

5          MR. HORWITZ:  I think I understand your background

6  and I --

7          THE COURT:  Yeah.

8          MR. HORWITZ:  -- I understand now what your

9  involvement was, and, Your Honor, and say that obviously

10  respectfully.  And the last thing I would just submit to the

11  Court is that, and I said this to the Government in a number

12  of conversations, both with the [inaudible] and with the

13  supervisor, that the analysis in this case now seems to have

14  come down to, if in a white collar case there are substantial

15  assets but not all assets that are unaccounted for, does that

16  A, priority mean that there must be detention and that there

17  is a risk of fligh and an economic danger.  And I would submit

18  to you that the evaluation that the Court must do even if you

19  find that there's a preponderance, is that you have to look at

20  -- you have to look at the totality of the circumstances --

21  the totality.  What his record is.  What his role was in the

22  allegations.  What the state of the case is.  This is a

23  complaint.  He's not an indicted defendant.

24          At the time that he was arrested, there was

25  virtually no indication to this defendant -- or I should

27

1  admit, to the company -- that there was a criminal

2  investigation afoot.  And I will add that while I only read on

3  my phone the Government's letter to the Court, there is an

4  indication in that letter that just simply because Mr. Farkas

5  had retained counsel in the SEC case, that that somehow

6  translates into knowledge that there is a criminal

7  investigation.  So there was no indication that there was a

8  criminal investigation.

9          He has a clean record.  His family is here in court,

10 his mother and his uncle are here.  His father had a

11 previously scheduled outpatient surgical proceeding which took

12 place today.  Had it not taken place today, he would be here.

13 This is a good family, Your Honor.  We've discussed the bail

14 package.  They own their own home.  It is assessed at a value

15 of $622,000.  We have discussed with the Government pledging

16 that property as security on a PRB [Ph.].  I will point out

17 that both the District of Florida and the Southern District of

18 Pre-trial Services have recommended that there be release on a

19 bond without security.  The Government has indicated three co-

20 signers.  We have two right here.  Mr. Farkas' uncle and his

21 father are in business in a business in New Jersey and they

22 are responsible and available to sign the bond, as is Mrs.

23 Farkas who's here and works for her husband's company.

24          Obviously I'm happy to answer the Court's questions,

25 but I do think, respectfully, that there are conditions short

28

1   of detention that could reasonably assure the defendant's
2   return.

3           THE COURT:  Okay.  I'd like to -- it's now
4   approaching 8:30 so I would like the Government to respond.
5   But before responding on the points that you see fit to
6   respond on, I have a couple of questions.  One, are -- does
7   Mr. Farkas have -- are there any assets that are available to
8   Mr. Farkas, and let's include the digital wallet for now, that
9   the Government would concede are not proceeds from the alleged
10  fraud and conspiracy?

11          MS. TEKEEI:  Your Honor, that's a -- it's a
12  difficult question to ask and I'm not in any way trying to
13  evade the Court's question, but this defendant and his co-
14  defendants had multiple bank accounts across multiple
15  different banks.  The Government is just getting its arms
16  around the scope of the bank accounts.  For example, the
17  defendant has a bank account in his name -- a business bank
18  account -- that's linked to him to which he has sole control
19  at a Citibank in the name of Digital Card Solutions in which
20  there exist $750,000 approximately today.

21          And we're -- when I say we're learning new facts
22  about the defendant and his co-defendants and their shell
23  companies and their bank accounts every day, it is not an
24  exaggeration.  We are.  So it is hard for us standing here
25  today to answer that question.  We do know that shortly before

29

1   his scheduled departure -- or shortly before his flight to

2   South Korea, the defendant liquidated more than $114,000 of

3   his crypto currency assets held in a digital wallet.  And we

4   don't know where those assets landed.  We don't know where

5   they went.  We know that he did not report those assets to

6   Pre-trial Services in Florida or here.  And there may be other

7   assets that he did not report to Pre-trial Services in both

8   districts.

9          THE COURT:  Okay.  That brings me to -- makes me

10  skip ahead to a different question which is, does the United

11  States have an extradition treaty with South Korea?

12         MS. TEKEEI:  Your Honor, I have not done that

13  research myself, so I would hesitate to give the Court an

14  answer except for that I doubt it.  But I'm happy to look into

15  that and I think we could figure that out relatively quickly.

16  We may -- I'm sorry.  The Agent tells me we may.

17         THE COURT:  Okay.

18         MS. TEKEEI:  So I just don't know but I can find

19  out.  Your Honor, I'm sorry, I didn't mean to interrupt the

20  Court if you have additional questions that I can answer.

21         THE COURT:  Mr. Horwitz did you have an answer to

22  that question in particular?

23         MR. HORWITZ:  I do.  And in fact perhaps Ms. Tekeei

24  might not have been on the call, but in one of my early calls

25  with her co-counsel, from the U.S. Attorney's office, he did

30

1   indicate to me, and I have verified, that we do have an

2   extradition treaty with South Korea.  I will say -- I just

3   want to quickly put something o the record -- I know my client

4   would like me to.  With respect to this company called Digital

5   Card Solutions, I'm told by my client that during his

6   Pre-trial Services interview in Florida he was asked questions

7   about his accounts, this is a business account, but that after

8   the interview, he called the local counsel that he had in

9   Florida to say I want you to make sure that Pre-trial Services

10  knows about the Digital Card Services [sic].  He made that

11  call from either Broward County or from the federal detention

12  center.  It was a recorded call.  I don't know whether or not

13  local counsel ever made that call or what happened with that.

14          When Ms. Tekeei indicates that the Government is

15  learning new facts, I think some of the facts that she's

16  learning are some of the facts that I disclosed today.

17  Because we did have discussions about Digital Card Solutions,

18  about the balance in that account.  And we had a discussion

19  about the crypto currency account that she just referenced.

20          THE COURT:  The 114,000?

21          MR. HORWITZ:  Correct.  And it's my understanding

22  that that was an account -- and I disclosed this to the

23  Government today.  That is an account that was used for two

24  purposes.  One, it was used at times as a personal account for

25  crypto that Mr. Farkas used -- not having anything whatsoever

31

1  to do with any of the allegations here.  And that --

2          THE COURT:  Still concerned that it wasn't disclosed

3  to Pre-trial Services in Florida.

4          MR. HORWITZ:  I understand that.  I believe, and I

5  think that -- I think that this is in the Government's letter,

6  that the -- and I wasn't present for either of the interviews,

7  so I hope this is not too -- I hope this is not, if you would,

8  cutting the salami too thinly.  My understanding is that the

9  Pre-trial Services officer in florida asked about bank

10 accounts and business bank accounts.  And the subject of

11 crypto currency or crypto accounts didn't come up.

12         As I said to Your Honor, as soon as I had a chance

13 to speak to Mr. Farkas today about all of his holdings, I

14 communicated them to the Government.  And what the Government

15 hasn't indicated to you is that in that conversation that I

16 had this afternoon with the Government, I indicated another

17 account which the Government wasn't aware of -- another

18 business account that was used over which Mr. Farkas had at

19 some point had signing authority.  And I think that, with

20 respect, Your Honor, I think that's important because to the

21 extent there are questions about credibility we're not only

22 answering the Government's questions, but we were volunteering

23 information that the Government didn't have before, which

24 perhaps may be useful to them in their investigation.

25         THE COURT:  Okay.  Mr. Horwitz, before I ask Ms.

32

1   Tekeei to speak again, can you tell me who -- which of Mr.

2   Farkas' family is here today?

3          MR. HORWITZ:  Yes.  Mr. Farkas' mother, Cindy, is

4   here.  And Mr. Farkas' uncle, Glen Farkas is here.  He is a

5   co-partner or co-owner of the business that he has with Mr.

6   Farkas in suburban New Jersey.  They own a tiling company.

7   And, again, Mr. Farkas' father is at home recuperating from

8   his outpatient surgery.  We frankly thought that -- we thought

9   that the defendant might come today, but we were counting on

10  the presentment to be tomorrow, which is why he didn't

11  reschedule the surgery.

12         THE COURT:  Okay.  So sorry, I interrupted you, Ms.

13  Tekeei, or got a little distracted.  Before you go on to your

14  rebuttal to Mr. Horwitz' presentation, what is Mr. Sharma's

15  status at this time?

16         MS. TEKEEI:  We've been in extensive communication

17  with the Marshal service.  It appears as though he did not

18  make -- Mr. Sharma did not make the air lift, which was

19  supposed to bring him here estimated today.  We don't know

20  why.

21         THE COURT:  Otherwise I would have been seeing him

22  today, too.

23         MS. TEKEEI:  That's correct, Your Honor.

24         THE COURT:  Okay.  But he is arrested and he will be

25  brought to the SDNY?

33

1       MS. TEKEEI:  He is arrested, he is detained.  He has

2 been ordered removed to our district and we're eagerly

3 awaiting his arrival.  Your Honor, I'd like to just -- a

4 couple of quick points unless the Court has any questions

5 about that.

6       THE COURT:  I guess the last question was -- and you

7 may -- if you -- if this is involved in part of your

8 proceedings to go into -- tell me a little bit more about the

9 email, but why don't you go ahead.

10       MS. TEKEEI:  Oh, sure, Your Honor.  The facts that

11 the Government or the prosecution team have at hand are the

12 facts as they are conveyed in the sworn to complaint.  Which

13 is that there is an employee at Centra Tech who was counsel at

14 Centra Tech who conveyed to an employee at a regulatory

15 authority that Mr. Farkas had requested that employee to do

16 extradition related research.  We did not convey in our -- in

17 the complaint and did not have a date as to when that

18 extradition research was to be -- was done.  And we have facts

19 conveyed through the employee of the regulatory agency that

20 Mr. Farkas in the days leading up to his departure for Korea

21 deleted or requested or sometime around that time discussed

22 the deletion of that email with the employee who provided him

23 with that research.

24       THE COURT:  I just want to --

25       MS. TEKEEI:  Sure.

34

1      THE COURT:  -- note for the record, that Mr. Farkas

2  is shaking his head.  And Mr. Farkas, you have been advised of

3  your rights.  I don't want you --

4      THE DEFENDANT:  Sorry.  Sorry.

5      THE COURT:  -- to be doing anything that potentially

6  could jeopardize your rights under --

7      THE DEFENDANT:  I'm sorry, Your Honor.

8      THE COURT:  -- United States v. Miranda.

9      THE DEFENDANT:  I'm sorry, Your Honor.

10     THE COURT:  So please don't -- please try not to

11 comment, even non-verbally --

12     THE DEFENDANT:  I'm sorry.

13     THE COURT:  -- at this point.

14     MS. TEKEEI:  Thank you, your Honor.  And the facts

15 are, as we know them, in the complaint, a Wall team [Ph.] has

16 interviewed the employee at Centra Tech.  We're waiting on the

17 Wall team to communicate with defense counsel to discuss any

18 privilege issues before the prosecution team has additional

19 facts.  As Mr. Horwitz has conveyed, he provided the

20 Government with a copy of that email today with understandings

21 as to the use of that email.  I will not speak to the

22 substance of the email except for to say that it speaks for

23 itself.

24     Your Honor, it is also relevant to the Government

25 that in -- shortly before the defendant's departure or

35

1   supposed -- or attempted departure to South Korea, the assets

2   and the monetized assets in the Centra company's coffers were

3   depleted.  The employees had been fired or laid off and the

4   company was on its last leg.  There are many places that one

5   can go from South Korea so that even though the Government has

6   an extradition treaty with South Korea, there are so many

7   places that one can go from South Korea that the Government

8   does not have extradition treaties with.  So we don't think

9   that his planning that travel either in advance or at any time

10  was -- is necessarily -- should necessarily give the Court

11  comfort that he did not intend to flee.  Given that it could

12  have very well been under the guise of a regularly planned

13  trip.

14          That's as to the email.  I want the Court to be

15  clear as to who has access to the digital wallet.  The U.S.

16  Attorney's Office, the FBI and law enforcement do not have

17  access to the digital wallet full stop.  The wallet portions

18  that were provided pursuant to the seizure warrants and legal

19  process are -- have been altered.  They do not work.  And we

20  know, and the record before the Court is that two people had

21  access to that and had that code to begin with.  That is Mr.

22  Sharma and Mr. Farkas.  Now when we said earlier to the Court

23  that we appreciate Mr. Horwitz' candor with us and in

24  attempting to and trying to come to an agreement on bail

25  conditions, we mean that.  This is not to say that we don't

36

1  believe what Mr. Horwitz is telling us.  Our problem is with

2  the source of the information and that is Mr. Farkas.  And we

3  have no way of corroborating the facts as they have been

4  conveyed.  We don't believe that Mr. Horwitz has messed up

5  conveying the facts.  We believe that we just don't trust the

6  source of that information.

7          And so as it stands today, in a nano-second, the

8  person who has or the people who have the real portions of

9  that access code to the digital wallet can deplete it

10  immediately.  It doesn't matter if everyone in the world has

11  their eyes on the digital key and is watching the wallet, it

12  can be depleted in a nanosecond.  And that gives us grave

13  concerns for risk of flight and economic danger to the

14  community.  We do not seek detention lightly.  And we provided

15  alternatives for the Court to explore in light of all those

16  factors to include the successful transfer of the assets in

17  the digital wallet to law enforcement.  Unless the Court has

18  any further questions.

19          THE COURT:  Mr. Horwitz, I may be sabotaging myself,

20  but do you have anything else to add?

21          MR. HORWITZ:  That's okay.

22          THE COURT:  It's 8:40.

23          MR. HORWITZ:  No, it's -- the only point I would

24  make, Your Honor, is that it seems like it's a bar that I can

25  never reach.  In other words, unless I can -- I'm trying to

37

1    prove the negative which is I'm saying that we don't have

2    digital -- we don't have access to the code.  We provided it

3    in good faith.  We provided information to the Government and

4    until the Government gets its hands on the code, which is out

5    of my control, I can't do anything.  And I would, again, just

6    end by saying it would seem that there are in fact less

7    restrictive conditions that could be placed on Mr. Farkas

8    short of detention.

9            THE COURT:  Okay.  I'm just going to take a quick

10   two minute break on the bench, but just be relaxed.  We're off

11   the record for a few minutes.

12           THE CLERK:  Judge, we are back on the record.

13           THE COURT:  Please be seated.  I am going to cut to

14   the chase before I enumerate everything else.  I am going to

15   order that Mr. Farkas be detained right now.  But that his

16   detention can be modified subject to several enumerated

17   conditions.  I don't make this decision lightly.  And I do

18   want to recognize the presence of Mr. Farkas' uncle and his

19   mother here.  I am a parent myself and it would break my heart

20   to be here today.  However, I find that the Government has

21   shown by a preponderance of evidence that Mr. Farkas as he

22   sits here today without access to the digital wallet

23   constitutes a flight risk.  And I did that by reviewing the

24   totality of the circumstances including the nature of the

25   assets at issue in this case, the ability for anybody who does

Case 1:18-cr-00340-LGS   Document 121-7   Filed 05/20/19   Page 307 of 421

38

1   have access to the digital wallet to deplete those assets in a

2   matter of nanoseconds, which distinguishes this case from the

3   Madoff case where the assets were not movable and not easily

4   transferrable.

5          Another concern is that this case sounds in fraud

6   and my concern was that information was only provided to the

7   Government and only volunteered to the Government after Mr.

8   Farkas was caught lying and that there is a record of assets

9   depleted over time.  So the conditions under which Mr. Farkas

10  may be released are as follows; a personal recognizance bond

11  of five million dollars cosigned by three financially

12  responsible persons.  And secured by one million dollars in

13  real property and/or cash.  Home detention and location

14  monitoring.  Compliance with the April 16th seizure warrant

15  which we all understand, which -- here -- which directs any

16  person or entity presently in possession or control of the

17  property to effectuate the transfer of 91,000 ether currently

18  on deposit in ether wallet address,

19  0XDA6F983076725CB2899205A16E16D1ED60A0067A with compliance

20  defined as the actual or -- actual and successful transfer of

21  the relevant assets into the custody and control of law

22  enforcement.  And if I have misread any of the ether wallet

23  address, I believe we all understand which warrant we are

24  speaking about so we should not be slicing the salami too thin

25  as Mr. Horwitz has referenced before.

39

1        An additional condition will be a prohibition

2  against accessing directly or indirectly the digital wallet

3  containing Centra Tech ICO funds or transferring any funds out

4  of the digital wallet except for purposes of complying with

5  the seizure warrant.  A prohibition against use or access to

6  any computer, smart phones, or internet.  Prohibition against

7  possession of any firearms, destructive devices, or other

8  weapons.  Drug testing as required by the Pre-trial Services

9  officer.  Travel restricted to the Southern District of New

10 York, Eastern District of New York, and the Southern District

11 of Florida.  That Mr. Farkas also surrender any travel

12 documents and make no new applications.  And I will also add

13 internet monitoring to -- as an additional condition to the

14 home detention if Mr. Farkas is able to satisfy the other

15 conditions and is released.  And in additional conditions is

16 also disclosure of all assets that Mr. Farkas may have

17 possession, custody, or control or access to including ones

18 that he may share jointly in business accounts, and that

19 include not actual cash, but any crypto or digital currency.

20 And if I didn't say it already, all of these above conditions

21 are to be met before Mr. Farkas may be released.  And any

22 other conditions as recommended by Pre-trial Services.

23        MR. HORWITZ:  Your Honor, I'd just like to make a

24 record that Mr. Farkas' passport was taken by the FBI when he

25 was arrested on April 1st.  He does not have other travel

40

1  documents.

2       THE COURT:  All right.

3       MS. TEKEEI:  That is correct.  And, Your Honor, if I

4  may, and with apologies for interrupting.  One additional

5  condition that we failed to put in our list was no

6  communication with any of his co-conspirators to include Mr.

7  Sharma and Mr. Trapani absent the presence of counsel.

8       THE COURT:  Okay.  Yes.  An additional condition is

9  no communications with any of Mr. Farkas' co-defendants absent

10 -- outside of the presence of counsel.  I'm going to give Mr.

11 Farkas -- because I am hopeful that you can comply with these

12 conditions and that you can be released because you have

13 family that cares about you very much.  They've spent all day

14 here with you.  That I'm going to give the warnings that I

15 usually give upon release even though you are to be detained

16 right now.  Because I want you to have the time to think about

17 them and think about what you would be doing to yourself and

18 to your family if you were to violate any of these conditions.

19      That if, upon release, you fail to appear in court

20 or if you violate any of the conditions of your release, one,

21 a warrant will be issued for your arrest.  Two, you and anyone

22 who signed the bond will be responsible for paying its full

23 amount which is five million dollars.  And three, you may be

24 charged with a separate crime of bail jumping which can mean

25 additional jail time of no more than one year and/or a fine.

41

1      In addition, if you commit a new offense while you

2  are released, and in addition to the sentence prescribed for

3  that offense, you would be sentenced to an additional term of

4  imprisonment of not more than 10 years if the offense is a

5  felony.  Or not more than one year if the offense is a

6  misdemeanor.  This term of imprisonment will be -- would be

7  executed after any other sentence of imprisonment is

8  completed.

9      And I also will give you a warning while you are

10 awaiting trial, warn you not to have any contact with or

11 engage in any intimidation of potential or designated

12 witnesses or jurors.  Not to engage in any intimidation of any

13 court officer and not to engage in any conduct that would

14 obstruct any investigation by law enforcement.  And finally,

15 you do have a right to appeal my order.  Okay.  Is there

16 anything else -- we need to set a preliminary hearing date,

17 right?

18      MS. TEKEEI:  Yes.  But, Your Honor, before we do

19 that, and, again, apologies if I missed this, but so that the

20 record is clear, our understanding of the reasoning behind the

21 Court's decision is because the defendant poses a risk of

22 flight and an economic danger to the community.

23      THE COURT:  Yes.  Yes.

24              [Pause in Proceedings]

25      THE COURT:  All right.  What date should I set for

42

1   the preliminary hearing?

2       MR. HORWITZ:  We would take the full 30 days, Your

3   Honor.

4       THE COURT:  Excuse me.

5       MR. HORWITZ:  I said we would take the full 30 days,

6   Your Honor.

7       THE COURT:  Okay.  So you'll waive to May 25 --

8       MR. HORWITZ:  Correct.

9       THE COURT:  -- 2018?

10      MR. HORWITZ:  Yes, your Honor.

11      THE COURT:  Okay.  Is there anything else from the

12  Government or from defense counsel at this time?

13      MS. TEKEEI:  Not for the Government, Your Honor.

14  Thank you.

15      THE COURT:  No, Your Honor.

16      THE COURT:  Okay.  Best of luck to you, Mr. Farkas.

17  And, again, apologies for keeping you and your family waiting

18  all day.  We have a very, very full day today.  All right.

19  Thank you.

20      MS. TEKEEI:  Thank you, your Honor.

21      THE CLERK:  All right.  This matter is adjourned.

22

23              * * * * *

24

25

43

1          I certify that the foregoing is a court transcript from

2    an electronic sound recording of the proceedings in the above-

3    entitled matter.

4

5    _____

6                 Shari Riemer, CET-805

7    Dated:   May 6, 2018

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# Exhibit G

# Exhibit G

```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3      --------------------------------X
                                       :
4      UNITED STATES OF AMERICA,       : 18-MJ-2695 (UA)
                                       :
5                 v.                   : May 2, 2018
                                       :
6      SOHRAB SHARMA, et al.,          : 500 Pearl Street
                                       : New York, New York
7                 Defendants.          :
       --------------------------------X
8
          TRANSCRIPT OF CIVIL CAUSE FOR BAIL HEARING
9              BEFORE THE HONORABLE DEBRA C. FREEMAN
                 UNITED STATES MAGISTRATE JUDGE
10
       APPEARANCES:
11

12     For the Government:       NEGAR TEKEEI, ESQ.
                                 United States Attorney's Office,
13                               One Saint Andrew's Plaza
                                 New York, New York 10007
14

15
       For the Defendant:        SHARON McCARTHY, ESQ.
16                               Kostelanetz & Fink LLP
                                 7 World Trade Center, 34th Floor
17                               New York, New York 10007

18

19

20
       Court Transcriber:        SHARI RIEMER, CET-805
21                               TypeWrite Word Processing Service
                                 211 N. Milton Road
22                               Saratoga Springs, New York 12866

23

24

25


       Proceedings recorded by electronic sound recording,
       transcript produced by transcription service
```

2

1          THE CLERK:  United States v. Sohrab Sharma.

2  Counsel, please state your name for the record.

3          MS. TEKEEI:  Good afternoon, Your Honor.  Negar

4  Tekeei on behalf of the United States.

5          THE COURT:  Good afternoon.

6          MS. McCARTHY:  Your Honor, Sharon McCarthy of

7  Kostelanetz & Fink on behalf of Mr. Sharma.

8          THE COURT:  Good afternoon.  All right.  So you

9  thought you were going to have more information today than

10  yesterday, maybe.

11          MS. TEKEEI:  We do, Your Honor.  However -- and I'm

12  happy to go into the explanations for this, but the

13  Government's position with respect to seeking detention

14  remains the same for reasons that I'm more than happy to walk

15  the Court through.

16          THE COURT:  Okay.  So you got access to the digital

17  wallet, electronic -- whatever we call that.  And you were

18  able to get to funds?

19          MS. TEKEEI:  Yes, your Honor.  If I may --

20          THE COURT:  Go ahead.

21          MS. TEKEEI:  I'm sure the Court -- I know the Court

22  has read our papers, but if I may just have a moment --

23          THE COURT:  The Court has --

24          MS. TEKEEI:  -- to give the Court some --

25          THE COURT:  -- has --

3

1          MS. TEKEEI:  -- background.

2          THE COURT:  -- read some of your papers.  Enough, I

3    hope, to get an understanding as to what's going on here.  I

4    may not be familiar with all of the details.  So you're

5    seeking detention.  I gather there's going to be an argument

6    on that.  So let me hear first from you as to why you're

7    seeking detention.

8          MS. TEKEEI:  Thank you, Your Honor.  I'm happy to

9    explain all of our reasons.  And, Your Honor, before I begin,

10   it's important to note that we do not seek detention lightly

11   in this case.  We recognize that there is no presumption here.

12   However, given the nature and circumstances of the offense,

13   the defendant's personal history and characteristics, the

14   massive obstruction of justice that he has perpetrated over

15   the last several months, we seek detention in this case out of

16   our concerns for the defendant's risk of flight, and also for

17   the danger to the community that he poses.

18          Let me begin with some background, Your Honor, about

19   the circumstances of the offense.  As is detailed in the

20   complaint, and in the related complaint against the

21   defendant's co-conspirator, Ray Trapani which the Court has

22   copies of, Mr. Sharma, and his co-conspirators perpetrated a

23   massive fraud in connection with a scheme to induce victims to

24   invest more than $25 million of crypto currency through

25   material misrepresentations and omissions that he made, and

4

1    his co-conspirators made, in connection with an Initial Coin

2    Offering by the company that he founded, that he currently

3    still owns, and that he operated, Centra Tech.

4         Last summer from approximately July through the date

5    of this complaint, Mr. Sharma and his co-conspirators lied

6    repeatedly to investors and the investing public, and as I

7    will explain momentarily, to the SEC, and to law enforcement.

8    Those lies include telling investors that Centra Tech had

9    inexperienced executive team with impressive credentials,

10   including a fake CEO named Mike Edwards that the defendant

11   concocted, that he then told the investing public about, and

12   that he didn't back away from.

13        The defendant and his co-conspirators told the

14   public that they developed a debit card -- the so-called

15   Centra Card -- that allowed users to spend cryptocurrency of

16   their choice and make purchases using MasterCard and Visa

17   systems.  That was false.  The defendant and his

18   co-conspirators told investors that they had partnerships with

19   various entities, including a bank called the Bancorp, which

20   did not exist.  So that was another lie.  And they also told

21   investors that they had state licenses that allowed them to

22   operate in various states throughout the United States.  Also

23   a lie.  So just to sum it up, and the complaint is very

24   detailed, but at its core the defendant in his co-conspirators

25   created fake people, they created fake documents, they

5

1   discussed having fake licenses, and they did all of that to

2   make money.   Pure and simple, to make money.

3           The evidence against the defendant which is

4   described in detail in the complaints, is conclusively strong.

5   It includes his own words, text messages that he sent and that

6   he received, emails that he sent and that he received

7   regarding his lies, and regarding attempts to cover up those

8   lies.   It includes marketing materials that the defendant and

9   his co-conspirators prepared and issued and released to the

10  investing public containing the fraudulent representations

11  that I've outlined.   And it includes evidence of their

12  continued efforts to conceal their crimes.   That's just a

13  synopsis of the offense conduct.

14          Directly relevant to the issue of bail before this

15  court, is the defendant's obstruction of justice in preventing

16  law enforcement and lying to law enforcement in efforts to

17  secure what is now more than $60 million of investor funds.

18  So let me give The Court some background as to the investor

19  funds that were in the digital wallet.

20          THE COURT:   How much was in there?

21          MS. TEKEEI:   In there were more than $60 million of

22  investor funds.

23          THE COURT:   And you've now been able to secure that

24  money?

25          MS. TEKEEI:   We've now been able to secure that

6

1   money.  Here is where -- here's the background that Your
2   Honor.  After the SEC again investigating the case and issued
3   subpoenas to Centra Tech, Centra Tech arranged with Mr. Sharma
4   to transfer the investor funds into a digital wallet.
5   Mr. Sharma then to purported to provide the passcode to that
6   digital wallet to Centra Tech in this way; he purported to
7   provide that passcode to his codefendant, Robert Farkas.  That
8   passcode was reduced to a piece of paper, it was purportedly
9   divided, and one half was kept by Mr. Farkas and one half was
10  kept by the chief compliance officer of Centra Tech, Alan Shut
11  [Ph.].  Those halves were put into a safe deposit box.  And so
12  Mr. Sharma and Centra Tech told the SEC, and then later the US
13  attorney's office and the FBI that the passcode to the digital
14  wallet was secure and that the investor funds were secure.
15  That is effectively what Mr. Sharma and counsel for the
16  company represented repeatedly.  After Mr. Sharma's arrest --
17          THE COURT:  I'm sorry they were put -- the two
18  halves are put in the same safe deposit box?
19          MS. TEKEEI:  No, Your Honor.  In two separate
20  safe-deposit boxes.
21          THE COURT:  Okay
22          MS. TEKEEI:  And Your Honor, if I may just
23  illustrate to the Court what I mean by that.  May I approach
24  Your Honor?
25          THE COURT:  You may.

7

1       MS. TEKEEI:  What I handed to Counsel on what I

2   handed to the Court is one of the fake halves of the fake

3   passcode that Mr. Sharma provided to Mr. Farkas.  This is

4   fake.  This half has been altered.  The other half which I

5   have not reduced to paper, I do not currently have possession

6   of, is similar to this in that there is an alphanumerical

7   sequence that's been divided in half, and there is also, and

8   Your Honor will see, I'm not quite sure how to describe it, it

9   looks like a barcode but it's called a QR code.  The QR code

10  and the alphanumerical sequence that are presented on this

11  piece of paper are what would have allowed the FBI to secure

12  the investor funds.  This is what we were told was one half of

13  the passcode.  We were told that by -- through Mr. Sharma's

14  counsel, we were told that through Centra Tech's counsel.  The

15  source of that information was purportedly Mr. Sharma.

16       When the FBI put this half together with the other

17  half it did not provide access to the digital wallet

18  containing the investor funds.  We suspected, and we've since

19  confirmed that the passcode Mr. Sharma provided was altered.

20  And it was altered in multiple ways.  One of the ways that it

21  was altered, is that this QR code right here, one of the

22  halves showed a QR code for entirely separate digital wallet,

23  not the wallet that contained the investor funds.  And so

24  someone superimposed a fake QR code -- or the QR code to a

25  separate wallet onto this piece of paper.

8

1          Another way that it was altered was in the
2    alphanumerical sequence that's listed at the bottom.  So in
3    two separate ways this fake passcode was provided to law
4    enforcement as a way of saying here you go, I've given you the
5    investor funds, nothing to worry about.  All the while, the
6    actual passcode was taped to the bottom of a drawer in the
7    kitchen of the apartment where Mr. Sharma shared with his
8    girlfriend -- his codefendant's sister.  We learned about that
9    yesterday.

10          And here's how we learned about it.  Despite a
11   seizure warrant, despite -- despite multiple efforts over the
12   course of the last several months, for the Government to
13   access the correct keycode -- the correct passkey -- despite
14   multiple representations about Sharma's having provided the
15   correct code, only yesterday did we learn through
16   Ms. McCarthy -- and obviously we credit her for her work in
17   helping us obtain that information -- that Mr. Sharma had
18   taped a piece of paper very similar to this to the bottom of
19   the kitchen drawer -- in a drawer in the kitchen of the
20   apartment where -- that he shared.

21          And this morning FBI agents went to that apartment,
22   they obtained consent to enter that apartment, and they
23   retrieved a piece of paper that looks very much like this.
24   They were able to access the digital wallet and they
25   transferred the investor funds in the digital wallet which

9

1   were 91,000 ether into a secure FBI wallet.

2          THE COURT:  91,000 what?

3          MS. TEKEEI:  Ether.  It's the cryptocurrency, the

4   digital assets that were contained in the wallet.  The wallet

5   in its entirety, Your Honor, had 100,000 ether in it.  So

6   100,000 units of this cryptocurrency.  Nine thousand of those

7   units of cryptocurrency we have been told our Mr. Sharma's.

8   And therefore, the FBI has not touched, and has left in place

9   the 9,000 units of cryptocurrency that are -- that were in the

10  digital wallet -- and the FBI has only secured the $91,000 --

11  I'm sorry -- the 91,000 units of cryptocurrency that belong to

12  investors.  That means that Mr. Sharma, in U.S. dollars, still

13  has access to more than $6 million of funds and is potentially

14  the reason why he obstructed justice over the course of the

15  last many months to prevent law enforcement from accessing not

16  only his investor -- the investor funds, funds that the

17  innocent public contributed in connection with his Initial

18  Coin Offering, but also his own funds.  And that's just what

19  we --

20         THE COURT:  Is there --

21         MS. TEKEEI:  -- know about.

22         THE COURT:  Is -- you've used different numbers.

23  Is there sort of a conversion rate from ether to dollars?

24         MS. TEKEEI:  There is Your Honor.  And it fluctuates

25  daily, and so

10

1          THE COURT:  So when you say $60 million and 91,000

2    ether, that was more than 60 million, but you left some

3    behind?

4          MS. TEKEEI:  Yes, Your Honor.  I don't have the

5    currency calculator --

6          THE COURT:  Okay.

7          MS. TEKEEI:  -- at my hands right now.  But if I

8    could just rewind for a moment, in connection with raising

9    investor funds for Centra Tech, the defendant and his

10   co-conspirators raised in July through October 2017, 91,000

11   units of ether.  That is a cryptocurrency.  The value of

12   ether, much like other denominations in other currencies

13   fluctuates from day-to-day.  As it turns out, the value of

14   ether today is worth more than it was almost year ago.  And so

15   while at the time, they had raised approximately 25 million or

16   more, that money, that 91,000 ether, today is worth more than

17   $60 million.

18         THE COURT:  I see.

19         MS. TEKEEI:  Yesterday it was worth approximately

20   $59 million.  It will continue to fluctuate over time.

21         THE COURT:  I see.  That explains why you say

22   defendants raised more than 25 million.

23         MS. TEKEEI:  Yes, Your Honor.

24         THE COURT:  -- and it's worth nearly 60 million --

25         MS. TEKEEI:  And the digital wallet --

11

1          THE COURT:  -- or over 60 million.

2          MS. TEKEEI:  -- in its entirety had 100,000 ether in

3   it.

4          THE COURT:  Okay.

5          MS. TEKEEI:  We are able to attribute 91,000 of that

6   to the investor funds and the remaining 9,000 we are told our

7   Mr. Sharma's.  And we, law enforcement, has not touched that

8   9,000.  That 9,000 remains in the digital wallet.  The funds

9   that the FBI has secured are the 91,000 in ether.

10         Your Honor, it's, you know, it's important to note,

11  that while we are, of course, happy that we have recovered

12  this massive amount of money in investor funds, all of this

13  only goes to underscore the depravity of the defendant's

14  obstruction of justice over the many months leading up to

15  this.  Mr. Sharma has been represented by counsel for many

16  months.  During the time period of this conspiracy, and while

17  he knew that law enforcement were trying to secure the funds,

18  he was convicted of perjury.  He pled guilty to perjury.  He

19  lied to a court here in New York City about a DUI.  He

20  provided testimony to Judge Statsinger lying about alcohol

21  that he had consumed.  And he was convicted for perjury.  And

22  while his case was pending, he then perpetrated lies in order

23  to hide assets from the Government.

24         Those facts are critical to the risk of flight that

25  this defendant poses, and the danger to the community that he

12

1   poses.  It is not the case that just because the funds are now

2   finally secured, the Government feels comfortable that there

3   are bail conditions that would make it so that he would

4   appear -- reasonably assure that he would appear, or

5   reasonably assure that he doesn't pose a danger to the

6   community.  In fact, it only makes our concerns -- it only

7   heightens our concerns at this point.

8           There are additional facts, I think, as are set

9   forth in our papers, Your Honor, that give the Government

10  serious concerns.  We have conveyed to the Court facts related

11  to an ongoing investigation in the Eastern District of New

12  York with the Department of Homeland Security that have

13  revealed that the defendant used the identifying information

14  of an elderly man, a priest, to obtain fraudulent loan

15  documents, to which he obtained approximately $400,000 in

16  funds.  The bank was alerted to the fraud.  The defendant, at

17  some point repaid those funds that he had fraudulently

18  obtained through the use of the elderly priest's identity, and

19  the bank in that case was whole, but that does not take away,

20  as far as we understand it, from the defendants use of the

21  fraudulent -- of the identity to obtain fraudulent funds and

22  his use of a vulnerable victim's information to perpetrate a

23  fraud even prior to the time period of this conspiracy.

24          Not a day goes by in this case that we do not learn

25  about a new account, or a new lie, or a new set of

13

1  circumstances that give rise to serious concerns as to this

2  defendant.  When I say we don't seek detention lightly, I mean

3  that.  We have given serious concern to the Government's

4  position in this case -- we have given serious consideration

5  to the Government's position in this case.  We engaged in

6  conversations with Ms. McCarthy over a period of time.  And I

7  am certain that Ms. McCarthy will provide explanations to this

8  court for all of the Government's concerns.  The source of

9  those explanations, Your Honor, is the defendant.  And while

10  we have -- take no issue with Ms. McCarthy's advocacy to us,

11  and advocacy before the Court, we question the source of the

12  information, and we question the defendants truthfulness

13  before this court.

14        An example of that is his failure to tell Pre-trial

15  Services in Florida of his multiple assets, of his more than

16  $6 million in cryptocurrency, that's just one example.  An

17  example of that is the fact that this defendant drew down his

18  bank accounts and his cryptocurrency accounts a few weeks

19  before his arrest in this case.  We don't know where that

20  money is.  We don't know what he's done with that money.

21  There are pools of assets out there that we simply have not

22  yet identified.

23        And so it is the case that because of the

24  defendant's obstruction of justice, because of the defendant's

25  offense conduct in this case, because of his repeated lies to

14

1   law enforcement, and this court, because of his liquidation of

2   his bank accounts, because of the fact that he now faces more

3   serious charges than he has ever faced before we do not

4   believe that there are conditions that can assure his

5   appearance and ensure the safety of the community.  I will

6   note that we understand from Ms. McCarthy that in connection

7   with defendant's perjury conviction for which he still pends

8   sentencing, he appeared in court whenever he was required to.

9   Now that was a perjury conviction, that was a perjury case in

10  New York State Court.

11          Today in front of this court he faces not only

12  sentencing for that conviction at some point, but he also

13  faces the charges in this case, which as we've estimated,

14  knowing what we know today, subject him to a guidelines range

15  of 210 to 262 months.  And that's only based on what we know

16  today.  He also faces a parallel SEC civil action, which only

17  compounds his legal troubles.  This defendant, who is a master

18  of lying, and a master of creating fake people and fake

19  identities, now faces more serious charges than he's ever

20  faced before, and has demonstrated that he cannot be relied

21  upon or trusted.  And so, Your Honor, we seek detention in

22  this case in light of all of these circumstances.

23          THE COURT:  Question for clarification.  Defendant's

24  codefendant -- was it the Government's understanding that he

25  also had a role in the misdirection of the Government with

15

1   respect to the passcode or any of this other obstruction that

2   you've described?

3        MS. TEKEEI:  Your Honor, the defendant's codefendant

4   Mr. Farkas, is that the one that your --

5        THE COURT:  Yes.

6        MS. TEKEEI:  -- referring to?

7        THE COURT:  Is there more than one codefendant?

8        MS. TEKEEI:  There is a defendant who was charge

9   separately.

10       THE COURT:  Mr. Farkas.

11       MS. TEKEEI:  His name is Ray Trapani.  But with

12   respect to Mr. Farkas, he was presented last week.  The facts

13   that were presented to the Court last week with respect to

14   Mr. Farkas through his counsel are that Mr. Farkas, while he

15   was detained in Florida, pending removal in this case learned

16   that Mr. Sharma had altered the passcode or passkey.  Now the

17   Government doesn't know who to believe.  And in connection

18   with Mr. Farkas' bail argument, Judge Wang ordered him

19   detained, and ordered him detained absent conditions that were

20   met that are set forth in our papers, Your Honor.

21       THE COURT:  I'm sorry.  She set conditions but said

22   they all had to be satisfied before release?

23       MS. TEKEEI:  Yes, Your Honor.  She -- let me just be

24   clear, she set conditions of bail but said that they needed to

25   all be satisfied prior to his release.  These conditions are

16

1   mirrored in the conditions that we've set forth for the Court

2   here.  And one of those conditions is compliance with the

3   seizure warrant.  Directly to the Courts question though as to

4   whether Mr. Farkas had anything to do with the alteration of

5   the code, standing here today, we have no way of knowing which

6   individual to believe or not believe given that they are

7   established fraudsters.  So --

8            THE COURT:  So you --

9            MS. TEKEEI:  -- either way, the code was altered.

10  And Mr. Sharma --

11           THE COURT:  -- you sought --

12           MS. TEKEEI:  -- had the correct code the whole time.

13           THE COURT:  -- so you sought detention of Mr. Farkas

14  based on a very similar argument to the argument you're making

15  now?

16           MS. TEKEEI:   A similar argument, Your Honor.  There

17  are a couple of facts though that exacerbate the case as to

18  Mr. Sharma.  One is his prior felony perjury conviction.  Two,

19  is that we now have proof that he fraudulently represented to

20  multiple law enforcement agencies the accuracy of the passcode

21  or passkey, which we did not have last week, although we

22  suspected it, we did not have definitive proof of that.  And

23  the third is that Mr. Sharma, as is reflected in our papers,

24  had a loaded weapon at the time of his arrest.  He is

25  technically in violation of federal criminal law by having a

17

1  firearm while pending sentencing for a felony guilty plea,

2  which is a conviction.  And so those facts, in addition to

3  his -- the role that he played in this fraud was slightly

4  higher or more of a leadership role than his codefendants.  So

5  the arguments that were making now --

6          THE COURT:  So the reason that I --

7          MS. TEKEEI:   -- are similar, but there are some

8  additional facts that we think put him at an even stronger

9  risk of flight and an even stronger risk of danger to the

10 community.

11         THE COURT:  The reason I'm asking is just in terms

12 of the obstruction allegations that you're making here, which

13 of course, are one of the things that can give you the right

14 to argue for detention on a non-violent -- or non-specified

15 kind of crime, I just wanted to get a sense of whether you

16 thought they were working together to obstruct the

17 investigation the way you described, or whether it was mostly

18 Mr. Sharma, or whether you just don't know.  So I think you've

19 answered the question of you're not really certain of that.

20 He did say that you understand that an accurate passkey was

21 taped under Mr. Sharma's kitchen drawer.  You don't know

22 whether there was also a piece taped under Mr. Farkas' kitchen

23 drawer, for example.

24         MS. TEKEEI:  That is absolute correct.  It is

25 certain that Mr. Sharma played a role in altering the passcode

18

1   or providing an incorrect passcode or making sure that law
2   enforcement had an incorrect passcode.  But we don't know,
3   with certainty, is whether Mr. Farkas also played a role in
4   that.
5           THE COURT:  Okay
6           MS. TEKEEI:  But we know that Mr. Sharma did because
7   the correct passkey he had all along.
8           THE COURT:  Okay.  Let me hear from defense counsel.
9           MS. McCARTHY:  Your Honor, I just want to start with
10  the last thing that was just mentioned, which is the loaded
11  firearm found in his apartment.  At the time he was arrested
12  on April 1st, Easter Sunday, at his apartment in Miami, he was
13  asked by the arresting agents whether there was a weapon while
14  he was in handcuffs, and he said yes, I have a gun.  It's in
15  my night table drawer.  I have a license for it.  He does.  He
16  has a license to carry a firearm in Florida.  And he told the
17  agents where to find that.  So I argued with the Government
18  sort of until I'm blue in the face about this particular
19  issue, but I don't believe that somebody who has a license to
20  carry a firearm and keeps it in his bedside table constitutes
21  a danger to the community.  In addition, I've spoken with his
22  attorney who represented him in the perjury matter in New York
23  County.  He was unaware of section 922(g) of Title 18.  He did
24  not know that it was a federal offense to possess a firearm
25  after one has entered a guilty plea to a felony, nor did he

19

1  understand that one is considered to be convicted at the time

2  of the entry of the guilty plea.  So I got that directly from

3  an attorney representing him.  So I really would like the

4  Court, if possible, to put that aside in terms of determining

5  whether or not my client presents a danger to the community.

6  I think it's a red herring here.  We have plenty to talk

7  about.

8       As you've just heard, my client was arrested on

9  April 1st.  Before his arrest, I can tell you I was

10  representing him in the SEC matters since February.  We had no

11  inclination that there -- or inkling that there was a criminal

12  investigation happening.  So I want the Court to understand

13  that.  That was the first that the defendant became aware that

14  there is a criminal investigation.  Up until then, it had been

15  an SEC investigation.  He was no longer active in his company

16  as of the entry of his guilty plea in October of 2017, and so

17  he had November 29th is the day the SEC appeared and that is

18  when the passcode situation arose where the SEC was informed

19  that the virtual wallet had been secured and the passcode was

20  in two separate spots.  Your Honor, we now know that that was

21  not true.  I cannot explain to the Court why that happened.  I

22  believe my client was very misguided, taking his own counsel

23  and perhaps others.  But that was misguided.

24       I had my first chance to speak with him face-to-face

25  since he was arrested on April 1st, I met with him for the

20

1  first time yesterday when he arrived in New York.  Within a

2  very short time of my meeting him, he told me the truth about

3  the passcode, and I immediately told the Government where it

4  could be found and his girlfriend met the FBI this morning and

5  they found it under the kitchen drawer.  And I just also want

6  to be clear that she did not know, as far as I understand,

7  that it was there.  I can't explain it, but I can tell the

8  Court something that is very unusual about this case.  As

9  you've heard, $25 million was raised in the Initial Coin

10 Offering by Centra Tech, the defendants company, and that

11 happened in the summer of 2017.  That -- those funds have

12 remained in that virtual wallet until today when the

13 Government took them out.  They've also increased in value

14 from 25 million to now I'm hearing $60 million plus.  This --

15 my client didn't do anything in that time when he knew there

16 was an SEC investigation going on to empty that account.  He

17 didn't do anything to deplete the investor assets.

18         Indeed, corporate counsel for his company was in the

19 process of trying to negotiate a settlement with the SEC on

20 behalf of Centra Tech.  And as part of that settlement, those

21 investor funds were going to go back to the investors.  So I

22 really -- I cannot explain why he did not give the proper

23 passcode.  It may be a trust issue, I'm not sure.  I'm not

24 here to explain it away, and I'm not here to ask the Court to

25 not take it into account.  But it is an unusual circumstance

21

1   where the money wasn't touched, and the investors will be made

2   whole and they will have made money off of their investment

3   this company.  So I think that the Government overstates his

4   danger as a financial matter.

5           He has significant ties to the New York area.  His

6   mother, his step father live in Port Washington.  The

7   stepfather was interviewed yesterday to be a potential

8   cosigner.  His father is a doctor in Rochester, New York.  He

9   works in the emergency room.  I have spoken with him.  He

10  is -- he makes a good living.  He could cosign a bond.  The

11  mother, unfortunately, received a grand jury subpoena

12  yesterday, so the Government wants to put her into the grand

13  jury.  So I don't think they will accept her as a cosigner,

14  but I can offer the father and stepfather as cosigners.

15          Your Honor, Mr. Sharma has known since November 29th

16  that the SEC was investigating the company.  It was

17  investigating the ICO, it was investigating these -- all of

18  the same allegations the Government has put into its

19  complaint, has been under discussion with -- by corporate

20  counsel for Centra Tech since that time.  He has not done

21  anything to deplete the assets.  He has not done anything to

22  try to run away.  He's traveled internationally numerous times

23  since that SEC investigation appeared.  He's always come back.

24  I have his passport.  It's in my possession.  He's not going

25  anywhere.  He can't get a new passport.  As I've said he has

22

1   significant ties to the country -- to the United States and to
2   this area as well as to Florida.  His girlfriend lives down in
3   Florida.
4           Your Honor, we ask the Court to also take into
5   consideration that he's now been interviewed by Pre-trial
6   Services in Florida -- where, by the way, although the
7   Government says he wasn't truthful about his assets -- he did
8   tell the Pre-trial Services that he was the owner of Centra
9   Tech, which possessed this wallet with the hundred thousand
10  Ethereum in them.  So I don't believe that was a lie to
11  Pre-trial Services.  He wasn't hiding anything.  I had to
12  explain to the Pre-trial Services officer yesterday when we
13  got the initial Pre-trial Services report after he told her
14  that he had 9,000 of Ethereum that was worth $6 million, she
15  put his net worth down as $29,000.  I don't know where that
16  came from.  We had to correct that.  He was absolutely
17  truthful about the fact that he has $6 million worth of
18  Ethereum in that wallet that the Government got access to
19  yesterday.
20          Your Honor, we do believe that there are conditions
21  that can reasonably assure Mr. Sharma's appearance in court.
22  The Government seems to be saying that the risk has to be
23  zero.  That they have to be absolutely sure that they know
24  where every penny he has is, that they know everything about
25  him before they will be satisfied that he will not present a

23

1   risk of flight.  And that is not the law Your Honor, as the
2   Court well knows, having to hear these arguments every day.
3          So we ask that the Court set a reasonable personal
4   recognizance bond, cosigned by his father and his stepfather,
5   with travel restricted to New York and Florida, and with
6   his -- the requirement that he surrender his passport, which I
7   said I've got in my position, that he surrender either to the
8   state of Florida or to Pre-trial Services his firearms
9   license.  His girlfriend has the actual license in her
10  possession right now.  That he not own firearm, that he not
11  purchase a firearm, that he undergo alcohol treatment, that he
12  not drink.  All of the conditions that are in the Pre-trial
13  Services report, Your Honor, I think are, in my view, and I
14  submit to the Court are sufficient to ensure that he will
15  return to court and that he will not present a danger to the
16  community.
17         THE COURT:  I have to Pre-trial Services reports.
18  One from April 2 and one from May 1.
19         MS. McCARTHY:  Your Honor, the one that's from April
20  2 was in Florida.  He had Florida local counsel down there who
21  appeared on his behalf.  On April 2nd he did not have that
22  attorney with him when he was brought in for Pre-trial
23  Services interview.  And he said that he wanted his attorney
24  there.  I don't know why he was not brought back for an
25  interview, but when we found out from the Government and

24

1   trying to work out a bail package that this was a concern to
2   them, we asked that another interview be scheduled, and you'll
3   see in the first paragraph of that report and says that he was
4   subsequently interviewed on April 16th, 2018.
5              THE COURT:  So he was detained in Florida and
6   brought here, or he was released in Florida and came here on
7   his own?
8              MS. McCARTHY:  So he was arrested on April 1st, he
9   was presented on April 2nd in Florida.  On April 5th, he
10  appeared in court with his counsel and he agreed and consented
11  to removal --
12             THE COURT:  Okay.
13             MS. McCARTHY:  -- and to detention without prejudice
14  so that he could have a bill hearing in New York.
15             THE COURT:  Okay.
16             MS. McCARTHY:  He did not arrive until yesterday.
17             THE COURT:  Right.  Okay.
18             MS. TEKEEI:  Your Honor?
19             THE COURT:  Hang on a second.  With respect to what
20  you said was his defendant's knowledge and ability to create
21  false persona, do you have any indication that he has himself
22  used aliases, travel on falsified ID, anything of that nature?
23             MS. TEKEEI:  We do not have -- no, we do not have
24  evidence that he has traveled on false identification or that
25  he is used aliases.  We do have evidence that he has used at

25

1   least one other person's personal identifying information in

2   connection with obtaining fraudulent loan documents.   And

3   that's what is conveyed in our papers.

4          THE COURT:   So I'm just looking at the criminal

5   history report.   What is this reference to a charge that was

6   dismissed for being out-of-state fugitive?   What was the story

7   there?   Do we know?

8          MS. McCARTHY:   Yes, I do know, Your Honor.   That

9   was -- he was charged with perjury in New York County, but he

10  was living in Florida.   And so what happened is that a warrant

11  was issued from New York for his arrest because he was not in

12  New York County.   And then when he appeared to -- because he

13  found out he had been indicted for perjury --

14         THE COURT:   Did the authorities --

15         MS. McCARTHY:   -- in New York County --

16         THE COURT:   -- in New York not know that he was in

17  Florida?

18         MS. McCARTHY:   They did, but because it's a local

19  charge anybody not within the district is considered a

20  fugitive.   It's a very odd thing.   I've dealt with this before

21  with New York County.   But that's what happened.   It was not

22  because he had fled, he was just in Florida.   But it was

23  dismissed at the time he appeared -- after he appeared to

24  answer the charge.

25         THE COURT:   All right.   So apart from the offense

26

1   that brings us here today, we have the perjury charge to which

2   he pleaded, we have a DWI, we have a -- two years before that

3   we've got some kind of, again, driving under the influence

4   with alcohol and/or marijuana, and then back before a youthful

5   offender status we have a disposition of charges -- I'm not

6   sure exactly how -- some kind -- oh, it was -- I'm sorry,

7   criminal possession of stolen property, which was I guess

8   pleaded down from burglary charges.  Any idea with the

9   criminal contempt charge was?  It goes back again, but

10  nonetheless, any idea what that was related to?

11        MS. TEKEEI:  Your Honor, we did not notice this on

12  the defendant's rap sheet or criminal history that we ran so

13  we don't have the background on that arrest or the

14  circumstances of that conviction.  Perhaps Ms. McCarthy could

15  clarify that.

16        THE COURT:  Do you have any idea what that charge

17  was for criminal contempt?

18        MS. McCARTHY:  Your Honor, my understanding from my

19  client is that when he was held in custody he violated the

20  rules of the prison by having a three-way phone call from the

21  jail and that resulted in this charge.  He was out of jail and

22  he helped somebody else get a three-way call who was

23  imprisoned.

24        THE COURT:  Okay.  Do you want to add anything after

25  hearing defense counsel's argument?

27

1      MS. TEKEEI:  Yes, Your Honor, and only briefly.

2  Ms. McCarthy is correct that when she met with Mr. Sharma

3  yesterday morning she then very quickly passed on to us the

4  information related to the correct keycode.  Mr. Sharma,

5  however, has been represented by counsel for many, many

6  months.  Local counsel in Florida who represented him in

7  connection with this arrest is a prominent white-collar

8  defense attorney who was previously an assistant United States

9  attorney in the Southern District of Florida.  And so it is

10 not the case that he was absent access to counsel and

11 therefore didn't know that he had to turn over the passcode or

12 passkey prior to his arrival in this district or a

13 conversation with Ms. McCarthy.  So the notion that when

14 counsel here confronted him about it he immediately was

15 truthful, still begs the question as to why he continued to

16 conceal those very important facts for so long.  That the

17 money was --

18      THE COURT:  How long was it since the time the

19 Government started asking through his counsel?

20      MS. TEKEEI:  Centra Tech through -- he's the owner

21 of Centra Tech.  Counsel for Centra Tech back in late 2017 and

22 early 2018 represented that the digital wallet had been

23 secured through the method that I conveyed, the pieces of the

24 passcode being put into half.  I'm sorry.

25      MS. McCARTHY:  I'm sorry.

28

1          MS. TEKEEI:  I believe Ms. McCarthy would like to

2     speak and I'm sure that she'll have a chance to do that.  But

3     counsel for Centra Tech represented -- I think what she wanted

4     me to clarify is that they represented to the SEC that the

5     wallet had been secured.  Later when -- after Mr. Sharma was

6     arrested those representations were also made to the U.S.

7     Attorney's Office and to criminal law enforcement.  He was

8     arrested on April 1st.  We had to get a seizure warrant to

9     affect the seizure, and still even after obtaining the seizure

10    warrant to access the key we were told that we had the correct

11    key, we were even told that we must not have known how to use

12    it and that's why it wasn't working.  So it wasn't until it

13    was clear to us that it was altered, and we continued pressing

14    for that information up until yesterday morning that we -- the

15    correct key was handed over.

16          THE COURT:  And just one more thing, just to clarify

17    because I was listening but not taking adequate notes here.

18    The amount of money that the Government is currently aware to

19    which Mr. Sharma would have access if he were released, to

20    your knowledge, totals are approximately what?

21          MS. TEKEEI:  Your Honor, it is at least the 9,000

22    ether which is now currently worth approximately five or six

23    million U.S. dollars.  It includes at least what he is

24    reported to Pre-trial Services which is the sum of

25    approximately $200,000.  We also believe, and as we conveyed

29

1  in March -- in February and March of this year, he withdrew

2  hundreds of thousands of dollars from his bank accounts and

3  also from cryptocurrency exchange accounts that he held, to a

4  net -- almost entirely liquidated.  So in the weeks and days

5  leading up to his arrest, he liquidated more than 100,000 U.S.

6  dollars in digital assets, and in the weeks leading up to his

7  arrest he withdrew or transferred more than $500,000 out of

8  other -- out of bank accounts.  That's what we know standing

9  here today.  We're attempting to get our arms around all the

10  different shell companies and bank accounts that are tied to

11  him, either directly or through other individuals.  But that's

12  what we know about today.

13          MS. McCARTHY:  Your Honor, this is the first time

14  hearing of shell companies.  I'm not sure that the Government

15  has -- I'm not sure why that was just thrown in here, so I --

16  I don't know what that is.

17          THE COURT:  Okay.  Hold on a second.  You have

18  evidence that significant sums of money were withdrawn from

19  various places and you don't know where they -- the money was

20  transferred to --

21          MS. TEKEEI:  Yes.

22          THE COURT:   -- if it was transferred anywhere?

23          MS. TEKEEI:  Yes, Your Honor.  Some of it are

24  withdrawals from bank accounts.  We have tried to obtain as

25  many records as we can to do a tracing analysis.  We don't

30

1  know where all of it has gone.  We don't know where much of it

2  has gone.  The assets in the digital wallet -- in one of the

3  digital wallets that he held were all liquidated shortly

4  before his arrest.  We don't -- we can't tell from the

5  accounting provided to us by Gemini Trust, which is where he

6  held some of his digital assets, where that money went.  We're

7  trying to figure it out.  I just wanted to --

8          THE COURT:  And what makes you say --

9          MS. TEKEEI:  -- address the Court's questions.

10         THE COURT:  -- there are shell companies?

11         MS. TEKEEI:  If I -- if there is a negative

12  connotation attributed to the word shell, I will simply say

13  companies.  Mr. Sharma has set up at least Sharma Tech [Ph.],

14  he set up a company called Revolutions.  There's a company

15  called Miami Exotics that he was involved with and had

16  operating authority over.  There is Centra Tech.

17         And, Your Honor, and I failed to mention this -- we

18  learned earlier this week that at least some of the Centra

19  Tech funds -- sorry -- some of the Centra Tech investor funds

20  for investors who have tamed the so-called Centra Card were

21  kept in a wallet -- a digital wallet that was separate from

22  the digital wallet that contained the 91,000 ether.  And so

23  there's one or more digital wallets that contain funds from

24  investors who received the so-called Centra Card in order to

25  be able to monetize some of their digital assets.  We don't

31

1   know what amount is contained there.  We don't know who has

2   access to it.  We don't know how many wallets there are.  But

3   we have learned, as recently as two days ago, that there were

4   separate digital wallets kept with Centra related assets.

5          THE COURT:  Okay.

6          MS. McCARTHY:  Your Honor, I mean, I know that the

7   Government has access to the defendant's bank account at maybe

8   Federal Credit Union.  I believe that if they just look they

9   would see that the funds from the Gemini account which was a

10  cryptocurrency account he had, those funds were deposited

11  directly into his bank account.  And it may be Federal Credit

12  Union.  So I dispute the Government's arguments about, you

13  know, funds being all over the place.  I don't know what

14  they're talking about.

15          But the fact of the matter is what the Court should

16  be interested in is that there are conditions that can be set.

17  The investor funds are safe and secure in the Government's

18  possession.  That is what is at issue in this case.  And the

19  Government is not going to get 100 percent certainty that

20  they're going to know where every single penny that the

21  defendant has access to is located.  I'm not hearing anything

22  about risk of ties overseas or anything of that nature.

23  Perhaps now I'll plant that seed and that will be said next.

24          Really, the goal posts keep getting move, Your

25  Honor.  The primary concern that the Government said was the

32

1   reason they were seeking detention was the inability to access

2   the virtual wallet.  They've done that now.  They've done it

3   because my client gave them the correct information.  It was

4   late in coming, and I don't make excuses for it, and it was a

5   bad thing that it took so long.  I agree.  However, they have

6   it now.  Enough.  We should set bail conditions.  He should be

7   released.  He's been in jail since April 1st and it is time

8   for him to now be permitted back into the community.

9           THE COURT:  Okay.  Here's what I've got.  I've got a

10  sufficient basis for the Government to be heard because I have

11  an argument about flight risk and also an argument about

12  obstruction.  And under 18 U.S.C. 3142(f)(2), the Government

13  can seek detention in a case that involves either a serious

14  risk the person will flee, or a serious risk the person will

15  obstruct or attempt to obstruct justice.  Also a serious risk

16  the person will threaten or intimidate a witness or juror.  I

17  don't have that, but I do have an alleged history of

18  obstruction and concerns expressed by the Government that I

19  will take as concerns about continuing obstruction.  That may

20  be a stretch.  But I do also have concerns about risk of

21  flight.  So I'm going to entertain this request for detention.

22  I'm just saying that as a threshold matter because the

23  Government doesn't get to seek detention in every case.  But I

24  think they've met the threshold.

25          And so then what do I have in terms of flight risk?

33

1   I have someone who has not seemingly tried to flee in the

2   past.  Apparently, I gather, has made court dates, it is also

3   not inspired confidence with his ability to be honest and

4   forthright with investigators, the Government, law

5   enforcement, the Court as witnessed by perjury issues, as

6   witnessed by the statements about this passcode and so on.  So

7   we have a lack -- a history of lack of honesty.  We also have

8   a history of moving some funds, unclear why, unclear to where,

9   but enough funds that would enable someone to travel, should

10  he wish to, and with access still apparently to 5- to $6

11  million in this account and other monies elsewhere.  That

12  raises some concern because one of the issues about flight

13  risk is whether there are means to flee.

14          In terms of incentive it's generally thought that

15  simply severity of the charges is not enough to suggest flight

16  risk.  We look at factors in their totality.  I don't know

17  about ties to other countries.  I have, from Pre-trial

18  Services that defendant is a naturalized citizen and that he

19  has traveled internationally for business and for leisure

20  purposes.  I don't have any particular place outside the

21  country where he seems to frequent, has property, has family

22  members, anything of that nature.  That's not shown.  In terms

23  of passport turned over, that's good with respect to travel.

24  I don't have history of using falsified travel documentation

25  or anything of that nature, but I do have one proffered by the

34

1   Government regarding using somebody else's identifying

2   information and also in connection with dishonesty,

3   willingness or ability to create false identities for purposes

4   of perpetrating fraud.  I don't know if that translates to

5   traveling on a false identity or alias.  It's not so evident

6   to me.  But there's at least something there, again, in

7   connection with lack of honesty and using someone else's

8   identity for some purpose that gives cause to some concern --

9   gives rise to some concern.

10        The firearm issue, I think is a bit of a side issue.

11   I certainly could set a condition that would require surrender

12   of firearms and not being permitted to have any.  It does give

13   some -- [inaudible] some concern about danger but I don't

14   think that is the main issue here by any stretch of the

15   imagination.  So I'm mostly concerned, when it comes down to

16   it with the reported history of dishonesty including to

17   various and assorted authorities, including a court, including

18   law enforcement, serious dishonesty from what the Government's

19   relating, and the amount of money that defendant would still

20   have available to him and the fact that he was recently taking

21   a lot of money out of accounts, moving it to where, it's

22   unclear, and for what purpose is unclear.  It may be just to

23   pay counsel, but it's unclear.  With respect to defendants

24   stated income and assets, you said you didn't think this was

25   correct and there was a need for correction in what was

35

1   reported to pretrial or what was understood by pretrial?

2           MS. McCARTHY:  So originally pretrial had his

3   account holding only 20,000 in his virtual wallet being worth

4   $9,000.  When he told them that he had 9,000 Ethereum worth $6

5   million.

6           THE COURT:  So ether and Ethereum is the plural or

7   something like that?

8           MS. McCARTHY:  I don't actually know.

9           MS. TEKEEI:  And Your Honor, ether is the asset.

10  Ethereum is the platform on which it can be exchanged.

11          THE COURT:  Oh.  Okay

12          MS. McCARTHY:  Ether.  So, yeah, that was what had

13  to change.  Your Honor, just -- I want to make sure that you

14  understand --

15          THE COURT:  So the actual -- the actual assets -- I

16  mean Counsel has talked about hundreds of thousands of dollars

17  being taken out of bank accounts.  I don't see that here on

18  the financial information.  I see $20,000 and then I see the

19  virtual wallet which will call 5- to 6 million instead of

20  9,000.

21          MS. McCARTHY:  Okay.  So I can't answer for all of

22  the withdrawals from his account.  I know that some of that

23  money was used to pay some of the Centra Tech-related

24  expenses.  He is the owner of Centra Tech.  I believe some of

25  it was used to pay a former employee a severance, you know,

36

1    money -- Centra Tech itself did not have a lot of money in its
2    bank account so there were times when my client's bank account
3    was used to pay for Centra Tech expenses.  But I certainly, by
4    no stretch, do I have an accounting that I can present to the
5    Court at this time.  If the Court would require that, we can
6    certainly, you know, strive to do that.  And come up with more
7    of a roadmap as to where all of the funds went.

8            But I want the Court to understand the Centra Tech
9    itself is no longer a going concern.  That once this case was
10   public and now on April 1st -- April 2nd when the complaints
11   were announced and published to the world, the business
12   essentially started to wind down.  But part of what Mr. Sharma
13   did when he was in prison was he authorized the General
14   Counsel of Centra Tech to basically just turnover to the
15   Government all of Centra Tech's computers and any -- all of
16   its data.  So the Government now has everything from Centra
17   Tech in its possession.  So he -- it couldn't have happened if
18   he had said no.  And he authorized that without the Government
19   having to go through obtaining any sort of court order to do
20   that.  And I think that's also significant -- a significant
21   fact that has not been raised with the Court.
22           MS. TEKEEI:  Your Honor, as to that, he was required
23   to do so, and the company was required to provide information
24   pursuant to legal process -- a subpoena.  And so it is not the
25   case that he voluntarily handed over Centra Tech's computers.

37

1   There was a subpoena.  They were required to comply with it by

2   law, and they chose to comply with the by turning all of the

3   equipment over rather than doing their own review.  So there

4   was no voluntary turning over.  They were required to do so.

5           MS. McCARTHY:  A subpoena for documents.  Subpoena

6   is counsel reviews the materials and turns over what's

7   responsive to the subpoena.  Mr. Sharma said turn over

8   everything to the Government.  That is in fact what happened.

9           MS. TEKEEI:  Your Honor, as to the reported income,

10  I would just like to note that -- and this is our letter --

11  Mr. Sharma, in connection with the funds that he had in Gemini

12  Trust back in October of 2017, they noticed exchanges in and

13  out of his Gemini Trust cryptocurrency account, such that it

14  raised a red flag in their systems.  And so they emailed him,

15  and they said to him can you provide us with some more

16  information.  And that email is attached to our papers, I'm

17  happy to hand up another copy.  In response to that inquiry

18  from Gemini Trust, Mr. Sharma told Gemini Trust that he

19  already -- he wrote, I already earn over 350K a year from my

20  W-2 employment and I have a large amount of money still

21  invested into cryptocurrencies.  That was merely a few months

22  ago, Your Honor.  It's not that long ago that he told someone

23  else that he made more than $350,000 a year, whereas he's now

24  told Pre-trial Services that he makes far less than that and

25  that he described that he had a large amount of money still

38

1   invested into cryptocurrencies. I just want to point that out

2   with respect to the income that's reported to Pre-trial

3   Services.

4          THE COURT:  Well the income reported to Pre-trial

5   Services as initially here at 100,000 but then his salary was

6   modified to 26,000 a year.  Before then, he worked earning

7   125,000 a year in his next earlier job.

8          MS. TEKEEI:  And so -- and so he's told other people

9   that he earned more than 350,000 only a matter of a few months

10  ago.  So there are still discrepancies -- there are still

11  discrepancies with respect to his income and his assets.

12         MS. McCARTHY:  Your Honor, all I can say is that

13  when he stepped down as an officer of Centra Tech when he took

14  his plea to perjury, I think this is, you know, this isn't

15  IBM, this is a company -- he's the owner, he's 27 years old.

16  He -- money came to him out of Centra Tech when he needed.  It

17  was his money that went into make the company.  So I can't

18  answer for how it was given to him, whether it was, you know,

19  return of capital, or it was return of a loan, or repayment of

20  a loan, but is a small company.  You know, we don't -- I can't

21  answer the question of what his actual salary was.  He told

22  the -- to Pre-trial Services essentially what he was claiming

23  as salary.  The rest of it is a tax issue frankly, as to

24  whether or not he was taking back out of the company that he

25  had invested.

39

1    THE COURT:  All right.  The last thing I will just

2 say is I am just thinking out loud about what I'm hearing

3 before making a decision, is that of course every individual

4 is entitled to an individualized bail determination and no two

5 people necessarily need to be treated the same way.  But on

6 the other hand we strive for some consistency of analysis and

7 logic for not only the appearance but the actuality of

8 fairness.

9    And so I am looking at what happened with the

10 codefendant to try to understand what the differences are --

11 the individualized differences are between them.  I gather

12 that one of the conditions that was set for bail for

13 Mr. Farkas was that the digital wallet be made available to

14 the Government and the transfer of those assets be made

15 available.  So it may have been, I mean I'm obviously -- I'm

16 not judge Wang -- we look -- we've had different arguments in

17 front of us.  But one thing she may have been thinking was

18 that is a significant issue and he's going to be held until

19 that issue is dealt with, which now seems to have been dealt

20 with.

21    In truth, the only issues that I really have here

22 with respect to flight risk or risk of obstruction are -- I'm

23 not seeing so much future danger to the community if this

24 business has been shut down, but what I'm seeing is a history

25 of being less than truthful.  I suspect that they have

40

1   continued through this interview by pretrial, although I can't

2   know for sure.  But the amounts of money look -- even apart

3   from ether versus dollars, putting that issue aside -- the

4   other amounts of assets strike me as not terribly plausible

5   based on what the Government has said about removing hundreds

6   of thousands of dollars from accounts relatively recently.

7   This email counsel has, the history reported to pretrial, it

8   looks a little questionable.  They -- $26,000 salary seems a

9   little hard to swallow, I don't know.

10          But I have a history of lack of candor.  I have a

11  significant history of keeping the Government from these

12  assets it was trying to recover including by providing

13  information that seems to have been knowingly false -- likely

14  to have been knowingly false.  Again, I'm not making an

15  ultimate determination on that but having something taped to

16  your drawer that's different from what's provided to the

17  Government is at least of great concern.  So I have a lack of

18  candor, I have a lack of candor with the Government, and at

19  least with the state court, I have a lack of candor to the

20  Court prior to the perjury plea.

21          And I have money that is of concern.  I mean, I also

22  note with respect to the conditions set for Mr. Farkas there

23  was a prohibition against accessing or transferring any funds

24  out of the digital wallet.  That may have been because he said

25  none of those funds were his own.  You know, I don't know if

41

1    the Government would be taking the position here that even if

2    he says 5- to $6 million as his he should not be able to get

3    that money.

4            MS. TEKEEI:  Your Honor, let me just be completely

5    clear, and we've conveyed this to Ms. McCarthy.  We do not --

6    we are not touching that money.  It is -- we do not currently

7    have information, probable cause to allow us to seize those

8    funds, and so we've conveyed to Ms. McCarthy that what needs

9    to be done is for those funds to be transferred to another

10   secure digital wallet.  The government is not, at this time,

11   is not seeking to seize those funds.

12           THE COURT:  So as far as the Government's concerned,

13   if this defendant is out, you would have no basis for seeking

14   the condition that he could not have access to those funds?

15           MS. TEKEEI:  That's correct, as it stands today.

16   Obviously, our investigation is ongoing and so if we learn

17   additional facts that we would -- we could present in order to

18   have access or seize those funds, we certainly will.  But as

19   it stands today, those funds would be his.

20           THE COURT:  Counsel, I'm not sure -- I'm willing to

21   consider setting conditions but I'm not sure how I deal with

22   this access to money and not having a sense of how much it is

23   and not having a sense of what's real or not real with respect

24   to wherewithal and ability to flee.  Because if he has $6

25   million, let's say roughly, or more than that, if there are

42

1   other accounts and other monies, I could say post $3 million
2   in, you know, collateral for a bond.  But there's still
3   another intentionally $3 million.  You can do a lot with $3
4   million.  So it is of concern to have someone who has
5   seemingly been this dishonest to have access to this much
6   money with, you know, facing serious charges.  It's of
7   concern.

8              MS. McCARTHY:  I hear Your Honor.  I think that
9   there are ways to satisfy the Court on that.  And one of the
10  ways would be essentially to transfer those -- the ether --
11  into a wallet as to which the defendant has no access.  And it
12  would be that we would have to essentially appoint somebody as
13  a trustee or somebody to be sort of -- I work at a tax firm, I
14  can hopefully figure this out with one of my partners on how
15  we could accomplish this, that you would get somebody not
16  related to him who would agree for a fee -- a small fee or
17  whatever, to be the person who is in charge of those funds --
18             THE COURT:  A fiduciary?
19             MS. McCARTHY:  -- a fiduciary essentially, and that
20  we could arrange so that his housing expenses are paid, his
21  food is paid, his legal fees are paid, his travel expenses
22  back and forth to New York are paid and that
23             THE COURT:  I would be a lot more comfortable if I
24  had some understanding of other sources of money too and was
25  really there.  Because I'm looking at this Pre-trial Services

43

1   report, and I don't know what to trust.  The Government's

2   talking about --

3        MS. McCARTHY:  Your Honor, I think if the Court

4   would -- perhaps we can -- if that is the Court's primary

5   concern, then I would ask for some time to sit down with my

6   client, speak to former counsel --

7        THE COURT:  Figure out --

8        MS. McCARTHY:  -- about --

9        THE COURT:  -- try to figure out the money?

10        MS. McCARTHY:  Figure out the money for you because

11   I do believe there was a fair bit of from his account back to

12   Centra, from Centra back to his account and various things

13   that were done on behalf of the company through both accounts.

14        THE COURT:  All right.

15        MS. McCARTHY:  And I haven't had time --

16        THE COURT:  I've got the following three things --

17        MS. McCARTHY:  Okay.

18        THE COURT:  -- okay.  I've got serious charges with

19   potential serious exposure.  I have a serious history of lack

20   of candor to authorities.  And I have serious concerns about

21   how much money there is available to him that he might use to

22   try to avoid these charges.  A person who has not demonstrated

23   himself to be trustworthy.  I'm not guaranteeing where I go

24   with us --

25        MS. McCARTHY:  I understand.

44

1          THE COURT:  -- but if I can get a little more

2   clarity with respect to what there is available to him, and

3   what you would propose to do about that I could at least have

4   some greater comfort that I, you know, that I'm cutting

5   through some of what may be dishonesty here and understanding

6   what the real situation is.  I'm not saying that this report

7   is dishonest, but what I'm saying is it makes me raise an

8   eyebrow, like something seems missing based on what the

9   Government's been saying.

10          MS. McCARTHY:  All right.

11          THE COURT:  I'm going to continue Mr. Sharma's

12   detention for the time being.  I am only on duty this week,

13   however, I have some time, I believe on my own calendar now on

14   Friday of next week.  I don't know if that's enough time to

15   sort things out.  Other than that, you can contact my chambers

16   and see.  I don't know that it makes sense at this point to

17   put this in front of another magistrate judge.  My calendar is

18   pretty tight, Friday opened up next week, otherwise I'm not

19   sure.

20          MS. McCARTHY:  Your Honor, I think that it makes

21   sense to keep it before Your Honor since you've heard

22   extensive argument.

23          THE COURT:  I think so too.

24          MS. McCARTHY:  -- of --

25          THE COURT:  Am just telling you my civil calendar is

45

1   pretty crowded.

2          MS. McCARTHY:  I understand.

3          THE COURT:  So sometimes things cancel and that's

4   what happened next week Friday and something else might as

5   well.  But --

6          MS. McCARTHY:  I understand.

7          THE COURT:  I don't have a lot of blocks of time.

8          MS. McCARTHY:  So should we put a control date --

9          THE COURT:  Now I can put you --

10         MS. McCARTHY:  -- on your calendar for the 11th?

11         THE COURT:  -- I can put you down on the 11th in

12  front of me in my courtroom at -- call at 2:00 -- Friday is

13  the -- Friday is day that opened up.  So the 11th -- May 11th

14  I can put in my courtroom at 2:00 as a control.  Once again, I

15  don't want you if there's nothing new to share, but if you

16  talk to each other and provide information and say look these

17  withdrawals, this is what this was, this is where this went,

18  this is how much there is, this is what he's agreeing not to

19  have access to.  This is our proposal for how we put it in

20  some escrow somewhere, some trust somewhere --

21         MS. TEKEEI:  I understand.

22         THE COURT:  -- or whatever, I think that might be

23  I think that might be helpful.  I do have concern, I do have

24  concern about flight risk and obstruction here.  There -- I am

25  persuaded -- given that flight risk is only a preponderance

46

1    I'm persuaded that there's been enough in the past that should

2    give me concern.  But I'm still open to hearing about this

3    money and that really, we can deal with these issues.  Okay.

4         MS. McCARTHY:  That's all we ask for your honor to

5    do --

6         THE COURT:  Okay.

7         MS. McCARTHY:  -- and we appreciate your --

8         THE COURT:  No promises.

9         MS. McCARTHY:  -- willingness to do this.

10        THE COURT:  No guarantees.

11        MS. McCARTHY:  I understand.  I understand.

12        THE COURT:  Okay.

13        MS. McCARTHY:  Thank you.

14        THE COURT:  All right.

15        MS. TEKEEI:  Thank you, Your Honor.

16        THE COURT:  You're welcome.

17                    *  *  *  *  *

18

19

20

21

22

23

24

25

47

1        I certify that the foregoing is a court transcript

2   from an electronic sound recording of the proceedings in the

3   above-entitled matter.

4

5   _____

6        Shari Riemer, CET-805

7   Dated May 8, 2018

# Exhibit H

# Exhibit H

```
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
2

3  --------------------------------X
                                   :
4  UNITED STATES OF AMERICA,       : 18-MJ-2695 (UA)
                                   :
5            v.                    : May 11, 2018
                                   :
6  SOHRAB SHARMA, et al.,          : 500 Pearl Street
                                   : New York, New York
7            Defendants.           :
   --------------------------------X
8
        TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL HEARING
9         BEFORE THE HONORABLE DEBRA C. FREEMAN
             UNITED STATES MAGISTRATE JUDGE
10

11 APPEARANCES:

12 For the Government:      SAMSON ENSER, ESQ.
                           NEGAR TEKEEI, ESQ.
13                         United States Attorney's Office,
                           One Saint Andrew's Plaza
14                         New York, New York 10007

15

16 For the Defendant:      SHARON McCARTHY, ESQ.
                           Kostelanetz & Fink LLP
17                         7 World Trade Center, 34th Floor
                           New York, New York 10007

18

19

20

21 Court Transcriber:      MARY GRECO
                           TypeWrite Word Processing Service
22                         211 N. Milton Road
                           Saratoga Springs, New York 12866
23

24

25


   Proceedings recorded by electronic sound recording,
   transcript produced by transcription service
```

2

1          THE CLERK:  United States v. Sharma.  Counsel,

2    please state your name for the record.

3          MR. ENSER:  Good morning, Your Honor.  Samson Enser

4    for the Government.  With me at counsel table is Special Agent

5    Brennan Raz [Ph.], the case agent from the FBI, and Lisa Chen

6    from the Pretrial Services Department.  And I just want to

7    note for the record some of people here in the audience.  My

8    colleague, AUSA Negar Tekeei; Greg [inaudible], agent with the

9    Department of Homeland Security who investigated the priest

10   fraud that was in our brief; Special Agent Kristin Elaine

11   [Ph.] from the FBI, another case agent on the case; Andrew

12   Rodin [Ph.] from the District Attorney's Office in New York.

13   He handled the perjury case that we have referenced in these

14   proceedings.  And John Daniels and Alison Levine from the

15   Securities and Exchange Commission.

16          FEMALE SPEAKER:  Good afternoon, Your Honor.

17          THE COURT:  Good afternoon.

18          MS. McCARTHY:  Quite a crowd.  I'm just here, Sharon

19   McCarthy of Kostelanetz & Fink.  I'm here for Mr. Sharma.

20          THE COURT:  Okay.  I had wanted some more

21   information about what the Government represented about

22   withdrawals of money over some recent period of time.

23          MS. McCARTHY:  Yes, Your Honor.  If I can hand up

24   to the Court,  I'm going to give the Court an analysis of the

25   Gemini account which is the

3

1            THE COURT:   I'm sure you gave this to opposing

2   counsel?

3            MS. McCARTHY:   I did.   It is the account where Mr.

4   Sharma bitcoin transactions and he made --

5            THE COURT:   It's colorful.

6            MS. McCARTHY:   -- withdrawals starting in October of

7   2017 through March 20, 2018.   And I believe what Ms. Tekeei

8   said on the record during a hearing was we have no idea where

9   that money went.   And Your Honor, we do know when that money

10  went.   We've been able to show that although we don't have

11  account statements for his Bank of America account which ends

12  in 3872, we can see that the funds were withdrawn from the

13  Gemini account into the 3872 Bank of America account and then

14  transfers were made --

15           THE COURT:   2783?

16           MS. McCARTHY:   3872.   If you look at the very first

17  one, 10/10/17, withdraw wire transfer --

18           THE COURT:   Wait.

19           MS. McCARTHY:   -- to Bank, BOA, Bank of America.

20           THE COURT:   Wait.  But the heading on that says

21  checking account 2783 which is an exact reversal of numbers.

22  Is that a different account we're talking about?

23           MS. McCARTHY:   I don't see a 2873.

24           THE COURT:   The heading, Centra Tech, Inc. BOA

25  checking account 2783 and all the accounts say 3872.

4

1          MS. McCARTHY:   It went into a different account

2    that's under the name of Centra Tech which is my client's

3    company which had 2783 was the end of that account number.   So

4    Judge, if I could just --

5          THE COURT:   I'm sorry, 3872 is the Gemini account?

6          MS. McCARTHY:   No.

7          THE COURT:   What's 3872?

8          MS. McCARTHY:   Okay.   So Gemini is -- there's this

9    very complicated receipt essentially or record of Gemini.

10   This is all of the bitcoin trading that he was doing, Mr.

11   Sharma was doing with a platform called Gemini.   So when he

12   would withdraw funds from Gemini, he had given Gemini first a

13   Bank of America account in which to deposit withdrawals.   What

14   this shows is that all of the, up until October, through

15   October 20, 2017, all the wire transfers went into that very

16   same Bank of America account that he gave to Gemini.   And then

17   on the right-hand side we were able to this up, the

18   withdrawals into his Bank of America account that then went to

19   a Centra Tech Bank of America account.   And that money was

20   used for the operating expenses of the company, Centra Tech.

21         THE COURT:   So you got step one, you have money in

22   these complex Gemini accounts.

23         MS. McCARTHY:   Right.

24         THE COURT:   That money is withdrawn from that and

25   put in a Bank of America account.

5

1          MS. McCARTHY:  In his name.

2          THE COURT:  Bank of America account which is --

3  those deposits aren't shown here but the withdrawals are shown

4  here?

5          MS. McCARTHY:  The withdrawals are shown, every

6  withdrawal that went to 3872.  And then we have --

7          THE COURT:  Wait.  I'm sorry --

8          MS. McCARTHY:  What I'm trying to say, Judge, is I

9  don't have the Bank of America account statement for Mr.

10  Sharma but I do have the Centra Tech Bank of America account

11  statements showing transfers from the Bank of America account

12  on the left.

13          THE COURT:  So you're saying the Gemini stuff went

14  into the Bank of America account that you don't have but you

15  have the money from that account then going into the Centra

16  Tech account.

17          MS. McCARTHY:  Correct, Your Honor.

18          THE COURT:  Okay.

19          MS. McCARTHY:  We've been able to trace it and it's

20  almost perfect.  There were additional monies that would be

21  tacked on at times for a transfer to Centra Tech.  But there's

22  a $36,000 difference in what went into his Bank of America

23  account from the Gemini withdrawals and then what went back

24  into -- went into a Centra Tech operating account.  And this

25  was the time period, Judge, when they were operating their

6

1   company that's at issue in the indictment, and that's not in

2   the indictment yet, it's going to be, but in the complaint

3   with the ICO.  So that's what this was for.  He was sending

4   the money that he withdrew from his bitcoin trading and

5   sending it to his company.

6          So all I'm trying to show, Judge, is that it is not

7   correct that we don't know where the money went.  We do know

8   where the money went.  It went into the company account.

9   Until he then -- the Bank of America account is closed.  Bank

10  of America closes both Mr. Sharma's account and Centra Tech

11  Bank of America account.  He then opens an account at Navy

12  Federal Credit Union which is the bottom box on the left which

13  is the 10/26/17 through the March 20, '18 withdrawals.  They

14  all go into that Navy Federal Credit Union account.  And then

15  the money then -- that's what we show.  It all gets deposited

16  into his Navy Federal Credit Union account.

17          THE COURT:  So he's got that 1.6 million in that

18  account.

19          MS. McCARTHY:  He no longer has 1.6 million in that

20  account.

21          THE COURT:  Well, he did as of that date.

22          MS. McCARTHY:  He did as of that date, March 20th.

23          THE COURT:  And was that money put back into Centra

24  Tech?

25          MS. McCARTHY:  No.

7

1          THE COURT:  That was just --

2          MS. McCARTHY:  This is the total withdrawals and at

3   times the funds were used for Centra Tech related purposes,

4   sometimes they were not.  That was his personal checking

5   account.  And Judge, we've been trying to get his father to be

6   the power of attorney on that account for the Navy Federal

7   Credit Union so that I can see all of the ins and outs of that

8   account including checks written but my client's in jail.

9   It's hard to do this.  We need a notary to be there.  We've

10  done all of that.  And yet the bank has rejected it.  We have

11  to do it again.  So I won't have those details.  The

12  Government tells me they don't have those details so I can't

13  provide those to the Court despite a week and a half of trying

14  to do that.  But I feel like we've done quite a bit being able

15  to show the Court that despite what the Government said that

16  we don't know where that money went, we do know where the

17  money went from the Gemini account.  And so that I think is a

18  significant thing that should give the Court some comfort that

19  he is not setting up accounts all over the place to manage to

20  flee if he's released on bail which seems to be what the

21  Government is claiming.

22          And Judge, of course if the Court has questions on

23  that, but I just want to tell you the second thing that we

24  came to address today was as the Court knows there was a

25  virtual wallet, or there is a virtual wallet, which still

8

1  contains 9,000 of ether which is valued right now today a

2  little bit over $6 million and that is Mr. Sharma's money.  We

3  told the Court that we would come with a proposal to have

4  those funds secured in a way that Mr. Sharma would not have

5  access to $6 million if he were released on bail conditions.

6  And Your Honor, what we have proposed to the Government is

7  that Mr. Sharma's, Dr. Rakesh Sharma, who lives in Binghamton,

8  New York and is an emergency room doctor, would be the trustee

9  of a trust.  The trust administrator would be an attorney by

10  the name of Richard J. Miller, Jr., who is a partner, the

11  managing partner at Morris & McVeigh.  And Your Honor, if I

12  could approach and hand up his CV?

13          THE COURT:  Again, you've provided this I assume?

14          MS. McCARTHY:  I have, yes.  I've spoken with Mr.

15  Miller.  He is happy to take on being the trust administrator

16  in these circumstances.  He's very comfortable with virtual

17  currency.  The trust document that we would draft would of

18  course have to be approved by the Government and the Court and

19  they would allow trust funds to be distributed for just his

20  enumerated expenses such as legal fees, living expenses,

21  travel depending on where he is to get to court, medical

22  expenses and things of that nature.  Mr. Sharma would have no

23  ability, although he would be the beneficiary of the trust,

24  would have no ability to invade the trust until such time as

25  is set in the trust agreement, trust document.  So for

9

1    instance, we could have it be that upon the termination of the

2    case, in this case in the Southern District of New York, the

3    funds would then revert to Mr. Sharma but not before then.   So

4    we would set some sort of a possible termination date.   We

5    haven't drafted the trust document, Your Honor, because I

6    wanted to talk to the Court about it and see if this would be

7    something that would work.   I have, however, today spoken with

8    my client.   We're going to go ahead and prepare a trust anyway

9    because he thinks it's in his interest to have a trust to

10   oversee those funds.   So --

11            THE COURT:   So how much is currently in the Navy

12   federal checking account?

13            MS. McCARTHY:   The last statement that I have,

14   Judge, I think it was -- and I don't have the most current

15   statement because I'm not able to access it.   I believe it was

16   229,000 as of April 8.   However, for a period of time the

17   general counsel of Centra Tech, whose name is Alan Shutt, S-H-

18   U-T-T, had power of attorney over that account and I believe

19   was paying certain expenses out of that account.   So at this

20   point I don't know how much is left in there because again I

21   haven't been able to get the power of attorney squared away.

22   Mr. Sharma believes there may be about 100,000 left in there

23   after -- less the expenses that were made by Alan Shutt as

24   power of attorney over the account.

25            THE COURT:   So was it one time over $1.5 million?

10

1          MS. McCARTHY: Had gone into the --

2          THE COURT: It's now down to 100,000?

3          MS. McCARTHY: Since October 2016 there had been 1.6

4    overtime deposited.

5          THE COURT: I'm sorry. I'm looking at this balance

6    seemingly as of March 20.

7          MS. McCARTHY: Yes.

8          THE COURT: 2018? Or is that not a balance? Is

9    that just a total of deposits?

10         MS. McCARTHY: That's the total deposits that were

11   over that period of time.

12         THE COURT: So these deposits totaling $1.65 million

13   were being used to pay company expenses? Legal expenses?

14   They are being used for what that it's gone down to $100,000?

15         MS. McCARTHY: Some of both. But Your Honor, I

16   don't, as I said, I don't have the details of that. If I can

17   get the power of attorney or the Government can subpoena those

18   details, I'd love for them to do that and we can all know

19   exactly where everything went. But I see certain things that

20   I'm able to explain and certain things that I'm not able to

21   explain. For instance, Mr. Sharma purchased a domain name at

22   one point for nearly $300,000. He

23         THE COURT: Out of that account?

24         MS. McCARTHY: Yes. He paid Raymond Trapani, who is

25   a co-defendant, he paid him a severance payment. How much was

11

1   that?  About $100,000.  There are just other expenses in there

2   that if I had the details I could explain it to the Court.

3         THE COURT:  Just sort of curious.  A lot of these

4   amounts that are being withdrawn from the Gemini account or

5   accounts are odd numbers.  They're not round at all.  It's not

6   like let me take $100,000 out and do something.  They are

7   numbers like $132,627.80.

8         MS. McCARTHY:  Your Honor, it was lots of ether, so

9   it would be -- and by that I mean like --

10         THE COURT:  Based on rate at the time?

11         MS. McCARTHY:  25 -- hold on a second.

12         THE COURT:  I'm just curious because when you look

13   above a lot of those withdrawals and deposits are round

14   numbers.

15         MS. McCARTHY:  I think it was just his trading

16   style, Your Honor.  I can't explain it otherwise.  I don't

17   think that there's any rhyme or reason to it.  I think it just

18   depended on what he wanted to get out that day or what he was

19   trading because you'll see that he'll make withdrawals and

20   then he'll deposit ether.

21         THE COURT:  Was it based on some kind of conversion

22   rate?  Is that why it's so odd?

23         MS. McCARTHY:  Yeah.  It's based upon how much the

24   ether is valued at on that particular day.

25         THE COURT:  So on the dates above when round numbers

12

1  were taken out, 95,000, 96,000, 206,000, as opposed to these,

2  you know, down to a penny, there was a round number conversion

3  rate at that time?

4       MS. McCARTHY:  I wish that I could tell you that I

5  was an ether expert and I'm not.  But we do have a record of

6  what was taken out and where it went.

7       THE COURT:  I'm just curious.

8       MS. McCARTHY:  Yeah.  But you know, I can tell you

9  that every day you can actually look up on Google and see how

10  much the ether is worth and I had printed it out for today

11  just to tell the Court and now I can't find it --

12       THE COURT:  It's all right.

13       MS. McCARTHY:  -- in all these papers.  But it

14  changes daily.

15       THE COURT:  And you do you don't have something that

16  shows the amount in the current -- currently in the checking

17  account?

18       MS. McCARTHY:  I can tell you what was in there when

19  he was in prison, when he was first arrested, was a little

20  over 225.  But the general counsel of the company who was

21  given power of attorney withdrew we believe about 100,000 for

22  various expenses.  And so we believe it's down to about

23       THE COURT:  So that's what shown on the Pretrial

24  Services report?

25       MS. McCARTHY:  He thought at the time of the

13

1   Pretrial he had about 220,000 in there.

2           THE COURT:  That's the same account, that's the same

3   reference.

4           MS. McCARTHY:  The same account, yes.

5           THE COURT:  All right.  So let me hear from the

6   Government in response to all this.

7           MR. ENSER:  Your Honor, I don't have much to say

8   about the Gemini trading or about what Ms. McCarthy has

9   represented to the Court about that particular bank account.

10  But I have new information --

11          THE COURT:  That you've shared?

12          MR. ENSER:  Yes.  I've shared it, I previewed it,

13  and I've provided the evidence that we are going to rely on.

14          First, we have reason to believe that the defendant

15  may have at least one passport that he didn't disclose to

16  Pretrial.

17          We have additional information about how he

18  obstructed justice by lying to his lawyers and through his

19  lawyers to the SEC, the FBI and the Government about the

20  passcode to access the victim investor funds of more than $60

21  million that were seized by the Government.

22          And we have additional information about his past

23  crimes including instances where he has lied to law

24  enforcement in an attempt to evade arrest.  So let me walk

25  through that.

14

1          First, with respect to the passport, the defendant

2    was arrested on April 1 in this case.  On April 16 he was

3    interviewed by Pretrial in the Southern District of Florida

4    and he was interviewed in the Southern District of New York by

5    Pretrial on May 1.  He told Pretrial Services in both Florida

6    and here that he essentially had one passport that he had

7    given to his counsel.  At the bail hearing before Your Honor

8    last week, his lawyer, and I assume she was relying on

9    information provided by the defendant, said twice on the

10   record that counsel has the defendant's passport.  However, in

11   a recorded jail call after defendant was arrested on April 1,

12   on the date of his arrest Sunday April 1, he participates in a

13   three-way call with his girlfriend who is a subject of our

14   investigation, and Raymond Trapani who is now his codefendant.

15   And in that call he makes two references to -- I should back

16   up.  At the beginning of the call his girlfriend, Brielle

17   Farkas, he was living with her --

18          THE COURT:  I thought the codefendant was someone

19   named Farkas.

20          MR. ENSER:  Judge, at the time the initial complaint

21   charged him and Robert Farkas.  We later filed another

22   complaint against a third cofounder of their company, Raymond

23   Trapani.  So I'm referring to Trapani as a codefendant.

24          THE COURT:  It's on a separate complaint?

25          MR. ENSER:  It is.

15

1          THE COURT:  Okay.

2          MR. ENSER:  And both of those complaints were

3  exhibits to the letter that the Government submitted on May 1

4  in advance of the first bail hearing in this case.

5          THE COURT:  Which I don't have a copy of anymore.

6          MR. ENSER:  I have it right here if Your Honor wants

7  it.

8          THE COURT:  I think we gave it back.

9          MR. ENSER:  I have it right here.  So in this call,

10  in this three-way call -- there are two three-way calls.  The

11  first call is between -- it starts out with the defendant,

12  Sharma, and Raymond Trapani.  At the time, Sharma and Farkas,

13  Sharma and Robert Farkas had been charged, Raymond Trapani had

14  not yet been charged.  And what happens in that call Trapani

15  asks Sharma, "Is my name on the report?"  I believe he's

16  talking about the complaint.  Sharma tells him no.  Trapani

17  says, "It was just you and RJ."  RJ is the nickname of Robert

18  Farkas.  What's the reasoning behind that?  In other words,

19  Trapani is asking how come they didn't charge me too

20  confirming that he is a coconspirator.

21          The second call, three-way between Trapani, Sharma,

22  and Brielle Farkas.  That's Sharma's girlfriend.  And it

23  happens to be the sister of his codefendant, Robert Farkas.

24  Early in the call Brielle, the girlfriend, tells Trapani who

25  tells Sharma they might come back to get a search warrant.  In

16

1  other words, the FBI or the Government may get a search

2  warrant to come search the apartment that Sharma had just been

3  arrested in.  This is the same apartment that we later learned

4  contained the passcode, the real passcode, to the digital

5  wallet with the victim investor funds of more than $60 million

6  worth of digital assets.  And the defendant's response, what

7  he says on the call is, "fuck".  Later in the same call as the

8  three of them, Sharma, Trapani, and Brielle are discussing the

9  bail hearing that they're going to have, that Sharma is going

10  to have in the Southern District of Florida he says two

11  separate times, he makes reference to having passports,

12  plural.  He says, "Make sure you bring the passports," and, "I

13  have to bring all my passports."  Plural.  Not one, plural.  I

14  have conferred with the Department of Homeland Security and

15  with the State Department, Department of Diplomatic Security

16  Services, an agent from each, to get background on whether it

17  is possible the defendant might have another passport.  And we

18  believe that he may still be in possession of a 2012 passport.

19  So let me walk through the facts.

20          First, according to defense counsel, Sharma was

21  issued a passport in August of 2006 in the name of Sohrab

22  [Ph.] Sharma which expired in August 2011.

23          Second, we know from the Department of Homeland

24  Security that Sharma was issued a new passport in April of

25  2012 in the name of Sohrab Sharma.  In February of 2016 he

17

1   applied and received a new passport in the same name, Sohrab

2   Sharma, both a passport book and a passport card.  In his

3   application for the February 2016 passport he claimed that he

4   had lost his 2012 passport book.  He says he lost it on

5   October 27, 2015 while getting into a taxicab.  Because he

6   claimed he had lost it, he did not return it to the

7   authorities.  He said he lost it, he didn't have it.  He

8   didn't have to return it and therefore, Customs and Border

9   Patrol, the Department of State did not do what they would

10   ordinarily do when you apply for a new passport which is punch

11   holes in it to indicate that it's terminated and send it back.

12   If he still has that passport, he can use it to travel and I'm

13   going to get to that in a minute.

14         In December of 2017 he applied for and received a

15   new passport in his new name, Sam Sharma.  When he did that,

16   he turned in the February 2016 passport book and card.  The

17   card and book were returned to him.  I understand that the

18   book would have been hole punched so it can't be used.  I

19   don't know if the card was tagged or anything like that.

20   Defense counsel has represented that Sharma provided to

21   defense counsel the 2017 book and card.  In other words, the

22   passport book and card issued in the name of Sam Sharma in

23   2017 and also his expired 2016 Sohrab Sharma passport.  What

24   is unaccounted for is the 2012 --

25         MS. McCARTHY:  I'm sorry, it's not the 2016.  It

18

1   expired 2006.

2        MR. ENSER:  The 2006, I'm sorry.  The 2006 Sohrab

3   Sharma passport which expired in 2011 and the 2017 passport

4   were given to defense counsel.  Sharma could still have the

5   2012 book, the one that he claimed was stolen.  Because it was

6   issued to him as an adult, it's good for ten years meaning it

7   would not indicate it expires until sometime in 2022.  And I

8   understand from talking to an agent with the Diplomatic

9   Security Service when a passport is reported stolen, there is

10  a computer system that indicates to those computers that will

11  all receive it that that passport has been reported, is

12  flagged as reported lost and should be not useable.  However,

13  there are serious imperfections in the system used by Custom

14  and Border Patrol that have been exploited in the past such

15  that people with a passport that does not on its face indicate

16  that it is unuseable, expired, terminated have been able to

17  flee the country.  As an example, the agent explained to me

18  that if you take a passport which has been flagged as lost and

19  go to buy a ticket at the counter at the airport for a

20  commercial flight very shortly before the flight takes off, if

21  you do that and you pay cash, the airline will send a

22  computerized notification to Customs and Border Patrol but

23  very frequently the flyer, the passenger, the person trying to

24  flee can get on the plane and even take off before Customs and

25  Border Patrol gets back to the airline to say that passport is

19

1  no good.  And people have fled the country that way.  And one

2  example the agent gave to me, which I think is particularly

3  applicable here or pertinent, if you're leaving the United

4  States there is no Customs when you're exiting.  The airline

5  bears the burden of notifying Customs and Border Patrol.  So

6  if Sharma, for example, wanted to fly to Iran he could get a

7  commercial flight to Iran via Jordan.  So in other words, with

8  a stopover in Jordan.  He can buy the ticket at the counter,

9  pay in cash.  CBP won't give word back to the airline in time.

10  He gets to Jordan.  Jordan doesn't check because it's just a

11  stopover.  And then he gets to Iran.  And Iran doesn't share

12  the computerized database used by the State Department, so

13  they would either not know or not care that that 2012 passport

14  is no good.  That's one example.  There are other examples of

15  how a passport like this could be used to flee.  He said

16  passports in plural on that call.  And given his history of

17  lying, his conviction for perjury, the overwhelming evidence

18  that he lied and committed securities fraud in this case, we

19  don't trust in any way representations he's made weather to

20  his counsel, to the Court, to Pretrial about the number of

21  passports he has.  We have serious concerns that he has

22  another passport that he could use to flee.

23          We have also additional information about how he

24  obstructed justice.

25          MS. McCARTHY:  May I address the passports before we

20

1  go on to the next issue?  Is that possible?

2          THE COURT:  I will come back to you.

3          MS. McCARTHY:  Okay.

4          THE COURT:  Just make a note.

5          MS. McCARTHY:  Yep.

6          MR. ENSER:  So in order to understand the

7  obstruction, some of this background was provided previously

8  but a little background is necessary.  The defendant, his

9  codefendant Raymond Trapani, his codefendant Robert Farkas,

10  they co-founded this company Centra Tech in 2017.  During the

11  period from July 30th to October 5, 2017 they committed the

12  main piece of the fraud we charged and through that fraud they

13  raised digital assets at least 91,000 ether units.  Ether is a

14  digital currency or crypto currency.  At the time they were

15  worth over 25 million.  Today those funds are worth over 60

16  million.  Initially -- and by the way, I'm basing this

17  information on information that's provided by Centra Tech

18  through its outside counsel at Ballard Spahr through counsel

19  for Sharma, through counsel for Farkas, and through

20  information that I received from the FBI agents who arrested

21  Sharma.  So through the fraud they raised that money.  Then

22  initially that money was in a digital wallet that only Sharma

23  could access through a passcode.  The Securities and Exchange

24  Commission issued a subpoena at the end of November of 2017 to

25  the company.  The company thus became aware that the SEC was

21

1  investigating them.  And Centra, through its outside counsel

2  at Ballard Spahr started to talk to the SEC.  The SEC

3  expressed concerns that Sharma being the only one with the

4  passcode.  And so Sharma then called Robert Farkas, his

5  codefendant, and Alan Shutt, the general counsel and chief

6  compliance officer of Centra Tech while they were in

7  California for a conference.  And Sharma told them that they

8  had to move the money to a new digital wallet, they had to

9  have only one passcode and they had to use a protocol to

10 secure that passcode.

11          THE COURT:  Don't repeat what I was told last time.

12          MR. ENSER:  Okay.

13          THE COURT:  I know I heard the story about half and

14 half and then it turned out not be the real thing and was

15 taped to the bottom of the drawer.  I got all that.

16          MR. ENSER:  Okay.  Well, what's important there in

17 that little piece of it is Sharma lied to Farkas and to Shutt

18 because he told them what he was transmitting to them was the

19 passcode.

20          THE COURT:  Heard that last time.

21          MR. ENSER:  Here's what's new.  On April 1 when

22 Sharma was arrested in the apartment that he shares with his

23 girlfriend Brielle Farkas, the agents went to the condominium,

24 they go to the 10th floor.  That's the floor the apartment is

25 on.  The agents as they were walking to the front door they

22

1  heard the door lock.  They then knocked at the front door for

2  approximately three to five minutes knocking and announcing

3  themselves.  No one opened the door.  They tried calling

4  Sharma's phone.  They heard it ring and then they heard it go

5  off.  Well, they heard a phone ring, and then they heard the

6  phone get silenced.  They continued knocking and announcing

7  themselves.  One of the agents went to get the condo manager.

8  He came up and opened the door.  At that point they saw Sharma

9  and Brielle Farkas, his girlfriend, walking down a staircase.

10 Sharma had a phone in his hand.

11         THE COURT:  I'm sorry, a back staircase?  What do

12 you mean walking --

13         MR. ENSER:  I believe this is a two floor apartment.

14 If I'm understanding it correctly, I think this is an

15 apartment that has like two floors.

16         THE COURT:  A duplex apartment?

17         MR. ENSER:  I think so, Judge.  I'm going --

18         THE COURT:  They're coming in one door and they're

19 going down in the apartment to another level?

20         MR. ENSER:  I think they were in the upper level

21 coming down is my understanding from reading --

22         THE COURT:  And your folks are going in on the lower

23 level --

24         MR. ENSER:  Right.

25         THE COURT:  -- or going in on the upper level?

23

1        MR. ENSER:  Lower level.

2        THE COURT:  Okay.

3        MR. ENSER:  Open door.  Brielle and Sharma are

4 coming down.

5        THE COURT:  Okay.

6        MR. ENSER:  When they heard that phone we assume

7 Sharma would have been near where they were on that ground

8 level or whatever on the 10th floor behind the door.  So they

9 command Sharma and Brielle outside the apartment.  They detain

10 them.  And either there or in route to being processed Sharma

11 said that he did see the agents through the peephole but he

12 wasn't sure if they were real agents and so he was making

13 phone calls to figure out what to do.  We believe during that

14 time span there was enough time for him to hide the passcode

15 which was in that drawer and we suspect that that's what was

16 happening there.  That time period was him attempting to hide,

17 and successfully hiding the passcode when he knew agents were

18 there to arrest him.

19        THE COURT:  What makes you say that?

20        MR. ENSER:  It was found in the apartment and he had

21 enough time and that three to five minute window.  Also the

22 fact that he was on a different level suggests that he left

23 you know, he sees the agents, locks the door, goes up, hides

24 it, comes back down.  It also explains the comment on the

25 phone call when he's told that the FBI or the Government are

24

1   making a search warrant to come back and his response was,

2   "fuck."

3           THE COURT:  The kitchen is upstairs?

4           MR. ENSER:  Judge, I haven't been to the apartment

5   and I'm inferring that.  I only have a 302 of the arrest.  I

6   don't know.  I'm sure the defendant can speak to that.

7           THE COURT:  They're shaking their head.

8           MS. McCARTHY:  Downstairs.

9           MR. ENSER:  Okay.  It's down.  So it's two levels

10  but it's downstairs is what I'm told.  I don't think that

11  changes --

12          THE COURT:  Well, it changes they went upstairs to

13  hide something and came back down again.

14          MR. ENSER:  As opposed to maybe they went downstairs

15  and then came back up.  I'm not sure if they went up or down.

16  I haven't been to the apartment.  I have a 302 that I'm going

17  off of that describes seeing the two of them coming up or down

18  a staircase.  But the bottom line is the time -- they had

19  enough time to hide it.  His comment "fuck" suggests he was

20  concerned they would go back to search there.  And we know it

21  was in fact recovered in a drawer in the kitchen next to the

22  stove.

23          The other thing we know is that after the government

24  obtained a seizure warrant we know from counsel for Robert

25  Farkas, that's Sharma's codefendant, that while Sharma and

25

1  Farkas were detained together in Florida, Sharma told Farkas

2  "I altered the passcode.  The passcode that you had half of

3  and that was given to the Government that the Government got a

4  hold of, I altered it."  Tell the Government and the Court

5  that you altered it and that the reason you altered it was as

6  an additional security measure.  So I think, Judge, that's the

7  additional information that you may not have already known.

8  And it demonstrates I think quite clearly Sharma's lack of

9  regard for the law, his willingness to obstruct justice, his

10 willingness to lie to anyone to protect his assets and his

11 ability to flee.  We do not know, we don't know if we have

12 identified all of his assets.  We're only beginning to get

13 records from subpoenas.  We learn more every day.  And at

14 bottom, the notion that the Court is aware of the full

15 universe of his assets at bottom it comes down to whether or

16 not he has told the truth, but he's a convicted serial liar.

17 We've discussed before he has an incentive to flee.  His

18 guidelines are 210 to 262 months.  That's our preliminary

19 guidelines analysis before the obstruction.  With the

20 obstruction, that would raise it to 262 to 327 months.  The

21 case is -- it's not just strong, it's overwhelming.  And the

22 two complaints before Your Honor and in particular I think the

23 Trapani complaint which has text messages where Sharma is

24 overtly discussing the plot, the fraud charged, and other

25 aspects of the fraud in the case with his coconspirators is

26

1    devastating and overwhelming.  That gives him another
2    incentive to flee.  He has the means to flee.  And that's in
3    part because we know -- the Court is now aware of significant
4    assets he has.  And who knows if there are other assets we're
5    not aware of?
6              THE COURT:  Well, hold on a second.  Last time I had
7    counsel in I was told that over a period of, a limited period
8    of time a small number of months Mr. Sharma was regularly
9    withdrawing hundreds of thousands of dollars.  He didn't know
10   where the money was.  And talking about means to flee, there
11   was concern about what he was doing with that money.  And so I
12   said let's see if we can find out what that story was and
13   because I was concerned about the idea of means to flee.  And
14   so counsel did all this work and came in with this color coded
15   chart which shows -- I'm assuming this is what you were
16   talking about with the -- the Government was talking about
17   with hundreds of thousands of dollars that had been withdrawn
18   unless it's different hundreds of thousands of dollars from
19   different accounts.  So now we see where that money went.  And
20   I'm not sure what it means by going back into the company.
21   I'll come back to defense counsel on this, the Centra Tech
22   checking account and what that Centra Tech checking account is
23   used for, who has access to it, whether Mr. Sharma has the
24   ability to withdraw money from that for personal use.  And we
25   see going into this other account which apparently now seems

27

1   somewhat depleted.  Very depleted.  But when you talk about

2   means to flee, there is the $6 million that counsel is

3   proposing be put in the control of a trustee.  What is the

4   means to flee that you are particularly concerned about other

5   than we don't know what else there is?  What do you know about

6   that gives you concern about means to flee?

7           MR. ENSER:  I am in a -- I'm at a disadvantage

8   because I don't know the full universe of his assets.

9           THE COURT:  Right.  But when you say we knows he has

10  means to flee, why do we know that?  How do we know that?

11  What means to flee are there that I should be concerned about

12  right now?

13          MR. ENSER:  First you have, which is submitted with

14  our letter, Sharma wrote an email to the Gemini Exchange.  I'm

15  just trying to find which exhibit it is.

16          THE COURT:  I thought these exhibits were prior

17  charging instruments.  The very end maybe?  I see an email

18  that's Exhibit [inaudible].  Is that what you're talking

19  about?

20          MR. ENSER:  Yes.  Yes, Judge.  This is the email.

21  This is less than a year ago.  He gives an account of what he

22  says his assets are.  I already earn -- this is the last line

23  of his email dated October 16, 2017.  I already earn over 350K

24  a year from my W-2 employment and I have a large amount of

25  money still invested into cryto currencies, plural.  Now, my

28

1  understanding is the funds that I think defense counsel is

2  talking about putting in a trust, if I'm not mistaken -- let

3  me just confer with --

4           [Pause in proceedings.]

5           MR. ENSER:  The 9,000 ether that is now valued at

6  over six million, that's I think what defense counsel is

7  talking about setting up a trust to manage.

8           THE COURT:  Right.  That's my understanding.

9           MR. ENSER:  That's one type of crypto currency.

10  It's not crypto currencies plural.  It's ether.  There are

11  other types of crypto currencies.  So when he says I have a

12  large amount of money still invested into crypto currencies,

13  plural, I don't know what that means.  I don't know if there

14  are other types of crypto currencies that he has pockets of

15  out there.  And you have his statement that I earn over

16  350,000 a year.  It's inconsistent with what he told Pretrial.

17  Now, if he was telling the truth there, then he has not

18  disclosed to Pretrial income that would have generated assets

19  that could be somewhere that we don't know about.  And you

20  know, with his history of lying, we don't know.  But there is

21  certainly from this document cause for concern that there

22  would be other assets he would have access to.  So when I say,

23  Judge, that there could be other assets, that's what I'm

24  basing it on.

25           The other thing I think that would be relevant for

29

1  Your Honor is the circumstances of his arrest in the perjury

2  case because that's new information that Your Honor wasn't

3  previously aware of.  From information provided by the

4  District Attorney's office, my understanding that perjury

5  case, what happened in that case is in March of 2016 the

6  defendant was caught drunk driving.  He lied to the officer

7  about whether he was drunk.  He took the case to trial.  He

8  lied under oath at the trial.  And then he was indicted

9  towards the end of 2017, in September 2017.  The District

10 Attorney's office in Manhattan obtained an arrest warrant and

11 they a sheriff or law enforcement officer in Florida went to

12 arrest him.  He went to an address that he had for Sharma

13 where Sharma was living at the time with his girlfriend,

14 Brielle Farkas.  He approached Sharma and he said, "Are you

15 Sam Sharma?"  Sharma said no.  "Are you Sohrab Sharma?"  "Yes.

16 How did you find me?"  And then further discussion ensued and

17 he arrested him.  It's an example of him lying to evade

18 enforcement, of him trying to hide his identity to avoid

19 getting arrested.  I think those are the only additional facts

20 that I have to bring to Your Honor's attention.  I think Your

21 Honor is aware of the other circumstances.  Our opposition is

22 we're seeking detention.  We don't think any set of conditions

23 can be set here that are appropriate.

24            THE COURT:  By the way, the third, now the third

25 codefendant arrested on a different complaint, was bail set

30

1   for that person or was he detained?

2          MR. ENSER:  He was released on conditions requiring

3   I believe either home detention or home incarceration and

4   participation in an inpatient drug treatment program.  He's

5   currently, I understand from his attorney, in the inpatient

6   program in Florida.

7          THE COURT:  Okay.

8          MS. McCARTHY:  Your Honor, if I may just address

9   initially the passport issue.  I have in my hand the passport

10  issued December 13, 2017 to Sam Sharma.  He changed his name

11  legally in I believe October of 2017 from Sohrab to Sam.  He

12  has the passport and I have the passport card that joins with

13  this passport.  I also have a canceled passport from 2006,

14  expired in 2011 under the name of Sohrab Sharma.

15         One thing that I think is important to keep in mind

16  is that my client has been in custody since April 1st.  I

17  obtained these passports by talking to Brielle Farkas who

18  lives in his apartment and she sent me this passport.  And I

19  said to her can you please look and see if there are any other

20  canceled passports in the house because sometimes people keep

21  them.  And she found this one from 2006.  She told me she

22  couldn't find any other passports in the house.  I can

23  certainly have her search the house up and down again, but

24  Your Honor, I don't know what to tell you.  I mean this is the

25  most current passport.  I believe that under the conditions

31

1   that we would propose for Mr. Sharma's release that it would

2   be very, very difficult for him to do what sounds like a James

3   Bond move buying a plane ticket in cash and jumping onto the

4   plane and flying to Jordan and then to Iran.  I don't know

5   where that comes from.  I would propose that he be on home

6   detention and that he have an ankle monitor or bracelet of

7   some kind so that Probation or Pretrial always knows where he

8   is.  It would be really hard for him to get to the airport and

9   get on a plane in those circumstances and particularly since

10   the most current passport will be in Pretrial Services'

11   possession.

12          So Your Honor, I don't think we have to, when

13   setting bail or considering bail and whether bail can be set

14   to think of every wild possibility out there in the universe.

15   People can flee.  It's absolutely sure.  And I don't know that

16   there's any 100 percent guarantee that someone won't flee

17   short of incarceration, but that is not what the Bail Reform

18   Act requires.

19          THE COURT:  Is Centra Tech, that was the company he

20   was working for?

21          MS. McCARTHY:  That was his company, yes, Your

22   Honor.

23          THE COURT:  Is it still in business?

24          MS. McCARTHY:  I think we reported that the list

25   time we were here

32

1          THE COURT:  I don't remember.

2          MS. McCARTHY:  -- since his -- I know.  Since his

3     arrest on April 1st essentially the company has had to wind

4     down.  All of their electronics has been delivered to the

5     Government.  There was a subpoena issued and rather than have

6     counsel go through the expense of issuing and reviewing all

7     the documents potentially responsive to the subpoena, Mr.

8     Sharma instructed general counsel and Ballard Spahr to simply

9     turn over to the Government all of their equipment.  They have

10    nothing left.  They had to leave the place where they were

11    renting space.  They have -- I've spoken to Mr. Enser about

12    this, they have paid for a certain period of time to maintain

13    data in the cloud.  I asked the Government to please look into

14    that because we are not in a position to keep up that payment.

15         THE COURT:  Do you have any idea where this 350 a

16    year, 350K a year comes from?

17         MS. McCARTHY:  Your Honor, I can tell you that

18    before he was arrested, convicted in a DUI, he had been an

19    officer of Centra Tech and had been a salaried employee of

20    Centra Tech.  Centra Tech's records aren't so great and so I

21    don't really -- I don't have any of the key documents.  I have

22    a single one from December of 2017 showing a $1,000 payment to

23    him but that was after he had been taken out as an officer of

24    the company.  But prior to that, he was an officer of the

25    company who was a salaried employee.  But I cannot answer

33

1  exactly what his salary was.  I

2          THE COURT:  This is a significant discrepancy

3  between what the Pretrial Services report indicates was a

4  salary and what this email indicates was his salary.

5          MS. McCARTHY:  Sure, Your Honor.  Well, at the time

6  of the email he was still an officer of the company I believe.

7  And Your Honor, I did have an opportunity to speak with the

8  attorney.  Let me just find -- I spoke with the attorney for a

9  woman by the name of Lorraine Martinez who starting in January

10 2018 was responsible for payroll at Centra Tech.  She told me

11 that -- and this can only be for 2018.  She recalls that Mr.

12 Sharma received a salary of about $1,200 biweekly.  So every

13 two weeks he would receive a $1,200 payment.  And after taxes

14 the net check would be a little over 650.  And then Mr. Sharma

15 asked her to keep those checks in his employee file and he

16 would periodically take a check and deposit it.  And so that

17 is what she said he was receiving in salary in 2018.

18         THE COURT:  650?  Say that again?

19         MS. McCARTHY:  1,200 biweekly.

20         THE COURT:  Biweekly meaning every other week?

21         MS. McCARTHY:  Yeah.

22         THE COURT:  Or twice a week?

23         MS. McCARTHY:  No, biweekly.  Every other week.  So

24 twice a month he would get $1,200.

25         THE COURT:  So roughly $2,500 a month?

34

1          MS. McCARTHY:   Mm hm [positive inflection].   2,400 a
2   month.
3          THE COURT:   So roughly 30,000 or something like
4   that?
5          MS. McCARTHY:   I believe so.
6          THE COURT:   So any idea where this 350,000 a year?
7   I asked that before that seems very inconsistent.
8          MS. McCARTHY:   So yes, Your Honor, what I'm trying
9   to explain, I'm so sorry I'm not being clear, but he had an
10   arrest, there was a perjury arrest I believe was a thing that
11   got him kicked out as the officer of the company.
12          THE COURT:   Right.   But even the Pretrial report
13   says he indicated he initially earned $100,000 last year but
14   later that year his salary was modified.   So the 350 then
15   would be -- this is prior thereto.   He work someplace else for
16   a period of two years.   In other words, Pretrial Services goes
17   through a history --
18          MS. McCARTHY:   He's had other companies.
19          THE COURT:   -- of payment and there's nothing in
20   there that looks like 350 in income.
21          MS. McCARTHY:   Yeah.   I don't have any ability right
22   now to tell the Court exactly what he received from Centra
23   Tech.   I was sitting in that little room with him too.   It was
24   right after we had first started talking and the Pretrial
25   Services officer was kind enough to come in and conduct his

35

1  interview right there.  I don't think that there's -- I can't

2  explain the discrepancy, Your Honor, but I can tell you that I

3  have been able to determine from the HR person what he was

4  making in 2018 which I think was another issue I was -- during

5  the last hearing the Government said that that seemed not

6  credible.  So Judge, I'm trying sort of step by step to

7  address these issues as they arise.  It's a bit like --

8           THE COURT:  All right.  There were other things you

9  wanted to say before I interrupted you?

10           MS. McCARTHY:  Yes.  Your Honor, the whole scenario

11  of the arrest with Mr. Sharma and his girlfriend, you know,

12  being concerned about people knocking on their door, I don't

13  think that's a crazy thing for people to be concerned about,

14  people knocking on their door.  Certainly Mr. Sharma would be

15  concerned on the phone after he is arrested that there may be

16  a search warrant because as we now know and as he informed me

17  to inform the Government he had in fact hidden the pass code

18  under a kitchen drawer in that apartment.  So it's perfectly

19  reasonable that in a call after his arrest he would be worried

20  about a search.  So I'm not sure what the Court is supposed to

21  assume from that.

22           The other thing, Your Honor, again going back to

23  this email to Gemini where he says I have a large amount of

24  money still invested in crypto currencies, he had an ether

25  account which we know about the 9,000.  That's different from

36

1    what's held in Gemini.  That's held on the ethereum platform.

2    It's not Gemini.  And he had bitcoin in the Gemini account.

3    So those are two different kinds of crypto currencies.  So

4    Judge, I don't know that -- the Government is sort of -- seems

5    to be suggesting that we need to have certainty about every

6    aspect of Mr. Sharma's life.  And I don't know that that is a

7    requirement.  I don't believe it's a requirement.  I ask the

8    Court to consider the things that we've been able to come up

9    with to secure the $6 million worth of ether.  The fact that

10   we've been able to determine where the Gemini bitcoin

11   withdrawals went and that we set up conditions that I believe

12   would secure his appearance in court.  His father, who's a

13   doctor in Binghamton, is willing to be a cosigner.  His

14   stepfather who lives in Port Washington and is a manager of

15   Starbucks in Manhattan and a number of Starbucks in a

16   territory are both willing to cosign a bond for him.  I

17   believe that conditions can be set and we ask that the Court

18   do so.

19          THE COURT:  Let me ask one last thing on this.  The

20   Government said in its letter at the time it was written which

21   might have been before certain information came out, I'm not

22   sure of the timing, said if the Court is not inclined to

23   detain Sharma, a specific set of conditions should be met

24   prior to release, before release.  Those consistence are

25   consistent with the conditions imposed by Judge Wang with

37

1    respect to Mr. Sharma's codefendant, Mr. Farkas.  And that
2    included a $5 million bond secured by $1 million in cash or
3    property.  I don't know what Mr. Farkas' personal financial
4    circumstances were, what income or actually what assets he
5    reported or the Government believes he had or his counsel
6    discussed.  I wasn't there for that.  If I were to try to set
7    conditions that are reasonably consistent with that but
8    tailored to this particular defendant, would that bond amount
9    under the circumstances make sense?  Or is there concern that
10   there is $6 million in an account which belongs to defendant
11   which could easily be used to satisfy a $5 million bond
12   leaving $1 million left over?
13           MS. McCARTHY:  Your Honor, can I just address I?  I
14   mean it is valued at $6 million but essentially the way that
15   it works with bitcoin or with ether --
16           THE COURT:  I need educating on this, yes.
17           MS. McCARTHY:  Yeah.  There's a basis in it.  So if
18   he bought ether at 75 and now it's selling at 550, you know,
19   he's got earnings on that.  And so there has to be a tax paid
20   on the earnings.  And he was in jail during tax time so he
21   didn't get to file an extension for 2017.  There's significant
22   tax owed for 2017 for those transactions.  So if the Court
23   could consider it as one would normally do if one gets a bonus
24   and tax hasn't been withdrawn as you consider that you have
25   half of it

38

1        THE COURT:  Well, my assumption in asking the

2   question is someone who isn't caring a whole lot about

3   consequences and is fleeing.  So if he were to flee and the

4   money in this account were taken out, no taxes were paid on

5   it, and the money was taken to pay the bond and the Government

6   came after the now gone Mr. Sharma to pay his owed taxes, he

7   might say well too bad, I'm not around.

8        MS. McCARTHY:  Well, one of the things he needs to

9   do, Your Honor, is he needs to pay counsel.  And so I would

10  ask that the Court not encumber $6 million worth of --

11       THE COURT:  Again, this whole assumption is if he's

12  gone somewhere and not defending this case anymore because

13  he's gone.

14       MS. McCARTHY:  Right.  But you can't spend security.

15  You can spend the security on a bond.  If you use $6 million

16  worth of ether as security, I believe is what the Court was

17  saying --

18       THE COURT:  No, no, no.  I wasn't --

19       MS. McCARTHY:  Or were you saying $6 million bond.

20       THE COURT:  No, no, no.  If I set a $5 million bond

21  which was done in Mr. Farkas' case and Mr. Sharma decided to

22  flee, there's $6 million that he's left behind.  So if someone

23  said to a cosigner you owe money on this and he's given them

24  power to access that account, there's $6 million in this

25  account that could arguably be used at the time to pay off the

39

1  bond.  He's gone and he's not incurring -- I'm just trying to

2  understand in terms of a bond amount.  I'm not looking for

3  cash security.  I'm just trying to figure out what's

4  reasonable for a bond amount that would, if I set conditions,

5  that would give people concern, would give Mr. Sharma concern

6  that if he fled there'd be real consequences to that.

7        MS. McCARTHY:  So Your Honor, as I've indicated, we

8  are setting up the trust for that account.  And so paying of

9  cosigners would not be part of the trust document.  So I don't

10  believe that that will be a valid concern.  The Court will

11  have an opportunity to review the trust document and see what

12  the expenses are that the trustee is permitted to authorize

13  from the trust.  And again, there will be a trust

14  administrator ensuring that everything is done properly.

15        THE COURT:  Let me ask again just for reasonable

16  fairness as between defendants.  If I were to go this route,

17  what was the Government's understanding about assets and

18  income of Mr. Farkas in setting a $5 million bond and $1

19  million security?  What situation do we have there?

20        MR. ENSER:  Judge, I didn't handle the Farkas bond

21  hearing.  It was my colleague.  I don't know the particulars.

22  What I do know is that Farkas has much more meager financial

23  means than Sharma.  Sharma is the sole owner of Centra Tech.

24  My understanding is Farkas was not an owner.  We are not aware

25  of him having a significant crypto currency asset base the way

40

1   Sharma does.  And Farkas also has I believe no criminal

2   history.  He had never been arrested before.  So I think it's

3   fair to say that they are not similarly situated in terms of

4   the stringency required or both from a financial resources

5   perspective, criminal history perspective.  He's much -- I

6   think Farkas is not as much of a flight risk as Sharma.

7            THE COURT:  I understand.

8            MR. ENSER:  In other words, we object to any bond.

9   We think only detention is appropriate.  But to the extent the

10  Court is going to set a bond, we think it should be higher

11  than the amount set for Farkas.

12           THE COURT:  Okay.  Because the letter that I got

13  said it should be consistent -- well, I don't know.  It says -

14  -

15           MR. ENSER:  It says we seek detention but in the

16  alternative --

17           THE COURT:  These conditions -- it said if the Court

18  is not inclined to detain Sharma, the specific set of

19  conditions should be met before any release.  Those conditions

20  are consistent with those imposed by Judge Wang and are as

21  follows.  So it seems to me that what you're proposing here,

22  this was the fallback plan if I were not to order detention.

23  And it looks like it's the same amounts.

24           MR. ENSER:  It was the fallback plan.  That was

25  before we learned that he had obstructed justice with the

41

1   passcode.

2            THE COURT:  No, it isn't.

3            MR. ENSER:  It is, Judge.  This letter was filed

4   before we had gotten into the --

5            THE COURT:  How could that be?  You already had the

6   passcode that was not working and knew that there was

7   something wrong with it and --

8            MR. ENSER:  No, Judge.  This letter was --

9            THE COURT:  Wait a minute.  This --

10           MR. ENSER:  This letter was filed on May 1 --

11           THE COURT:  Right.  But --

12           MR. ENSER:  -- before counsel told us that the real

13   passcode was in his apartment, in his girlfriend's apartment.

14           THE COURT:  Yes, but you already knew at that time

15   that you couldn't get into the digital wallet and were making

16   that a condition of Mr. Farkas' bond that the funds come out

17   of that wallet.  So you already knew he didn't have the right

18   passcode and that something was amiss.  It's true you didn't

19   know that the, I gather, that the actual passcode was taped

20   underneath Mr. Sharma's draw and that he presumably was

21   knowingly keeping that from you.  But you also did know that

22   you didn't have it yet and that he had said here it is and it

23   wasn't something that was actually working.  So you knew

24   something was afoot with respect to that.  But even so, you

25   knew that there was a prior perjury conviction, you knew you

42

1  were telling me up and down about obstruction.  So I have to

2  go back and look here.  This letter says it appears to have

3  been altered.  This very letter says Sharma failed to provide

4  the correct passcode and indeed appears to have altered it in

5  order to prevent law enforcement from preserving the assets in

6  the digital wallet.  That's what you were thinking at the time

7  you said $5 million.  So you already ready to accuse him.  You

8  already told me about the perjury or you told me about

9  fraudulent loan applications, various sort of things.  So all

10  right, I get that.  I also understand that there were some

11  things said in the public hearing with respect to Mr. Farkas

12  that were individual specific and went towards flight risk.

13         All right.  Here's what I'm thinking.  I am

14  concerned about Mr. Sharma's seeming history of dishonesty to

15  the Government, to his own counsel perhaps and to the

16  Government.  I'm concerned about that.  He's got a perjury

17  conviction so that's not hypothetical.  The Government's

18  proffers with respect to obstruction seem well founded at this

19  stage.  I don't know if there's another passport or there

20  isn't another passport.  But I'm thinking of setting

21  conditions that are similar to those set for Mr. Farkas but

22  perhaps more stringent in certain respects.

23         First of all, if I were to set conditions, would Mr.

24  Sharma be living in the same place he has been living?  Would

25  that be the concept?

43

1        MS. McCARTHY:  He would like to live in Florida and
2   in the apartment that he was arrested in, Your Honor.
3        THE COURT:  And what is the story with his
4   girlfriend?  She is currently a person under investigation as
5   well in the same case?
6        MR. ENSER:  She's a subject.
7        MS. McCARTHY:  Your Honor, if that were not
8   acceptable to the Court, obviously that's his first choice
9   because that's where he's made his home and all of his
10  belongings are there.  But his mother is here in court.  She
11  and her husband, his stepfather, have a home in Port
12  Washington.  They're both employed.  And he could live there.
13  Now, she's also been given a subpoena and she also has --
14       THE COURT:  She --
15       MS. McCARTHY:  She was served a subpoena --
16       THE COURT:  Who's she?
17       MS. McCARTHY:  The mother.
18       THE COURT:  Okay.
19       MS. McCARTHY:  The last time we were here.  So I
20  don't know what the Government's position would be with that.
21  The third option is his father who's a doctor in Binghamton
22  who he could live with in Binghamton.  If the Court were not
23  satisfied with him living in Binghamton, his father is willing
24  to actually rent an apartment in Manhattan and allow him to
25  live here and he would travel to Binghamton to work.  So there

44

1   are three options, Judge, for places that people are happy to

2   have Mr. Sharma live there.

3           THE COURT:  He, the father, which traveled to

4   Binghamton to work?

5           MS. McCARTHY:  Yeah.  He would do that for his son.

6           THE COURT:  How many people do you think you have

7   who would be financially responsible cosigners on a high bond?

8           MS. McCARTHY:  Well, the only two I can offer

9   because the other two are under subpoena are the father, who's

10  the doctor in the ER in Binghamton, and the stepfather who's

11  already been interviewed by Mr. Enser as a cosigner.

12          THE COURT:  If it weren't for the subpoena, you

13  would include his mother --

14          MS. McCARTHY:  Yes.

15          THE COURT:  -- as financially responsible?

16          MS. McCARTHY:  Yes.

17          THE COURT:  What's the story with the defendant's

18  mother?  She could not be a cosigner is the Government's view?

19          MR. ENSER:  We have reason to believe from the

20  multi-year investigation that the eastern district has been

21  doing with the Department of Homeland Security that Sharma

22  previously applied for and received fraudulent loans and he

23  used his mother's name in several of the documents.  We don't

24  know if she was involved in it or not.  Similarly, the priest

25  fraud that was briefed in our May 1 letter, Sharma's mother

45

1   was renting an apartment from the priest and it was through

2   that that Sharma got access to documents from which he stole

3   the priest's identity.  We don't know if his mother was a

4   knowing participant.  We just don't know.  So we've subpoenaed

5   her because we think she has information about this

6   investigation both with respect to those topics and other

7   topics.  But that's what I can tell the Court.

8           THE COURT:  Would the Government reject her at this

9   time as a cosigner?

10          MR. ENSER:  I don't know what her asset situation

11  is.

12          THE COURT:  No I mean because of your suspicions in

13  the investigation.  Not because of assets.

14          MR. ENSER:  I think, Judge, it's likely because --

15  it is likely that we would reject her.  If you want to know

16  why, I can explain it.  But the bottom line is we would like

17  to reject her.

18          THE COURT:  Tell me what there is terms of real

19  property or cash that could be used to secure a bond.

20          MS. McCARTHY:  There's no real property.  Neither

21  set of parents owns the property and Mr. Sharma doesn't own

22  property.  So I believe -- I don't think I have the notes of

23  the cosigner interview with Mr. Sharma's stepfather, but I

24  believe they have $500,000 in cash in the account.  He has a

25  401(k).  He has certain other savings.  So probably between

46

1    him and his real father they could perhaps come up with a

2    million.  I'm not quite sure if we can quite get there.  Maybe

3    700,000 actually.

4            THE COURT:  Yes.

5            MS. McCARTHY:  These are not wealthy people.  They

6    are hard-working people.  They don't have a lot to their

7    names.  They do have moral suasion over Mr. Sharma.  He's an

8    only child.  He has no siblings to go to for assistance here.

9    He has elderly grandparents.  His mother's parents live in

10   Port Washington.  I have no idea, Your Honor, whether they

11   would be able to cosign a bond.  I doubt that they have

12   anything to offer other than moral suasion.  So Your Honor, we

13   submit that if we can secure the $6 million worth of ether,

14   set a reasonably high bond that would essentially bankrupt his

15   parents, that Mr. Sharma would not flee, that it should secure

16   the Court that he will return.

17           THE COURT:  Mr. Sharma, in my view you are

18   benefitting right now from having an attorney who has managed

19   to talk you into doing certain things.  Those things like

20   providing the actual code for the digital wallet and allowing

21   the Government to secure those funds is helping you, in my

22   view, far more than you would have been helped had you

23   continued to hide that.  So your conduct previously is exactly

24   the opposite of what you might have thought was helping you.

25   It was really hurting you.  And only with this turnaround that

47

1   I'm seeing through this attorney sitting next to you am I

2   being at all swayed to be leaning here with respect to

3   detaining you or setting conditions.  So I really want you to

4   have that sink in because the history that the Government has

5   presented of obstructing the investigation, of lying, of all

6   these things, another whiff of that in the future and I

7   guarantee you whoever is sitting up here, whether it's me or

8   somebody else, is going to say all right, well we tried but

9   this person is really not to be trusted on release.  All

10  right?  You hear what I'm saying?

11              THE DEFENDANT:  Yes, Your Honor.

12              THE COURT:  Family members hear what I'm saying as

13  well?  Whoever's here in the courtroom?  I'm seeing some

14  nodding.  Okay.

15              Under the circumstances I'm going to set conditions

16  that are similar to what was set for Mr. Farkas but a little

17  lighter in certain cases and more stringent in other cases to

18  balance what I'm hearing about this particular defendant.  I'm

19  hearing two co -- I'm going to set a $5 million bond as in the

20  other case, the other defendant, with two cosigners because I

21  don't want to set conditions that are not possible to be met.

22  Secured by -- and if you tell me it cannot be done, if you go

23  and investigate, you'll let the Court know that you've done a

24  thorough investigation and it can't be done.  I would like to

25  set 1 million in security for the bond.  I don't know if

48

1    that's possible for you to raise but I'm going to set that

2    cash or property.   I'm going to require that defendant's

3    assets in the digital wallet, you'll know what I mean by that?

4    That were in the digital wallet containing the Centra Tech

5    funds --

6              MS. McCARTHY:   Containing his personal funds at this

7    point, Judge.

8              THE COURT:   Containing -- so the digital wallet had

9    Centra Tech funds and personal funds?   Or it has Centra Tech

10   funds, some of which he said he had personal right to?

11             MS. McCARTHY:   So there was 100 --

12             THE COURT:   Was it in the name of Centra Tech?

13             MS. McCARTHY:   It was 100,000 that was held in a

14   virtual wallet that --

15             THE COURT:   Did it indicate whose name it was in?

16             MS. McCARTHY:   I think there were designations that

17   the company did but --

18             THE COURT:   I'm saying containing defendant's funds.

19             MS. McCARTHY:   This 9,000 ether.

20             THE COURT:   Funds, (9,000)  E-T-H-E-R?

21             MS. McCARTHY:   Yes.

22             THE COURT:   I'm going to say which the Court

23   understands to be currently valued at approximately $6 million

24   just so everybody knows what money we are talking about, to be

25   placed in trust with a trust agreement to be reviewed by the

49

1  Government.  I'm assuming the Government will review it fairly

2  and will only bring concerns to the Court's attention if you

3  actually have legitimate concerns about it.  I don't want to

4  have to be bothered reviewing a trust agreement if the

5  Government can review it and say it seems to do what the Court

6  has in mind.  And what that is is to have somebody else

7  managing these funds.  To review by the Government and found

8  acceptable.  Prohibition against use or access to computers,

9  smart phones, or internet.  There may be some law on that to

10  the extent -- this goes back a ways.  I recall something about

11  emergencies or whatever, you have to be able to have a phone.

12  Counsel, I'll ask both of you if there's some reason why that

13  as a complete prohibition is problematic under the law, I

14  expect you'll bring it to my attention.

15      MR. ENSER:  That's fine, Judge.  We don't have an

16  objection to him having a flip phone, like a dumb phone that

17  he could use to call the police.

18      THE COURT:  Well sure, or a landline phone.  Right.

19      MS. McCARTHY:  Your Honor, just the one thing I'd

20  like to explore just to put it out there is my client will

21  likely want to try to do some legal research.  And I will talk

22  to Pretrial and see if there's a way that fact can be done.

23  Sometimes I believe that there's a way to have sort of a

24  monitoring of one's computer access.  And so you know, if we

25  can come up with a proposal

50

1              THE COURT:  You can come up with a proposal to

2    modify this.  And if this is too stringent, if the Circuit has

3    said no it's not proper to set a condition with barring all

4    internet use or something, come back to me.  I don't want to

5    run afoul of law on that.  But I do notice that that was a

6    condition set for Mr. Farkas.  So if there is a prohibition,

7    raise it in Mr. Farkas' case as well.  Is there a firearm or a

8    license?

9              MS. McCARTHY:  I'm being given his license.  I will

10   turn this over to Pretrial Services along with the passport.

11   The original license was just delivered to me.  And the

12   firearm was seized at the time of his arrest on April 1st by

13   the FBI.

14             THE COURT:  Okay.  Pretrial has a recommendation of

15   both drug and alcohol testing and treatment as deemed

16   appropriate by Pretrial Services.  I'm going to accept that

17   based on what is in the report.  Refrain from use of alcohol.

18   I'm going to say no contact with codefendants except in

19   presence of counsel.  Pretrial is recommending codefendants,

20   victims, witnesses.  I don't know if the victims' names are

21   known.  Certainly he shouldn't have contact with individuals

22   who are investors.  So I'm going to indicate also no contact

23   with is it Centra Tech investors?

24             MS. McCARTHY:  Yes, Your Honor.

25             THE COURT:  With respect to witnesses, that causes a

51

1   little bit of a problem because of the girlfriend.  The

2   Government's position is the girlfriend is a witness.  That's

3   a tall order that he have no contact with your significant

4   other if that's who this person is.  And if that is his

5   current place of abode, that's also an issue.

6          MR. ENSER:  We can live with him talking to his

7   girlfriend.

8          THE COURT:  All right.  In that case I'm not going

9   to require him to live elsewhere.  Passport surrender.  If

10  there is another passport somewhere, take to heart what I

11  said.  Find it, give it to your lawyer pronto, or tell her how

12  to go about finding it immediately.  Okay?  If some other

13  passport is found later, once again, you dig yourself a grave.

14  I'm going to run out of space to write.  Do you have another

15  dispo sheet by any chance?  You're going to have to Janice or

16  somebody to read this.  Can't apply for another passport

17  either at this time.  You already have this nice chart but I'm

18  going to accept the same language that was used for Mr. Farkas

19  with regard to disclosure of assets.  Defendant to disclose

20  all assets to Pretrial Services and the US Attorney's Office

21  including any assets of which he has possession, custody, or

22  control including joint or business accounts and including

23  cash, crypto currency, or digital currency, or anything else

24  like that for which I don't know the right terminology.

25          Now, electronic monitoring or location monitoring,

52

1  I'm wondering about home detention as opposed to home

2  incarceration.  The recommendation of Pretrial has neither but

3  I'm inclined to have monitoring with GPS monitoring in

4  particular because GPS, if you go somewhere it tells people

5  exactly where you are.  But home detention is usually to allow

6  somebody to be out working and I'm not sure what the story is

7  with defendant's employment situation.  I mean I'm sure it's

8  nice to be working but if he's not currently working is there

9  a reason to be somewhere outside the home?

10         MS. McCARTHY:  Your Honor, at this point there is

11  not.  Certainly if that should change and he can find a W-2

12  employment which I would suggest that that would be

13  appropriate as supposed to trying to start another business

14  right now, then we would certainly revisit that.  But I think

15  at this point he does not have a job to go to.

16         THE COURT:  So for Pretrial, if I say home detention

17  and he doesn't have a job, does that essentially translate to

18  home incarceration for that time period?

19         FEMALE SPEAKER:  Yes, Your Honor.  I think it just

20  basically does not allow outside --

21         THE COURT:  Unless it is for a job that is approved

22  by Pretrial Services.

23         FEMALE SPEAKER:  Right.  And he has to show proof of

24  where he's going to work.  And then we block out the time that

25  he's allowed to be outside.

53

1    THE COURT:  And where it is and all that.  And you

2  make sure it's suitable and appropriate.

3    FEMALE SPEAKER:  So if he doesn't have employment,

4  he just stays at home.

5    THE COURT:  Okay.  So I'm indicating home detention.

6  What that means is for the time being if you're not working

7  your home.  Now whether you find another job, maybe Pretrial

8  can assist in it, but it's got to be something very definite,

9  something that they approve, not something with Internet use.

10  And that's very difficult because if you have some kind of

11  desk job, you go somewhere and there's a computer on your

12  desk, then these conditions that I'm setting are problematic.

13  So it may be a difficult thing but again, the Court is always

14  here.  So if someone wants to come back and propose a

15  modification in light of changed circumstances, you can

16  propose something.

17    Defendant to be detained until all conditions are

18  met including the setting up of this trust account as reviewed

19  by the Government.  I think I'm all out of conditions to set.

20    MS. McCARTHY:  And Your Honor, just for the home

21  detention, just so it's clear, can we also have it that he can

22  travel to the Southern District of New York to meet with

23  counsel and attend court appearances?

24    THE COURT:  Southern District of New York, Eastern

25  District of New York, Southern District of Florida.  Travel

54

1   only for -- I'm going to say travel -- right.  Travel only for

2   court appearances, meetings with counsel, and any approved

3   work.  I'm saying any work approved by Pretrial.

4            MS. McCARTHY:  And obviously, Judge, if he has to go

5   to the doctor.

6            THE COURT:  Well, it goes along --

7            MS. McCARTHY:  That's all --

8            THE COURT:  Actually, you know what?  I'm going to

9   leave out any work approved by Pretrial.  That's going to go

10  along with home detention.  They'll talk about that.  Yes.  I

11  mean Pretrial Services will explain what home detention means.

12  There are certain things that if you have a doctor's

13  appointment and you tell them about it, but you've got to keep

14  them informed.

15           MS. McCARTHY:  Yes.

16           THE COURT:  I mean even to meet with counsel, you

17  can't just go and say oh yeah, I went to meet with counsel.

18  You have to tell Pretrial.  It has to be a set day, they have

19  to know where you are because otherwise you have this GPS and

20  they're going to say where is he, he's out somewhere, and you

21  violate a condition.  Here's the thing about all this.  If you

22  meet these conditions and then you're out and then you violate

23  any of these conditions that I'm setting, you don't appear in

24  court when you're supposed to, that's the big one, right?  But

25  you don't listen to Pretrial and you don't report as you're

55

1   supposed to, you don't stay at home when you're supposed to,

2   you're not complying with home detention, whatever it is, you

3   can be separately charged with violating the conditions of

4   your release.  If you don't appear, that's bail jumping.

5   That's a separate crime.  That has its own penalties.  And you

6   can face that even if this whole case were to go away.  You'd

7   still be left with that one.  Plus, you don't appear in court,

8   you and your cosigners end up responsible for $5 million.

9   Okay?

10       I'm just going to go over all this in summary.  I

11  may have to write it over again because it's written in all

12  different places here.  Defendant to be released upon

13  satisfaction of all of these conditions.  Your signature and

14  that of two cosigners, two financially responsible people and

15  a $5 million bond, personal recognizance bond.  It also has to

16  be secured by $1 million in cash or property.  As I told

17  counsel, I'm sure you heard, the thing about the law that I'm

18  supposed to follow is I can't set conditions that are

19  impossible to meet because setting conditions that are

20  impossible to meet is the same thing as detaining somebody.

21  But I'm not satisfied at this point that that's not possible.

22  And so counsel will look into it and we'll find out.  Good

23  serious effort is required before I determine it's not

24  possible.  Travel restricted to the Southern and Eastern

25  Districts of New York and Southern District of Florida.

56

1   Southern and Eastern Districts of New York for purposes of

2   traveling here to get to court if need be or to meet with

3   counsel if need be.  Southern District of Florida is where I

4   understand you live and you'll stay at home unless and until

5   there's some reason why you're not at home as approved by

6   Pretrial.  It's called home detention beyond GPS monitoring.

7   You're to surrender any and all travel documentation that you

8   have, passports, anything resembling a passport, anything on

9   which you could travel.  Drug and alcohol testing and

10  treatment if deemed appropriate by Pretrial Services.  No

11  firearm, destructive device, or other weapons.  Surrender the

12  firearms license.  The assets in the digital wallet containing

13  your own funds are to be placed in trust with the trust

14  agreement that gets reviewed by the Government and found

15  acceptable by the Government.  No use of computers, smart

16  phones or internet.  No use of alcohol.  No contact with

17  codefendants except in the presence of counsel.  No contact

18  period with Centra Tech investors.  Counsel is to disclose --

19  I'm sorry, defendant is to disclose, so that's you, all of

20  your assets to Pretrial Services and the US Attorney's Office

21  including anything you've got jointly with somebody, anything

22  you control, even if it's not in your name and regardless of

23  what kind of currency might be in the account, cash, cryto

24  currency, digital currency, any form of something of value.

25  All right?  Okay.  Thank you to everybody's who here.  Do you

57

1  want me to hand back down some of the stuff here?  I'm going

2  to give you things I should hand back down to people.  There

3  are various sort of things.  I've got Mr. Miller's file, I've

4  got the Pretrial report, and I have the submission from the

5  Government.  Anything else before I go off the record?

6          MS. McCARTHY:  No.  Thank you, Your Honor.

7          THE COURT:  All right.

8          MR. ENSER:  Thank you, Your Honor.

9                 *  *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

58

1        I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5                                      _Mary Greco_
                            _____

6                                      Mary Greco

7   Dated:  May 16, 2018

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25