

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

June 5, 2019

**BY ECF AND EMAIL**
The Honorable Lorna G. Schofield
United States District Court
Southern District of New York
40 Foley Square
New York, New York 10007

     Re:    *United States* v. *Sohrab Sharma et al.,* **18 Cr. 340 (LGS)**

Dear Judge Schofield:

     The Government respectfully opposes defendant Sohrab Sharma's untimely motion (Dkt. 125) to suppress specified statements that he made to law enforcement agents with the Federal Bureau of Investigation ("FBI") who arrested him on April 1, 2018 at the apartment where he and his girlfriend resided, and certain physical evidence that was seized from the apartment as a result of those statements. In his belated motion, Sharma claims that his statements to the arresting FBI agents about the presence and location of a firearm (which he illegally possessed despite a prior felony conviction for perjury) in the apartment should be suppressed because he made the statements after being handcuffed by the agents but before being warned of his rights under *Miranda* v. *Arizona*, 384 U.S. 436 (1966). (Dkt. 125 at 1.) Sharma further claims that because these unwarned statements led to the seizure of his firearm, laptop and second iPhone, those pieces of physical evidence "should be suppressed as 'fruits of the poisonous tree'" under "*Wong Sun* v. *United States,* 371 U.S. 471 (1963)" (Dkt. 121 at 4). These claims, like those set forth in Sharma's prior motion (Dkt. 116) to suppress evidence, are unsupported by anything other than conclusory allegations of Sharma's counsel, lack any merit, and should be rejected without a hearing. In particular, as noted below, Sharma's "fruit of the poisonous tree" argument is foreclosed by controlling Supreme Court precedent that Sharma's counsel failed to cite in his untimely motion.[1]

     As an initial matter, in deciding Sharma's untimely motion, the Court should rely only on the facts set forth in the Government's submission filed May 20, 2019 (Dkt. 121 (the "May 20 submission")) in opposition to Sharma's prior motion to suppress evidence, and should disregard the unsworn and conclusory allegations made by Sharma's counsel that are not supported by any

---

[1] Furthermore, to the extent that Sharma's new arguments in his reply submission (Dkt. 126) in support of his prior suppression motion (Dkt. 116) are based upon the meritless *Miranda* claims advanced in his present suppression motion (Dkt. 125), those reply arguments also fail for the reasons set forth below.

Honorable Lorna G. Schofield
June 5, 2019
Page 2 of 8

witness affidavits or other competent proof. (*See* Dkt. 121 at 59-61 (collecting cases holding that a defendant cannot obtain an evidentiary hearing or the suppression of evidence on a motion to suppress that is supported by only by conclusory assertions of counsel).) In the Government's May 20 submission, the Government provided a detailed recitation of the facts of the FBI's seizure of Sharma's laptop computer, two iPhones and firearm in the course of arresting him pursuant to a valid arrest warrant at the apartment where he and his girlfriend resided, and of the FBI's subsequent search of the laptop and iPhones after obtaining a search warrant allowing the FBI to do so. The Government's May 20 submission based that factual recitation on a contemporaneous report prepared by the arresting agents shortly after the arrest that was attached as an exhibit to that submission (Ex. E to Dkt. 121) and on the summary of the report that was set forth in the subsequent FBI agent affidavit in support of that search warrant (Ex. F to Dkt. 121).

Based on the facts set forth in the Government's May 20 submission, the Government has shown that:

> (a) prior to Sharma's arrest, the FBI case agents in charge of the investigation of this case had gathered overwhelming evidence that was more than sufficient to furnish probable cause to believe that Sharma had committed the securities and wire fraud offenses charged in this case through the use of electronic devices such as the laptop and iPhones later seized in connection with his arrest, and that any such devices belonging to him were highly likely to contain incriminating evidence of the charge fraud offenses;

> (b) the FBI agents who arrested Sharma on April 1, 2018 were lawfully at Sharma's apartment to execute a valid warrant for his arrest on securities and wire fraud charges that had been approved by a federal magistrate judge;

> (c) the arresting agents properly seized the iPhone that Sharma was holding in his hand when agents arrested him at the entrance of his apartment incident to his arrest, because they had probable cause to believe that it contained incriminating evidence of Sharma's participation in the charged fraud offenses and should be seized to ensure that it was not concealed or destroyed and to enable law enforcement to subsequently obtain a warrant to search it;

> (d) Sharma and his girlfriend both, through their expressed desire to be cooperative with the arresting agents and other statements and cooperative conduct, voluntarily consented to allow the agents to search a bedroom in their apartment to locate and seize a firearm belonging to Sharma that he was prohibited from possessing by virtue of his prior felony conviction for perjury;

> (e) the arresting agents properly seized Sharma's second iPhone and laptop after seeing them in plain view in the bedroom (because they had probable cause to believe they contained incriminating evidence and to ensure that they were preserved until law enforcement could obtain a warrant to search them) while the agents were lawfully in the bedroom, with the voluntary consent of Sharma and his girlfriend, to locate and seize his firearm; and

Honorable Lorna G. Schofield
June 5, 2019
Page 3 of 8

>    (f) the agents also properly seized the firearm from the bedroom as contraband that Sharma was barred from possessing.

(*See* Dkt. 121 at 3-4, 14-24 & nn. 11-12, 34-42 & nn. 19-20.)  Aside from unsworn and conclusory allegations made by Sharma's counsel, Sharma has not disputed any of these facts.

Against this backdrop, even if Sharma's statements to the arresting agents about the presence and location of his firearm in the apartment were obtained in violation of his *Miranda* rights — which is not the case — the physical evidence discovered as a result of the statements still should not be suppressed.  Although the statements were made before Sharma was given *Miranda* warnings, the facts detailed in the Government's May 20 submission — facts that are effectively undisputed — show that Sharma nonetheless made these statements voluntarily.  On this record, Sharma's bid to suppress the physical evidence recovered as a result of those statements is foreclosed by *United States* v. *Patane*, 542 U.S. 630 (2004), a controlling decision of the Supreme Court that Sharma's counsel fails to cite, let alone distinguish, in his untimely suppression motion.  The *Patane* Court held that law enforcement's failure to give *Miranda* warnings does not require suppression of physical evidence discovered as a consequence of unwarned statements if — as in this case — the statements were nonetheless made voluntarily.  *Id.* at 637-44.

In *Patane*, law enforcement officers went to defendant Patane's residence after receiving information that Patane had contacted his ex-girlfriend in violation of a restraining order and also might have illegal possession of a .40 caliber Glock pistol despite a prior felony conviction.  *Id.* at 634-35.  After arriving at Patane's residence and restraining him, one of the officers asked Patane about the Glock pistol before giving him adequate *Miranda* warnings.  *Id.* at 635 & n.1.  Patane "was initially reluctant to discuss the matter, stating: 'I am not sure I should tell you anything about the Glock because I don't want you to take it away from me.'"  *Id.*  Nevertheless, the officer "persisted, and [Patane] told him that the pistol was in his bedroom."  *Id.*  The officer then found the pistol and seized it.  *Id.*  Patane was subsequently indicted for illegally possessing this firearm following a felony conviction in violation of Title 18, United States Code, Section 922(g)(1).  *Id.* at 637-44.  Patane argued, among other things, "that the gun should be suppressed as the fruit of an unwarned statement."  *Id.*  The Supreme Court rejected this argument "[b]ecause the *Miranda* rule protects against violations of the [Fifth Amendment's] Self-Incrimination Clause, which, in turn, is not implicated by the introduction at trial of physical evidence resulting from voluntary statements" (*id.* at 634).

In doing so, the Supreme Court explained that "the *Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause" of the Fifth Amendment (*id.* at 635-36) whose core protection "is a prohibition on compelling a criminal defendant to testify against himself *at trial*" (*id.* at 637 (emphasis added)), but the Clause does not prohibit and "cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements" (*id.*).  As a result, the Self-Incrimination Clause "is not implicated by the admission into evidence of the physical fruit of a voluntary statement" and "there is no justification for extending the *Miranda* rule to this context" (*id.* at 636-37).  According to the Supreme Court, "[i]t

follows that police do not violate a suspect's constitutional rights (or the *Miranda* rule) by negligent or even deliberate failures to provide the suspect with the full panoply of warnings prescribed by *Miranda*" (*id.* at 641-42). Rather, "[p]otential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial" (*id.*). At that point, the exclusion of unwarned statements "is a complete and sufficient remedy for any perceived *Miranda* violation" (*id.* (citation and internal quotation marks omitted)). For this reason, the Supreme Court held that "unlike unreasonable searches under the Fourth Amendment or actual violations of the Due Process Clause or the Self-Incrimination Clause [of the Fifth Amendment], there is, with respect to mere failures to warn, nothing to deter" and "therefore no reason to apply the fruit of the poisonous tree doctrine of *Wong Sun*" (*id.* at 642 (internal citation and internal quotation marks omitted)). In light of those principles, the "[i]ntroduction of the nontestimonial fruit of a voluntary statement, such as [Patane's] Glock, does not implicate the Self–Incrimination Clause" of the Fifth Amendment and "[t]he admission of such fruit presents no risk that a defendant's coerced statements (however defined) will be used against him at a criminal trial." *Id.* at 643. Accordingly, the Supreme Court held that the exclusion of Patane's unwarned statements that led to the discovery of the Glock, without suppression of the Glock itself, "is a complete and sufficient remedy for any perceived *Miranda* violation." *Id.* at 643 (internal quotation marks and citation omitted).

Following *Patane*, the Second Circuit in *United States* v. *McCoy*, 407 F. App'x 514 (2d Cir. 2010), reversed a district court's decision to suppress physical evidence obtained as a result of a defendant's consent to search made before *Miranda* warnings were given. 407 F. App'x at 515-16. In *McCoy*, law enforcement officers went to defendant McCoy's house after receiving information over a radio dispatch furnishing cause to believe that someone might be in McCoy's home with a firearm that had been used to assault a victim, entered McCoy's home without a warrant, removed him from the home, and handcuffed him on the rear porch of his home while they investigated further. *Id.* at 515; *United States* v. *McCoy*, 07 Cr. 152 (WMS) (HBS), Dkt. 46 (Report and Recommendation) at 3-7 (W.D.N.Y. Apr. 29, 2009) ("*McCoy* R&R"). Before giving McCoy any *Miranda* warnings, and while McCoy was sitting handcuffed on the porch, one of the officers asked McCoy where the gun was located. McCoy nodded toward a pile of rubbish in the backyard and said "over there." *McCoy* R&R at 7. After a few officers searched the rubbish without success for the weapon and returned to the porch and asked McCoy again where the gun was, McCoy responded "up in the house" and yelled into the house to his girlfriend to "just show them where it is." *Id.* McCoy's girlfriend then told the officers that the gun was upstairs in a corner underneath some clothes. *Id.* at 4-7. Taking McCoy's and his girlfriend's statements as consent to proceed upstairs to look for the firearm, several officers went upstairs and searched without success for the weapon. *Id.* The officers then called upon McCoy's girlfriend to come to a location upstairs and point out where the firearm might be, and she pointed to a bedroom, which the officers searched without finding the firearm. *Id.* The officers finally searched a different bedroom, lifted up the mattress that was in this bedroom, and found a loaded firearm with an ammunition clip next to it. *Id.* McCoy was placed under arrest, and subsequently indicted for illegally possessing the firearm and ammunition following a felony conviction, in violation of Title 18, United States Code, Section 922(g)(1). *McCoy*, 07 Cr. 152 (WMS) (HBS), Dkt. 1 (Indictment) (W.D.N.Y. July 10, 2007); *McCoy* R&R at 4-7. Relying on *Patane*, the Second Circuit found that although defendant McCoy's statements were made before he was given *Miranda* warnings, it was

nonetheless reasonable for the officers to believe that he had voluntarily given them consent to enter the house and retrieve the gun by telling the officers that the gun was in the house and instructing his girlfriend to show the officers were the gun was located. 407 F. App'x at 515. Accordingly, the Second Circuit found that it was error to suppress the physical evidence (that is, the firearm and ammunition) recovered as a result of the challenged statements. *Id.*

*Patane* and *McCoy* require the same result in this case. Here, as detailed in the Government's May 20 submission, while the arresting agents were handcuffing Sharma in the hallway outside of the apartment where he and his girlfriend resided and patting him down for the agents' safety, the agents asked Sharma if he had any firearms. (*See* Dkt. 121 at 3-4, 14-24 & nn. 11-12, 38-42 & nn. 19-20.) In response, Sharma not only divulged that he had a firearm, but further volunteered the precise location where the firearm was stored: near the nightstand in their apartment. (*Id.*) After the agents advised Sharma and his girlfriend that Sharma was being placed under arrest but that his girlfriend was not under arrest, both Sharma and his girlfriend advised that they understood and wanted to cooperate with the agents (a sentiment that Sharma later reiterated). (*Id.*) With no handcuffs or other physical restraints on her, Sharma's girlfriend voluntarily escorted the agents to and from the bedroom at Sharma's request to retrieve shoes to wear and another item that Sharma had requested. (*Id.*) After Sharma's girlfriend and the agents obtained the items that Sharma had requested, she then accompanied the agents into the bedroom a second time when they went to locate and seize the firearm, which Sharma was barred from possessing as a result of his prior felony conviction for perjury. (*Id.*) While lawfully in the bedroom to locate the firearm, the agents seized the firearm as contraband. (*Id.*) They also saw in plain view and seized Sharma's laptop and second iPhone based on probable cause to believe those devices contained incriminating evidence of Sharma's charged fraud offenses. (*Id.*) During the course of this encounter, Sharma and his girlfriend never demanded that the arresting agents obtain a search warrant before entering or reentering the bedroom, never objected to the agents seizing the firearm or questioned their authority to do so, and never asked to speak with an attorney. (*Id.*) Moreover, neither Sharma nor his girlfriend lacked the education or sophistication to voluntarily and intelligently consent to the seizure of the firearm given their educational and professional backgrounds and Sharma's prior experience with the criminal justice system and law enforcement. (*Id.* & n.21.) Under these circumstances, it is clear that Sharma voluntarily made the unwarned statements that led to the seizure of his firearm, laptop and second iPhone. Accordingly, as in *Patane* and *McCoy*, those pieces of physical evidence should not be suppressed, even if their seizure was the fruit of a custodial interrogation without *Miranda* warnings.[2]

---

[2] Under Second Circuit precedent, Sharma cannot make the substantial showing of coercive conditions required to demonstrate that the consent given by him and his girlfriend was not voluntarily furnished. *See, e.g.*, *United States* v. *Garcia*, 56 F.3d 418, 423 (2d Cir. 1995) ("Consent to search has been found despite formal arrest, and such additional aggravating circumstances as handcuffing of a suspect, the presence of six law enforcement officers in his home and their assurance that they would remain indefinitely and secure a search warrant if consent were withheld."). Furthermore, it should go without saying that *Miranda* warnings are not a prerequisite for consent to search, even if the person tendering consent is in custody. *See United States* v. *Faruolo*, 506 F.2d 490, 495 (2d Cir. 1974) ("The argument that *Miranda* warnings are a prerequisite to an effective consent to search is not at all persuasive."); *United States* v. *Moreno*,

Honorable Lorna G. Schofield
June 5, 2019
Page 6 of 8

In any event, the arresting agents did not violate Sharma's rights under the Fifth Amendment or *Miranda* when they elicited the statements about the presence and location of his firearm in his apartment that set in motion the events culminating in the seizure of his firearm, laptop and second iPhone from the apartment. As detailed in the Government's May 20 submission (Dkt. 121 at 20-26 & n.12, 40-41 & n.21), the arresting agents asked Sharma whether he had any firearms while they were in the process of frisking him for their safety and placing him under arrest, and in response, Sharma disclosed that he had a firearm and further volunteered the location where the firearm was stored in the apartment. (*Id.*) Contrary to the unsworn and unsupported assertions of Sharma's counsel (Dkt. 125 at 1-2), this back-and-forth occurred before the agents had conducted a protective sweep of the apartment (Dkt. 121 at 23-24), and thus before the agents knew whether any additional dangers lurked inside the apartment. Furthermore, just moments before handcuffing Sharma, Sharma and his girlfriend had locked the front door to the apartment when the agents initially approached, avoided answering the door after the agents repeatedly knocked and announced themselves, forced the agents to secure the assistance of a building manager to open the door, and were initially observed walking down a staircase from the upper section of the apartment once the door was opened — a collection of suspicious circumstances that would lead a reasonable law enforcement officer to be concerned for his safety. (Dkt. 125 at 20-26, 44 & n. 23.) Given these facts, and the dangers inherent in arresting any criminal defendant pursuant to a felony arrest warrant in a location controlled by the defendant but unknown to the agents, it was entirely lawful and appropriate for the agents to ask Sharma whether he had any firearms while they patted him down for their safety.

Law enforcement officers are permitted to engage in limited pre-*Miranda* questioning of suspects to protect their safety and that of the general public because the need for answers to questions in a situation posing such a safety threat "outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *New York* v. *Quarles*, 467 U.S. 649, 657 (1984). This exception was predicated on the practical considerations facing any law enforcement officer confronted with the question "whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible." *Id*. at 657-58. Several principles guide courts' application of the *Quarles* safety exception to *Miranda*. *First*, the "safety exception clearly encompasses questions necessary to secure the safety of police officers," and is not limited to the safety of the general public "so long as the questioning 'relate[s] to an *objectively* reasonable need to protect the police or the public from an immediate danger.'" *United States* v. *Estrada*, 430 F.3d 606, 612 (2d Cir. 2005) (emphasis in original) (quoting *Quarles*, 467 U.S. at 658-59). *Second*, while the questioning may not be designed solely to elicit testimonial evidence, the questions "need not be posed as narrowly as possible, because '[p]recision crafting cannot be expected' in the circumstances of a

---

701 F.3d 64, 77 (2d Cir. 2012) ("*Miranda* warnings, however, are not a prerequisite to obtaining a valid consent to search."); *United States* v. *Wilson*, 914 F. Supp. 2d 550, 558 (S.D.N.Y. 2012) ("A suspect who has not received required *Miranda* warnings can still give valid voluntary consent to a search of his home."). *Miranda* warnings, in other words, are simply one of the factors to be considered when determining whether consent to search is voluntary and thus proper under the Fourth Amendment; but the absence of such warnings is by no means controlling (and, for the reasons discussed above, the consent here was plainly voluntary).

tense and dangerous arrest." *Id.* (quoting *United States* v. *Newton*, 369 F.3d 659, 678 (2d Cir. 2004)). *Third*, whether the safety exception applies is fact-specific, to "recogniz[e] the need for 'flexibility in situations where the safety of the public and the officers are at risk.'" *Id.* (quoting *United States* v. *Reyes*, 353 F.3d 148, 155 (2d Cir. 2003)).

Here, in order to ensure that Sharma did not have access to any live weapons that could be used to harm the arresting agents, it was reasonable and appropriate for the agents to ask Sharma whether he had any firearms while they were in the process of frisking him and placing him under arrest pursuant to a valid felony arrest warrant, at a location controlled by him but unfamiliar to the agents.[3] While law enforcement agents arresting a defendant on a felony arrest warrant must of course be mindful of the defendant's constitutional right to remain silent, the Constitution "is not a suicide pact," *Kennedy* v. *Mendoza-Martinez*, 372 U.S. 144, 160 (1963). Requiring *Miranda* warnings before arresting officers have ascertained whether criminal defendants that they are in the process of arresting on felony charges are armed and dangerous would place the officers "in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible." *Quarles*, 467 U.S. at 657-58. That sensibly is not the law, nor should it be, notwithstanding Sharma's protestations to the contrary.

The Court need not resolve the separate question whether *Quarles* permitted the arresting agents to ask Sharma whether he had any prior felony convictions (which would make it illegal for him to possess the firearm) after they had handcuffed him and conducted a protective sweep of the apartment, because the Government will not be offering Sharma's statements in response (that he was "not yet" a convicted felon as he had a pending criminal case in which he had been charged with perjury but was unsure of the final outcome of the case) during the Government's case-in-chief at trial. Accordingly, Sharma's motion to suppress should be denied as moot to the extent it seeks suppression of those particular statements.[4]

---

[3] *See, e.g.*, *Newton*, 369 F.3d at 678 (2d Cir. 2004) (under *Quarles*, safety exception to *Miranda*, law enforcement officers were entitled to ask the defendant whether he had any "contraband" in his apartment after handcuffing him when he answered the front door); *Estrada*, 430 F.3d 606, 608 (*Quarles* safety exception permitted officers to ask defendant whether there were any weapons in his apartment after handcuffing him in his apartment and making him lay face-down); *United States* v. *Simmons*, 661 F.3d 151, 153-54, 156 (2d Cir. 2011) (*Quarles* safety exception allowed officers to ask the defendant about the presence and location a gun that he had allegedly used in a dispute, about the dispute, and whether he had a license for the gun after detaining him in his apartment).

[4] Even if these particular statements by Sharma had been illegally obtained — which is not the case — that would only prohibit the Government from introducing them during its case-in-chief at trial, and would not bar the Government from using them to impeach testimony given by Sharma on direct examination at trial, *see Oregon* v. *Hass*, 420 U.S. 714, 722 (1975), or for other permissible purposes (*see, e.g.*, Gordon Mehler et al., Federal Criminal Practice: A Second Circuit Handbook § 17-8 (2019) (listing permissible uses for suppressed evidence and collecting cases authorizing such uses)). Accordingly, while the Government undertakes not to introduce the

Finally, based on the facts set forth above and in the Government's May 20 submission (Dkt. 121), Sharma's untimely motion to suppress fails as a matter of law and should be rejected without a hearing. All of the facts that the Government relies on in opposing Sharma's belated motion were set forth in an FBI report and warrant affidavit that the Government produced in discovery to Sharma on June 29 and July 3, 2018, respectively, long before the deadline set by this Court of April 29, 2019 for Sharma's pretrial motions such as the instant suppression motion that Sharma filed a month late on May 29, 2019. If Sharma had wished to dispute any of those facts, he had more than an ample opportunity to come forward with competent proof doing so within the timetable set by the Court ordered motions deadline. Nevertheless, like his prior motion (Dkt. 116) to suppress, Sharma has based his present motion (Dkt. 125) to suppress on conclusory factual allegations without any supporting witness affidavits from anyone with personal knowledge of the facts relevant to the motion. As shown by the precedents cited in the Government's May 20 submission, Sharma cannot manufacture a dispute warranting a hearing on his motion — let alone the ultimate relief sought by his motion — through unsworn and unsupported allegations of his counsel. (*See* Dkt. 121 at 59-60 (collecting cases).) Accordingly, Sharma's untimely motion to suppress statements and evidence, like his prior motion to suppress evidence, should be denied without a hearing.

For the reasons set forth above, and in the Government's May 20 submission (Dkt. 121), Sharma's untimely motion (Dkt. 125) to suppress specified statements and physical evidence, like his prior motion (Dkt. 116) to suppress evidence, should be denied without a hearing. Furthermore, to the extent that Sharma's new arguments in his reply submission (Dkt. 126) in support of his prior suppression motion (Dkt. 116) are based upon the meritless claims advanced in his present suppression motion (Dkt. 125), those reply arguments also fail for the reasons set forth above.

Respectfully submitted,

CRAIG STEWART
Attorney for the United States
Acting Under 28 U.S.C. § 515

By:   /s/
Samson Enzer / Negar Tekeei
Assistant United States Attorneys
(212) 637-2342 / -2482

cc:   All counsel of record

---

statements in question during its case-in-chief at trial against Sharma, the Government reserves the right to make other permissible uses of the statements.