```
UNITED STATES DISTRICT COURT                    USDC SDNY
SOUTHERN DISTRICT OF NEW YORK                   DOCUMENT
------------------------------------------------------------ X    ELECTRONICALLY FILED
                                                  :             DOC #:_____
   UNITED STATES,                                 :             DATE FILED: 8/13/2019
                                                  :
                                                  :                18 Cr. 340 (LGS)
                      -against-                   :
                                                  :                **OPINION AND ORDER**
   SOHRAB SHARMA, et al.,                         :
                                   Defendants.    :
------------------------------------------------------------ X
```

LORNA G. SCHOFIELD, District Judge:

Defendants Sohrab Sharma and Robert Farkas seek dismissal of the Indictment or disqualification of the Assistant United States Attorneys and FBI case agents assigned to this case (the "Prosecution Team") based on the disclosure of potentially privileged information. Defendant Sharma also seeks suppression of a firearm and statements made during his arrest. For the reasons below, the motion to dismiss the Indictment or disqualify the Prosecution Team is denied, and Defendant Sharma's motion to suppress is granted as to his statements but denied as to the firearm.

I. **BACKGROUND**

The Indictment charges Centra Tech, Inc., Sharma, Farkas and Raymond Trapani with securities fraud, wire fraud, and conspiracy to commit those offenses in connection with a fraudulent scheme from approximately July 2017 through April 2018 to raise more than $25 million from investors to finance Centra Tech's initial coin offering ("ICO").

A. **Motion to Dismiss**

In furtherance of the scheme, Defendants used the digital communications platform Slack to communicate with each other, investors and the public over digital workspaces and channels.

On March 30, 2018, the Government obtained a search warrant for six Slack workspaces used by Defendants (the "Slack Warrant").

On April 10, 2018, Centra Tech produced numerous computers, drives, cellphones and hard copy documents pursuant to a subpoena. After receiving the devices and documents, the Government agreed with Centra Tech's outside counsel Ballard Spahr LLP to a review protocol to identify and segregate potentially privileged materials. After Ballard Spahr stated that it would not represent Centra Tech in the criminal proceedings, the Government also agreed to a review protocol with defense counsel for the individual defendants. Pursuant to the protocol, defense counsel provided the Government with a list of attorneys and law firms that had represented Defendants. A "filter" team of law enforcement personnel who were walled off from the investigation (the "Filter Team") identified and segregated privileged materials.

On April 16, 2018, Slack provided the FBI an internet link to download records produced in response to the Slack Warrant. On June 5, 2018, the FBI's Computer Analysis Response Team ("CART") loaded the approximately 1.3 million files onto a review platform available on the FBI's computer system. On June 12, 2018, CART released the Slack Warrant Returns to FBI Special Agent Brandon Racz for his review.

On July 23, 2018, the Prosecution Team engaged the Filter Team to begin segregating potentially privileged documents. Pursuant to the review protocol, on September 4, 2018, the Filter Team identified 57 potentially privileged items, including three duplicates. Eleven documents (Category 3 below) were inadvertently omitted from this group because they were "labeled" rather than "flagged" as potentially privileged. On October 18, 2018, the Filter Team determined that 15 of the 57 items were not privileged and released them to members of the Prosecution Team. One of these released documents (Category 1 below) was a potentially

privileged document that had not been flagged as privileged because it was in HTML format rather than text format and was essentially unreadable.

On November 9, 2018, CART allowed Special Agent Racz viewing privileges to access the Slack Warrant returns to search for responsive items. Special Agent Racz was barred from access to any items flagged as privileged or potentially privileged. On January 2, 2019, Special Agent Kristin Allain received the same viewing privileges. The Special Agents completed their responsiveness review on January 4, 2019, and marked 112,508 files as responsive.

On January 15, 2019, the Government produced disks to defense counsel containing Slack database reports of documents labeled "responsive." Defense counsel informed the Government that it was experiencing difficulties reviewing the disks. On February 7, 2019, the Government provided defense counsel with hard drives with responsive Slack Warrant returns but inadvertently produced the Government's internal database, which included the privilege flags. On April 17, 2019, defense counsel notified the Government that potentially privileged materials in the Slack Warrant returns had been produced to defense counsel. The Filter Team subsequently barred the Prosecution Team from accessing any Slack Warrant returns pending the Filter Team's investigation and review.

The Filter Team identified 21 potentially privileged documents of approximately 1.3 million files within the Slack Warrant returns that had been inadvertently released to the Prosecution Team. These documents fall into three categories. First, as discussed above, Document 1 was inadvertently released to the Prosecution Team because it was formatted in an essentially unreadable form. Second, nine documents (including two duplicates, so seven distinct documents) were flagged as potentially privileged but labelled "responsive" by the investigating agents before the Filter Team was engaged ("Category Two documents"). It is

3

unclear how these documents came to be released to the Prosecution Team despite the potentially privileged flag. Third, 11 documents, "labeled" potentially privileged due to technician error, when they should have been "flagged" as potentially privileged, were inadvertently released to the Prosecution Team ("Category Three documents"). The 11 documents in Category Three included three duplicates, so eight distinct documents. Of those eight documents, the Filter Team labeled seven as potentially privileged and one was properly released to the Prosecution Team. In total, Defendants contend that 15 potentially privileged documents were released to the Prosecution Team.

By separate Order, the Court granted Defendants' application to redact all or part of 11 of the 15 documents as they appear to contain privileged attorney-client communications.

**B.      Motion to Suppress**

On April 1, 2018, the FBI arrested Sharma pursuant to an arrest warrant at his Florida apartment where he lived with his girlfriend. During the arrest, the FBI seized Sharma's first iPhone, which was in his hand. While the FBI patted down Sharma for weapons, they asked whether he had any firearms. Sharma said that he owned a 9mm handgun, which was upstairs near his nightstand. Sharma wanted to remove his jewelry after the arrest and needed a small screwdriver, located in the upstairs section of the apartment, to remove his bracelet. Two agents accompanied Sharma's girlfriend upstairs to retrieve the screwdriver. While the agents were upstairs, they saw in plain view a second iPhone and MacBook Pro laptop on Sharma's bed. The agents returned downstairs and asked Sharma if he had any prior felony convictions. Sharma said, "not yet" and that he had a pending criminal charge for perjury. The searching agents called one of the New York case agents to inquire about seizing the handgun. The searching agents were directed to retrieve the firearm. They also retrieved the electronic devices after

4

Sharma's girlfriend identified them as Sharma's property. The agents told Sharma that they were seizing his electronic devices, and he said that he wanted to cooperate with law enforcement. In sum, the agents seized two iPhones, one MacBook Pro and a handgun with the magazine, bullets and holster.

On April 18, 2019, the devices were sent to the case agents in New York. On July 2, 2018, the FBI obtained a search warrant for the two iPhones and laptop.

## II. DISCUSSION

### A. Motion to dismiss

Defendants move to dismiss the Indictment or disqualify the Prosecution Team because of the disclosure to them of potentially privileged documents. The motion is denied because any disclosure was not so egregious to warrant dismissal or disqualification.

#### 1. Standard

The underlying purpose of the attorney-client privilege is "to encourage full and frank communication between attorneys and their clients." *United States v. Krug*, 868 F.3d 82, 86 (2d Cir. 2017) (citing *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)). To that end, "[t]he attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *Id*. The attorney work-product doctrine "applies when documents are created by an attorney 'in anticipation of litigation.'" *United States v. James*, 712 F.3d 79, 96 n.6 (2d Cir. 2013) (quoting *Matter of Grand Jury Subpoenas Dated Oct. 22, 1991 and Nov. 1, 1991*, 959 F.2d 1158, 1166 (2d Cir.1992)).

The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. To establish

5

a Sixth Amendment violation, Defendants must show an interference with the attorney-client relationship. *United States v. Schwimmer*, 924 F.2d 443, 447 (2d Cir. 1991). When the Government intentionally intrudes on the attorney-client privilege, such conduct "warrants careful scrutiny," but even in cases of intentional intrusion, the "[Second] Circuit never has gone so far as to adopt a per se rule" requiring the dismissal of an indictment. *Id*. Rather, "unless the conduct of the Government has . . . been . . . manifestly and avowedly corrupt, a defendant must show prejudice to his case resulting from the intentional invasion of the attorney-client privilege." *Id*. (internal quotation marks and citation omitted); *accord United States v. Hoey*, No. 15 Cr. 229, 2016 WL 270871, at *6 (S.D.N.Y. Jan. 21, 2016); *see also United States v. Sanin*, 113 F.3d 1230 (2d Cir. 1997) ("In order to make out a Sixth Amendment violation . . . , a defendant must show that he has suffered prejudice as a result of communications that allegedly impinged upon the attorney-client privilege.") (unpublished opinion). "The dismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001); *accord United States v. Sammy*, 763 F. App'x 45, 46 (2d Cir. 2019) (summary order).

        **2. Discussion**

The motion to dismiss the indictment is denied. To the extent that the Prosecution Team viewed any of the potentially privileged documents, Defendants have shown neither that the Government's conduct was "manifestly and avowedly corrupt" nor that Defendants were prejudiced by the disclosures. *See Schwimmer*, 924 F.2d at 447.

Defendants have not shown that the Government intentionally intruded on the attorney-client privilege. *See United States v. Weissman*, No. 94 Cr. 760, 1996 WL 751386, at *13 (S.D.N.Y. Dec. 26, 1996) (denying motion to dismiss the indictment because the Government's

intrusion into the attorney-client privilege could not be characterized as intentional). That the Government knew that some of the returns from the Slack Warrant might contain privileged communications is not a reason for dismissal. The Government and defense counsel agreed to a protocol for segregating potentially privileged materials. That protocol was effective as to all but 21 documents out of the 1.3 million files returned from the warrant. The record contains no evidence that the Government intentionally diverged from the protocol.

Document 1 was inadvertently released because, at the time of review, it was configured in a long file of html code such that it was not recognizable as a potentially privileged communication. It is unclear how the nine Category Two potentially privileged documents were released for responsiveness review despite being flagged as potentially privileged. The 11 Category Three Documents were inadvertently released due to a technician error in "labeling" rather than "flagging" the documents as potentially privileged.

As soon as defense counsel alerted the Government of the error, the Filter Team barred the Prosecution Team from accessing the returns from the Slack Warrant. The Government took reasonable precautions to avoid exposure to privileged materials in the 1.3 million files in the Slack Warrant returns. Defendants have not shown that the Government's conduct was "manifestly and avowedly corrupt." *See Schwimmer*, 924 F.2d at 447

Neither have Defendants shown prejudice from the disclosure of potentially privileged materials. The Government represents that none of the AUSAs on the Prosecution Team have viewed the Slack Warrant returns. Although Agents Racz and Allain may have seen some of the potentially privileged documents (those marked "responsive"), the Government represents that the agents do not recall coming across anything they believed to be potentially subject to the

7

attorney-client privilege and, if they had, they would have immediately notified the AUSAs assigned to the case.

Even if Agents Racz and Allain had seen the potentially privileged documents, Defendants offer no explanation as to how this exposure prejudiced their defense. None of the potentially privileged documents (except Document 1) has any apparent bearing on what are likely to be the issues in this case, and consequently, they would not give the Government any unfair "tactical advantage" and insight into Defendants' "means of defeating the charges." *See United States v. Baslan*, No. 13 Cr. 220, 2014 WL 3490682, at *3 (E.D.N.Y. July 11, 2014).

Defendants argue that Document 1 "consist[s] of very specific factual and legal defenses to the charges contained in the Indictment, [which] will be some of the same defenses that the Defendants currently plan to raise at trial." Document 1, dated February 20, 2018, is a memorandum from Ballard Spahr LLP, Centra Tech's outside counsel in the then on-going SEC investigation, to Centra Tech addressing a single legal issue. The arrests in this case did not occur until more than a month later. As discussed above, it does not appear that anyone on the Prosecution Team read Document 1 because it was unreadable when it was reviewed. But even if they had, Document 1 does not discuss litigation or trial strategy in either the SEC investigation or this case. Defendants' own statement, quoted above from Defendants' reply memorandum of law, is the only disclosure of Defendants' trial strategy in this case, and the only disclosure of any connection between Document 1 and this case. Under these circumstances, the Government should not be faulted in the highly unlikely event the disclosure had some impact on what Defendants have now announced is a part of their trial strategy.

Defendants argue that, if the Indictment is not dismissed, the entire Prosecution Team should be disqualified from the case. Disqualification is a matter for the court's discretion.

*United States v. Walker*, 243 F. App'x 621, 623 (2d Cir. 2007) (summary order) (citing *United States v. Badalamenti*, 794 F.2d 821, 828 (2d Cir. 1986)). Courts have disqualified prosecutors who engaged in serious misconduct that prejudiced defendants. *See id.* ("At least one district court has disqualified prosecutors who engaged in serious misconduct by reviewing and copying -- against the district court's explicit instructions -- attorney work product that provided an important insight into defense tactics, strategy, and problems.") (internal quotation marks omitted); *United States v. Stewart*, 294 F. Supp. 2d 490, 494 (S.D.N.Y. 2003) ("Disqualification . . . is reserved for situations of prior representation, conflicts of interest, prosecutorial misconduct, and other unethical attorney behavior."). The record contains no evidence of bad prosecutorial behavior. Disqualification is not warranted.

Defendants argue that the Court should hold a hearing to determine whether the prosecution was tainted by exposure to privileged information pursuant to *Kastigar v. United States*, 406 U.S. 441 (1972). *See Schwimmer*, 924 F.2d at 446 (applying *Kastigar* standard to breaches of a defendant's attorney-client privilege). Defendants' request is denied. To warrant a taint hearing, Defendants have the burden of showing a "factual relationship" between the privileged information and the prosecution. *See United States v. Blau*, 159 F.3d 68, 72 (2d Cir. 1998); *accord United States v. Hoey*, 725 F. App'x 58, 61 (2d Cir. 2018) (summary order) ("[Defendant] had to show a factual connection between the allegedly privileged information and the charges in this case."). "An insubstantial and speculative possibility of taint does not trigger *Kastigar*." *United States v. Connolly*, No. 16 Cr. 0370, 2019 WL 2120523, at *19 (S.D.N.Y. May 2, 2019) (internal quotation marks omitted). "[F]ailure to show the requisite factual relationship [is] sufficient to end the inquiry[.]" *Blau*, 159 F.3d at 72; *accord Connolly*, 2019 WL 2120523, at *19. As discussed above, Defendants have shown no such relationship.

9

Lastly, Defendants request the appointment of an independent examiner to "examine all seized materials, conduct a privilege review, and return all privileged materials." Defendants have not identified any fundamental flaws in the privilege review protocol -- to which Defendants agreed initially -- that warrant the appointment of an independent examiner. Once Defendants alerted the Government of the Prosecution Team's potential exposure to privileged materials, the Filter Team conducted an investigation into why potentially privileged documents were inadvertently released to the Prosecution Team. Now that the Government is aware of the issue, there is no reason to believe that proceeding pursuant to the protocol to which Defendants agreed is unfair.

The cases that Defendants cite in support of their request for an independent examiner are inapposite. Defendants rely on cases in which the Government searched documents obtained from attorney offices. *See United States v. Kaplan*, No. 02 Cr. 883, 2003 WL 22880914, at *11 (S.D.N.Y. Dec. 5, 2003); *United States v. Stewart*, 2002 WL 1300059, *4 (S.D.N.Y. June 11, 2002); *In re Search Warrant for Law Offices Executed on March 19, 1992*, 153 F.R.D. 55, 59 (S.D.N.Y. 1994). Here, the Slack Warrant returned over 1.3 million files from Centra Tech's Slack account, only a fraction of which involved attorney communications. Unlike in *United States v. Jackson*, 07 Cr. 0035, 2007 WL 3230140, at *5 (D.D.C. Oct. 30, 2007), Defendants do not challenge the legality of the Slack Warrant. Unlike *In re Grand Jury Subpoenas*, 454 F.3d 511, 522 (6th Cir. 2006), the Government is already in possession of the potentially privileged materials, and given the voluminous record in this case, to begin anew with an independent examiner would cause unnecessary delay. Accordingly, Defendants' request to appoint an independent examiner is denied.

### B. Motion to Suppress

Defendant Sharma moves to suppress (1) the contents of his laptop and two iPhones seized on April 1, 2018, (2) statements he made to law enforcement when he was arrested and (3) the firearm itself. As explained below, the motion is denied as to the fruits of the search but granted as to Sharma's statements.

#### 1. Standard

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . " U.S. Const. amend. IV. Generally, "as a basic principle of Fourth Amendment law, entries into a home without a warrant, or searches and seizures inside a home without a warrant, are presumptively unreasonable." *United States v. Delva*, 858 F.3d 135, 147 (2d Cir. 2017) (internal quotation marks omitted). There are several exceptions to the warrant requirement, however, including "security-based limited searches in conjunction with an in-home arrest pursuant to an arrest warrant . . . and seizures . . . of any evidence that is in plain view during the course of [the officers'] legitimate emergency activities." *Id*. (citing *Mincy v. Arizona*, 437 U.S. 385, 393 (1978)). "If an article is already in plain view, neither its observation nor its seizure would involve any invasion of privacy." *Id*. at 149 (internal quotation marks omitted) (quoting *Horton v. California*, 496 U.S. 128, 133 (1990)).

#### 2. Discussion

##### a. iPhones and Laptop

Sharma's first iPhone was properly seized as part of a search incident to a valid arrest. "[I]t is well settled that a search incident to a lawful arrest is a traditional exception to the

[search] warrant requirement of the Fourth Amendment." *Id*. at 148. "[A] search may be made of the person of the arrestee by virtue of the lawful arrest. [In addition,] a search may be made of the area within the control of the arrestee." *Id*. (second alteration in original). Here, the Agents seized the iPhone from Sharma's hand incident to his lawful arrest.

Sharma's second iPhone and laptop were seized from his upstairs bedroom pursuant to the plain view exception. Under the plain view exception, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Id*. at 149 (internal quotation marks omitted) (citing *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993)). "Seizure of everyday objects in plain view is justified where the officers have probable cause to believe that the objects contain or constitute evidence." *United States v. Babilonia*, 854 F.3d 163, 180 (2d Cir. 2017) (upholding warrantless seizure of defendant's cell phones and iPad because their incriminating nature was immediately apparent to agent who had been investigating defendants for months and knew that the conspiracy involved use of cell phones).

Defendant argues that the searching agents were not lawfully entitled to be in his bedroom, where they saw the second iPhone and laptop on his bed. Sharma, however, implicitly consented to the agents' presence in his bedroom. And Sharma's girlfriend, who lived with him in the apartment, also consented. "Consent may be inferred from an individual's words, gestures, or conduct." *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981); *accord United States v. Iverson*, 897 F.3d 450, 458 (2d Cir. 2018) ("Consent may be express or implied."). Here, Sharma's girlfriend voluntarily escorted the agents into Sharma's bedroom to retrieve his shoes and screwdriver, at Sharma's request. Sharma did not object to the agents accompanying Sharma's girlfriend upstairs and said that he wanted to cooperate. Given the

12

totality of the circumstances, it was reasonable for the agents to conclude that Sharma consented to their presence in his bedroom. *See Iverson*, 897 F.3d at 458. Furthermore, the agents were required to "locate appropriate clothing" for Defendant, *United States v. Chervin*, No. 10 Cr. 918, 2011 WL 4373928, at *4 (S.D.N.Y. Sept. 20, 2011) (citing *United States v. Di Stefano*, 555 F.2d 1094, 1101 (2d Cir. 1977)). The agents were lawfully entitled to go into the bedroom to retrieve Sharma's shoes and the screwdriver to remove Sharma's bracelet, explicitly at Sharma's behest.

Sharma does not dispute that the agents had probable cause to believe that the iPhones and laptop contained evidence of Sharma's participation in the scheme to defraud. Indeed, the arrest warrant includes allegations that Sharma sent and received text messages and email communications in connection with the fraud. Accordingly, the devices were properly seized under the plain view and search incident to arrest exceptions.

That the Government obtained a search warrant for the devices three months after the devices were seized is not unreasonable. A seizure based on probable cause may be unconstitutional if there is "unreasonable delay in securing a warrant." *United States v. Martin*, 157 F.3d 46, 54 (2d Cir. 1998); *United States v. Smith*, 759 F. App'x 62, 64 (2d Cir. 2019) (summary order). In determining the reasonableness of the Government's delay in seeking a search warrant after a valid seizure, a court looks to factors including the length of time for which the individual was deprived of his property, any diminished interest in the property that the individual may have had, and whether the seizure affected the individual's liberty interests. *See Martin*, 157 F.3d at 54; *accord United States v. Howe*, 545 F. App'x 64, 65–66 (2d Cir. 2013) (summary order). "The court also analyzes the government's interests in seizing the property, and balances the competing interests." *Howe*, 545 F. App'x at 66.

Here, any delay in obtaining the search warrant was not constitutionally unreasonable. Approximately three months elapsed from the time the Government obtained the devices and when the search warrant was issued. During the delay, Sharma's possessory interest in the devices was diminished by the fact that Sharma was prohibited from possessing the devices as a result of his detention and bail conditions. *See United States v. Loera*, 333 F. Supp. 3d 172, 186 n.6 (E.D.N.Y. 2018) ("Courts have routinely upheld periods [of] delay[ ] between procuring the information and searching it, where, as here, law enforcement's retaining the thing to be searched did not interfere with defendant's ability to use it."). Nor did Sharma's deprivation of his devices affect his liberty interests. *See United States v. Mathews*, No. 18 Cr. 124, 2018 WL 2277839, at *3 (S.D.N.Y. May 17, 2018) (Delay in securing warrant to search cell phone was not unreasonable because, among other things, the "seizure of the cell phone had little or no impact on Defendant's liberty interests"). Lastly, the Government had a strong interest in retaining the devices given the likelihood that they contained evidence of Sharma's participation in the fraud. *See Howe*, 545 F. App'x at 66. In short, considering the relevant factors and balancing the Government's interest against Defendant's, a three-month delay in obtaining a search warrant for the devices was not unreasonable under the circumstances. *See id*. (finding thirteen-month delay not unreasonable).

### b. Statements

Defendant Sharma moves to suppress two statements he made to law enforcement when he was arrested. First, in response to the FBI's question about whether Sharma had any weapons, Sharma responded that there was a firearm upstairs near his nightstand. Second, in response to the FBI's question about whether Sharma had a felony conviction, Sharma responded, "not yet" and stated that he had a pending criminal case on perjury charges.

Defendant's motion is granted as to the first statement, and denied as moot as to the second. The Fifth Amendment to the Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "Although statements made by a suspect in custody in response to police interrogation are typically inadmissible unless preceded by *Miranda* warnings, *see Miranda v. Arizona*, 384 U.S. 436, 467–68, 86 (1966), the Supreme Court has recognized a 'public safety' exception to that rule." *United States v. Ferguson*, 702 F.3d 89, 93 (2d Cir. 2012); *accord United States v. Fiseku*, No. 15 Cr. 384, 2015 WL 7871038, at *13 (S.D.N.Y. Dec. 3, 2015), *aff'd*, 906 F.3d 65 (2d Cir. 2018). Under this exception, "overriding considerations of public safety [may] justify [an] officer's failure to provide *Miranda* warnings before he ask[s] questions devoted to locating [an] abandoned weapon." *Ferguson*, 702 F.3d at 93 (alterations in original) (quoting *New York v. Quarles*, 467 U.S. 649, 651). The public safety exception applies so long as the questioning relates to an "objectively reasonable need" to protect the police or the public from any immediate danger. *United States v. Reyes*, 353 F.3d 148, 153 (2d Cir. 2003); *accord Fiseku*, 2015 WL 7871038, at *13.

The Government does not contest that Defendant did not receive *Miranda* warnings, was in custody and under interrogation for purposes of *Miranda*. Rather, the Government argues that the FBI properly inquired about Defendant's possession of weapons pursuant to the public safety exception. Absent any evidence of exigency, however, the public safety exception does not apply. Here, there is no evidence of an "objectively reasonable need" to protect law enforcement or the public from any immediate danger at the time of arrest. *See Reyes*, 353 F.3d at 153.

In invoking the public safety exception, the Government cites cases in which law enforcement had reason to believe that the presence of a weapon presented a realistic threat. *See*

*Quarles*, 467 U.S. at 657 (finding that public safety exception applied where defendant was handcuffed in a supermarket and asked to disclose where he disposed of the firearm because the gun presented a public danger since "an accomplice might make use of it," or "a customer or employee might later come upon it"); *United States v. Newton*, 369 F.3d 659, 678 (2d Cir. 2004) (finding that the public safety exception applied where officers asked a handcuffed suspect whether he had any contraband because the suspect was dangerous -- based on a report from the suspect's mother that he possessed a firearm in their home and had threatened to kill her and her husband -- and that, "until the gun was found, there was a serious and immediate risk of harm to anyone in the apartment"); *United States v. Simmons*, 661 F.3d 151 (2d Cir. 2011) (finding that the public safety exception applied where law enforcement had "a reasonable basis for believing that [Defendant] was home and that he might have a gun, which they understood he had recently brandished" and that the officers "were justified in questioning Defendant in order to assuage those [safety] concerns and defuse the perceived threat of violence").

These cases are not persuasive. The Government provides no evidence that the FBI had information that Defendant was dangerous or volatile, or that they perceived any threat to their safety. *See Fiseku*, 2015 WL 7871038, at *14 ("That there was reasonable suspicion to believe that some crime was afoot, under the case law, is not tantamount to a finding that the public safety was endangered so as to justify non-Mirandized custodial interrogation."). The Government has not established that any exigency existed when Defendant was arrested in his private residence for a non-violent crime. Accordingly, Defendant's motion to suppress the non-*Mirandized* statements regarding the location and Defendant's possession of the firearm is granted. *Accord e.g.*, *United States v. Miller*, 281 F. Supp. 3d 330, 333 (E.D.N.Y. 2017) (suppressing statement that Defendant "had a gun and that it was in his waistband" as a *Miranda*

violation not within the public safety exception); *United States v. Memoli*, 333 F. Supp. 2d 233, 236 (S.D.N.Y. 2004) (suppressing pre-*Miranda* statements about the existence, location and number of guns that defendant made).

Defendant moves to suppress his statement that he was "not yet" a convicted felon. The Government represents that they will not "be offering Sharma's statements" during the Government's case-in-chief at trial. Accordingly, Defendant's motion to suppress the statement is denied as moot.

### c. Firearm

Defendant's motion to suppress the firearm itself is denied. Defendant argues that the firearm should be suppressed under the "fruits of the poisonous tree" doctrine. Failure to give *Miranda* warnings does not require suppression of physical evidence discovered as a consequence of unwarned statements that are voluntary and uncoerced. *See United States v. Patane*, 542 U.S. 630, 637-44 (2004) ("[T]he *Miranda* rule is prophylactic employed to protect against violations of the Self-Incrimination Clause," which "is not implicated by the admission into evidence of the physical fruit of a voluntary statement."); *United States v. McCoy*, 407 F. App'x 514, 516 (2d Cir. 2010) (summary order) ("[T]he Self–Incrimination Clause of the Fifth Amendment cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements.") (alteration in original) (quoting *United States v. Haygood*, 157 Fed. App'x. 448, 449 (2d Cir. 2005)); *accord Fiseku*, 2015 WL 7871038, at *16.

The evidence does not suggest that Defendant's statements were not voluntary. Sharma told law enforcement twice that he wanted to cooperate and volunteered that his firearm was on his nightstand, and Sharma's girlfriend led the FBI to the bedroom where the gun was located at Sharma's request. *See United States v. Simmons*, 861 F. Supp. 2d 307, 311 (S.D.N.Y. 2012),

17

*aff'd*, 543 F. App'x 101 (2d Cir. 2013) ("[A] defendant's directions to a firearm amounts to, or may be found to amount to, implied consent, at least for the limited purpose of retrieving the gun."). Considering the totality of the circumstances, Sharma's statements were voluntary, and the firearm is admissible.

Defendant's request for an evidentiary hearing is denied. Defendant relies on conclusory statements that an "evidentiary hearing will demonstrate that the agents never asked for consent" and that Defendant never consented to the agents' search, but Defendant has failed to provide any supporting witness affidavits or declarations to dispute any of the Government's factual assertions set forth in the FBI reports and warrant affidavit. *See States v. Kirk Tang Yuk*, 885 F.3d 57, 77 (2d Cir. 2018) ("[A]n evidentiary hearing is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question."); *United States v. Smith*, No. 08 Cr. 154, 2008 WL 3200210, at *1–2 (E.D.N.Y. Aug. 5, 2008) ("[T]he defendant must be able to show that there are contested issues of fact that necessitate an evidentiary hearing . . . It is well-settled that such showing must be made by an affidavit of someone with personal knowledge of the underlying facts."). Absent disputed facts, Defendant's request for an evidentiary hearing is denied.

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is DENIED. Defendant Sharma's motion to suppress is GRANTED as to the statement about the guns, DENIED as moot as to the "not yet" statement, and DENIED as to the firearm, iPhones and laptop.

18

The Clerk of Court is respectfully directed to close the motions at Docket Numbers 116, 117, 125, 133 and 136.

Dated: August 13, 2019
New York, New York

_____
**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**