UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                 :

UNITED STATES OF AMERICA

                                 :

           - v. -

                                 :     18 Cr. 340 (LGS)

SOHRAB SHARMA,
      a/k/a "Sam Sharma," and     :
ROBERT FARKAS,
      a/k/a "RJ,"               :

                   Defendants.    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x

## THE GOVERNMENT's MOTIONS *IN LIMINE*

                                     CRAIG STEWART
                                      Attorney for the United States
                                      Acting Under 28 U.S.C. § 515
                                      Southern District of New York

Samson Enzer
Negar Tekeei
Daniel Loss
Assistant United States Attorneys
     *- Of Counsel -*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ................................................................................................... 2

    A.    The Criminal Fraud Charges Against Defendants Sharma and Farkas ...................... 2

    B.    The Charged Conspiracy to Defraud Centra Tech Investors ...................................... 3

ARGUMENT ...................................................................................................... 17

    I.    The Court Should Admit Proof of Certain Bad Acts by the Defendants ...................... 17

    A.    Applicable Law ............................................................................................ 18

    B.    Discussion .................................................................................................. 21

    II.    The Court Should Admit Various Co-Conspirator Statements ..................................... 39

    III.    The Court Should Admit Various Statements by the Defendants' Agents .................. 48

    IV.    The Court Should Preclude the Defendants' Alleged Advice-of-Counsel Defense ...... 50

    A. Relevant Facts ............................................................................................. 52

    B. Applicable Law ............................................................................................ 56

    C. Discussion ................................................................................................. 62

    V.    The Defendants Should Be Precluded From Offering Evidence About Their Purported Offers to Return Funds That They Stole Through Fraud ...................................... 71

    A.    Relevant Facts ............................................................................................. 72

    B.    Discussion .................................................................................................. 74

    VI.    The Court Should Preclude the Defendants' Proposed Expert Witness Testimony ...... 78

    VII.    The Court Should Admit Farkas' Proffer Statements If He Opens The Door .............. 86

CONCLUSION ................................................................................................... 94

## PRELIMINARY STATEMENT

Defendants Sohrab Sharma and Robert Farkas (the "defendants") are charged in this criminal case with conspiring to commit, and committing, securities and wire fraud in connection with a scheme to defraud investors in a company that they co-founded called Centra Tech, Inc. ("Centra Tech"). In advance of trial, the Government respectfully moves *in limine* for rulings from this Court:

- allowing the Government to admit evidence at trial of specified criminal acts of defendants Sharma and Farkas as direct proof of the charged conspiracy to defraud Centra Tech investors, or for purposes authorized by Federal Rule of Evidence 404(b);

- allowing the Government to admit evidence of various statements by the defendants or their co-conspirators during and in furtherance of that conspiracy pursuant to Federal Rule of Evidence 801(d)(2)(E);

- allowing the Government to admit evidence of various statements by defendants' agents or employees at Centra Tech pursuant to Federal Rule of Evidence 801(d)(2)(D);

- precluding the defendants from offering evidence or arguments at trial about the defendants' alleged reliance on advice from a fake law firm called "Pope & Dunn";

- precluding the defendants from offering evidence or arguments about offers that they claim to have made to the United States Securities and Exchange Commission (the "SEC") and to the Government for the purported purpose of effectuating the return of funds that they stole from their victims;

- precluding the defendants' proposed expert witnesses from testifying; and

- allowing the Government to introduce statements that defendant Farkas made during post-arrest proffer sessions with the Government and the Federal Bureau of Investigation ("FBI"), in the event that he opens the door at trial to those proffer statements.

For the reasons set forth below, the Government respectfully submits that each of the requested *in limine* rulings should be granted.[1]

**BACKGROUND**

**A. The Criminal Fraud Charges Against Defendants Sharma and Farkas**

On May 14, 2018, a Grand Jury in this district filed the Indictment in this case, numbered 18 Cr. 340 (LGS), charging Centra Tech co-founders Sohrab Sharma, Robert Farkas and Raymond Trapani with conspiring to commit, and committing, securities and wire fraud in connection with a scheme to solicit victims to invest valuable assets for the purchase of digital currency tokens that were issued by Centra Tech as part of a so-called "initial coin offering" or "ICO," through fraudulent misrepresentations. As a result of the defendants' fraudulent conduct, Centra Tech raised over $25 million in assets from victims during the ICO from approximately July 30, 2017 through October 5, 2017.

Counts One and Two of the Indictment charge that from at least in or about July 2017 through in or about April 2018, Sharma, Farkas and Trapani conspired to commit, and committed, securities fraud by offering and selling digital tokens to victims through fraudulent misrepresentations, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18

---

[1] Throughout this submission, "Dkt. [Number]" refers to a docket entry in this case; "Ex. A" refers to a redacted version of an October 27, 2017 *New York Times* article about Centra Tech, attached as Exhibit A; "Ex. B" refers to the defendants' August 30, 2019 letter regarding expert testimony, attached as Exhibit B; "Ex. C" refers to the Government's November 8, 2018 letter to all defendants, attached as Exhibit C;

U.S.C. §§ 371 and 2. Counts Three and Four of the Indictment charge that from at least in or about July 2017 through in or about April 2018, Sharma, Farkas and Trapani conspired to commit, and committed, wire fraud by using email, telephone and other wire communications to offer and sell digital tokens to victims through fraudulent misrepresentations, in violation of 18 U.S.C. §§ 1349, 1343 and 2.

**B. The Charged Conspiracy to Defraud Centra Tech Investors**

The evidence at trial will show that in or about July 2017, Sharma co-founded Centra Tech with Farkas and Trapani in Miami, Florida. They claimed that Centra Tech had a purported cryptocurrency debit card that supposedly allowed users to spend various types of cryptocurrency such as "Bitcoin" and "Ether" to make purchases in real-time at stores and other establishments that accept Visa payment cards and Mastercard payment cards.[2] Sharma served in various roles at Centra Tech, including as the company's president and chief technology officer until approximately late October 2017; Farkas served in various roles at the company, including as the company's chief marketing officer until approximately late October 2017, and then as the company's chief operating officer; and Trapani served as the company's chief operating officer until approximately late October 2017.

From approximately July 30, 2017 through October 5, 2017, Sharma, Farkas and Trapani solicited investors to provide valuable digital assets in exchange for the purchase of digital tokens called "Centra tokens" or "CTRs" that were issued by Centra Tech through the company's ICO.[3]

---

[2] Unless otherwise indicated, the facts set forth below are based on what the Government expects the evidence at trial will show.

[3] An "initial coin offering" or "ICO" is a type of fundraising event in which an entity offers participants a unique digital "coin" or "token" in exchange for consideration. The consideration

As part of this ICO fund-raising effort, Sharma, Farkas and Trapani deliberately made a series of fraudulent oral and written misrepresentations to investors during the ICO. Based in part on these fraudulent claims, investors provided digital funds that included at least 100,000 units of the valuable digital currency "Ether," that were then worth more than $25 million, for the purchase of Centra tokens issued by Centra Tech.

During the company's ICO, Sharma, Farkas and Trapani deliberately made or caused Centra Tech to make the following fraudulent claims in soliciting such investments from victims, among others:

- Sharma, Farkas and Trapani claimed to investors that Centra Tech had developed a debit card that enabled users to spend various cryptocurrencies to make purchases at stores that accept Visa or Mastercard payment cards, and that Centra Tech had partnerships with Bancorp, Visa and Mastercard to issue Centra Tech debit cards. In fact, Centra Tech had no such partnerships with Bancorp, Visa or Mastercard.

- Sharma, Farkas and Trapani claimed to investors that Centra Tech's executive team included a purported Chief Executive Officer named "Michael Edwards" and a purported Chief Financial Officer named "Jessica Robinson" who had impressive work histories and academic credentials. In fact, "Michael Edwards" and "Jessica Robinson" were fictitious people who were fabricated to dupe investors.

---

often comes in the form of "digital currency" or "cryptocurrency," as opposed to "fiat currency," which is a term used to describe currency that a government has declared to be legal tender, such as the U.S. dollar. "Digital currency" or "cryptocurrency" is a digital representation of value that can be digitally traded and functions as (1) a medium of exchange, (2) a unit of account, or (3) a store of value, but does not have legal tender status. Unlike fiat currency, digital currency is not issued by any jurisdiction and functions only by agreement within the community of users of that particular currency. Examples of digital currencies are "Bitcoin" and "Ether," both of which are issued and distributed on their own "blockchains." A "blockchain" is a digitalized, decentralized, cryptographically-secured ledger that allows market participants to keep track of digital currency transactions without central recordkeeping. The tokens or coins issued in an ICO are issued and distributed on a blockchain. Tokens are often also listed and traded on online internet platforms, typically called digital currency exchanges, and they usually trade for other assets. Often, tokens are listed and tradeable immediately after they are issued.

- Sharma, Farkas and Trapani claimed to investors that Centra Tech held money transmitter and other relevant licenses in 38 states. In fact, Centra Tech did not have such licenses in the majority (if not all) of those states.

Contemporaneous text messages and email communications among Sharma, Farkas and Trapani confirm that all three of them were well aware of the falsity of those fraudulent claims when they conveyed those lies to Centra Tech investors during the ICO. For example, text messages that were recovered during a consensual search of one of Trapani's cellphones (the "Trapani Cellphone") reveal the following:

- With respect to the purported partnerships with Bancorp, Visa and Mastercard that Centra Tech had claimed it possessed in a whitepaper that was available to the investing public on Centra Tech's website as of July 31, 2017, Sharma engaged in a cellphone text-message conversation with Trapani that day in which they discussed Centra Tech's lack of actual partnerships with banks or credit card companies. During that exchange, Sharma wrote: "Should write down a list of places to call tomorrow," "For the conbranded [*sic*] card." Later in the exchange, Sharma wrote: "Gotta get it going on the banks today plz." Sharma also subsequently wrote: "We just need to get s [*sic*] banking license," "Need our direct agreement with visa," "Or MasterCard," "That's the move," "Cut out the middle man," "I wish we just knew someone."

- With respect to Centra Tech's purported CEO "Michael Edwards" and purported CFO "Jessica Robinson," Sharma text-messaged Trapani on or about July 29, 2017 and discussed (and joked about) their fake CEO and CFO. Sharma wrote that they "Need to find someone who looks like Michael," "Team photos," "He's real lol," "Everyone real," "Except Jessica," "And Mike." Similarly, Sharma later wrote during that same text-message exchange: "Gonna kill both Ceo and her," "Gonna say they were married and got into an accident." That same day, Sharma also text-messaged Trapani: "I had fufu people on there," "And I been getting called out," "So gonna get it corrected," "Lol," "Lol," "Lol," "Just send me a pic lol."[4]

- With respect to Centra Tech's purported money transmitter and other licenses in 38 states, Sharma had a text-message conversation with Farkas and Trapani on or about August 30, 2017 about applying for state licenses that Centra Tech had previously represented it

---

[4] The evidence at trial will show that "fufu" is slang for fake. For the Court's reference, according to the *Urban Dictionary* website available on the internet, "Fufu" is defined as "Fake, not real, not genuine." *Urban Dictionary*, Definition of "Fufu," *available at* https://www.urbandictionary.com/define.php?term=Fufu (last visited October 11, 2019).

already held in 38 states. For example, Sharma wrote in one message on or about August 30, 2017 to Trapani and Farkas: "Gotta apply for all licenses," "Should I even say this."

To attract investors to purchase Centra tokens issued during the ICO, Sharma, Farkas and Trapani also used various market manipulation techniques to artificially inflate the market price of Centra tokens on a cryptocurrency trading exchange called "EtherDelta" that was based in Manhattan. The victims who invested in Centra tokens during the ICO based on fraudulent misrepresentations by Sharma, Farkas and Trapani included investors based in Manhattan, and various electronic communications relating to this fraudulent scheme were sent and received from Manhattan during and in furtherance of the scheme.

After the completion of the ICO in early October 2017, Sharma and Farkas continued the fraudulent scheme (at least until their arrests in this case in April 2018) in order to prevent Centra Tech investors from seeking a return of their investments and to artificially inflate the value of Centra tokens traded on secondary cryptocurrency exchanges.

At the trial of defendants Sharma and Farkas, the Government will prove their guilt through, among other things, the following evidence: (1) testimony from their co-defendant and former co-conspirator, Trapani, who has pleaded guilty pursuant to a cooperation agreement with the Government; (2) testimony from representatives of Bancorp, Visa and Mastercard that will contradict and prove the falsity of representations that the defendants made to investors during Centra Tech's ICO about Centra Tech's purported partnerships with those companies; (3) testimony from former employees of Centra Tech showing that "Michael Edwards" and "Jessica Robinson" were not real people; (4) evidence from the Nationwide Multistate Licensing System & Registry ("NMLS") showing that the defendants and Centra Tech did not even begin applying to NMLS for the state money transmitter licenses that it claimed during the ICO to hold in 38 states

until after the ICO was complete, and never completed the process of obtaining such licenses in the majority of those states; (5) fraudulent marketing materials that the defendants disseminated via the internet to promote their ICO, including, for example, whitepapers with fraudulent representations that were downloaded during the ICO from Centra Tech's website, as well as videos downloaded from the YouTube website in which Sharma reiterated many of those fraudulent claims; (6) testimony from victims who exchanged valuable assets for Centra tokens during the ICO based at least in part on the defendants' fraudulent claims about Centra Tech; and (7) contemporaneous text message and email communications among Sharma, Farkas and Trapani showing that they were fully aware of the fraudulent and illegal nature of their scheme to deceive Centra Tech investors.

## 1. The Origins of the Conspiracy to Defraud Centra Tech Investors

The evidence will show that before founding Centra Tech and launching the company's ICO, Sharma had known Trapani since they were in high school and they had previously committing various crimes together.   Sharma was dating one of Farkas's sisters and developed a relationship with Farkas as a result.   In or about June 2017, as it was becoming clear to Sharma and Trapani that a luxury car rental business that they started in Miami (and funded with monies that they borrowed on fraudulent pretenses) was going to fail, they had discussions about possible business opportunities relating to the emerging cryptocurrency industry.   In or about late June or early July 2017, Sharma started Centra Tech from the apartment in Miami where Sharma was living at the time with his girlfriend, Brielle Farkas.   In or about the middle or end of July 2017, Sharma invited his girlfriend's brother, Robert Farkas, and Trapani to join him in efforts to raise funds through an ICO for Centra Tech.

### 2. Roles of the Conspirators During the Fraudulent ICO

The evidence will show that during the period of the ICO from on or about July 30, 2017 through on or about October 5, 2017:

- Sharma, Farkas and Trapani worked out of a small room in Sharma's apartment. It was not until early October 2017, after the company's ICO raised more than $25 million in assets from investors, that Centra Tech moved into leased luxury office space at an office building in downtown Miami.

- Sharma was the architect of Centra Tech and of the company's ICO and marketing materials (which, as noted, contained a variety of misrepresentations). For example, when Farkas and Trapani joined Centra Tech, Sharma had already created (or caused others to create) a company website for Centra Tech with, among other things, a link to a an early version of the whitepaper soliciting investments in the company's ICO.

- Sharma tasked Farkas and Trapani with various assignments that primarily related to promoting investor interest in Centra Tech's ICO. For example, at Sharma's urging, Farkas and Trapani monitored various online chat rooms and blogs for "trolls" who posted disparaging information about Centra Tech or its ICO and took measures to address such disparagement. Many of those measures involved various lies and other types of deceptive conduct. For example, at Sharma's request, Trapani posted positive comments about Centra Tech using an anonymized screenname on various online chats to create the misleading impression that an independent, unbiased investor with no ties to the company believed it was a good investment.

### 3. Fraudulent Conduct During the ICO

The evidence will show that in late July and early August 2017, during the early stages of Centra Tech's ICO, Sharma, Farkas and Trapani made a variety of misleading statements portraying Centra Tech's executive team as a group of experienced professionals with impressive credentials. For example, at Sharma's direction, both Farkas and Trapani created LinkedIn profiles for themselves containing false information about their educational and professional credentials to give Centra Tech the appearance of legitimacy.[5] Similarly, in late July 2017,

---

[5] This is documented in contemporaneous text messages that have been recovered from the

Sharma created (or caused others to create) various whitepapers soliciting investments in Centra Tech's ICO that included fraudulent information about the company's purported executive team. For example, a version of the whitepaper that was available on Centra Tech's website as of on or about July 31, 2017 contained a section entitled "Centra Tech Team" listing: (i) a purported individual named "Michael Edwards" as Centra Tech's "CEO & Co-Founder," along with a supposed picture of "Michael Edwards"; and (ii) a purported individual named "Jessica Robinson" as Centra Tech's "CFO," along with a supposed picture of "Jessica Robinson." In reality, "Michael Edwards" and "Jessica Robinson" were fictional people (and the photograph of "Michael Edwards" was actually that of a Canadian professor) who were invented by Sharma.

In early August 2017, shortly after Centra Tech's ICO began, Cliff High, an analyst and predictor of cryptocurrency trading market trends with a wide internet following among cryptocurrency traders, publicly endorsed Centra Tech's ICO to his viewers — an endorsement that he later told his followers was a mistake. Nevertheless, Centra Tech's ICO raised over a million dollars in digital assets from investors by early August 2017. After realizing his mistake, Cliff High conducted a hostile interview of Sharma about Centra Tech's ICO. The interview was videotaped and then published on the YouTube website on or about August 6, 2017. Sharma participated in the interview remotely from a computer in the room in his apartment where he and his co-conspirators, Farkas and Trapani, were running Centra Tech's ICO. Trapani and Farkas

_____

Trapani Cellphone, including the following examples. On or about July 30, 2017, starting at approximately 12:40AM, Sharma text-messaged Trapani to "Go make a linked in," to "Add yourself to centra tech," "As Coo," and to "Google," "Coo linked in profiles," "And get all the info," "Put precious [*sic*] jobs," "Like banks etc." Starting at approximately 1:39AM on or about July 30, 2017, Sharma text-messaged Trapani: "December," "2016," "Take Harvard out," "Do Like university of Georgia," "It would too suspect everyone from hRvard," "Add a construction company prior."

were both present in the room when Sharma participated in the interview. During the interview, Sharma made several false statements about Centra Tech in response to questions from Cliff High. For example, Sharma made false claims that "Michael Edwards" was the CEO and a seed investor in Centra Tech, and that Centra Tech had a licensing agreement with Bancorp to issue Centra debit cards with Visa and Mastercard logos on the cards. All of these claims by Sharma were false, as he as well as Farkas and Trapani well knew. Although the interview did not seem to go well, the publicity that Centra Tech's ICO received from the interview, and from subsequent paid-celebrity-endorsements from Floyd Mayweather and Khaled Mohamed Khaled, a/k/a "DJ Khaled," helped draw investors' attention to the ICO.

As another way to promote interest in Centra Tech's ICO, Sharma, Farkas and Trapani also would artificially "pump" up the price of Centra tokens traded on the Manhattan-based cryptocurrency exchange called EtherDelta. One of the ways that Sharma, Farkas and Trapani did this was by having one of them sell large blocks of Centra tokens to another at above-market prices, which would attract more attention from investors. Because transactions on EtherDelta were anonymous, it was not readily apparent to the investing public that Sharma, Farkas and Trapani were engaging in such transactions (without any economic substance) solely to manipulate the market price of Centra tokens. Sharma provided Farkas and Trapani with units of Ether to make the purchases of Centra tokens for these price-pumping transactions — Ether units that they had raised from investors who had purchased Centra tokens in the company's ICO. Contemporaneous text messages recovered from the Trapani Cellphone show the roles and involvement of Sharma and Farkas in such efforts to manipulate the market price of Centra tokens. In addition, Sharma also engaged in efforts to artificially manipulate the price of Centra tokens by

making false statements to the proprietor of the EtherDelta cryptocurrency exchange that had the effect of artificially freezing the reported market price of Centra tokens (when the price was high) on a widely-followed cryptocurrency tracking website called CoinMarketCap.

On or about August 30, 2017, while the ICO was underway, Sharma received a cease-and-desist notice from Bancorp directing Centra Tech to refrain from "REPRESENTING THAT THE BANCORP BANK HAS ANY CONNECTION WITH, OR IS THE ISSUER OF ANY CARD PRODUCTS RELATED TO CENTRA TECH . . . [and from] USING OUR LOGO OR OTHER IMAGES IN CONNECTION WITH THE MARKETING OF ANY PRODUCT OR WALLETS YOU OFFER." (Emphasis in original.) Text messages recovered from the Trapani Cellphone show that in response, Sharma engaged in a group text-message conversation with Farkas and Trapani about taking down (among other things) images of the Bancorp logo that had been posted on Centra Tech's website and blaming freelancers for their fraudulent and unauthorized references to Bancorp in Centra Tech's offering and marketing materials. During this group conversation, Sharma text-messaged Farkas and Trapani and told Farkas, among other things, to contact anyone that has Centra Tech marketing materials with the Bitset image and "ask them to remove it," and to do the same regarding "that language," "Saying we work Bancorp," "Od bad," "Their lawyer reached out." Shortly thereafter, Farkas responded to Sharma and Trapani: "No Bancorp on it." Sharma responded: "In the bottom? . . . . U sure," "I thought I saw," "On press releases." Farkas wrote: "Just checked them all," "No Bancorp." Sharma responded: "Okay," "We gotta get that shit removed everywhere and blame freelancers lol," "Fuck," "One fucking [expletive]," "Caused so much . . . [r]uckess."

On or about September 29, 2017, as the ICO was coming to its end, Sharma advised Farkas

and Trapani via a group text-message conversation that the SEC had brought an enforcement action charging a company called "RECoin" and the company's founder, among others, with defrauding investors in an unregistered offering of securities styled as an initial coin offering of digital tokens. During this conversation, Sharma text-messaged Farkas and Trapani: "Sec just shut down REcoin," "Read the article," "We gotta clean up every single thing that we can't do," "And can't offer today," "Google SEC REcoin." Trapani responded "I peep." Sharma text-messaged Farkas and Trapani: "Delete all the cards have shipped info," "Everything gotta get cleaned up," "RJ [*i.e.*, Farkas] can u jump on that . . . on our pages." Trapani responded: "They were pitching a straight security" at approximately 11:55PM on or about September 29, 2017. Sharma wrote "Yea," "I know," "But fill [*sic*] fraud can be a word thrown around," "Especially with the card limits." Trapani responded "Word." Sharma later text-messaged Farkas and Trapani: "I want a product page like [a particular competitor's]," "Theirs is so nice." Trapani wrote "Lol yeah no real product." Sharma wrote: "Yea but it doesn't say much," "And looks good," "We don't have a real product either right now," "So I wanna tighten up ship asap." Trapani wrote "Feel you."

### 4. The Immediate Aftermath of the Fraudulent ICO

The evidence will show that as the ICO was coming to a conclusion in early October 2017, Sharma, Farkas and Trapani used fraud proceeds raised from victim-investors during the ICO to lease luxury office space in Miami for Centra Tech's headquarters, hired multiple employees to work for the company, and purchased computers and other equipment for the company to use.

On October 5, 2017, which was the last day of the Centra Tech ICO, Trapani surrendered at the Manhattan District Attorney's Office on a perjury indictment charging Sharma and Trapani

with lying under oath as defense witnesses for Sharma at a misdemeanor criminal trial a few months earlier in Manhattan Criminal Court in which Sharma was being tried for driving while intoxicated ("DWI").[6]   On September 19, 2017, the Manhattan District Attorney's Office filed a sealed indictment in New York County Supreme Court charging Sharma and Trapani with perjury. As a result, Sharma was arrested on or about October 3, 2017 and Trapani surrendered on or about October 5, 2017.[7]   Both Sharma and Trapani later pled guilty to perjury charges in that case.

On or about October 27, 2017, the *New York Times* published an article about Centra Tech and its co-founders Sharma, Farkas and Trapani on the internet raising questions about their qualifications and the accuracy of their representations to investors during the company's ICO. The article also reported that "For now, the bigger problem facing Mr. Sharma and Mr. Trapani is the perjury indictment by a Manhattan grand jury [unsealed] on Oct. 5," as the company was finishing up its ICO.

In the wake of the article, Sharma advised Trapani that both of them needed to officially

---

[6]   In July 2017, while Sharma was making preparations to initiate Centra Tech's ICO, Sharma proceeded to trial in Manhattan Criminal Court on misdemeanor charges stemming from an incident in March 2016 in which he was arrested on DWI charges in Manhattan after drinking too much alcohol at a dinner with several friends at a restaurant.   Shortly before the trial, Sharma asked Trapani to falsely testify in Sharma's defense at the DWI trial, and Trapani agreed to do so. In advance of Trapani's testimony, Sharma told Trapani to testify that Sharma had only one glass of wine at the dinner before driving home and getting arrested, even though they both knew that Trapani was not at the dinner and that Sharma had in fact consumed multiple glasses of wine at the dinner.

[7]   When Trapani surrendered on October 5, 2017, he brought the Trapani Cellphone with him to the Manhattan District Attorney's Office, the cellphone was seized by local police, and he signed a consent form authorizing local police to conduct a "complete search" of the cellphone.   Pursuant to this consent form, the Trapani Cellphone was searched, its contents were copied into an extraction report containing more than 14,000 pages of materials, and the cellphone was returned to Trapani.   The extraction report was later obtained by the Government and the FBI in April 2018 as part of the federal criminal investigation that led to this fraud prosecution.

step down from their executive positions at Centra Tech. On or about October 31, 2017, Centra Tech issued a public statement via the internet stating, in relevant part, that "Co-Founders Sam Sharma and Ray Trapani are stepping aside to support the continued growth of the Company," and "to further their vision, the reconstituted Executive Management team" included "William Hagner as President" and "Robert Farkas as Chief Operating Officer," among others. Contrary to this public statement, William Hagner, who was Trapani's grandfather, was in and out of hospitals at the time and never had any involvement in the management of Centra Tech, and Sharma continued to control the management of the company. Trapani, however, separated from Centra Tech in early November 2017.

Meanwhile, during the period from November 2017 through April 2018, Sharma and Farkas scrambled to (a) try to obtain the money transmitter and other licenses that they had previously misrepresented to investors that they already had in 38 states, and (b) develop substitutes for the critical business relationships with Visa and Mastercard that they had previously misrepresented to investors were already in place.

### 5. Attempts to Obstruct Investigations of the Centra Tech Fraud

As noted, during Centra Tech's ICO from July 30 through October 5, 2017, Sharma, Farkas and Trapani raised at least 100,000 Ether units through fraudulent misrepresentations. The Ether units that Centra Tech raised from investors can be grouped into two broad categories: thousands of Ether units provided by a company in South Korea called Bitsset in exchange for Centra tokens, and thousands of Ether units raised from hundreds of other investors in exchange for Centra

tokens.[8]

On or about November 29, 2017, the SEC issued a subpoena to Centra Tech, care of Centra Tech's outside counsel at the law firm of Ballard Spahr LLP, compelling Centra Tech to produce a variety of documents relating to an investigation by the SEC of whether the company and its co-founders had violated the federal securities laws during the ICO. The SEC subpoena included requests for, among other things, documents sufficient to identify all digital and other assets held by or on behalf of Centra Tech, and documents sufficient to identify all investors who purchased any tokens offered by Centra Tech.

From approximately November 29, 2017 through April 2018, Sharma engaged in various efforts to obstruct the SEC's investigation. For example, during this period:

- Sharma caused Centra Tech's outside counsel at Ballard to produce to the SEC a fraudulent summary spreadsheet (the "Summary Spreadsheet") that Sharma prepared in response to the SEC's subpoena. The Summary Spreadsheet purported to show that Centra Tech received a total of approximately 91,000 Ether units in exchange for Centra tokens issued by Centra Tech during the Centra Tech ICO: approximately 40,000 Ether units from so-called "Korea Partners," a reference to Bitsset, and approximately 51,000 Ether units from hundreds of individual Centra token purchasers named in the Summary Spreadsheet. In fact, as Sharma well knew, he and his confederates had raised at least 100,000 Ether units from Centra token purchasers during Centra Tech's ICO.[9] The difference of 9,000 Ether units that Sharma lied about was worth about $6 million at various points in this case (and is presently worth over a $1 million), and the other 91,000 Ether units were worth over $60 million at various points in this case (and are presently worth over $17 million).

---

[8] It appears that Bitsset aggregated investment funds from various individual investors in Korea, and invested those funds on behalf of the individual investors in Centra Tech.

[9] This is confirmed by contemporaneous text messages recovered from the Trapani Cellphone. For example, on or about October 2, 2017, Sharma text-messaged Farkas and Trapani: "I did mad job stuff over the weekend," "Also got us 100K in ETH in the account . . . . And we still have 28.9M ctr left." Trapani wrote: "Good shit . . . . Was just watching it as you where moving it wondering what you where doing lol," "Perfect." Later that day, Sharma text-messaged Farkas and Trapani: "Made it 100K in ETH for storage."

- Sharma also caused Centra Tech's outside counsel at Ballard to convey false information to the SEC about measures that Centra Tech had taken to prevent the dissipation of the alleged total of 91,000 Ether units that the company had raised through the ICO. Specifically, Sharma caused Centra Tech's outside counsel to misrepresent to the SEC that the claimed total of 91,000 Ether units in ICO proceeds, as well as 9,000 Ether units that Sharma claimed were proceeds of his own personal cryptocurrency trading, had been placed in a passcode-protected digital wallet, the only passcode to which had been reduced to a piece of paper, divided into halves, and placed in two separate safe deposit boxes controlled by Farkas and another company executive, respectively. In fact, as Sharma well knew, the passcode fragmented into those halves was fake, and the true passcode was on a piece of paper that Sharma kept in the apartment where he and Farkas' sister lived in Miami.

On April 1, 2018, Sharma and Farkas were arrested in the Southern District of Florida by FBI agents on the securities and wire fraud charges in this case and remanded pending their removal to the Southern District of New York for prosecution. On April 12, 2018, after the FBI obtained the two pieces of paper that purportedly combined to reveal the passcode needed to access the funds in the digital wallet set up by Sharma (the "Sharma Wallet"), FBI agents attempted without success to use the supposed passcode to transfer investor funds from the Sharma Wallet to a secure digital wallet maintained by law enforcement, in order to prevent anyone from dissipating the funds during the pendency of this criminal fraud prosecution. On April 13, 2018, the Government served a judicially authorized seizure warrant on Sharma and Farkas through their original attorneys in this criminal case, Sharon McCarthy of the law firm of Kostelanetz & Fink LLP (for Sharma) and Daniel Horwitz of the law firm of McLaughlin & Stern LLP (for Farkas), requiring Sharma and Farkas to assist the FBI in effectuating the transfer of investor funds in the Sharma Wallet to a secure digital wallet controlled by law enforcement.

In advance of Sharma's bail hearing in the Southern District of New York, the Government filed a motion on May 1, 2018 seeking to have Sharma detained without bail pending trial, or at a minimum, detained until bail conditions were met requiring (among other things) that he comply

with the seizure warrant.   Later that day, after Sharma met with his lawyer (Ms. McCarthy) in the jail where he was detained, Sharma's lawyer reported to the Government that the actual passcode to the Sharma Wallet was on a piece of paper taped underneath a drawer in the kitchen of the apartment where Sharma and Farkas' sister lived in Miami, and Sharma's lawyer later reported as much to the Court on the record at Sharma's first bail hearing in this case.   The FBI recovered the passcode during a consensual search of that kitchen on May 2, 2018 and then successfully used the passcode to execute the seizure warrant on the Sharma Wallet.   Following their respective bail hearings in early May 2018 — including a bail hearing on May 2, 2018 at which Sharma caused his attorney to reiterate to the Court his false claim that 9,000 of the Ether units in the Sharma Wallet belonged to him and not Centra Tech investors — Sharma and Farkas were released on bail pending trial in this case.

## ARGUMENT

### I.    The Court Should Admit Proof of Certain Bad Acts by the Defendants

The Government intends to offer evidence during its case-in-chief at trial concerning the following criminal acts by either or both of defendants Sharma and Farkas:   (a) specified prior acts of fraud that Sharma committed with Trapani before they and Farkas formed the charged conspiracy to defraud Centra Tech investors (and certain prior acts of fraud and drug trafficking that Sharma committed with or in the presence of Trapani, if the defendants will not agree to refrain from cross-examining Trapani about his culpability for these acts); (b) the aforementioned scheme in which Sharma committed perjury and caused Trapani to commit perjury as defense witnesses for Sharma in a misdemeanor DWI trial, which took place during the planning stages of the Centra Tech fraud; (c) acts of market manipulation by Sharma, Farkas and Trapani, to artificially inflate the market price of the Centra tokens; and (d) efforts by Sharma to obstruct parallel investigations

by the SEC as well as the Government and FBI of the charged Centra Tech fraud conspiracy. For the reasons that follow, evidence of all of these acts are highly probative and admissible as direct proof of the charged offenses, or for purposes authorized by Federal Rule of Evidence 404(b); any resulting prejudice does not substantially outweigh the significant probative value of this evidence; and any such prejudice can be adequately minimized through appropriate limiting instructions to the jury. Accordingly, all of this evidence should be admitted at trial.

### A. Applicable Law

Under Rule 402 of the Federal Rules of Evidence, "[a]ll relevant evidence is admissible" at trial unless its admission is contrary to the United States Constitution, a federal statute, another Federal Rule of Evidence, or other rules proscribed by the United States Supreme Court. Federal Rule of Evidence 401 defines "relevant evidence" as evidence having "any tendency to make a fact more or less probable than it would be without the evidence" where "the fact is of consequence in determining the action." Fed. R. Evid. 401. Direct evidence is "not confined to that which directly establishes an element of the crime." *United States* v. *Gonzalez*, 110 F.3d 941, 942 (2d Cir. 1997). Rather, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.*

Under Rule 404(b) of the Federal Rules of Evidence, evidence of uncharged crimes, wrongs, or other acts by a defendant may be admitted for purposes other than proving the defendant's propensity to commit crimes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). The Second Circuit has long followed "an inclusionary approach to evaluating Rule

404(b) evidence, which allows evidence to be received at trial for any purpose other than to attempt to demonstrate the defendant's criminal propensity." *United States* v. *Edwards*, 342 F.3d 168, 176 (2d Cir. 2003) (internal quotation marks and citation omitted). Under Rule 404(b), it is well settled that "other acts" evidence is admissible so long as the evidence: (1) is advanced for a proper purpose; (2) is relevant to the crimes for which the defendant is on trial; and (3) has probative value that is not substantially outweighed by any unfair prejudicial effect. *See United States* v. *Paulino*, 445 F.3d 211, 221 (2d Cir. 2006); *United States* v. *LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004). If requested, the admission of such evidence must be accompanied by an appropriate limiting instruction to the jury. *See United States* v. *Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993).

Rule 404(b) does not govern all evidence that can be characterized as "other acts" proof. When determining whether Rule 404(b) governs the admissibility of particular evidence, the Second Circuit has cautioned that relevant evidence of a crime is not limited to "that which directly establishes an element of the crime." *Gonzalez*, 110 F.3d at 941. In keeping with that principle, "other acts" evidence can constitute direct evidence and, in that case, is not subject to analysis under Rule 404(b). *See, e.g., United States* v. *Carboni*, 204 F.3d 39, 44 (2d Cir. 2000). For example, where, as here, a defendant is charged with conspiracy, "uncharged acts may be admissible as direct evidence of the conspiracy itself." *United States* v. *Baez*, 349 F.3d 90, 93 (2d Cir. 2003) (quotation marks and citation omitted). Furthermore, it is well established that "other acts" evidence is admissible as direct proof of the crimes charged and not considered Rule 404(b) evidence if it (i) "arose out of the same transaction or series of transactions as the charged offense," (ii) "is inextricably intertwined with the evidence regarding the charged offense," or (iii) "is

necessary to complete the story of the crime on trial." *Carboni*, 204 F.3d at 44 (quotation marks and citation omitted).

Regardless of whether the evidence is admitted as direct evidence or under Rule 404(b), "other acts" evidence is, like all evidence, excludable under Federal Rule of Evidence 403 if its probative value is substantially outweighed by the danger of unfair prejudice. Rule 403 authorizes the exclusion of relevant evidence only if its "probative value is *substantially outweighed* by the danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403 (emphasis added). All evidence of guilt is, of course, prejudicial, in the sense of disadvantaging the defense, but that is not the same as being "unfairly" prejudicial under Rule 403. *See Costantino* v. *Herzog*, 203 F.3d 164, 174 (2d Cir. 2000). As the Second Circuit has stated, "*all* evidence incriminating a defendant is, in one sense of the term, 'prejudicial' to him: that is, it does harm to him" and in "that sense, the more pertinent evidence is, the more prejudicial it is," but "[w]hat 'prejudice' as used in Rule 403 means is that the admission is, as the rule itself literally requires, 'unfair' rather than 'harmful.'" *United States* v. *Jimenez*, 789 F.2d 167, 171 (2d Cir. 1986) (emphasis in original). Evidence is *unfairly* prejudicial "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States* v. *Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). Evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial. *See United States* v. *Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990).

The Second Circuit reviews the evidentiary rulings of a district court for abuse of discretion and reverses only in cases involving "manifest error." *See United States* v. *Miller*, 626 F.3d 682, 688 (2d Cir. 2010).

### B. Discussion

#### 1. Evidence of Prior Crimes that Sharma Committed With or In the Presence of Trapani Should Be Admitted

During the Government's case-in-chief at trial, the Government intends to call cooperating witness Trapani, who has pleaded guilty under a cooperation agreement with the Government, to testify about the roles that he and his co-defendants, Sharma and Farkas, played in the charged conspiracy to defraud Centra Tech investors.

Before they formed the charged fraud conspiracy, Sharma committed the following criminal acts with or in the presence of Trapani:

- In or about 2009 or 2010, while Trapani was employed by Sharma and their mutual associate ("Associate-1") at a used car dealership in Long Island, Sharma and others engaged in the following criminal acts: ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

- From in or about 2016 through in or about 2017, for the purported purpose of raising startup capital for a luxury car rental business called Miami Exotics, Sharma participated with Associate-1 and Trapani in a scheme to fraudulently obtain a total of about $500,000 in funds that were borrowed against the credit of several members of Trapani's extended family. As part of this scheme, Sharma, among other things, participated in phone calls with various lending banks in which Sharma impersonated the voices of various of Trapani's relatives and requested that Sharma be added as an authorized borrower on the relevant line of credit or that the relevant line of credit be increased, so that Sharma could borrow more funds that had not been approved by Trapani's relatives. While a portion of the borrowed funds were used for Miami Exotics, a portion of the borrowed funds were dissipated and wasted for personal expenses of Sharma, Associate-1 and Trapani. The

21

majority of the borrowed funds were later repaid to the lenders using funds that Sharma, Farkas and Trapani raised from Centra Tech investors through the securities and wire fraud offenses charged in this case.

During the Government's case-in-chief at trial, the Government intends to offer evidence of the fraudulent acts that Sharma committed with Trapani in relation in Miami Exotics from in or about 2016 through in or about 2017.   The Government does not intend to offer evidence during its case-in-chief of the criminal acts ████████████████ that Sharma committed with or in the presence of Trapani when they worked together at Sharma's used car dealership in or about 2009 or 2010, so long as defendants Sharma and Farkas agree to refrain from cross-examining Trapani about these acts.   But if the defendants will not make such a commitment, it would be unfair and misleading to the jury to let the defendants cross-examine Trapani about these criminal acts — which were committed by Sharma with Trapani, or by Sharma in Trapani's presence — without also informing the jury of Sharma's involvement in those acts.[10]

### a. Sharma's Prior Fraudulent Acts Concerning Miami Exotics

Proof of the criminal acts that Sharma committed with Trapani in relation to Miami Exotics, before they conspiring to defraud Centra Tech investors as charged in this case, is admissible for several independent reasons:

*First*, because Sharma committed those prior criminal acts with Trapani, evidence of those prior criminal acts by Sharma are appropriate to give the jury the background necessary to understand how Sharma's criminal relationship with Trapani developed and why Sharma had

---

[10]   The Government (via an email at 1:20PM today) asked counsel defendants Sharma and Farkas if they would agree to forgo cross-examination of Trapani on these topics.   Sharma's counsel did not respond, though they corresponded via email with the Government before and after that today. Farkas' counsel reported that this request is reasonable, but they need additional time to consider this request.

sufficient trust in Trapani to enlist Trapani as one of his co-conspirators in the charged scheme to defraud Centra Tech investors. *See United States* v. *Pipola,* 83 F.3d 556, 566 (2d Cir. 1996) ("One legitimate purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship developed; this sort of proof furnishes admissible background information in a conspiracy case . . . [and] may also be used to help the jury understand the basis for the co-conspirator's relationship of mutual trust.").

The evidence at trial will show that during the charged scheme to defraud Centra Tech investors, Sharma conspired with Trapani and Farkas to dupe investors into parting with millions of dollars in assets through brazen lies, including false claims that Centra Tech was led by two accomplished senior executives whom Sharma and his confederates knew were actually fictitious people, and misrepresentations that the company had necessary business partnerships and licenses that Sharma and his confederates knew the company did not have. At various points during this fraudulent scheme, Sharma made openly incriminating statements in contemporaneous text messages with Trapani revealing that Sharma was fully aware of the fraudulent and illegal nature of the scheme. In order for the jury to understand why Sharma would have placed enough trust in Trapani to bring him into the inner circle of this criminal fraud conspiracy and openly make incriminating statements to Trapani, in writing, about Sharma's involvement in the conspiracy, it is critical for the jury to learn that Trapani had earned Sharma's trust through a long-standing criminal relationship in which Trapani had previously committed criminal acts of fraud with Sharma. *Cf. United States* v. *Reifler*, 446 F.3d 65, 93 (2d Cir. 2006) (evidence that racketeering defendant had ties to organized crime was admissible to explain, among other things, "(a) why [one defendant] could comfortably approach [his alleged co-conspirators] with a proposal for a

scheme that was explicitly fraudulent . . . [and] (b) why the participants discussed the planned frauds candidly among themselves, without any apparent concern that one of them might inform law enforcement authorities. . . .").

Under the circumstances, evidence of such prior criminal acts by Sharma is admissible in order "to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed."   *United States* v. *Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000) (affirming that in trial of defendant for conspiring with two co-conspirators, the district court properly admitted evidence that the defendant had previously committed crimes with either or both of those co-conspirators including a credit card fraud, a marijuana transaction, and causing law enforcement to make a false arrest) (quotation marks and citation omitted); *accord United States* v. *Flom*, 256 F. Supp. 3d 253, 266-67 (E.D.N.Y. 2017) (in trial of defendant for agreeing to engage in a money laundering scheme with a cooperating informant, evidence of defendant's prior money laundering crime with the informant was admissible to show "how [the defendant] came to meet and trust [the informant] and to [the defendant's] knowledge of the fraudulent nature of the scheme at issue in this case"), *aff'd*, 763 F. App'x 27 (2d Cir. 2019).[11]

---

[11]   *See also, e.g.*, *United States* v. *Isaac*, 14 F. App'x 81, 83 (2d Cir. 2001) (evidence of trial defendant's prior criminal acts with several cooperating witnesses was properly admitted under Rule 404(b) for "the purpose of establishing [his] relationship of trust with certain witnesses to whom he had confessed the charged crimes"); *United States* v. *Guerrero*, 882 F. Supp. 2d 463, 492 (S.D.N.Y. 2011) (evidence of defendants' uncharged crimes with co-conspirators "including shootings of drug rivals, . . . robberies of drug customers and their knowledge of and acquiescence in [a] murder . . . is plainly admissible to explain the development of the illegal relationship between the defendants and their co-conspirators and explain he mutual trust that existed between the co-conspirators (including the cooperating Government Witnesses)"), *aff'd*, 560 F. App'x 110 (2d Cir. 2014); *Roldan-Zapata*, 916 F.2d at 804 (same).

*Second*, because Sharma's prior criminal acts in relation to the Miami Exotics fraud were committed jointly by Sharma and Trapani, those prior criminal acts constitute potential impeachment material for Trapani under *Giglio* v. *United States*, 405 U.S. 150 (1972) that are independently admissible in order to allow the Government to disclose to the jury information about Trapani's criminal past that bears on the jury's evaluation of his credibility. During the Government's direct-examination of Trapani, the Government intends to elicit testimony from Trapani about his role as an active participant in those prior criminal acts to illustrate for the jury that he is not hiding anything and to take the "sting" out of any potential cross-examination about those prior criminal acts. When the Government relies on testimony from cooperating witnesses such as Trapani, who were "participants in the events about which they testified, it [is] appropriate for the prosecution to elicit testimony during direct examination that expose[s] details damaging to their credibility." *United States* v. *Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991). Such questioning on direct-examination is permissible, because if the Government were not allowed to probe impeachment material on direct-examination and those matters were raised for the first time on cross-examination, it would create the appearance that the Government or the witness was concealing damaging facts from the jury. Furthermore, allowing Trapani to testify to his role in those prior criminal acts without permitting him to indicate that that they were carried out with Sharma risks misleading and inflaming the jury into believing that the Government was letting a criminal with a history of prior misbehavior worse than Sharma "cooperate down" against Sharma (and Farkas) in the hope of receiving sentencing leniency, when in fact all of those prior criminal acts were also committed with Sharma.

*Third*, Sharma's prior criminal acts relating to Miami Exotics are also admissible for other purposes authorized by Rule 404(b).   For example, the Miami Exotics conduct illustrates why Sharma and Trapani were in desperate enough need of money to embark on the charged scheme to defraud Centra Tech investors.   Evidence that they owed hundreds of thousands of dollars on loans that they had previously borrowed under false pretenses for Miami Exotics is admissible under Rule 404(b) as proof of their motive for committing the charged fraud on Centra Tech investors.   *See* Fed. R. Evid. 404(b) ("proving motive" is a permissible purpose for admitting proof of a defendant's uncharged criminal acts).

*Finally*, because of the highly probative value of the Miami-Exotics-fraud-evidence that the Government seeks to introduce as necessary background to the charged fraud conspiracy, one cannot say that the probative value of this proof is "substantially outweighed" by its potential for unfair prejudice, as required to exclude this proof under Rule 403.   While evidence of those prior criminal acts about Sharma's involvement in a fraud to obtain about $500,000 in funds may be troubling to a jury, they are far less serious in scope (and similar in kind) to the indisputably admissible evidence that will come in at trial of Sharma's role in orchestrating the charged scheme to trick hundreds of victim-investors into parting with tens of millions of dollars in assets through brazen lies.  *See Roldan-Zapata*, 916 F.2d at 804 (evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial).   While evidence of such prior criminal acts are prejudicial in the colloquial sense that they will paint Sharma in an unfavorable light, this evidence is not unfairly prejudicial because it is highly probative on necessary background to the charged fraud conspiracy offenses and is not so unflattering as to invite the jury to consider this evidence for an improper purpose.   Additionally,

any prejudice from the introduction of this evidence can be eliminated with an appropriate limiting instruction, which the Government will not object to if requested by the defendants. *See United States* v. *Livoti*, 8 F. Supp. 2d 250, 252–53 (S.D.N.Y. 1998) (admitting 404(b) evidence of an uncharged choking incident by the defendant because "the prejudice claimed by [the defendant] will be minimized by a limiting instruction" and "jurors are presumed to follow a court's instructions"), *aff'd*, 196 F.3d 322, 326 (2d Cir. 1999); *United States* v. *Cadet*, 664 F.3d 27, 33 (2d Cir. 2011) ("'[T]he law recognizes a strong presumption that juries follow limiting instructions.'" (quoting *United States* v. *Snype,* 441 F.3d 119, 129 (2d Cir.2006) (*Cadet*'s brackets)).

### b. Sharma's Prior Crimes Concerning His Used Car Dealership

As noted, when Trapani worked for Sharma's and Associate-1's used car dealership in or about 2009 or 2010, Sharma committed various ████████ with Trapani, and Sharma also committed various acts of ██████████ with his business partner, Associate-1, that Trapani observed and tacitly condoned. If the defendants will not agree to refrain from cross-examining Trapani about his involvement in these prior criminal acts, the Government is entitled to elicit direct testimony from Trapani about about these acts "to avoid the appearance that [the Government] [is] concealing impeachment evidence from the jury." *Coonan*, 938 F.2d at 1561. As a practical matter, Sharma's involvement in such acts is so inextricably intertwined with Trapani's that it would be extremely difficult, if not impossible, for Trapani to explain those acts without also discussing Sharma's role in them. More importantly, it would be unfair and misleading to the jury to try to make Trapani do so. Allowing Trapani to testify to his role in those prior criminal acts — many of which were actually committed by Sharma and merely observed and tacitly condoned by Trapani — poses a substantial danger of unfairly giving the jury

the misimpression that Trapani was a worse actor than Sharma and thus had an incentive to slant the truth to "cooperate down" against Sharma, when in reality, the opposite is true.   When the jury is tasked with evaluating the credibility of Trapani and his testimony in light of his prior criminal acts, the jury should not be given only half the story.   If the defendants will not agree to refrain from cross-examining Trapani about his involvement in these prior criminal acts, the Government should be allowed to elicit direct-testimony from Trapani about Sharma's role in those crimes.

> ### 2. Evidence about Sharma and Trapani Conspiring to Commit Perjury During the Charged Fraud Conspiracy Should Be Admitted

The Government also intends to offer proof at trial relating to above-referenced scheme in which Sharma committed perjury and caused Trapani to commit perjury in Sharma's defense at his misdemeanor DWI trial in Manhattan criminal court, during the early stages of the charged conspiracy to defraud Centra Tech investors.   Specifically, the Government plans to introduce proof establishing the following facts relating to Sharma's perjury scheme:

- In or about July 2017, while Sharma was making preparations to initiate Centra Tech's fraudulent ICO fund-raising effort, Sharma committed perjury and caused Trapani to commit perjury as defense witnesses at Sharma's DWI trial.[12]

- While Centra Tech's fraudulent ICO was underway, Sharma was arrested on or about October 3, 2017 and Trapani surrendered on or about October 5, 2017 after being charged with perjury by the Manhattan District Attorney's Office.

- While Trapani was in Manhattan on the date of his surrender on those state perjury charges, Trapani used his cellphone, namely the Trapani Cellphone, to engage in text-message communications in furtherance of the federal securities and wire fraud offenses charged in this case — communications that will be part of the Government's proof that this criminal prosecution is appropriately venued in the Southern District of New York.

---

[12]   Although Sharma and Trapani lied under oath in Sharma's defense at the DWI trial in July 2017, Sharma was still convicted.   The Government does not intend to elicit evidence of this DWI conviction during the Government's case-in-chief at trial in this case.

- On October 27, 2017, the *New York Times* published an article about Centra Tech and its co-founders Sharma, Farkas and Trapani raising questions about their qualifications and the accuracy of their representations to investors during the company's initial coin offering, and noting that "For now, the bigger problem facing Mr. Sharma and Mr. Trapani is the perjury indictment by a Manhattan grand jury on Oct. 5," as Centra Tech was finishing fund-raising through its ICO. In the wake of the article, Centra Tech issued a public statement on October 31, 2017 claiming that "Co-Founders Sam Sharma and Ray Trapani are stepping aside to support the continued growth of the Company" and that "the reconstituted Executive Management team" included "William Hagner as President" and "Robert Farkas as Chief Operating Officer," among others. While Trapani did leave the company shortly thereafter, Sharma continued to serve behind the scenes as the *de facto* chief executive officer of the company notwithstanding the company's public statement to the contrary.[13]

- Despite the red flags raised by the *New York Times* article, Farkas did not dissociate himself from Centra Tech. To the contrary, Farkas took on a heightened role in the day-to-day management of the company following the article, and Sharma and Farkas along with

---

[13] The Government intends to offer the *New York Times* article, in the redacted form shown in Exhibit A, not to prove what the statements in it assert, but rather for the non-hearsay purposes of showing the effect that the article's allegations had on those who reviewed them, Sharma and Farkas, and to provide context for their subsequent actions. *See United States* v. *Rowland*, 826 F.3d 100, 115 (2d Cir. 2016) (affirming admission of out-of-court statement because it "was not offered for the truth of the matters asserted, but instead to provide context for what" others "knew during their subsequent meeting with [the defendant]"; "[t]he statement was offered for its effect on the listeners, not its truth, and was therefore not hearsay"), citing Fed. R. Evid. 801(c). Whether or not the allegations in the article were true, the fact that Sharma and Farkas were put on notice of those allegations by the article is highly probative of why their subsequent actions were inculpatory — a relevant, non-hearsay use of the article. *See, e.g.*, *Jordonne* v. *Ole Bar & Grill, Inc.*, 13 Civ. 1573 (VB) (JCM), 2016 WL 3409088, at *6 (S.D.N.Y. Apr. 26, 2016) (admitting news reports to show notice of their allegations to defendants), *adopted by* 2016 WL 3360524 (S.D.N.Y. June 16, 2016). For example, in the wake of the *New York Times* article, the defendants scrambled to reorganize the company to keep investors at bay by misleading the world into thinking that Sharma was stepping back. Without the article, the jury may be misled into thinking that Sharma withdrew from the charged fraud conspiracy at the end of October 2017 when he appeared to step down from his role on the executive team, when, in reality, he continued to run the company from behind the scenes. Furthermore, the probative value of the *New York Times* article, in its redacted form, is not substantially outweighed by any danger of prejudice from the article under Rule 403, as the remaining unredacted allegations reported in the article are no worse than the allegations in the Indictment. In addition, any prejudice can be minimized with a standard limiting instruction to the jury that they are not to consider the article for the truth of the statements contained within it, but only for notice of its contents to the defendants and to explain actions taken by the defendants after the publication of the article.

others at Centra Tech scrambled to try to obtain the licenses and to develop substitutes for the critical business relationships with Visa and Mastercard that they had falsely claimed were in place while raising funds from Centra Tech investors during the ICO.

Evidence of these facts is admissible for the following reasons.

*First*, the foregoing evidence concerning Sharma's perjury scheme as admissible because it "is inextricably intertwined with the evidence regarding the charged offense" and "is necessary to complete the story of the crime on trial." *Carboni*, 204 F.3d at 44 (internal quotation marks and citation omitted). Sharma committed perjury and caused Trapani to permit perjury in Sharma's defense at Sharma's DWI trial during the charged conspiracy to defraud Centra Tech investors, while Sharma was planning the ICO at the heart of the conspiracy. Sharma and Trapani were taken into state custody on resulting perjury charges during the midst of the efforts by Sharma, Farkas and Trapani to raise funds from Centra Tech through the statements challenged by this prosecution as fraudulent and misleading. On the date of his surrender on those perjury charges in Manhattan, Trapani used the Trapani Cellphone in the Southern District of New York to send and receive electronic communications in furtherance of the charged fraud conspiracy. And the *New York Times* article publicizing those perjury charges and other warning signs of the fraud at Centra Tech prompted public statements and actions by Sharma and Farkas that are probative of their culpable participation in the charged conspiracy to defraud Centra Tech investors. As the foregoing recitation makes clear, evidence of Sharma's perjury scheme and what Sharma and Farkas did in its aftermath are too interwoven into the fabric of the story of the charged fraud offenses to untangle in telling that story to the jury.

Moreover, such perjury evidence is critical to help the jury understand: (a) why Centra Tech told the public that Sharma was stepping aside from the company (when in reality he did not)

and why Trapani in fact did so in the middle of the charged fraud conspiracy (shortly after they and Farkas had successfully raised over $25 million in assets from investors through deception); (b) why Sharma and Farkas scrambled afterwards to try to obtain the licenses and business relationships that they had previously misrepresented were in place to Centra Tech investors; and (c) why their post-perjury scrambling was incriminating evidence of their awareness that they had lied beforehand, rather than exculpatory evidence of purportedly good faith efforts to make good on their lofty promises to investors. *Cf. United States* v. *Kaiser*, 609 F.3d 556, 570 (2d Cir. 2010) (affirming that prior bad acts of accounting fraud predating the charged securities conspiracy were admissible because they had "carry-over effects" during the conspiracy and thus were "inextricably intertwined with the evidence regarding the charged offense" (quoting *Carboni*, 204 F.3d at 44)).

Furthermore, the perjury evidence in question is admissible to give the jury background to understand why Farkas' actions after the arrests of Sharma and Trapani on perjury charges is powerful proof that Farkas' acted with a guilty state of mind throughout the charged fraud conspiracy. For example, evidence that Farkas took on a larger role in the management of Centra Tech after and despite the red flags and questions raised in the *New York Times* article about Centra Tech and the arrests of two of its co-founders on perjury charges is powerful evidence that Farkas was not unwittingly following orders from Sharma and Trapani when he did so. The jury will not have sufficient context to comprehend the significance of the article, including its discussion of the arrests of Sharma and Trapani on perjury charges, without the perjury evidence at issue.

Under these circumstances, the perjury evidence is too inextricably interwoven with indisputably admissible evidence of the charged fraud offenses to be excluded from the body of

evidence presented to the jury. *See United States* v. *Rigas*, 490 F.3d 208, 238-39 (2d Cir. 2007) (affirming district court's decision to permit Government to adduce evidence of uncharged fraudulent acts predating the charged conspiracy as direct proof of charged accounting fraud conspiracy because the evidence was "'inextricably intertwined with'" the proof of the charged conspiracy and "'necessary to complete the story of the crime on trial'"); *Carboni*, 204 F.3d at 44 (in case charging false statements to maintain a line of credit, affirming admissibility of uncharged acts of falsification of business inventory, which occurred at or around the same time as the charged crimes, as direct proof inextricably intertwined with charged conduct).

*Second*, because Sharma's perjury scheme involved him and Trapani committing perjury together for Sharma's benefit, the evidence about this perjury scheme is also admissible to provide "'the background of the conspiracy charged and [the development of] the illegal relationship between participants in the crime.'" *United States* v. *Rahim*, No. 08 Cr. 2815, 339 F. App'x 19, 23 (2d Cir. 2009) (alteration in original) (affirming admissibility of Rule 404(b) proof of uncharged instances of securities fraud crimes by the defendant with one of his co-conspirators in the charged securities fraud conspiracy (quoting *United States* v. *Rosa*, 11 F.3d 315, 334 (2d Cir. 1993)). Like the prior-crimes-evidence of frauds that Sharma committed with Trapani as described above, proof that Sharma trusted Trapani enough to enlist him to commit perjury on Sharma's behalf and that Trapani did so is admissible and critical to ensure that the jury understands why Sharma was comfortable bringing Trapani into the charged fraud conspiracy and candidly making incriminating statements to Trapani in writing about the conspiracy. *See supra* at 22-24 & n. 10

(collecting authorities).[14]

That the perjury evidence will inform the jury that Sharma has been convicted of a crime (here, for lying under oath and causing Trapani to do the same) does not negate the admissibility of this proof.   In conspiracy trials, courts routinely allow evidence of a defendant's prior crimes with another who later conspires with the defendant, notwithstanding that such evidence reveals aspects of the defendant's prior criminal history, to give the jury the background necessary to understand the relationship of trust among members of the conspiracy.   *See, e.g.*, *United States* v. *James Rosemond*, S6 10 Cr. 431 (LAK), Dkt. 529 (S.D.N.Y. Oct. 26, 2017) (Kaplan, J.) (granting government motion to admit evidence that defendant met two co-conspirators in charged crimes years earlier when the three of them were incarcerated as proof of background necessary to understand relationship of trust among defendant and those co-conspirators and the formation of the charged conspiracy); *United States* v. *Blakeney*, 942 F.2d 1001, 1018 (6th Cir. 1991) (in trial of defendant charged with participating in criminal conspiracy, witness testimony and corroborating prison records showing that the defendant met one of his co-conspirators in prison

---

[14] There is an inconsistency in Second Circuit case law as to whether evidence offered to establish the nature of the relationship among co-conspirators should be treated as direct evidence or admissible other act evidence under Rule 404(b).   *Compare United States* v. *Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (treating such evidence as direct evidence), *with Rosa*, 11 F.3d at 333 (treating such evidence as admissible pursuant to Rule 404(b)). The Second Circuit has noted this inconsistency and suggested that the question whether to treat evidence of this kind as Rule 404(b) or direct proof turns, essentially, on the closeness of the nexus between the "other acts" and the charged conduct.   *See Kaiser*, 609 F.3d at 570.   The nexus between Sharma's perjury scheme and the charged fraud conspiracy offenses is sufficiently close in this case to warrant admitting evidence about the perjury scheme as direct proof of the charged fraud conspiracy offenses. Practically speaking, however, the basis upon which the perjury evidence is admitted should have little bearing here, because the Government does not object to the Court instructing the jury (as it would be required to do upon defense request under Rule 404(b)) about the purposes for which the perjury is being offered.

several years before the formation of the conspiracy was properly admitted to establish the plausibility of these two individuals from two distant regions of the country entering into a criminal conspiracy); *cf. United States* v. *Fabian*, 312 F.3d 550, 557 (2d Cir. 2002) (affirming district court's admission of evidence of prior joint arrests and convictions of two participants in robbery conspiracy with trial defendant to show their "long-standing friendship" and because it "made the allegation that [one of them] had served as a tipster for the robbery more likely"), *abrogated on other grounds by United States* v. *Parkes*, 497 F.3d 220, 230 (2d Cir. 2007).

*Third*, evidence of the scheme in which Sharma caused Trapani to commit perjury to help Sharma avoid being convicted at a misdemeanor criminal trial is also admissible because the Government is entitled to elicit direct testimony from Trapani about his arrest and conviction for perjury in that case "to avoid the appearance that [the Government] [is] concealing impeachment evidence from the jury." *Coonan*, 938 F.2d at 1561. Moreover, allowing the jury to hear that Trapani previously lied under oath — without permitting the jury to learn that he did so at the request of Sharma for Sharma's benefit — would unfairly mislead the jury into believing that Trapani lied on his own initiative. In order to give the jury the context needed to fairly and accurately assess the credibility of Trapani and his anticipated testimony against Sharma and Farkas about the charged fraud offenses, it is critical that the jury be informed of Sharma's role in bringing about the perjury offense that Trapani was convicted of committing.

*Lastly*, the perjury evidence described above should not be excluded under Rule 403. The evidence is highly probative for the reasons set forth above. Although the evidence will reveal to the jury that Sharma has been convicted of lying under oath to avoid liability in a misdemeanor trial, it is not unfairly prejudicial because it is less disturbing and certainly not more sensational or

troubling than indisputably admissible evidence that Sharma and Farkas duped Centra Tech investors into giving them tens of millions of dollars in assets. *See, e.g.*, *Paulino*, 445 F.3d at 223 (upholding admission of prior conviction under Rule 404(b) where conviction was for offense similar to charged crime and "did not involve conduct more inflammatory than the charged crime" (internal quotation marks omitted)). In any event, the Government will not object if the defense requests an appropriate limiting instruction, which would suffice to prevent any unfair prejudice to Sharma or Farkas from the introduction of the perjury evidence in question.[15]

### 3. Evidence of the Defendants' Acts of Market Manipulation In Furtherance of their Fraudulent Centra Tech Scheme Should Be Admitted

The Government plans to introduce evidence at trial of facts described above (at 10-11) showing that during and in furtherance of the charged scheme to defraud Centra Tech investors into buying Centra tokens, Sharma and Farkas as well as Trapani engaged in efforts to artificially inflate the market price of Centra tokens on a secondary cryptocurrency exchange called EtherDelta.

Evidence of such acts of market manipulation — all of which were committed by members of the charged fraud conspiracy during and in furtherance of that conspiracy — are admissible as direct evidence of the existence of the charged fraud conspiracy. *See, e.g.*, *United States* v. *Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992) ("[A]n act that is alleged to have been done in

---

[15] *See, e.g.*, *United States* v. *Alcantara*, 674 F. App'x 27, 31 (2d Cir. 2016) (affirming trial conviction of defendant on charges stemming from her participation in a scheme to fraudulently obtain tax refunds using stolen identifying information of others where the district court allowed the government to reopen its case after the defense summation to introduce the defendant's prior tax fraud conspiracy conviction under Rule 404(b) but "provided an instruction intended to limit the prejudicial effect of [the defendant's] prior conviction").

furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged.").

Those acts of market manipulation were committed by all three members of the charged fraud conspiracy (Sharma, Farkas and Trapani), for the purpose of artificially inflating the market price of the very tokens that they were promoting during their initial coin offering through the fraudulent misrepresentations challenged by the Indictment in this case, to further the goals of that conspiracy. Put simply, the manipulation was part and parcel of the conspiracy. As such, this market manipulation evidence is highly probative, as it is direct proof that the defendants were deliberate and willing participants in the conspiracy, and that they were actively involved in a variety of plainly unlawful efforts to achieve the goals of the conspiracy. *Cf. United States* v. *Klein*, 340 F.2d 547, 549 (2d Cir. 1965) (courts allow the introduction of evidence respecting similar offenses "based on the sound recognition that when there exists a pattern of misrepresentations, closely related in time and subject matter, it is reasonable to believe that they were not made innocently" (quotation marks and citation omitted)).

In addition, because Trapani was involved in committing the above-listed acts of market manipulation with Sharma and Farkas, the Government is also entitled to elicit testimony about such acts from Trapani during his direct examination "to avoid the appearance that it [is] concealing impeachment evidence from the jury." *Coonan*, 938 F.2d at 1561.

Finally, because of the highly probative value of the market-manipulation-proof that the Government seeks to introduce as direct evidence of the charged fraud conspiracy, the probative value of this proof is not "substantially outweighed" by its potential for unfair prejudice, as required to exclude this proof under Rule 403. Evidence of these acts of market manipulation are

of the same ilk, and indeed were part and parcel of, the charged conspiracy to defraud Centra Tech

investors and thus this evidence is not more troubling or sensational the charged fraud conspiracy.

*See, e.g.*, *Paulino*, 445 F.3d at 223; *Roldan-Zapata*, 916 F.2d at 804.

### 4. Evidence about Efforts by Sharma to Obstruct Investigations of the Centra Tech Fraud Should Be Admitted

Finally, the Government intends to introduce trial evidence against Sharma of the facts

detailed above (at 14-17) concerning Sharma's efforts to obstruct the parallel investigations by the

SEC as well as the Government and the FBI concerning the fraudulent conduct at issue in this

case.[16]

As to Sharma, evidence that he attempted to obstruct the parallel civil and criminal

investigations of the charge fraud scheme — by causing Centra Tech to relay false information

through its outside counsel to the SEC about the passcode needed to retrieve millions of dollars in

assets raised from victims of the fraud, and by causing his original counsel in this case to falsely

represent to the Government and to this Court that certain investor funds belonged to him —

illustrates that Sharma was conscious of his own guilt of the charged fraud offenses.  *Cf. United*

---

[16]    The Government does not intend to use this proof about Sharma's obstructive conduct against
Farkas, and would agree to an appropriate limiting instruction that this obstruction proof is being
offered solely against Sharma as circumstantial evidence that he was conscious of his own guilt of
the charged fraud offenses.   There is, however, one caveat to that.   Evidence of the subpoena
served by the SEC on Centra Tech on or about November 29, 2017 is relevant and admissible
against Farkas, for much the same reasons why the *New York Times* article is admissible against
him:   to show that the SEC subpoena was a warning sign that put him on notice that the SEC had
serious concerns about whether Centra Tech had committed fraud during its ICO, and thus his
subsequent actions betray that he acted with a guilty state of mind before and after the subpoena.
For example, the fact that Farkas, after learning of the SEC's inquiry, did not dissociate himself
from Centra Tech or report to civil or criminal regulators that he had helped Sharma use
photographs of his father and one of his sisters to depict fictional senior executives of the company
during the ICO is telling proof that he was a deliberate and willing participant in the fraud on
Centra Tech investors all along.

*States* v. *Malpiedi*, 62 F.3d 465, 467 (2d Cir. 1995) (witness testimony that she saw defendant alter documents when the defendant collected documents to respond to a grand jury subpoena issued as part of a fraud investigation was direct evidence of the defendant's obstruction of the investigation and was also proof "of his consciousness of guilt of the other [fraud] charges").

A "'defendant's knowledge of [a] conspiracy and his participation in it with criminal intent may be established through circumstantial evidence,'" and "'[s]uch circumstantial evidence may include acts that exhibit a consciousness of guilt, such as . . . attempts to influence the testimony of a witness.'" *United States* v. *Pirgousis*, 290 Fed. App'x. 388, 391 (2d Cir. 2008) (quoting *United States* v. *Gordon*, 987 F.2d 902, 906-07 (2d Cir. 1993)). Here, evidence that Sharma engaged in such a cover up to conceal his improper diversion of investor funds raised through the charged fraud conspiracy persuasively demonstrates that he was conscious of the fraudulent and illegal nature of the conspiracy and of his guilt for deliberately participating in that conspiracy. The Second Circuit has approved the introduction of such evidence of a defendant's efforts to obstruct an investigation into his illegal conduct as circumstantial proof that he was conscious of his guilt as to the underlying conduct being investigated. *See Pirgousis*, 290 Fed. App'x at 391 (district court properly instructed the jury that it could infer the defendant's consciousness of guilt on the charged securities fraud offenses from testimony of the defendant's co-conspirator that the defendant had coached the co-conspirator to lie to the SEC and another regulator in their investigations of the fraud).

The obstruction-related proof that the Government seeks to introduce should not be excluded under Rule 403. For the reasons set forth above, this proof is highly probative of Sharma's consciousness of his guilt of the charged fraud offenses. *Cf. United States* v. *Gasparik*,

141 F. Supp. 2d 361, 373 (S.D.N.Y. 2001) (evidence that a securities fraud defendant's attempt to obstruct an investigation of the fraud was "highly probative in demonstrating consciousness of guilt, and is not substantially outweighed by the danger of unfair prejudice").    It is similar in kind to, but not more disturbing than, the charged fraud offenses.    *See Paulino*, 445 F.3d at 223; *Roldan-Zapata*, 916 F.2d at 804.    Under the circumstances, one cannot say that the probative value of this obstruction proof is "substantially outweighed" by any danger it may present of unfair prejudice to Sharma as required to exclude this evidence under Rule 403.    In any event, any prejudice from the introduction of this evidence can be minimized with the issuance of an appropriate limiting instruction.    Indeed, the Second Circuit in *Pirgousis* upheld a limiting instruction used to guide the jury on how to evaluate evidence adduced at trial of uncharged acts of obstruction — that the defendant had coached a co-conspirator to lie to the SEC and another regulator about their respective investigations of the defendant's securities fraud offenses — in assessing whether the defendant was guilty of the securities fraud offenses charged in that case. 290 Fed. App'x at 391.    There is no reason a similar approach could not be used in this case.

## II.        The Court Should Admit Various Co-Conspirator Statements

The Government expects to introduce evidence at trial, in the form of electronic communications such as text messages and chat messages, as well as the testimony of cooperating and other witnesses, about statements made by various participants in the charged conspiracy to defraud Centra Tech investors during and in furtherance of the conspiracy.    In particular, the Government expects to elicit testimony falling into the following categories, which the Government submits are co-conspirator statements admissible under rule 801(d)(2)(E): (a) statements made by the co-conspirators during the planning stages of the conspiracy, including discussions between and among the defendants and co-conspirators before launch of the Centra

Tech ICO; (b) statements made by the co-conspirators to carry out the scheme during the Centra Tech ICO; (c) statements in furtherance of the conspiracy made by the co-conspirators after the Centra Tech ICO; and (d) statements made by the co-conspirators during the course of the conspiracy about past acts or events.[17]   For each of these categories of co-conspirator statements, the Government has provided examples below, which are intended to be illustrative, not exhaustive.

## A. Applicable Law

Under Rule 801(d)(2)(E), an out-of-court statement offered to prove the truth of its contents is not hearsay if "[t]he statement is offered against an opposing party" and it "was made by the party's coconspirator during and in furtherance of the conspiracy."   Fed. R. Evid. 801(d)(2)(E). "Thus, '[i]n order to admit a statement under this Rule, the court must find (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy.'"   *United States* v. *Gupta*, 747 F.3d 111, 123 (2d Cir. 2014) (*Gupta*'s brackets) (citation omitted).   "In determining the existence and membership of the alleged conspiracy, the

---

[17]   With respect to statements made by Sharma, Farkas or Trapani during and in furtherance of the charged conspiracy to defraud Centra Tech investors, the Government is allowed to offer those statements against Sharma and Farkas to prove the truth of what the statements asserted, as follows: (a) the Government may offer such statements by Sharma against him as statements of a party-opponent under Federal Rule of Evidence 801(d)(2)(A) and against Farkas as co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E); (b) the Government may offer such statements by Farkas against him as statements of a party-opponent under Rule 801(d)(2)(A) and against Sharma as co-conspirator statements under Rule 801(d)(2)(E); and the Government may offer such statements by Trapani against Sharma and Farkas as co-conspirator statements under Rule 801(d)(2)(E).

[district] court must consider the circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself." *Id.* at 123 (citing Fed. R. Evid. 802(d)(2) and *Bourjaily* v. *United States*, 483 U.S. 171, 176-81 (1987)). The "district court may consider the hearsay statement itself" as evidence of "the existence of [the alleged] conspiracy." *United States* v. *Padilla*, 203 F.3d 156, 161 (2d Cir. 2000) (citing *Bourjaily*, 483 U.S. at 181).

Under this exception to the hearsay rule, "[t]he conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment." *United States* v. *Gigante,* 166 F.3d 75, 82 (2d Cir. 1999). "In fact, the Second Circuit has held that it is not even necessary that the Government charge a conspiracy to take advantage of Rule 801(d)(2)(E)." *United States* v. *Ulbricht,* 79 F. Supp. 3d 466, 483-84 (S.D.N.Y. 2015) (citing *United States* v. *DeVillio,* 983 F.2d 1185, 1193 (2d Cir. 1993)); *see also United States* v. *Maldonado-Rivera,* 922 F.2d 934, 962 (2d Cir. 1990) ("Though . . . Fed. R. Evid. 801(d)(2)(E) requires proof that both the declarant and the party against whom a declaration is offered be members of the same conspiracy, it does not require that the conspiracy be one charged in the indictment").

"A finding as to whether or not a proffered statement was made in furtherance of the conspiracy should be supported by a preponderance of the evidence, and such a finding will not be overturned on appeal unless it is clearly erroneous." *Gupta*, 747 F.3d at 124 (quotation marks omitted). When "the existence of a conspiracy has been shown, evidence sufficient to link another defendant with it need not be overwhelming," *United States* v. *Provenzano*, 615 F.2d 37, 45 (2d Cir. 1980) (quotation marks omitted). Statements may be "in furtherance of" the conspiracy if they "provide reassurance, serve to maintain trust and cohesiveness among

[coconspirators], or inform each other of the current status of the conspiracy." *Gupta*, 747 F.3d at 124 (quotation marks omitted).

This standard permits the introduction of any co-conspirator statement that "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a coconspirator or other person's usefulness to the conspiracy." *United States* v. *Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988). Thus, statements are in furtherance of the conspiracy if they: (1) inform or provide an update as to the status or progress of the conspiracy, *see United States* v. *Desena*, 260 F.3d 150, 158 (2d Cir. 2001); (2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *Maldonado-Rivera*, 922 F.2d at 958; (3) "seek to induce a co-conspirator's assistance," *Desena*, 260 F.3d at 158 (internal quotations omitted); (4) "provide reassurance," *id.*; (5) "serve to foster trust and cohesiveness," *id.*; (6) "facilitate and protect" the conspiratorial activities, *United States* v. *Diaz*, 176 F.3d 52, 87 (2d Cir. 1999); or (7) inform a co-conspirator of "the identity and activities of his coconspirators," *United States* v. *Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989). If a statement might permissibly be viewed as "merely a casual conversation about past events," but might also permissibly be viewed as furthering the conspiracy in some fashion, then a trial court's decision admitting the statement into evidence is not clear error, and must stand. *Gupta*, 747 F.3d at 126-27.

Indeed, "[s]tatements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current developments and problems facing the group." *United States* v. *Jefferson*, 215 F.3d 820, 824 (8th Cir. 2000) (internal quotations omitted). For example, in *United States* v. *Lozano-Reyes*, the Second Circuit affirmed the trial

court's admission of co-conspirator statements relating to past events because the statements served a current purpose in the conspiracy, namely, "to engender trust, to increase [the witness's] familiarity with the conspiracy's modus operandi, and to outline future conspiratorial actions and the anticipated profits." No. 95-1707, 1996 WL 313934 (Table), at *2 (2d Cir. June 12, 1996).

### B. Discussion

The Government respectfully submits that the following categories of statements are admissible under Rule 801(d)(2)(E) against both Sharma and Farkas as co-conspirator statements during and in furtherance of the charged conspiracy. Illustrative examples of each category of co-conspirator statements are provided below.

### 1. Pre-ICO Statements by Co-Conspirators During the Charged Fraud Conspiracy

Statements made by the co-conspirators as they were in the planning stages of the charged conspiracy to defraud Centra Tech investors are admissible under Rule 801(d)(2)(E).

For example, the evidence at trial will show that (a) Sharma and Trapani had agreed to defraud Centra Tech investors before the company's ICO commenced on July 30, 2017; and (b) while Sharma was preparing fraudulent marketing materials to disseminate to investors to solicit investments in Centra Tech's ICO, Sharma exchanged text messages with Trapani on or about July 29, 2017 regarding photographs that Sharma needed of Centra Tech's purported team of executives and employees to include in the fraudulent marketing materials, including several text messages about Centra Tech's purported CEO "Michael Edwards" and supposed CFO "Jessica Robinson." During these text messages sent a day before the ICO began, Sharma wrote to Trapani: "Need to find someone who looks like Michael," "Team photos," "He's real lol," "Everyone real," "Except Jessica," "And Mike," "Gonna kill both Ceo and her," and "Gonna say they were married and got

43

into an accident." That same day, Sharma also text-messaged Trapani: "I had fufu people on there," "And I been getting called out," "So gonna get it corrected," "Lol," "Lol," "Lol," "Just send me a pic lol."

All such statements are admissible against both defendants Sharma and Farkas. As to Sharma, the statements are not hearsay at all when offered by the Government and thus are plainly admissible. As to Farkas, such statements by Sharma during the conspiracy are also admissible because they were plainly meant to plan and facilitate one of the fraudulent misrepresentations that the conspiracy would use to solicit investments in Centra Tech (namely, that Centra Tech was led by seasoned and qualified senior executives named "Michael Edwards" and "Jessica Robinson"), inform a co-conspirator of the status or progress of the conspiracy, come up with a cover story for what the conspirators would say if that lie was discovered ("Gonna kill both Ceo and her," and "Gonna say they were married and got into an accident") to protect the conspiratorial activities, and address a problem that arose for the conspiracy so that it could continue to progress ( "I had fufu people on there," "And I been getting called out," "So gonna get it corrected").

Even if Farkas did not join the conspiracy until after these statements were made by Sharma, the statements would still be admissible against him as statements of a co-conspirator (Sharma) during and in furtherance of the charged fraud conspiracy. *See, e.g.*, *United States* v. *Diaz*, 176 F.3d 52, 103 (2d Cir. 1999) (statements made in furtherance of a conspiracy, even prior to a particular defendant's joining that conspiracy, are admissible against that defendant under Rule 801(d)(2)(E)); Wright & Miller, 30B Fed. Prac. & Proc. Evid. § 6779 (2018 ed.) ("[s]tatements can be admitted under Rule 801(d)(2)(E) even if the party against whom the evidence is offered did not join the conspiracy until after the statements were made" because he

"takes the conspiracy as he found it" (quotation marks and citations omitted)).

### 2. Statements During the ICO by Co-Conspirators in Furtherance of the Conspiracy

Statements made by the defendants or their co-conspirators during the Centra Tech ICO, which occurred from approximately July 30, 2017 through October 5, 2017, are also admissible under Rule 801(d)(2)(E). For example, the defendants exchanged multiple series of text messages during the Centra Tech ICO in which they discussed removing their false statements from Centra Tech's website and marketing materials:

- On or about August 30, 2017, after Bancorp sent Sharma a notice directing Sharma to cease and desist from representing that Bancorp had a connection with Centra Tech, Sharma, Farkas and Trapani exchanged a series of text messages regarding taking steps to remove Bancorp from Centra Tech's website and marketing materials, after which Sharma wrote: "We gotta get that shit removed everywhere and blame freelancers lol . . . ."

- On or about September 29, 2017, during a group cellphone text-message conversation, Sharma, Farkas and Trapani discussed taking down (among other things) the version of Centra Tech's whitepaper available on the Centra Tech Website at the time. In one message, Sharma wrote: "I rather cut any fufu," "Off right own," "Now," "Then worry," "Anything that doesn't exist current," "We need to remove," "Have them do it asap." In another, Sharma wrote: "Delete all the cards have shipped info," "Everything gotta get cleaned up," "RJ [Farkas] can u jump on that . . . on our pages." Sharm wrote: "I want a product page like [another company]," "Theirs is so nice." Trapani wrote "Lol yeah no real product." Sharma wrote: "Yea but it doesn't say much," "And looks good," "We don't have a real product either right now," "So I wanna tighten up ship asap." Trapani wrote "Feel you."

These statements and others like them are classic examples of the types of co-conspirator statements that Rule 801(1)(d)(2)(E) allows as admissible evidence. They are all amongst co-conspirators regarding the methods of carrying out their conspiracy, seek to induce co-conspirators' assistance, or facilitate or protect the conspiratorial activities.

### 3. Post-ICO Statements by Co-Conspirators in Furtherance of the Conspiracy

After the Centra Tech ICO was complete, the defendants continued to scramble to develop the technology to implement their ideas behind the Centra card, and continued their marketing campaign to promote Centra Tech. Statements made by the defendants and their co-conspirators during this phase of the conspiracy are also admissible pursuant to Rule 801(d)(2)(E). For example:

- On or about October 10, 2017, after receiving a cease-and-desist letter from Visa, Sharma emailed a response to Visa's letter, stating:

  > This matter has been brought to my attention. I will have this matter rectified in 48 hours. We are currently in the process of finalizing our Co-branded Prepaid Card Program, but might not meet the Nov 1st lock out deadlines for submission from our issuing bank whom is an authorized visa issuer for card design approval, So can see where this issue might of came from.
  >
  > However, I have immediately contacted my web developers to remove all issues and I will have this document [a cease and desist acknowledgment] signed and returned within 48 hours.
  >
  > Thank you,
  > Sam Sharma

- On or about November 28, 2017, Sharma exchanged emails with a Centra Tech victim-investor ("Victim-1"), during which Victim-1 inquired about the status of Sharma at Centra Tech and the status of the promised Centra cards, which Victim-1 had not yet received. Sharma responded: "Yes, I am still the owner of Centra Tech, just not as President or CEO. I am building the right executive team whom has a vast amount of knowledge and experience to carry on our roadmap and plans. Cards are almost ready for production. . . . International Cards are set to go out this month and next and domestic cards in January."

These statements are admissible against Sharma (because they are his own) and against Farkas under Rule 801(d)(2)(E) because they were made by Sharma, a co-conspirator, during and in

furtherance of the charged conspiracy to defraud Centra Tech investors.[18]   They further the goals

of the conspiracy by attempting to conceal certain aspects of it — to Visa, the fact that the

defendants had misrepresented that Centra Tech had a partnership with Visa, and, to Victim-1, the

fact that the defendants had misrepresented the status of the Centra cards during the ICO.   *See,

e.g.*, *United States* v. *Pecora*, 798 F.2d 614, 630 (3d Cir. 1986) ("[T]he concealment of the

existence of the conspiracy served not only to cover up the declarants' past participation in criminal

behavior, but to shield the ongoing conspiracy as well."   (citing *Grunewald* v. *United States*, 353

U.S. 391, 405–06 (1957)).   *See also United States* v. *Arrington*, 867 F.2d 122, 130 (2d Cir. 1989)

("[E]ven where particular crimes have already been committed, 'the conspiracy does not

necessarily end; it continues until its aim has been achieved, it has been abandoned, or otherwise

terminated.'" (quoting *United States* v. *Rucker*, 586 F.2d 899, 906 (2d Cir. 1978))).

    Thus, although the conspirators had spread their core misrepresentations during the Centra

Tech ICO, the conspiracy continued beyond the ICO, and evidence of their statements in

furtherance of the conspiracy continuing after the ICO are also admissible pursuant to Rule

801(d)(2)(E).

### 4.   Co-Conspirator Statements During Conspiracy About Past Acts or Events

    The Government intends to introduce at trial statements by co-conspirators made during

the charged fraud conspiracy about past criminal acts or misrepresentations, to further various

goals of the conspiracy.   For example, during Centra Tech's ICO, Trapani participated in a video

---

[18]  Portions of these statements are false and thus are also independently admissible as non-hearsay evidence offered to show their effect on the recipients of the false statements — in these examples, false statements made to placate Visa and Victim-1 — rather than to prove that what the statements asserted were true.   *See* Fed. R. Evid. 801(c).

promoting Centra Tech.   The video contained false representations about Centra Tech's purported partnership with Bancorp.   This video was available to the public via the internet as of on or about September 22, 2017 but was subsequently removed.   On or about September 22, 2017, during a group cellphone text-message conversation among Sharma, Farkas and Trapani, Farkas wrote: "Says Bancorp on your video ray is that ok."   Trapani responded:   "Gotta get it edited but we have been saying Bancorp."   Sharma wrote "What video," "Fake it off," "I don't wanna get sued." Such statements about past misrepresentations ("we have been saying Bancorp") and other like them were made in furtherance of the charged fraud conspiracy because they kept various "coconspirators abreast of current developments and problems facing the group," *Jefferson*, 215 F.3d at 824 (internal quotations omitted), and also because they were "designed . . . to control damage to or detection of the conspiracy," *United States* v. *Johnson*, 200 F.3d 529, 533 (7th Cir. 2000).

The Court should admit such co-conspirator statements about a past event or criminal act that furthered the charged fraud conspiracy by "appris[ing] a co-conspirator of the progress of the conspiracy," *United States* v. *Rahme*, 813 F.2d 31, 36 (2d Cir. 1987).

III.   <u>**The Court Should Admit Various Statements by the Defendants' Agents**</u>

The Government expects to introduce trial proof of statements made by agents or employees of Centra Tech, which was owned, controlled, or operated by each of defendants Sharma and Farkas throughout the time period of the charged conspiracy to defraud Centra Tech investors.   Rule 801(d)(2)(D) permits the introduction into evidence of a statement by a party's agent "concerning a matter within the scope of the agency . . . made during the existence of the relationship."   *United States* v. *Pilarinos*, 864 F.2d 253, 257 (2d Cir. 1988).

The Advisory Committee Notes to Rule 801(d) specifically note that admissions by a party

and his agents may be received into evidence without many of the technical prerequisites of other evidentiary rules — such as, for example, trustworthiness or personal knowledge. *See Pappas v. Middle Earth Condominium Assoc.*, 963 F.2d 534, 537 (2d Cir. 1992). Accordingly, "admissibility under this rule should be granted freely." *Id.* The Second Circuit has held that the existence of an agency relationship may be "sufficiently established without identifying the employee" who is the declarant, provided there exists sufficient "circumstantial evidence" of the scope and existence of that relationship. *Id.*

For example, the Government at trial will introduce statements made by a Centra Tech employee ("Employee-1") on or about January 29, 2018, to NMLS on a recorded call (the "NMLS Call"). NMLS is the system of record for financial services licensing or registration in participating state agencies, and accepts and tracks applications for, among other things, money transmitter licenses — such as the ones the defendants claimed that Centra Tech had for 38 different states — for multiple states. Employee-1 was in charge of, among other things, attempting to apply for money transmitter licenses on behalf of the defendants and Centra Tech in various states. During the NMLS Call on or about January 28, 2019, more than three months *after* the Centra Tech ICO, Employee-1 provided Employee-1's email address — legal@centra.tech — and a telephone number for Centra Tech, and inquired about how to apply for money transmitter licenses, stating:

> "We are applying for a money service business license. . . . [W]e only have bonds for . . . like, five or six states right now, but I don't have all of the paperwork together to actually submit the license . . . We will eventually be applying for additional licensing in other states. We just don't have the bonds yet for them."

The NMLS Call is an example of a statement made by an agent of Sharma and Farkas concerning a matter within the scope of Employee-1's duties as an employee of theirs. The

NMLS Call — and other statements by Sharma and Farkas's employees at Centra Tech that relate to their duties and made while they were employed at Centra Tech — are admissible pursuant to Rule 801(d)(2)(D).

## IV.    The Court Should Preclude the Defendants' Alleged Advice-of-Counsel Defense

After motion practice and an order from this Court compelling the defendants to do so, the defendants have begrudgingly given notice that they "may" assert at trial that they relied on what they have conclusorily described as "legal advice" from the purported law firm "Pope & Dunn" as a defense to the securities fraud charges set forth in Counts One and Two of the Indictment (but not as to the wire fraud charges set forth in Counts Three and Four of the Indictment). Despite repeated requests from the Government, the defendants have refused to identify what the "legal advice" in question was, let alone provide full discovery concerning this alleged defense as required by this Court's order compelling the defendants to do so and by the defendants' discovery obligations under Federal Rule of Criminal Procedure 16(b). Nevertheless, from the defendants' limited disclosures on the topic, it appears that the defendants will claim that John Lambert — a college student who was fraudulently posing as the fake attorney "Eric Pope" of the fake law firm "Pope & Dunn"[19] — advised Sharma or Centra Tech that the Centra tokens that the defendants sold to investors during the ICO were not "securities" subject to the federal securities laws or the

---

[19] On or about August 6, 2019, Lambert pled guilty to an information filed by the Government in the Southern District of New York, captioned *United States* v. *John Lambert*, 19 Cr. 571 (VEC), charging Lambert with conspiracy to commit wire fraud for conduct relating to his pretending to be a licensed attorney. Lambert's sentencing is currently scheduled for November 18, 2019.

regulatory jurisdiction of the SEC, and as a result, that Centra Tech did not need to register its ICO with the SEC.

Even if such advice was given to the defendants, that would not be a defense to the charged securities fraud counts in the Indictment. The defendants are not charged with failing to register the Centra Tech ICO with the SEC. Rather, defendants are charged with securities fraud for deliberately lying to investors to induce their purchases of Centra tokens. To establish that the defendants conspired to, and did, commit securities fraud by deceiving investors into buying Centra tokens, the Government will, of course, have to prove that the tokens were, in fact, "securities" to satisfy jurisdictional elements of the securities fraud charges, but the Government need not prove the defendants knew that the tokens qualified as "securities." The defendants' beliefs on whether the tokens constituted "securities" (whether founded on advice or otherwise) have no relevance whatsoever to their guilt. In terms of *mens rea*, what the Government must prove is that the defendants knew that the representations they made to induce the purchase of Centra tokens were false, and deliberately made those false representations to deceive investors.

Because the Government need not establish that the defendants knew that Centra tokens constituted "securities," any evidence or arguments about the alleged advice that the defendants claim to have received from the fake law firm "Pope & Dunn" on that issue are irrelevant and have no probative value to any question of material fact in dispute at the trial in this case. Conversely, the injection of such evidence or argument into the trial will invite a time-consuming and distracting side-show about Lambert's crimes, and how he ended up communicating with Sharma during the ICO about Centra Tech. Because such evidence or arguments are irrelevant to any material questions of fact in dispute in this case and present an unwarranted danger of confusing

and misleading the jury and wasting the time of the Court and the jury, they should be precluded under Rule 403.   In any event, even if such alleged advice could theoretically form the basis for a defense to the securities fraud charges, the defendants should also be precluded from raising such a defense at trial because they have failed to make the threshold factual showings required to raise such a defense, and also because they have failed to provide full pretrial discovery relating to such a defense as required by prior directives of this Court and Rule 16(b).

## A.   Relevant Facts

The securities fraud counts in the Indictment charge Sharma and Farkas with conspiring to commit, and committing, securities fraud during the period from approximately July 30, 2017 through April 2018 in connection with their offers and sales of digital Centra tokens issued by Centra Tech as part of the company's initial coin offering, which took place from approximately July 30, 2017 through October 5, 2017.   As noted, the evidence at trial will show that the Sharma and Farkas duped investors into purchasing Centra tokens during the ICO based on a series of blatantly false, deliberate misrepresentations about core aspects of Centra Tech's purported business model, including lies that their company had critical business relationships and licenses that it did not have, and lies that their company was managed by two seasoned and qualified senior executives who, in reality, did not exist.

On or about August 9, 2017, after the ICO was well underway and had already raised over a million dollars in digital assets from Centra token sales, Sharma began communicating on behalf of Centra Tech with a purported attorney named "Eric Pope," at a purported law firm called "Pope & Dunn," who was, in fact, a college student without a law license named John Lambert posing as an attorney. After the completion of the ICO, Centra Tech retained the law firm of Ballard Spahr

LLP as outside counsel by no later than November 2017 to represent the company in connection with the SEC's investigation of Centra Tech and its co-founders, including Sharma and Farkas, that the SEC initiated in approximately the fourth quarter of 2017.

During discussions in January 2018 between Centra Tech (through its outside counsel at Ballard) and SEC staff attorneys in connection with the SEC's investigation, Centra Tech claimed that during its ICO, the company had sought legal advice from purported attorney "Eric Pope" at the purported law firm "Pope & Dunn" about whether the ICO constituted a securities offering under the federal securities laws. On January 16, 2018, Centra Tech through Ballard produced to the SEC certain communications between Sharma and "Eric Pope" — that began well after the start of Centra Tech's ICO — that appear to relate to whether the ICO qualified as a securities offering subject to the federal securities laws and the regulatory jurisdiction of the SEC.

After Sharma and Farkas were arrested in April 2018 and indicted in May 2018 in this criminal prosecution, the Government made numerous productions of pretrial discovery materials pursuant to Federal Rule of Criminal Procedure 16(a) to Sharma and Farkas. Although the Government did not believe that Sharma's communications with the fake attorney "Eric Pope" would give rise to a valid advice-of-counsel defense in this case, the Government made multiple disclosures to Sharma and Farkas concerning "Eric Pope" and "Pope & Dunn," including disclosures of documents that the Government had received from the SEC concerning "Eric Pope" and "Pope & Dunn." Under the case management scheduling order imposed by the Court in January 2019 this case (Dkt. 97), the defendants' provision of reciprocal discovery to the Government under Federal Rule of Criminal Procedure 16(b) was due June 10, 2019.

On February 20, 2019, the Government sent counsel for Sharma and Farkas a letter

requesting (among other things) that they provide notice as to whether they intends to assert any defenses based on alleged advice of counsel as to any of the crimes charged in the Indictment, and if so, to produce all discovery relating to such a defense.   With respect to the requested notice, the letter asked them to disclose by March 1, 2019 whether they intend to assert an advice-of-counsel defense and if so to identify:   "(a) every actual or purported attorney who provided legal advice upon which such an alleged defense will be based, (b) the client whom the actual or purported attorney was acting on behalf of in tendering the advice, (c) a summary of the substance of the advice, (d) the date on which the advice was given, (e) the manner in which the advice was given, and (f) the charges in the Indictment against which the alleged defense will be raised."   As to the requested discovery, the letter also listed categories of documents that the Government requested Sharma and Farkas to produce by March 15, 2019 if they elected to assert an advice-of-counsel defense.   However, despite repeated requests from the Government, counsel for Sharma and Farkas refused to provide the requested disclosures.

On July 1, 2019, this Court issued an order (Dkt. 140) granting a motion to compel filed by the Government (Dkt. 133), and directing Sharma and Farkas to inform the Court and the Government by September 6, 2019 whether they plan to rely on an advice of counsel defense, and if so, to provide discovery relating to any advice of counsel defense they intend to advance at trial. That deadline was extended to September 11, 2019 at the request of the defense.   (Dkt. 167).

On September 11, 2019, the defendants filed a letter indicating that they "may assert an 'advice of counsel' defense" at trial as to the securities fraud charges set forth in Counts One and Two of the Indictment "based upon the legal advice rendered from the firm Pope & Dunn."   (Dkt. 169 at 1).   The defendants' letter further asserted that "Although the defendants are not prepared

to specify today which document(s) will be offered towards this defense, the government is currently in possession of all the relevant discovery as to the firm of Pope & Dunn." (*Id.*). The defendants' first and only production of reciprocal Rule 16(b) discovery materials to the Government was a production on August 23, 2019 of approximately 18 pages of documents that appear to have been downloaded from the website of the fake "Pope & Dunn" law firm where the fake attorney "Eric Pope" claimed to work.

Neither the defendants' September 11 letter nor their 18-page discovery production identifies the substance of the alleged advice that they claim to have received or relied upon, the names of the actual or purported attorneys at "Pope & Dunn" who allegedly provided the claimed advice, the relevant client (e.g., Centra Tech, Sharma, or Farkas) whom each actual or purported attorney was acting on behalf of in tendering the alleged advice, the manner in which the alleged advice was given, or the timing of the alleged advice. Furthermore, the defendants have not produced to the Government any communications that they or others had with "Eric Pope" or others at "Pope & Dunn," nor have they disclosed to the Government whether there are documents in the Rule 16(a) discovery productions that the Government provided to the defendants that contain such communications, let alone which ones.

After multiple follow-up requests from the Government, the defendants have refused to identify the substance of the alleged advice that they claim to have relied upon. Instead, by an email on October 8, 2019, the defendants stated through their counsel that "Our response is that Pope and Dunn represented to Centra Tech that they were attorneys, that they provided legal advice and that our clients are victims of Pope and Dunn," without any explanation of what that alleged "legal advice" was, how it was allegedly conveyed or memorialized, or when that occurred.

### B. Applicable Law

#### 1. Advice of Counsel in the Context of Criminal Securities Fraud Charges

Evidence concerning a defendant's alleged reliance on advice of counsel is properly excluded where such evidence is irrelevant to the *mens rea* requirement of the offense charged. *See, e.g.*, *United States* v. *Sardana*, 101 F. App'x 851, 854-55 (2d Cir. 2004) (affirming rejection of advice-of-counsel evidence and jury instruction because the charged offense did "not require proof that the defendant knew his conduct was against the law"). This stems from the principle that a "defense of reliance on advice of counsel is available only to the extent that it might show that a defendant lacked the requisite specific intent." *Stichting* v. *Schreiber*, 327 F.3d 173, 183 (2d Cir. 2003). For this and other reasons, the "situations in which the advice-of-counsel defense may be employed are severely limited." *Lurie* v. *Wittner*, 228 F.3d 113, 134 (2d Cir. 2000).

In a securities fraud prosecution, "the government is required to prove specific intent only as it relates to the action constituting the fraudulent, misleading or deceitful conduct, but not as to the knowledge that the instrument used is a security" under the federal securities laws. *United States* v. *Brown*, 578 F.2d 1280, 1284 (9th Cir. 1978). "The government need only prove that the object sold or offered is, in fact, a security; it need not be proved that the defendant had specific knowledge that the object sold or offered was a security." *Id.* Thus, even in securities fraud prosecutions where the existence of a security is in dispute, there is no requirement for the Government to prove the defendant's knowledge with respect to the nature of the instrument. *See, e.g., United States* v. *Leonard*, 529 F.3d 83, 91-92 (2d Cir. 2008) (rejecting argument that the district court erred in refusing to charge the jury that, to be guilty of securities fraud or securities fraud conspiracy, the defendants had to have known that the "units" they were selling possessed

the characteristics that made them securities).[20]   With respect to the *mens rea* required to establish

the crime of securities fraud, the focus is "necessarily on whether a defendant possessed the intent

to *defraud* investors, his belief as to the nature of the [securities] notwithstanding." *United States*

v. *Tucker*, 345 F.3d 320, 330 (5th Cir. 2003) (*Tucker*'s emphasis).   The "defendant's belief

concerning the nature of the securities is irrelevant." *Id.*   That is because the securities laws are

designed to require every person promoting securities through fraudulent conduct to act at his peril

regarding whether that which he sells comes within the inhibition of the securities laws.   *See*

*Mueller* v. *Sullivan*, 141 F.3d 1232, 1233-36 (7th Cir. 1998) (Easterbrook, J.) (rejecting

defendants' argument that their convictions for securities fraud under state law modeled on Section

10(b) of the Securities and Exchange Act of 1934 should be overturned because the trial court

violated their constitutional rights by failing to instruct the jury that the prosecution was required

to prove that the defendants knew that the notes that they sold to investors while concealing

material facts were "securities" within the purview of the relevant statute).[21]

---

[20]   The Second Circuit did not expressly discuss this argument in its opinion, but rather rejected it
*sub silentio* by noting that the defendants had raised a number of objections to the district court's
jury instructions, and concluding that all of them lacked merit.   *See Leonard*, 529 F.3d at 92.   In
doing so, the Circuit implicitly rejected the relevant argument, which was set forth in one of the
defendants' appeal briefs.   *See* Brief of Defendant-Appellant Paul C. Dickau, *United States* v.
*Leonard*, No. 05-5523, 2007 WL 5036228 (2d Cir. Jan. 25, 2007).   In pertinent part, that
defendant's appeal brief argued that for the *mens rea* requirement of the substantive securities
fraud counts against him to be proven, "the defendants had to have known that the [relevant] units
possessed the characteristics that made them securities (assuming, for the sake of argument, that
they were)," and that the district court therefore erred by denying a defense request for a jury
instruction "that it had to be established beyond a reasonable doubt that a defendant knew the
[relevant] units possessed the characteristics that made them a security under the *Howey* test."   *Id.*
[21]   It is also black-letter law that there is "no *mens rea* requirement" as to purely jurisdictional
elements of criminal statutes (*see United States* v. *Blackmon*, 839 F.2d 900, 907 (2d Cir. 1988)
(addressing the wire fraud statute)), and that establishing whether the instruments sold by a
defendant to others through fraud qualify as "securities" under the federal securities fraud statutes

Accordingly, in a securities fraud prosecution, evidence that the defendant believed — based on advice of counsel or otherwise — that what he offered or sold to investors through fraud was not a "security" under the federal securities laws is irrelevant and properly excluded. *See Tucker*, 345 F.3d at 330-31. In *Tucker*, the defendant was convicted at trial of (among other things) securities fraud for selling trust certificates to investors based on fraudulent representations. *Id.* at 323-34. On appeal, the defendant argued that the district court had erred by precluding him from offering testimony showing that he "'believed, and relied upon, advice from counsel and others that the trust certificates involved were not securities, and therefore not regulated by the federal securities laws.'" *Id.* at 330 (citation omitted). The Fifth Circuit rejected this argument for several reasons, including because "the Securities and Exchange Act's *raison d'etre,* to prevent a seller's fraudulent behavior" is "served rather than undermined" by focusing the *mens rea* requirement for securities fraud on whether the defendant "possessed the intent to *defraud* investors" regardless of "his belief as to the nature of the certificates" and whether they qualified as securities (*id.* at 330 (*Tucker's* emphasis)). Because the defendant's beliefs concerning whether the certificates were, in fact, securities was "irrelevant," the testimony that the defendant sought to offer on the subject was properly excluded on this ground (and for other reasons as well). *Id.* at 330-31.

### 2. The Threshold Factual Showings Required to Assert Advice of Counsel

Even if an advice-of-counsel defense was theoretically available to rebut the jurisdictional

---

is a jurisdictional element of proving a criminal violation of those statutes (*see, e.g., United Housing Foundation, Inc.* v. *Forman*, 421 U.S. 837, 859-860 (1975) (dismissing securities fraud claims under Sections 10(b) of the Securities Exchange Act of 1934 and Section 17(a) of the Securities Act of 1933 for lack of federal jurisdiction where instrument at issue did not constitute a security)).

element of whether the instruments that a defendant sold to others through fraud constituted "securities" under the anti-fraud provisions of the federal securities laws, the defendant cannot assert such a defense "unless there are sufficient facts in the record to support the defense." *United States* v. *Quinones*, 417 F. App'x 65, 67 (2d Cir. 2011) (citing *United States* v. *Evangelista*, 122 F.3d 112, 117 (2d Cir. 1997)). To do so, a defendant must show that (1) before taking action in connection with the charged conduct, he honestly and in good faith sought the advice of counsel; (2) he fully and honestly laid all the facts before his counsel; and (3) he in good faith and honestly followed counsel's advice, believing it to be correct and intending that his acts be lawful. *See United States* v. *Colasuomo*, 697 F.3d 164, 181 (2d Cir. 2012); *United States* v. *Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1194-95 (2d Cir. 1989). Where a defendant fails to meet even one of the aforementioned requirements, he is not entitled to a jury instruction regarding advice of counsel. *See Colasuonno*, 697 F.3d at 181 (affirming denial of instruction, as the defendant did not satisfy the second prong of the test); *Quinones*, 417 F. App'x at 67 (affirming denial of instruction and order precluding defense from arguing advice of counsel in summation; "defendants are not entitled to such an instruction unless there are sufficient facts in the record to support the defense," and "the defendants [in this case] have not shown the required factual predicate for an advice-of-counsel defense").

### 3. Discovery Obligations Required to Assert Advice of Counsel

Furthermore, as this Court recognized in its order (Dkt. 140) granting the Government's motion to compel the defendants in this case to disclose before trial whether they intend to assert any defense based on advice of counsel, and if so, to produce all discovery relating to such a defense: "if defendants 'intend to rely on an advice of counsel defense' they must 'disclose all

documents concerning the [] . . . defense' including 'not only those documents which support [their] defense, but also all documents (including attorney-client and attorney work product documents) that might impeach or undermine such a defense[.]'" (Dkt. 140 at 1-2 (quoting *United States* v. *Hatfield*, No. 06 Cr. 0550, 2010 WL 183522, at *13 (E.D.N.Y. Jan. 8, 2010) (this Court's brackets)).

When a defendant asserts a defense based on his reliance on the advice of counsel, he waives any attorney-client privilege over his communications with the counsel in question. *See, e.g.*, *United States* v. *Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("[a] defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes"). As a result, defendants asserting such a defense must disclose to the Government "any communications or evidence defendants intend to use to establish the defense" and "even otherwise-privileged communications that defendants do *not* intend to use at trial, but that are relevant to proving or undermining the advice-of-counsel defense, are subject to disclosure in their entirety." *United States* v. *Crowder*, 325 F. Supp. 3d 131, 138 (D.D.C. 2018) (*Crowder*'s emphasis) (quotation marks omitted) (collecting cases). Failure to make such disclosures results in forfeiture of the defense. *See, e.g.*, *Bilzerian*, 926 F.2d at 1291 (affirming refusal to let the defendant testify about his "good faith regarding the legality" of the charged conduct unless he was also subject to cross-examination regarding communications with his attorney); *United States* v. *Wells Fargo Bank N.A.*, 12 Civ. 7527 (JMF), 2015 WL 3999074, at *1 (S.D.N.Y. June 20, 2015) (defendant asserting advice-of-counsel defense must "make a full disclosure during discovery and the failure to do so constitutes a waiver of that defense" (internal quotation marks omitted)).

Where, as in this case, defendants have availed themselves of the strategy of obtaining Rule

16(a) discovery from the Government, they have an obligation to provide reciprocal discovery under Rule 16(b) of any materials in their possession, custody or control that they intend offer in their defense at trial, including non-impeachment exhibits that they intend to introduce through Government witnesses. *See, e.g.*, *United States* v. *Napout*, No. 15 Cr. 252, 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017) ("Rule 16 requires Defendants to identify all non-impeachment exhibits they intend to use in their defense at trial, whether [or not] the exhibits will be introduced through a government witness."); *United States* v. *Hsia*, No. 98 Cr. 57, 2000 WL 195067, at *2 (D.D.C. Jan. 21, 2000) ("[E]vidence [introduced] through cross-examination that the Court finds is part of [defendant's] case-in-chief" is subject to Rule 16(b) disclosure). That the defendants received those materials from the Government does not relieve them of their reciprocal discovery obligations. *See Hsia*, 2000 WL 195067, at *1-2 ("The fact that the government already is in possession of the documents does not eliminate defendant's duty to disclose them."). Nor can the defendants satisfy their reciprocal discovery obligations "merely by providing the government with the thousands of pages of discovery [they] received from the government and stating that the documents upon which [they] [plan] to rely are found somewhere therein." *Id.* Although Rule 16(b) "does not specifically say that the parties must identify the specific documents upon which they may rely at trial, its purpose is to avoid surprise and gamesmanship; it definitely contemplates reciprocity in the production of evidence that both parties intend to introduce in their case-in-chief at trial." *Id.* (internal quotations and citation omitted). Accordingly, to comply with their reciprocal Rule 16(b) discovery obligations, the defendants must either produce the actual materials that they intend to rely on in their defense, or identify the documents from prior Government disclosures to the extent that the defendants received the documents in question from

the Government. *See, e.g.*, *United Sates* v. *Crinel*, No. 15-61, 2016 WL 5779778 (E.D. La. Oct. 4, 2016) (ordering defendant to comply with her reciprocal discovery obligations by either producing actual documents or identifying Bates numbers from prior government disclosures).

## C. Discussion

The Court should preclude the defendants from offering evidence or making arguments that they relied on advice of the fake lawyer "Eric Pope" or his fake law firm "Pope & Dunn" as a defense to the securities fraud charges in this case because: (a) such evidence or arguments are irrelevant and pose an undue danger of confusing and misleading the jury and wasting the time of the Court and the jury, and thus are inadmissible under Rule 403; (b) the defendants have failed to make a threshold showing, as is their burden, that there are sufficient facts to support such a defense; and (c) the defendants have failed to provide pretrial full discovery regarding such a defense.

### 1. The Alleged Advice-of-Counsel Defense Should Be Precluded Under Rule 403

Because of the defendants' failure to comply with their discovery obligations under this Court's orders and Rule 16(b), it is not clear from the record what the alleged advice that the defendants claim to be relying on as a defense to the securities fraud charges in the Indictment was, let alone how the alleged advice negates any of the elements of those charges.

The defendants have made no claim that "Eric Pope" or "Pope & Dunn" advised them or Centra Tech that it was lawful for them to induce investors to buy Centra tokens through deliberate lies such as misrepresentations that their company had critical business relationships and licenses that it did not actually have and false statements that the company was led by two seasoned senior

executives who, in reality, were fabricated by the defendants and did not exist. Nor could they. Such a claim would fail on the facts (because the defendants have furnished no evidence that the defendants made full disclosure of all the facts about their deliberate lies to "Eric Pope" or "Pope & Dunn"), and it would fail on the law because advice of counsel cannot be used to defend against deliberate affirmative misstatements such as those that the defendants are charged with uttering. The Supreme Court and Second Circuit have both recognized that defendants cannot rely on advice of counsel to shield themselves from criminal liability for deliberately making misrepresentations about material facts that they know to be false when they convey them. *See Williamson* v. *United States*, 207 U.S. 425, 453 (1908) ("no man can willfully and knowingly violate the law and excuse himself from the consequences thereof by pleading that he following the advice of counsel"), *cited with approval by United States* v. *King*, 560 F.2d 122, 132 (2d Cir. 1977) (in securities and wire fraud prosecution, affirming that district court properly denied defendant's request for a jury instruction concerning his claimed reliance on the advice of counsel in signing representation letters that contained material misrepresentations: "significant representations were made as to specific facts (e.g. that there were no buy-back agreements) and as to those we cannot understand how a businessman who knows that such factual representations are untrue can screen himself by trying to rely on advice of counsel").

From the limited information that the defendants have revealed about the alleged advice-of-counsel defense they have said that they "may" assert at trial, it appears that what the defendants will claim is that the fake attorney "Eric Pope" of the fake law firm "Pope & Dunn" advised Sharma or Centra Tech that the Centra tokens that the defendants sold to investors during the company's ICO were not "securities" subject to the federal securities laws or the regulatory

jurisdiction of the SEC.

Even if such advice was given to the defendants, that would not constitute a defense to the charged securities fraud counts. The defendants are charged in those counts with deliberately lying to investors to induce their purchases of Centra tokens. To establish that the defendants conspired to, and did, dupe investors into buying Centra tokens by telling them fraudulent representations as charged in the securities fraud counts, the Government does not have to prove that the defendants knew that the tokens that they peddled to those investors through deliberate lies qualified as "securities" within the meaning of the federal securities laws. *See Brown*, 578 F.2d at 1284 ("The government need only prove that the object sold or offered is, in fact, a security; it need not be proved that the defendant had specific knowledge that the object sold or offered was a security."). To convict the defendants on those securities fraud counts, the "government is required to prove specific intent only as it relates to the action constituting the fraudulent, misleading or deceitful conduct, but not as to the knowledge that the instrument used is a security" under the federal securities laws. *Brown*, 578 F.2d at 1284; *see also Tucker*, 345 F.3d at 330-31; *Leonard*, 529 F.3d at 91-92. As a result, whether the defendants believed — based on advice from a fake lawyer, a real lawyer, or otherwise — that the Centra tokens that they were selling during their fraudulent scheme were not "securities" is irrelevant to the principal question that the jury must decide: whether they deliberately lied when they sold those tokens. *See Tucker*, 345 F.3d at 330-31 (because the focus of the *mens rea* requirement for securities fraud is on whether the defendant "possessed the intent to *defraud* investors," the "defendant's belief concerning the nature of the securities is irrelevant" (*Tucker*'s emphasis)). Even if the defendants had been advised that the Centra tokens did not constitute the type of instrument that would fall within the

64

jurisdiction of federal securities and criminal authorities, that would in no way refute that they deliberately lied to investors to dupe them into buying the Centra tokens that defendants were hustling. Because the defendants' beliefs concerning whether the Centra tokens were, in fact, securities is irrelevant to the fact questions that the jury must decide, evidence or arguments about what those beliefs were or the alleged advice on which those beliefs were purportedly based are irrelevant and have no probative value in determining any fact of consequence to the disposition of this case. *See Tucker*, 345 F.3d at 330-31 (affirming district court's preclusion of testimony that the defendant believed based on advice from counsel and others that trust certificates that he sold as part of securities fraud scheme were not "securities"); *Sardana*, 101 F. App'x at 854-55 (holding that evidence concerning a defendant's alleged reliance on advice of counsel is properly excluded where such evidence is irrelevant to the *mens rea* requirement of the offense charged).[22]

In addition to the fact that such evidence or arguments have no probative value, their admission would pose a substantial danger of confusing and misleading the jury with what will invariably become a time-consuming side-show about the fake lawyer "Eric Pope" and his fake law firm "Pope & Dunn." The defendants will undoubtedly attempt to begin this side-show with what will be time-consuming and distracting live testimony about John Lambert, who, during his

---

[22] By way of analogy, if two members of a bank robbery crew sought and received advice from an attorney about whether a bank was not federally insured, went and robbed the bank without every believe that the advice was accurate, and ended up getting arrested and prosecuted on federal bank robbery charges because it turned out the bank was actually federally insured, contrary to the advice, there can be no question that the defendants would not be permitted to assert an advice-of-counsel defense. Just as the bank robbers' beliefs as to whether or not the bank was federally insured shed no light on the *mens rea* requirement for determining their guilt on the federal bank robbery charges (whether the robbers intended to steal property from the bank through violence or intimidation), the beliefs of the defendants in this securities fraud case as to whether Centra tokens were "securities" say nothing about their intent to deceive Centra Tech investors.

time in college, fabricated the fake law firm "Pope & Dunn" headed by a fake lawyer named "Eric Pope," and defrauded several victims into paying Lambert for what they thought was legal advice from the reputable attorney "Eric Pope."  This, in turn, will invite a mini-trial on exactly what said in each and every communication between Lambert, posing as "Eric Pope," and the defendants; whether the defendants exercised due diligence before hiring "Eric Pope" from an online freelancing website; whether the defendants disclosed all the facts pertinent to any advice that "Eric Pope" tendered; the exact advice, if any, received in response; whether that advice was facially unreasonable; when the advice was received; and whether the defendants honestly and reasonably believed any such advice and acted upon it.  The defendants' counsel have also made clear in communications with the Government that in the event of the Court allowing them to put on a defense of reliance of on advice from "Eric Pope," they will seek to introduce what they have described as "live testimony" — preferably, in their view, from other victims of Lambert — regardless of whether the Government would stipulate that Lambert, fraudulently posing as the fake lawyer "Eric Pope," tendered some sort of advice (which the defendants have thus far refused to identify) Federal Rule of Evidence to the defendants or Centra Tech.  All of that poses an enormous danger of confusing and distracting the jury from the material questions of fact in dispute at trial, misleading the jury into thinking that the fact that the defendants may have been victims of a fraud themselves might somehow be a defense to criminal liability for charged securities fraud offenses (which is not true), and needlessly wasting the time of the Court and the jury. Accordingly, evidence or arguments about any advice that the defendants received from "Eric Pope" or "Pope & Dunn" should be precluded under Rule 403.

### 2.  The Alleged Advice-of-Counsel Defense Lacks Sufficient Factual Support

Even if such advice could somehow provide a defense to the securities fraud charges in this case — which it cannot — the defendants have failed to meet their burden of establishing the threshold factual showings required to present an advice-of-counsel defense with respect to "Pope & Dunn."   To assert an advice-of-counsel defense, the defendants must first show that there are sufficient facts in the record to prove that (1) before taking action in connection with the charged conduct, they honestly and in good faith sought the advice of counsel; (2) they fully and honestly laid all the facts before his counsel; and (3) they in good faith and honestly followed counsel's advice, believing it to be correct and intending that his acts be lawful.   *See Colasuomo*, 697 F.3d at 181; *Beech-Nut Nutrition Corp.*, 871 F.2d at 1195.   The defendants have not done so, and cannot do so on this record.

As to the first requirement, to the extent that the defendants sought any advice from "Pope & Dunn" (albeit on a topic irrelevant to the *mens rea* for any of the securities and wire fraud offenses charged in the Indictment), such communications did not commence until August 9, 2017, *after* the defendants had already raised over a million dollars in assets from investors based on fraudulent misrepresentations disseminated to the investing public through, among other things, a whitepaper posted to Centra Tech's website as of July 31, 2017, another whitepaper posted to Centra Tech's website as of August 3, 2017, a LinkedIn profile for the fake CEO of Centra Tech posted to the internet as of August 3, 2017, and a YouTube video interview of Sharma on or about August 6, 2017.   Inherent in the concept of advice of counsel is that the defendant sought an attorney's advice as to "what he could lawfully do *in the future*."   *Beech-Nut Nutrition Corp*., 871 F.2d at 1195; *see also United States* v. *Cheek*, 3 F.3d 1057, 1061 (7th Cir. 1993) ("A crucial element in this defense is that defendant secured the advice on the lawfulness of his *possible future*

*conduct*.") (quotation marks omitted). Where, as here, the defendants did not reach out for any advice until after "already manifest[ing] [their] intent" to commit the charged conduct, the advice later received cannot establish an advice-of-counsel defense. *See United States* v. *Polytarides*, 584 F.2d 1350, 1353 (4th Cir. 1978).

As to the second requirement, the defendants have furnished no discovery or other evidence whatsoever that they fully and honestly disclosed all the pertinent facts about their fraudulent scheme to solicit investor funds to "Eric Pope" or "Pope & Dunn" before receiving advice. As explained above, the defendants have not produced to the Government any communications between the defendants and "Eric Pope" or "Pope & Dunn," let alone any communications establishing that that defendants fully and honestly disclosed all the pertinent facts about their scheme to "Eric Pope" or "Pope & Dunn." Although Centra Tech produced communications between Sharma and "Pope & Dunn" to the SEC during the SEC's parallel investigation, none of those communications indicate that Sharma or Farkas revealed to "Eric Pope" or "Pope & Dunn" that (a) Sharma had participated in text-message communications (such as those quoted below) calling into question whether he genuinely believed that the Centra tokens that he and his confederates were selling to investors through fraud were not "securities," (b) the marketing materials that Centra Tech was disseminating to solicit investments in the company's ICO were riddled with brazenly false lies that the defendants knew to be false relating to core aspects of Centra Tech's purported business model, or (c) the true facts that belied the statements. Nor do any of those communications that Centra Tech produced to the SEC indicate that Sharma or Farkas brought to the attention of "Eric Pope" or "Pope & Dunn" all of the various modes of communications that they were using to solicit investments in their internet-based ICO marketing

68

campaign, much less the contents of all of the representations in those communications bearing on whether or not a reasonable investor would have been led to believe that Centra tokens were the kinds of investment contracts that have been deemed to be "securities" under the federal securities laws.

As to the third requirement, in light of the overwhelming evidence in the record that the defendants acted in bad faith for the purpose of deceiving investors through brazen lies, it is hard to imagine how the defendants could possibly show that they in good faith followed the alleged advice that they claim to have received, believing it to be correct and intending that their acts be lawful. For example, about a week before Centra Tech's fraudulent ICO campaign had ended, Sharma advised Farkas and Trapani via a group text-message conversation that the SEC had brought an enforcement action charging a company called RECoin and the company's founder, among others, with defrauding investors in an unregistered offering of securities styled as an initial coin offering. During this conversation:

- Sharma text-messaged Farkas and Trapani: "Sec just shut down REcoin," "Read the article," "We gotta clean up every single thing that we can't do," "And can't offer today," "Google SEC REcoin." Trapani responded "I peep."

- Sharma text-messaged Farkas and Trapani: "Delete all the cards have shipped info," "Everything gotta get cleaned up," "RJ [*i.e.*, Farkas] can u jump on that . . . on our pages." Trapani responded: "They were pitching a straight security."

- Sharma wrote "Yea," "I know," "But fill [*sic*] fraud can be a word thrown around," "Especially with the card limits." Trapani responded "Word."

- Shortly thereafter, Sharma text-messaged Farkas and Trapani: "I want a product page like [a particular competitor's]," "Theirs is so nice." Trapani wrote "Lol yeah no real product." Sharma wrote: "Yea but it doesn't say much," "And looks good," "We don't have a real product either right now," "So I wanna tighten up ship asap." Trapani wrote "Feel you."

Sharma's statement to Farkas and Trapani that "But [st]ill fraud can be a word thrown

around," in response to Trapani's suggestion that they did not need to worry about the SEC coming after them because Centra Tech (unlike RECoin) was not pitching "a straight security" in its ICO that would be subject to SEC jurisdiction, betrays the defendants' knowledge that what they were doing to was fraudulent, illegal, and done in bad faith. Indeed, it appears that Sharma recognized and articulated that they were in danger of being charged by the SEC for securities fraud because they had deliberately lied ("But [st]ill fraud can be a word thrown around"), regardless of whether or not they had a basis for arguing (as Trapani suggested) that they were not pitching "a straight security."

Furthermore, even if there was ever a point in time when the defendants truly believed that their ICO was not a securities offering (which would not negate any element of any of the securities or wire fraud charges against them), these text messages show that they were disabused of that belief before they had finished raising funds through their fraudulent ICO campaign of deliberate lies when the SEC brought an enforcement action against a different ICO promoter. Instead of stopping their ICO and returning the funds that they had raised through fraud by that point, they continued their fraudulent scheme. In light of those irrefutable facts, among others in the record, the defendants cannot plausibly claim, let alone show, that they in good faith and honestly followed the alleged advice of counsel that they claim to have relied upon, believing it to be correct and intending that their acts be lawful.

### 3. The Defendants' Alleged Advice-of-Counsel Defense Should Be Precluded Because They Have Failed To Provide Full Discovery About The Defense

Finally, the defendants also should be barred from asserting an advice-of-counsel defense at trial because they have failed to comply with their discovery obligations regarding any such defense. In order to prevent the defendants from ambushing the Government and the Court with

such a defense on the eve of or during trial, this Court ordered the defendants to inform the Court and the Government by September 11, 2019 (*i.e.*, about three months before trial) whether they plan to rely on an advice of counsel defense, and if so, to provide all discovery relating to any advice of counsel defense they intend to advance at trial. (Dkt. 140, 167). The defendants' vague and conclusory two-page notice filed September 11, 2019 in response to that order indicates that they "may assert an 'advice of counsel' defense" at trial as to the securities fraud counts of the Indictment "based upon the legal advice rendered from the firm Pope & Dunn" (Dkt. 169 at 1). But neither the defendants' September 11 letter nor their lone 18-page reciprocal discovery production identifies the substance of the alleged advice that will form the basis for such a defense, the names of the actual or purported attorneys at "Pope & Dunn" who allegedly provided advice upon which such a claimed defense will be based, the relevant client (*i.e.*, Centra Tech, Sharma, or Farkas) whom each actual or purported attorney was acting on behalf of in tendering the alleged advice, the manner in which the alleged advice was given, or when the alleged advice was given. Indeed, the defendants have not produced to the Government *any* communications that they or others had with "Eric Pope" or others at "Pope & Dunn," nor have they disclosed to the Government whether there are documents in the Government's Rule 16(a) discovery productions to the defendants containing such communications, let alone which ones. For failing to comply with this Court's directive that the defendants provide full discovery before trial regarding any advice-of-counsel defense that they are seeking to assert, the defendants should be barred from raising such a defense at trial.

**V.    The Defendants Should Be Precluded From Offering Evidence About Their Purported Offers to Return Funds That They Stole Through Fraud**

The defendants should be barred from introducing evidence about offers that they claim to

have made to the SEC and to the Government for the purported purpose of effectuating the return of millions of dollars in assets that they stole from victims through the defendants' fraudulent scheme — self-serving offers that were proposed after their fraudulent ICO fundraising efforts were complete and had been discovered by federal securities and law enforcement authorities. Because such after-the-fact offers are irrelevant to whether the defendants are guilty of the charged securities and wire fraud offenses, pose an undue danger of confusing and misleading the jury, and will needlessly invite a time-consuming mini-trial on why the defendants' claims about the terms of those offers are misleading and why the offers were rejected, such evidence should be excluded under Rule 403. To avoid burdening the Court with unnecessary briefing on this issue, the Government asked counsel for the defendants if they would agree not to elicit evidence or make arguments at trial about such alleged offers to repay the defendants' victims, and counsel for defendant Sharma refused to do so. To the contrary, it is clear that defendant Sharma at least will try to use such plainly improper evidence or arguments in his defense at trial. This Court should not permit either of the defendants to do so.

## A. Relevant Facts

After the defendants were arrested on federal securities and wire fraud charges in this case in April 2018, the Government seized a total of 100,000 units of Ether that the defendants obtained from Centra Tech investors through fraud during the company's ICO, pursuant to two judicially authorized seizure warrants, to prevent anyone from dissipating those investor funds during the pendency of this criminal prosecution. Before the Government had uncovered evidence sufficient to refute Sharma's lies to the Government and the Court that 9,000 of the 100,000 Ether units belonged to him, the Government initially obtained a seizure warrant for 91,000 of the

100,000 Ether units and seized them in May 2018, after Sharma begrudgingly revealed the actual passcode needed to access and secure those funds when it became apparent to him that he had to do so in order to ensure his release from custody on bail pending trial. After further investigation uncovered proof that the remaining 9,000 Ether units were also fraud proceeds raised from Centra Tech investors, the Government obtained a seizure warrant for and seized those funds in October 2018. The Government is also aware of evidence that, in addition to the 100,000 Ether units of fraud proceeds that have been seized to date by the Government, there were significant additional victim funds that the defendants raised from Centra Tech investors through fraud — additional fraud proceeds that they have not disclosed to the Court or to the Government, and that the Government has not yet located or seized.

Of the 100,000 Ether units in investor proceeds that the Government has been able to seize, the defendants could have but did not return those funds to Centra Tech investors in October 2017 after the *New York Times* published its article raising questions about the veracity of their representations to investors, in November 2017 after the SEC served a subpoena on the company for documents relating to the fraud, in December 2017 after several aggrieved investors filed a putative class securities fraud action against them and the company (among others) in the United States District Court for the Southern District of Florida (captioned *Rensel* v. *Centra Tech, Inc. et al.*, 17 Civ. 24500 (JLK) (S.D.Fl.)), or in the period from December 2017 through March 2018 when the SEC was laboring under the false impression created by Sharma that the 100,000 Ether units were secured by a passcode that had been divided into separate safe deposit boxes that none of the Centra Tech co-founders could access on his own.

Yet, two months before they are scheduled to stand trial on criminal fraud charges in

Manhattan federal court — a year and six months after they were arrested on those charges — the defendants filed a motion with this Court for the purported purpose of obtaining an order directing the Government to immediately return the seized Ether to anyone who purchased Centra tokens during the ICO and suffered a loss as a result. As the Government will show in its forthcoming submission in opposition to that motion, the relief that the defendants claim to seek: (a) is not authorized by the law; (b) has apparently been sought by the defendants without any input (let alone consent) from victims of the defendants' fraud and other relevant stakeholders; (c) provides no mechanism for obtaining discovery from the defendants of whether there are additional victim assets obtained by the defendants through fraud during the period before their trial when they can and would invoke their Fifth Amendment rights against self-incrimination; and (d) is less protective of the interests of such victims and stakeholders than the statutorily-authorized forfeiture and restitution processes that are routinely used by the Government in fraud cases.

## B. Discussion

In reality, the defendants' recently-filed motion to return the seized Ether to their victims is a naked attempt to manufacture a basis to improperly invite the jury to acquit them on a "no harm, no foul" theory of criminal liability: that because they have allegedly offered to make the victims of their fraud whole through the return of the assets that they stole through lies, they should not be convicted of fraud. Not surprisingly, the law does not recognize such a defense to the securities and wire fraud offenses charged in this case, and the defendants should be precluded from injecting such a defense into their trial.

Even assuming for the sake of argument that the defendants' motion accurately characterized the terms of their so-called offers to return the seized Ether — which is not the case

— those offers are irrelevant and should be precluded. The defendants are not charged with failing to return the seized Ether units to the victims of their fraud. They are charged with conspiring to make, and making, fraudulent misrepresentations to obtain those funds from Centra Tech investors. That they supposedly offered to return proceeds of their fraud to their victims, after their fraudulent ICO fundraising effort had been completed and was discovered by federal securities and criminal authorities, does nothing to refute that they are guilty of the fraud in obtaining those funds in the first place. As a result, evidence of any such repayment offers should be precluded as irrelevant and unduly prejudicial under Rule 403.

On this point, the Second Circuit's decision in *United States* v. *Sindona*, 636 F.2d 792 (2d Cir. 1980) is persuasive. In *Sindona*, the defendant was charged with (among other things) wire fraud arising out of his scheme to obtain and misapply $15 million in funds from a bank through fraud. The district precluded evidence that the defendant later — after the bank became insolvent — caused the funds to be repaid in part because this proof was irrelevant to whether the defendant was guilty of the charged wire fraud. *Id.* at 800. Relying on Rule 403, the Second Circuit affirmed. *Id.* The Second Circuit explained that "[t]he only probative value associated with the repayment" would "either be to show that [the victim bank] suffered no loss or that [at the time of the fraud] Sindona did not intend to misapply [the victim bank's] funds," but "loss to the victim need not be shown in order to prove a violation" of the wire fraud statute, and the repayment was irrelevant to Sindona's intent at the time of the fraud because the "offense occurred and was complete when the misapplication took place." *Id.* (internal quotation marks and citation omitted). Because "[w]hat might have later happened as to repayment is not material and could not be a defense" to the charged wire fraud offense, the Second Circuit found that the district court

properly precluded evidence of the repayment of proceeds of the fraud.  *Id.* (internal quotation marks and citations omitted).  In doing to, the Second Circuit cited with approval a portion of its earlier decision in the seminal insider trading case of *United States* v. *Chiarella*, 588 F.2d 1358 (2d Cir. 1978) that remains good law:  namely, the part in which the *Chiarella* Court held that the district court had properly precluded, as irrelevant and unduly prejudicial, evidence that defendant Chiarella disgorged the profits from his insider trading scheme because Chiarella's state of mind during his insider trading scheme would not be illuminated by evidence that he later agreed to an SEC decree requiring restitution.  *Sindona*, 636 F.2d at 800-01 ("This court, in *United States* v. *Chiarella*, 588 F.2d 1358, 1371 (2d Cir. 1978), *rev'd on other grounds*, 445 U.S. 222 (1980), found it difficult to understand how agreeing to an SEC restitution decree would indicate the defendant's state of mind years earlier.").

That is equally true here.  Whether or not the defendants caused their victims to suffer an actual loss is not an element of any of the securities or wire fraud offenses that they are charged with committing.[23]  Any offer by the defendants to repay funds to their victims after they obtained those funds through the charged fraud offenses has no bearing on whether they acted with criminal intent when they agreed to lie, and uttered lies, with the goal of inducing victims to exchange those funds for the purchase of digital tokens issued by that their company.  The defendants had

---

[23] *See, e.g.*, *United States* v. *Hickey*, 580 F.3d 922, 930 (9th Cir. 2009) ("loss to investors is not an element of either mail fraud or securities fraud, nor is an intent to cause loss"); *United States* v. *Surgent*, No. 04 Cr. 364, 2006 WL 2535103 (E.D.N.Y. Sept. 1, 2006) ("the amount (or even the existence) of market loss is not relevant to guilt" of securities fraud offense); *Sindona*, 636 F.2d at 800 (under wire fraud statute, "loss to the victim need not be shown in order to prove a violation.  Thus, an absence of loss to [the victim bank] is irrelevant.").

completed all of the acts needed for a jury to convict them of the charged securities and wire fraud offenses long before they made any such repayment offer was made to the SEC or to the Government. Accordingly, evidence of any after-the-fact repayment offers has no probative value in assessing whether the defendants are guilty of the charged fraud offenses.

But such evidence does pose an enormous danger of confusing and misleading the jury, and will waste the time of the Court and the jury by needlessly inviting a mini-trial on the actual terms of the repayment offers, the circumstances that prompted the defendants to make those offers, and why they were rejected. For example, the defendants' misleading claim that "the SEC prevented Centra Tech's effort to refund Ether during the SEC's civil investigation when the dollar value of Ether was over $70 million (almost three times the amount the defense understands the government accuses the Defendants of obtaining from Centra Tech's customers)" (Dkt. 193 at 6) will invite a lengthy and confusing mini-trial on what actually happened during the settlement discussions between Centra Tech's outside counsel at Ballard Spahr and SEC staff attorneys that the defendants have grossly mischaracterized — a frolic that likely would require hours if not days of testimony from attorneys from both sides who were involved in those discussions.[24] Similarly,

---

[24] Almost a year before the defendants filed their motion to return the seized Ether units to their victims, their counsel, via an email dated October 30, 2018, requested information from the Government as part of discovery in this criminal case about settlement discussions that had previously occurred, during the period between November 2017 and April 2018, among staff attorneys of the SEC and Centra Tech through its outside counsel at Ballard Spahr, regarding a potential resolution of the SEC's investigation of Centra Tech and its co-founders. In response, the Government provided the defendants' counsel with a letter on November 8, 2018 reporting facts that squarely contradict a number of the mischaracterizations in the defendants' motion — facts that the defendants fail to disclose, let alone address, in their motion. For example, the Government's November 8 letter stated, among other things, the the following:

> [P]lease note that we believe that [your] October 30 email's characterization of specified settlement discussions between Centra Tech's outside counsel at Ballard

the defendants' claim that "the government has refused the Defendants' request to return the Ether prior to the final resolution of this matter" (Dkt. 193 at 2) will invite another mini-trial about why their proposal is actually less favorable for victims and other stakeholders than the statutorily-approved forfeiture and restitution processes used in connection with criminal sentencing. All of that, which has nothing to do with the question the jury is tasked with deciding at the defendants' trial — whether the defendants are guilty of the charged fraud offenses — poses a tremendous danger of confusing the jury, misleading the jury into believing that the defendants' claimed offers to return the seized Ether refute some element of the charged fraud offenses (which they do not), and wasting the time and resources of the Court and the jury.

For all of these reasons, the defendants should be precluded under Rule 403 from introducing evidence about offers that they made to the SEC or to the Government for the purported purpose of effectuating the return of the seized Ether units that they stole from victims through fraud.

## VI.    The Court Should Preclude the Defendants' Proposed Expert Witness Testimony

---

and SEC staff attorneys is inaccurate. It is our understanding that Ballard never proposed on behalf of Centra Tech during those discussions to reach a settlement with the SEC under which Centra Tech would return all of the Ether units raised from investors who purchased Centra tokens during Centra Tech's initial coin offering ("ICO"). On the contrary, Ballard reported that Centra Tech was prepared to reach a settlement with the SEC under which Centra Tech would offer to refund a sum of United States dollars to Centra token purchasers equal only to the value of the Ether units provided by the Centra token purchasers at the time of their respective purchases of Centra tokens during the company's ICO. Ether was valued at approximately $291 per Ether unit on the last date of the ICO on or about October 5, 2017, and had nearly quadrupled in value to approximately $1,139 per Ether unit as of the date when Ballard relayed this proposal in January 2018.

(Ex. C at 1-2).

Under case management scheduling orders imposed by this Court, this Court initially ordered the defendants to provide to the Government by June 10, 2019 notice of any expert witnesses they intend to call during their case-in-chief at trial and any associated expert discovery materials as required under Rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure (Dkt. 97), and this Court later extended the defendants' deadlines for making such disclosures to September 3, 2019 (Dkt. 142). On August 30, 2019, the defendants provided the Government with a perfunctory notice of their intent to offer expert testimony from three expert witnesses at trial lacking anything close to the written summary required by Rule 16(b)(1)(C) of what the witnesses' expected testimony will be, the opinions that the witnesses will offer, or the bases and reasons for those opinions. Because the defendants have failed to comply with their expert disclosure obligations under Rule 16(b)(1)(C), the defendants should be precluded from calling their proposed expert witnesses at trial, or at a minimum, the defendants should be ordered to immediately supplement their expert disclosures to bring them into compliance with Rule 16(b)(1)(C).

## A. Relevant Facts

On August 30, 2019, the defendants provided the Government with a conclusory letter notifying the Government that they intend to call three expert witnesses, namely Danny Yang, Keren Zhou, and Maria Yip or Marcie Bour (the "Defense Expert Letter," attached as Exhibit B). This less than two-page expert disclosure attached each witness's curriculum vitae, and provided the following disclosures as to the substance of the witness' statements, conclusions, and findings:

- **Danny Yang**

  He is the CEO of Datient, Inc., and a block chain analyst. He is expected to testify about facts relating to the ICO, wallet, and sale of Centra Tokens. His findings and conclusions have not been

completed as of the date of this letter. His resume has been provided herein.

- **Keren Zhou**

    He is the co-founder of Galois Capital which manages a crypto hedge fund. He is expected to testify about the crypto market during all of 2017 and early 2018. His findings and conclusions have not been completed as of the date of this letter. His resume has been provided herein.

- **Maria Yip or Marcie Bour**

    Maria Yip is the founder and managing partner of Yip Associates which specializes in forensic accounting and financial investigation. Marcie Bour is a partner in the firm. At this time, either of the two may be called to testify about the financial affairs of Centra Tech during its tenure. Their findings and conclusions have not been completed as of the date of this letter. Marcie Bour's resume has been provided herein. Maria Yip's resume is forthcoming.

(Ex. B at 1-2). On September 20, 2019, in response to the Defense Expert Letter, the Government notified the defense by telephone that their expert disclosures were insufficient, and requested that the defense provide a summary of the witness' testimony, opinions, and the bases and reasons for these opinions. On September 23, 2019, the defense responded that witnesses Yang and Zhou "should be done with their analysis by mid-October," and that they were "working on it" with Yip. On October 4, 2019, in connection with their motion for a continuance of the trial date (Dkt. 194), the defense notified the Court that Yip, a "forensic accountant" who has "been diligently working on this matter" will not be completed with her work until "the end of October 2019 or in November." (Dkt. 194 at 4). In its letter to the Court, the defense omitted that it had not provided any information about Yip's testimony to the Government, except for the expectation that she would "testify about the financial affairs of Centra Tech during its tenure." (Defense Expert Letter at 1).

To date, the defendants have not supplemented their Defense Expert Letter, and have not provided a "written summary of [each proposed witness's] testimony," "the witness's opinions," or "the bases and reasons for these opinions," as required by Rule 16(b)(1)(C).

## B. Applicable Law

In light of district courts' established "gatekeeping" role with regard to expert testimony based on scientific, technical, or "other specialized" knowledge, *see Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, 141 (1999); *Daubert* v. *Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597 (1993), the admission or exclusion of expert testimony is committed to the broad discretion of the trial court, *see Hamling* v. *United States*, 418 U.S. 87, 108 (1974). Accordingly, a district court's decision to admit or exclude expert testimony is reviewed for abuse of discretion, *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137 at 158, and a "decision to exclude expert testimony . . . shall be sustained unless manifestly erroneous," *United States* v. *Lumkin*, 192 F.3d 280, 289 (2d Cir. 1999) (internal quotation marks omitted).

Federal Rule of Criminal Procedure 16(b)(1)(C) provides, in relevant part:

> The defendant must, at the government's request, give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial . . . . This summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed R. Crim. P. 16(b)(1)(C); *see also United States* v. *Yousef*, 327 F.3d 56, 148 (2d Cir. 2003) (noting that Rule 16 "requires" a defendant to provide such material at the Government's request) (citing Rule 16(b)(1)(C)).

The purpose of this rule is to "minimize surprise that often results from unexpected expert

testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination."  Fed. R. Crim. P. 16, Advisory Committee's Note (1993).  A party who fails to comply with its discovery obligations may be precluded from introducing evidence not disclosed.  Fed. R. Crim. P. 16(d)(2); *United States* v. *Ulbricht*, 858 F.3d 71, 115-18 (2d Cir. 2017) (affirming district court's preclusion of defense expert, where defendant made insufficient and untimely expert disclosure:  "If a party fails to comply with Rule 16, the district court has 'broad discretion in fashioning a remedy,' which may include granting a continuance or 'ordering the exclusion of evidence.'" (quoting *United States* v. *Lee*, 834 F.3d 145, 158 (2d Cir. 2016) (internal quotation marks omitted))).

Compliance with Rule 16's expert discovery requirements is necessary to enable a district court to make several gatekeeping determinations required by the Federal Rules of Evidence, including, for example, determining whether the party seeking to offer expert witness testimony has met the requirements of Federal Rule of Evidence 702 that the witness has "specialized knowledge will help the trier of fact," is "qualified as an expert by knowledge, skill, experience, training, or education," will base his testimony "on sufficient facts or data," has shown that "the is the product of reliable principles and methods," and "has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.[25]  The party that proffers the testimony

---

[25] District courts are responsible for ensuring that expert testimony "rests on a reliable foundation and is relevant to the task at hand," *Amorgianos* v. *Romano Enters.*, 303 F.3d 256, 265 (2d Cir. 2002) (citation and internal quotation marks omitted), and would assist the jury by "shed[ding] light on activities not within the common knowledge of the average juror," *see United States* v. *Wexler*, 522 F.3d 194, 204 (2d Cir. 2008) (citation and internal quotation marks omitted); *United States* v. *Cruz*, 981 F.2d 659, 663-64 (2d Cir. 1992); *see also United States* v. *Rea*, 958 F.2d 1206, 1216-17 (1992) ("[W]hether the witness's opinion will be 'helpful' . . . [is] a legal matter that must be determined by the court before it may allow the opinion to be heard by the jury."); *Andrews* v.

bears the burden of showing that it is admissible.  *See Bourjaily*, 483 U.S. at 172-73.

In addition, expert testimony that "expresses a legal conclusion" should be excluded. *Hygh* v. *Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992).   As the Second Circuit explained, "[e]ven if a jury were not misled into adopting a legal conclusion proffered by an expert witness, the testimony would remain objectionable by communicating a legal standard — explicit or implicit — to the jury." *Id*. at 364.   An expert "is not qualified to compete with the judge in the function of instructing the jury." *Id*.

In *United States* v. *Nersesian*, 824 F.2d 1294, 1308 (2d Cir. 1987), the Second Circuit expressed discomfort with the "uncontrolled" use of expert testimony that might have the effect of providing "an additional summation by having the expert interpret the evidence."   The Circuit stated that the district court must be vigilant to prevent an expert from coming "dangerously close to usurping the jury's function." *Id*.; *see also Bilzerian*, 926 F.2d at 1294 (holding that expert testimony in securities cases "must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying the law to the facts before it").   In addition, testimony about industry practice — while itself otherwise permissible — may not be used to circumvent the prohibition on testimony on a legal conclusion. *Id.* at 1295.

Even if expert testimony would otherwise be admissible, it may be excluded under Federal

---

*Metro N. Commuter R.R.*, 882 F.2d 705, 708 (2d Cir. 1989) (expert testimony is inadmissible when it addresses "lay matters which [the trier of fact] is capable of understanding and deciding without the expert's help"). Thus, compliance with Rule 16 expert disclosures are necessary to facilitate the district court's assessment of whether expertise is helpful, whether the expert is qualified, and whether his testimony is relevant and reliable.

Rule of Evidence 403 if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See* Fed. R. Evid. 403; *Daubert*, 509 U.S. at 595. As the Supreme Court noted in *Daubert*, "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." 509 U.S. at 595 (internal quotation marks omitted); *see also United States* v. *Young*, 745 F.2d 733, 766 (2d Cir. 1984) (danger of confusion stems from the "aura of special reliability and trustworthiness surrounding expert testimony" (internal quotation marks omitted)).

### C.   Discussion

The defendants have failed to meet their expert disclosure obligations under Rule 16(b)(1)(C). Their cursory, one-line summary of each witness's projected topic of testimony — "facts relating to the ICO, wallet, and sale of Centra Tokens" (Yang), "the crypto market during all of 2017 and early 2018" (Zhou); and "the financial affairs of Centra Tech during its tenure" (Yip or Bour) — do not come anywhere close to meeting the requirements of Rule 16(b)(1)(C). Nowhere in the Defense Expert Letter do the defendants identify *any* of the "witness'[] opinions," let alone "the bases and reasons for those opinions." Fed. R. Crim. P. 16(b)(1)(C). With less than two months left before trial, the defense have disclosed virtually nothing about what their proposed expert witnesses will say, what their foundation for saying so will be, or what principles or methodologies they will use to say so. If Yip, for example, is conducting some financial analysis of "the financial affairs of Centra Tech during its tenure" that will not be completed or disclosed to the Government until November 2019, that would leave almost no time for the Government and the Court to properly review the bases for such an analysis or the reasons for any opinions (as yet undisclosed) that Yip may offer, for any *Daubert* hearing or motion practice

concerning the admissibility or permissible scope of Yip's expected testimony, or for the Government to determine whether it should call a rebuttal expert witness to respond.

Nothing about the Defense Expert Letter would enable the Court to discharge its gatekeeping duties under Federal Rule of Evidence 702 to determine whether "specialized knowledge will help the trier of fact," or if "[1] the testimony is based on sufficient facts or data; [2] the testimony is the product of reliable principles and methods; and [3] the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. In addition, to the extent the defendants' lack of proper expert disclosure is designed to conceal that they intend to elicit legal conclusions — for example, whether the Centra Tech ICO constituted an offering of securities — from any of the three proposed expert witnesses, any such testimony should be excluded as it usurps the role of the Court in instructing the jury. *Hygh*, 961 F.2d 359-63 (expert may not "communicat[e] a legal standard – explicit or implicit – to the jury").

This Court has given the defendants more than an ample opportunity to comply with their expert disclosure obligations under Rule 16(b)(1)(C). The defendants were arrested in this case in April 2018, began receiving Rule 16(a) discovery materials from the Government in June 2018, were ordered in January 2019 (Dkt. 97) to provide the Government by June 10, 2019 notice of any expert witnesses they intend to call during their case-in-chief at trial and any associated expert discovery materials as required under Rule 16(b)(1)(C), and the defendants' deadline for such disclosures was extended (Dkt. 142) to September 3, 2019. Because the defendants have brazenly failed to comply with their expert disclosure obligations under Rule 16(b)(1)(C), the defendants should be precluded from calling their proposed expert witnesses at trial, *see, e.g.*, *Ulbricht*, 858 F.3d at 115-18, or at a minimum, the defendants should be ordered to supplement their expert

disclosures forthwith to bring them into compliance with their Rule 16(b)(1)(C) discovery obligations.

## VII.  The Court Should Admit Farkas' Proffer Statements If He Opens The Door

In the event that Farkas opens to the door to the admission of any of the statements that he made during proffer sessions with the Government following his arrest in this case by, for example, making affirmative assertions (through his counsel's arguments or questioning of witnesses, or through testimony in his defense) that contradict his proffer statements, the Court should allow the Government to introduce Farkas' proffer statements.

After his arrest in April 2018, Farkas and his original counsel in this case met with representatives of the Government and the FBI for two proffer sessions on or about May 9, 2018 and May 17, 2018.   These proffer sessions were governed by a proffer agreement (the "Proffer Agreement," ████████████████████ , which Farkas and his counsel signed at the first session and then initialed at the second session.   Although the Proffer Agreement generally prohibits the Government from using Farkas' proffer statements directly against him in the Government's case-in-chief at trial in any prosecution of Farkas, the Proffer Agreement contains a waiver provision stating that the Government may use any proffer statements made by Farkas and all evidence obtained directly or indirectly therefrom "for the purpose of cross-examination should [Farkas] testify," and the Government may also use proffer statements made by Farkas "to rebut any evidence or arguments offered by or on behalf of [Farkas] (including arguments made or issues raised sua sponte by the District Court) at any stage of the criminal prosecution (including bail, all phases of trial, and sentencing) in any prosecution" brought against Farkas.   (████).   The Proffer

86

Agreement further provides that "[t]o the extent that the Government is entitled under this Agreement to offer in evidence any statements made by [Farkas] or leads obtained therefrom, [Farkas] shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule that such statements or any leads therefrom should be suppressed."  (████).  During his proffer sessions pursuant to the Proffer Agreement, Farkas made a variety of incriminating statements establishing that he knowingly participated in the charged securities and wire fraud offenses.  For example, Farkas made the following self-inculpatory statements (among others), the substance of which is summarized below in a manner that removes references to his co-defendants:





If Farkas opens to the door to the admission of any of his proffer statements by, for example, making affirmative assertions through his counsel or his testimony that contradict his proffer statements, the Court should allow the Government to introduce Farkas' proffer statements. If Farkas opens the door through assertions or arguments of his counsel, the Government should be permitted to call a law enforcement agent who witnessed Farkas make the relevant proffer statements to offer testimony summarizing Farkas' proffer statements in a manner that removes any references to his co-defendant Sharma to avoid any of the concerns under *Bruton* v. *United States*, 391 U.S. 123, 135-36 (1968). If Farkas opens the door through his own testimony in his defense, the Government should be permitted to confront Farkas with his prior proffer statements on cross-examination or to introduce the proffer statements wholesale through such a law enforcement witness, and there would be no need to "*Bruton*-ize" the proffer statements since Sharma would also have an opportunity to cross-examine Farkas as well.

## A. Applicable Law

### 1. Proffer Agreements and Statements

Proffer agreements, such as the one executed by the parties here, have been upheld and routinely enforced by and within the Second Circuit. *See United States* v. *Velez,* 354 F.3d 190, 193-96 (2d Cir. 2004); *United States* v. *Parra,* 302 F. Supp. 2d 226, 235-40 (S.D.N.Y. 2004);

*United States* v. *Chan,* 185 F. Supp. 2d 305, 308 (S.D.N.Y. 2002); *United States* v. *Chaparro,* 181 F. Supp. 2d 323, 334 (S.D.N.Y. 2002). As Judge Cote explained in *Chaparro,* there is "no unfairness to [defendant] in allowing use of his statements during proffer sessions once he has opened the door to their use by his arguments and evidence," because the "design of the [Proffer] Agreement provides any defendant who decides to speak with the Government strong incentives to speak truthfully, and discourages anyone from speaking at all if she intends to lie or intends at a later time in the prosecution to advocate a position at odds with the facts she describes during the proffer session." 181 F. Supp. 2d at 334.

The Second Circuit recently described when a defendant "opens the door" to his proffer statements being used, and noted that, under the terms of the proffer agreement, counsel for the defendant may argue, without opening the door, that the Government has failed to prove its case beyond a reasonable doubt, and may "draw the jury's attention to the lack of evidence' presented on specific elements without triggering the waiver." *United States* v. *Rosemond,* 841 F.3d 95, 108 (2d Cir. 2016) (quoting *United States* v. *Oluwanisola,* 605 F.3d 124, 132 (2d Cir. 2010)); *see also Velez,* 354 F.3d at 196. Defense counsel is also "entitled to argue that certain inferences from the Government's proof should not be drawn," without opening the door. *Rosemond,* 841 F.3d at 111. Moreover, defense counsel "may cross-examine a witness in a way that casts doubt on his credibility . . . as well as challenge a witness's perception or recollection of an event," without opening the door, because such attacks do not "necessarily imply that the event did not occur." *Id.* at 108 (quotation marks, citations, and alterations omitted); *see also id.* at 109 (listing certain arguments that do not trigger the waiver provision of the proffer agreement).

Defense counsel will open the door to admission of the proffer statements, however, if counsel's arguments directly or indirectly "assert[] new facts" that contradict statements the defendant made during the proffer sessions. *See id.* at 108; *see also id.* at 109 (the proffer waiver is triggered by "an affirmative assertion of fact contradicting the proffer"); *id.* at 110 (listing certain arguments that do trigger the waiver provision of the proffer agreement).

## 2. The *Bruton* Rule

In *Bruton* v. *United States*, 391 U.S. 123, 135-36 (1968), the Supreme Court held that admission of a non-testifying co-defendant's confession naming the defendant as a perpetrator at their joint trial violates the latter's Sixth Amendment right to cross-examination. However, "[t]he Court later made clear that that a non-obvious redaction of a co-defendant's confession to eliminate any references to the defendant will eliminate any *Bruton* problem." *United States* v. *Lyle*, 919 F.3d 716, 733 (2d Cir. 2019) (citing *Gray* v. *Maryland*, 523 U.S. 185, 195-97 (1998) and *Richardson* v. *Marsh*, 481 U.S. 200, 208-09 (1987)).

Thus, the Second Circuit has made clear that in a multi-defendant trial, where the Government seeks to offer statements from a non-testifying defendant that specifically inculpates a co-defendant, the statements can be redacted in a way that eliminates the use of the co-defendant's name and, in conjunction with appropriate limiting instructions, alleviates the concerns raised by *Bruton*. *See Lyle*, 919 F.3d at 733 (upholding district court's admission of a co-defendant's post-arrest confession when redactions were sufficient to eliminate any *Bruton* problem, stating: "We have consistently held that the introduction of a co-defendant's confession with the defendant's name replaced by a neutral noun or pronoun does not violate *Bruton*.") (citations omitted); *United States* v. *Jass*, 569 F.3d 47, 61 (2d Cir. 2009) (upholding district court's

admission of a co-defendant's post-arrest confession where district court instructed the jury not to use the confession in any way against the defendant, and the confession was redacted in a way that permitted the jury to follow the limiting jury instruction); *United States* v. *Tutino*, 883 F.2d 1125, 1135 (2d Cir. 1989) (approving substitution of neutral words "others," "other people," and "another person" for names of co-defendants in confession of non-testifying defendant); *see also*, *e.g.*, *United States* v. *Yousef*, 327 F.3d 56, 149 (2d Cir. 2003) (upholding redaction of co-defendant's name to "my neighbor"); *United States* v. *Kyles*, 40 F.3d 519, 526 (2d Cir. 1994) (upholding redaction of co-defendant's name to "he"); *United States* v. *Williams*, 936 F.2d 698, 701 (2d Cir. 1991) (upholding redaction of co-defendant's name to "this guy"); *United States* v. *Benitez*, 920 F.2d 1080, 1087 (2d Cir. 1990) (upholding redaction of co-defendant's name to "friend").

"So long as the confession standing alone is not incriminating, even if the confession taken together with other evidence implicates the defendant, the confession may be admitted." *United States* v. *Wimbley*, 18 F. App'x 24, 27-28 (2d Cir. 2001). This is true even when redacted statements by co-defendants interlock with each other and additional evidence to implicate both defendants. *United States* v. *Martinez-Montilla*, 135 F. Supp. 2d 422, 424 (S.D.N.Y. 2001) (explaining that "the *Bruton* rule is not violated even where the interlocking of the redacted statements with other evidence at trial could conclusively lead to the identification of the individual referred to through neutral pronouns as the codefendant" (citing *Williams*, 936 F.2d at 700; *United States* v. *Smith*, 198 F.3d 377, 385 (2d Cir. 1999) (finding redacted statement admissible because it was not incriminating on its face, notwithstanding other evidence permitting jury to make inferences identifying co-defendant)). The operative questions when evaluating a *Bruton* claim

91

are: "(1) did the redacted statement give any indication to the jury that the original statement contained actual names, and (2) did the statement standing alone otherwise connect co-defendants to the crimes." *Jass*, 569 F.3d at 58 (quotation marks omitted). Thus, the Second Circuit has held that, "[t]o determine whether a redaction is sufficient under *Bruton*, we view the redacted statement separate and apart from any other evidence admitted at trial." *Lyle*, 919 F.3d at 733 (citations omitted); *see also Williams*, 936 F.2d at 700-01 ("[T]he appropriate analysis to be used when applying the *Bruton* rule requires that we view the redacted confession in isolation from the other evidence introduced at trial. If the confession, when so viewed, does not incriminate the defendant, then it may be admitted with a proper limiting instruction even though other evidence in the case indicates that the neutral pronoun is in fact a reference to the defendant.").

**B. Discussion**

If Farkas testifies at trial to any facts contrary to his prior proffer statements, he will open the door to the use of his proffer statements for purposes of cross-examination, as provided in the Proffer Agreement. As the Supreme Court stated in *United States v. Mezzanatto*, "making the jury aware of the inconsistency" between a defendant's testimony and proffer statements "will tend to increase the reliability of the verdict[.]" 513 U.S. 196, 205 (1995). In the event that Farkas testifies, counsel for Sharma will be able to cross-examine Farkas as to any statements made by Farkas that implicate Sharma and, therefore, the holding in *Bruton* — that the admission of a *non-testifying* co-defendant's confession naming the defendant as a perpetrator at their joint trial violates the latter's Sixth Amendment right to cross-examination — is not implicated. Thus, in using Farkas' proffer statements to cross-examine him, there would be no need to "*Bruton*-ize" any references to Sharma.

Should Farkas' counsel assert facts that contradict prior statements Farkas made during his proffer sessions, the Government intends to offer evidence of Farkas' own admissions in the proffer sessions in response. As the principles outlined above make clear, to permit Farkas to offer evidence, arguments, or lines of cross-examination that assert facts contrary to the admissions in his proffer session — without also permitting the jury to assess that evidence in light of those proffer statements — would thwart the truth-seeking purpose of a trial. *See United States* v. *Gomez,* 210 F. Supp. 2d 465, 475-76 (S.D.N.Y. 2002). If Farkas elects not to testify, but his counsel asserts facts that contradict statements Farkas made during the proffer sessions, the Government intends to offer evidence of Farkas' admissions in the proffer sessions in a format that will eliminate any *Bruton* problem.

If Farkas' counsel opens to the door — by directly or indirectly asserting facts that contradict statements that Farkas made during the proffer sessions — to any particular proffer statements being admitted, the Government would seek to introduce the substance of the statements ▆▆▆▆▆ through a law enforcement officer who was present for the proffers.[26] Specifically, the Government would offer testimony through such a law enforcement witness summarizing the substance of Farkas' relevant proffer statements in a manner that would remove any references to Sharma (or Trapani in an abundance of caution) to avoid any

---

[26] The Government could also seek to introduce Farkas' proffer statements by stipulation of the parties, if the defendants indicate they are amenable to such a stipulation.

*Bruton* concerns by, for example, using the passive voice or substituting "another person" for "Sharma" or "other people" for references to Sharma and Trapani together. *See Tutino*, 883 F.2d at 1135 (2d Cir. 1989) (approving substitution of neutral words "others," "other people," and "another person" for names of co-defendants in confession of non-testifying defendant). Because the Government would introduce the substance of these proffer statements through the testimony of a law enforcement officer who was present for the proffers, the proposed "*Bruton*-ized" version of Farkas' proffer statements attached as Exhibits G and H do not contain a verbatim recitation of what the law enforcement witness would say on the witness stand. Rather, the proposed redactions and modifications in ███████████ are intended to give notice to the defendants of the topics that the Government would not seek to elicit at all, and those that the Government would have the law enforcement witness "*Bruton*-ize" through live testimony.

For these reasons, the Government should be allowed to use Farkas' proffer statements should he testify, or to rebut any inconsistent testimony or evidence, or arguments asserting inconsistent new facts offered or made on Farkas' behalf.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court make the evidentiary rulings requested in this application in advance of the defendants' trial in this case.

Respectfully submitted,

CRAIG STEWART
Attorney for the United States
Acting Under 28 U.S.C. § 515

By: ____/s_____
Samson Enzer / Negar Tekeei / Daniel Loss
Assistant United States Attorneys
(212) 637-2342 / -2482

Dated: October 11, 2019
       New York, New York