**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK**

THE UNITED STATES OF AMERICA,
Plaintiff

vs.

SOHRAB "SAM" SHARMA,

Defendant.

Case No. 18-Cr-340-LGS

Judge Lorna G. Schofield

**<u>DEFENDANT'S SENTENCING MEMORANDUM
AND REQUEST FOR A DOWNWARD VARIANCE</u>**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................... 1

Mr. Sharma's Personal History and Background (18 U.S.C. § 3553(a)(1)) .................................. 2

I.     Family Background............................................................................. 2

II.    Mr. Sharma Has Abused Alcohol And Marijuana Since He Was A Teenager ................ 3

III.   Mr. Sharma's Family and Friends ........................................................ 4

IV.   Mr. Sharma's Future ....................................................................... 8

The Nature and Circumstances of the Offense and Mr. Sharma's Personal Characteristics
(U.S.C. § 3553(a)(1)) ................................................................................ 9

V.    The ICO Craze .............................................................................. 9

VI.   Centra Tech .................................................................................. 12

        A.    Centra Tech's ICO ........................................................ 13

        B.    Centra Tech Quickly Expands ........................................... 14

        C.    Card Development ........................................................ 15

        D.    The SEC Investigation and Mr. Sharma's Actions Relating to the 100,000
            in Forfeited Ether ........................................................ 17

        E.    During The Relevant Time Period Mr. Sharma Provided Substantial
            Assistance to the Government ........................................... 19

VII.   Mr. Sharma's Criminal History Category Overstates the Serious of His Prior
Crimes and Warrants a Horizontal  Departure (U.S.S.G. § 4A1.3)........................... 20

VIII.  The Remaining 18 U.S.C. § 3553(a) Factors Also Warrant a Below Guidelines
Sentence of 30 Months...................................................................... 23

        A.    Factors to Reflect the Seriousness of the Offense, to Afford General
            Adequate Deterrence, and to Protect the Public (18 U.S.C. § 3553(a)(2))......... 23

IX.   The Kind of Sentences Available (18 U.S.C. §3553(a)(3)).................................. 25

X.    The Kinds of Sentence and the Sentencing Range is Not Appropriate (18 U.S.C.
§ 3553(a)(4)(A)).............................................................................. 26

        A.    A 22 Level Loss Enhancement is Excessive Under U.S.S.G. § 2B1.1(b)(1) ...... 26

        B.    Mr. Sharma Has a High Risk Of Severe Complications Should He
            Contract COVID-19 While Incarcerated ................................ 29

        C.    A Below-Guidelines Sentence Would Not Result in a Sentencing
            Disparity (18 U.S.C. § 3553(a)(6)) ...................................... 31

        D.    There Is No Need or Basis to Provide Additional  Restitution to Any
            Victims of the Offense (18 U.S.C. § 3553(a)(7)) ......................... 32

E.      The Court Should Not Impose a Fine ................................................................ 34

CONCLUSION.................................................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Adkins,*
   937 F.2d 947 (4th Cir. 1991) ...............................................................................22

*United States v. Behr,*
   No. 03 Cr. 1115-02 (RWS), 2006 WL 1586563 (S.D.N.Y. June 9, 2006) ..............24

*United States v. Casiano,*
   No. 98 Cr. 1316, 2001 WL 96366 (S.D.N.Y. Feb. 2, 2001) (RWS) .......................22

*United States v. Coello,*
   415 F. Supp. 3d 306 (E.D.N.Y. 2019) ....................................................................8

*United States v. Cooper,*
   No. 13 Cr. 66 (JPO) 2020 WL 4195273 (S.D.N.Y. June 11, 2020) .......................30

*United States v. El-Hanafi,*
   460 F. Supp. 3d 502 (S.D.N.Y. May 19, 2020) (KMW) ........................................30

*United States v. Gross,*
   452 F. Supp. 3d 26 (S.D.N.Y. 2020) (AJN)...........................................................29

*United States v. Joseph Kim,*
   No. 18 Cr. 107 (N.D. Ill., Nov. 9, 2018)................................................................32

*United States v. Lauersen,*
   348 F.3d 329 (2d Cir. 2003)...................................................................................26

*United States v. Leviner,*
   31 F. Supp. 2d 23 (D. Mass. 1998) ..................................................................21, 22

*United States v. Mishoe,*
   241 F.3d 214 (2d Cir. 2001)...............................................................................21, 23

*United States v. Park,*
   456 F. Supp. 3d 557 (S.D.N.Y. 2020)................................................................29, 30

*United States v. Paulino-Duarte,*
   No. 00 Cr. 686, 2001 WL 290047 (S.D.N.Y. March 26, 2001) .............................23

*United States v. Pugh,*
   937 F.3d 108 (2d Cir.)............................................................................................26

*United States v. Rivers*,
  50 F.3d 1126 (2d Cir. 1995)..............................................................................21, 22

*United States v. Rodriguez*,
  No. 17 Cr. 157 (VEC), 2020 WL 3051443 ........................................................30

*United States v. Spencer*,
  No. 04 Cr. (PAE), 2020 WL 3893610 (S.D.N.Y. July 10, 2020) ........................30

**Statutes and Other Authorities**

18 U.S.C. § 371 ........................................................................................................25, 34

18 U.S.C. § 3553(a) ................................................................................................ *passim*

18 USC § 3571 ............................................................................................................. 34

18 USC § 3572 ..............................................................................................................34

28 U.S.C. § 991(b)(1)(B) ..............................................................................................31

U.S.S.G. § 2B1.1(b)(1) ..................................................................................26, 27, 28

U.S.S.G. § 2D1.1(7) ......................................................................................................23

U.S.S.G. § 4A1.1.(c) .....................................................................................................21

U.S.S.G. § 4A1.3 ..............................................................................................20, 22, 23

CPLR § 720.20(3) ..........................................................................................................20

## <u>PRELIMINARY STATEMENT</u>

Defendant Sohrab "Sam" Sharma is very sorry for the harm he caused others, and has accepted responsibility for his actions.  He did not come up with his idea of starting Centra Tech to lie and mislead people, but he understands that his actions were criminal, and the implications of those actions on others – victims, his family, and his fiancée.

The government will almost certainly seek to portray Mr. Sharma as a hardened criminal, and assert that he be sentenced for a long term of imprisonment.  While he is flawed, he is not an evil person, nor a hardened criminal.  Rather, he is young man with an imperfect childhood who abused alcohol and marijuana from the time he was sixteen through and until his arrest, and tried too hard to succeed no matter the cost.

His arrest and imprisonment were life-altering events.  After spending two months in jail, he stopped using alcohol and drugs, and as noted in the Presentence Investigation Report ("PSR"), throughout the thirty-one months since his release "Sharma has kept all court appearances and has been in compliance with all terms and conditions of his pretrial release.  He is not viewed as a flight risk or a danger to the community."  PSR at 54.  And fortunately, $33.4 million is available to pay victims, making it very likely all victims will be fully compensated.

He remains in a positive, long-term relationship with his fiancée who has stood by him throughout.  As evidenced by the wonderful letters submitted on his behalf, his family and friends remain loving and supportive parts of his life, know the other positive parts of Mr. Sharma, and believe in him and his ability to turn a new and better chapter in his life.  Mr. Sharma is a talented young man with valuable computer programing skills that will allow him to be a productive member of society and help support his family.

Mr. Sharma has seen prison, has been detained on house arrest for over two years with no internet access, embarrassed himself and his family, hurt those close to him, and has severely

1

impacted what he had hoped would be a bright future.  He will forever be a felon, and have a huge money judgment handing over his head.  Further bestowing a long prison sentence on him is not necessary to satisfy the goals of punishment and deterrence, and will almost certainly further harm his chances at being a productive member of society after his term is over.

While Mr. Sharma agrees with Probation's recommendation of a below guideline sentence, its recommendation of 120 months imprisonment is excessive, and is significantly greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).  He respectfully requests the Court grant for a downward variance pursuant to the sentencing considerations set forth in § 3553(a), and impose a sentence of 30 months.

### Mr. Sharma's Personal History and Background (18 U.S.C. § 3553(a)(1))

**I.**   **Family Background**

Mr. Sharma is an only child who comes from modest means and a family who immigrated to the United States when he was a young child. S*ee* PSR at ¶ 147.  Unfortunately, Mr. Sharma had a troubled childhood. ███████████████████████████████████████

██████████████████████████████████████. *Id.* ████████████

████████████████████████████████████████. ████████████

████████████████████████████████████████████████████

*Id.* ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████. *Id.* ██████████████████

████████████████████████████████████████████████████

██████. *Id.*

Mr. Sharma has been infatuated with computers since he was 14 years old.  During the summer of 2005, when he was 14 years old, he spent the entire summer inside his house learning how to write code and program computers.  When he was 20 years old, he was the lead web developer and was a part of the initial team for the company Sigelock, which redeveloped the fire hydrant.  *See* www.Sigelock.com.

## II.    Mr. Sharma Has Abused Alcohol And Marijuana Since He Was A Teenager

Mr. Sharma's difficult childhood led to problems in his teenage and then young adult years.  Due in part to his father abandoning his family and the pressure and disappointment he felt from his father, starting at 16 years old, Mr. Sharma started to abuse alcohol and marijuana, almost daily.  *See* PSR at ¶¶ 156, 157.

These familial issues continued to impact Mr. Sharma when he went to college.  Instead of pursuing a medical degree as pushed by his father, he majored in liberal studies.  Mr. Sharma attended St. John's University, in Jamaica, New York in 2009.  However, he never finished.  While intelligent, Mr. Sharma could not focus enough to finish his education, and his alcohol and marijuana use increased and significantly impacted his studies.  In 2011, he left St. Johns to work a full-time job to support his mother and grandparents.

This alcohol and marijuana abuse continued through his entire work history.  Unfortunately, his abuse did not stop when he started Centra Tech – it continued and even increased.  One of the many poor decisions Mr. Sharma made was bringing co-conspirator, Raymond Trapani, to help with Centra Tech.  Mr. Trapani, a drug addict, was not exactly the moral compass Mr. Sharma needed, and only helped to exacerbate his substance abuse problems and poor decision-making.  While Mr. Sharma was developing and managing Centra Tech, he was under the influence of either alcohol or marijuana every day.  In particular, he would smoke

3

marijuana with Mr. Trapani on a near-daily basis.  Although this does not excuse his behavior, it should be taken under consideration by the Court as a mitigating factor since Mr. Sharma's judgment and actions were partially obscured by his excessive, long term alcohol and marijuana use.  Mr. Sharma also better understands now that the people he associates with will impact the decisions he makes.  He has seen that through the example set by his fiancée, Brielle Farkas.  She helps him and makes him want to make good decisions, not bad ones.

Mr. Sharma's substance abuse continued right up until he was arrested by the FBI for this matter on April 1, 2018, when he was 26 years old.  In fact, Mr. Sharma was under the influence of marijuana the day he was arrested.  His arrest and two months of detention were, not surprisingly, shocking and significant events in his life.  Since his arrest, Mr. Sharma has not used alcohol or marijuana.

## III.    Mr. Sharma's Family and Friends

Mr. Sharma understands the magnitude of his mistakes, and the impact on others.  Yet there is much more to Mr. Sharma that others see and know.   Hopefully the letters submitted by family and friends provide this Court with that additional insight into Mr. Sharma.  He is a young man who is intelligent, caring, talented, hardworking, and respectful of others.  Mr. Sharma is generous with his time and does his best to help others in need.  These positive character traits are articulated in the letters attached to this sentencing memorandum.  Mr. Sharma's family and friends have attested to who he is and his character:

> [Sam is] respectful, and humble from the way I see him treat my family and my sister.

Ex. A.16, Daisha Lee Letter.

> He has a gentle soul, a big heart, and a very sweet demeanor. He is a hard worker and loved to help people especially his family.

Ex. A.21, Ali Pooladi Letter.

4

Sohrab is a good-natured person. He is caring of people around him and he is always willing to help. For instance, while he lived in New York, he was always caring of my aging parents who were recent immigrants to United States.  He always helped them with their day to day needs, from taking them to their grocery shopping to their medical appointments. He is truly caring of others around him.

Ex. A.23, Hoda Pooladi Letter.

Sam is trustworthy. . . . he helped me and my family in a great time of need . . . Sam has proven to be an honest and loyal friend.

Ex. A.1. Eduardo Baiza Letter.

Sohrab has always been a well-mannered, respectful, loving, and polite person.  I know that he has been a caring, kind and taking care of his mother and his grandparents.  He is making sure to put their needs before his.  Sohrab has always been an upright character in the community, reliable, trustworthy and honest young man.  He is a man of integrity and good moral, and extremely dedicate to his family, friends and community. Sohrab has always been a hard worker, responsible and focused person.

Ex. A.28, Naghmeh Taebi Letter.

From the day I met Sohrab, I fell in love with his caring attitude, compassion for others, unmatched work ethic and energy, devotion for serving others, helping everyone whom he came across with and his passion for helping others.

At his young age, I remember him working very long hours throughout the week without having any time off to help his mother and supporting his elderly grandparents whom he loved and loves so much. As busy as Sohrab was with his work, he still made sure to visit his grandparents every week and assist them with all their needs.

Sohrab['s] passion for helping others was not limited only for his family members. He always saw best in everyone whom he came across with and wanted to help them to succeed.

Ex. A.25, Fazel Razavi Letter.

I have always thought of Sohrab as a motivated, energetic and hardworking young man with a good demeanor.  He cares deeply about his family and friends and is always willing to help others.

Ex. A.14, Armeen Golestaneh Letter.

I never heard anything except that he is a bright, friendly, compassionate, respectful, and well-mannered young man… He started working when he was 16 years old, to take

care of some of his needs and not putting any burden on me…He was loving, caring, hardworking, and very responsible person.  Sohrab was very compassionate person and it was a norm for him to put others first.

Ex. A.22, Forouzan Pooladi Letter.

Sam stopped at a parking lot across the street and opened up a can of cat food from his backpack for the stray animals.  I mention this because he has such a big heart and I know that from living with him for so long.  There is so much said about Sam, but I get to see a different person, a person who I want to spend the rest of my life with.

Sam cares so much about others who are less fortunate.  He tells me stories about homeless people he encounters on his drive to the lawyer and the bond they start forming.  There is one person Sam started seeing on multiple occasions who is disabled with a dog.  He will stop, spare any change he has and take the time to talk to him.  This man has told Sam he's the angel that he's been praying for because he goes out of his way to make a difference whenever he seems him.  He'll spend time just talking to him, and letting the man see his worth, that he is not invisible. Sam will tell me, I thought I saw him down the road, so I drove around to find him and finally did.  There was a time recently when we were in the mall food court, and I was sitting waiting for our food to be ready.  A man walked up into a crowd of people and asked if anyone could spare $5 so he could get lunch.  As everyone turned their head away from the man, Sam immediately helped.  He felt bad that no one wanted to give this man the time of day and couldn't afford a sandwich.  It makes me so happy to see this quality within him. He never feels bad for himself, he is always focused on what I mentioned before, people who are less fortunate than us.  These are just two instances of things I witness and hear about all the time.

Ex. A.10, Brielle Farkas Letter.

He always love to help people, community, and his family.  He is a very generous young man with a big heart.  He would go out of his way to help people.  I remember one winter, it was snowing very heavily and he was getting ready to go to work, I was looking at the window and was very worried how he can drive, but he said grandma I will be fine.  Suddenly I saw someone fell on snow on the street and couldn't get up, I told him, he ran at the door I gave him his jacket.  He went to help a stranger who fell in snow, he called ambulance, took off his jacket, covered that stranger and stayed with him until the ambulance arrived and took him.  I am very proud of him.

Ex. A.24, Mohtaram Pooladi Letter.

Sorbee comes from a good family who loves him; his father is a well-known and highly respected doctor.  He has a heart of gold; he would always go above and beyond for his friends and continues to do so to this day.

Ex. A.2. Bhavdeep (Bobby) Chawla Letter.

I am certain that Sam is a good kid at heart and that he has good intentions. I can again hear the kindness in his voice, and from the bottom of my heart, I feel that Sam is ready to turn over a new leaf. I have heard his tears of repentance and shame. Even though I know he will grow from this and one day begin a new life, he will never forgive himself for the things he has done and the shame he has brought to his family.

Ex. A.15. Catherine Kenny Letter.

I am a hard worker and as the director of the rehab unit, I have a great deal of responsibility. I would not put my name on the line to defend anyone that I do not believe in. But I can say, I believe in Sorbee, and although he might not be related to me by blood, he IS my family. I stand by Sorbee with everything I have. I will support him through this. I request you to kindly take this letter into high consideration before making any judgement.

Ex. A.3. Gegendeep Chawla Letter.

…I do believe in justice, but I also believe in helping those who are before us, I believe in helping our Generation of youth, guiding them to the right place and creating for them that opportunity of change in life. I know Sam will take that course and be the best he can be for himself. Though he is in front of you all, I know Sam has not lost the value of being a Nuclear bomb, full of potential, who can create change for other who struggle on a day to day bases but also for himself.

Ex. A.20. Jonathan Mendez Letter.

Sorbee Sharma is a kind, hard-working, generous individual. He has spent the last two years of his life locked inside of his home, dwelling on what he has done, and wishing to be a functioning member of society again. After speaking with Sorbee, I know he feels much remorse for his actions and that this weighs heavy on him. He has learned a tremendous lesson and has expressed to me countless times how he wishes things went differently.

Ex. A.13. Joshua Garcia Letter.

I also know Sorbee has had a substantial amount of time to think about and know what he has done wrong and feels a great deal of remorse.

Ex. A.4. Simren Chawla Letter.

**IV.    Mr. Sharma's Future**

Mr. Sharma has been a software developer since he was 14 years old.  He is a hardworking, bright young man with a lot of potential.  While he has not used his skills and hard work wisely in the past, he now understands his only path forward is to do so – not only to stay out of trouble in the future, but to preserve his relationships.

At the time of his offense, Mr. Sharma was 25 years old.  He had, by this time, spent almost a decade abusing alcohol and marijuana.  As a result of his arrest in this matter, Mr. Sharma spent two months in detention, and then over two years in home confinement with no internet access and no ability to leave his house except to go to his attorney's office.  The failure of his company, his arrest, the time spent confined at his apartment not being able to do anything other than work on his case with no internet access, and the time spent with his fiancée, has changed Mr. Sharma.  He has stopped using alcohol and marijuana, he has matured, and he recognizes the ends do not justify the means regardless of his intentions, and there are consequences for one's actions.

Unfortunately, many people that come through the criminal justice system do not have the skills and familial support that Mr. Sharma does.  He also has strong, loving relationships with family and friends that will help guide him in the future.  *See United States v. Coello*, 415 F. Supp. 3d 306, 310 (E.D.N.Y. 2019)  ("Research shows that criminal offenders who have frequent contact with family members and positive family relationships have better post-release outcomes and lower recidivism rates.").  He has a chance to turn the corner and become a productive member of society.  A long term of imprisonment will be counter-productive to him turning that corner – relationships may be gone, skills will become obsolete, and the mental impact will be significant. He respectfully asks the Court to consider all these factors, to permit him a chance at a future, and to pay off his money judgment obligations.

**The Nature and Circumstances of the Offense and Mr. Sharma's Personal Characteristics**
**(U.S.C. § 3553(a)(1))**

### V.     The ICO Craze

Centra Tech and its token sale took place during an unprecedented explosion of companies selling digital tokens instead of equity to raise funds, and people buying the tokens with the hope of large returns through selling purchased tokens on the secondary market.  It was a time in the industry of great optimism about the future of cryptocurrency.

This new paradigm allowed entrepreneurs with an idea and a "white paper' – a document explaining the project and the sale of tokens – to bypass venture capital firms to quickly raise unprecedented funds to develop new projects in this industry, and it allowed people excluded from these projects to participate directly by buying tokens and reselling them.  The sales from an Initial Coin Offering ("ICO") also benefited companies and founders over traditional venture capital fundraising because it permitted rapid fundraising without giving up any equity in or control of the company, in contrast to typical equity investments.

Generally, during 2017, ICO sales took some version of the following predictable path, often covering less than 6 months from beginning to end.  One or more individuals would create and publish a "white paper" discussing the vision for the company, the intention to raise funds through the company's ICO to fund the company's development, and that as part of the token sale the company and founders would be granted a portion of the tokens.  The tokens typically were intended to have some functionality on the yet to be blockchain project.

Tokens typically were immediately sellable on a secondary exchange (a digital currency trading platform), and many ICO purchases quickly sold their tokens for a profit.  Unlike equity, the purchase of a token did not provide the holder with any rights in the company or the company's revenue.

Centra Tech was one of thousands of small startups that went this route of quickly raising millions of dollars through the issuance and sale of digital tokens, in an ICO.  From June 1 through the end of 2017 alone, there were over 1,300 ICO sales.[1]



ICO sales started in early 2017 and exploded in the last half of 2017.  The market for purchasing ICO tokens from companies grew nearly 100 times from Q1 2017 to Q4 2017, with a total raised of over $4.9 billion in 2017.[2]

---

[1] 2017's ICO Market Grew Nearly 100x From Q1 To Q4,
https://news.crunchbase.com/news/2017s-ico-market-grew-nearly-100x-q1-q4/#:~:text=An%20estimated%20%244.9%20billion%20was,based%20startups%2C%20according%20to%20Crunchbase.
[2] 2017's ICO Market Grew Nearly 100x From Q1 to Q4,
https://news.crunchbase.com/news/2017s-ico-market-grew-nearly-100x-q1-q4/#:~:text=An%20estimated%20%244.9%20billion%20was,based%20startups%2C%20according%20to%20Crunchbase.

Through the course of 2017, ICO's raised on average nearly $25 million.[3]  A number of the more successful ones raised well over $100 million, including Filecoin ($257 million), Sirin Labs ($157 million), the Bancor Protocol ($153 million), and Polkadot ($145 million).[4]



Purchasers of these tokens often sought and made huge returns during this time period, quickly flipping their token purchases by reselling them on the secondary market.  The total market cap of cryptocurrencies grew from just below $4 billion on July 2, 2017, to more than $68 billion by January 12, 2018.[5]  Illustrious of the rapid rise in the value of cryptocurrencies is Bitcoin, the most well-known cryptocurrency.  In 2017 it increased in price approximately 1,300 percent, from $1,017 per Bitcoin to $13,445 (and as high as $19,345 on December 15, 2017).  Traders often

---

[3] ICO Market 2018 vs 2017: Trends, Capitalization, Localization, Industries, Success Rate, https://cointelegraph.com/news/ico-market-2018-vs-2017-trends-capitalization-localization-industries-success-rate.

[4] The 11 biggest ICO fundraises of 2017, https://www.businessinsider.com/the-10-biggest-ico-fundraises-of-2017-2017-12.

[5] Market share of Ethereum-based tokens grows to 91%, https://medium.com/@amincad/market-share-of-ethereum-based-tokens-grows-to-91-fdefadfd9f6e.

made significant gains speculating on digital tokens, and they lost money as well, particularly as prices dropped in the winter of 2017-2018, later referred to as the "token winter." At this time, the SEC began issuing public statements making it clear the SEC believed many ICOs constituted the sale of unregistered securities.[6] By early 2018, it was reported the SEC was investigating ICOs.[7]

## VI.   Centra Tech

As noted above, in the summer of 2017, cryptocurrency and blockchain technology was still in its infancy, but exploding. Mr. Sharma, a self-taught computer programmer, became interested in cryptocurrency and the underlying blockchain technology.

He decided to try to build a company based on the concept of allowing users of cryptocurrency to spend their cryptocurrency on the VISA/Mastercard networks and to create an exchange similar to eBay where individuals could use company tokens to purchase merchandise online. This idea became Centra Tech, and the Centra Tech token. He identified the launching of an ICO as fast path to raising funds to build a business, and delivering new products – the Centra Card debit card, a digital wallet and the CBay marketplace.

This was not a Ponzi scheme. A combination of Mr. Sharma's youth, being in way over his head in regards to starting a rapidly growing tech startup, his general lack of business experience in the credit card industry and regulated industries, his substance abuse, along with the desire to make his vision a reality led him to make material misrepresentations for which he has

---

[6]   *See, e.g.*, Statement of Cryptocurrencies and Initial Coin Offerings, https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11.

[7]   Cyptocurrency Firms Targeted in ICO Probes, https://www.wsj.com/articles/sec-launches-cryptocurrency-probe-1519856266

accepted responsibility.  Mr. Sharma knows he should not have lied in his effort to make the company successful, or doubled down on his initial lies.

### A.    Centra Tech's ICO

As of July 2017, the company essentially consisted of Mr. Sharma working out of his small apartment in Florida.  From his apartment he, with some help from independent contractors, drafted a white paper explaining the vision of the company (which included misrepresentations) and the token sale (including the granting of tokens to the founders), developed the basis for the underlying blockchain technology and, in July 2017, starting selling Centra Tech tokens through its ICO.

At the time there was uncertainty as to whether ICO tokens were securities.  On July 25, 2017, the SEC issued what is commonly referred to as the DAO report, stating the SEC's position that certain tokens could be securities. Indictment, Dkt. No. 14 at ¶ 13.  As a result, shortly after the report, Mr. Sharma sought a legal opinion as to whether the Centra Tech token was a security. He hired and paid an individual named Eric Pope, purportedly from the law firm Pope and Dunn, who represented himself to be an attorney versed in securities law.  In response to Mr. Sharma's inquiry, Mr. Pope (whose real name we now is John Lambert) informed Mr. Sharma that the Centra Token was not a security and provided Mr. Sharma with a form 8-K that he fraudulent represented to Mr. Sharma was filed with the SEC.  *See* Ex. B.  Unbeknownst to Mr. Sharma, Eric Pope's real name was John Lambert, and he and his purported law partner were not attorneys.  Several months later, Mr. Sharma's new counsel discovered information that called Mr. Lambert into question.  At his direction, counsel reported it to and cooperated with law enforcement by providing necessary documents to assist in the investigation, ultimately leading to Mr. Lambert's conviction.

The ICO continued until approximately October 5, 2017, a period of 72 days.  For a variety of reasons, including his false statements, sales of the Centra Tech token were much better than expected.  Centra Tech essentially blew up overnight, causing Mr. Sharma to scramble to manage a company that could deliver on the volume of ICO contributions it was receiving and the unexpected and intense demands of this business.  Soon some of his original falsehoods came to light, and over time, others did too.  While he removed or corrected some over time, Mr. Sharma's poor judgment, lack of experience in running a fast-growing technology and his substance abuse also led him to also try to cover up past falsehoods with more falsehoods.

The company raised approximately $26 million from its ICO.  Mr. Sharma also sold many of his founder's tokens on the secondary market (meaning through sales on cryptocurrency exchanges), raising another approximately $6 million.

### B.      Centra Tech Quickly Expands

As a result of the successful ICO, Centra Tech, like many funded start-ups, began hiring employees and rented space.  By  late 2017, the company had moved into Class B office space in Miami and had hired thirty-eight employees.  These hires included a new CEO, a general counsel, computer programmers, marketing, human resources, and compliance personnel, including for the purpose of getting required state money state transmitter licenses. *See* Rental Ad, Ex. C; Company Chart Ex. D.  Notwithstanding the misrepresentations of Mr. Sharma, Mr. Trapani, and Mr. Farkas, the Centra Tech employees worked every day performing legitimate functions.  *See* Exs. A.5, A.26, A.12, A.18 (Letters of Alexander Cruz, Huma Riaz, Jessica Franklin, and Lorraine Martinez).

Centra Tech focused on and delivered its digital wallet, for the storage of cryptocurrency, and was working to deliver the Centra Card, a cryptocurrency debit card, including getting proper

partners and the physical card.  In trying to ramp up the company, Centra Tech added employees, found office space, and ramped up business operations.  The company spent approximately $5 million, raised in part from Mr. Sharma's founder token sales, for business expenses.[8]

These expenses included the following:  payroll (ADP)/employee salaries and independent contractor expenses (including Up Work), as well as employee recruiting fees, approximately $1.5 million (excluding the defendants); professional services and vendors relating to the Centra Card and compliance software (Actimize), approximately $800,000; legal fees (including Ballard Spahr), approximately $425,000; furniture, office equipment, and offices expenses (including phone and internet), approximately $200,000; rent and parking, approximately $130,000; and health care and business insurance, approximately $20,000.

### C.    Card Development

Some of the afore mentioned expenditures were for the purpose of developing the Centra Card.  It was a major product and feature of Centra Tech and hundreds of thousands of dollars were put toward the development of the cards themselves through various vendors.  While Mr. Sharma made a number of misrepresentations relating to the card, the concept of the card was not a fraud, and substantial efforts were made to bring it to the market.

On August 1, 2017, Mr. Sharma began a relationship with Galileo, an authorized Visa and Mastercard processor/program manager, through Metropolitan Commercial Bank through the head of card services who was in New York.  Soon Mr. Sharma received an NDA and pricing sheet from Galileo for the issuance of the Centra Card.  Thereafter, Mr. Sharma submitted the card art,

---

[8] Unfortunately, the company maintained inadequate financial records.  The defense recognizes that the government may have a different view as to the amount spent on business-related expenses, as well as the merit of certain expenses, and recognizes that Mr. Sharma spent significant funds, as well as Mr. Trapani ($1.9 million).

which would bear the Visa and Mastercard logos.   While Mr. Sharma placed the Visa and Mastercard logo on the whitepapers prior to finalizing any relationship with Visa and MasterCard through Galileo, Mr. Sharma was in negotiations with Galileo from August 1, 2017 through on, or about, January 3, 2018, when Centra Tech was refunded $125,000 because Metropolitan Commercial Bank withdrew from the program.   During the pendency of the relationship with Galileo, Mr. Sharma, due to delays with Galileo, had also started a relationship with Intercash in, or about, September 2017, which was during the time of the ICO period. Centra Tech spent $440,986.00 with Intercash for the card program – the manufacturing of 50,000 black cards as well as custom blue and gold Centra Cards.  *See* Intercash Invoices, Ex. F.  Centra Tech also paid tens of thousands of dollars to Lion Credit Card to make metal Centra Cards.  Further, Centra Tech shipped over 400 working Centra Cards and welcome kits to users.  Shipment to customers began in approximately December 2017.

In approximately early October 2017, prior to learning of any government investigation, Mr. Sharma hired a general counsel, Allan Shutt in an effort improve internal regulatory compliance, primarily related to the Centra Card.  This included directing Mr. Shutt to retain a reputable law firm to help Centra Tech scale and implement its products in a complaint manner. Mr. Shutt then retained the services of Ballard Spahr to assist in these efforts, and efforts were made to obtain state money transmitter licenses.

Cryptocurrency companies were, and still are, at the forefront of financial technology.  It was Mr. Sharma's hope that Centra Tech could (and ultimately did) bring cryptocurrency products such as its Centra Card to market in the form of a cryptocurrency debit card that allowed users to spend numerous types of cryptocurrency when making everyday purchases and the Centra Wallet was a digital wallet mobile application that allowed users to store and use multiple

cryptocurrencies.  After Centra Tech shut down, Mr. Sharma was hired as a consultant to develop an application for a payments company founded by a former employee of Centra Tech, using similar technology and with Mr. Sharma's initial technological assistance, is providing cryptocurrency debit cards, as are numerous other companies.[9]

### D.    The SEC Investigation and Mr. Sharma's Actions Relating to the 100,000 in Forfeited Ether

At the conclusion of Centra Tech's ICO, in October 2017, Mr. Sharma had placed a significant majority of the ether raised in the Company's ICO – 91,000 ether in a digital wallet as reserves for Centra Tech to build out its product line and roadmap.  Mr. Sharma was in sole possession of the digital private key that enabled access to those funds.  He also placed another 9,000 ether in that wallet, partially raised from the sale of his founder's CTR tokens, for a total of 100,000 ether ("100,000 ether").  This was prior to anyone at Centra Tech becoming aware of the SEC's investigation.

Following receipt of the SEC's subpoena and pursuant to Ballard Spahr's negotiations with the SEC, on approximately November 28, 2017, Mr. Sharma transferred the 100,000 of ether proceeds to another digital wallet to set aside these proceeds while the SEC investigation continued.  Mr. Sharma falsely represented that he did not have access to this wallet when, in fact, he did.  He recognizes this was wrong, and is not seeking to minimize what he did.

After the SEC initiated its investigation, Mr. Sharma and Centra Tech, through Ballard Spahr, made efforts to initiate a return of investor funds, but the SEC declined, apparently at least in part on the grounds that rescission of an unregistered securities offering was not permissible.  The point is not to cast blame or hide behind regulatory challenges for the failure to

---

[9] *See* What are Crypto Debit/Credit Cards and are they Worth Using?, https://due.com/blog/what-are-crypto-debit-credit-cards-and-are-they-worth-using/

previously return these proceeds to the investors, or ignore Mr. Sharma's actions that lead to the SEC's investigation and his failure to disclose that he had the private key to the 100,000 ether. Rather, it is to point to actions demonstrating that Mr. Sharma did not seek to impede the return of these proceeds to purchasers.

Relatedly, as the government has previously noted, by improperly keeping the private key, Mr. Sharma could have dissipated the 100,000 ether within a few seconds. *See* Bond Hr'g Tr., Dkt. No. 9. Throughout the pendency of the SEC investigation, including after being notified of a fraud investigation against him personally in February, and despite his travels overseas, Mr. Sharma never transferred any of the 100,000 ether from the digital wallet even though he could have done so from anywhere by the push of a simple keystroke. Instead, with his consent and pursuant to Court approval, on September 24, 2020, the government sold all 100,000 ether, with a net sale price of approximately $33.4 million. This is more than was raised by Centra Tech in its ICO.

During the pendency of this case, Mr. Sharma also took steps to be transparent with his intended actions to access the 9,000 ether that had not been seized by the FBI. His counsel contacted the government to confirm there was no hold on the funds so they could be placed in the trust, which was approved by the government. When the government was made aware of this by his counsel, counsel agreed to hold off accessing the funds while the government sought a warrant, which it did, freezing the additional 9,000 ether.

Lastly, well prior to trial, on October 4, 2019, the defense filed a motion asking the Court to order the Government to return the Ether to investors. *See* Dkt. No. 193. Win, lose or draw at trial, Mr. Sharma's position was that there was no reason to wait until after the trial to give the money back to the victims. The defense is expecting the government to state this was all a ploy

18

designed for trial tactics – of course the same could be said for the government's objection to this request (the Court never ruled on the motion). It also misses the important point that if Mr. Sharma did win at trial, he would have already given up any right he might have to reclaim the 100,000 ether.

No question Mr. Sharma lied and made some very poor decisions, that is why he is in this position. But the court should consider his efforts in returning proceeds, that $33.5 million remains for the benefit of purchasers, and that the vast majority of Centra Tech ICO purchasers likely will get their funds back. While this is in no way a defense to his actions, Mr. Sharma hopes it provides additional context for the Court to consider as mitigating factors pursuant to § 3553(a).

### E.    During The Relevant Time Period Mr. Sharma Provided Substantial Assistance to the Government

As described above, Centra Tech's attorneys at Ballard Spahr discovered that Mr. Lambert was not a licensed attorney. During the SEC investigation of Centra Tech, Mr. Sharma, through Ballard Spahr, assisted the SEC with their investigation into Mr. Lambert. To the best of Mr. Sharma's knowledge, at the time of his cooperation, the government was unaware of the fraudulent activities of Mr. Lambert towards Mr. Sharma and the other victims who retained Mr. Lambert. Mr. Sharma provided the government with necessary documentation to assist them in investigating, stopping, and ultimately prosecuting Mr. Lambert. Mr. Sharma requests the Court consider the facts that: (1) Mr. Sharma never received any substantial assistance credit for the prosecution of Mr. Lambert prosecution, and (2) that Mr. Sharma was a victim of Mr. Lambert's fraud.

**VII.   Mr. Sharma's Criminal History Category Overstates the Serious of His Prior Crimes and Warrants a Horizontal  Departure (U.S.S.G. § 4A1.3)**

Mr. Sharma's plea agreement specifically permits him to seek a departure from Criminal History Category III on the grounds it overstates the seriousness of his prior crimes.  Mr. Sharma has several prior convictions for relatively minor offenses, almost all relating to his problems with substance abuse, which artificially inflate his Criminal History Category and contribute to the extraordinarily and unreasonably high Guidelines range in this case.

At age 18, Mr. Sharma was sentenced as a youthful offender to probation for possession of stolen property in the fifth degree.  While an eligible youthful offender disposition is not a criminal conviction under New York law (*see* CPLR § 720.20(3)), it nevertheless resulted in a 1-point addition to Mr. Sharma's criminal history score.  *See* PSR ¶ 133.  At age 23, Mr. Sharma's problems with substance abuse became manifest and resulted in two convictions, one for driving under the influence and the possession of a small amount of marijuana, and the other for possession of a small amount of marijuana and several traffic infractions, including driving with a suspended license.  *See* PSR ¶¶ 134-35.  In both cases, Mr. Sharma pled guilty to misdemeanors or violations and received a sentence of either probation or the imposition of a fine.  *Id.*  A few months later, at age 24, Mr. Sharma again made the poor decision to get behind the wheel of a car while intoxicated.  He pled guilty and received a Conditional Discharge and a fine.  *See* PSR ¶ 136. Relatedly, he pled guilty to perjury charges relating to the previously discussed DWI arrest and his asking Mr. Trapani to lie for him during the trial.  *See* PSR ¶ 137.  He was sentenced to probation. *Id.*  While Mr. Sharma takes full responsibility for the poor choices he has made, it is noteworthy that his criminal history does not include a single conviction resulting in prison time, nor a conviction for a crime of violence or malice against another, and all are at their core related to substance abuse.  Nevertheless, his criminal history receives a score of six under the Guidelines,

20

including two points pursuant to U.S.S.G. § 4A1.1.(c) (committing the instant offense while under a criminal justice sentence) resulting in a Criminal History Category of III, the same score a defendant convicted of two prior murders would receive.  PSR ¶ 138.

Mr. Sharma's history warrants a horizontal departure because his classification as a Category III offender overstates the seriousness of his past conduct and the likelihood that he will commit future crimes.  Pursuant to the reasoning set forth in *United States v. Mishoe*, 241 F.3d 214 (2d Cir. 2001) and *United States v. Rivers*, 50 F.3d 1126 (2d Cir. 1995) and their progeny, a downward departure to Criminal History Category II is proper.

Because "the sentencing range normally prescribed by the Sentencing Table will sometimes not be the just punishment," *Mishoe*, 241 F.3d at 221, the Sentencing Guidelines themselves contemplate the exercise of discretion to downwardly depart in certain instances.  One such instance concerns the defendant's Criminal History Category.  Criminal history is taken into account in sentencing because it is thought to be a strong predictor of recidivism and a good measure of culpability.  *United States v. Leviner*, 31 F. Supp. 2d 23, 29-30 (D. Mass. 1998) (horizontally departing from a Criminal History Category where the defendant's past convictions were non-violent offenses and minor drug possession charges).  Although this generally may be true, the Sentencing Commission recognized that the numerical formula for determining a defendant's Criminal History Category may, like here, result in sentencing ranges that are overly severe.  *Mishoe*, 241 F.3d at 218; *Leviner*, 31 F. Supp. 2d at 30.  As the Fourth Circuit has observed:

> "Criminal history" is, relatively, one of the most flexible concepts in the guidelines. While it is possible to classify the severity of current federal offenses with a reasonable degree of precision, mathematically accurate evaluation of the countless possible permutations of criminal history, involving offenses high and petty committed in numerous jurisdictions, would be at best unwieldy. The Sentencing Commission recognized this difficulty, and though it prescribed a mathematical method to calculate criminal history, it specifically identified overstatement or

21

understatement of the seriousness of the defendant's past conduct as a ground for departure from the raw criminal history score.

*United States v. Adkins*, 937 F.2d 947, 952 (4th Cir. 1991).

The Sentencing Commission, therefore, built into the Guidelines a mechanism for alleviating harsh Criminal History calculations. Specifically, Guidelines § 4A1.3 grants sentencing courts broad discretion to downwardly depart, by means of a "horizontal departure," whenever the criminal history calculation overstates the seriousness of the defendant's criminal record. *Rivers*, 50 F.3d at 1130; *United States v. Casiano*, No. 98 Cr. 1316, 2001 WL 96366, at *3 (S.D.N.Y. Feb. 2, 2001) (RWS) (granting downward departure under § 4A1.3 from Criminal History Category II to Category I).

Because the criminal history system of the Guidelines frequently does not accurately account for differences in the seriousness of prior convictions, horizontal downward departures are an oft-used device to correct this problem. *See Leviner*, 31 F. Supp. 2d at 32. Section 4A1.3 manifests the Sentencing Commission's view that "a sentencing judge should exercise discretion whenever the judge concludes that the consequences of the mathematical prior-history calculation" over-represents the seriousness of the defendant's prior record. *Rivers*, 50 F.3d at 1130

There are a number of factors present here that warrant a horizontal downward departure. Mr. Sharma's offenses were relatively minor in comparison to most defendants in Category II, and were non-violent. This is not to minimize any of his prior offenses. Furthermore, it is relevant that Mr. Sharma's prior offenses did not result in being sentenced to any prison time. As the Second Circuit explained:

> Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishment failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentence; particularly the times served, for the prior offenses. If, for example, a defendant twice served five or six

22

> years and thereafter committed another serious offense, a current sentence might not have an adequate deterrent effect unless it was substantial, perhaps fifteen or twenty years. Conversely, if a defendant served no time or only a few months for the prior offenses, a sentence of even three or five years for the current offense might be expected to have the requisite deterrent effect.

*Mishoe*, 241 F.3d at 220. Thus, a long term of imprisonment, such as the one recommended by Probation, is far in excess of what is necessary to punish and deter Mr. Sharma. *See United States v. Paulino-Duarte*, No. 00 Cr. 686, 2001 WL 290047, at *5 (S.D.N.Y. March 26, 2001) (horizontally departing from a Criminal History Category V to IV, finding that "a longer incarceration of [defendant] is unlikely to reduce the risk of recidivism").

The Court should also compare Mr. Sharma's criminal history to the criminal histories of criminals who typically fall under Category III or even Category II. Mr. Sharma is not a violent offender, his offenses primarily relate to substance abuse, and he does not have a trail of felonies. The Court has discretion to depart and find that his true criminal history warrants being Category II. With an offense level of II, this would reduce Mr. Sharma's guideline range from 168 to 180 months imprisonment to 151 to 180 months. U.S.S.G. § 2D1.1(7). The Court should exercise its discretion and do so.

## VIII. The Remaining 18 U.S.C. § 3553(a) Factors Also Warrant a Below Guidelines Sentence of 30 Months

### A. Factors to Reflect the Seriousness of the Offense, to Afford General Adequate Deterrence, and to Protect the Public (18 U.S.C. § 3553(a)(2))

The defense respectfully asserts that a sentence of thirty months imprisonment reflects the seriousness of the offense, and adequately serves to provide both general and specific deterrence, as well as protect the public. 18 U.S.C. § 3553(a)(2).

From on, or about, April 1, 2018 to on, or about June 7, 2018, or 67 days, Mr. Sharma was detained at the Federal Detention Center Miami and the Metropolitan Correctional Center in New

York, New York.  After June 7, 2018, he was released on a $5,000,000 PRB Bond and placed on home detention with GPS monitoring where he was only allowed to leave for visits to his attorney's office.  *See* Dkt. No. 33.  This pretrial release was more restrictive than the pretrial release of Mr. Farkas and Mr. Trapani who were able to leave their residences for any reason during the pendency of this case.

On November 16, 2018, Mr. Sharma's bond was modified so he could only access the internet, or use/possess internet-enabled devices (computers, smart phones, etc.) in his attorney's office and in the presence of his attorney, for the purpose of his defense of this action.  *See* Dkt. No. 84.

From November 16, 2018 to July 24, 2020, a period of eighteen months, his bail conditions remained substantially the same.  On July 24, 2020, after entering his current plea of guilty, his bail conditions were modified to allow him to leave his residence with a curfew from 12:00 a.m. until 6:00 a.m., in addition to being with co-defendant, Robert Farkas, while not in the presence of counsel.  *See* Dkt. No. 373.

In total, Mr. Sharma has already spent more than thirty-two months in prison and pretrial conditions that have significantly limited his freedom.  He spent his time of incarceration at the Federal Detention Center – Miami, and the Metropolitan Correctional Center, a facility which several district judges have found to be particularly unsanitary.  *See United States v. Behr*, No. 03 Cr. 1115-02 (RWS), 2006 WL 1586563, at *5 (S.D.N.Y. June 9, 2006) ("The MCC houses criminals of all types of offenses together in 26-bed dormitories.  It is overcrowded, unsanitary, and lacks certain facilities.").

A 30 month sentence of incarceration will be more than sufficient to deter Mr. Sharma from future criminal conduct, and sends a strong message to the community that individuals who

make material misrepresentations to raise funds will be punished significantly.  And it, along with the conditions imposed during a three year term of supervised release, will adequately protect the public.   In total, with his pre-sentence incarceration, house arrest, a thirty-month term of imprisonment, and three-year term of supervised of release, Mr. Sharma will have been under the government's supervision for a total of approximately eight years, or approximately 25% of his life.  Under any measurement, that is significant.

While all the factors identified under (a)(1) are very important, reintegration into society is also important.  Imprisoning Mr. Sharma for more than 30 months will not send a correspondingly stronger message, but will impact his ability to re-unite with his fiancée and his family, both positive influences on him, his ability to get a job, and to successfully re-integrate into society.

## IX.    The Kind of Sentences Available (18 U.S.C. §3553(a)(3))

Mr. Sharma stands before the Court having plead guilty to three separate violations of 18 U.S.C. § 371, Conspiracy to Commit, Wire Fraud, Conspiracy to Commit Securities Fraud, and Conspiracy to Commit Mail Fraud.  Dkt. No. 368.  Notably, each of the offenses are Class D felonies, punishable by a maximum of five years imprisonment.  The Court should not impose consecutive sentences – concurrent sentences are more than an adequate punishment.  Here, there is one conspiracy, with the same defendants, the same scheme to defraud, the same victims, and over the same time period.  Each of the three counts which the defendant pled guilty to carry an equal statutory maximum and are based upon essentially the same conduct during the same time frame.  Despite the PSR recognizing the need for a variance, the PSR calls for the imposing consecutive sentences on these three counts.  However, any sentence the Court imposes on these three counts should run concurrently as there is a "presumption in favor of concurrent sentences"

on multiple counts. *United States v. Pugh*, 937 F.3d 108, 124 (2d Cir.), *opinion amended and superseded on other grounds*, 945 F.3d 9 (2d Cir. 2019).

**X.     The Kinds of Sentence and the Sentencing Range is Not Appropriate (18 U.S.C. § 3553(a)(4)(A))**

    **A.     A 22 Level Loss Enhancement is Excessive Under U.S.S.G. § 2B1.1(b)(1)**

Mr. Sharma does not dispute that pursuant to § 2B1.1, he is legally responsible for more than $25 million but less than $65 million of "loss." PSR ¶ 120. However, the application of this loss amount, increasing Mr. Sharma's offense level by 22 points, is excessive.

Section 2B1.1(b)(1) of the Guidelines is not supported by any empirical data and the guidelines range is driven solely by the loss amount. It does not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime that Mr. Sharma committed. The United States Sentencing Commission came up with increases in the base offense level based on arbitrary loss amounts when they fashioned the Guidelines, specifically the loss amounts in § 2B1.1(b)(1). *See United States v. Lauersen*, 348 F.3d 329, 344 (2d Cir. 2003) (holding that overlapping enhancements warrants a sentencing judge to consider a departure due to the cumulative effect, here the trial court reduced the low end of the Guidelines from 135 to 187 months and imposed an 87 month sentence).

In *United States v. Algahaim*, the Second Circuit agreed with the long-standing criticisms of the fraud guideline finding that the Sentencing Commission, in promulgating § 2B1.1, "let the amount of loss, finely calibrated into sixteen categories, become the principal determinant of the adjusted offense level and hence the corresponding sentencing range" thereby causing an "unusualness . . . that a sentencing court is entitled to consider" in determining the appropriateness of a non-Guidelines sentence. 842 F.3d 796, 800 (2d Cir. 2016). While recognizing that the Sentencing Commission was "entitled" to use this approach, the Second Circuit expressed its

concern regarding this method of calculating an appropriate criminal sentence and noted that it lacked any precedential support.  *Id.*  The "sentencing judge [can] consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence."  *Id.*  "Where the commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *Id.*

In *United States v. Adelson*, defendant Adelson was convicted by a jury of conspiracy, securities fraud, and false filing.  441 F. Supp. 2d 506 (S.D.N.Y. 2006) (JSR).  The district court found that the loss amount guideline combined with other guidelines in securities fraud demonstrated an "utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well harm that guideline calculations can visit on human beings if not cabined by common sense."  *Id.* at 512 (finding that a guideline of life imprisonment created unreasonable result).  Like in *Adelson*, here the loss amount and other enhancements combine for a guideline range that is way out of proportion with common sense.

In *United States v. Johnson*, the sentencing judge followed the Second Circuit's warning, and gave the following rationale for a below-Guidelines sentence for a defendant convicted of a large-scale fraud as follows:

> As far as this court can tell, the Sentencing Commission's loss-enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime.  It is no wonder that Judge Stefan Underhill, concurring in a recent Second Circuit opinion, called the loss enhancement Guideline "fundamentally flawed, especially as loss amounts climb."  *United States v. Corsey,* 723 F.3d 366, 380 (2d Cir. 2013) (Underhill, J., concurring); *see also United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012) (Rakoff, J.) ("By making a Guidelines sentence turn, for all practical purposes, on [loss enhancement], the Sentencing Commission . . . effectively guaranteed that many such sentences would be irrational on their face.").  Given the feeble underpinnings of the loss enhancement, it is particularly galling that this factor is often more or less solely responsible for a white-collar offender's

27

Guidelines sentence. Accordingly, Judge Underhill opined that, because the loss Guideline "was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices . . ., district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides." *See Corsey*, 723 F.3d at 379 (Underhill, J., concurring). I agree with Judge Underhill, and refuse to mechanistically impose such an illogical sentence. That this situation continues unabated is a great shame for the many offenders sentenced under this Guideline who do not receive a sentence that makes any sense for the actual crime of conviction.

No. 16 Cr. 457 (NGG), 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018).

Moreover, this particular loss guideline does not differentiate between moral culpability of different types of fraud. For example, § 2B1.1 does not distinguish between a Ponzi scheme or an individual that steals money, in contrast to someone who makes false statements to raise money but actually spends significant funds on creating a company and a product, which is the case here. As such, the mechanical application of § 2B1.1 would produce an unjust result in this case where although material misrepresentations were made, the victims received the token they purchased that they were then able to and many did sell,[10] there was time, effort and resources expended to build a business and to deliver a product, and the vast majority of the funds were not stolen or dissipated, in contrast, for example, to a Ponzi scheme or similar scam.

Here, Mr. Sharma's base offense level of 6 was increased by 22 levels due solely to a loss calculation of more than $25,000,000 but less than $65,000,000, bringing his offense level to 28. The sixteen loss categories that are set forth in § 2B1.1 are not based on any empirical data or any logical policy concerns and do not take into account the specific nature of this offense. This is the exact reason that the Second Circuit identified this bracketing procedure as "unusual." *See Algahaim*, 842 F.3d at 800.

---

[10] Purchasers of ICO tokens frequently sell their tokens. Thus, there are purchasers who did not suffer any injury, or whose losses were offset by their sales.

Additionally, this Court should consider the significant amount of unspent funds preserved for the victims - $33.5 million (the proceeds from the sale of 100,000 ether).  Mr. Sharma agreed not to seek to offset against the money judgment.  As a result of the sale proceeds, and not all purchasers suffering a full or partial loss, everyone who was a victim of Mr. Sharma's actions almost certainly will be made whole.  This should be taken into consideration as the court did in *Algahaim*.  Funds for repayment exist because the funds raised in the initial coin offering were not solely used for personal use and depleted, as is the case in most frauds.  Nor did Mr. Sharma dissipate those funds with one stroke of a key as he could have for months.

Mr. Sharma recognizes he misled a lot of purchasers in an effort to raise funds for his business, and that his lies contributed to the success of Centra Tech's fundraising efforts. However, the simple application of a 22 level enhancement is excessive.

## B.    Mr. Sharma Has a High Risk Of Severe Complications Should He Contract COVID-19 While Incarcerated

It has been noted in the Southern District of New York that "we are not currently living under normal circumstances."  *United States v. Gross,* 452 F. Supp. 3d 26, 30 (S.D.N.Y. 2020) (AJN).  Judge Alison J. Nathan has stated that we are living in times where a term of incarceration can in turn be a death sentence if a medically vulnerable inmate catches COVID-19. *See United States v. Park,* 456 F. Supp. 3d 557, 564 (S.D.N.Y. 2020) ("The Court fears that leaving [the defendant] any longer at FCI Danbury may convert a three-year prison sentence into a death sentence.  And that the Court cannot allow," where the defendant had serious medical issues including asthma and immune-compromising diseases ).

Mr. Sharma suffers from ████████████████████ which poses a serious risk to his health if he were to contract COVID-19.  *See* Medical Records Ex. F.  █████████

████████████████████████████████████████████



In a prison setting, COVID-19 is a "ticking time bomb." *Park,* 456 F. Supp. 3d at 560. "[D]ata reveals dramatically higher rates of COVID spread and fatalities in prisons than the general population." *United States v. Spencer,* No. 04 Cr. (PAE), 2020 WL 3893610, at *84 (S.D.N.Y. July 10, 2020). Other judges in this District have agreed that prison settings intensify the already serious risks posed by the virus. *United States v. Cooper*, No. 13 Cr. 66 (JPO) 2020 WL 4195273, at *2 (S.D.N.Y. June 11, 2020); *United States v. Rodriguez*, No. 17 Cr. 157 (VEC), 2020 WL 3051443, at *2 -3; *United States v. El-Hanafi*, 460 F. Supp. 3d 502, 508 (S.D.N.Y. May 19, 2020) (KMW); *United States v. Michelle Morton*, 16 Cr. 371 (RA) (S.D.N.Y.) Dkt. Nos. 945, 946 (Court imposed a 15-month prison sentence where there was over a 40-million-dollar securities



investment fraud; defendant cited ongoing medical conditions); *United States v. Akparanta,* 19 Cr. 363 (LGS) Dkt. Nos. 53, 54, 60 (40-month sentence for 44-year-old correctional officer accused of sexually abusing female inmates where he had medical conditions plus received a delayed surrender); and *United States v. Richard Wong*, 20 Cr. 210 (LTS) (S.D.N.Y.) Dkt. Nos. 39, 40, 44 (Over $315,000 in wire fraud loss and an 18-month sentence was imposed with delayed surrender. Guidelines were 27 to 33 months and the defendant cited ongoing medical conditions.).

Considering the foregoing, this Court should consider Mr. Sharma's ███████████ and the risks arising COVID-19 while imposing its sentence.

### C.    A Below-Guidelines Sentence Would Not Result in a Sentencing Disparity (18 U.S.C. § 3553(a)(6))

A purpose of the Sentencing Commission establishing policies and practices is to "avoid[] unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct." 28 U.S.C. § 991(b)(1)(B). Given the nature of the offense, and the fact that it was not a scheme to steal money from investors, a downward variance from the Guidelines would not create an unwarranted sentencing disparity.

Courts have repeatedly imposed below-Guidelines sentences on defendants who have been convicted of offenses related to cryptocurrency. For example, in *United States v. Murgio et al*, Judge Alison J. Nathan imposed a below-Guidelines sentence for each of the six defendants for various offenses relating to an unlawful Bitcoin exchange. No. 15 Cr. 769 (AJN) (S.D.N.Y.) (imposing below-Guidelines sentences for two defendants who were convicted following a jury trial, as well as four additional defendants who pled guilty to offenses).

In *United States v. Zaslavskiy*, a recent case in the Eastern District of New York involving cryptocurrency ICOs, the judge sentenced the defendant to 18 months' imprisonment, well below the Guidelines range of 30-37 months. No. 17 Cr. 647 (RJD) (RER) (E.D.N.Y., Nov. 18, 2019).

Judge Dearie noted that it was extraordinary that most or all of the victims would be recompensed and therefore sentenced the defendant well below the Guidelines range even though he was main actor in the securities fraud to which he pled guilty.  Likewise, the victims in Mr. Sharma's case will likely be fully recompensed through the remission process.

In *United States v. Homera Joshua Garza*,  the court sentenced the defendant, the principal of three companies through which the defendant defrauded investors, to 21 months' imprisonment, followed by 6 months of home confinement for offenses relating to the purported generation and sale of virtual currency, well below the applicable Guidelines range of 63-78 months.  No. 17 Cr. 158 (D. Conn., Sept. 13, 2019).  Judges in other districts have also varied downward from applicable Guidelines ranges when sentencing defendants for cryptocurrency-related fraud crimes, including when they sought to keep for themselves the fraudulently obtained funds.  *See, e.g., United States v. Joseph Kim*, No. 18 Cr. 107 (N.D. Ill., Nov. 9, 2018) (imposing a sentence of less than half of the low end of the Guidelines range on the trader defendant for his misappropriation of his firm's Bitcoin and Litecoin for his personal benefit).

Additionally, the Court imposed a sentence of one year and one day on Mr. Farkas. Therefore, Mr. Sharma's request of 2.5 times the sentence of Mr. Farkas would not result in an unwarranted sentencing disparity, while Probation's sentencing recommendation of ten times that of Mr. Farkas would amount to an unwarranted sentencing disparity.

### D.    There Is No Need or Basis to Provide Additional  Restitution to Any Victims of the Offense (18 U.S.C. § 3553(a)(7))

Unlike many fraud cases before this Court, here any victims making a claim for restitution will likely be paid in full.  The government recently sold the 100,000 ETH that Mr. Sharma agreed to forfeit for total net proceeds of $33,422,373.49, which was more than was raised by Centra Tech in its ICO.  Because the government sought a remissions process, which Mr. Sharma consented to

(as well as agreeing not to seek to apply any excess sale proceeds towards his money judgment), on November 5, 2020, the Court granted the government's uncontested motion for miscellaneous relief, finding that restitution is impracticable.  Dkt. No. 407.  Given the granting of this motion, and as agreed to by the government, this Court is precluded from ordering restitution beyond the sale proceeds of the 100,000 ether seized.

Also as noted above, many victims of the ICO fraud likely sold their tokens for a net gain, or otherwise have not suffered a full loss due to the partial sales of their tokens.  In addition, corporate entities or speculative trading firms that purchased tokens may no longer exist – many entities failed after the ICO boom fizzled.  To the extent the government asserts that the sale proceeds may be insufficient, that assertion appears to run counter to the limited number of victims that have responded to the SEC, the government and US Probation.

As part of the government investigation, it obtained the list of email addresses people signed up with to purchase tokens from Centra Tech.  In addition to the publicity generated by this case post arrest, which has been significant, the government has sent out over 1200 victim notification letters.  This is derived from the list of purchasers, many of whom likely broke even or made a profit selling their tokens and are thus not victims entitled to restitution.  It is the defense's understanding that this extensive effort has resulted in approximately 56 letters from the victims claiming approximately $1,635,716.39 in losses.  While undoubtably a claims process will lead more claimants to submit a claim, after almost three years of victim outreach it seem highly unlikely that a significant number of additional victims will come forward, meaning that it appears almost certain that the victims who make claims will get paid in full, and the government will receive a partial windfall from the $33,422,373.49 in sale proceeds.

33

### E.      The Court Should Not Impose a Fine

Until very recently, Mr. Sharma has not been able to work due to this pretrial restrictions, has little to no savings, and by the government's calculation will have, after sentencing, a money judgment against him of $7,088,960.00, as Mr. Sharma agreed not to seek to offset the forfeiture money judgment for proceeds in excess of the original ICO sale.  This constitutes a massive debt for Mr. Sharma and sends a very strong message to him and others that crime does not pay.

Pursuant to the final PSR, Probation recommends a $250,000 fine in total on all three counts.  Mr. Sharma requests the Court not impose any fine for several reasons. First, pursuant to 18 USC §§  371 and 3571, imposing a fine is not mandatory. Second, based upon totality of the factors the Court should consider under 18 USC §§ 3572, imposing a fine under these circumstances is not necessary. Third, in an effort to help make the victims whole, Mr. Sharma has already consented to a preliminary order of forfeiture equaling approximately $33.4 million as described above, plus he consented to a money judgement of over $7 million, which he remains obligated to pay.  Accordingly under the factors in 18 USC §§ 3553(a) and 3571, we ask the Court not to impose a fine as it is unnecessary.

## CONCLUSION

Mr. Sharma wants the chance to continue to rebuild his life, with a sober mindset and he has the family support and marketable skills, whether in blockchain or other software applications, to do so.  He is eager to start over, and build a new life with his fiancée.

While he recognizes the seriousness of his actions, the Court should not warehouse Mr. Sharma for the next ten years. He has the capability to be a productive member of society after serving a lesser period of incarceration.  Mr. Sharma's family and friends are a tremendous support system that will be there for him to help him transition back into society after completing his term of imprisonment.

In conclusion, Mr. Sharma respectfully submits that sentence of thirty months imprisonment and three years of supervised release is more than sufficient to achieve the goals of the criminal justice system.

Dated: January 7, 2021

Respectfully submitted,

/s/ Grant P. Fondo.
Grant P. Fondo (admitted *pro hac vice*)
Goodwin Procter LLP
601 Marshall St.
Redwood City, CA  94063
(650) 752-3100
gfondo@goodwinlaw.com

Gennaro Cariglio Jr.
Gennaro Cariglio Jr. P.L.
8101 Biscayne Blvd. Penthouse 701
Miami, FL 33138
(305) 899-0438
Sobeachlaw@aol.com

Denis P. Kelleher Jr.
Talkin, Muccigrosso & Roberts LLP
40 Exchange Place, 18th Floor
NY, NY 10005 212-922-1080
dpkesq@wsaccess.com

Melissa Lee Brumer
Goodwin Procter LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
MBrumer@goodwinlaw.com

*Counsel for Defendant Sohrab Sharma*