UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                 :

UNITED STATES OF AMERICA        :

                                 :

        - v. -             :     S3 18 Cr. 340 (LGS)

                                 :

SOHRAB SHARMA,          :

  a/k/a "Sam,"              :

                                 :

          Defendant.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## THE GOVERNMENT'S SENTENCING MEMORANDUM


                            ILAN T. GRAFF
                            Attorney for the United States
                            Acting Under 28 U.S.C. § 515
                            Southern District of New York
                            One Saint Andrew's Plaza
                            New York, New York 10007

Negar Tekeei
Samson Enzer
Daniel Loss

Assistant United States Attorneys
  - Of Counsel –

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS AND PROCEDURAL HISTORY ...................................... 3

  I.   Summary of Offense Conduct ...................................................................... 3

    A. The Origins of the Conspiracy to Defraud Centra Tech Investors and Roles of the
       Conspirators During their Fraudulent Fundraising Efforts. ................................ 4

    B. Fraudulent Conduct in Connection with Centra Tech's Fundraising Efforts. .................. 5

      1.   Fraudulent Representations Concerning Centra Tech's Purported Executive Team. .. 5

      2.   Fraudulent Representations Regarding Partnerships with Bancorp, Visa, and
         Mastercard.............................................................................................. 6

      3.   Fraudulent Representations Concerning Centra Tech's Purported Licenses. ............ 10

      4.   Fraudulent Representations Conveyed During Media Interviews............................. 10

      5.   Fake Demonstrations and Fake "Centra Tech" Cards. ................................. 12

    C. The October 27, 2017 *New York Times* Article and Subsequent Steps Taken by Sharma,
       Farkas, and Trapani...................................................................................... 13

  II.   Presentence Investigation Report...................................................................... 21

  III.  A Downward Departure is Not Warranted. ...................................................... 22

DISCUSSION ................................................................................................... 26

  I.   The Nature and Seriousness of Sharma's Criminal Conduct and the Need for Just
     Punishment Warrant a Substantial Sentence of Imprisonment........................................ 27

  II.  A Guidelines Sentence of Incarceration is Also Necessary in light of Sharma's History
     and Characteristics, to Afford Adequate Deterrence, Promote Respect for the Law, and to
     Protect the Public from Further Crimes by Sharma.......................................................... 34

  III.  The Nature of Sharma's Fraudulent Scheme Means that Some Victims May Not Be Made
     Whole. ........................................................................................................ 36

  IV.  The Sentencing Guidelines Loss Enhancement is Appropriate........................................ 38

  V.   Sharma Did Not Provide "Substantial Assistance" to the Government. .......................... 40

  VI.  Sharma's Medical History Does Not Support the Significant Variance He Seeks........... 42

  VII. A Guidelines Sentence Would Not Result in an Unwarranted Sentencing Disparity. ..... 42

  VIII. Sharma's Family Ties and Personal History Do Not Support the Significantly Below-
       Guidelines Sentence He Seeks.......................................................................... 43

CONCLUSION.................................................................................................. 44

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in advance of the sentencing of defendant Sohrab Sharma, who pleaded guilty in this case to securities fraud conspiracy, wire fraud conspiracy and mail fraud conspiracy for his role as the leader of a scheme that deceived thousands of victims into investing more than $36 million in digital tokens issued by the company which he owned and co-founded, Centra Tech, Inc. ("Centra Tech").

Actions speak louder than words, and the series of criminal acts of escalating severity that Sharma has committed in his relatively short life betray that he is a recidivist con-artist who, in this case, used a web of lies to prey on unwitting investors' enthusiasm for burgeoning developments in the financial technology industry.  The sheer extent and repetition of Sharma's undisputed criminal conduct speaks for itself.  After committing identity theft, loan fraud, perjury and numerous other criminal acts over the course of seven years that went virtually unpunished, Sharma embarked on an elaborate and lucrative scheme to swindle victims into investing in the purported cryptocurrency debit card company that he dubbed "Centra Tech."  As part of this fraudulent scheme, Sharma used brazen lies touting the purportedly impressive credentials of fabricated senior Centra executives and fake business partnerships and licenses that he knew were non-existent to dupe thousands of investors into parting with tens of millions of dollars in assets.  To ensure the success of this criminal scheme, Sharma recruited and enlisted others to effectuate his crimes with a multimedia blitz of misinformation and fake demonstrations, and then worked to cover up those crimes after his lies garnered more attention than he had expected.  In total, Sharma himself obtained more than $36 million in fraud proceeds, and, along with his co-conspirators, dissipated millions of dollars of funds that he purloined from victims.

In light of the indisputable quantity and severity of the flagrantly criminal actions by Sharma in the Centra Tech fraud and in his earlier criminal escapades, it is hard to take seriously the portrait that Sharma and his supporters have attempted to paint of Sharma as a naïve businessperson with pure intentions. The gravity of Sharma's fraudulent conduct and efforts to obstruct investigations of it rupture that façade: he raised tens of millions of dollars from his victims through calculated lies and manipulations, misused several million dollars on himself and his co-conspirators, and lied, repeatedly, to the United States Securities and Exchange Commission, criminal law enforcement authorities, and this Court as part of efforts to obstruct investigations of his fraud on Centra Tech investors and the resulting criminal prosecution in this case. When Sharma is judged by his actions, rather than his words, it is crystal clear that he is a predatory fraudster who must be sentenced to a lengthy term in prison to reflect the gravity of his crimes, to promote respect for the law, to deter him from reoffending again, to deter others from emulating his misdeeds, and to protect the public from further crimes by him.

The parties and the United States Probation Department agree that the advisory Sentencing Guidelines range applicable to the defendant's conduct is 14 to 15 years of imprisonment. PSR 178.[1] The Probation Department has recommended a below-Guidelines sentence of 10 years of imprisonment. For the reasons explained below, the Government respectfully submits that a sentence within the applicable Guidelines range of 14 to 15 years' imprisonment is both necessary

---

[1] "PSR" refers to the Probation Department's Final Presentence Investigation Report dated December 11, 2020; "Compl." refers to criminal complaint 18 Mag. 2695 filed against Sharma in this case ; "Dkt." refers to docket entries in this case, unless otherwise noted; and "Ex. A" refers to an audio recording of an August 14, 2017 interview of Sharma by Neocash Radio, a cryptocurrency podcast, during the Centra Tech fraud.

and appropriate to adequately punish Sharma for his misconduct in this case and to protect the public from his further crimes.[2]

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

### I.    Summary of Offense Conduct

From at least approximately July 2017 through October 2017, Sharma, along with co-defendants Robert Farkas and Raymond Trapani, solicited investors to provide valuable digital assets in exchange for the purchase of digital tokens called "Centra tokens" or "CTRs" that were issued by the startup company that they co-founded, called Centra Tech, during the company's "ICO" and other fundraising efforts.  PSR ¶¶ 24-30.  As part of these fundraising efforts, Sharma and his confederates deliberately made a series of fraudulent misrepresentations to investors.  *Id.* ¶ 24.  Based in part on these false claims, investors provided digital funds, including at least 100,000 units of the valuable digital currency "Ether" ("ETH") and additional amounts in other digital currencies such as Bitcoin ("BTC") and Litecoin ("LTC"), that were then worth more than $35 million, for the purchase of Centra tokens.  *Id.* ¶¶ 24, 90; Dkt. 411.

During the company's fundraising efforts, Sharma and his confederates deliberately made multiple fraudulent claims in soliciting such investments from victims, among others:

- Sharma and his confederates claimed to investors that Centra Tech's executive team included a purported CEO named "Michael Edwards" and a purported CFO named "Jessica Robinson" who had impressive work histories and academic credentials.  In fact, "Michael Edwards" and "Jessica Robinson" were fictitious people who were fabricated to dupe investors.  *Id.* ¶¶ 25, 48-58.

- Sharma and his confederates claimed to investors that Centra Tech had developed a debit card that enabled users to spend various cryptocurrencies to make purchases at stores that accept Visa or Mastercard payment cards, and that Centra Tech had partnerships with

---

[2] The Court previously ordered that restitution is impracticable in this case (Dkt. 407), and, as the Court is aware, the Government intends to create a remission program to distribute judicially forfeited assets to victims.  On November 11, 2020, the Court entered a consent preliminary order of forfeiture against Sharma and a money judgment in the amount of $36,088,960.  Dkt. 411.

Bancorp, Visa and Mastercard to issue Centra Tech debit cards. *Id.* ¶¶ 25, 35-47. In fact, Centra Tech had no such partnerships with Bancorp, Visa or Mastercard. *Id.*

- Sharma and his confederates claimed to investors that Centra Tech held money transmitter and other relevant licenses in 38 states. In fact, Centra Tech did not have such licenses in the majority (if not all) of those states. *Id.* ¶¶ 25, 59-63.

In addition, to attract investors to purchase Centra tokens issued during their fundraising efforts, Sharma and his confederates also used various market manipulation techniques to artificially inflate the market price of Centra tokens on a cryptocurrency trading exchange called "EtherDelta" that was based in Manhattan. *Id.* ¶ 27.

After the completion of Centra Tech's fundraising efforts in approximately October 2017, Sharma and Farkas continued the fraudulent scheme (at least until their arrests in this case in April 2018) which, among other things, prevented Centra Tech investors from seeking a return of their investments, and artificially inflated the value of Centra Tokens traded on secondary cryptocurrency exchanges. *Id.* ¶ 28.

## A. The Origins of the Conspiracy to Defraud Centra Tech Investors and Roles of the Conspirators During their Fraudulent Fundraising Efforts.

In or about late June or early July 2017, Sharma started Centra Tech from the apartment in Miami where he was living at the time with his girlfriend, Brielle Farkas, who is Farkas's sister. Sharma caused Centra Tech to be incorporated, launched its website, and recruited Farkas and Trapani to join his efforts to raise funds for Centra Tech in July 2017. *Id.* ¶ 30.

Sharma was the architect of Centra Tech and of the company's ICO and its fraudulent marketing materials from the beginning. *Id.* ¶ 31. For example, when Farkas and Trapani joined Centra Tech, Sharma had already created (or caused others to create) the Centra Tech website with, among other things, a link to a white paper soliciting investments in the company's ICO. *Id.*

At the beginning of their fraudulent fundraising efforts, Sharma, Farkas and Trapani worked out of a small room in Sharma's apartment.  *Id.* ¶ 32.  But in early October 2017, after their fundraising efforts had raised more than $25 million in assets from investors, they moved Centra Tech into leased luxury office space in downtown Miami.  *Id.* ¶ 32.

Sharma, the leader of the conspiracy to defraud Centra Tech investors, tasked Farkas and Trapani with various assignments that primarily related to promoting investor interest in Centra Tech's fundraising efforts.  *Id.* ¶ 33.  For example, at Sharma's urging, Farkas and Trapani monitored various online chat rooms and blogs for "trolls" who posted disparaging information about Centra Tech or its ICO and took measures to address such disparagement.  *Id.*  Many of those measures involved various lies and other types of deceptive conduct.  *Id.*  For example, at Sharma's request, Trapani posted positive comments about Centra Tech using an anonymized screenname on various online chats to create the misleading impression that an independent, unbiased investor with no ties to the company believed it was a good investment.  *Id.*

**B.  Fraudulent Conduct in Connection with Centra Tech's Fundraising Efforts.**

In soliciting investor funds from July through October 2017, Sharma and his confederates made numerous fraudulent statements and omissions, including those set forth below.

**1.  Fraudulent Representations Concerning Centra Tech's Purported Executive Team.**

First, Sharma and his confederates made multiple fraudulent statements and omissions concerning Centra Tech's executive team.  *Id.* ¶¶ 48-58.  These fraudulent representations included reference to the fabricated senior executives at Centra Tech purportedly named "Michael Edwards" and "Jessica Robinson," who in reality did not exist.  *Id.*

For example, white papers used to solicit investments in the company's ICO contained a section entitled "Centra Tech Team" listing: (i) a purported individual named "Michael Edwards"

as Centra Tech's "CEO & Co-Founder," along with a supposed picture of "Michael Edwards"; and (ii) a purported individual named "Jessica Robinson" as Centra Tech's "CFO," along with a supposed picture of "Jessica Robinson." The white papers also included a picture of the purported CEO "Michael Edwards." *Id.* ¶ 49. The "Michael Edwards" depicted in at least one white paper was actually a picture of a Canadian physiology professor (not named Michael Edwards) who had no knowledge of Centra Tech, and who had never given permission to Sharma or anyone else at Centra Tech to use his photograph. *Id.* After an internet blogger posted an article exposing that the photograph of "Michael Edwards" was actually that of a Canadian professor with no ties to Centra Tech, the defendants switched to using a photograph of Farkas's father as the photograph of "Michael Edwards" in marketing materials. *Id.* ¶¶ 49-50. Farkas also posted a photograph of his sister as the fictitious "Jessica Robinson." *Id.* ¶ 55.

Sharma and his confederates were well aware that "Michael Edwards" and "Jessica Robinson" of Centra Tech were not real people, and they took active steps to conceal as much. *Id.* For example, on September 13 and 14, 2017, Sharma and his confederates participated in a group cellphone text message conversation while Sharma was on a business trip in South Korea for the purpose of soliciting investments in Centra Tech from a South Korean company. *Id.* ¶ 58. During this group conversation, Trapani sent a text message to Sharma and Farkas in which Trapani wrote "Just gotta close this shit with [the South Korean company] get that ETH." Sharma responded, "We need to remove mike Edwards and 'Jessica asap," and "After ICO" – a reference to removing those fake executives from Centra Tech's marketing and other materials. *Id.*

### 2. Fraudulent Representations Regarding Partnerships with Bancorp, Visa, and Mastercard.

Sharma and his confederates also made numerous materially false representations to investors that Centra Tech had partnerships with Bancorp, Visa, and Mastercard to issue Centra

Tech debit cards. *Id.* ¶¶ 25, 26, 35-47. In fact, as Sharma and his confederates well knew, Centra Tech had not entered into any partnerships with these entities.

In approximately August 2017, Bancorp became aware of such false statements regarding Bancorp and alerted Sharma and Centra Tech. *Id.* ¶ 37. A representative of Bancorp ("Representative-1") discovered that Centra Tech's website was using Bancorp's issuer statement, which is a statement identifying the card issuer any time a Visa or Mastercard image is displayed,. *Id.* Representative-1 knew by looking at materials on the Centra Tech website that Bancorp would never work with a company such as Centra Tech by virtue of the risk level of the product Centra Tech was offering. *Id.* Representative-1 reviewed Bancorp internal databases, and confirmed that Bancorp did not have any card issuance or other relationship with Centra Tech. *Id.* Representative-1 took screenshots of the Centra Tech website, including of pages containing misrepresentations about Bancorp, Visa, and Mastercard, and Bancorp's issuer statement:

- "The Centra Card Visa Debit Card is issued by The Bancorp Bank, member FDIC, pursuant to a license from Visa U.S.A. Inc."

- "The Centra Card Mastercard Debit Card is issued by The Bancorp Bank, member FDIC, pursuant to a license from Mastercard International Incorporated."

*Id.*; Compl. ¶ 22. There was no such thing as a "Centra Card Visa Debit Card" issued by Bancorp, and no such thing as a "Centra Card Mastercard Debit Card" issued by Bancorp.

On August 30, 2017, Sharma sent an email to John Lambert, a college student who was fraudulently posing as the fake attorney "Eric Pope" of the fake law firm "Pope & Dunn," conveying a message that Sharma had received from Bancorp directing Centra Tech to cease and desist from misrepresenting that Bancorp had any connection with, or was the issuer of any card products related to, Centra Tech. *Id.* ¶ 39. Sharma did not disclose to "Eric Pope" that Sharma had made fraudulent use of Bancorp's name and logo, nor that Sharma had deliberately lied about a purported partnership between Bancorp and Centra Tech, in connection with his scheme to

defraud Centra Tech investors.  *Id.*  Sharma also did not disclose to "Eric Pope" the numerous

other lies that he made in connection with his scheme to defraud Centra Tech investors.  *Id.*[3]

On August 30, 2017, during a group cellphone text message conversation between Sharma,

Farkas, and Trapani, they discussed Bancorp's cease-and-desist notice.  *Id.* ¶ 40.  Sharma asked

Farkas to remove the Bancorp logo from Centra Tech's press releases, and Farkas did so as

requested.  *Id.*  Sharma further responded "Okay," "We gotta get that shit removed everywhere

and blame freelancers lol[.]"  *Id.*

Sharma and his confederates repeatedly acknowledged to one another that Centra Tech's

white papers, website, and marketing materials contained false representations about the company

and its purported product even while they were raising funds from investors using those very same

marketing materials.  For example, on September 29, 2017, during a group cellphone text message

conversation, Sharma advised Farkas and Trapani that the United States Securities and Exchange

Commission (the "SEC") had announced an enforcement action against an ICO issuer called

RECoin, and the three of them discussed taking down the version of Centra Tech's white paper

available on the Centra Tech website at the time.  Sharma wrote: "I rather cut any fufu," (slang for

fake) "Off right now," "Now," "Then worry," "Anything that doesn't exist current," "We need to

remove," "Have them do it asap," "We don't have a real product either right now."

In approximately October 2017, well after Sharma and his confederates had raised millions

of dollars based on their false representations about Centra Tech's purported relationship with

Visa, Visa also became aware of their false statements regarding Visa, and demanded that they

remove all references to Visa from the Centra Tech Website and any promotional materials.  *Id.*

---

[3]     On August 6, 2019, Lambert pled guilty to an Information filed in the Southern District of
New York, captioned *United States* v. *John Lambert*, 19 Cr. 571 (VEC), charging Lambert with
conspiracy to commit wire fraud for conduct relating to his pretending to be a licensed attorney.

¶¶ 42-46.  Similarly, Mastercard's internal records of licensing agreements and relationships with card-issuing banks and other third parties contained no record of any Mastercard-approved relationship, either direct or indirect, with Centra Tech.  *Id.* ¶ 47.

On or about September 11, 2017, after Sharma and his confederates' fraudulent fundraising efforts were well underway and had already raised millions of dollars from victims of their fraud, Sharma reached out for the first time to Intercash, a Canadian company that provides program manager services for prepaid fiat currency payment card programs.  On or about September 26, 2017, near the conclusion of his fraudulent fundraising efforts, Sharma caused Centra Tech to enter into an agreement pursuant to which Intercash pledged to use its "best endeavors" (but made no guarantees) to procure specified services, including finding an issuing partner bank licensed to issue standard Mastercard-branded prepaid fiat currency payment cards.

In approximately December 2017, months *after* the conclusion of the defendants' fraudulent ICO and related fundraising efforts that were in part based on representations that Centra Tech had a prepaid card program with Bancorp, Visa and/or Mastercard, Intercash provided Centra Tech with approximately 400 to 600 test cards that were standard Mastercard-branded, generic prepaid fiat currency Mastercard payment cards issued by Wirecard Card Solutions Limited under Wirecard's license agreement with Mastercard.  *Id.*  Upon receipt of the test cards, Sharma and Farkas, breached Centra Tech's agreement with Intercash by tampering with the card designs to falsely rebrand them as "Centra Cards" bearing Centra Tech's and Mastercard's logos. *Id.*  This continued to create a false impression to investors that Centra Tech had a partnership with Mastercard, when in fact, Mastercard had not approved any card program with Centra Tech.  *Id.*

Upon learning of the use of the falsely branded "Centra Cards" in or about February 2018, Mastercard notified Wirecard that it had learned that Wirecard appeared to be operating a Centra

Card prepaid program involving cryptocurrency that had not been approved by Mastercard in violation of Mastercard's rules, and Intercash promptly suspended Centra Tech's account.  *Id*. Wirecard explained in a March 9, 2018 letter to Mastercard that the Centra Tech branded cards were "never . . . submitted to nor approved for use by Intercash or [Wirecard]."  *Id.*  The letter explained that Centra Tech impermissibly "added their own branding" to "some test cards (generic approved Intercash branded cards only)" that Intercash had sent to Centra Tech exclusively "for the purposes of evaluation and beta internal testing," and that Centra Tech improperly "added their own branding to overlay the correctly approved card design and created unapproved social media coverage of a product that does not exist, without any consent or authorization from Intercash or [Wirecard]."  *Id.*  Wirecard further informed Mastercard that "there will be no partnership with Centra and no agreement to provide them with a card programme," and that "[t]he test cards that were issued to Centra have been terminated and no further cards will be issued to them."  *Id.*

### 3. Fraudulent Representations Concerning Centra Tech's Purported Licenses.

In soliciting investor funds from approximately July through October 2017, Sharma and his confederates fraudulently claimed that Centra Tech held money transmitter and other licenses in 38 states.  In fact, as Sharma and his confederates well knew, Centra Tech did not have such licenses to operate in those states.  Even as of January 2018, several months after Sharma and his confederates had raised millions of dollars based on, among other things, false claims that Centra Tech had money transmitter licenses in 38 states, Centra Tech still did not have such licenses.  *Id.*

### 4. Fraudulent Representations Conveyed During Media Interviews

Sharma and his confederates repeated their fraudulent claims about Centra Tech orally in interviews that were broadcast over the Internet.  *Id.* ¶¶ 64-75.

One example took place on August 6, 2017, during a videotaped interview of Sharma by Cliff High, an analyst of cryptocurrency trading market trends, that was published on YouTube. Sharma participated in the interview remotely from a computer in his apartment.  *Id.* ¶ 66.  During the interview, Sharma made several false statements about Centra Tech in response to High's questions.  *Id.* ¶ 67.  For example, Sharma falsely claimed that "Michael Edwards" was the CEO and a seed investor in Centra Tech, and that Centra Tech had a licensing agreement with Bancorp to issue Centra debit cards with Visa and Mastercard logos on the cards.  *Id.*  The publicity that Centra Tech received from the interview, and from subsequent paid-celebrity-endorsements helped draw investors' attention to the company's ICO.  *Id.* ¶ 68.

On August 14, 2017, Sharma was interviewed by Neocash Radio, a cryptocurrency podcast, about the Centra Tech ICO.  *Id.* ¶¶ 69-74.  During the interview, Sharma, a skilled liar, made multiple misrepresentations of facts that would plainly be of importance to investors, and did so with chilling poise and conviction despite the brazen falsity of such lies.  A recording of the interview is attached as Exhibit A for the Court's review.  The false representations that Sharma made during the interview included the following:

- Regarding Centra Tech's purported partnerships with Visa and Mastercard, Sharma falsely stated:  "[I]nternationally, we currently have our license with Mastercard, to service international clients.  Domestically, we do have the Visa partnership, so we are able to issue Visa cards domestically and Mastercards internationally . . . currently right now it's just available for Mastercards internationally and Visa cards here in the United States."  Ex. A at 2:13-2:43; PSR ¶ 70.

- Sharma falsely identified "Mike Edwards" as a "VP," "co-founder," and early investor in Centra Tech: "We have one private investor, who's actually Mike Edwards, he's also our VP and co-founder.  He put up a lot of the capital originally."  Ex. A 5:58-6:20.

- Sharma falsely claimed that Centra Tech was licensed in 38 states, and stated that "the states that we are operating in currently for licensing purposes is just so that ability to withdrawn and transmit your Bitcoins. As far as actually utilizing the card itself to the wallet and spending the cryptocurrencies, that's available in all states."  Ex. A at 4:34-5:15; PSR ¶ 74.

11

### 5.   Fake Demonstrations and Fake "Centra Tech" Cards.

Sharma and his confederates also generated investor interest in Centra Tech by staging fake demonstrations and posting them on social media to dupe investors into believing that Centra Tech had an operational cryptocurrency debit card.  *Id.* ¶ 76.

For example, in early August 2017, Sharma and Farkas created a video that they later posted on YouTube purporting to show Sharma using a "Centra Card" to make a purchase at a mall in Florida, as well as a supposed real-time deduction in the cryptocurrency balance in Sharma's digital wallet, as purportedly displayed on a supposed smartphone application on Sharma's iPhone.  *Id.* ¶ 77.  Farkas recorded Sharma swiping the card and the application on his phone adjusting the balance for the transaction.  *Id.*  In reality, Sharma was using an ordinary credit card to make the purchase, no cryptocurrency was used or exchanged in the transaction, and the defendants used a device called a scraper to manipulate the displayed account balance on Sharma's iPhone to mislead investors into believing that cryptocurrency had been deducted from Sharma's digital wallet and that Centra Tech had a fully operational cryptocurrency debit card.  *Id.*  After certain members of the public noticed aspects of the YouTube video revealing that the card used by Sharma was actually a standard credit card, Sharma, Farkas, and Trapani had another individual take the video down from YouTube, edit out parts of the video that revealed it was a fake demonstration, and re-upload to YouTube the tampered version of the video.  *Id.*

Also in August 2017, Sharma traveled to South Korea in order to lure investment funds from Bitset, a South Korean company that Sharma hoped would market Centra Tech's ICO to potential South Korean investors.  *Id.* ¶ 78.  During that trip, Sharma and Trapani, with the unwitting assistance of a Centra Tech employee, used a fake "Centra Tech" branded card to make it appear as though Centra Tech had a working, legitimate card that converted cryptocurrency into

fiat in real time during everyday merchant transactions. *Id.* In reality, Sharma was text messaging Trapani and the Centra Tech employee with instructions regarding how to manipulate certain databases and technology to process the transaction and make it appear as though Sharma's (fake) "Centra Tech" branded card was working as promised. *Id.* Sharma also repeatedly assured individuals at Bitset that Centra Tech had a real partnership with Bancorp, and even provided an individual at Bitset with a fake contract with Bancorp as proof of that partnership. *Id.* Believing Sharma's lies, including that the fake demonstrations were real and that Centra Tech had a real partnership with Bancorp, individuals at Bitset advertised Centra Tech and aggregated investments of more than 40,000 ETH from South Korean investors. *Id.*[4]

In September 2017, Sharma and his confederates also caused multiple plastic cards bearing the "Centra Tech" logo that falsely included the Visa and/or Bancorp logos to be sent and delivered by commercial interstate mail carriers to Centra Tech victim investors in the United States and elsewhere. In reality, many of these fake Centra Tech cards were standard credit cards that Sharma, using a credit card account controlled by him, fraudulently caused to be created. *Id.* ¶ 79.

## C. The October 27, 2017 *New York Times* Article and Subsequent Steps Taken by Sharma, Farkas, and Trapani.

On October 27, 2017, the *New York Times* published an article about Centra Tech and Sharma, Trapani, and Farkas. The *Times* Article raised questions about (a) the defendants' qualifications, (b) the accuracy of the defendants' representations to investors during Centra Tech's fundraising efforts, including misrepresentations about members of Centra Tech's executive team, and (c) an indictment that had been filed in New York County Supreme Court

---

[4] Sharma maintains that one of his points of contact at Bitset was aware of misrepresentations regarding Centra Tech. Even if this were true, there can be no dispute that other individuals at Bitset were unaware of and deceived by Sharma's misrepresentations.

charging Sharma and Trapani with committing perjury as defense witnesses for Sharma at a criminal trial. *Id.* ¶ 86. *Id.* The *Times* article noted that, "For now, the bigger problem facing Mr. Sharma and Mr. Trapani is the perjury indictment by a Manhattan grand jury on Oct. 5," as Centra Tech had completed its fundraising efforts. *Id.*

In the wake of the *Times* article, Centra Tech investors and the public began asking questions regarding the credibility of the company's claims and the stability of its executive team. *Id.* ¶ 87. On October 27, 2017, Sharma signed corporate resolutions purporting to remove him from leadership positions at Centra Tech. *Id.* ¶ 88. However, Sharma continued to serve behind the scenes as the *de facto* chief executive officer of the company notwithstanding the company's public statement to the contrary. *Id.*

### D. Sharma's Attempts to Obstruct Investigations of the Centra Tech Fraud

As stipulated in the plea agreement under which Sharma pleaded guilty, during the course of his scheme to defraud Centra Tech investors, Sharma engaged in the following obstructive conduct: With respect to an investigation being conducted by the SEC relating to Centra Tech and its efforts to raise funds from investors through fraud, Sharma caused Centra Tech to relay false representations to the SEC concerning alleged measures that Centra Tech had supposedly taken to prevent the dissipation of investor assets in Centra Tech's possession that Centra Tech had raised from investors through fraud. For example, Sharma caused Centra Tech's outside counsel to misrepresent to the SEC that he had surrendered the sole passcode needed to access such investor assets when, in fact, he had secretly maintained a copy of the passcode. *Id.* ¶ 89.

Sharma also engaged in the following obstructive conduct:

As noted, during Centra Tech's fundraising efforts from approximately July through October 2017, Sharma, Farkas and Trapani raised more than 100,000 Ether units, as well as

additional amounts in other digital currencies such as Bitcoin and Litecoin, through fraudulent misrepresentations.  *Id.*  ¶ 90.  The Ether units that Centra Tech raised from investors can be grouped into two broad categories:  thousands of Ether units provided by Bitset in exchange for Centra tokens, and thousands of Ether units raised from hundreds of other investors in exchange for Centra tokens.[5]  *Id.*

On or about November 29, 2017, the SEC issued a subpoena to Centra Tech, care of Centra Tech's outside counsel, compelling Centra Tech to produce various documents relating to an investigation by the SEC of whether the company and its co-founders had violated the federal securities laws.  *Id.* ¶ 91.  The SEC subpoena included requests for, among other things, documents sufficient to identify all digital and other assets held by or on behalf of Centra Tech, and documents sufficient to identify all investors who purchased any tokens offered by Centra Tech.  *Id.*

From approximately November 29, 2017 through April 2018, Sharma engaged in various efforts to obstruct the SEC's investigation.  For example, during this period:

- Sharma caused Centra Tech's outside counsel to produce to the SEC a fraudulent summary spreadsheet (the "Summary Spreadsheet") that Sharma prepared in response to the SEC's subpoena.  The Summary Spreadsheet purported to show that Centra Tech received a total of approximately 91,000 Ether units in exchange for Centra tokens issued by Centra Tech during the Centra Tech ICO:  approximately 40,000 Ether units from so-called "Korea Partners," a reference to Bitset, and approximately 51,000 Ether units from hundreds of individual Centra token purchasers named in the Summary Spreadsheet.  In fact, as Sharma knew, he and his confederates had raised at least 100,000 Ether units from Centra token purchasers during Centra Tech's ICO.[6]  The difference of 9,000 Ether that Sharma lied

---

[5]  Bitset aggregated investment funds from numerous individual investors in Korea, and invested those funds on behalf of the individual investors in Centra Tech.

[6]  This is confirmed by contemporaneous text messages recovered from Trapani's cellphone.  For example, on or about October 2, 2017, Sharma text-messaged Farkas and Trapani:  "I did mad job stuff over the weekend," "Also got us 100K in ETH in the account . . . . And we still have 28.9M ctr left."  Trapani wrote:  "Good shit . . . . Was just watching it as you where moving it wondering what you where doing lol," "Perfect."  Later that day, Sharma text-messaged Farkas and Trapani: "Made it 100K in ETH for storage."

about was worth approximately $6 million at various points in this case, and the other 91,000 Ether were worth more than $60 million at various points in this case.  *Id.* ¶ 92.

- Sharma also caused Centra Tech's outside counsel to convey false information to the SEC about measures that Centra Tech had taken to prevent the dissipation of the alleged total of 91,000 Ether units that the company had raised through the ICO.  Specifically, Sharma caused Centra Tech's outside counsel to misrepresent to the SEC that the claimed total of 91,000 Ether units in ICO proceeds, as well as 9,000 Ether units that Sharma claimed were proceeds of his own personal cryptocurrency trading, had been placed in a passcode-protected digital wallet, the only passcode to which had been reduced to a piece of paper, divided into halves, and placed in two separate safe deposit boxes controlled by Farkas and another company executive, respectively.  In fact, as Sharma well knew, the passcode fragmented into those halves was fake, and the true passcode was on a piece of paper that Sharma kept in the apartment where he lived with Farkas' sister in Miami.  *Id.* ¶ 93.

In addition to Sharma's efforts to obstruct the SEC's investigation, Sharma engaged in the following additional obstructive efforts regarding the investigation and prosecution of this case:

On April 1, 2018, Sharma and Farkas were arrested in the Southern District of Florida by law enforcement agents with the Federal Bureau of Investigation ("FBI") on the securities and wire fraud charges in this case and remanded pending their removal to the Southern District of New York for prosecution.  *Id.* ¶ 95.  On April 12, 2018, after the FBI obtained the two pieces of paper that purportedly combined to reveal the passcode needed to access the Ether funds in the digital wallet set up by Sharma (the "Sharma Wallet"), FBI agents attempted without success to use the supposed passcode to transfer investor funds from the Sharma Wallet to a secure digital wallet maintained by law enforcement, in order to prevent anyone from dissipating the funds during the pendency of this criminal fraud prosecution.  *Id.*  On April 13, 2018, the Government served a judicially authorized seizure warrant on Sharma and Farkas through their original attorneys in this case, requiring Sharma and Farkas to assist the FBI in effectuating the transfer of investor funds in the Sharma Wallet to a secure digital wallet controlled by law enforcement.

For several weeks, Sharma failed to effectuate compliance with the seizure warrant until, as described below, it became clear that Sharma would need to comply with the warrant in order

to be released on bail.  *Id.* ¶ 96.  During this time period, Sharma caused his original attorney in this case to reiterate Sharma's misrepresentations to the Government regarding the passcode to the Sharma Wallet and the funds within the Sharma Wallet, including (i) falsely claiming, as Sharma had before, that the Sharma Wallet contained proceeds of his own personal cryptocurrency trading, (ii) falsely claiming, as Sharma had before, that the funds in the Sharma Wallet were protected by a passcode which had been reduced to paper, divided in half, and placed in two separate safe deposit boxes, and (iii) the two halves of the passcode that the FBI had obtained were operable, and that the FBI was having trouble accessing the wallet due to "a common [technical] issue with virtual currency wallets."  *Id.* ¶ 96.[7]  In truth, Sharma had hidden the true passcode and was refusing to comply with the seizure warrant.  *Id.*

In advance of Sharma's bail hearing in the Southern District of New York, Farkas was ordered detained in late April 2018 until (among other things) the seizure warrant was complied with, and the Government filed a motion on May 1, 2018 seeking to have Sharma detained without bail pending trial, or at a minimum, detained until bail conditions were met requiring (among other things) that he comply with the seizure warrant.  *Id.* ¶ 97.  Later that day, after Sharma met with his lawyer in the jail where he was detained, Sharma's lawyer reported to the Government that the actual passcode to the Sharma Wallet was on a piece of paper taped underneath a drawer in the kitchen of the apartment where Sharma and Farkas's sister lived in Miami, and Sharma's lawyer later reported as much to the Court on the record at Sharma's first bail hearing in this case.  *Id.* The FBI recovered the passcode during a consensual search of that kitchen on May 2, 2018 and then successfully used the passcode to execute the seizure warrant as to 91,000 of the 100,000

---

[7]  The Government does not mean to suggest that Sharma's original attorney was aware of the falsity of claims that Sharma caused her to convey to the Government, and later, to the Court. Rather, it appears that Sharma's original attorney did so unwittingly.

Ether units that were in the Sharma Wallet.  *Id.*  Following bail hearings for Sharma in early May 2018 — including a bail hearing on May 2, 2018 at which Sharma caused his attorney to reiterate to the Court his false claim that 9,000 of the Ether units in the Sharma Wallet belonged to him (as opposed to fraud proceeds raised from Centra Tech investors) — Sharma and Farkas were released on bail pending trial in this case.  *Id.*  Based on Sharma's false representations that the 9,000 Ether units were his, the Court approved a plan to have those funds placed in a trust for his benefit (Dkt. 13) to pay, among other things, his living expenses and legal fees for defending this criminal fraud prosecution.  In fact, as later became clear, those funds were also proceeds of Sharma's fraud on Centra Tech investors.  After further investigation uncovered proof that Sharma had lied about the source of the 9,000 Ether units, which in reality were no more his than the 91,000 Ether units in fraud proceeds that had previously been seized from his Sharma Wallet, the Government obtained a second seizure warrant and seized those additional funds in October 2018.

Now, after more than two years of extensive litigation in this case, it is undisputed that Sharma personally obtained approximately $36,088,960 in fraud proceeds, including but not limited to 100,000 Ether units in Centra Tech fraud proceeds that the FBI seized in 2018 pursuant to judicially authorized seizure warrants (the "Seized Ether Units").  Dkt. 411.  The Seized Ether units were worth approximately $29,000,000 when Sharma personally obtained them in 2017.  *Id.* It has also became clear that Sharma and his confederates obtained not only the Seized Ether Units, but also millions of dollars in additional cryptocurrency assets comprising fraud proceeds that they received, and dissipated, during their scheme to defraud Centra Tech investors.

Sharma and his co-conspirators collectively dissipated more than approximately $10 million in fraudulent proceeds, including millions of dollars for personal use.  Of that pool of approximately $10 million in fraud proceeds, the lion's share — approximately $7 million  — was

transferred to bank accounts controlled by Sharma, of which Sharma diverted millions toward personal use, including more than $800,000 in cash withdrawals, more than $240,000 in credit card payments for Brielle Farkas's American Express credit card, thousands of dollars on travel by private charter plane, and thousands of dollars at high-end retail outlets such as Louis Vuitton, Givenchy, Saks Fifth Avenue, and Nordstrom.[8]

### E. Sharma's Prior Criminal Acts

Prior to embarking on the massive scheme to defraud Centra Tech investors that resulted in this federal criminal prosecution, Sharma committed a series of criminal acts of escalating severity that went virtually unpunished, including the following.

#### 1. Misappropriation of Elderly Man's Personal Identifying Information for Additional Fraudulent Loans.

From approximately 2011 through 2013, Sharma obtained approximately six loans in the name of an elderly man, yielding more than $395,000 in borrowed funds based on loan applications that contained false or misleading representations to the lending banks. *Id.* ¶ 99. Sharma obtained four of the six loans by misappropriating his elderly victim's name and personal identifying information, and forging his victim's signature in the applications for those four loans. *Id.* It was only after the victim reported Sharma to law enforcement that Sharma repaid four of the six loans

---

[8] During the period of the fraud conspiracy offenses to which Sharma has pleaded guilty, Sharma and his co-conspirators raised more than $36 million in digital assets from Centra Tech investors through fraud, of which approximately $10 million in fraud proceeds went to the digital asset exchange accounts of Sharma and his co-conspirators, including, as to Sharma, approximately $7 million in fraud proceeds that went to Sharma's digital asset exchange accounts and was then transferred to bank accounts controlled by Sharma. In addition to the approximately $7 million in fraud proceeds, the Sharma-controlled bank accounts also received about $500,000 from his company, Centra Tech, and about $1.1 million from unidentified sources during the fraud conspiracy, yielding a total of about $8.6 million in funds, of which Sharma used millions toward personal uses as noted above, and transmitted approximately $4.5 million to Centra Tech's bank accounts. Even if all of the funds that Sharma transmitted to Centra Tech's bank accounts constituted Centra Tech "business" expenditures – which is not the case – he clearly diverted millions in fraud proceeds to himself for personal use.

(though Sharma did repay two of the loans before law enforcement became involved).  *Id.*  Sharma was never arrested, charged, convicted, prosecuted, or sentenced for this conduct.

### 2.  "Ghost Loan" Scheme at Long Island Dealership.

In or about 2012 through 2014, while Sharma and a criminal associate ("CC-1") employed Trapani at a used car dealership in Long Island, New York that was run by Sharma and CC-1, Sharma and CC-1 engaged in a "ghost loan" scheme in which they received and misappropriated funds that were borrowed from lenders based on fraudulent car loan applications for, among other things, operating expenses.  *Id.* ¶ 98.  Sharma was never arrested, charged, convicted, prosecuted, or sentenced for this conduct.

### 3.  Fraudulent Loans for Miami Exotics.

From in or about 2016 through 2017, for the purported purpose of raising startup capital for a luxury car rental business called Miami Exotics, Sharma participated with CC-1 and Trapani in a scheme to fraudulently obtain a total of approximately $500,000 in funds through misrepresentations to banks and lending institutions.  *Id.* ¶ 100.  Sharma was never arrested, charged, convicted, prosecuted, or sentenced for this conduct.

### 4.  Perjury in Manhattan Criminal Court.

In July 2017, while Sharma was preparing to initiate his fraudulent efforts to raise funds from investors in Centra Tech, Sharma committed perjury and caused Trapani to commit perjury as defense witnesses for Sharma at a trial in Manhattan Criminal Court.  *Id.* ¶ 102.  At the time, Sharma was on trial for criminal charges stemming his arrest in March 2016 for driving while intoxicated.  *Id.*  Sharma and Trapani lied under oath in Sharma's defense at the trial in July 2017.  *Id.*  Although Sharma was arrested and ultimately pled guilty to committing perjury, he was

sentenced to five years of probation and 50 hours of community service and thus served virtually no jail time for lying under oath in that solemn judicial proceeding. *Id.* ¶ 136.

## II.     Presentence Investigation Report

The Probation Office, consistent with the plea agreement under which Sharma pleaded guilty in this case, calculates that Sharma has a total Guidelines offense level of 33, which includes a two-level enhancement based on Sharma's role as an organizer, leader, manager, and supervisor of the charged criminal activity (U.S.S.G. § 3B1.1(c)) and a two-level enhancement because Sharma willfully obstructed or impeded, and attempted to obstruct or impede, the administration of justice with respect to the investigation and prosecution of Sharma's offense of conviction (U.S.S.G. § 3C1.1).  PSR ¶¶ 117-130.

The Probation Department has determined that Sharma has four criminal history points from five prior convictions: a November 15, 2010 conviction for criminal possession of stolen property in Nassau County; a February 20, 2015 conviction for driving under the influence of alcohol in Florida; a February 20, 2015 conviction for driving without a drivers' license in Florida; a July 20, 2017 conviction for driving while intoxicated in New York; and a February 21, 2018 conviction for perjury in New York County Supreme Court. *Id.* ¶¶ 132-36.[9]  In addition, because Sharma committed the instant offense from at least on or about July 30, 2017 through at least in or about April 2018, while under a conditional discharge sentence from a prior offense, two additional criminal history points are added pursuant to U.S.S.G. § 4A1.1(d) and Application Note

---

[9] Sharma's November 15, 2010 conviction for criminal possession of stolen property and his February 20, 2015 conviction for driving without a drivers' license are not reflected in the parties' plea agreement, which calculated a total of five criminal history points.  These additional convictions do not, however, alter the criminal history category (of III) that is reflected in the parties' plea agreement.

4 to U.S.S.G. § 4A.1.1.  *Id.* ¶ 138.  This total of six criminal history points establishes that Sharma is in Criminal History Category III.  *Id.* ¶ 139.

Accordingly, based on a total offense level of 33 and a Criminal History Category of III, Sharma's Guidelines range would be 14 to 17½ years of imprisonment.  However, because the statutorily authorized maximum sentence for the securities fraud conspiracy, wire fraud conspiracy and mail fraud conspiracy counts to which Sharma pleaded guilty is 15 years of imprisonment, Sharma's sentencing Guidelines range is 14 to 15 years of imprisonment.  *Id.* ¶ 178.

After interviewing Sharma and his mother, and preparing its final presentence investigation report for this case, the Probation Department has recommended that the Court impose a sentence of 10 years of imprisonment on Sharma.  PSR at 46.  In making its recommendation, the Probation Department observed that Sharma appeared to have been "motivated by greed," that Sharma's scheme "defrauded hundreds, and potentially thousands of victims of millions of dollars," and considered "Sharma's leadership role in the offense, and the large number of victims who suffered losses," including those who suffered financial insecurities and emotional distress.  *Id.* at 47-48. The Probation Department also considered Sharma's extensive prior criminal history, including multiple arrests for alcohol, marijuana, and motor vehicle-related offenses.  *See id.* at 48. Considering all of the relevant factors — including Sharma's role, his personal history, statements made by Sharma's mother, and the need for just punishment and deterrence from future behavior — the Probation Department recommended a downward variance below the applicable Guidelines sentencing range to a sentence of 10 years of imprisonment.  *Id.*

## III.    A Downward Departure is Not Warranted.

Sharma seeks a downward departure, pursuant to U.S.S.G. § 4A1.3, arguing that Criminal History Category III overstates the seriousness of his criminal history.  The Government concurs with the Probation Department's view that such a departure is not warranted.  *See* PSR ¶ 195.

By way of background, § 4A1.3 is a policy statement that "authorizes . . . a departure from the guidelines in the limited circumstances where reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's criminal history or likelihood of recidivism."  U.S.S.G. § 4A1.3, Application Note.  Section 4A1.3(b)(1) provides that, "If *reliable* information indicates that the defendant's criminal history category *substantially* over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted."  U.S.S.G. § 4A1.3(b)(1) (emphases added).  As the Second Circuit has explained, "[t]his type of departure is most frequently used when a series of minor offenses, often committed many years before the instant offense, results in a [criminal history category] that overstates the seriousness of the defendant's prior record."  *United States* v. *Carrasco*, 313 F.3d 750, 757–58 (2d Cir. 2002). In addition, the Second Circuit has said that downward departures are "unusual."  *United States* v. *Leiva-Deras*, 359 F.3d 183, 193 (2d Cir. 2004); *see also United States* v. *Williams*, 37 F.3d 82, 85 (2d Cir. 1994) ("[T]he power to depart is to be used sparingly and is reserved for unusual cases.").

Sharma argues that a downward departure is warranted based on a combination of his age and the nature and seriousness of his multiple prior convictions, and asks this Court to reduce his Criminal History Category from III to II, resulting in a Guidelines range of 12½ to 15 years' imprisonment (instead of the applicable Guidelines range of 14 to 15 years' imprisonment).  Dkt. 437 at 20-23.  Sharma claims that his five prior criminal convictions — involving criminal possession of stolen property, driving while intoxicated or under the influence, perjury, and multiple probation violations — "overstate[] the seriousness of his past conduct and the likelihood that he will commit future crimes."  *Id.* at 21.  That claim fails.[10]

---

[10] There is no dispute about the correct mathematical calculation of the applicable Guidelines range.  This is because (1) Sharma has six criminal history points; (2) four of these points result

First, Sharma's prior crimes were not minor.  Criminal possession of stolen property, perjury in a criminal trial at the New York County Court, committing the massive fraud scheme at issue in this case *while* under a prior sentence of conditional discharge, and multiple convictions for choosing to drive while under the influence all represent serious crimes.  That Sharma's criminal history consists of a pattern of criminal acts of escalating seriousness that he committed over the course of the seven years preceding — and then during — his scheme to defraud investors in Centra Tech indicates that Sharma never learned from his first, second, third, fourth, or fifth arrests or convictions.

Second, and crucially, Sharma's youthful offender conviction in 2010 for criminal possession of stolen property was not aberrational.  Rather, it was — unfortunately — the start of a long list of criminal acts of intensifying seriousness that he has committed thus far.  Sharma does not dispute that, in the year after this 2010 conviction, from approximately 2011 through 2013, he misappropriated an elderly man's name and personal identifying information to obtain multiple fraudulent loans as part of a scheme that yielded him more than $395,000 in fraudulently obtained funds.  PSR ¶ 99.  Toward the end of that fraudulent scheme, from approximately 2013 to 2014, Sharma and a co-conspirator engaged in a "ghost loan" scheme in which they received and misappropriated funds borrowed from lenders based on fraudulent car loan applications.  *Id.* ¶ 98. Sharma then left the New York area for Florida, where he was promptly convicted in 2015 for

---

from his convictions for criminal possession of stolen property, a felony perjury conviction, and committing multiple federal crimes by leading the scheme to defraud investors in Centra Tech while he was under a sentence of conditional discharge a prior conviction; (3) each of his convictions for driving under the influence of alcohol, or while intoxicated, or without a drivers' license are also properly counted conduct; and (4) controlling Second Circuit precedent allows youthful offender adjudications, such as Sharma's 2010 conviction for criminal possession of stolen property, to be considered under the Guidelines for calculating the criminal history category, *see, e.g.*, *United States* v. *Cuello*, 357 F.3d 162, 163–64 (2d. Cir. 2004); *United States* v. *Reinoso*, 350 F.3d 51, 54 (2d Cir. 2003) (Sotomayor, J.).

driving under the influence of alcohol (*id.* ¶ 133) and for driving without a driver's license (*id.* ¶ 134). Undeterred by these convictions and the term of probation he was serving, Sharma then initiated, in approximately 2016, a scheme to fraudulently obtain a total of approximately $500,000 in funds through misrepresentations to banks and lending institutions for the purported purpose of raising startup capital for his luxury car rental business. *Id.* ¶ 100. During that scheme, in 2017, Sharma returned to New York, committed and suborned perjury in his defense at a criminal trial in New York County Court, and sustained a New York conviction for driving while intoxicated. *Id.* ¶¶ 135, 136. Having exhausted his loan fraud schemes, and entangled in criminal proceedings in Florida and New York, Sharma turned his attention to the Centra Tech fraud.

To be sure, there are cases where a downward departure may be warranted in "limited" circumstances where "reliable information" demonstrates that the criminal history category "substantially" overstates the seriousness of the defendant's criminal history or the likelihood of recidivism. *See* U.S.S.G. § 4A1.3 & Application Note. But this simply is not such as a case. The undisputed facts here reflect that of a defendant with a record of criminal convictions and uncharged, but undisputed, criminal conduct in the seven years leading up to the initiation of a massive fraud on thousands of investors. Although some of Sharma's criminal conduct resulted in convictions that garner criminal history points, many of his other criminal acts went unpunished and did not. Regardless, those acts provide important context for understanding that Sharma has an extensive criminal history demonstrating a strong likelihood of recidivism. The sheer quantity, frequency, and gravity of Sharma's crimes, charged and uncharged, are deeply troubling. Many of Sharma's criminal acts — criminal possession of stolen property, the fraudulent scheme involving an elderly man's identity and fraud on lending institutions, the "ghost loan" scheme involving fraud on lending institutions, the scheme to raise money for his luxury car rental business

through additional fraudulent loans, lying and causing another to lie under oath in New York County Criminal Court — reflect a disturbing willingness by Sharma to place his own self-interests above the interests of society without regard to the law or the harm that his behavior may have on the victims of his deceit.  His scheme to defraud Centra Tech investors and his repeated efforts to obstruct the investigation and prosecution of this case carry these same hallmarks — lies and deceit to further his self-interest.[11]

Sharma's request for a downward departure from the Guidelines sentencing range of 14 to 15 years' imprisonment should be denied.

## DISCUSSION

Based on the facts set forth above, this Court should sentence Sharma to a term of imprisonment within the applicable Guidelines range of 14 to 15 years' imprisonment in order to meet the goals of sentencing enumerated by Congress in Title 18, United States Code, Section 3553(a).  Several of the factors that sentencing courts must consider under Section 3553(a), in addition to the advisory Guidelines, call for such a sentence for Sharma. The Section 3553(a) factors applicable here include the need for the sentence imposed to reflect the seriousness of Sharma's offense conduct, to promote respect for the law, to provide just punishment, to account

---

[11]  The cases cited by Sharma are a far cry from the present circumstances or otherwise do not support a departure pursuant to U.S.S.G. § 4A1.3.  For example, the Fourth Circuit's decision in *United States* v. *Adkins* involved the question of whether, in an atypical case, a district court may downwardly depart where a career offender status overstates the seriousness of the defendant's past conduct, which is not an issue presented here.  937 F.2d 947, 952 (4th Cir. 1991).  In *United States* v. *Casiano*, the district court found that the criminal history category was overstated "because [the defendant's] prior offense was related to the instant offense."  No. 98 Cr. 1316, 2001 WL 96366, at *3 (S.D.N.Y. Feb. 2, 2001) (RWS).  Finally, *United States* v. *Paulino-Duarte* involved a horizontal departure from a criminal history category of V to IV where the defendant had a "relatively short . . . career as a minor street level [drug] pusher."  No. 00 Cr. 686, 2001 WL 290047, at *5 (S.D.N.Y. March 26, 2001) (finding that "a longer incarceration of [defendant] is unlikely to reduce the risk of recidivism").  These cases are inapposite.

for Sharma's history and characteristics, to afford adequate deterrence to Sharma and other similarly situated individuals, and to protect the public from further crimes by Sharma. These considerations weigh heavily in favor of a Guidelines sentence, which the Court can impose through consecutive sentences for each of Sharma's crimes of conviction, up to the 15-year-limit that the parties and the Probation Department agree constitutes the statutory maximum term of imprisonment that may be imposed. Sharma's request for a substantial downward variance for a sentence of 30 months (or 2 ½ years) of imprisonment, and the Probation Department recommends a limited downward variance for a sentence of 10 years of imprisonment. The Government respectfully submits that, to the extent the Court is inclined to grant a downward variance from the applicable Guidelines range of 14 to 15 years of imprisonment, the extent of such a downward variance should be no more than what is recommended by the Probation Department.

## I.      The Nature and Seriousness of Sharma's Criminal Conduct and the Need for Just Punishment Warrant a Substantial Sentence of Imprisonment.

The nature and seriousness of Sharma's brazenly fraudulent offense conduct and the need to impose just punishment weigh decidedly in favor of a Guidelines sentence of incarceration. *See* 18 U.S.C §§ 3553(a)(1), (a)(2)(A). After engaging in a series of criminal acts of escalating seriousness over seven years that went virtually unpunished, Sharma concocted and executed a scheme to defraud thousands of victims of tens of millions of dollars under the guise of investing in a burgeoning blockchain technology company he dubbed "Centra Tech." To lure victims into parting with those funds, Sharma falsely claimed that Centra Tech had a highly-credentialed CEO and CFO who were both fabricated, and partnerships with legitimate financial institutions and necessary licenses that were actually non-existent. In Centra Tech, Sharma, by then a seasoned fraudster, hit the jackpot. In the summer and fall of 2017, Sharma, the face of Centra Tech, launched an aggressive campaign of lies and deceit over multiple forms of media — press releases,

web sites, web-based investor communications channels, media interviews, and YouTube — that connected with scores of his victims and misled investors into believing that Centra Tech had a fully operational cryptocurrency debit card that worked on established networks, when in reality it did not.  As Sharma concedes, his lies were successful, and "Centra Tech essentially blew up overnight."  Dkt. 437 at 19.  Then, Sharma did, as he acknowledges, "scramble" to manage Centra Tech (*id.*), but that scrambling only took place after he had already raised millions of dollars from his fraud, and only in the wake of reports by Internet sleuths and others who began to reveal that Sharma had fabricated Centra Tech's executive team, fabricated videos purporting to show him and others using the "Centra card," and fabricated his partnerships with legitimate institutions.

Sharma argues that, as mitigating factors, this Court should consider that Centra Tech hired employees and lawyers, that he was actually working on developing the so-called "Centra Card" with third parties who had relationships with legitimate financial institutions, and that Centra Tech shipped what he calls "working Centra Cards" in December 2017 to victim investors.  Dkt. 437 at 15-16.  However, the fact that, after raising millions of dollars based on his lies, Sharma chose to double down on the fraud by spending some of the ill-gotten gains to lease luxury office space, hire employees, and hire law firms and lawyers to handle Centra Tech's regulatory violations provides cold comfort to Sharma's victims.  These expenditures do not prove that Sharma was a legitimate business person trying to build a legitimate company – they only prove that Sharma was trying to make Centra Tech (and himself) *appear* legitimate after aspects of the scheme began to unravel and Centra Tech's victims and the public demanded answers and progress.  As United States District Judge William H. Pauley III of this Court recently found in rejecting a similar argument by a defendant who pleaded guilty to soliciting millions of dollars in investments in a purported business through securities fraud, the notion that the business was somehow legitimate

because the defendant caused the business to spend over a hundred thousand dollars "in legal expenses to keep regulators at bay" and thousands of dollars a month for office space during the fraud "turns the world upside down." *See United States* v. *Genovese*, 18 Cr. 183 (WHP), Sent'g Hr'g Tr. at 81 (S.D.N.Y.).

Like many fraudulent schemes involving access to millions of dollars of fraud proceeds, it is not surprising that semblances of a legitimate operation developed over time. It is also not surprising that Sharma hired employees and oversaw efforts to fast-track the development of a prepaid debit card that — though materially different from what he had originally touted — could resemble the operation of a legitimate enterprise and even satisfy some victim investors. However, despite what Sharma told the investing public during his fraudulent fundraising efforts, Centra Tech did *not* have a highly-credentialed executive team, did *not* have a fully operational debit card that enabled users to spend various cryptocurrencies to make purchases at stores that accepted Visa or Mastercard payment cards, did *not* have partnerships with Bancorp, Visa, or Mastercard to issue Centra-branded cryptocurrency debit cards, and did *not* have money transmitter and other relevant licenses in 38 states. Sharma does not dispute any of these facts, because he cannot. Nor does Sharma dispute that he also used various market manipulation techniques to artificially inflate the market price of Centra tokens, selling and buying large blocks of Centra tokens using funds raised from Centra Tech investors, concealing that they were executing the transactions (as opposed to unbiased investors without any employment relationship with Centra Tech).

It is troubling that Sharma's attempts to minimize his actions in this scheme as mere "mistakes," *see* Dkt. 437 at 4, "poor decisions," *see* Dkt. 437 at 19, or the result of aberrational behavior caused by substance abuse, *id.* at 3-4. There can be no mistake that this scheme, designed and executed by Sharma from the beginning, was a calculated effort to raise money through fraud

and, later, to pacify his victims (as well as his critics, family and friends, and Centra Tech employees) as best as possible in order to avoid the very real consequences of his lies.  Hundreds of communications – in documentary records such as text messages, emails, and Centra Tech marketing materials, and also in videos and recordings – demonstrate Sharma's repeated lies, day in and day out, over the course of the nine months during which he planned and executed the Centra Tech fraud.  Among this surfeit of evidence, the Government includes with this submission only one example:  a recording of an interview that Sharma gave to Neocash Radio near the beginning of his fraudulent fundraising efforts, and throughout which Sharma, with chilling ease, amplifies some of the most convincing lies that he told victim investors.  *See, e.g.*, Ex. A at 2:13-2:43 (lies about Visa and Mastercard); 5:58-6:20 (lies about "Mike Edwards"); 4:34-5:15 (lies about Centra Tech's money transmitter and other licenses).  Sharma's repeated lies were not "mistakes" or "poor decisions" – they were part of a calculated and ongoing effort to defraud his victims, and his failure to acknowledge as much is a disturbing indicator of the likelihood that even now, after being arrested and prosecuted on serious federal fraud charges, he retains the distorted perception of reality that prompted him to prey on victims through fraud in this case.

Even if it is true that Sharma aspired to create a company and a technology that matched the lies he had successfully peddled, his efforts to build and maintain the façade of a seemingly legitimate company were, in reality, integral to his efforts to cover up his fraudulent scheme. Sharma's handiwork in building this veneer of legitimacy appears to have had some success even to this day, as evidenced by some of the letters from Centra Tech victims and other individuals Sharma submitted in connection with sentencing.  But whether a minority of Centra Tech victims received prepaid debit cards that Sharma billed as the "Centra Card" well *after* he had already raised (and misused) millions of dollars through fraud provides little solace for the countless

victims who invested in Centra Tech based on those lies.  No amount of belief – whether honest, or feigned for purposes of seeking sentencing leniency – on Sharma's part that the scheme he led would ultimately lead to some form of a cryptocurrency debit card that worked, or a profit or compensation for the investors, excuses his extensive fraudulent actions or false representations. Sharma was not acting in good faith when he lied, repeatedly, to investors to raise money under the auspices of "Centra Tech," when he misused investor funds for his own lifestyle and to fund the lifestyles of his co-conspirators, or when he scrambled to develop a company and a technology as his lies began to unravel.

Nor did Sharma act in good faith when he launched a concerted effort to obstruct investigations into his fraudulent scheme, including by causing Centra Tech's counsel to submit false and misleading information to the SEC regarding the true number of victims and amount of fraud proceeds raised from victims during Centra Tech's ICO, and deceptions about the measures that Sharma and Centra Tech had supposedly taken to prevent the dissipation of investor assets raised through fraud in Sharma's possession.  Sharma attempts to mitigate these obstructive efforts by arguing that, *after* he received the SEC's subpoena, he "preserved" 91,000 ETH that he intended to be returned to victim investors.  This Court should reject this argument, as the record in this case makes clear that the funds seized by the Government do not represent all the funds that Sharma and his co-conspirators raised from their victims during their fraudulent fundraising efforts.  It is now undisputed that Sharma and his co-conspirators raised millions of dollars in fraud proceeds in addition to, and separate and apart from, the 100,000 ETH that the Government was able to seize pursuant to judicially authorized seizure warrants.  That law enforcement was able to seize 100,000 ETH of Sharma's fraud proceeds despite Sharma's obstructive conduct is, indeed, significant.  However, millions of dollars in additional funds that the defendants raised through

their scheme were dissipated or remain unsecured.  For example, the Government was unable to seize, and Sharma no longer has, approximately $7 million in fraudulent proceeds that Sharma directed to bank accounts that he controlled, of which Sharma spent millions of dollars for personal use (including hundreds of thousands of dollars in cash withdrawals and luxury items like the Rolex watch he purchased for his co-conspirator, Farkas).  While Sharma is obligated to repay approximately $7 million to account for those diverted funds under the money judgment entered as part of the preliminary order of forfeiture that the Government secured against him in this case, it is unclear when (if ever) he we will be able to do so.

Emboldened by his lies to the SEC, after his arrest in this case, Sharma refused to effectuate compliance with a seizure warrant issued by a Magistrate Judge of this Court, and caused his attorney to reiterate, unwittingly, misrepresentations to the Government about the passcode to a digital wallet containing proceeds of his fraud on Centra Tech investors and the sources of the funds within the digital wallet.  Then, Sharma tripled down on his misrepresentations at bail hearings before a Magistrate Judge of this Court, during which Sharma caused his attorney to reiterate his false claim that 9,000 of the 100,000 Ether units in the digital wallet belonged to him (as opposed to fraud proceeds raised from Centra Tech investors).  PSR ¶ 97.  Sharma's protracted efforts to obstruct the investigation and prosecution of this case materially impeded on the Government's efforts to seize and preserve funds representing proceeds of his fraud. Significant resources were devoted to investigating, seizing, and securing the Ether amidst the various lies and misrepresentations Sharma made and caused his counsel to make, and Sharma almost got away with diverting 9,000 of the Ether units to a trust to pay his living expenses and legal fees for defending this criminal case arising from the fraud through which he obtained those funds in the first place.  By now it is clear that one of the hallmarks of Sharma's fraudulent conduct is the way

he causes his misrepresentations to be furthered through unwitting legal counsel, as he did to through counsel statements to the SEC, the Government, and the Court in this case.[12]  That Sharma avoided dissipating 9,000 ETH that the Government was aware of and actively working to seize (a "mitigation" argument he makes, *see* Dkt. 437 at 18) can hardly be surprising.  Sharma knew that the 9,000 ETH he had been lying about contained proceeds of his fraud and were not, as he had previously argued, merely derived from his personal cryptocurrency trading, and correctly calculated that dissipating those funds would worsen his culpability.  Sharma intentionally misled this Court, he misled the Government, and he misled the SEC — all part of a pattern of obstruction that underscores the nature and seriousness of his offense.[13]

Significantly, and notwithstanding that Sharma has submitted letters from five victims of his fraud on potentially thousands of Centra Tech investors, Sharma does not dispute that the more than 30 victim impact statements submitted to this Court "detail how the victims have suffered financial losses that have negatively impacted their lives," and that some victims reported "experiencing depression, anxiety and anger" towards him and his co-conspirators' unlawful actions.  PSR ¶ 111.  There is no question that many of these victims suffered harm as a result of Sharma's fraud.

Against this backdrop, the impact of harm caused by Sharma, the lies he peddled to victims, the investing public, the SEC, law enforcement, and this Court, and the nature and seriousness of the offenses in which he participated, cannot be ignored and militate in favor of a Guidelines sentence of incarceration.

---

[12]  Sharma's attempt to hide behind "Eric Pope" to justify his actions is a continuation of this pattern of conduct — using lawyers to attempt to conceal his true intentions and true criminality.

[13] Nor should Sharma receive any credit for his thinly-veiled attempt to buttress trial arguments by filing a motion to "return" Ether to investors, for reasons set forth in the Government's previously-filed opposition (Dkt. 209) to that motion.

II.     **A Guidelines Sentence of Incarceration is Also Necessary in light of Sharma's History and Characteristics, to Afford Adequate Deterrence, Promote Respect for the Law, and to Protect the Public from Further Crimes by Sharma.**

A Guidelines sentence of incarceration is also necessary to deter Sharma from yet again returning to fraud as a way of earning income in the future, to deter others contemplating fraud from emulating Sharma's misdeeds, and to protect the public from further crimes by Sharma until he is significantly more mature.

As detailed above, the Centra Tech fraud was far from Sharma's first crime of deception. On the contrary, the elaborate Centra Tech fraud was carefully planned and executed by Sharma after he had already engaged in three other fraudulent schemes — his fraudulent impersonation of an elderly victim to obtain loan proceeds, his fraudulent "ghost loan" scheme, and his fraudulent exotic car rental loan scheme — and while he was serving a term of probation after multiple criminal convictions and interactions with law enforcement. Then, even after he was arrested in this case (and after he had admittedly committed perjury at a criminal trial in New York County Court), Sharma continued his offense conduct by causing misrepresentations to be made to Magistrate Judges in this Court. None of his prior interactions with law enforcement or the criminal justice system have deterred Sharma from criminal conduct, and there is no reason to believe that he will be deterred by the 2½-year prison sentence he now seeks.

General deterrence is particularly important here in light of the nature of the fraudulent scheme at issue in this case. Compared to more traditional ways that companies raise capital, ICOs present increased risks of fraud and manipulation because the markets for digital assets represent a new frontier that are not yet as well-monitored by regulators as traditional capital markets. *See, e.g.*, "Spotlight on Initial Coin Offerings," *available at* www.sec.gov/ICO (last visited Oct. 30, 2020). Moreover, fraudulent ICOs leave victims with little recourse because it is often difficult to

trace investments that are made using cryptocurrencies.  *Id.*  Additionally, while legitimate ICOs represent a new, expedient means to raise capital, the loss of investor confidence that may result from fraudulent ICO offerings will make it more difficult for honest coin issuers to raise capital. As a result, a substantial sentence in this case is needed to send a strong message to others, like Sharma, who seek to use digital assets or other new technologies to commit old-fashioned fraud.

Given the enormous illegal profits that can potentially be earned from conducting a fraudulent ICO like Sharma's in this case, a sentence to a mere 2½ years of imprisonment — 11½ years below the applicable Guidelines range and 7½ years below the Probation Department's sentencing recommendation — would hardly deter others from committing similar crimes.  A Guidelines prison sentence is necessary to send a message to Sharma and others who might be considering emulating his misdeeds that the potential profits to be earned from defrauding victims are not worth the punishment for such misconduct.

Finally, a Guidelines sentence is necessary to protect the public from further crimes by Sharma.  Since the age of 18, Sharma has committed a series of criminal acts of escalating severity, including schemes to obtain money through fraud, which led to his fraudulent and obstructive conduct in this case.  Sharma is now 29 years old.  If Sharma's sentencing submission is any indication of whether he has any sincere remorse or genuine desire to reform his behavior, then it demonstrates that Sharma is still attempting to minimize the nature of this criminal scheme and the elaborate methods he employed to execute it, the amount of funds that he fraudulently raised (and misused), his admitted leadership role, and the impact of the scheme on victims.  Sharma goes so far as to describe his co-conspirator, Trapani, in a derisive manner, blaming Trapani for his (Sharma's) use of drugs and alcohol during the fraudulent scheme, although, as Sharma admits, he had abused alcohol and marijuana even as a teenager.  *See, e.g.* Dkt. 437 at 3.  Sharma recruited

Trapani into his Centra Tech scheme, just as he had asked Trapani to lie for him at a criminal trial in New York County Court.  Then, Sharma assigned Trapani specific tasks to help to effectuate the Centra Tech scheme, personally received multiple times the fraudulent proceeds that he diverted to Trapani, and participated in the scheme long after Trapani's participation ceased.

The Government does not dispute that Sharma has accepted responsibility sufficient to warrant a decrease in his offense level, pursuant to U.S.S.G. §§ 3E1.1(a) and (b).  However in casting blame and aspersions on Trapani, Sharma shows his true colors, and the limitations on the extent of his acceptance of responsibility.  Sharma's argument that he should receive credit regarding his purported victimization by John Lambert, discussed in further detail below, suffers from this same flaw — again, Sharma attempts to cast blame on others while eliding facts related to his own culpability.  This, too, is one of the hallmarks of Sharma's criminality.  *See, e.g.* PSR ¶ 40 (describing text messages between Sharma, Farkas, and Trapani about removing the fraudulently placed Bancorp logo from Centra Tech's materials, during which Sharma wrote: "We gotta get that shit removed everywhere and *blame freelancers* lol," which is exactly what he proceeded to do) (emphasis added).  Sharma's efforts to minimize his conduct and cast blame on others are poor excuses for his conduct, demonstrate his lack of true remorse and reformation, and militate forcefully in favor of a substantial term of incarceration that will prevent him from engaging in further fraudulent conduct.

## III.   The Nature of Sharma's Fraudulent Scheme Means that Some Victims May Not Be Made Whole.

Sharma's contention that victims will likely be paid in full is belied by a number of facts. Sharma's claim is based on the false premise that the relevant universe of victims is limited to those who invested the 100,000 Ether (worth about $29 million at the time of their investment) that was later seized by the Government and liquidated by the Government for approximately

36

$33.4 million.  In fact, Sharma and his co-conspirators raised millions of dollars in additional funds, including in additional Ether and other types of digital currencies, that were dissipated or remain unsecured.  Upon the entry of a final order of forfeiture with respect to the $33.4 million, the Government intends to establish a remission program to compensate victims.  Nevertheless, it appears clear, for a number of reasons, that victims are unlikely to be made whole, let alone that the Government will be left with a "windfall," as Sharma falsely claims.

First, Sharma admitted pursuant to the Consent Preliminary Order of Forfeiture that he "personally obtained digital assets . . . from the Centra Tech fraud victims . . . that were collectively worth $36,088,960 in United States currency when [Sharma] personally obtained those assets." Thus, at bare minimum, even taking into account the appreciation in the value of the Ether seized by the Government, investors will be left with a shortfall of at least approximately $2.7 million (*i.e.*, $36,088,960 minus $33.4 million).  In this regard, Sharma's contention that the $33.4 million in proceeds from the Government's sale of the seized Ether "was more than was raised by Centra Tech in its ICO" is misleading at best:  the relevant figure is the amount of funds raised from Centra Tech fraud victims (*i.e.*, at least $36,088,960), whether raised "in its ICO" or otherwise.

Second, Sharma's false assertion that victims will be "paid in full" also ignores the substantial administrative costs, including the likely need for engagement of a claims administrator, involved in the establishment and operation of a remission program.  Such costs will reduce the pool of available compensation for victims.  In that connection, Sharma's assumption that the number of victims who will file claims in the remission process is limited, simply because of the number of victims who did not respond to victim notification letters, has little basis in logic and, in any event, the failure to file a claim or respond to a notification does not negate a victim's economic loss.

Finally, in speculating that "many victims of the ICO fraud likely sold their tokens for a net gain, or otherwise have not suffered a full loss due to the partial sale of their tokens," Sharma wholly disregards the losses likely suffered by secondary market purchasers who invested in Centra tokens before the Centra Tech fraud was disclosed.  For example, according to the Digital Coin Price website (digitalcoinprice.com), from in or about August 2017 through March 2018, while the fraud was occurring, Centra tokens traded on the secondary market at prices between approximately $0.33 and $4.11 per token.  At its peak, on or about January 3, 2018, the market capitalization of Centra tokens exceeded $279 million.  Yet by April 9, 2018 — barely one week following the defendants' April 1, 2018 arrest and the corresponding exposure of their fraud to the investing public — the price of the Centra token had collapsed to just $0.01, where it essentially remained until June 2, 2018, the last date for which price information was reported, representing a staggering hundreds of millions of dollars of loss of market capitalization from the January 3 peak.  Accordingly, numerous secondary market investors appear to have lost tens (if not hundreds) of millions of dollars as a result of the Centra Tech fraud over and above the $36,088,960 in funds that Sharma personally obtained from sales of Centra tokens to investors during the ICO, a fact that Sharma fails to address entirely.

In short, Sharma has simply no basis to argue that victims will be paid in full or that the Government will be left with a windfall.  Nevertheless, for the reasons set forth in the Government's motion to forgo restitution (Dkt. 404), the Government believes that restitution is impracticable in this case due to the large number of victims and the complexity of determining each victim's losses, and thus is not seeking a restitution order.

## IV.    The Sentencing Guidelines Loss Enhancement is Appropriate.

Sharma's argument that the loss enhancement under U.S.S.G. § 2B1.1(b)(1) is excessive is meritless.  While there may be circumstances in which the loss amount overstates the seriousness

of an economic offense, that concept has no applicability here, in light of the Sharma's primary responsibility for every aspect of the fraud, the millions of dollars of fraudulent proceeds he used to fund his personal lifestyle, his substantial criminal history, and the harm suffered by his victims. The cases cited by Sharma are simply inapposite.

- For example, in *United States* v. *Adelson,* 441 F.Supp.2d 506, 513 (S.D.N.Y. 2006), the Court likened the defendant to an "accessory after the fact," a "position that has historically been viewed as deserving lesser punishment that that accorded the instigators of the wrong doing." The Court emphasized that a Guideline sentence would have amounted to life imprisonment (85 years) for an individual who was "sucked into the fraud" because he "feared the effects of exposing what he had belatedly learned was the substantial fraud perpetrated by others." *Id.* By contrast, Sharma, who is only 29 years old and faces, at most, a 15-year term of imprisonment, as the leader of the conspiracy to defraud Centra Tech investors, and was primarily responsible for every major aspect of the fraud.

- In *United States* v. *Lauersen*, 348 F.3d 329, 344 (2d Cir. 2003), the Court held that a downward departure from the Guidelines might be warranted because there was "substantial overlap" between the loss enhancement and an enhancement for the defendant's receipt of more than $1 million in proceeds from a financial institution. The Court explained that "the large amount of money involved in the fraud significantly triggers both" enhancements. *Id.* By contrast, here there is no financial institution enhancement, and none of the other offense level enhancements applicable to Sharma are duplicative of the loss enhancement.

- *United States* v. *Johnson*, No. 16 Cr. 457, 2018 WL 1997975, at *2-3 (E.D.N.Y. Apr. 27, 2018) concerned a loss enhancement that was based on gain from fraudulent trades (not victims' losses) and where, as of the time of sentencing, victims had "undoubtedly been made whole, and then some." Thus, unlike the situation here, the loss enhancement in *Johnson* did not correlate to actual losses suffered by victims.

Sharma's attack on Guidelines Section 2B1.1 for its failure to "differentiate between moral culpability of different types of fraud" is also unavailing. Sharma argues that his conduct was less culpable than the typical fraud defendant because (1) his victims "received the [Centra] token they purchased"; (2) many of his victims were able to sell the Centra tokens they received; and 3) Sharma did not steal or dissipate most of the funds. These arguments are meritless. First, the real value of the tokens that victims received paled in comparison to what they paid for them (as

reflected by the fact that, since the defendants' arrest and disclosure of the fraud, the tokens became essentially worthless).  Second, to the extent that certain initial purchasers were able to "break even" or profit by selling their tokens on the secondary market before the fraud was detected, this simply transferred the economic harm to the secondary market purchasers, who were also victimized by Sharma's fraud.  Third, while the Government seized $29 million of funds that Sharma illegally received from investors who purchased Centra tokens during the company's fraudulent ICO (thereby preventing Sharma from stealing or dissipating such funds), Sharma has admitted (pursuant to the Consent Preliminary Order of Forfeiture entered against him) to having personally obtained more than $36 million in fraud proceeds that were purloined from victims, meaning that at least $7 million in such fraud proceeds were in fact stolen or dissipated.  Even putting that aside, the loss guideline is properly designed to deter fraudulent conduct that causes economic harm, irrespective of the manner in which a defendant uses victims' funds.  *See United States* v. *Seacott*, 15 F.3d 1380, 1387 (7th Cir. 1994).

Finally, for the reasons discussed above, Sharma's claim that the loss enhancement is excessive because "everyone who was a victim of [his] actions almost certainly will be made whole" is purely speculative and contrary to the facts.

## V.     Sharma Did Not Provide "Substantial Assistance" to the Government.

Sharma's assertion that he provided "substantial assistance" in the SEC's investigation of John Lambert and in the Government's prosecution of Lambert strains credulity.  Neither Sharma nor his company, Centra Tech, self-reported information about Lambert on their own initiative. Rather, after receiving subpoenas issued by the SEC in late 2017 concerning the SEC's investigation of Sharma's fraud on Centra Tech investors, outside counsel for Centra Tech responded to those subpoenas by producing, among other things, a small set of email communications and records related to "Eric Pope," the name by which John Lambert was

pretending to be a lawyer. It is abundantly clear that the "Eric Pope" documents Centra Tech produced to the SEC were a thinly veiled attempt to set up a purported reliance-on-counsel defense to limit Sharma's culpability, even though Sharma never fully disclosed to "Pope & Dunn" that he had made material misrepresentations to Centra Tech investors regarding fake executives, fake business partnerships, and fake licenses, and never sought advice about the legality or veracity of such fraudulent misrepresentations.

Nor did Sharma "provide[] the government with necessary documentation to assist them in investigating, stopping, and ultimately prosecuting," as he claims, for the very first time, in his sentencing submission. *See* Dkt. 437 at 19. The only interactions that counsel for Sharma had with the prosecution team in charge of Lambert's prosecution occurred *after* Lambert was charged, arrested and pled guilty, and then only to probe whether Sharma qualified as a "victim" of Lambert's crimes (which neither he nor Centra Tech is),[14] so that Sharma could attempt to advance a victimization argument in his defense at a trial in this case. In truth, Sharma repeatedly refused to provide records of his communications with "Eric Pope" to the Government, even after multiple motions to compel and Court orders requiring him to produce such records. *See, e.g.* Dkt. 133, 140, 169. Sharma has never provided the Government with substantial assistance. His false claim in this regard is only further proof of his inability to appreciate the gravity of his crimes and the limitations of his claims of remorse.

---

[14] United States District Judge Valerie E. Caproni, who presides over Lambert's case, denied Centra Tech's motion to intervene as a victim in that case because (a) Centra Tech conceded Lambert was paid from an account not associated with Centra Tech; and (b) Centra Tech has unclean hands, as established by the guilty pleas of Sharma, Farkas, and Trapani. *United States* v. *Lambert*, 19 Cr. 571 (VEC), Dkt. 57.

**VI.    Sharma's Medical History Does Not Support the Significant Variance He Seeks.**

Sharma's ███████████████████████ also does not support the significantly below Guidelines sentence he seeks.  The Centers for Disease Control and Prevention (the "CDC") does not list ███████████████████████ as a condition that causes an increased risk of severe illness from the COVID-19 virus.  *See* CDC Website, Coronavirus Disease 2019: People with Certain Medical Conditions, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated Dec. 29, 2020).  Regardless, given the availability of delayed surrender, Sharma's arguments about his medical conditions are moot.  The Government respectfully submits that the Court can, and should, impose the sentence that it would have imposed in the absence of COVID-19.  However, rather than order a surrender date in the next few months, the Court may delay Sharma's surrender until the spring of 2021 or until such time as the COVID-19 pandemic is better controlled.  This reasonable middle ground permits the Court both to accommodate Sharma's alleged concerns about his health risks and to impose a sentence that adequately serves the purposes of sentencing under Section 3553(a).

**VII.    A Guidelines Sentence Would Not Result in an Unwarranted Sentencing Disparity.**

A Guidelines sentence would not result in an unwarranted sentencing disparity with respect to Sharma, a defendant with a significant criminal history and a seven-year streak of admitted criminal conduct, who was the mastermind of the fraudulent scheme in this case, who personally obtained a total of approximately $36,088,960 in fraud proceeds from that scheme and, who dissipated millions of dollars of fraud proceeds before obstructing investigations into and this prosecution of the fraudulent scheme he designed and executed.  That Sharma continues to advance the argument that "it was not a scheme to steal money from investors," Dkt. 437 at 31, notwithstanding the fact that he dissipated millions of dollars of fraud proceeds that he raised from investors, only underscores why a Guidelines sentence is particularly appropriate here, based on

42

the nature and seriousness of his crimes, his personal characteristics and criminal history, and the need for just punishment, among other important factors. Sharma, the leader of the conspiracy to defraud Centra Tech investors, personally obtained more than $36 million in fraud proceeds, which is more than 100 times the amount obtained by Farkas, a minor participant in the conspiracy whom the Court sentenced to one year and one day of imprisonment. Farkas's cut of the fraud proceeds — consisting of approximately $350,000 and a Rolex watch that Sharma gifted him — pale in comparison even to the approximately $7 million of fraud proceeds that Sharma dissipated, as noted above. In this case, Sharma is the vastly more culpable defendant, and, unlike Farkas (who has no prior criminal history), committed this crime after sustaining multiple criminal convictions. Against this backdrop, a Guidelines sentence for Sharma would not result in an unwarranted sentencing disparity.[15]

## VIII.   Sharma's Family Ties and Personal History Do Not Support the Significantly Below-Guidelines Sentence He Seeks.

The letters of support from Sharma's family, friends, and co-conspirator, Farkas, are significant in what they omit: not one of them contains a true acknowledgement of the scope and gravity of the massive fraud that Sharma designed and executed, an appreciation for the impact of his crimes, or a recognition that this offense conduct is only the most recent of Sharma's efforts to

---

[15] Sharma's conduct in the Centra Tech fraud, the amount of victim funds he raised and dissipated, and his attempts to obstruct the investigation and prosecution of this case also set him apart from other defendants convicted of cryptocurrency related offenses whose sentences Sharma cites as examples of below-Guidelines sentences. *See, e.g.*, *United States* v. *Zaslavskiy*, No. 17 Cr. 647 (RJD) (E.D.N.Y.) (18 months' imprisonment for a defendant who defrauded investors through two initial coin offerings with a loss amount of approximately $300,000); *United States* v. *Murgio et al.*, 15 Cr. 769 (AJN) (S.D.N.Y.) (5½ years' imprisonment for conduct that, unlike Sharma's, did not involve raising more than $36 million from victim investors); *United States* v. *Garza*, 17 Cr. 158 (D. Conn.) (21 months' imprisonment for defendant with no criminal history in involving approximately $9 million in victim losses); *United States* v. *Kim*, 18 Cr. 107 (N.D. Ill.) (15 months' imprisonment for trader in schemes involving approximately $1.1 million in losses).

raise money through fraud.  Sharma's letters of support are also noteworthy in that they demonstrate that Sharma committed this brazen scheme — time and again choosing lies and deceit for personal and artificial professional gain — notwithstanding his relatively privileged personal history and the strong affection and support provided by his extensive network of family and friends.  Sharma had a strong familial support network, options, and opportunities.  Instead, he chose an escalating crime spree involving lies and deceit.  Sharma's personal history and circumstances, and the letters of support he submits, do not mitigate the nature and seriousness of his criminal conduct, and they do not obviate the need for a sentence of incarceration that would serve as just punishment and afford adequate deterrence to criminal conduct.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that a sentence of imprisonment within the applicable Guidelines range of 14 to 15 years of imprisonment would be reasonable and just in this case.

Respectfully submitted,

ILAN T. GRAFF
Attorney for the United States
Acting Under 28 U.S.C. § 515

By:    _____/s/_____
Negar Tekeei
Samson Enzer
Daniel Loss
Assistant United States Attorneys
Southern District of New York

44