

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

September 11, 2024

**By ECF**

The Honorable Lorna G. Schofield
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re: *United States v. Sohrab Sharma*, 18 Cr. 340 (LGS)

Dear Judge Schofield:

  The Government respectfully writes in response to defendant Sohrab Sharma's motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) (Dkt. 625), which requests a sentence reduction based principally on (1) his medical concerns, including asthma, high cholesterol, and pre-diabetes, and (2) his efforts to rehabilitate while incarcerated. Dkt. 625 at 18-25. In addition, Sharma argues that the Section 3553(a) factors support his early release. For the reasons described below, Sharma's request should be denied on multiple grounds, including that (i) he has failed to present "extraordinary and compelling reasons" warranting a sentence reduction, and (iii) that a sentence reduction would not be consistent with an analysis of the Section 3553(a) factors.

**I. Background**

  **A. The Offense Conduct**

  In the course of several months in 2017, Sharma defrauded thousands of victims out of digital assets worth tens of millions of dollars. Sharma, along with codefendants Robert Farkas and Raymond Trapani, founded Centra Tech, a company that purported to sell financial products related to cryptocurrencies. Beginning in approximately July 2017, Sharma and his codefendants solicited investments for Centra Tech's "initial coin offering," or "ICO," and other fundraising efforts. Thousands of investors provided digital assets, in the form of virtual currencies such as Ether, Bitcoin, and Litecoin, in exchange for Centra Tech's digital tokens, known as "Centra tokens." The victims' digital assets were worth more than $25 million at the time of the investments in 2017, and more than $60 million at times when the fraud was ongoing in 2018.

Hon. Lorna G. Schofield
September 11, 2024
Page 2

PSR ¶¶ 12-14, 20, 24.[1]  Sharma personally obtained fraud proceeds totaling approximately $36,088,960.  Dkt. 411.

Sharma and his coconspirators made various fraudulent claims in soliciting investments, including false claims that Centra Tech's executive team included CEO "Michael Edwards" and CFO "Jessica Robinson," both of whom were fictitious (PSR ¶¶ 25-26, 48-51, 56-58); that "Edwards" and "Robinson" had impressive professional and academic credentials (PSR ¶¶ 25-26, 52-55); that Centra Tech had partnerships with Bancorp, Visa, and Mastercard (PSR ¶¶ 25-26, 35-47, 70-73); that Centra Tech had developed a debit card that enabled consumers to use cryptocurrencies to buy items at stores that accept Visa or Mastercard payment cards (PSR ¶¶ 12, 25, 70, 76-79, 84); and that Centra Tech held licenses to transmit money and conduct other relevant business in 38 states, when in fact Centra Tech lacked such licenses in most if not all of those jurisdictions (PSR ¶¶ 25-26, 59-63).

Sharma was the undisputed leader of the conspiracy.  PSR ¶¶ 14, 33, 108, 123.  He touted fraudulent claims about Centra Tech in interviews broadcast online, drawing interested investors' attention to Centra Tech's ICO.  PSR ¶¶ 64-75.  He also went to elaborate lengths, including by staging phony demonstrations, to dupe investors into believing that Centra Tech had an operational cryptocurrency debit card.  PSR ¶¶ 76-79.  In August 2017, for example, Sharma recorded and then caused a video to be posted on social media purporting to show himself using a Centra Tech card to make a purchase with cryptocurrency at a shopping mall. In reality, the card he used was an ordinary credit card, and the transaction did not use any cryptocurrency.  PSR ¶ 77.  Sharma also helped manipulate the market for Centra tokens, including by concealing the use of investor funds to buy Centra tokens on a cryptocurrency exchange in order to artificially inflate the tokens' price.  PSR ¶¶ 27, 85.

On multiple occasions, Sharma tried to obstruct investigations of the Centra Tech fraud in order to prevent law enforcement from securing the fraud proceeds he had collected from victims.  He first caused Centra Tech's outside counsel to provide false information to the Securities and Exchange Commission ("SEC").  As a result, outside counsel informed the SEC that Sharma had surrendered a passcode needed to access digital assets obtained from investors, when in fact Sharma maintained a copy of the code (PSR ¶ 89); produced, in response to a subpoena, a fraudulent spreadsheet that materially underreported the amount of Ether that Sharma and his coconspirators had obtained from investors (PSR ¶¶ 90-92); and misled the SEC about measures taken to prevent the dissipation of 91,000 Ether units raised during the fraudulent ICO (PSR ¶ 93).

---

[1] "PSR" or "Presentence Report" refers to the Presentence Investigation Report prepared by the United States Probation Office ("Probation Office") in connection with Sharma's sentencing in this case and revised on February 9, 2021; "Dkt." refers to an entry on the District Court's docket for this case; Ex. A refers to the Bureau of Prisons ("BOP") Sentencing Computation for Sharma; Ex. B refers to Sharma's request for early release to the BOP; Ex. C refers to the BOP's response to Sharma's early release request; and Ex. D refers to the BOP's medical records for Sharma.  Portions of Ex. B are redacted and Ex. D is being filed under seal pursuant to this District's and this Court's ECF Privacy Policy.  Unless otherwise noted, case text quotations omit internal quotation marks, citations, and previous alterations.

Hon. Lorna G. Schofield
September 11, 2024
Page 3

Sharma also tried to obstruct the investigation and prosecution of this case. After his arrest, he failed to comply with a seizure warrant for a digital wallet containing fraud proceeds that he controlled—until it became clear that compliance was necessary to secure his release on bail. In addition, Sharma caused his attorney to unwittingly make misrepresentations, including to judges during bail proceedings, about the nature of the funds in the digital wallet and measures Sharma had taken to protect the funds. PSR ¶¶ 94-97.

The Centra Tech fraud continued Sharma's years-long pattern of criminal conduct, much of it involving dishonesty. In 2010, he was convicted for criminal possession of stolen property. PSR ¶ 131. From approximately 2011 to 2013, he misappropriated an elderly man's personal identifying information to obtain $395,000 in fraudulent loans. PSR ¶ 99. From 2013 to 2014, Sharma perpetrated a "ghost loan" scheme, using fraudulent car-loan applications to obtain loans that he then misappropriated. PSR ¶ 98. In 2015, he was convicted in Florida of driving under the influence of alcohol and of driving without a license, offenses he committed on different dates. PSR ¶¶ 132-133. Starting in 2016, while on probation for one of those convictions, he initiated a scheme to defraud lenders into providing approximately $500,000 as purported startup capital for a luxury car-rental business. PSR ¶ 100. In 2017, Sharma sustained another conviction for driving while intoxicated (PSR ¶ 134), and committed and suborned perjury while on trial in New York County Court, resulting in a 2018 perjury conviction (PSR ¶¶ 101, 135).

### B. Sharma's Arrest and Plea

Sharma was arrested on April 1, 2018, for wire fraud and securities fraud offenses alleged in a criminal complaint. Dkt. 1; PSR ¶ 95. On May 14, 2018, a grand jury returned the Indictment.

This Court initially scheduled Sharma's trial to begin in October 2019. Dkt. 97, at 3. In April 2019, however, Sharma requested an 18-month adjournment that would delay the trial until April 2021 (Dkt. 115), three years after his arrest. The Court granted a more modest adjournment, until December 2019. Dkt. 138, at 1-2. Scheduling conflicts with another jury trial ultimately forced another adjournment, until April 2020. Dkt. 206, at 1-2. But the COVID-19 pandemic and summer scheduling conflicts among members of the defense team forced additional adjournments, first to September 2020 (Dkt. 323) and then, finally, to November 2020 (Dkt. 337).

On July 17, 2020, Sharma pled guilty, pursuant to a written plea agreement with the Government (the "Plea Agreement"), to conspiracy to commit securities fraud, conspiracy to commit wire fraud, and conspiracy to commit mail fraud. In the Plea Agreement, the parties agreed that under the United States Sentencing Guidelines (the "Guidelines"), Sharma's Guidelines offense level was 33, his criminal history category was III, and the applicable Guidelines range was 168 to the statutory maximum 180 months' imprisonment (the "Stipulated Guidelines Range").

### C. Sharma's Sentencing

On March 4, 2021, the Court conducted a sentencing proceeding that was held, pursuant to the CARES Act and with Sharma's express consent, by videoconference. Sharma appeared at the

Hon. Lorna G. Schofield
September 11, 2024
Page 4

videoconference alongside various relatives and friends, each of whom introduced themselves to the Court. Dkt. 479 (Sentencing Tr.) at 62-64. In addition to hearing from the parties and from Sharma, the Court heard from multiple victims who described significant financial losses and ongoing emotional, psychological, and reputational damage as a result of Sharma's crimes. *Id.* 96-114. The victims' remarks echoed more than 30 victim impact statements the Court received before sentencing. PSR ¶ 110.

After carefully considering all the arguments and the 18 U.S.C. 3553(a) factors, the Court sentenced Sharma principally to concurrent terms of four years' imprisonment on Counts One and Two of the Information, and a consecutive four-year term of imprisonment on Count Three, for an aggregate prison term of eight years, substantially below the Stipulated Guidelines Range of 14 to 15 years' imprisonment. Dkt. 479 at 117-124. In imposing sentence, the Court stated that "the most salient" factors were "first, of course, the nature and circumstances of the offense," Sharma's "personal history and characteristics," that the "sentenced need[ed] to take into consideration factors that aren't necessarily personal to [Sharma], and that is it must reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and that includes not only deterring [Sharma] from future wrongful behavior but also setting n example, showing to others who might be tempted to engage in this kind of conduct what the consequences are," "protecting the public from further crimes," "avoid[ing] unwarranted sentence disparities amongst defendants who are similarly situated," and "perhaps most important, impos[ing] a sentence that is sufficient, but no greater than necessary, to accomplish these purposes." Dkt. 479 at 118. Further explaining its reasoning, the Court stated:

> I think we all acknowledge and you acknowledge that this was a very serious offense. You founded this company, you solicited investors, and the company raised tens of millions of dollars, 26 million from the initial coin offering and I think $36 million in all. In any event, it is many, many millions of dollars, and we have just heard from people who contributed by investing in this enterprise, and the people we have heard from are ordinary people, and many of those people lost their investment, and it is because of the dishonesty and lies underlying this behavior.
>
> I can't underscore enough that it is not just the amount of money, although the amount of money is fairly staggering for someone, in a relatively short period of time, to separate from people through means of fraud, but it's also just the extensive nature of the fraud. There were so many things in this case that just had no foundation, that were completely made up. And whether it was using people's identities that we heard from one victim, some of those identities were family members of people close to you, or whether it was making things appear to work that did not work or creating documents that were false, there were just so many things in this conspiracy that were just fake. And, sadly, you were the leader of the conspiracy.

> Now, I have to consider that and I have to consider how serious the crime is. I also take into account that there is 33 [and a half], almost, million dollars available to pay victims, and that is not small change either, and that certainly works in your benefit. And the fact that you have been trying hard to pay back money, that also works in your benefit.
>
> I have also thought about what your actions were as this began to unravel. Certainly it doesn't help your case that you tried to obstruct the SEC investigation and that you misled the F.B.I. about access to the wallet containing the Ether. All of those facts, sadly, are not in your favor.
>
> And I tried really hard, as I always do, to try to understand what was going on here, what – how a person could do these things, and I don't mean because they are so incredible, but only because I really try to understand how a person gets to where they are. And certainly, you know, your own personal circumstances explain some of that, although, you know, not entirely.

Dkt. 479 at 118-120. The Court conveyed its sincere hope that Sharma would lead a law-abiding life and that he would make an impact, but noted that, in "this particular case, the amounts of money were so large, the fraud so egregious, so many people seriously affected, and in an area of investment and in the world that has garnered so much attention," that it was required to "look at the 3553(a) factors that also look to systemic reasons, just punishment, the seriousness of the crime, paying your dues, and general deterrence." *Id.* at 121-22.

The Court also acknowledged, as mitigating factors, Sharma's age and "difficulties growing up," as well as his support from friends and family members. *Id.* at 122. The Court noted that, while she did not doubt that Sharma was good, kind, caring, and generous to those he cared for, "the disconnect is, and I see it sometimes in people who are in this situation, is they are so kind and caring and generous to people in their immediate circle, because they are real people to them, they mean something to them, but somehow they can't extend that to other people, to people who are strangers, who become faceless and therefore unimportant, and that's something you need to work on." *Id.* The Court also considered "the offenses of [Sharma's] codefendants," noting that Trapani had not yet been sentenced and that "Farkas is not really a useful comparison" because "his role was completely different, the amount of money he made was completely different, and so I just don't consider him to be in the same category." *Id.* at 123. Ultimately, the Court held that "it is important in this case to impose a substantial sentence of incarceration to promote respect for the law, to deter you and others from committing similar offenses," and conveyed hope that the term of supervised release afterwards would help Sharma build a foundation for a more positive future. *Id.* at 122.

Hon. Lorna G. Schofield
September 11, 2024
Page 6

The Court ordered forfeiture as agreed to by the parties: $36,088,960 in fraud proceeds, of which approximately $29,000,000 in Ether had been seized by the Government.  Dkt. 410, 411, 615.

### D. Sharma's Withdrawn Appeal

On July 6, 2021, Sharma appealed his conviction and sentence, arguing that his plea and sentencing proceedings—to which he consented proceeding remotely—should have been conducted in person, and that he was entitled to withdraw his plea, or, alternatively, be resentenced before a different Court, because the Government breached the parties' plea agreement when advancing certain arguments in response to Sharma's sentencing submission.  *United States v. Sharma*, 21-612 (2d Cir.), Dkt. 27.  The Government opposed.  *United States v. Sharma*, 21-612 (2d Cir.), Dkt. 43.  Sharma subsequently withdrew his appeal.  *United States v. Sharma*, 21-612 (2d Cir.), Dkt. 61.

### E. Sharma's Administrative Request for Release, BOP Medical Records, and Instant Motion

Sharma, 33, is currently housed at FPC Montgomery in Montgomery, Alabama.  According to BOP sentencing computation records, Sharma's term of incarceration commenced on August 25, 2021, and he has served approximately 40 percent of his sentence.  Ex. A.  Sharma's projected satisfaction date, assuming he receives good time and other BOP credits, is April 4, 2026.  Ex. A.  On or about May 10, 2022, Sharma submitted a request to the Warden of FCI Coleman in Wildwood, Florida, where Sharma was previously housed, for early release and home confinement, arguing that he had pre-existing medical conditions that put him "at a high risk of suffering life-threatening complications" from Covid-19.  Ex. B.  On or about May 21, 2022, the Warden responded to the request with a letter which set forth BOP program statement guidelines regarding requests for compassionate release, and stated:

> [Y]our concern about being exposed to, or contracting COVID-19 does not currently warrant an early release from your sentence.  Your condition is stable, you are not terminally ill, and your life expectancy is normal for your age.  You are not completely disabled or totally confined to a bed or chair.  You are able to independently attend to your activities of daily living and your medical condition does not affect your ability to function in a correctional setting.

Ex. C.  The Warden's letter stated that, based on the information gathered, Sharma had not met the requirement for early release outlined in the first stage of the Warden's review, and denied Sharma's request.  Ex. C.  Based on records provided by the BOP to the Government, it does not appear that Sharma submitted any subsequent requests for early release, either to the Warden at FCI Coleman or to the Warden at FPC Montgomery, where he currently resides.

Sharma's BOP medical records reflect that he is regularly seen for various medical concerns, including asthma, high cholesterol (hyperlipidemia), and pre-diabetes; that he received

Hon. Lorna G. Schofield
September 11, 2024
Page 7

the COVID-19 vaccine on August 27, 2021; and that he was seen as recently as June 13, 2024 by a BOP medical provider. Ex. D.

On or about August 12, 2024, Sharma filed a motion for early release, and more specifically "that this Court grant Mr. Sharma a reduction of sentence and convert the balance of his eight-year sentence of imprisonment to a sentence of seven years imprisonment with the same terms of supervised release to follow." Dk. 625 at 2. Sharma argues that a reduction in his sentence is warranted as a result of (1) his medical concerns, including asthma, high cholesterol, and pre-diabetes, and (2) his efforts to rehabilitate while incarcerated. *Id.* at 19-28. In addition, Sharma argues that the Section 3553(a) factors support his early release. Dkt. 625 at 28. In support of both arguments, Sharma also cites (i) conditions at FCI Coleman during certain periods of the pandemic, (ii) sentencing disparities when compared to his co-defendants, and (iii) public attention to his case as a result of a documentary in which Trapani participated. *Id.* at 3-15, 22-23. Sharma also argues that he will not pose a danger to society upon release. *Id.* at 25-28.

**II.     Sharma's Motion for a Sentence Reduction Should Be Denied**

The Court should deny Sharma's motion for early release. Sharma's medical concerns, the steps he appears to have taken toward rehabilitation, and the other factors he complains of – prison conditions, sentencing disparities, and public attention to his case, among others – do not, either individually or in combination, constitute an extraordinary or compelling reason for a sentence reduction under Section 3582(c)(1)(A)(i).

Nor do the Section 3553(a) factors counsel in favor of reducing his sentence. Sharma committed serious crimes, and the need for the sentence to reflect the seriousness of Sharma's offense conduct, to promote respect for the law, to provide just punishment, to account for Sharma's history and characteristics, to afford adequate deterrence to Sharma and other similarly situated individuals, and to protect the public from further crimes by Sharma all weigh heavily against reducing his 96-month sentence.

**A.    Applicable Law**

Under 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act, a court "may not modify a term of imprisonment once it has been imposed," except that:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are

> applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A)(i).

Thus, there are three prerequisites for granting a compassionate release motion. First, the defendant must have exhausted his administrative rights. *See* 18 U.S.C. § 3582(c)(1)(A). Second, the court must find that "extraordinary and compelling reasons warrant" a reduction of sentence. 18 U.S.C. § 3582(c)(1)(A)(i). And third, the court must consider the sentencing factors set forth in 18 U.S.C. § 3553(a). 18 U.S.C. § 3582(c)(1)(A).

Accordingly, a defendant seeking a reduction in sentence must first request such a reduction from the warden of the facility in which he is housed. This exhaustion requirement is a mandatory claim-processing rule, *see United States v. Saladino*, 7 F.4th 120, 124 (2d Cir. 2021), and as such a defendant's failure to exhaust is not subject to judicial excusal, *see Ross v. Blake*, 578 U.S. 632, 638-39 (2016) ("[M]andatory exhaustion statutes . . . establish mandatory exhaustion regimes, foreclosing judicial discretion" to waive their requirements.); *accord United States v. Ogarro*, No. 18 Cr. 373 (RJS), 2020 WL 1876300, at *5 (S.D.N.Y. Apr. 14, 2020) (concluding court may not waive Section 3582(c)(1)(A)(i)'s exhaustion requirement).

As part of its recent November 1, 2023 amendments to the United States Sentencing Guidelines, the Sentencing Commission promulgated an updated policy statement concerning motions for reductions in sentence under Section 3582(c)(1)(A). *See* U.S.S.G. § 1B1.13. The policy statement advises that "[u]pon motion of . . . the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that – (1) . . . extraordinary and compelling reasons warrant the reduction; . . . (2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13.

The Sentencing Commission lists a series of circumstances that, alone or in combination, can present extraordinary and compelling reasons for a reduction in sentence. Those include circumstances in which: (1) the defendant is suffering from serious medical conditions; (2) the defendant is at least 65 years old, is experiencing a serious deterioration in physical or mental health because of the aging process, and has served at least 10 years or 75 percent of his or her term of imprisonment; (3) the defendant is dealing with the death or incapacitation of a close family member or caregiver; (4) the defendant was a victim of abuse while in custody; (5) the defendant presents "any other circumstances or combination of circumstances . . . similar in gravity" to those enumerated elsewhere in the policy statement; and (6) the defendant has served at least 10 years of an "unusually long sentence," and a "change in the law . . . would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed." U.S.S.G. § 1B1.13(b).

The statute also "sets out a fourth requirement: that the 'reduction is consistent with applicable policy statements issued by the Sentencing Commission.'"[2] *Keitt*, 21 F.4th at 71 n.2 (quoting 18 U.S.C. § 3582(c)(1)(A)). The relevant Sentencing Guidelines policy statement, U.S.S.G. § 1B1.13, sets forth binding requirements that must be met before a court can reduce a sentence. *See* 18 U.S.C. § 3582(c)(1)(A) (requiring reduction in sentence to be "consistent with applicable policy statements issued by the Sentencing Commission").

As the proponent of the motion, the defendant bears the burden of proving that he is entitled to the requested relief under Section 3582. *See United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue."); *United States v. Ebbers*, 432 F. Supp. 3d 421, 426 (S.D.N.Y. 2020) ("The defendant has the burden to show he is entitled to a sentence reduction." (citing *Butler*)); *United States v. Givens*, No. 14 Cr. 546-09 (CM), 2020 WL 4699042, at *2 (S.D.N.Y. Aug. 13, 2020) (similar).

### B. Sharma Has Failed to Establish an Extraordinary and Compelling Reason for a Reduction in Sentence.

Sharma has failed to establish that "extraordinary and compelling reasons" support his early release. None of the circumstances he identifies – whether considered independently or together – are sufficient to meet his burden. The Court should deny the Motion.

*First*, Sharma, who is 33 years old, received the Janssen COVID-19 vaccine in August 2021, and has no record of ever contracting COVID-19 during his term of incarceration, argues that he "suffers from chronic medical conditions that are not being adequately treated and that have left him exposed to potentially severe COVID-19 complications." Dkt. 625 at 19. But courts in this district have denied motions by defendants much older than the defendant who have suffered from multiple conditions or required multiple surgeries for conditions far more serious than Sharma's. *See, e.g.*, *United States v. Castillo*, No. 03 Cr. 979 (KMW), 2023 WL 2262881, at *2 (S.D.N.Y. Feb. 28, 2023) (denying release for 65-year-old defendant with "serious age-related medical conditions including an enlarged prostate, eye problems, and heart disease" because those conditions were "well-managed" by the BOP); *United States v. Saleh*, No. 93 Cr. 181 (LAP), 2023 WL 158444, at *5 (S.D.N.Y. Jan. 10, 2023) (holding that 65-year-old defendant requiring multiple surgeries is "not 'experiencing a serious deterioration in physical or mental

---

[2] A prior version of Section 1B1.13 was held to be outdated and therefore non-binding on district courts after passage of the First Step Act of 2018. *See United States v. Brooker*, 976 F.3d 228, 236 (2d Cir. 2020). Section 1B1.13 was amended as of November 1, 2023, however, so as to fix the issue identified in *Brooker*, among other changes. Accordingly, *Brooker* has been abrogated, and the policy statement is once again binding on district courts considering reduction in sentence motions. *See United States v. Corbett*, No. 10 Cr. 184 (PAE), 2023 WL 8073638, at *3 (S.D.N.Y. Nov. 21, 2023) ("The amended guidance from the Commission as to what constitutes extraordinary and compelling reasons now controls the analysis of a compassionate release petition, however initiated.").

health because of the aging process'" but "[r]ather, he is experiencing the usual aches and pains of a 65-year-old"); *United States v. Borelli*, No. 84 Cr. 63 (LAP), 2021 WL 2228075, at *2 (S.D.N.Y. June 2, 2021) (finding no extraordinary and compelling circumstances for 72-year-old defendant suffering from diabetes, hypertension and heart disease, and cataracts), *aff'd*, No. 21-1506, 2022 WL 6831650 (2d Cir. Oct. 12, 2022); *United States v. Sabir*, 481 F. Supp. 3d 270, 275 (S.D.N.Y. 2020) (holding that 66-year-old defendant with prostate cancer, asthma, and prediabetes had not established "extraordinary and compelling circumstances"); *United States v. Gotti*, 433 F. Supp. 3d 613, 617 (S.D.N.Y. 2020) (denying release where 79-year-old defendant's hypothyroidism, hyperlipidemia, gout, glaucoma, left eye blindness, hypertension, ischemic cardiomyopathy, heart failure, chronic obstructive pulmonary disease, esophageal reflux, and chronic atrial fibrillation could be "adequately treated and monitored" by BOP); *Cf. United States v. Haney*, 454 F.Supp.3d 316, 323 (S.D.N.Y. 2020) ("But if Haney's age alone were a sufficient factor to grant compassionate release in these circumstances, it follows that every federal inmate in the country above the age of 60 should be forthwith released from detention, a result that does not remotely comply with the limited scope of compassionate release and that would arguably have a devastating effect on a national community that is now itself so under stress.").

Simply put, Sharma's medical concerns are not so outside the norm that they would merit a sentence reduction, especially considering his offense conduct. However, he claims that his medical conditions are sufficiently serious to warrant early release. But "[t]he BOP has elaborated on what qualifies as a serious physical or medical condition: It is when the defendant either has an 'incurable progressive illness or has suffered a debilitating injury from which he will not recover'; is 'completely disabled, meaning the defendant cannot carry on any self-care and is being totally confined to a bed or chair'; or is 'capable of only limited self-care and confined to a bed or chair more than 50% of waking hours.'" *United States v. Lisi*, 440 F. Supp. 3d 246, 251 (S.D.N.Y. 2020) (citation omitted). Sharma's conditions do not rise to this level. Other courts in this District have declined to find extraordinary and compelling circumstances when presented with conditions that appear far worse that Sharma's. *See, e.g.*, *United States v. Santiago-Figueroa*, No. 18 Cr. 618-2 (GBD), 2023 WL 7183328, at *2 (S.D.N.Y. Nov. 1, 2023) (finding no extraordinary and compelling reason based on defendant's gastrointestinal issues, obesity, and hypertension); *Lisi*, 440 F. Supp. 3d at 251 (same for maxillary cyst, affecting vision and smell; chronic asthma; pain in back, shoulders, and arm; and chronic high blood pressure); *United States v. Goode*, No. 14 Cr. 810-07 (CM), 2020 WL 58272, at *5-7 (S.D.N.Y. Jan. 6, 2020) (same for alleged end stage renal disease, renal anemia, hyperthyroidism, hypertension, and stage five renal failure); s*ee also United States v. France*, No. 17 Cr. 724 (JSR), 2020 WL 3415241 at *1 (S.D.N.Y Jun. 19, 2020) ("Although France suffers from some medical conditions that put him at heightened risk for COVID-19, including obesity, asthma, and pre-diabetes, France's medical records indicate that he is otherwise in fairly good health and is receiving treatment for his conditions."). Sharma has not met his heavy burden of establishing an extraordinary and compelling reason for release based on his medical concerns, and this first argument should be rejected.

*Second*, Sharma argues that his "rehabilitative efforts are extraordinary and compelling," pointing to educational and other training he has completed, his employment during his incarceration, his lack of a disciplinary history, and positive feedback from his supervisors. Dkt. 625 at 21-24.

Hon. Lorna G. Schofield
September 11, 2024
Page 11

While Sharma appears to have built a more productive life for himself and contributed to the lives of his fellow inmates, that is one of the ordinary purposes of incarceration – not an extraordinary development unforeseeable at sentencing. Indeed, Sharma's conduct in prison appears to meet this Court's expectations as set out at sentencing: "So I'm hopeful that, even while you are serving your sentence, you will be able to continue to make the good progress and do the kind of work you have done on personally rehabilitating yourself." Dkt. 479; *see also, e.g.*, *United States v. Saleh*, 93 Cr. 181 (WHP), 2020 WL 3839626, at *4 (S.D.N.Y. July 8, 2020) (denying relief while observing that "every inmate should strive for a productive institutional record while incarcerated because that is what is expected").

Moreover, the Guidelines clarify that "rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13(d). The Court may consider "rehabilitation of the defendant while serving the sentence" only "in combination with other circumstances." *Id.*; *see also United States v. Raposo*, No. 98 Cr. 185 (JPC), 2024 WL 165195, at *9 (S.D.N.Y. Jan. 16, 2024) ("[G]iven the Court's findings that Raposo's other arguments do not constitute extraordinary and compelling reasons, even evidence of complete rehabilitation cannot suffice."). To be sure, Sharma's current record while in BOP custody encouraging, it is an insufficient basis for granting the extraordinary relief of a reduced sentence. That is because an inmate's general compliance with prison regulations weighs very little—if at all—in support of finding an extraordinary and compelling reason for relief. *See, e.g., United States v. Saleh*, No. 93 Cr. 181 (WHP), 2020 WL 3839626, at *4 (S.D.N.Y. July 8, 2020) (observing that "every inmate should strive for a productive institutional record while incarcerated because that is what is expected"); *United States v. Hawkins*, No. 3:08 Cr. 61 (AWT), 2022 WL 1172322, at *2 (D. Conn. Apr. 20, 2022) (similar); *United States v. Sanchez*, No. 08 Cr. 789-1 (RJS), 2020 WL 2571074, at *2 (S.D.N.Y. May 21, 2020) (similar); *United States v. Lisi*, No. 15 Cr. 457 (KPF), 2020 WL 881994, at *4 (S.D.N.Y. Feb. 24, 2020) (similar). Sharma's rehabilitative efforts are not a basis for early release.

*Third*, Sharma complains about facility lockdowns and, generally, conditions from approximately August 2021 through December 2022 at FCI Coleman. Dkt. 625 at 9-12. The Court should not reduce Sharma's sentence based on this generalized grievance, applicable to every inmate during the pandemic. Notably, Delvalle does not claim that he had any medical condition making him particularly susceptible to serious illness during the pandemic. In similar circumstances, courts decline to find that conditions of confinement during the pandemic justify relief. *See United States v. Ramirez*, 571 F. Supp. 3d 40, 47 (S.D.N.Y. 2021) ("If the challenging conditions of confinement caused by the pandemic warranted a sentence reduction here, essentially every inmate who has been in BOP custody at any time since March 2020 would be entitled to a sentence reduction."); *United States v. Porter*, No. 96 Cr. 515 (LAP), 2024 WL 2159850, at *5 (S.D.N.Y. May 14, 2024) (rejecting argument for sentencing reduction based on challenging conditions of confinement because defendant did not claim medical vulnerability and because other problems cited were "not unique to this Defendant"); *United States v. Santana*, No. 12 Cr. 790 (PAE), 2023 WL 2625790, at *4 (S.D.N.Y. Mar. 24, 2023) ("[G]eneralized statements about prison conditions untethered to compelling specifics of the defendant's particular circumstances

do not make the defendant's conditions 'extraordinary and compelling.'").[3] The Court should decline to reduce Sharma's sentence based on his conditions of confinement.

*Fourth*, Sharma claims a disparity between his sentence and that of his co-conspirator, Raymond Trapani, who pled guilty pursuant to a cooperation agreement and provided substantial assistance to the Government in the investigation and prosecution of others, including Sharma. This argument misses the mark entirely because, as a cooperating witness who was prepared to testify against Sharma and others, and who provided substantial assistance to the Government, it is entirely appropriate that the Court would weigh the sentencing factors differently for Trapani, and impose a sentence shorter than the one Sharma received.

Sharma also claims a disparity between his sentence and that of his other co-defendant, Robert Farkas, Dkt. 625 at 29, 32, but ignores the Court's clear finding that "Farkas is not really a useful comparison" because "his role was completely different, the amount of money he made was completely different, and so I just don't consider him to be in the same category." Dkt. 479 at 123. Indeed, Sharma, the leader of the conspiracy to defraud Centra Tech investors, personally obtained more than $36 million in fraud proceeds, which is more than 100 times the amount obtained by Farkas, a minor participant in the conspiracy whom the Court sentenced to one year and one day of imprisonment. Farkas's cut of the fraud proceeds — consisting of approximately $350,000 and a Rolex watch that Sharma gifted him — pale in comparison even to the approximately $7 million of fraud proceeds that Sharma dissipated, as noted above. In this case, Sharma is the vastly more culpable defendant, and, unlike Farkas (who has no prior criminal history), committed this crime after sustaining multiple criminal convictions. Against this backdrop, Sharma's significantly below Guidelines sentence does not result in an unwarranted sentencing disparity.

*Finally*, Sharma's general complaints about public and media attention to the case and, in particular, surrounding a documentary in which he believes he was cast in a negative light, are neither extraordinary and compelling circumstances warranting early release nor "more than sufficient to punish, deter, and promote respect for the rule of law." Dkt. 625 at 29-30. Notably, it was Sharma who sought and invited attention to the lies he perpetrated about Centra Tech in a multi-media blitz in furtherance of the scheme – among other things, flashy YouTube marketing materials, interviews with digital assets media outlets, and a *New York Times* feature. *See* PSR ¶ 66-74; 86-88. It is no wonder that the attention continued through the conclusion, and beyond, the criminal case. Regardless, media attention to Sharma's scheme does not support his request for early release.

---

[3] Sharma's reliance on *United States v. Foozailov*, No. 17-cr-262-LGS, 2021 WL 1894273 (S.D.N.Y. May 11, 2021) (Schofield, J.) is misplaced because, as he recognizes, his medical concerns are different than the medical conditions of the defendant in that case. *See* Dkt. 625 at 11. And, unlike the defendant in *United States v. Kitroser*, another case he cites in support of his argument about pandemic prison conditions, Sharma has *not* served a long sentence or been detained for the entirety of the pandemic. No. 15 Cr. 19-1 (KPF), 2023 WL 3173513, at *6 (S.D.N.Y. May. 1, 2023).

### C. A Sentence Reduction Would Not Be Appropriate Based on the Section 3553(a) Factors.

Even if the Court were to find extraordinary and compelling circumstances to justify early release, the Section 3553(a) factors weigh conclusively against any reduction in the sentence this Court imposed in October 2021. *See United States v. Robinson*, 848 F. App'x 477, 478 (2d Cir. 2021) ("[T]he District Court's reasonable evaluation of the Section 3553(a) factors is an alternative and independent basis for denial of compassionate release."). The need for the sentence to reflect the seriousness of Sharma's offense conduct, to promote respect for the law, to provide just punishment, to account for Sharma's history and characteristics, to afford adequate deterrence to Sharma and other similarly situated individuals, and to protect the public from further crimes by Sharma all weigh heavily against reducing his 96-month sentence.

*First*, the nature and seriousness of Sharma's brazenly fraudulent offense conduct and the need to impose just punishment weigh decidedly against reduction. *See* 18 U.S.C §§ 3553(a)(1), (a)(2)(A). After engaging in a series of criminal acts of escalating seriousness throughout seven years that went virtually unpunished, Sharma concocted and executed a scheme to defraud thousands of victims of tens of millions of dollars under the guise of investing in a burgeoning blockchain technology company he dubbed "Centra Tech." To lure victims into parting with those funds, Sharma falsely claimed that Centra Tech had a highly-credentialed CEO and CFO who were both fabricated, and partnerships with legitimate financial institutions and necessary licenses that were actually non-existent. In Centra Tech, Sharma, by then a seasoned fraudster, hit the jackpot. In the summer and fall of 2017, Sharma, the face of Centra Tech, launched an aggressive campaign of lies and deceit over multiple forms of media — press releases, web sites, web-based investor communications channels, media interviews, and YouTube — that connected with scores of his victims and misled investors into believing that Centra Tech had a fully operational cryptocurrency debit card that worked on established networks, when in reality it did not. As Sharma conceded in connection with his sentencing, his lies were successful, and "Centra Tech essentially blew up overnight." Dkt. 437 at 19. Then, Sharma did, as he acknowledged at sentencing, "scramble" to manage Centra Tech (*id.*), *after* he had already raised millions of dollars from his fraud, and only in the wake of reports by Internet sleuths and others who began to reveal that Sharma had fabricated Centra Tech's executive team, fabricated videos purporting to show him and others using the "Centra card," and fabricated his partnerships with legitimate institutions. Sharma's actions not mere "mistakes," *see* Dkt. 437 at 4, "poor decisions," *see* Dkt. 437 at 19, or the result of aberrational behavior caused by substance abuse, *id.* at 3-4, as he argued in connection with his sentencing. There can be no mistake that the scheme, designed and executed by Sharma from the beginning, was a calculated effort to raise money through fraud and, later, to pacify his victims (as well as his critics, family and friends, and Centra Tech employees) as best as possible in order to avoid the very real consequences of his lies.

Sharma continued his fraudulent scheme when he launched a concerted effort to obstruct investigations into his fraudulent scheme, including by causing Centra Tech's counsel to submit false and misleading information to the SEC regarding the true number of victims and amount of fraud proceeds raised from victims during Centra Tech's ICO, and deceptions about the measures that Sharma and Centra Tech had supposedly taken to prevent the dissipation of investor assets

raised through fraud in Sharma's possession. Emboldened by his lies to the SEC, after his arrest in this case, Sharma refused to effectuate compliance with a seizure warrant issued by a Magistrate Judge of this Court, and caused his attorney to reiterate, unwittingly, misrepresentations to the Government about the passcode to a digital wallet containing proceeds of his fraud on Centra Tech investors and the sources of the funds within the digital wallet. Then, Sharma tripled down on his misrepresentations at bail hearings before a Magistrate Judge of this Court, during which Sharma caused his attorney to reiterate his false claim that 9,000 of the 100,000 Ether units in the digital wallet belonged to him (as opposed to fraud proceeds raised from Centra Tech investors). PSR ¶ 97. Sharma's protracted efforts to obstruct the investigation and prosecution of this case materially impeded on the Government's efforts to seize and preserve funds representing proceeds of his fraud. Significant resources were devoted to investigating, seizing, and securing the Ether amidst the various lies and misrepresentations Sharma made and caused his counsel to make, and Sharma almost got away with diverting 9,000 of the Ether units to a trust to pay his living expenses and legal fees for defending this criminal case arising from the fraud through which he obtained those funds in the first place.

Against this backdrop, and as described in further detail in the Government's sentencing submission, Dkt. 441, the impact of harm caused by Sharma, the lies he peddled to victims, the investing public, the SEC, law enforcement, and this Court, and the nature and seriousness of the offenses in which he participated, cannot be ignored and militate against reducing Sharma's already significantly below Guidelines-range sentence.

*Second*, the need to deter Sharma from yet again returning to fraud as a way of earning income in the future, to deter others contemplating fraud from emulating Sharma's misdeeds, and to protect the public from further crimes by Sharma also weigh heavily against a sentence reduction. *See* 18 U.S.C. § 3553(a)(1)(2)(B)-(C).

As described in further detail in the Government's sentencing submission, Dkt. 441 at 21-23, the Centra Tech fraud was far from Sharma's first crime of deception. On the contrary, the elaborate Centra Tech fraud was carefully planned and executed by Sharma after he had already engaged in three other fraudulent schemes — his fraudulent impersonation of an elderly victim to obtain loan proceeds, his fraudulent "ghost loan" scheme, and his fraudulent exotic car rental loan scheme — and while he was serving a term of probation after multiple criminal convictions and interactions with law enforcement. Then, even after he was arrested in this case (and after he had admittedly committed perjury at a criminal trial in New York County Court), Sharma continued his offense conduct by causing misrepresentations to be made to Magistrate Judges in this Court. None of his prior interactions with law enforcement or the criminal justice system deterred Sharma from criminal conduct, and there is no reason to believe that he has been fully deterred by the approximately three years of his sentence that he has served to date. General deterrence is also important due to the nature of Sharma's fraudulent scheme – an initial coin offering presenting increased risks of fraud and manipulation in the digital assets market, particularly because it is often difficult to trace investments made using digital assets.

The need to protect the public from further crimes by Sharma also mitigates against his early release. Since the age of 18, Sharma has committed a series of criminal acts of escalating

Hon. Lorna G. Schofield
September 11, 2024
Page 15

severity, including schemes to obtain money through fraud, which led to his fraudulent and obstructive conduct in this case, impacting thousands of victims.

*Finally*, for many of the same reasons described above, Sharma's remaining Section 3553(a) arguments about his rehabilitation, the difference in his sentence when compared to those of his co-defendants, and public attention to this case fall flat – Sharma has served only three years of his eight year sentence; Trapani and Farkas are differently situated than Sharma, the leader of the scheme who gained millions more than his co-conspirators and who spearheaded efforts to obstruct investigations into his crimes; and public attention to Centra Tech, which Sharma sought and invited as he executed the scheme, does not support his request for early release. While Sharma's overall efforts while incarcerated for the past approximately three years can be recognized, they do not warrant a reduction in his sentence when balanced against other Section 3553(a) factors such as the need for just punishment and to afford adequate specific and general deterrence.

### III.     Conclusion

For the reasons set forth above, the defendant has failed to demonstrate "extraordinary and compelling reasons" for a reduction in sentence, and the Section 3553(a) factors continue to weigh conclusively in favor of maintaining the original sentence. Accordingly, for either and both of these reasons, the Government respectfully submits that the motion should be denied.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: /s/ Negar Tekeei
Negar Tekeei
Assistant United States Attorney
(212) 637-2482

Encls.

cc:     All counsel of record (via ECF)